Official Form 1 (04/10)

| United States Bankruptcy Court<br>NORTHERN DISTRICT OF TEXAS | **Voluntary Petition** |
|---|---|

| Name of Debtor (if individual, enter Last, First, Middle):<br>FRE Real Estate, Inc.,<br>a Corporation | Name of Joint Debtor (Spouse)(Last, First, Middle): |
|---|---|
| All Other Names used by the Debtor in the last 8 years<br>(include married, maiden, and trade names):<br>fka Fenton Real Estate, Inc., fka TCI Park West II, Inc. | All Other Names used by the Joint Debtor in the last 8 years<br>(include married, maiden, and trade names): |
| Last four digits of Soc. Sec. or Indvidual-Taxpayer I.D. (ITIN) No./Complete EIN<br>(if more than one, state all): 20-8019480 | Last four digits of Soc. Sec. or Indvidual-Taxpayer I.D. (ITIN) No./Complete EIN<br>(if more than one, state all): |
| Street Address of Debtor (No. & Street, City, and State):<br>6731 Bridge Street, Suite 373<br>Fort Worth TX<br>ZIPCODE 76112 | Street Address of Joint Debtor (No. & Street, City, and State):<br>ZIPCODE |
| County of Residence or of the Principal Place of Business: Tarrant | County of Residence or of the Principal Place of Business: |
| Mailing Address of Debtor (if different from street address):<br>SAME<br>ZIPCODE | Mailing Address of Joint Debtor (if different from street address):<br>ZIPCODE |
| Location of Principal Assets of Business Debtor<br>(if different from street address above): , Farmers Branch TX | ZIPCODE 75234 |

**Type of Debtor** (Form of organization) (Check one box.)
- ☐ Individual (includes Joint Debtors) *See Exhibit D on page 2 of this form.*
- ☒ Corporation (includes LLC and LLP)
- ☐ Partnership
- ☐ Other (if debtor is not one of the above entities, check this box and state type of entity below)

**Nature of Business** (Check one box.)
- ☐ Health Care Business
- ☐ Single Asset Real Estate as defined in 11 U.S.C. § 101 (51B)
- ☐ Railroad
- ☐ Stockbroker
- ☐ Commodity Broker
- ☐ Clearing Bank
- ☐ Other

**Tax-Exempt Entity** (Check box, if applicable.)
- ☐ Debtor is a tax-exempt organization under Title 26 of the United States Code (the Internal Revenue Code).

**Chapter of Bankruptcy Code Under Which the Petition is Filed** (Check one box)
- ☐ Chapter 7
- ☐ Chapter 9
- ☒ Chapter 11
- ☐ Chapter 12
- ☐ Chapter 13
- ☐ Chapter 15 Petition for Recognition of a Foreign Main Proceeding
- ☐ Chapter 15 Petition for Recognition of a Foreign Nonmain Proceeding

**Nature of Debts** (Check one box)
- ☐ Debts are primarily consumer debts, defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose"
- ☒ Debts are primarily business debts.

**Chapter 11 Debtors:**
Check one box:
- ☐ Debtor is a small business as defined in 11 U.S.C. § 101(51D).
- ☒ Debtor is not a small business debtor as defined in 11 U.S.C. § 101(51D).

Check if:
- ☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $2,343,300 (amount subject to adjustment on 4/01/13 and every three years thereafter).

Check all applicable boxes:
- ☐ A plan is being filed with this petition
- ☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

**Filing Fee** (Check one box)
- ☒ Full Filing Fee attached
- ☐ Filing Fee to be paid in installments (applicable to individuals only). Must attach signed application for the court's consideration certifying that the debtor is unable to pay fee except in installments. Rule 1006(b). See Official Form 3A.
- ☐ Filing Fee waiver requested (applicable to chapter 7 individuals only). Must attach signed application for the court's consideration. See Official Form 3B.

**Statistical/Administrative Information**
- ☒ Debtor estimates that funds will be available for distribution to unsecured creditors.
- ☐ Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to unsecured creditors.

THIS SPACE IS FOR COURT USE ONLY

**Estimated Number of Creditors**

| 1-49 | 50-99 | 100-199 | 200-999 | 1,000-5,000 | 5,001-10,000 | 10,001-25,000 | 25,001-50,000 | 50,001-100,000 | Over 100,000 |
|---|---|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

**Estimated Assets**

| $0 to $50,000 | $50,001 to $100,000 | $100,001 to $500,000 | $500,001 to $1 million | $1,000,001 to $10 million | $10,000,001 to $50 million | $50,000,001 to $100 million | $100,000,001 to $500 million | $500,000,001 to $1 billion | More than $1 billion |
|---|---|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ |

**Estimated Liabilities**

| $0 to $50,000 | $50,001 to $100,000 | $100,001 to $500,000 | $500,001 to $1 million | $1,000,001 to $10 million | $10,000,001 to $50 million | $50,000,001 to $100 million | $100,000,001 to $500 million | $500,000,001 to $1 billion | More than $1 billion |
|---|---|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ |

Official Form 1 (04/10) FORM B1, Page 2

| **Voluntary Petition** <br> *(This page must be completed and filed in every case)* | Name of Debtor(s): <br> *FRE Real Estate, Inc., a Corporation* |
|---|---|

| All Prior Bankruptcy Cases Filed Within Last 8 Years | (If more than two, attach additional sheet) | |
|---|---|---|
| Location Where Filed: <br> *Northern District of Texas, Dallas Division* | Case Number: <br> *11-30210-BJH-11* | Date Filed: <br> *01/04/2011* |
| Location Where Filed: | Case Number: | Date Filed: |

| Pending Bankruptcy Case Filed by any Spouse, Partner or Affiliate of this Debtor | (If more than one, attach additional sheet) | |
|---|---|---|
| Name of Debtor: <br> *NONE* | Case Number: | Date Filed: |
| District: | Relationship: | Judge: |

| **Exhibit A** <br> (To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under Chapter 11) <br><br> ☐ Exhibit A is attached and made a part of this petition | **Exhibit B** <br> (To be completed if debtor is an individual whose debts are primarily consumer debts) <br> I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12 or 13 of title 11, United States Code, and have explained the relief available under each such chapter. I further certify that I have delivered to the debtor the notice required by 11 U.S.C. §342(b). <br> X _(signature)_                                   04/04/2011 <br>      Signature of Attorney for Debtor(s)                    Date |
|---|---|

**Exhibit C**

Does the debtor own or have possession of any property that poses or is alleged to pose a threat of imminent and identifiable harm to public health or safety?

☐ Yes, and exhibit C is attached and made a part of this petition.
☒ No

**Exhibit D**

(To be completed by every individual debtor. If a joint petition is filed, each spouse must complete and attach a separate Exhibit D.)

☐ Exhibit D completed and signed by the debtor is attached and made part of this petition.

If this is a joint petition:

☐ Exhibit D also completed and signed by the joint debtor is attached and made a part of this petition.

**Information Regarding the Debtor - Venue**
(Check any applicable box)

☒ Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.

☐ There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.

☐ Debtor is a debtor in a foreign proceeding and has its principal place of business or principal assets in the United States in this District, or has no principal place of business or assets in the United States but is a defendant in an action proceeding [in a federal or state court] in this District, or the interests of the parties will be served in regard to the relief sought in this District.

**Certification by a Debtor Who Resides as a Tenant of Residential Property**
(Check all applicable boxes.)

☐ Landlord has a judgment against the debtor for possession of debtor's residence. (If box checked, complete the following.)

_____
(Name of landlord that obtained judgment)

_____
(Address of landlord)

☐ Debtor claims that under applicable nonbankruptcy law, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after the judgment for possession was entered, and

☐ Debtor has included with this petition the deposit with the court of any rent that would become due during the 30-day period after the filing of the petition.

☐ Debtor certifies that he/she has served the Landlord with this certification. (11 U.S.C. § 362(l)).

Official Form 1 (04/10)             FORM B1, Page 3

| **Voluntary Petition** *(This page must be completed and filed in every case)* | Name of Debtor(s): **FRE Real Estate, Inc., a Corporation** |
|---|---|

## Signatures

### Signature(s) of Debtor(s) (Individual/Joint)

I declare under penalty of perjury that the information provided in this petition is true and correct.
[If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7.

[If no attorney represents me and no bankruptcy petition preparer signs the petition] I have obtained and read the notice required by 11 U.S.C. §342(b)

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X _____
Signature of Debtor

X _____
Signature of Joint Debtor

_____
Telephone Number (if not represented by attorney)

_____
Date

### Signature of a Foreign Representative

I declare under penalty of perjury that the information provided in this petition is true and correct, that I am the foreign representative of a debtor in a foreign proceeding, and that I am authorized to file this petition.

(Check only one box.)

☐ I request relief in accordance with chapter 15 of title 11, United States Code. Certified copies of the documents required by 11 U.S.C. § 1515 are attached.

☐ Pursuant to 11 U.S.C. § 1511, I request relief in accordance with the chapter of title 11 specified in this petition. A certified copy of the order granting recognition of the foreign main proceeding is attached.

X _____
(Signature of Foreign Representative)

_____
(Printed name of Foreign Representative)

_____
(Date)

### Signature of Attorney*

X *[signature]*
Signature of Attorney for Debtor(s)

**Robert A. Simon 18390000**
Printed Name of Attorney for Debtor(s)

**Barlow Garsek & Simon, LLP**
Firm Name

**3815 Lisbon Street**
Address

**Fort Worth TX 76107**

**817-731-4500**
Telephone Number

**04/04/2011**
Date

*In a case in which § 707(b)(4)(D) applies, this signature also constitutes a certification that the attorney has no knowledge after an inquiry that the information in the schedules is incorrect.

### Signature of Debtor (Corporation/Partnership)

I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.

The debtor requests the relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X *[signature]*
Signature of Authorized Individual

**Ronald F. Akin**
Printed Name of Authorized Individual

**President**
Title of Authorized Individual

**04/04/2011**
Date

### Signature of Non-Attorney Bankruptcy Petition Preparer

I declare under penalty of perjury that: (1) I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110; (2) I prepared this document for compensation and have provided the debtor with a copy of this document and the notices and information required under 11 U.S.C. §§ 110(b), 110(h), and 342(b); and, (3) if rules or guidelines have been promulgated pursuant to 11 U.S.C. § 110(h) setting a maximum fee for services bankruptcy petition preparers, I have given the debtor notice of the maximum amount before preparing any document for filing for a debtor or accepting any fee from the debtor, as required in that section. Official Form 19 is attached.

_____
Printed Name and title, if any, of Bankruptcy Petition Preparer

Social-Security number (If the bankruptcy petition preparer is not an individual, state the Social-Security number of the officer, principal, responsible person or partner of the bankruptcy petition preparer.) (Required by 11 U.S.C. § 110.)

_____
Address

X _____

_____
Date

Signature of bankruptcy petition preparer or officer, principal, responsible person, or partner whose Social-Security number is provided

Names and Social-Security numbers of all other individuals who prepared or assisted in preparing this document unless the bankruptcy petition preparer is not an individual.

If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.

*A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both. 11 U.S.C. § 110; 18 U.S.C. § 156.*

Preliminary Statement

The Debtor's principal asset is Fenton Centre, two-tower mid-rise office complex on LBJ Freeway in Farmers Branch. It is a valuable, income producing property that has a good chance of successful rehabilitation in bankruptcy. NexBank is the first lienholder on Fenton Centre and several other parcels of nearby real estate, improved and unimproved, that help secure the same loan. As NextBank will undoubtedly advise the Court, this Debtor filed an earlier Chapter 11 case in Northern District of Texas, which was dismissed by Judge Barbara Houser on March 1, 2011. The Case Number was 11-30210-bjh-11. Fenton Centre was one of approximately thirty (30) properties scattered around Texas and Louisiana that had been aggregated for purposes of a single filing. The Order of dismissal followed extensive findings announced on the record by Judge Houser on February 17, 2011. A copy of Transcript of Proceedings containing Judge Houser's finding is attached to the Preliminary Statement as Exhibit "A."

As set forth in the Transcript, Judge Houser was troubled by the aggregation of many properties shortly before filing into FRE Real Estate, which owned Fenton Centre. She found the pre-filing activity to be a circumvention of the Bankruptcy Code, constituting a substantive consolidation of multiple entities without a plan of reorganization. She commented that the evidence reflected a substantial equity in the properties, but she found that the process was fatally defective.

The instant case differs importantly, in that:

1. The 30 property aggregation that Judge Houser found objectionable has been dismantled. This case contains only Fenton Centre, 4.7 acres of adjacent property (reserved for a contemplated third Fenton Centre tower), the ART Three Hickory Tract, and the

Thermalloy building. Each of those properties is mortgaged to NexBank as security for the same loan;

2. FRE Real Estate, Inc. is not a new entity created for purposes of the bankruptcy filing. It has owned Fenton Centre for several years.

3. The debtor will be represented by a highly qualified Restructuring Officer, John Doyle, who has significant experience and success in like matters.

4. Fenton Centre is negotiating with a new tenant for large block of office space. The potential tenant is a large, highly solvent, publicly traded company and is acceptable to the Debtor and to NexBank. A decision is expected within the next month. If that deal is made, Fenton Centre will be become cash flow positive, after debt service to NexBank.

5. An additional significant tenancy is also likely.

6. Fenton Centre is near breakeven today and will be able to meet all requirements of Section 362(d)(3) of the Bankruptcy Code, and all other bankruptcy requirements in a timely manner; and

7. There is a dispute between the Debtor and NexBank over $2,524,733.05 swept out of the Debtor's reserve accounts by NexBank in late 2010. NexBank has, to date, refused to account to the Debtor as to how those funds were utilized and/or applied to the debt.

The evidence will show a high likelihood that this Debtor can successfully reorganize, and, pursuant to a plan, pay NexBank in full what it is actually owed.

# Transcript of the Testimony of **fre ruling217**

**Date:** February 22, 2011
**Volume:** I

**Case:**

Printed On: February 22, 2011

National Court Reporters
Phone: 214 651-8393
Fax: 214 651-6068
Email: NCRDEPO@AOL.COM
Internet: NCRDallas.com

Exhibit "A"

Page 1

```
1              IN THE UNITED STATES BANKRUPTCY COURT

              FOR THE NORTHERN DISTRICT OF TEXAS
2                         DALLAS DIVISION

3

4   IN RE:                          )  BK. NO: 11-30210-BJH-11

5                                   )

6   FRE REAL ESTATE, INC.           )

7        D E B T O R                )

8

9

10              *   *   *   *   *   *   *   *   *   *

11

12                  TRANSCRIPT OF PROCEEDINGS

13

14              *   *   *   *   *   *   *   *   *   *   *

15

16

17

18

19

20        BE IT REMEMBERED, that on the 17th day of February,

21   2011, before the HONORABLE BARBARA J. HOUSER, United States

22   Bankruptcy Judge at Dallas, Texas, the above styled and

23   numbered cause came on for hearing, and the following

24   constitutes the transcript of such proceedings as hereinafter

25   set forth:
```

NATIONAL COURT REPORTERS (214) 651-8393

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)

074a5ddc-2f03-4017-bb10-7707746b075f

Exhibit "A"

Page 2

1 * * * * * *
2 THE COURT: Nothing further. I don't need to
3 hear further argument.
4 I have given this case a lot of thought. I gave it a
5 lot of thought following the February 3rd commencement
6 hearing. Let me back up.
7 Certainly as soon as this case came to my attention
8 very shortly after the filing, and the request by the debtor,
9 of course, as always comes up for interim authority to use
10 cash collateral and we started preparing for that hearing and
11 we saw motions to dismiss come flying in by a variety of
12 secured creditors and joinders in motions to dismiss, it
13 became apparent to me that we had a difficult situation
14 brewing.
15 Ultimately at the interim cash collateral hearing I
16 believe I suggested that what occurred certainly had caused
17 red flags to arise. And that perhaps I would hear evidence
18 that would explain and that I would look forward to hearing
19 that evidence. Now, I haven't gone back to review the
20 transcript of the hearing, but I think I pretty much said
21 words to that effect. Which was my way, Mr. Buncher, of
22 telling you that I really needed to understand why these
23 entities chose to do this in the face of motions to dismiss
24 for bad faith filings and the heat that the case was
25 generating literally from virtually day one.

Page 3

1 And so it is disappointing to me that I've now had a
2 day and a half of evidence and the masterminds of this
3 structure chose not to appear at the hearing to explain why
4 this made some sense.
5 Maybe it's as simple as they didn't have bankruptcy
6 counsel and they didn't realize that this was going to create
7 all of the red flags and all of the hubbub that it has. I
8 have no idea if they did or didn't have bankruptcy counsel.
9 But for publicly traded entities of the sophistication that I
10 think I appreciate here, it would be surprising to me if that
11 were the case. But, again, I simply don't know. Because,
12 frankly, I didn't hear from anybody who has personal
13 knowledge of what was hoping to be accomplished here.
14 Now, as most all of you are experienced enough lawyers,
15 I'll say it that way, to know that as a lawyer I preferred
16 the debtor's side of the case. Some would say I was a
17 debtor's lawyer. So it has caused me to have, as I said, a
18 few sleepless nights thinking about this, because I heard
19 Mr. Morgan loud and clear the first day, that he believes
20 there is enormous equity value in these properties. $48
21 million was the number he offered. And, again, that may be
22 quibbled with by certain parties. But nevertheless, I heard
23 him loud and clear the first day that he believed there was
24 substantial equity that could be and should be preserved
25 here. And as some would say, a former debtor's lawyer, I

Page 4

1 think bankruptcy is about preserving that value and having
2 the opportunity to restructure obligations in order to
3 successfully reorganize.
4 The problem that I have here, though, is there are too
5 many red flags and no explanations. And that's about as
6 succinct as I can state it. We have a sophisticated
7 structure, as evidenced by Wells Fargo Exhibit 191, that
8 existed as of December 22nd, 2010. And, again, it's a
9 structure of the Transcontinental Realty Investors, Inc.,
10 American Realty Trust, Inc., and Income Opportunity Realty
11 Investors' choice. They structured their public entity as
12 they saw fit. And they structured it in a fashion that had a
13 number of subsidiary entities to each of those three parents
14 entities. And at least five of those subsidiaries were, as
15 we bankruptcy lawyers would call them, single asset real
16 estate entities. And, again, this was the structure of
17 choice for Transcontinental Realty Investors, American Realty
18 Trust, and Income Opportunity Realty Investors.
19 And for some unexplained reason, after a number of the
20 properties previously held in these subsidiary entities had
21 been posted for foreclosure and virtually all, if not all, of
22 the properties at issue in our debtor, FRE Real Estate, Inc.,
23 were in default and thus foreclosure was in all likelihood
24 imminent for those properties for which they had not yet been
25 posted for foreclosure, we have transfers of the properties'

Page 5

1 assets into this, while it's not a new entity because it did
2 exist and it had an office building of its own, but all of
3 the other properties that are at issue in this bankruptcy
4 case were transferred into the debtor on December 22nd, 2010,
5 or at least documentation was signed as of that date. There
6 is some fuss as to when deeds were actually transferred, et
7 cetera. And the rights of the creditors of those entities
8 have been changed.
9 Now, in some instances I can unequivocally state that
10 the rights have been changed to the detriment of the
11 creditors. In other instances, it is premature to know if
12 the rights have been changed to the detriment or potentially
13 to the benefit of the creditors. But certainly with respect
14 to Petra and the Amaco Office Building; State Bank and the
15 Arcon land; U.S. Bank and the Parkway North Office Building;
16 Regions Bank and the Westgrove Air Plaza Office Hanger; and
17 First Bank & Trust Centura land; we know for a fact that the
18 rights of those creditors have been adversely effected by the
19 orchestration that occurred with respect to these assets
20 immediately prior to the debtor's bankruptcy filing.
21 Now, with respect to those five creditors and those
22 five assets, had the transfer not occurred, those creditors
23 and those assets would have had to have been filed in what
24 the Bankruptcy Code calls a single asset real state case.
25 Congress has seen fit to provide special protections to

2 (Pages 2 to 5)

Page 6

1 lenders in single asset real estate cases. Section 362(d)(3)
2 of the Bankruptcy Code requires specific things to occur in
3 order for the automatic stay to remain in place in a single
4 asset real estate case. Other provisions of the Code give a
5 single asset real estate entity a more limited period of time
6 in which to propose and confirm a plan of reorganization.
7    By undertaking the orchestration that occurred here,
8 each of those five secured creditors have been denied their
9 rights pursuant to those provisions of the Bankruptcy Code.
10    Now, as I indicated in my colloquy with Mr. Roberts, I
11 could fix that problem, because I have given thought to the
12 potential from the debtor's perspective, harshness of
13 dismissing this case and the chaos that they fear will occur
14 upon a dismissal of the case. And how I could fix that
15 problem is by simply, coincidentally upon those creditors'
16 request for adequate protection, fashioning an adequate
17 protection order that simply happened to track the
18 requirements of Section 362(d)(3).
19    But what I can't fix for those creditors is the fact
20 that with respect to a bankruptcy filing -- and I'll pick
21 State Bank, as an example. With respect to a bankruptcy
22 filing of what would have been on December 22nd Coventry
23 Point Inc., State Bank of Texas would have been the
24 substantial creditor in that case, with a secured claim of
25 roughly $3.9 million and tax debt of roughly a quarter of a

Page 7

1 million dollars, and trade debt of $22,000.
2    Now, while I suppose it's theoretically possible that
3 $22,000 of unsecured claims could be an impaired accepting
4 class so that I would cram down a plan on a $4 million
5 creditor. The simple fact remains that that is always a
6 better argument than it is a likely outcome, for a lot of
7 reasons. State Bank could go up and buy the $22,000 of
8 unsecured claims, if worse comes to worse and completely
9 control the class and the case.
10    But my point being is there's no way to return those
11 secured lenders to the position that they would have enjoyed
12 had these orchestrated transfers not occurred. They would
13 have been substantially in control, if not completely in
14 control, of the fate of the bankruptcy of their single asset
15 entity and would have had considerable powers. And now that
16 the eggs all got scrambled as a result of the orchestrated
17 transfers that occurred here, I have no way of unscrambling
18 those eggs in the context of a confirmation process to put
19 those parties back to the relative position they would have
20 had before. Because now they are simply one of dozens of
21 secured creditors of a single debtor, my debtor. And they
22 don't enjoy the same, for lack of a better word, power that
23 Congress gave them under the Bankruptcy Code in an entity
24 which has lesser creditor and lesser debt levels. So there
25 is no question but those creditors have been, for lack of a

Page 8

1 better word, irreparably damages by the orchestration of
2 transfers that occurred here.
3    Now, one suggestion was, Well, just let those
4 properties go. Well, that's really not something that's
5 before me today. What's before me today is dismiss this case
6 for a bad faith filing, or find that it was an appropriate
7 filing and decline to dismiss. It's the only issue that's
8 before the Court today.
9    Now, it's possible that other creditors are damaged, as
10 well. Certainly the facts have changed for virtually every
11 creditor. Instead of the entity to which they made a loan,
12 they now, other than NexBank who loaned to FRE Real Estate
13 Inc., all of the other secured creditors are now with a
14 borrower that they didn't lend to and never consented to
15 assuming their debt. The unsecured creditors may be
16 benefited or hurt, depending upon the circumstances present
17 for each of the prior entities prior to transfer. And at
18 this point in the case, the Court simply can't tell if
19 unsecured creditors are benefited or burdened. But what the
20 Court can say is that essentially the effect of this
21 orchestrated transfer was to effect a substantive
22 consolidation of what should have been a, I guess I didn't
23 count, 15 or 18 entity bankruptcy filing into a single
24 bankruptcy filing. And the creditors now have no ability to
25 object to such a substantive consolidation, because it

Page 9

1 occurred essentially in the dark of night without the
2 opportunity for them to have knowledge or to have an
3 independent third party, such as a judge in a bankruptcy case
4 in which substantive consolidation is proposed, apply the
5 legal test for such a substantive consolidation.
6    So what we have here is virtually all, if not all of
7 the properties in default. We have a substantial number of
8 those properties posted for foreclosure. We have transfers
9 of the assets in violation of every secured lenders' loan
10 documents without their consent, and, frankly, without their
11 knowledge. We have five creditors, at least, for whom their
12 special rights created by the Bankruptcy Code have been
13 irretrievably lost. And we have the rights of virtually
14 every other creditor changes, as a result of the action that
15 has occurred. And, again, that change may be positive or
16 negative. It's premature for the Court to really know.
17    And, as I've indicated, the Court is simply left
18 hanging as to what the business justification for this was,
19 if any there was. Even after hinting that I looked forward
20 to hearing the explanation for the orchestrated transfers as
21 the initial cash collateral hearing, and after the better
22 part of a day and a half of testimony, I still have
23 absolutely no idea why the principals of these entities
24 believed that this orchestrated process made sense.
25    As a result of the fact that no explanation was

3 (Pages 6 to 9)

Page 10

1  offered, the Court is left, I believe, with the only logical
2  conclusion. And that is, this was done to attempt to
3  circumvent the requirements of the Bankruptcy Code. That, of
4  course, is very troubling to the Court, both in the context
5  of this case and in the context of any other case that might
6  be filed before the Court.
7      I'm also troubled because of what I believe to be
8  essentially a lack of independent parties. All of the assets
9  are operated by essentially independent contractors. That
10 prior to the orchestrated transfer and subsequent, continued
11 to work for Transcontinental Realty Investors, Inc., American
12 Realty Trust, Inc., and Income Opportunity Realty Investors.
13     So as the evidence with respect to Mr. Crown suggests,
14 we have people who are wearing too many hats here.
15 Mr. Crown's company -- Mr. Crown has been asked by his
16 employer, Pryme, to assist the debtor as its financial
17 advisor. Now, normally when you have a financial advisor in
18 a bankruptcy case, there is an application to employ that
19 person under Sections 327 or 328 of the Bankruptcy Code.
20 Affidavits of disinterestedness are filed. And the Court
21 holds a hearing with respect to the retention. None of that
22 has occurred here in this case. And when asked about it,
23 Mr. Crown says, Well, he's not really getting paid by the
24 debtor, so why should he have to file anything to be
25 employed? Well, the answer to that is because you're working

Page 11

1  for a debtor, apparently, and the debtor and its
2  professionals are fiduciaries.
3      And as the cross-examination by Mr. Staber suggests,
4  Mr. Crown is wearing a couple of hats here, or at least his
5  employer is wearing a couple of hats that probably precludes
6  him from being retained in this case as a disinterested
7  professional. He was asked specifically that when there's
8  discussions about what's going to happen to the debtor's
9  properties, who are you representing, and the answer was,
10 Transcontinental Realty Investors, American Realty Trust, and
11 Income Opportunity Realty Investors. And from this Court's
12 perspective, that's the wrong answer. You're representing
13 the debtor.
14     Now, certainly the ultimate holder has an interest.
15 And they may have an interest as the holder of these crafted
16 seller notes. So they may be interested in what's going to
17 happen to the property, but that's not who you're accountable
18 to for what's going to happen to the properties. You're
19 accountable to the debtor and the debtor alone. And so that
20 is of concern here.
21     Mr. Morgan is also of concern, but in a slightly
22 different way. Because Mr. Morgan appears to be an
23 experienced person in real estate. He certainly -- he nor
24 Mr. Crown can be painted with the orchestration that occurred
25 here as they both unequivocally testified that they got

Page 12

1  involved subsequent, although it appears, perhaps, that
2  Mr. Crown's company was involved in this process. He just
3  simply wasn't. But in any event, Mr. Morgan is new to this.
4  He came in, in fact, on December 23rd after it had all
5  occurred. But, again, I have to say that the structure of
6  his involvement is odd. There's no money to pay him. He
7  doesn't expect to be paid for his time. But he expects that
8  he will get some sort of a success fee that cannot yet be
9  described and is not written down. But because of his prior
10 relationships with Mr. Akin, who as Mr. Buncher and I
11 discussed appears on a number of the entities as president
12 and director, because he has a history with Mr. Akin and he
13 trusts him, he thinks it will be fair.
14     Well, I appreciate that they have a friendship that
15 goes back for many years. I appreciate that he trusts him.
16 But I will tell you that it is odd that we have the person
17 who is going to be responsible for the debtor's
18 reorganization who isn't getting paid and who can't disclose
19 to the Court or the creditors what the structure of his
20 expected compensation is. That causes me to say that if he
21 were a professional person that had to be retained under the
22 Bankruptcy Code, he would likely not get retained. And if he
23 is just an employee of the debtor, the issues surrounding the
24 potential divided loyalty might be grounds for the
25 appointment of a Chapter 11 Trustee so that, in fact, an

Page 13

1  independent person would have the opportunity to decide what
2  makes sense here and not someone who made well because of
3  years of friendship and close relationships be beholding to
4  parties that they should be directly beholden to.
5      So I'm not sure we have an independent debtor in
6  possession. And I'm not sure we have an independent
7  financial advisor advising the debtor. Those are very
8  troubling to the Court.
9      As I mentioned previously, I am troubled by what has
10 essentially effected a substantive consolidation of multiple
11 entities pre-petition without compliance with the
12 requirements of the Bankruptcy Code, had that same
13 transaction been attempted pursuant to a plan of
14 reorganization. And, again, it might well have been approved
15 as part of a plan. But creditors would have had the
16 opportunity to vote. And the Court would have required
17 extensive evidence with respect to whether or not there was
18 someone's ox getting gored as a result of the transaction.
19     Finally, I am very troubled by the precedent this
20 creates. I do not believe that these types of transfers
21 should occur immediately prior to a bankruptcy filing without
22 a good business justification being provided to the Court
23 that the Court finds credible such that the Court can find
24 that this wasn't simply bad faith, that this wasn't an
25 attempt to circumvent specific provisions of the Bankruptcy

4 (Pages 10 to 13)

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)

074a5ddc-2f03-4017-bb10-7707746b075f

Exhibit "A"

Page 14

1 Code.
2 Moreover, while I have given this a lot of thought, I
3 do not think it's my problem to fix. And so the debtor's
4 request that I not throw the baby out with the bath water
5 because there's something that could actually have been
6 reorganized here, that argument I appreciated it in the
7 briefs. It kept me awake often. But I don't think it
8 outweighs the fact that this Court believes that it must send
9 a message that this cannot be tolerated. And, again, perhaps
10 if there had been a good business explanation offered by a
11 credible witness such that the Court could find no attempt to
12 circumvent the provisions of the Code, no bad faith, perhaps
13 that would make a difference. But I don't have that here.
14 So I recognize this is going to be a heck of a mess.
15 But unfortunately this is a heck of a mess of the parties who
16 created it. And that is not the creditors and that is not
17 the Court. For those reasons, I will grant the motions to
18 dismiss this bankruptcy case.
19 Now, I don't know quite what to do, Mr. Olson, with
20 your request. So I'm prepared to entertain further argument
21 about that.
22 MR. WEITMAN: Your Honor, if I may, I have
23 been thinking about that issue. And if Your Honor were to
24 first find that there was bad faith and cause for the
25 annulment of the automatic stay, then we would have, if you

Page 15

1 will, an annulment of the automatic stay --
2 THE COURT: But I haven't had a hearing on
3 that motion yet. That's the problem.
4 MR. WEITMAN: I hear you.
5 THE COURT: I hear you. But unfortunately, we
6 haven't yet heard those motions. I can't make that finding,
7 at least not at the moment, I don't think.
8 Mr. Olson?
9 MR. OLSON: Your Honor, if I could give my two
10 cents worth?
11 THE COURT: Please.
12 MR. OLSON: I wouldn't want to come back later
13 to make that argument. I wouldn't want to slow down the
14 dismissal of the case. We brought that up simply because we
15 anticipated that a dismissal would preclude our ability to be
16 heard on the motion to annul. And I asked for that language
17 only on the slim basis that if you find that this was done in
18 bad faith, perhaps a sanction, if you will, would be to say,
19 then it was a nullity and it's of no effect. And the people
20 who conducted sales can record their deed and it's simply the
21 fact that the bankruptcy was filed and dismissed will have no
22 effect on the validity of the sale and the deed. I think
23 that's all this Court could do.
24 THE COURT: Let me hear from others.
25 MR. STROMBERG: Thank you, Your Honor.

Page 16

1 On behalf of State Bank of Texas, we have a hearing
2 scheduled, I believe it's the 28th, on our motion to annul
3 the automatic stay. And you'll forgive me because this
4 probably comes from my being a bankruptcy lawyer and not a
5 real estate lawyer, but I'm not sure what the effect would be
6 if the case is dismissed before a determination on annulment
7 is made. Because as I understand the Texas cases from the
8 state courts, they regard any action that is taken in
9 violation of the Bankruptcy stay as not merely voidable, but
10 void. Not recognizing, perhaps, the distinction that the 5th
11 Circuit has made about the difference between annulment and
12 lifting of the automatic stay.
13 So I am in the position of having a client who without
14 notice of the bankruptcy foreclosed in the morning and got
15 notice in the afternoon. And we have the 5th Circuit
16 authority, it was a Mississippi case, but nevertheless,
17 talking about the fact that if you were a creditor who
18 happens to be in that situation, the effect of the recording
19 statute may be such with annulment that you would end up with
20 valid title, but first the Bankruptcy Court has to make a
21 determination. So I'm stuck in the unenviable position of
22 probably having an incurable defect of title, unless the real
23 estate lawyer tells me I'm completely wrong. And that's
24 quite possible.
25 So unless I can be heard on the annulment issue, then I

Page 17

1 run the risk that having first foreclosed without notice of
2 the bankruptcy and having messed up the title, in effect,
3 because the bankruptcy for an entity that we didn't recognize
4 for a case that we didn't know about, and our connection to
5 which we didn't know about took place, then I'll be penalized
6 a second time by not being able to clear title before the
7 case exits the bankruptcy court.
8 So I don't know what Your Honor can do about that. I'm
9 not necessarily asking that the brakes be put on the train
10 here. But on the other hand, I would like the opportunity,
11 if it's at all possible, to get the annulment issue heard and
12 determined.
13 THE COURT: When is that heard?
14 MR. STROMBERG: The 28th, Your Honor.
15 THE COURT: Well, but that is going to -- I
16 mean, I hear you. But I don't know which of the two you're
17 saying. You say, Don't put the brakes on dismissal. But
18 don't dismiss until after the 28th.
19 MR. STROMBERG: If Your Honor were inclined to
20 give us until the 28th, I'd be happy to have it after that
21 date. As I said, this motion has been pending for a while.
22 THE COURT: No, I know.
23 MR. STROMBERG: So I'd be happy to have the
24 issue determined at that time. Unless the debtor is prepared
25 to agree under the circumstances. But if not, then I'd

5 (Pages 14 to 17)

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)

074a5ddc-2f03-4017-bb10-7707746b075f

Exhibit "A"

Page 18

1  probably need to have my hearing before the dismissal, just
2  to be able to cure the title issues. I don't know any other
3  way to deal with this because, as I think about it, if Your
4  Honor dismisses, then the question of whether or not you have
5  jurisdiction to rule on the annulment is an open question.
6       THE COURT: Mr. Kinvig.
7       MR. KINVIG: Your Honor, my client is in a
8  very similar situation to Mr. Stromberg and we're both in a
9  little bit different situation from Mr. Olson.
10      My client ended up posting for foreclosure,
11 foreclosing, and then we found out about the bankruptcy. And
12 then we found out about the transfers. In that order. And
13 as Mr. Stromberg eluded to, I believe it's the Pinetree case,
14 the 5th Circuit case that is in my pleadings and I believe
15 maybe in his pleadings, as well. But we both rely on. And
16 just if I could give a little bit more color to that case.
17      What ended up happening is the Court focused on the
18 timing issue. And the Court essentially found that if you
19 foreclose without notice of a transfer and without notice of
20 any bankruptcy filing, you're essentially a bona fide
21 purchaser for value. And as a PFV, you're therefore not
22 really effected by the automatic stay. And so while the
23 Court -- the 5th Circuit used the term annulment to say,
24 Well, the Court would go back and annul the automatic stay to
25 effectively bless the foreclosure, it's not a traditional

Page 19

1  annulment in the sense that there's separate factors that a
2  Court would normally go through to grant an annulment of the
3  automatic stay, which the Court might need to, or want to, or
4  have to do for Mr. Olson's client. Mr. Stromberg's client
5  and my client are in the different situation, the different
6  paradigm of the 5th Circuit case in Pinetree where even
7  though the Court called it an annulment, it's not necessarily
8  an annulment. The Court essentially just blesses the
9  foreclosure and says, This timing issue seems to make you a
10 BFP. And as a BFP, the stay didn't really involve you. It
11 didn't really effect you. So to put that color on it, we do
12 want to make sure that we're protected in that instance so
13 that we don't -- our position is we've already foreclosed.
14 And we believe we have good title to the property. We don't
15 want to have this case dismissed and all of a sudden we have
16 to foreclose again or we end up in a single asset bankruptcy,
17 even after we've foreclosed a second time.
18      Also as I mentioned in my pleadings on the motion to
19 annul, and I believe I also mentioned it in our joinder to
20 the motion to dismiss, one of our properties produces
21 substantial cash flow, roughly 45 to $50,000 a month. And
22 according to the debtor's cash collateral budget, they have
23 just sort of been hording that cash. And I would imagine
24 that there's roughly $100,000 in some bank account somewhere
25 that is my client's cash collateral. And so when the Court

Page 20

1  dismisses the case, whatever day the Court chooses, and
2  however the Court decides how you want to do that, we'd like
3  to make sure that that cash collateral is also protected or
4  at least in a paradigm to where we can maybe go and get a
5  state court receiver or something to seize our cash
6  collateral, which we're entitled to via contract.
7       Thank you.
8       MR. LINEGAR: Your Honor, my issue is somewhat
9  a little bit simpler. It's an issue of time.
10      I need to take my clients to the airport so they can
11 catch their plane back home.
12      With respect to the motions, do you want us to prepare
13 orders dismissing the case, or will the Court prepare its own
14 order?
15      THE COURT: Well, I want -- I'm going to ask
16 somebody to prepare the order. But we're going to have to
17 figure out what the timing of the dismissal is, vis-a-vis
18 these other issues.
19      MR. LINEGAR: I'll just check with
20 Mr. Weitman.
21      May I be excused?
22      THE COURT: Of course. Thank you.
23      MR. STABER: Your Honor, I want this case
24 dismissed as quickly as possible. So I'm going to offer you
25 a solution of how we get the results to protect these three

Page 21

1  entities. Not because I represent them, but because this is
2  in my client's interest to go ahead and get this dismissed.
3       Again, the reference has been made. Actions take in
4  violation of the automatic stay in the 5th Circuit are
5  voidable and not void. And there has been no such action
6  being brought to avoid those transfers.
7       Moreover, Section 349 of the Bankruptcy Code provides
8  that unless you order otherwise, 349(b)(1), it reinstates any
9  transfer that would otherwise be avoided, including 549
10 post-petition transfers, which I guess technically that's
11 what we have here. So I don't see a problem fashioning
12 relief under 349(b) in this instance, having the Court
13 recognize that if they had been avoided, these post-petition
14 transfers, they would have been reinstated. And since no
15 action was brought under 5th Circuit case law, they're not
16 avoided.
17      THE COURT: But --
18      MR. STABER: And, therefore, you're -- this
19 case and the dismissal of it does not in any manner avoid
20 those foreclosures and they can remain in place. It's a
21 little bit of a stretch, Your Honor. And I'm trying to find
22 something that works for the Court and for the parties here
23 to avoid delay. And as I look at what happens on dismissal,
24 it's supposed to reinstate any of these type of transfers
25 that would have otherwise been avoided.

6 (Pages 18 to 21)

NATIONAL COURT REPORTERS (214) 651-8393

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)

074a5ddc-2f03-4017-bb10-7707746b075f

Exhibit "A"

Page 22

1  THE COURT: But they haven't avoided. I'm not
2  sure 349(b) -- I mean, I'll give it some thought, but --
3  MR. STABER: I thought it might be a way,
4  especially in light of the case law, that the Court could
5  make a finding. These transfers were not avoided. Therefore
6  the bankruptcy under the 5th Circuit case law, the bankruptcy
7  and the dismissal does not effect that they occurred.
8  Moreover, if --
9  THE COURT: But the first biggest problem is,
10  I haven't had a hearing on these motions.
11  MR. STABER: I understand, Your Honor. And
12  that's why I was looking at 349 and hoping and hoping that
13  that could provide some help. Because even if there were
14  something wrong with the transfers and foreclosures, the
15  actual legal effect of your dismissal would be to reinstate
16  them, even though they occurred post-petition, if they had
17  otherwise been avoided.
18  Again, it's not my client's position. I was trying to
19  find --
20  THE COURT: No.
21  MR. STABER: -- a legal mechanism to expedite
22  getting this dismissed. And one of the other things, Your
23  Honor, we're talking about fashioning orders and issues that
24  may arise. I am waiting for the U.S. Trustee at some point
25  to say, We need to get fees paid. I am waiting for the U.S.

Page 23

1  Trustee at some point to say, We need to get fees paid, U.S.
2  Trustees. I don't want that holding up the order. I had a
3  nice suggestion that there's $100,000 retainer out there that
4  would be a good source of paying those. But that's another
5  issue as we look at timing, since we're dismissing the case.
6  But, again, Your Honor, I want that on the table for the
7  Court because I don't want an order to come through and then
8  suddenly we have this issue of how are those going to be
9  paid. So, again, I'm not trying to complicate it, but
10  actually trying to move it along so we can go ahead and see
11  dismissal here.
12  Thank you, Your Honor.
13  MR. SAKONICK: Your Honor, Steve Sakonick
14  again for Parkway North. I remember at the opening
15  statements somebody had made request regarding cash
16  collateral. I know it was mentioned by one of the prior
17  creditors here.
18  Under state law you have to take possession of the
19  rents in order to enforce your assignment of rents. Under
20  546(b), we do that automatically with filing of the notice of
21  perfection, which my client invoked through a filing of a
22  notice of perfection. What we'd like to see in the order is
23  that the cash collateral be surrendered. I mean, Parkway
24  North, according to their budgets would generate about
25  $20,000 a month in excess cash flow after escrowing 9,000 and

Page 24

1  change for taxes. So that's about 30,000 a month we're
2  looking to be returned to the secured creditor. What we
3  would like to see is that the order include not only the
4  transfer, but that the 546(b) have taken effect so that the
5  creditors are deemed to have taken control over the cash
6  under the applicable state law.
7  THE COURT: Mr. Weitman.
8  MR. WEITMAN: Your Honor, we haven't discussed
9  this. You obviously cannot pressure the debtor to do this.
10  But I presume, you know, based on 102 and the debtor's
11  consent, the debtor could consent to the annulment of the
12  automatic stay.
13  THE COURT: Oh, of course the debtor could.
14  MR. WEITMAN: I mean, I just -- that is --
15  granted, it's not within the Court's power, but it certainly
16  is within the Court's maybe request, kind request to stop the
17  bleeding in this case.
18  I would also point out, Your Honor, I've drafted a
19  proposed order that basically states that we incorporate by
20  reference the Court's findings of fact and conclusions of
21  law. I had some language dealing with what I thought might
22  be cause, which has now been removed with respect to the
23  annulment of the stay. And since the U.S. Trustee hasn't
24  shown up, I removed any provision for payment of the U.S.
25  Trustee's fees. And I've also included something that

Page 25

1  basically the debtor with its officers will cooperate fully
2  to basically get back to the secured lenders of the income
3  producing property their cash so that we can have an orderly
4  transition.
5  THE COURT: I don't know what you mean by --
6  you didn't have the cash in the first place.
7  MR. WEITMAN: Not me. But I'm thinking for
8  all of the group here. If we have --
9  THE COURT: They didn't have the cash. The
10  debtor had the cash.
11  MR. WEITMAN: Right. Correct. For the debtor
12  to turn over to the respective secured creditors --
13  THE COURT: Why should I order that? The
14  secured creditors didn't have the cash when the debtor filed.
15  So why should I order that it be turned over?
16  MR. WEITMAN: Only because we've been
17  operating under cash collateral orders. And I would think
18  that with the dismissal of the case it might provide for an
19  orderly transition of the respective creditors collateral.
20  If Your Honor doesn't wish to do that, so be it. I'm just
21  saying that it was among the things to try to "have a softer
22  landing" if this case were to be dismissed.
23  THE COURT: Well, but a softer landing for
24  who?
25  MR. WEITMAN: The secured lenders.

7 (Pages 22 to 25)

NATIONAL COURT REPORTERS (214) 651-8393
Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)
074a5ddc-2f03-4017-bb10-7707746b075f
Exhibit "A"

Page 26

1  THE COURT: I mean obviously the secured
2  lenders like that. I'm guessing the debtor won't consent to
3  that. I don't know. Have you asked Mr. Buncher?
4  MR. WEITMAN: I thought I shouldn't bring that
5  up until after the Court ruled.
6  MR. BUNCHER: I would like to be heard. But I
7  was waiting for everybody --
8  THE COURT: A break?
9  MR. WARNER: Good afternoon, Your Honor.
10  THE COURT: Mr. Warner.
11  MR. WARNER: Michael Warner, Cole Schotz on
12  behalf of HCM LP.
13  Not my motion, but my issue now. And Mr. Weitman has
14  raised the issue. And I'm not sure he articulated the issue
15  that's important to me and my client.
16  On the date of the filing of the petition, the debtor
17  had no cash from the Fenton property, my property. It was in
18  a rock box. We had swept it. We had swept it and have taken
19  the position pre-petition as well as post-petition that it
20  was an absolute assignment. I don't need to debate the legal
21  issue.
22  On the date of the petition the debtor sought to use
23  cash collateral. We said it's not cash collateral as defined
24  under the Code. We said it is our cash. We entered into an
25  agreement on an interim basis to use our cash. And the words

Page 27

1  carefully said, It's the cash use agreement, not the cash
2  collateral agreement. Very technical. The language in the
3  agreement said that we took the position that it was
4  absolutely and unconditionally assigned to us, the lenders,
5  before January 4, 2011. Notwithstanding that, the order goes
6  on to say, We will allow your use. We allowed them to use
7  January and February. And interesting to note, about 280
8  grand, roughly, January and February were the budgeted
9  expenses. The operating report for the month of January
10  showed expenses of 95,000 actually being used. So in excess
11  of 180, we'll call it, from January was not used. Now, it
12  may have been used in February. We haven't seen an operating
13  report. But we also gave them the February money of another
14  280. If this case is dismissed today, tomorrow, or whatever
15  the date it is --
16  THE COURT: You want your money back.
17  MR. WARNER: -- I want my money back.
18  THE COURT: It hasn't been spent.
19  MR. WARNER: It hasn't been spent as of the
20  date of the dismissal, because that money was not the
21  debtor's, it was given to them pursuant to an agreement to
22  use, assuming this case was going forward. So the order to
23  that extent needs my protection.
24  Thank you.
25  THE COURT: I hear you.

Page 28

1  Mr. Franke.
2  MR. FRANKE: Your Honor, for Regions Bank.
3  Again, I find myself me too.
4  Regions actually didn't do a post-petition foreclosure.
5  Actually recorded the deed. I am favorable --
6  THE COURT: With or without knowledge.
7  MR. FRANKE: Without knowledge, Your Honor.
8  We didn't have knowledge of the case until two days ago.
9  THE COURT: Oh, that's right. You told me
10  that. Sorry.
11  MR. FRANKE: We are the ones that are real
12  late to the game.
13  I liked Mr. Staber's argument. I liked his position.
14  I liked what Mr. Stromberg just proposed. I like what
15  Mr. -- the proposal agreeing to the annulment. To the extent
16  that this Court would entertain, since it's not
17  Mr. Staber's client's issue, the Court would entertain some
18  type of research on 349 that would assist in that, happy to
19  provide it since we're late to the game. We haven't filed a
20  motion to annul the stay. Anything along those lines, if I
21  asked, would be significantly delaying. And I could hear a
22  loud groan behind me if I asked for that. But if it would
23  help expedite that, I want to protect Regions. They're one
24  of those five creditors who have the single asset. And they
25  didn't have knowledge and they did foreclose and they did

Page 29

1  record the deed. And I could find myself in a single asset
2  case back here months from now doing the same exact thing and
3  I want to avoid that. So if the Court will entertain, I'm
4  happy to provide under short notice while everybody is
5  negotiating the order.
6  THE COURT: Please. That would be great.
7  MR. FRANKE: Thank you, Your Honor.
8  THE COURT: Mr. Buncher.
9  MR. BUNCHER: I'm not trying to be flippant
10  here. But what comes to mind a little bit is, be careful
11  what you ask for here. Okay. Because they want the case
12  dismissed and thrown out immediately, but then they say,
13  Well, wait a minute. We didn't think about the fact that the
14  Court hasn't ruled on the stay issues and so forth. And I
15  can appreciate that. But that's where we are. And, frankly,
16  we had significant issues, factual issues with regard to
17  precisely timing of emails that were sent to the Trustees
18  that were foreclosing, phone calls that were placed. So
19  these are -- they're not lengthy facts, but there are facts
20  specific, relevant to that decision of whether legal title
21  existed in the debtor at the time of this bankruptcy filing
22  and prior to the foreclosures.
23  There's a decision from Judge Lynn in Fort Worth, the
24  in re Nguyen, N-g-u-y-e-n, I believe, decision, wherein he
25  held that legal title -- in order to transfer title under

8 (Pages 26 to 29)

Page 30

1  Texas law, there has to be actual delivery of the title --
2  excuse me, of the deed to the bank that's doing the
3  foreclosing. And in that particular case he could not
4  determine from the facts on the record whether the title --
5  whether the deed was -- whether the agent, the Trustee that
6  was conducting the sale had sufficient authority to actually
7  receive to take delivery of title, as opposed to having to
8  deliver it to the bank. So I would object to any findings of
9  annulment of stay, or retroactive annulment of stay without
10 having had hearings with regard to the facts of each specific
11 foreclosure. And Mr. Olson's client admitted in the
12 stipulation having not actual knowledge of the bankruptcy and
13 the transfer. I think, frankly, they have to go through the
14 process of re-posting the properties for foreclosure.
15         THE COURT: Well, no if I annul the stay.
16         MR. BUNCHER: True. And if we want to delay
17 dismissal and have hearings on that, I guess that's the
18 Court's prerogative to do so. I'm not following at all this
19 349/549 argument. 549 is where the debtor avoids a -- it's
20 an avoidance of a post-petition transfer of -- by the debtor
21 to somebody.
22         THE COURT: I'm not following it either.
23         MR. BUNCHER: So as far as what happens with
24 the cash, I mean, you know Mr. Warner, most of the cash, I
25 believe, is sitting in his lock box. The reason for the

Page 31

1  discrepancy between the cash collateral budget and what the
2  MOR says is because by the time the orders got entered and
3  the money got transferred, a lot of the January bills ended
4  up getting paid in the first month of February -- first part
5  of February.
6          I really think a number of these issues are going to
7  just have to be sorted out. If the Court wants to take up
8  the stay issues before dismissing, I guess we will come down
9  and try all of that. With respect to what happens with
10 properties and where we go from here, honestly, I've got to
11 visit with my client in terms of what we're going to do. And
12 whether they're going to try to take further actions to
13 protect these properties. And, you know, whether they're
14 going to try to talk to some of the lenders about maybe
15 working something out with respect to certain properties, or
16 just try to do some things with a subset of these properties.
17 So I really can't speak to these -- all of these issues here
18 today, Your Honor.
19         THE COURT: I appreciate that.
20         MR. WEITMAN: Just a last comment, Your Honor,
21 to make it absolutely clear.
22         I think based on what I'm hearing Mr. Buncher say, this
23 could be a protracted period of review, et cetera, with
24 respect to each of the parties that are seeking annulment of
25 the automatic stay. And I think everyone is of the view that

Page 32

1  these cases should be dismissed. They should be dismissed
2  immediately.
3          THE COURT: Well, I'm not sure everybody is of
4  that view, Mr. Weitman.
5          MR. WEITMAN: Pardon me. I would just say
6  Wells Fargo is of the view, forgive me, that these cases
7  should be dismissed. That if we keep the case alive to have
8  six evidentiary hearings as to the kinds of issues that
9  Mr. Buncher intends to bring before the Court --
10         THE COURT: Well, it's not Mr. Buncher. Other
11 parties, secured creditors.
12         MR. WEITMAN: The -- we have the issue of the
13 annulment of the automatic stay.
14         THE COURT: Yes.
15         MR. WEITMAN: And what was known and what was
16 not known by each of the entities, which would be, I believe,
17 a long evidentiary hearing.
18         THE COURT: But, Mr. Weitman, you know, you're
19 not telling me anything I don't know.
20         MR. WEITMAN: I would just ask Your Honor if
21 Your Honor would consider granting a dismissal immediately
22 and let everything else follow its course with what needs to
23 be done outside of bankruptcy.
24      Thank you.
25         THE COURT: And I'm sure that is your client's

Page 33

1  position. But I've got other people who are worried about
2  other things, too. So what's the -- I mean, I don't think I
3  can do anything today to deal with the annulment of the stay.
4  There are motions on file that the debtor is contesting some
5  of those motions. I think they've got to be heard. So I
6  don't know what parties want me to do. I am going to dismiss
7  this case. Whether I dismiss it today or in two weeks is
8  going to be dependent upon trying to minimize prejudice to
9  everyone. Everybody is in this case that I have found
10 shouldn't be in the situation they're in.
11        And so, Mr. Weitman, while I appreciate that Wells
12 Fargo would like the case to be dismissed today, I don't
13 think there is unanimity among the movants that that is
14 appropriate. So what is -- I mean, anybody got any
15 suggestions?
16        I mean, we could hear all of the annulled stays. I
17 don't know if I have time to add them all to the --
18 somebody's setting is the 28th. I don't know if I have time
19 to add all of them to that setting and to hold the dismissal
20 in abeyance until after that settling. I don't know.
21         MR. OLSON: Could I?
22         THE COURT: Please.
23         MR. OLSON: Your Honor, if you'll recall when
24 we were here last time, there was discussion of pushing the
25 motions to lift stay back to the 28th. Mr. Stromberg had

9 (Pages 30 to 33)

Page 34

1  gone first and had gotten a setting for his client on the
2  28th. And a couple of us, I've forgotten who the third
3  fellow was, said, Well, we'll get those on the 28th, as well.
4  Mr. Buncher said, Wait a minute. The Court's not going to
5  have time to hear three contested final hearings on the 28th.
6  So I have not set mine. But with the evidence that has come
7  in on February 3rd and today, particularly the stipulations,
8  it may be that we could try all of that on the 28th on just
9  the, what's your chronology on the 4th and let the Court take
10 it from there since the Court has found the bad faith. That
11 might help compress it. And I'd be willing to work toward
12 trying to get it all heard on one day.
13 I sympathize with Mr. Weitman. And, frankly, my client
14 doesn't want it to drag on, either. But we would like to
15 avoid re-posting, if we could.
16   THE COURT: Understood.
17   MR. STROMBERG: Your Honor, I echo the
18 sentiments from Mr. Olson. You know, in a case many years
19 ago in which Mr. Neligan's firm was involved where he was
20 representing the debtor, it was a trucking case, and Judge
21 Abramson asked me whether or not in that case we should just
22 give the parties the benefit of their bargain. And my
23 response to him was, Well, we've been subject to the
24 automatic stay and we didn't necessarily like it. Don't make
25 it any worse by pulling the wheels off at the last minute.

Page 35

1  And I ask the same of Your Honor here. I realize that we've
2  been here supporting dismissal. But on the other hand,
3  Mr. Kinvig did say in his opening remarks that he wanted
4  to -- he was alerting the Court to this issue and we had
5  filed our motions, respectively, to annul the automatic stay
6  well before the first hearing on February 3rd. So anything
7  that the Court can do to hear these motions before dismissal
8  occurs, before jurisdiction is gone, and before we suffer
9  additional prejudice as a result of the transactions that
10 brought us here in the first place, we would appreciate it.
11 Thank you.
12   MR. FRANKE: Your Honor, it sounds like my
13 time might be better served researching getting an expedited
14 motion on file, if I can do that for relief from stay for
15 Regions. I'd be willing to go forward with that on the 28th,
16 as well. And I'm more than happy to do that. I don't want
17 to delay it any longer than that.
18   MR. KINVIG: Your Honor, I'd echo what
19 Mr. Stromberg said without repeating it. We do not actually
20 have a hearing set currently. But we would be happy to do it
21 on the 28th. As I mentioned, because of the two branches of
22 sort of the annulment case law and us being on a much shorter
23 branch, as opposed to Mr. Olson, I think that we could really
24 get things done pretty quickly because it's -- there are
25 factual issues, but they're not many. And it's a pretty

Page 36

1  short subject to work through.
2    MS. HARTWICK: Your Honor. Jo Hartwick for
3  Petra. We, like Wells Fargo, Petra would like the case
4  dismissed immediately. But we can also appreciate that the
5  Court has to consider everybody's situation.
6  Thank you.
7    THE COURT: Thank you, Ms. Hartwick.
8  Please, Mr. Buncher.
9    MR. BUNCHER: Your Honor, just -- I would just
10 point out that we have agreements with counsel for I think
11 Mr. Stromberg and Mr. Kinvig for discovery to be taking
12 place, including a couple of depositions that have been
13 scheduled. And I'm not giving up my right to take that
14 discovery of the Trustee that was conducting the
15 foreclosure sale and a corporate rep --
16   THE COURT: Of course not. Until the case is
17 dismissed, you're free to do --
18   MR. BUNCHER: The only reason I'm bringing
19 this up is, we had agreement -- I think one of them is set
20 the 28th. But we had not agreed to set the others on the
21 28th only because it places potentially an undue burden on
22 our side to have to do a bunch of discovery by the 28th. But
23 whatever the Court sets as the time frame, we'll comply with
24 it. You know, I don't see why it's that big of a deal that
25 they re-post the properties for foreclosure, frankly.

Page 37

1    THE COURT: Because they're afraid your client
2  is going to try and put the properties back and file again,
3  is my guess.
4    MR. BUNCHER: I understand. And the Court has
5  ruled that the way they did it -- they shouldn't have done it
6  the way they did it. But as I said in my closing remarks,
7  there is -- first of all, the lenders are in no different
8  position as far as the foreclosures, and the timing, and what
9  happened if we had filed all of the different entities in the
10 bankruptcy. And so, you know, we will be considering whether
11 or not we're going to try to re-file something here.
12   THE COURT: Of course.
13   MR. BUNCHER: If they want the case dismissed,
14 the case should just be dismissed, is I guess my point. I
15 don't think we should have to keep doing work in a case that
16 the Court has dismissed.
17   THE COURT: Well, but the filing of the case
18 has caused these problems. And so the Court is going to deal
19 with them.
20 Here's what we're going to do. I'm not going to
21 dismiss the case today. I'm going to hear all of the motions
22 to annul on the 28th. And you all just pack your toothbrush
23 and your lunch, because it's going to be piecemeal. You have
24 25 minutes, whoever had the motion set on the 28th at 25
25 minutes, which was not much. We have 50 more minutes that

10 (Pages 34 to 37)

NATIONAL COURT REPORTERS (214) 651-8393
Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)
074a5ddc-2f03-4017-bb10-7707746b075f
Exhibit "A"

Page 38

morning. And then that afternoon we have our U.S. Trustee and our Chapter 13 docket. Ms. Durham's U.S. Trustee's docket is not terribly lengthy and often those things come off. So we'll just keep hearing it during the day, as best we can. I will tell you that I will take up my 13 docket at 2. And I have -- I will not know how many cases on are on that docket until about 1:00 that afternoon. So there might be 5 cases, there might be 40 cases. So we're just going to see what we can do. And I guess for lack of a better word, hope for the best. Hope that there will be enough time that day that we can hear the motions to annul.

So I've got motions to annul by Mr. Kinvig's client, Mr. Stromberg's client, Mr. Olson's client, Mr. Franke, you're going to file one?

MR. FRANKE: Yes, Your Honor.

THE COURT: Anybody else? Am I overlooking anybody else?

MR. WATSON: RMR Your Honor.

THE COURT: Come to the podium, Mr. Watson, please.

MR. WATSON: Jermaine Watson on behalf of RMR. We have a motion for stay relief on file, as well.

THE COURT: Well, but for what? Did you foreclose?

MR. WATSON: No, we did not foreclose.

Page 39

THE COURT: So what -- help me. You've got to tell me more.

MR. WATSON: I'm sorry. I'm sorry, Your Honor.

THE COURT: These are requests to annul the stay where the lender foreclosed prior to the bankruptcy, or the same day as the bankruptcy filing.

MR. WATSON: Yes. We had our sale posted, but we didn't foreclose.

THE COURT: You didn't foreclose.

MR. WATSON: We did not foreclose, Your Honor.

THE COURT: So there's nothing to worry about. Once the case is dismissed, you go do whatever you want to do.

MR. WATSON: Okay. Thank you.

THE COURT: The people that I'm concerned about are the people who took action either property or improperly and we'll figure that out.

MR. BUNCHER: What time is the first hearing?

THE COURT: 9.

Now, Mr. Warner, I don't know what to do with you. I think you need to talk to the debtor about where your cash collateral -- where your cash is, from your perspective and how much is left over from February, January and February.

MR. WARNER: As of what date? That's the

Page 40

problem.

THE COURT: Well, until the case is dismissed they have authority per your agreement to use cash -- to use your cash.

MR. WARNER: Right.

THE COURT: So I think there's also going to have to be a reconciliation. Now, ideally, I'm hoping that we'll be able to dismiss the case promptly following the hearing on the 28th. But --

MR. WARNER: And here's what I'll do, Your Honor. I will get with the debtor prior to the 28th and get the cash from us and cash out so that I'll know. And then on a daily basis we'll account so that the order I can give -- that the order that's given to the Court on dismissal includes a paragraph that reads, Cash in/cash out, net back to us.

THE COURT: Well, I'm not going to say yes to that. Obviously that will be your position that the order should say that. You need to talk to the debtor to see if the debtor is agreeable to that being a part of the order.

MR. BUNCHER: I would also --

MR. WARNER: I apologize, Mr. Buncher. But assume that the debtor is not agreeable. That's an issue to address at the time of the dismissal.

THE COURT: Of course. Yes.

Page 41

MR. WARNER: Thank you.

THE COURT: I mean, if the debtor doesn't agree, then we'll hear about objections to the form of the order at that 28th hearing.

MR. WARNER: Very good.

THE COURT: But in the mean time, I do want a proposed form of order circulated. And if there are problems, I want to hear about them before the 28th so that I have an opportunity to understand what the fuss about the form of the order is going to be prior to during the hearing itself.

MR. WARNER: As to my straightforward issue, I'll circulate proposed language to Mr. Buncher that would be asserted in whomever is drafting the dismissal order. And we'll either alert the Court that it's agreeable or it's not.

THE COURT: Perfect.

MR. WARNER: Thank you.

MR. WEITMAN: Your Honor, one question. With respect to the hearing on the 28th, are you then going to cover at the back end of the hearing the dismissal issues and how you intertwine that?

THE COURT: That's my thinking.

MR. WEITMAN: And is there an estimated time when that -- or I need to be there the whole day?

THE COURT: Well, I would hope not. But

11 (Pages 38 to 41)

Page 42

1  perhaps one of your colleagues can call you as we're winding
2  up on the annulment issues. Because, Mr. Weitman, I have no
3  idea. It may well be that we can finish this up quickly and
4  we'll reach it in the morning. It may well be that it's
5  tedious and we aren't going to reach it until later in the
6  afternoon. I just have no way of knowing right now.
7      MR. WEITMAN: Well, possibly Mr. Buncher, who
8  has been so kind during these proceedings, will notify me
9  before we get to that point with a little bit of notice.
10     Thank you.
11     MR. BUNCHER: I would only point out that we
12 have another cash collateral hearing on February 22nd,
13 because our current order expires at the end of February.
14 And, you know, I don't think anybody -- it's in anybody's
15 interest to have us unable to pay the operational expenses at
16 the properties if, for example, the Court doesn't enter an
17 order on February 28th finally disposing of the case. We
18 still may need to have some interim relief in that event. So
19 I just bring that to the Court's attention. We may be here
20 on the 22nd if we can't work something out. There --
21     THE COURT: It seems to me that -- I mean,
22 I'll just offer my view. It seems to me that we could
23 continue the interim order pending the conclusion of the
24 issues on dismissal.
25     MR. BUNCHER: And we'll get -- Mr. Crown can

Page 43

1  supply the March budgets to people. But, I mean, we can't
2  have a situation where we can't pay the bills on Fenton
3  Center, for example.
4      MR. WARNER: Your Honor, I'm happy to address
5  it with counsel and not do it here in front of the Court as
6  to what we do vis-a-vis March. Because if it's dismissed on
7  the 28th, I don't want to be having money out there.
8      THE COURT: Understood. Understood.
9      MR. WARNER: Nor do I want bills pre-paid.
10 Nor do I want expenses in advance of a budget. So we'll talk
11 about it. We have a hearing on the 22nd. Just so the
12 Court's aware, there's a hearing on March the 3rd on my
13 motion, as the Court is aware, to terminate exclusivity. So
14 if the Court wants to clean it calendar a little bit, given
15 that this case is being dismissed, I'm going to assume we're
16 not going to have that hearing. I'm going to assume that I
17 won't file my witness and exhibit list and all of that and
18 get prepared for it. So we'll consider that off, since the
19 Court has ruled that the case is being dismissed.
20     THE COURT: Fair enough.
21     MR. WEITMAN: Your Honor, if I may just
22 interject, only because there was a point Mr. Staber brought
23 up earlier. And that is that in order to dismiss, there may
24 need to be U.S. Trustee fees paid. It seems like the folks
25 that have the income, okay, that is the basis from which you

Page 44

1  calculate, as I understand it the U.S. Trustee's fees, if
2  there might be a line item for an allocation among the income
3  producing properties for the U.S. Trustee fees through the
4  date of dismissal.
5      THE COURT: Well, you all talk about that.
6  Clearly the U.S. Trustee fees are going to have to be dealt
7  with. And I think you all should talk about how you're going
8  to do that.
9      MR. WEITMAN: Okay. Thank you.
10     THE COURT: What else?
11     MR. BUNCHER: I'm sorry. I guess we are still
12 having -- we are still having a hearing on February 22nd
13 because there are open issues. I don't know if we're going
14 to get them resolved or not, Your Honor, on the cash
15 collateral.
16     THE COURT: I understand. I'm not taking that
17 one off the docket. My hope is though between now and then
18 you all will agree to an interim that gets us to the date of
19 dismissal. But if you don't, we'll have a contested hearing.
20 But --
21     MR. BUNCHER: Honestly, I think that
22 Mr. Warner and I should be able to work something out, I
23 would hope.
24     MR. WARNER: The Court's looking at me as if I
25 should respond.

Page 45

1      THE COURT: No, I'm not. I hear you. I wish
2  everybody could always work things out. Sometimes that
3  happens and sometimes it doesn't.
4      All right. Thank you all very much. We are in recess.
5  You're excused. I'm going to be out here a minute.
6      Thank you.
7      (End of Proceedings.)

12 (Pages 42 to 45)

NATIONAL COURT REPORTERS (214) 651-8393

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)

074a5ddc-2f03-4017-bb10-7707746b075f

Exhibit "A"

Page 46

```
 1              CERTIFICATE
 2       I, CINDY SUMNER, do hereby certify that the
 3   foregoing constitutes a full, true and complete transcription
 4   of the proceedings as heretofore set forth in the
 5   above-captioned and numbered cause in typewriting before me.
 6
 7
 8
 9
10
11
12
13
14
15          _____
            CINDY SUMNER, CSR #5832
            Expires 12-31-11
16          National Court Reporters
            116 Gettysburg Lane
17          Richardson, Texas 75080
            214-651-8393
18          Firm #417
19
20
21
22
23
24
25
```

*CERTIFIED DUPLICATE. The original certified Transcript file was electronically signed using Real Legal technology.*

13 (Page 46)

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)

074a5ddc-2f03-4017-bb10-7707746b075f

Exhibit "A"