Michael D. Warner, Esq., Texas Bar No. 00792304
Emily S. Chou, Esq., Texas Bar No. 24006997
**COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.**
A Professional Corporation
301 Commerce Street, Suite 1700
Fort Worth, Texas  76102
817-810-5250 Telephone
817-810-5255 Facsimile
mwarner@coleschotz.com
echou@coleschotz.com

Attorneys for Highland Capital Management, L.P., as Special Servicer

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| In re | : Case No. 11-42042-DML-11 |
| | : |
| FRE REAL ESTATE, INC., | : Chapter  11 |
| | : |
| Debtor. | : Hearing Date: April 13, 2011 |
| | : Hearing Time: 1:30 p.m. |
| | : |
| | : Related Docket no. 21 |

## OBJECTION OF THE SPECIAL SERVICER TO THE DEBTOR'S MOTION
## FOR AUTHORITY TO USE CASH COLLATERAL

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ................................................................................................ ii

I.      INTRODUCTION ................................................................................................... 1

II.     STATUS OF THE CASES AND JURISDICTION ............................................... 4

        A.      THE SECOND CHAPTER 11 CASE ..................................................... 4

        B.      THE FIRST CHAPTER 11 CASE .......................................................... 5

III.    FACTUAL BACKGROUND .................................................................................. 7

        A.      THE FENTON CENTRE .......................................................................... 7

        B.      THE LOAN DOCUMENTS ..................................................................... 9

        C.      THE JANUARY 2011 FORECLOSURES .............................................. 13

        D.      THE APRIL 2011 FORECLOSURES ...................................................... 14

IV.     LEGAL ANALYSIS .............................................................................................. 15

        A.      THE DEBTOR HAS NO INTEREST IN THE FENTON CENTRE
                RENTS/LEASES .......................................................................................... 15

        B.      EVEN ASSUMING, ARGUENDO, THAT THE RENTS/LEASES ARE
                PROPERTY OF THE DEBTOR'S ESTATE, THE DEBTOR HAS NOT
                DEMONSTRATED AND CANNOT DEMONSTRATE THAT THE
                SPECIAL SERVICER'S INTERESTS ARE ADEQUATELY
                PROTECTED ............................................................................................... 24

                (i)     The Special Servicer's Interests are Not Adequately Protected ............... 26

                (ii)    The Debtor Asserts the Existence of an Equity Cushion .......................... 30

                (iii)   The Debtor Has Not Proposed to Provide An Actual  Replacement
                        Lien To the Special Servicer .................................................................... 30

V.      RESERVATION OF RIGHTS .............................................................................. 32

VI.     CONCLUSION ...................................................................................................... 32

76332/0022-7509604v4

# TABLE OF AUTHORITIES

**Page(s)**

CASES

In re Amaravathi Ltd. P'ship, 416 B.R. 618 (Bankr. S.D. Tex. 2009) (Isgur, J.)...................21, 22

Bankwest, N.A. v. Todd, 49 B.R. 633 (D.S.D. 1985) ..................................................................29

Butner v. United States, 440 U.S. 48 (1979) .......................................................................16, 22

In re Buttermilk Towne Center, LLC, 442 B.R. 558 (9th Cir. BAP 2010) ..................................31

In re Cafeteria Operators, L.P., 299 B.R. 400 (Bankr. N.D. Tex. 2003) ..........................15, 16, 25

In re Dunes Casino Hotel, 69 B.R. 784 (Bankr. D. N.J. 1986)....................................................30

In re Elmira Litho, Inc., 174 B.R. 892 (Bankr. S.D.N.Y. 1994).................................................30

F.D.I.C. v. Int'l Prop. Mgmt., Inc., 929 F.2d 1033 (5th Cir. 1991) ..............................17, 18, 19, 23

In re Four Bucks, LLC, 2009 WL 1857432 (Bankr. N.D. Tex. June 29, 2009)..........16, 17, 18, 20

In re Four Seasons Marine & Cycle, Inc., 263 B.R. 764 (Bankr. E.D. Tex. 2001) .......................16

In re Jason Realty, L.P., 59 F.3d 423 (3d Cir. 1995) ...................................................................16

In re Las Torres Dev., LLC, 408 B.R. 876 (Bankr. S.D. Tex. 2009) (Bohm, J.)....................21, 23

Matter of Vill. Props., Ltd., 723 F.2d 441 (5th Cir. 1984)................................................16, 22, 23

In re Megan-Racine Assocs. Inc., 202 B.R. 660 (Bankr. N.D.N.Y. 1996)............................25, 30

In re Mosello, 195 B.R. 277 (Bankr. S.D.N.Y. 1996) .................................................................29

In re O.P. Held, Inc., 74 B.R. 777 (Bankr. N.D.N.Y. 1987)........................................................25

Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group,
    Inc.), 16 F.3d 552 (3d Cir. 1994) ...........................................................................................25

Richland Plantation Co. v. Justiss-Mears Oil Co., 671 F.2d 154 (5th Cir. 1982)........................19

Sharon Steel Corp. v. Citibank (In re Sharon Steel Corp.), 159 B.R. 165 (Bankr. W.D. Pa.
    1993) ......................................................................................................................................31

Taylor v. Brennan, 621 S.W.2d 592 (Tex. 1981) ................................................................18, 19

United Sav. Ass'n v. Timbers of Inwood Forest Assocs., 484 U.S. 365 (1988) ...................25, 31

## STATUTES

11 U.S.C. § 101(51B) ............................................................................................................4

11 U.S.C. § 361 ..............................................................................................................25, 30

11 U.S.C. § 363 ........................................................................................................15, 25, 32

11 U.S.C. § 363(a) ........................................................................................................15, 24

11 U.S.C. § 363(c) .............................................................................................................15

11 U.S.C. § 363(c)(2) .....................................................................................................16, 25

11 U.S.C. § 363(c)(4) ........................................................................................................32

11 U.S.C. § 363(e) .............................................................................................................25

11 U.S.C. § 363(p)(1) and (2) .......................................................................................25, 26

11 U.S.C. § 552(b)(1) ........................................................................................................31

11 U.S.C. § 1107(a) .............................................................................................................4

11 U.S.C. § 1108 ..................................................................................................................4

28 U.S.C. §§ 157 and 1334 .................................................................................................5

28 U.S.C. § 157(b)(2) ...........................................................................................................5

28 U.S.C. §§ 1408 and 1409 ...............................................................................................5

## OTHER AUTHORITIES

H.R. Rep. No. 599 ...............................................................................................................31

iii

To the Honorable D. Michael Lynn, United States Bankruptcy Judge:

Highland Capital Management, L.P. (the "Special Servicer"), the special servicer of the secured loan in the original principal amount of $62 million advanced to the Debtor, FRE Real Estate, Inc. (the "Debtor"), hereby objects (the "Objection") to the Debtor's Motion for Authority To Use Cash Collateral (the "Motion"), based upon the following facts and legal authority.

# I.
# INTRODUCTION[1]

1.      This Second Chapter 11 Case is an ill-conceived and bad faith attempt by the Debtor to derail the Special Servicer's foreclosure of the Debtor's real property in North Texas, commonly referred to as the Fenton Centre, and neither the Debtor nor the Fenton Centre have the ability to service the secured debt with which the property is encumbered.  The Special Servicer holds a valid mortgage lien on the Fenton Centre[2], which has been in default multiple times over the last two years and continuously for the last seven months.

2.      With absolutely no legitimate or reasonable strategy in place to satisfy its mortgage indebtedness – presently in excess of $60 Million – the Debtor now seeks this Court's countenance in delaying the Special Servicer's efforts to realize the benefit of its bargain and foreclose on its collateral under the guise of a purported reorganization effort.

---

[1]      Capitalized terms used in this Introduction are defined hereinbelow.  All references to Exhibits herein incorporate such exhibit into this Objection.  Each Exhibit has been Bates Stamped with numbers for the Court's convenience.

[2]      The Special Servicer also has liens on two other non-cash generating minor parcels of real property originally pledged as additional collateral by entities other than the Debtor, which are more fully addressed in ¶ 28, and Footnote 17, infra.

3.      The Fenton Centre has three significant infirmities that absolutely prohibit any ability to reorganize: (a) an appraised value of $39 Million (compared to a debt in excess of $60 Million); (b) an occupancy rate of approximately 50%, and (c) an absolute assignment of Rents/Leases prohibiting the Debtor from utilizing funds from the Fenton Centre to fund a reorganization.

4.      In reality, this Second Chapter 11 Case is a classic two-party dispute/bad faith filing initiated one (1) day before a scheduled foreclosure sale. [3]

5.      Further, and as noted above, because the Special Servicer holds a present and absolute assignment of the Rents/Leases from the Debtor, the Debtor lacks any ownership interest in the Rents/Leases.  As such, the income from the Fenton Centre is not cash collateral, thus requiring the denial of the Motion.  Given that there is absolutely no operating income that the Debtor can utilize to operate its business, the Second Chapter 11 Case is a sham for which no reorganization is possible whatsoever.

6.      In addition, even assuming, *arguendo*, that the Rents/Leases are property of the Debtor's estate (which is not the case), the Debtor has not demonstrated and cannot demonstrate that the Special Servicer's interests are adequately protected.

7.      To offset the use of the Special Servicer's cash flow from the Fenton Centre, the Debtor has offered the Special Servicer a replacement lien on post-petition Rents/Leases.  The Motion and the Budget offer no legitimate guidance on the Debtor's alleged creation of post-petition leases to which the Debtor has offered as replacement security.

---

[3]      Addressed below are certain historical events that: (i) preceded the filing of the Debtor's First Chapter 11 Case; (ii) occurred during the First Chapter 11 Case; and (iii) preceded the filing of this Second Chapter 11 Case.  These events clearly show the Debtor and its insiders/affiliates as they really are – entities that will go to all lengths, including acts taken in bad faith, to prevent the Special Servicer from realizing the benefit of it bargain with the Debtor.

2

8.      In recognition of the major hurdles the Debtor will have to face in this Second

Chapter 11 Case, and as a result of the dismissal less than two months ago of its First Chapter 11

Case, the Debtor took the unusual step, in an apologetic fashion, to file as part of the Petition

initiating the Second Chapter 11 Case, what it called a *Preliminary Statement* (the "Preliminary

Statement").  The Preliminary Statement and Footnote 2 to the Motion allude to a possible new

tenant for the Fenton Centre, as if to suggest that the new tenant will be the panacea that solves

all the Debtor's financial problems.  The contents of the Preliminary Statement and Footnote 2 to

the Motion will be addressed and shown to be nothing more than a continuation of what the

Debtor started well prior to the First Chapter 11 – a smoke and mirrors presentation with respect

to the "next big tenant" for the Fenton Centre that the Debtor has no reasonable prospects of

securing due, in part, to an inability to fund in excess of $3.5 Million for required tenant

improvements preceding the new lease.

9.      Further, as demonstrated below, there is no equity cushion in the Fenton Centre

(or the other collateral pledged to the Special Servicer).  Without question, the Debtor cannot

adequately protect the Special Servicer's interest as required by the Bankruptcy Code.

10.     Finally, the Debtor continues to act in bad faith, warranting a recognition that

reorganization is not a reality for the Debtor; rather, the Debtor's real intent is to continue to

interfere with, delay and hinder the Special Servicer from protecting and realizing the rights it

bargained for in connection with the loan made to the Debtor.[4]  Demonstrated throughout this

---

[4]      Two simple examples of inactions by the Debtor that should lead to the conclusion that
one of the Debtor's objectives is to delay the Special Servicer from exercising its rights against its
collateral are clear from the filing of the Second Chapter 11 Case.  First, while the Federal Rules of
Bankruptcy Procedure clearly permit a debtor to file its Schedules and Statement of Financial Affairs
within 15 days following the filing of the Petition (see FRBP 1007(c)) this Debtor knew, and in fact has
publically broadcasted since the dismissal of the First Chapter 11 Case, that it would file this Second
Chapter 11 Case to abruptly halt (which it did) the Special Servicers' foreclosure sales.  Rhetorically, it
must be asked, why the Debtor did not file Schedules and a Statement of Financial Affairs concurrent

Objection are multiple instances of events and actions of the Debtor that will show the Debtor as it really is – an instrumentality of its insiders and affiliates having no legitimate ability to reorganize the Fenton Centre. The Special Servicer respectfully requests that the Court deny the Motion in its entirety.

## II.
## STATUS OF THE CASES AND JURISDICTION

### A.    THE SECOND CHAPTER 11 CASE

11.    On April 4, 2011 (the "Petition Date"), the Debtor filed its voluntary petition initiating this case (the "Second Chapter 11 Case"). This is the second Chapter 11 Petition filed by the Debtor within a 3-month period. The Debtor's first chapter 11 case (the "First Chapter 11 Case")[5] was filed on January 4, 2011, and dismissed by the Honorable Barbara J. Houser, United States Bankruptcy Judge for the Northern District of Texas, Dallas Division ("Judge Houser"), as a bad faith filing on February 17, 2011.

---

with the filing of its Petition. Surely it is not for a lack of knowing that a Petition would be filed or that Schedules and a Statement of Financial Affairs are necessary. Second, and equally *telling* of the Debtor's motives, is the fact that the Debtor failed to designate this Second Chapter 11 Case as a *Single Asset Real Estate* case pursuant to Section 101(51B) of the Bankruptcy Code on the face page of the Debtor's Petition. The significance of this seemingly minor point is that the First Chapter 11 Case was dismissed, based, *inter alia*, upon findings by Judge Houser that the nature of the various entities *rolled-up* into the Debtor were *Single Asset Real Estate* cases. See discussion in § II.B., infra. By not checking the box, concurrent with the filing of the Second Petition, the *clock does not start to run* on the unique obligations and duties imposed upon a Single Asset Real Estate case and its debtor, until such designation is made by the Debtor or ordered by the Court. Thus, by delaying the inevitable confirmation that the Debtor's Second Chapter 11 Case is a single asset real estate case, the Debtor delays, in bad faith, its obligations under the Bankruptcy Code.

[5]    The First Chapter 11 Case was assigned Case number 11-30210-BJH-11. The Debtor's Street Address on the Petition initiating the First Chapter 11 case was 1750 Valley View Lane, Suite 400, Dallas, Texas. The Debtor's Street Address on the Petition initiating the Second Chapter 11 case was 6731 Bridge Street, Suite 372, Fort Worth, Texas.

4

12.     Since the Petition Date, the Debtor has remained in possession of its assets and continues to operate its business as a debtor in possession pursuant to Section 1107(a) and 1108 of the Bankruptcy Code.  No official committee of unsecured creditors has been appointed in the Second Chapter 11 Case.  Further, no trustee or examiner has been appointed.

13.     This Court has jurisdiction over the Motion pursuant to, *inter alia*, 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this District and before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### B.     THE FIRST CHAPTER 11 CASE

14.     In direct response to the Special Servicer's foreclosure sale of the Fenton Centre (and its two other parcels of collateral), scheduled for January 4, 2011, TCI Park West II, Inc. ("Park West"), now known as FRE Real Estate, Inc., the Debtor herein, and its insiders/affiliates embarked on a campaign to intentionally delay the Special Servicer's exercise of its enforcement rights and orchestrated multiple transactions to intertwine the properties and assets of multiple single asset real estate entities.

15.     More specifically, as the Debtor admitted in the First Chapter 11 Case, multiple parcels of real property, owned by entities other than the Debtor, many of which were subject to foreclosure sales scheduled on January 4, 2011, were transferred to the Debtor on the eve of the filing of the First Chapter 11 Case to thwart the scheduled foreclosure sales.[6]  Through the machinations of the Debtor's insiders/affiliates, the foreclosure sales were abruptly halted through the filing of a single Chapter 11 case.  Some, but clearly not all, of the actions of the

---

[6]     See **Exhibit A**, which was filed in the First Chapter 11 Case by the Debtor as an Exhibit in connection with the motions to dismiss, consisting of a *before and after roll-up organizational chart*, which clearly demonstrates the lengths to which this Debtor, and its insiders/affiliates have gone to convolute their business operations.  The Exhibit was number 191 and was admitted into evidence by Judge Houser.

Debtor and its insiders/affiliates that rose to the level of bad faith, as found by Judge Houser, would not have existed had each of the transferor entities (the insiders/affiliates) simply addressed its own respective financial structures using whatever legal rights they possessed.  In other words, each individual transferor could have resorted to its respective rights and filed its own respective Chapter 11 cases –but they did not.

16.     **The numbers spoke for themselves - - 38 properties, owned by at least 19 different entities, that affect 11 different secured lenders, were transferred to the Debtor on the eve of the filing of the First Chapter 11 Case**.

17.     The backlash of this unfathomable roll-up of properties was two motions to dismiss and multiple joinders.  Following two days of hearings, Judge Houser dismissed the First Chapter 11 Case[7].  In connection with the hearings on the motions to dismiss, Judge Houser made numerous findings and statements, many of which are directly relevant to this Motion, and the Debtor (in its currently re-constituted form) including:

> a.     "I'm also troubled because of what I believe to be essentially a lack of independent parties.  All of the assets are operated by essentially independent contracts.  That prior to the orchestrated transfer and subsequent, continued to work for Transcontinental Realty Investors, Inc., American Realty Trust, Inc., and Income Opportunity Realty Investors."[8]

---

[7]     See generally, Ruling on Motions to Dismiss, Transcript of February 17, 2011 (**Exhibit B**) and Hearings on Motions seeking the annulment of the Automatic Stay, Transcript of February 28, 2011 (**Exhibit W**), both in the First Chapter 11 Case, and filed as Docket nos. 177 and 187, respectively.

[8]     Ruling on Motions to Dismiss, Transcript of February 17, 2011 (**Exhibit B**) at 10:7 – 12, Bates 14.  As of this moment there is no reason to believe that the same individuals, entities, insiders and affiliates will not continue to control the Debtor.

6

b.    "Mr. Morgan is also of concern, but in a slightly different way. … But, again, I have to say that the structure of his involvement is odd.  There's no money to pay him."[9]

c.    "But my point being is there's no way to return those secured lenders to the position that they would have enjoyed had these orchestrated transfers not occurred."[10]

### III.
### FACTUAL BACKGROUND

**A.    THE FENTON CENTRE**

18.    The Fenton Centre is located in Farmers Branch, Dallas County, Texas, and consists of four tracts of land totaling 33.035 acres located at the northwest corner of LBJ Freeway and Luna Road.  Two of the tracts are improved with the Fenton Centre office improvements, one tract contains 12.47 acres of common area land, and the fourth tract contains 4.70 acres (considered to be excess land).  The improved portion of the land consists of two four-story office buildings containing a total of 696,458 net rentable square feet commonly known as Fenton Centre I and II.  The foregoing four tracts and the two office buildings are referred to herein as the "Fenton Centre".

---

[9]    Ruling on Motions to Dismiss, Transcript of February 17, 2011 (**Exhibit B**) at 12:3 – 6, Bates 16.  The Debtor's Preliminary Statement provides for the potential retention of Mr. Doyle, as the Debtor's *restructuring officer.*  Preliminary Statement, at ¶ 3.  As there is no free and clear cash, and the Rents/Leases are not cash collateral that the Debtor can use, there is no source of payment of Mr. Doyle.  As of this date the Debtor has not sought the Court's approval of Mr. Doyle's employment, likely because, *inter alia*, it does not have the financial wherewithal to compensate him.  It further appears that there is *no line* item for the compensation of Mr. Doyle in the Budgets attached as Exhibits A or B to the Motion.

[10]    Ruling on Motions to Dismiss, Transcript of February 17, 2011 (**Exhibit B**) at 7:10 – 12, Bates 11.  As noted in Footnote 17, infra, the Debtor has not *un-rolled* all of the properties transferred into the Debtor prior the First Chapter 11 Case, and thus continues to have the same infirmities present in the First Chapter 11 Case.

19.     As of January 20, 2011, the Rent Roll[11] for the Fenton Centre was:

| | FENTON CENTRE I | FENTON CENTRE II | TOTAL |
|---|---|---|---|
| **TOTAL SQUARE FOOTAGE** | 351,080 | 345,378 | 696,458 |
| **TOTAL OCCUPIED SQUARE FEET** | 162,300 | 192,485 | 354,785 |
| **TOTAL VACANT SQUARE FEET** | 188,780 | 152,893 | 341,673 |
| **PERCENTAGE OCCUPIED** | 46.23% | 55.73% | 50.94%[12] |

20.     The Fenton Centre was appraised on November 17, 2010, for $39,295,000 (the "Fenton Appraisal")[13].  A true and correct copy of the Fenton Appraisal is attached as **Exhibit D**[14].  In contrast the Debtor asserts – without any evidence - that the Fenton Centre is "worth approximately $67,000,000".  Motion, at ¶ 4.

21.     In addition, the Debtor asserts that the *Three Hickory Tract* (defined herein as the *Income Realty Property* – see ¶ 28, infra) is "worth approximately $1,250,000."  Motion, at ¶ 4. These baseless assertions demonstrate the Debtor's utter disregard for the truth.  As recent as

---

[11]      See **Exhibit C** attached hereto and incorporated herein by this reference.

[12]      The Motion confirms that the Fenton Centre is "approximately 51% leased".  Motion, at ¶ 3.

[13]      To be more precise, the Fenton Appraisal encompasses <u>all</u> of the collateral for the obligations owed to the Special Servicer, and not just the Fenton Centre.  See Fenton Appraisal, at pg. 2, Bates 28.  See also ¶ 28 herein and Footnote 17, infra.

[14]      During the First Chapter 11 Case and in connection with the Debtor's efforts to defend the various motions to dismiss the First Chapter 11 Case, the Debtor sought from all secured lenders, including the Special Servicer, copies of appraisals with respect to such secured lender's respective collateral.  As part of the exhibits offered by the Debtor, and admitted by the Court, were the appraisals of various parcels of real property owned by the Debtor (the parcels included in the roll-up).  The Debtor used these appraisals to suggest to the Court that equity exists in the properties and thus the Debtor should be given the opportunity to attempt to reorganize.  Conspicuously absent from the group of appraisals admitted into evidence by the Debtor was the Fenton Appraisal (**Exhibit D**, hereto), notwithstanding that the Fenton Appraisal was promptly provided to the Debtor in response to its request for production. When asked why the Debtor did not include the Fenton Appraisal in the exhibits presented to the Court, the Debtor's counsel stated that the Fenton Appraisal demonstrated that there is no equity in the Fenton Centre and thus did not suit the Debtor's purpose in presenting appraisals to the Court.  Nevertheless, the Debtor failed to present any appraisal with respect to the Fenton Centre building in connection with the First Chapter 11 Case.

March 14, 2010, the Debtor's Vice President, Richard David Morgan ("Mr. Morgan"), responded to the question: "Does FRE consider the price of $600,000 for the Property reasonable and acceptable under the circumstances?" by stating "Yes under the circumstances".  The "Property" in question was the Income Realty Property (the Three Hickory Tract), which the Debtor now, less than 30 days later, states is "worth approximately $1,250,000."  Again, such valuation is completely without any support whatsoever.

22.    Notably, the Motion is void of any reference of an appraisal for the Fenton Centre.  Notwithstanding the Debtor having no appraisal for the Fenton Centre, the Debtor somehow asserts, without any factual support, that there is an *equity cushion* to protect the Special Servicer of "approximately $8,000,000".  Motion, at ¶ 5.  No evidence is provided to support such an assertion.  Further, as discussed below, the Debtor asserts that it is on the verge of having a new tenant that will result in an improved Rent Roll and increased value.  Motion, at Footnote 2.  The Special Servicer does not believe the new tenant is a likely reality, as addressed in ¶¶ 66 and 67, infra.

### B.    THE LOAN DOCUMENTS

23.    On January 19, 2007, NexBank, SSB ("NexBank" or "Lender") advanced a loan in the original amount of $62 million (the "Fenton Loan") to TCI Park West II, Inc. ("Park West"), now known as FRE (the Debtor herein), in connection with Park West's purchase of real property located off the LBJ Freeway in Farmers Branch, Texas, consisting of land and approximately 700,000 square feet of commercial office space known as the Fenton Centre.

24.    As of March 23, 2011, the Lender is owed no less than $60,044,335.93 (exclusive of legal fees, costs, expenses and other items) pursuant to the terms of the Fenton Loan

Documents (as defined below).  Based upon the Fenton Appraisal ($39,295,000), it is clear that the Lender is undersecured by at least $20 million.

25.     The Fenton Loan was evidenced by a Promissory Note dated January 19, 2007, (the "Fenton Note") and Loan Agreement dated January 19, 2007 (the "Fenton Loan Agreement").  True copies of the Fenton Note and the Fenton Loan Agreement are attached as **Exhibits F** and **G**, respectively.  The Fenton Loan Agreement appointed NexBank, a state savings bank, as the administrative agent (the "Fenton Agent") for the Fenton Loan and gave the Fenton Agent the right to pursue remedies under, *inter alia*, the Fenton Loan Agreement.  As the Fenton Agent, NexBank delegated certain Fenton Loan administration responsibilities to the Special Servicer, including the right to pursue remedies on the Lender's behalf.

26.     In connection with the Fenton Loan transactions, Park West executed and delivered a Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Filing (the "Fenton Deed of Trust") that granted the Fenton Agent, among other things, a security interest in Fenton Centre[15].  A true copy of the Fenton Deed of Trust is attached as **Exhibit H**.  To further secure the Fenton Loan, Park West's parent, Transcontinental Realty Investors, Inc. ("Transcontinental"),[16] executed and delivered a Guaranty Agreement (the "Guaranty") in favor of the Fenton Agent, which obligated Transcontinental to guaranty the entire repayment of the Fenton Loan to the Fenton Agent on behalf of the Lender.  A true copy

---

[15]     The Fenton Deed of Trust is *all inclusive*, in that it addresses, *inter alia*, the: (a) Deed of Trust, (b) the Security Agreement, (c) the Assignment of Leases and Rents, and (d) the Fixture Filing. The foregoing is important when considering the absolute assignment in favor of the Special Servicer, as address in Section IV.A., infra, since all concepts and provisions are integrated into one document.

[16]     Transcontinental is one of numerous entities that transferred certain real property to the Debtor in connection with the roll-up, prior to the filing of the First Chapter 11 Case.  Transcontinental is a publicly traded entity that Judge Houser acknowledged to have "sophistication".  Ruling on Motions to Dismiss, Transcript of February 17, 2011 (**Exhibit B**) at 3:9, Bates 7.

of the Guaranty is attached as **Exhibit I**.  The Fenton Loan Agreement, the Fenton Note, the Fenton Deed of Trust, the Guaranty and all other related Fenton Loan documents and agreements, including amendments thereto, are collectively referred to herein as the "<u>Fenton Loan Documents</u>."

27.    On January 31, 2009, the Fenton Loan matured and all amounts under the Fenton Loan became due and payable.  The Special Servicer requested that Park West fulfill its obligations under the Fenton Loan Documents and pay off the Fenton Loan, which at the time totaled $62,235,244.79.  Park West failed and refused to satisfy its obligations pursuant to the terms of the Fenton Loan Documents.

28.    On May 1, 2009, after the parties engaged in extensive negotiations regarding a modification of the Fenton Loan, the parties entered into a Loan Modification Agreement (the "<u>First Fenton Loan Modification</u>"), which afforded Park West with additional time to repay the Fenton Loan.  A true copy of the First Fenton Loan Modification is attached as **Exhibit J**.  In connection with the First Fenton Loan Modification, Transcontinental and Income Opportunity Realty Investors, Inc. ("<u>Income Realty</u>"),  another insider/affiliate of the Debtor, executed and delivered a Deed of Trust (the "<u>Fenton Supplement Deed of Trust</u>") in favor of KeyCorp Real Estate Capital Markets, Inc. (as agent for the Lender), granting a security interest in certain parcels of land known as: (i) Thermalloy Building, Lot 1 of Kennington Square Addition, Farmers Branch, Texas (the "<u>Transcontinental Property</u>"); and (ii) Three Hickory Addition, Lot 1, Block A, Farmers Branch, Texas (collectively, the "<u>Income Realty Property</u>").[17]  A true copy of the Fenton Supplemental Deed of Trust is attached as **Exhibit K**.[18]

---

[17]      The Transcontinental Property and the Income Realty Property were both transferred to the Debtor, as part of the roll-up of assets, preceding the First Chapter 11 Case.  The Transcontinental Property and the Income Realty Property were <u>not</u> transferred back to their respective original owners in the intervening period between the dismissal of the First Chapter 11 Case and the filing of the Second

29.     Shortly after the execution of the First Fenton Loan Modification, Park West defaulted on its obligations.  After a series of additional discussions and negotiations, the parties agreed to a second modification of the Fenton Loan (the "Second Fenton Loan Modification") executed on September 15, 2009.  A true copy of the Second Fenton Loan Modification is attached as **Exhibit L**.  The Second Fenton Loan Modification extended the Fenton Loan term to April 1, 2010, (with an optional extension to April 1, 2011, subject to certain conditions), and required Park West to enter into a contemporaneous Cash Management Agreement (the "CMA")[19] in exchange for the Special Servicer's agreement to cease reposting the foreclosure sale, which had previously been scheduled for June 2, 2009.  A true copy of the CMA is attached as **Exhibit M**.

30.     Only weeks after signing the CMA and while it was in the process of being implemented, Park West again defaulted on the Fenton Loan obligations by, among other things,

---

Chapter 11 Case, as was done with respect to in excess of 30 other parcels of property.  The Preliminary Statement provides, as an excuse, that both properties are "mortgaged to NexBank as security for the same loan" and thus implies that the failure to *un-roll* those two properties was reasonable.  The Special Servicers disagrees and asserts that the roll-up structure found to be bad faith (among other grounds) by Judge Houser did not exempt these two properties, just because they constitute collateral for an obligation owed by another entity.  The Debtor's bad faith continues to be evident, by the failure to *un-roll* these two properties from the Debtor's title.  See also, Footnote 4, supra.

[18]     The Special Servicer's collateral consists of: (1) the Fenton Centre, which includes the adjacent vacant 4.7 acres of undeveloped land referred to in the Motion as the "Adjacent Land", Motion, at ¶ 3 (all of which was owned by the Debtor prior to the roll-up); (2) the Transcontinental Property, referred to in the Motion as the "Three Hickory Tract", Motion, at ¶ 3 (owned by Transcontinental prior to the roll-up); and (3) the Income Realty Property, referred to in the Motion as the "Thermalloy Building", Motion, at ¶ 3 (owned by Income Realty prior to the roll-up).  See **Exhibit A**.  The Fenton Appraisal (**Exhibit D**) values all collateral at $39,295,000.  In contrast, the Motion, without evidence, provides, at ¶ 4: (a) the Fenton Centre is "worth approximately $67,000,000"; (b) the Transcontinental Property is "worth approximately $1,250,000"; and (c) the Income Realty Property is "worth approximately $1,790,000", for an aggregate of $70,040,000.

[19]     The CMA was a critical component of the Second Fenton Loan Modification and served as the primary inducement for the Special Servicer's agreement to enter into the Second Fenton Loan Modification in lieu of reinitiating foreclosure.  The CMA, among other things, required Park West to direct all payments from the tenants of the Fenton Centre to a bank account controlled by the Special Servicer.

12

failing to make a $450,000 payment to the "Operating Expense Reserve" established under the CMA.  By April 1, 2010, Park West again faced the maturing of the Fenton Loan and all amounts coming due.  Instead of making an additional principal payment to obtain an automatic one-year extension, however, Park West elected to cause further defaults under the Loan Documents.

31.     Nevertheless, Park West requested that the Special Servicer refrain from foreclosing on the Fenton Centre and provide Park West with an opportunity to cure the defaults and extend the term of the Fenton Loan.  The Special Servicer required Park West to make a principal reduction payment before agreeing to extend the Fenton Loan yet another time, but Park West again indicated that it was unable to make such payment.  In an effort to resolve the dispute, the Special Servicer agreed to modify the CMA to provide for monthly principal reduction payments in lieu of requiring a lump sum payment to extend the term of the Fenton Loan.  As a result, the parties modified the Fenton Loan Documents for a third time, effective April 1, 2010, (the "Third Fenton Loan Modification").  A true copy of the Third Fenton Loan Modification is attached as **Exhibit N**.  In connection with the Third Fenton Loan Modification, Park West agreed, among other things, to extend the maturity date to April 1, 2012, and to enter into an amended and restated CMA (the "Amended CMA").  A true copy of the Amended CMA is attached as **Exhibit O**.

## C.     THE JANUARY 2011 FORECLOSURES

32.     In light of Park West's persistent breaches and continued monetary defaults under the Fenton Loan Documents, the Special Servicer accelerated the entire indebtedness by letter dated October 6, 2010.  On October 8, 2010, the Special Servicer provided Park West with notice of the foreclosure sales scheduled for November 2, 2010, which sales were adjourned to January

13

4, 2011.   True copies of the October 6, 2010 and October 8, 2010 letters (collectively, the "**Notice Letters**") are attached as **Exhibits P** and **Q**, respectively.

33.     In addition, on December 7, 2010, the Special Servicer filed an action in the District Court of Dallas County, Cause No. DC-10-15755-F (the "State Court Action"), against Park West, Transcontinental and various insiders/affiliates for breach of contract, fraud, tortuous interference and related claims.   A detailed description of Park West's defaults, misappropriation of Rents and other wrongful actions is set forth in the Special Servicer's Amended Petition in the State Court Action, which was filed on March 2, 2011 and is attached as **Exhibit R.**[20]

34.     The January 4, 2011, foreclosure sales were abruptly halted by the filing of the First Chapter 11 Case on the morning of January 4, 2011, mere moments before the scheduled sales.

### D.     THE APRIL 2011 FORECLOSURES

35.     The dismissal of the First Chapter 11 Case permitted the Special Servicer to re-notice the foreclosure sales for April 5, 2011.   A true copy of the notice rescheduling the foreclosure sales are attached hereto as **Exhibit S**.

36.     The Second Chapter 11 Case was filed on the evening of April 4, 2011 to avoid foreclosure yet again.

37.     It is clear from the historical relationship with the Debtor that the Debtor will go to great lengths to prevent the Special Servicer from prosecuting its rights and remedies pursuant to the express terms of the Fenton Loan Documents and applicable law.

---

[20]     The historical recitation of facts within the Amended Petition filed in the State Court Action is replete with contractual breaches and misuse of the Lender's collateral demonstrating a pattern of intentional delays and actions designed to hinder the Lender from realizing on its collateral.

14

# IV.
# LEGAL ANALYSIS

## A.   THE DEBTOR HAS NO INTEREST IN THE FENTON CENTRE RENTS/LEASES

38.   The Court should prohibit the Debtor from using the Rents from, and the Leases[21]

of, the Fenton Centre (collectively the "Rents/Leases"), because the Debtor has no interest in the

Rents/Leases.   Section 363 of the Bankruptcy Code governs a debtor's ability to use cash

collateral.   11 U.S.C. § 363.   Specifically, Section 363(c) provides, *inter alia*:

> (1)   If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the trustee [or debtor-in-possession] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

> (2)   The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—

> (A)   each entity that has an interest in such cash collateral consents; or

> (B)   the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

Pursuant to Section 363(a), "cash collateral" is:

> cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents or profits of property,. . . whether existing before or after the commencement of a case under this title.

---

[21]   The terms "Rents" and "Leases" are defined in the Fenton Deed of Trust (**Exhibit H**), at §§ 1.1(aa), and 1.1(q), respectively, Bates 293 and 290, respectively.

76332/0022-7509604v4

39.     A debtor must own an interest in rents to be authorized to use them as cash collateral pursuant to Section 363(c) of the Bankruptcy Code.  See 11 U.S.C. § 363(a) (defining cash collateral as "cash … in which the estate and an entity other than the estate have an interest"); In re Cafeteria Operators, L.P., 299 B.R. 400, 403 (Bankr. N.D. Tex. 2003); see also In re Jason Realty, L.P., 59 F.3d 423 (3d Cir. 1995) (holding that rents in which debtor has no interest, such as those subject to an absolute assignment, are not available as cash collateral).  If rents are deemed cash collateral, a debtor may only use such cash collateral if it obtains either the consent of the affected creditor or authorization from the Court.  See 11 U.S.C. § 363(c)(2); Cafeteria Operators, 299 B.R. at 403; In re Four Seasons Marine & Cycle, Inc., 263 B.R. 764, 768 (Bankr. E.D. Tex. 2001).

40.     Whether a debtor owns an interest in rents is determined according to state law. See Butner v. United States, 440 U.S. 48, 54 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law."); Matter of Vill. Props., Ltd., 723 F.2d 441, 445 (5th Cir. 1984); In re Four Bucks, LLC, 2009 WL 1857432, *1 (Bankr. N.D. Tex. June 29, 2009).  Further, "[a]ssignments of rents are interests in real property and, as such, are created and defined in accordance with the law of the situs of the real property." Jason Realty, 59 F.3d at 427 (citing Butner, 440 U.S. at 55).  Accordingly, Texas state law governs whether the Debtor owns an interest in the Fenton Centre Rents/Leases.

41.     The Debtor has no right to use any of the Rents/Leases of the Fenton Centre to pay any expense or make any adequate protection payment, because the Debtor absolutely and unconditionally assigned all of the Rents/Leases from the Fenton Centre to the Lender.  The Fenton Deed of Trust (**Exhibit H**) provides:

ASSIGNMENT OF RENTS AND LEASES

> 10.1   <u>Assignment of Rents, Profits, etc</u>.   All of the Rents are
> hereby absolutely and unconditionally assigned to Beneficiary, to
> be applied by Beneficiary in payment of the Indebtedness.
> Notwithstanding any provision of this Deed of Trust or any other
> Loan Document which might be construed to the contrary, the
> assignment in this Paragraph 10.1 is an absolute assignment and
> not merely a security interest.  However, Beneficiary's rights as to
> the assignment shall be exercised only upon the occurrence of an
> Event of Default.  Prior to the occurrence of an Event of Default,
> Grantor shall have a license to collect and receive all Rents as
> trustee for the benefit of Beneficiary and Grantor, and Grantor
> shall apply the funds so collected first to the payment of the
> Indebtedness in such manner as Beneficiary elects and thereafter to
> the account of Grantor.   Notwithstanding anything contained
> herein to the contrary, no part of the Property will be leased
> without the prior written consent of the Beneficiary, which consent
> may be granted or withheld in the sole discretion of the
> Beneficiary.

Fenton Deed of Trust (**Exhibit H**), pg. 30, Bates 317.

42.     Because the Debtor's license to collect the Fenton Centre Rents/Leases was

revoked upon the Debtor's default under, *inter alia*, the Fenton Deed of Trust (<u>see</u> ¶ 50, <u>infra</u>),

the Debtor is not entitled to use the Rents/Leases from the Fenton Centre as cash collateral

pursuant to controlling case law.  <u>See</u> <u>F.D.I.C. v. Int'l Prop. Mgmt., Inc.</u>, 929 F.2d 1033, 1035-36

(5th Cir. 1991) (holding that absolute assignment of rents clause in a deed of trust passed

immediate title to the rents to the secured lender, subject to postponement of enjoyment of the

rent proceeds until the mortgagor defaults); <u>In re Four Bucks, LLC</u>, 2009 WL 1857432 (Bankr.

N.D. Tex. 2009) (holding that where the debtor absolutely assigned rents to the secured creditor,

no interest in the rents passed to the debtor's estate and the debtor could not properly use the

rents as cash collateral).

43.     Pursuant to Texas law, there are two recognized forms of assignments of rents:

collateral and absolute.  A "collateral" assignment is akin to a traditional secured transaction in

that the "assignment of rentals does not become operative until the mortgagee obtains possession

of the property, or impounds the rents, or secures the appointment of a receiver, or takes some

other similar action."  Essentially, this requires that the lender take some affirmative act or step

in order to effectuate its rights under the assignment.  Taylor v. Brennan, 621 S.W.2d 592, 594

(Tex. 1981).

44.    In contrast, an "absolute" assignment, instead of creating a security interest,

passes title to the rents "automatically upon the happening of a specified condition, such as

default."  Id.  Unlike a collateral assignment, an absolute assignment allows a lender to enforce

its rights the moment that such a default or other pre-condition is satisfied.

45.    Determining whether an assignment of rents is collateral or absolute hinges upon

the intent of the parties, evidenced by the terms and language of the instruments by which the

rents have been assigned.  Id.  There is a presumption under Texas law that parties intend to

effectuate a collateral assignment.  However, this presumption may be overcome by a showing

from the lender of "especially clear evidence that an absolute assignment was the intent of the

parties to the agreement."  Four Bucks, 2009 WL 1857432, at *2 (quoting F.D.I.C. v. Int'l Prop.

Mgmt., Inc., 929 F.2d 1033, 1036 (5th Cir. 1991)).

46.    In Four Bucks, this Court identified four (4) factors which courts should analyze

in determining whether parties intended to effectuate an absolute assignment: (i) a statement of

such intent to absolutely assign the rights to the rents, effective at the present; (ii) a statement of

obligation by the borrower to collect rent payments solely for the lender's benefit; (iii) clause or

provision in the assignment that eliminates any duty of the lender to bring a legal action to

assume control of the rents; and (iv) "a clause referencing the automatic transfer of rights,

interests, estates, or rents upon a specified condition, normally a default."  Four Bucks, 2009 WL

1857432, at *2 (internal citations omitted).  Moreover, it is not necessary that all four of these factors be present, as they are merely a set of factors which a court should consider in determining "intent" of the parties.  Id.  It should also be noted that documents signed contemporaneously (such as would be the case with a promissory note, loan, deed of trust and an assignment of rents) should be construed together in order to ascertain the parties' true intent.  See Richland Plantation Co. v. Justiss-Mears Oil Co., 671 F.2d 154, 156 (5th Cir. 1982); Taylor, 621 S.W.2d at 594.

47.      Here, the Fenton Deed of Trust (**Exhibit H**) confirms that the assignment of the Rents/Leases is absolute and unconditional and that the Debtor was merely afforded a license to collect the Rents/Leases for the benefit of the Lender until an event of default.

48.      Specifically, the express and unambiguous language in Paragraph 10.1 of the Fenton Deed of Trust unequivocally confirms the intent of the parties to create an absolute assignment of Rents/Leases and satisfies each of the four factors identified by this Court in Four Bucks.  Paragraph 10.1 of the Fenton Deed of Trust confirms that: (i) the Rents/Leases are absolutely and unconditionally assigned to the Lender; (ii) the Debtor granted a license to collect the Rents/Leases as trustee for the benefit of the Lender; (iii) the Lender is not required to institute legal action to exercise their rights as to the assignment of their Rents/Leases; and (iv) the Lender's rights as to the assignment of the Rents/Leases are automatic upon the Debtor's default.

49.      Under this framework, upon execution of the Fenton Deed of Trust, a present transfer was granted to the Lender, even though the enjoyment of that transfer would be deferred until a default event occurred.  See F.D.I.C. v. Int'l Prop. Mgmt., 929 F.2d at 1035 ("Thus,

although the lender's rights arise immediately, the assignment defers the lender's enjoyment of those rights until the borrower's default.").

50.     The Debtor's defaults were numerous and culminated (the last time) in the issuance of the Notice Letters.  Pursuant to the Notice Letter of October 6, 2010 (**Exhibit P**), the Fenton Note was accelerated and all indebtedness due under the Fenton Note became fully due and payable.  The Notice Letter of October 8, 2010 (**Exhibit Q**), provides, in pertinent part as follows:

> Borrower is hereby advised that as a result of the default under the Deed of Trust, Mortgage Servicer, on behalf of Mortgagee, has revoked Borrower's license pursuant to Section 10.1 of the primary Deed of Trust and the Additional Deed of Trust to collect and receive Rents (as define in the Deed of Trust).  Accordingly, Mortgage Servicer, on behalf of Mortgagee, hereby demands that Borrower pay over to Mortgage Servicer all Rents received by Borrower immediately upon receipt thereof by Borrower.
>
> **Exhibit Q**, Notice Letter, October 8, 2010, at pg. 3, Bates 542.

51.     In <u>Four Bucks</u>, this Court held that the debtor had no rights to the rents based upon the express language in the assignment of rents, which is almost identical to the assignment language contained in the Deed of Trust executed by this Debtor.  There, the deed of trust stated that the "[Debtor] hereby absolutely and unconditionally assigns and grants to Lender all rights to and interest in the Leases and other property."  <u>Four Bucks</u>, 2009 WL 1857432, at *2.  The debtor was also granted a license to collect the rents generated from the property, which license would automatically terminate upon the occurrence of a default.  This Court, after reviewing the language of the loan documents in their totality to ascertain the clear intent of the parties, held that "the Lender and Debtor intended to create and did create an absolute assignment of the rents collected from the Property."  <u>Id.</u> at *3.

76332/0022-7509604v4

52.     A *side by side* comparison of the absolute assignment language in the Fenton

Deed of Trust (**Exhibit H,** pg. 30, Bates 317) with the language of the lender's deed of trust in

the Four Bucks case[22] reveals that the two provisions are substantially identical:

| FENTON DEED OF TRUST | FOUR BUCKS DEED OF TRUST |
|---|---|
| 10.1  Assignment of Rents, Profits, etc.  All of the Rents are hereby absolutely and unconditionally assigned to Beneficiary, to be applied by Beneficiary in payment of the Indebtedness.  Notwithstanding any provision of this Deed of Trust or any other Loan Document which might be construed to the contrary, the assignment in this Paragraph 10.1 is an absolute assignment and not merely a security interest.  However, Beneficiary's rights as to the assignment shall be exercised only upon the occurrence of an Event of Default.   Prior to the occurrence of an Event of Default, Grantor shall have a license to collect and receive all Rents as trustee for the benefit of Beneficiary and Grantor, and Grantor shall apply the funds so collected first to the payment of the Indebtedness in such manner as Beneficiary elects and thereafter to the account of Grantor. Notwithstanding anything contained herein to the contrary, no part of the Property will be leased without the prior written consent of the Beneficiary, which consent may be granted or withheld in the sole discretion of the Beneficiary. | 1.2     ASSIGNMENT OF RENTS.  Borrower hereby absolutely and unconditionally assigns to Lender Borrower's right, title and interest in and to all current and future Leases and Rents; it being intended by Borrower that this assignment constitutes a present, absolute assignment and not an assignment for additional security only. Nevertheless, subject to the terms of this Section 1.2 and Section 3.6, Lender grants to Borrower a revocable license to collect and receive the Rents, which license shall be automatically revoked upon the occurrence of an Event of Default (as hereinafter defined). Borrower shall hold the Rents, or a portion thereof sufficient to discharge all current sums due on the Debt, for use in the payment of such sums. |

53.     It should be noted that two decisions from the Bankruptcy Court for the Southern

District of Texas have concluded that the assignment of rents at issue in those cases were

collateral, instead of absolute assignments of rents.  However, these two cases, In re Las Torres

Dev., LLC, 408 B.R. 876 (Bankr. S.D. Tex. 2009) (Bohm, J.), and In re Amaravathi Ltd. P'ship,

416 B.R. 618 (Bankr. S.D. Tex. 2009) (Isgur, J.), are distinguishable from the facts here and

those in Four Bucks.  Those cases involved multiple loans with the lenders (i.e., two promissory

notes in Las Torres and four promissory notes in Amaravathi), rather than one loan transaction

---

[22]     The language from the lender's Deed of Trust is directly from Exhibit C to the *Objection To Debtor's Motion for Authority to Use Cash Collateral*, filed as Docket no. 22, in In re Four Bucks, LLC., Case number 09-42629-DML-11.

with one set of loan documents, as is the case at present with the Fenton Loan Documents being signed by the parties and intended to be read as a single transaction.

54.     The <u>Amaravathi</u> Court rejected the notion of applying Texas state law in favor of the Bankruptcy Code with respect to the parties' rights and interest in rents, which is in direct contravention of the Supreme Court's decision in <u>Butner v. United States</u>, 440 U.S. 48, 54 (1979), which held that state law governs a mortgagee's rights to rents during a bankruptcy case.[23]  The results reached by the <u>Amaravathi</u> Court are surprising considering the fact that the Supreme Court in <u>Butner</u> specifically held that Bankruptcy Courts are to look to state law when determining property rights of a bankruptcy estate.  The <u>Amaravathi</u> Court determined that the general rule of applying state law is subject to two exceptions: if Congress enacts statutes to create uniform laws on bankruptcy subjects across the country, or if there is some overriding federal interest requiring a different result.  <u>Amaravathi</u>, 416 B.R. at 622.  The Court in <u>Amaravathi</u> stated that because the Bankruptcy Code of 1978 was an example of such an effort by Congress to create uniform bankruptcy laws in the area of property subject to a debtor's estate, state law should not apply.

55.     In the Fifth Circuit decision of <u>Matter of Village Properties, Ltd.</u>, 723 F.2d 441 (5th Cir. 1984), however, it was held that <u>Butner</u> remained good law even after the enactment of the Bankruptcy Code of 1978, therefore requiring Bankruptcy Courts to analyze state law when determining debtor's property rights.  <u>Village Properties</u>, 723 F.2d at 443.  The <u>Amaravathi</u> Court attempted to distinguish <u>Village Properties</u>, arguing that its application of <u>Butner</u> was limited factually to the context of a mortgagee perfecting a security interest.  <u>Amaravathi</u>, 416

---

[23]     In his decision, however, even Judge Isgur noted that the Fifth Circuit had not directly addressed the issues involved with treatment of post-petition rents in this type of case and seemed to invite the parties to appeal the decision to the Fifth Circuit for a more definitive ruling.  <u>Id.</u> at 623.

B.R. at 623.  This is a far too narrow reading of <u>Village Properties</u>, considering the Fifth Circuit made clear that "the <u>Butner</u> decision remains unscathed by the new Bankruptcy Code," without restricting such a determination to the specific facts of that case.  <u>Village Properties</u>, 723 F.2d at 445.

56.    The Special Servicer asserts that this Court's analysis of <u>Village Properties</u> and <u>Butner</u> in the <u>Four Bucks</u> decision was the more appropriate resolution of the issue given the precedent in this Circuit.  Accordingly, this Court should follow the well-reasoned ruling of <u>Village Properties</u> without giving credence to the anomalous decision in <u>Amaravathi</u>.

57.    Knowing full well that the Special Servicer asserts that it has an absolute assignment in the Rents/Leases, the Debtor expends one Footnote (Footnote 5) [24] in the Motion to address the weak assertion, unsupported by any facts or evidence, that the Fenton Loan Documents are *ambiguous*.  Further, no legal analysis is provided, save for the citation to the Fifth Circuit Decision in <u>F.D.I.C. v. Int'l Prop. Mgmt., Inc.</u>, <u>supra</u>, and the Bankruptcy Court decision in <u>Las Torres</u>, <u>supra</u>.

58.    The language of Section 10.1 of the Fenton Deed of Trust (**Exhibit H**, pg. 30, Bates 317) makes it clear that Section 10.1 <u>controls</u> in the event of any ambiguity – which the Special Servicer states does not exist.  Specifically, Section 10.1 provides "**Notwithstanding any provision of this Deed of Trust or any other Loan Document which might be construed to the contrary, … .**"

59.    The Debtor acknowledges that the only source of income consists of the Rents/Leases derived from the Fenton Centre.  Motion, at ¶¶ 4 ("All or nearly all of the Debtor's

---

[24]    Footnote 5 of the Motion acknowledges that the Special Servicer has made the contention that it holds an absolute assignment of the Rents/Leases.  Thus, it is surprising that the Debtor is unable to address, with any certainty, a legal dispute with the absolute assignment of the Rents/Leases.  It was obviously no surprise to the Debtor that the Special Servicer would continued to make such an assertion.

cash flow comes from rents, … .") and 8.  Those Rents/Leases are subject to an absolute, present and unconditional assignment of Rents/Leases which absolutely entitles the Special Servicer to the Debtor's right, title and interest in and to any and all Rents/Leases, Profits or other income generated by and from Fenton Centre.  In accordance with controlling authority of the Fifth Circuit and the decision of this Court in <u>Four Bucks</u> the assignment of rents absolutely and unconditionally divested the Debtor of any and all rights to the Fenton Centre's Rents/Leases and transferred the same to the Special Servicer upon the Debtor's default.  As a result, the Debtor has no available income to operate the Fenton Centre or to fund a plan of reorganization.  Accordingly, the Court should enter an Order declaring that the Rents/Leases and the proceeds thereof from the Fenton Centre do <u>not</u> constitute cash collateral, and deny the Motion.

**B.    EVEN ASSUMING, *ARGUENDO*, THAT THE RENTS/LEASES ARE PROPERTY OF THE DEBTOR'S ESTATE, THE DEBTOR HAS NOT DEMONSTRATED AND CANNOT DEMONSTRATE THAT THE SPECIAL SERVICER'S INTERESTS ARE ADEQUATELY PROTECTED**[25]

60.    In the event the Court determines that the Rents/Leases constitute property of the Debtor's estate (which the Special Servicer disputes as demonstrated above), the Debtor concedes those Rents/Leases constitute the Special Servicer's cash collateral.[26]  Motion, at ¶¶ 6, 8 and 9.  Absent a Court order or written consent of the Special Servicer, the Debtor is strictly

---

[25]    Nothing herein shall be deemed or construed to be an admission on the part of the Special Servicer that the Rents/Leases are cash collateral.

[26]    In the *Emergency Motion for Interim and Final Orders Authorizing the Debtor to Use Cash Collateral and to Provide Adequate Protection to Pre-Petition Secured Lenders*, filed by the Debtor in the First Chapter 11 Cases, as Docket no. 52, the Debtor states, at paragraph 13: "<u>The Debtor believes that the liens on its real estate properties constitute duly perfected, non-avoidable liens</u> against those properties, and that the Debtor's cash and cash receipts constitute 'cash collateral' as that term is defined in § 363(a) ('<u>Cash Collateral</u>')." [Emphasis added].

24

prohibited from using any cash collateral pursuant to Section 363(c)(2) of the Bankruptcy Code[27].

61.    Section 363(e) of the Bankruptcy Code conditions the use of cash collateral as is necessary to provide adequate protection to a secured creditor.  11 U.S.C. § 363(e).  "Adequate protection" is intended to safeguard a secured creditor's constitutional right to have the value of its secured claim, as it existed on the petition date, preserved.  See United Sav. Ass'n v. Timbers of Inwood Forest Assocs., 484 U.S. 365, 370 (1988).  In other words, the Special Servicer must be assured that it will be able to recover its lien's value upon confirmation of the Debtor's plan, and such assurance must be based upon "sufficient, accurate information" provided by the Debtor.  See In re O.P. Held, Inc., 74 B.R. 777, 784 (Bankr. N.D.N.Y. 1987).

62.    Adequate protection, as that term is used in Section 363, is defined in Section 361 of the Bankruptcy Code.  Section 361 specifies three means of providing adequate protection: (1) periodic cash payments; (2) providing additional or replacement liens; or (3) other relief that will result in the "indubitable equivalent."  11 U.S.C. § 361.  A debtor has the burden of affirmatively proving that the creditor is adequately protected and the creditor must establish the validity of its interest.  11 U.S.C. § 363(p)(1) and (2).  See In re Cafeteria Operators, L.P., 299 B.R. 400, 406 (N.D. Tex. 2005); see also Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.), 16 F.3d 552, 564 (3d Cir. 1994).  If adequate protection cannot be provided, a request to use cash collateral must be denied.  See In re Megan-Racine Assocs. Inc., 202 B.R. 660, 663 (Bankr. N.D.N.Y. 1996).

63.    The Debtor affirmatively acknowledges that it granted the Lender a lien and security interest in, inter alia, the Fenton Centre, the Transcontinental Property and the Income

---

[27]    On April 6, 2011, the Special Servicer filed its Notice of Prohibition of Use of Rents, Docket no. 13, which is incorporated herein by this reference.

Realty Property.[28]  Motion, at, *inter alia*, ¶¶ 5, 6, 8 and 9.  Thus, the Special Servicer has met its

burden under Section 363(p)(2) of the Bankruptcy Code.  In addition, the undisputed evidence

attached hereto as **Exhibits F** through **O**, clearly establish, *inter alia*, the liens and claims of the

Special Servicer.  The Debtor, however, has not satisfied its burden under Section 363(p)(1) of

the Bankruptcy Code.

**(i)    <u>The Special Servicer's Interests are Not Adequately Protected</u>**

64.    The Debtor suggests (without providing any legal basis whatsoever) that it is

providing the Special Servicer with adequate protection in six fashions:

| | |
|---|---|
| First: | The assertion of an equity cushion of approximately $8 Million; |
| Second: | The Debtor will follow a budget and not deviate therefrom; |
| Third: | Beginning July, 2011, the Debtor will use the Special Servicer's Rents to pay the Special Servicer interest, at the non-default rate; |
| Fourth: | The Debtor will insure the Fenton Centre and pay all Taxes; |
| Fifth: | The Debtor will continue to lease the Fenton Centre and perform routine maintenance and repairs; and |
| Sixth: | The Debtor will provide a replacement lien on all post-petition rents. |

Motion, at ¶ 9.

65.    Each of the forgoing suggestions of adequate protection are not adequate

protection at all, for the following reasons:

---

[28]        <u>See</u> Footnote 26, <u>supra</u>.

76332/0022-7509604v4

| First: | There is absolutely no evidence of an equity cushion, in any amount. Rather, the unrefuted evidence is to the contrary – the Special Servicer is undersecured; |
|---|---|
| Second: | Following a budget, approved by the Court, is not protection, save from theft by the Debtor. The Special Servicer is not protected from a diminution in its collateral, rather a diminution of its collateral occurs by the expenditure of the amounts provided for the budget; |
| Third: | An undersecured creditor that is paid from its Rents, for interest, does not protect the creditor's collateral from diminution, but rather causes a diminution of such collateral; |
| Fourth: | Obviously the Debtor proposes to use the Special Servicer's own Rents to pay insurance and taxes. This clearly is not protecting the collateral from diminution; |
| Fifth: | Attempting to lease the Fenton Centre without success, is not adequate protection. Further, maintenance and repair to the Fenton Centre is just that - "maintenance" - and not protection or prevention of a diminution in value; and |
| Sixth: | As noted in ¶¶ 66 - 67, infra, the Debtor is unlikely to enter into any new Leases, as it does not have the financial wherewithal to perform tenant improvements to the Fenton Centre, as will be required by any new legitimate tenant. |

66.     In an attempt to suggest that adequate protection of the Special Servicer's interests will exist, the Debtor focuses on an expected increase in cash flow and an increase in value of the Fenton Centre, as a result of an alleged new tenant that the Debtor is negotiating with. Specifically the Preliminary Statement provides, at paragraph 4[29] as follows:

> Fenton Centre is negotiating with a new tenant for [sic] large block of office space. The potential tenant is a large, highly solvent, publically traded company and is acceptable to the Debtor and to NexBank. A decision is expected within the next month. If that deal is made, Fenton Centre will become cash flow positive, after debt service to NexBank.

---

[29]     See also, Motion, at Footnote 2, which provides: "The Debtor is negotiating with a large and creditworthy potential tenant that would occupy an entire floor of one tower and substantially increase occupancy and monthly rental income. The Debtor should know by the end of May 2011, whether a lease will be concluded." If the new tenant prospect is so relevant and likely, the Special Servicer questions why is there no evidence to support the same.

67.     Paragraph 4 of the Preliminary Statement is misleading and must be considered in

light of historical events and the Debtor's current financial position, including the following:

a.      The Special Servicer understands that the potential new tenant is HSS Systems, LLC ("HSS").  HSS is a legal entity and a subsidiary of HCA Holdings, Inc. ("HCA"), and is not HCA.   On January 19, 2011, the Debtor presented the Special Servicer with a draft *revised proposal* from HSS. Since January 19, 2011, no further information has been provided to the Special Servicer with regard to a proposed lease with HSS.

b.      Neither the Special Servicer nor NexBank confirmed that HSS is an acceptable tenant, as suggested by the Debtor. Rather, the Special Servicer stated in correspondence to the Debtor's counsel: *HCMLP* [the Special Servicer] *is glad to see the debtor actively negotiating to place a tenant in the Fenton property.   HCMLP will comply with all relevant provisions of the loan documents regarding leasing and anticipates the debtor will do the same.  If the potential tenant or its broker have any specific questions, HCMLP would be pleased to respond, if they are submitted in writing.  Thanks.*  [Emphasis added].[30]

c.      During the First Chapter 11 Case, the Debtor's Vice-President and Chief Restructuring Officer, Mr. Morgan, was specifically asked, under oath, whether the Debtor had the financial wherewithal to address the substantial tenant improvement costs that would be necessary to secure HSS, as a new tenant.   Mr. Morgan admitted that the Debtor did not have the funds to support the necessary tenant improvements and fit-out of the space, which would cost approximately $2.5 Million to $4 Million.[31]

---

[30]     See **Exhibit T**, correspondence of February 1, 2011, between counsel for the Debtor and the Special Servicer.  The Debtor and Mr. Morgan have chosen to *spin* the words of this correspondence in a light in which it was not intended. Mr. Morgan made a similar *puffing* assertion to Judge Houser in the First Chapter 11 Case in connection with the Hearings on the motions to dismiss.  See also, Motions to Dismiss (Day 2) Transcript of 2/17/11 (**Exhibit U**), filed as Docket no. 176, in the First Chapter 11 Case, at 50:8 - 12, Bates 709 ("They sent me a letter of support from the counsel supporting the transaction … .")

[31]     See (a) Morgan Deposition Transcript of 1/27/11 (**Exhibit V**), at 147:5 - 153:17, Bates 908 to 910 (discussing 100,000 square feet of space available for HSS, with the Debtor being responsible for $25 per square foot of fit-out expenses); (b) First Meeting of Creditors Transcript of 2/8/11 (**Exhibit Y**), at 115:22 - 117:1, Bates1402 to 1404 (discussing tenant improvement costs of $35 per square foot for

76332/0022-7509604v4

      d.      Upon further questioning of Mr. Morgan with respect to the source of the Debtor's cash to complete the tenant improvement costs, Mr. Morgan stated: *So we'd either refinance it or we'd have to borrow the money from a second mortgage in order to pay for it.*  Further, Mr. Morgan stated that the Debtor had not even spoken to any party about either refinancing or borrowing the necessary funds.[32]

      e.      During the hearings on the motions to dismiss the First Chapter 11 Case, Mr. Morgan testified that the HSS proposal was *within days* of coming through.[33]  As of April 11, 2011, it is 67 days later, and still no proposal.

68.     In short, the Debtor fails to provide sufficient information to meet its burden that the Special Servicer is adequately protected.  Rather, it merely asserts that the Special Servicer is adequately protected, and, on this basis alone, the Debtor asks the Court to force the Special Servicer to bear the full risk that its collateral will not be further eroded.  A mere assertion of adequate protection, however, is not adequate protection.  See Bankwest, N.A. v. Todd, 49 B.R. 633, 638 (D.S.D. 1985) ("[I]t is plainly not enough for a Debtor to merely make predictions, write them down, and offer them as exhibits showing adequate protection."); In re Mosello, 195 B.R. 277, 292 (Bankr. S.D.N.Y. 1996) (a finding of adequate protection cannot be based upon speculation; it must be premised on facts, or on projections grounded on a firm evidentiary basis).

---

100,000 square feet); and (c) Motions to Dismiss (Day 2) Transcript of 2/17/11 (**Exhibit U**) at 48:12 - 49:18, Bates 707 to 708 (wherein Mr. Morgan states that the tenant improvement costs to be borne by the Debtor will be "close to 4 million").

[32]     See First Meeting of Creditors Transcript of 2/8/11 (**Exhibit Y**), at 116:18 - 117:13, Bates 1403 to 1404; and Motions to Dismiss (Day 2) Transcript of 2/17/11 (**Exhibit U**) at 49:15 - 18, Bates 708.

[33]     See Motions to Dismiss (Day 1) Transcript of 2/3/11 (**Exhibit X**), filed as Docket no. 142, in the First Chapter 11 Case, at 179:24 – 180:1, Bates 1231 to 1232.

76332/0022-7509604v4

69.     Where a debtor fails to demonstrate that it can adequately protect a creditor's interest in the cash collateral to be used, the debtor's use of such cash collateral <u>must be</u> prohibited.  <u>See In re Megan-Racine Assocs. Inc.</u>, 202 B.R. 660, 663 (Bankr. N.D.N.Y. 1996). Accordingly, the Debtor's Cash Collateral Motion should be denied.

### (ii)     The Debtor Asserts the Existence of an Equity Cushion

70.     Although the existence of an equity cushion is not expressly mentioned in Section 361 of the Bankruptcy Code, an equity cushion is a recognized form of adequate protection.  <u>See In re Elmira Litho, Inc.</u>, 174 B.R. 892, 904 (Bankr. S.D.N.Y. 1994) (holding that "an equity cushion can, in certain circumstances, serve as a form of adequate protection"); <u>In re Dunes Casino Hotel</u>, 69 B.R. 784, 794 (Bankr. D. N.J. 1986) ("The existence of equity above the secured party's interest which provides an 'equity cushion' to the secured party may, in a given case, provide adequate protection").

71.     The Motion, at ¶ 5, asserts an equity cushion of "approximately $8,000,000." This naked assertion is devoid of any admissible evidence, and rightfully so, as the Debtor has no independent appraisal of the Fenton Centre.  In contrast, the Fenton Appraisal - $39,295,000 – as of November, 17, 2011, evidences a complete lack of an equity cushion[34].

### (iii)     The Debtor Has Not Proposed to Provide An Actual Replacement Lien To the Special Servicer

72.     As noted above, the Debtor states in the Motion that it will grant the Special Servicer a "replacement lien" on "all post-petition rents and common area maintenance charges, and other costs reimbursements collected from tenants to the extent and with the priority that

---

[34]     <u>See</u> Footnote 18, <u>supra</u>.

76332/0022-7509604v4

such liens existed pre-petition."  Motion, at ¶ 9.  Because the Debtor has not demonstrated the creation of post-petition Leases that are not already subject to the Special Servicer's pre-petition liens it is not offering a true replacement lien.  See 11 U.S.C. § 552(b)(1); see also In re Buttermilk Towne Center, LLC, 442 B.R. 558, 565 (9th Cir. BAP 2010) (holding that a mortgagee that held a collateral assignment of rents on property in which the debtor had no equity was not adequately protected by cash collateral orders entered by the bankruptcy court that granted the lender a "replacement lien" on post-petition rents, because the lender's pre-petition security interest in the rents extended to post-petition rents under 11 U.S.C. § 552(b)(1)).

73.    As stated previously, the Debtor is "hanging its hat" on the HSS lease, which as of today, has not been presented to the Court, and thus should not be considered, as any form, of adequate protection.  Accordingly, the Debtor's use of cash collateral will cause the Special Servicer's position to deteriorate with no resulting protection.

74.    The Debtor cannot adequately protect the Special Servicer's interests as required by the Bankruptcy Code.  As noted above, "[t]he purpose of providing 'adequate protection' is to insure that a secured creditor receives in value essentially what he bargained for."  In re Timbers of Inwood Forest Associates, Ltd., 808 F.2d 363, 377 (5th Cir. 1987), aff'd, 484 U.S. 365 (1988) (citing H.R. Rep. No. 599 at 339, 1978 U.S. Code Cong. & Ad. News at 5787, 6295); see also Sharon Steel Corp. v. Citibank (In re Sharon Steel Corp.), 159 B.R. 165, 169 (Bankr. W.D. Pa. 1993) (citations omitted).  The Lender will not receive what they bargained for when they loaned funds to the Debtor if the Court permits the Debtor to use the Special Servicer's cash collateral as the Motion proposes.[35]

---

[35]    The Special Servicer requests that the Court order the collection, deposit and segregation of any cash generated from the Rents/Leases presently in the possession and/or control of the Debtor and/or its agents and representatives, and hereinafter coming into the possession and/or control of the Debtor and/or its agents and representatives, from any source whatsoever.  Such collection and

# V.
## RESERVATION OF RIGHTS

75.     This Objection is without prejudice to the right of the Special Servicer to object to any final or other adequate protection relief sought on any ground whatsoever.  Further, the Special Servicer reserves its rights to object to any and all provisions of the Budgets attached to the Motion.  All such rights are fully reserved and preserved.

# VI.
## CONCLUSION

76.     For the reasons set forth above, the Special Servicer respectfully requests that the Court enter an order: (i) denying the relief sought by the Debtor in the Motion; (ii) finding that the Rents/Leases of the Fenton Centre have been absolutely and unconditionally assigned to the Lender, such that the Debtor has no interest in the Rents/Leases; (iii) prohibiting the Debtor from using or dissipating any cash generated from the Rents/Leases and held in its possession, or that of its agents and representatives, or in any account in any financial institution without the written permission of the Special Servicer; (iv) directing the Debtor and its agents and representatives to immediately turn over to the Special Servicer that portion of the collateral derived from the Rents/Leases, and constituting cash collateral within the meaning of Section 363 of Bankruptcy Code that is in the Debtor's possession, or that of the Debtor's agents and representatives, or in any accounts at any financial institutions or otherwise under the Debtor's control; and (v) directing the Debtor to segregate and account for any and all proceeds of the Rents/Leases presently in its, or its agents and representatives, possession and/or control, or hereafter received by the Debtor, or any entity under the Debtor's control, from any source whatsoever, and to turn

---

segregation of cash collateral is mandated by Section 363(c)(4) of Bankruptcy Code, which requires a debtor in possession to segregate any cash collateral in its possession, custody or control.  See 11 U.S.C. § 363(c)(4).

76332/0022-7509604v4

over to the Special Servicer any additional proceeds of the Rents/Leases as collected and segregated; and (v) granting all other just and proper relief.


DATED:  April 11, 2011.                    Respectfully submitted,


                                           */s/ MICHAEL D. WARNER*
                                           _____
                                           Michael D. Warner (Texas Bar No. 00792304)
                                           Emily S. Chou  (Texas Bar No. 24006997)
                                           **COLE, SCHOTZ, MEISEL, FORMAN &
                                           LEONARD, P.A.**
                                           301 Commerce Street, Suite 1700
                                           Fort Worth, Texas 76102
                                           Telephone:     (817) 810-5250
                                           Facsimile:     (817) 810-5255
                                           **mwarner@coleschotz.com**
                                           **echou@coleschotz.com**

                                           Attorneys for the Special Servicer




### CERTIFICATE OF SERVICE

I hereby certify that on April 11, 2011, true and correct copies of the *OBJECTION OF THE SPECIAL SERVICER TO THE DEBTOR'S MOTION FOR AUTHORITY TO USE CASH COLLATERAL* was served on the following by Federal Express overnight delivery in the above case.

Robert A. Simon, Esq.                      US Trustee
Barlow Garsek & Simon, LLP                 1100 Commerce Street, Room 976
3815 Libson Street                         Dallas, TX 75242-1496
Fort Worth, TX 76107



DATED: April 11, 2011

                    By:  */s/ Michael D. Warner* _____

76332/0022-7509604v4