# Exhibit U

21

HC 00659

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 2 of 94

1

1          IN THE UNITED STATES BANKRUPTCY COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
2                    DALLAS DIVISION

3

4   IN RE:                  )   BK. NO: 11-30210-BJH-11

5                           )

6   FRE REAL ESTATE, INC.   )

7        D E B T O R        )

8

9

10            *   *   *   *   *   *   *   *   *   *   *

11

12              TRANSCRIPT OF PROCEEDINGS

13

14            *   *   *   *   *   *   *   *   *   *   *

15

16

17

18

19

20        BE IT REMEMBERD, that on the 17th day of February,

21   2011, before the HONORABLE BARBARA J. HOUSER, United States

22   Bankruptcy Judge at Dallas, Texas, the above styled and

23   numbered cause came on for hearing, and the following

24   constitutes the transcript of such proceedings as hereinafter

25   set forth:


              NATIONAL COURT REPORTERS (214) 651-8393

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 3 of 94

2

1                          I N D E X

2                                                        PAGE

3   Exhibit Index                                          3

4   RICHARD MORGAN

5        DIRECT EXAMINATION
             BY:  Mr. Buncher                            12
6        CROSS-EXAMINATION
             BY:  Mr. Weitman                            35
7            BY:  Mr. Leninger                           58

8   GREG CROWN

9        DIRECT EXAMINATION
             BY:  Mr. Weitman                            67
10       CROSS-EXAMINATION
             BY:  Mr. Staber                             79
11           BY:  Mr. Kinvig                             92
             BY:  Mr. Leninger                           93
12           BY:  Mr. Olson                              94
             BY:  Mr. Buncher                            96
13       REDIRECT EXAMINATION
             BY:  Mr. Weitman                           104

14

15

16

17

18

19

20

21

22

23

24

25

HC 00661

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 4 of 94

3

1                 E X H I B I T   I N D E X

2                                              PAGE FIRST REFERENCED

3    Exhibit D                                    50

4    Exhibit F                                    40

5    Exhibit M                                    33

6    Exhibit P-28                                 17

7    Exhibit Q                                    19

8    Exhibit R                                    22

9    Exhibit S                                    31

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NATIONAL COURT REPORTERS (214) 651-8393

HC 00662

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 5 of 94

4

```
 1                P R O C E E D I N G S
 2               THE COURT:  All right.  We've got continued
 3  hearings in FRE Real Estate on motions to dismiss or convert.
 4      I'll take appearances from the parties, please.
 5               MR. BUNCHER:  Yes, Your Honor.  Doug Buncher
 6  and Seymour Roberts for the debtor.  And Mr. David Morgan and
 7  Greg Crown are here in the courtroom with us.
 8               THE COURT:  Excellent.
 9     Good morning.
10               MR. LENINGER:  Good morning, Your Honor.  John
11  Leninger on behalf of Armed Forces Bank.  And I have Doug
12  Mead and Brent Parsons, representatives of the Bank with me.
13               THE COURT:  Excellent.
14               MR. STROMBERG:  Good morning, Your Honor.
15  Mark Stromberg on behalf of State Bank of Texas.
16               MS. HARTWICK:  Good morning, Your Honor.  Jo
17  Hartwick on behalf of Petra.
18               MR. WATSON:  Good morning, Your Honor.
19  Jermaine Watson on behalf of RMR Investments.
20               MR. SAKONCHICK:  Good morning, Your Honor.
21  Steve Sakonchick for U.S. Bank, secured creditor, and Parkway
22  North.  And we were one of the foreclosing parties.
23               THE COURT:  Excellent.
24     Mr. Kinvig.
25               MR. KINVIG:  Good morning, Your Honor.
```

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 6 of 94

5

 1   Cameron Kinvig on behalf of American Bank of Commerce.

 2              MR. STABER:  Good morning, Your Honor.  David

 3   Staber on behalf of Sidney Wicks, Trustee of the Sidney Wicks

 4   Revocable Trust.

 5              MR. FRANKE:  Good morning, Your Honor.  Bob

 6   Franke on behalf of Regions Bank.

 7              MR. OLSON:  Good morning.  Dennis Olson on

 8   behalf of First Bank & Trust and the Bank of Weatherford.

 9              THE COURT:  Mr. Weitman.

10              MR. WEITMAN:  Good morning, Your Honor.  David

11   Weitman and Chris Brown with the law firm of K&L Gates here

12   on behalf of Wells Fargo Capital Finance.

13         Your Honor, if we may just start with a couple of

14   housekeeping matters that may simplify things.

15              THE COURT:  Please.

16              MR. WEITMAN:  When we were last here, I think

17   that was about 45 degrees colder than it is today --

18              THE COURT:  At least.

19              MR. WEITMAN:  -- the Court asked about whether

20   there were any charts.  And I'm happy to report that we have

21   some flow charts and other items that will assist the Court.

22              THE COURT:  Excellent.

23              MR. WEITMAN:  Mr. Brown will tell us, you

24   know, what exhibits they would then be.  And these are items,

25   I might add, that we worked with Mr. Buncher to complete.


NATIONAL COURT REPORTERS (214) 651-8393

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 7 of 94

6

```
 1                THE COURT:  Excellent.  I appreciate that.
 2                MR. WEITMAN:   The first one, Your Honor,
 3    multi-colored, as it is, is the entity's ownership prior to
 4    December 27th.  Because that's when -- the entity's ownership
 5    interest prior to December 27th when the stock got
 6    transferred, the stock ownership's interest in the
 7    transferror entities.  And then we're also getting into right
 8    now, which entities owned what properties prior to December
 9    22nd.  So that's reflected here, as Your Honor sees, with
10    Transcontinental, if you will, with the various tracts of
11    property; the affiliates, or subsidiaries of
12    Transcontinental, and their respective properties; American
13    Realty Trust.  In the middle, Your Honor, Income Opportunity
14    Realty Investors, AEC; in parenthesis in each instance the
15    name of the property.  Then on the next page of this exhibit
16    Your Honor will see how things changed after December, as of
17    December 23 with who owns what properties.
18         If Your Honor looks further over -- oh, by the way,
19    Your Honor, forgive me.  If Your Honor looks far on the
20    right, what happens here is you've got ABC LD income that
21    then owns all of those transferor entities.  And then you see
22    which entities have assets.  And by in large, they don't.  We
23    put that in parenthesis.  And then, Your Honor, a little bit
24    to the left, ABC LD then owns FRE Real Estate and now FRE
25    Real Estate owns all of these tracts of land that Your Honor
```

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 8 of 94

7

1    heard a lot about.  And then you see, Your Honor, who has the

2    seller notes.  And that is reflected in parenthesis, holder

3    of seller notes, Transcontinental to Realty Investors, Income

4    Opportunity Realty Investors, and American Realty Trust.

5    Those public entities that we spoke of.

6               THE COURT:  All right.

7               MR. WEITMAN:  Your Honor, another chart --

8               THE COURT:  Thank you.

9               MR. WEITMAN:  -- to assist the Court.  And

10   this is blue and yellow showing each of the transferor

11   entities into FRE Real Estate.  So if Your Honor looks,

12   there's a transfer of TCI Land Portfolio to FRE Real Estate

13   receives that property and then issues the seller note and

14   then assume various trade debt, tax debt, and maybe a tax

15   loan.  That would be the Propel that Your Honor heard about.

16   And assumes mortgage debt.  And this is -- this shows

17   essentially the 20 entity transfers, although I think there

18   may be 23 different seller notes that are generated.

19               THE COURT:  All right.

20        This is exceedingly helpful.  Thank you.

21               MR. WEITMAN:  Great.

22        When we were here last time, Your Honor, we had a list,

23   what we'll call the list of transferor entities and other

24   information.  It was a chart.  And we revised it since then

25   with Mr. Buncher and Mr. Crown giving us additional

HC 00666

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 9 of 94

8

1  information.

2      If I may approach?

3          THE COURT:  You may.

4      Thank you.

5          MR. WEITMAN:  Here we followed the same chart

6  that Your Honor just looked at in terms of the name of the

7  transferor.  Then there was a name change.  Name of the

8  transferee.  The amount of the seller note.  And we also

9  wanted to try to find out the amount of the unsecured debt.

10 We wanted to clarify what we said earlier.  Some numbers

11 changed.  Not a great amount, but they did change.

12     In addition, Your Honor, although the seller notes are

13 in the middle here, the amount of the seller notes, they were

14 then adjusted because they had to do a calculation under

15 those purchase agreements.  So Your Honor may see this

16 difference, if you will, from the last chart that shows how

17 much mortgage debt was secured, or how much the seller note

18 was.  They got it more refined in the blue and yellow.  And

19 these may be just the note amounts that were issued.

20         MR. BROWN:  Your Honor, if I may, those

21 exhibits would be Wells Fargo 191, 192, and 193.

22         THE COURT:  In order?

23         MR. BROWN:  In the order that he introduced

24 them, yes.

25         THE COURT:  Excellent.

HC 00667

Case 11-42042-dml11 Doc 30-31 Filed 04/11/11 Entered 04/11/11 15:34:21 Desc
Exhibit U - Part 1 - Hearing Transcript February 17 2011 Page 10 of 94

9

1          MR. WEITMAN:  Your Honor received a notebook,

2  or actually many notebooks last time and it included what was

3  going to be Exhibits 1 and 2 of the officers, directors and

4  members of those relevant entities.  And we worked again with

5  Mr. Buncher.  So the Court can see these.  They have been

6  admitted.  Excuse me.  We would ask now that they be

7  admitted.  If I may just hand them up to the Court.

8          THE COURT:  Please.

9          MR. WEITMAN:  That would be Wells Fargo 1 and

10  Wells Fargo 2.  It shows where things stood in terms of the

11  entities just prior to the transfers.  Who were the officers,

12  directors, and members.  As the Court may recall, all of the

13  ownership interest in the transferor entities went up to ABC

14  LD Income.

15          THE COURT:  Yes.

16          MR. WEITMAN:  And then it changed.  The

17  officers and directors and members changed when it was

18  acquired by ABC LD Income.  So it shows as of January 4th who

19  the new players are.

20          THE COURT:  All right.

21      And are there changes?  Because looking down this list

22  initially, it looks like they're the same.

23          MR. WEITMAN:  There is a 1 and a 2.  There's

24  one as of December 23.

25          THE COURT:  Right.  But the people look the

NATIONAL COURT REPORTERS (214) 651-8393

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 11 of 94

10

1   same.

2            MR. WEITMAN:  Oh, I'm sorry, Your Honor.

3   That's because you're looking at the parent entities, in some

4   instances.  But as you get in deeper to look at the

5   subsidiaries, you'll see it.

6            THE COURT:  All right.

7            MR. WEITMAN:  We want to get every entity

8   that's on the chart essentially.

9            THE COURT:  Excellent.

10           MR. WEITMAN:  Your Honor, yesterday afternoon

11  we were able to reach agreement among the lenders and the

12  debtor as to the joint stipulation summarizing all of the

13  documents.  We filed that with the Court.  We have a courtesy

14  copy for the Court possibly to help going through this

15  hearing.

16           THE COURT:  The stipulation?

17           MR. WEITMAN:  Yes, Your Honor.

18           THE COURT:   I think I have a copy of it.

19       This is what was filed at 2:07 yesterday?

20           MR. WEITMAN:  Yes, Your Honor.

21           THE COURT:  All right.  Yes, I've seen that.

22           MR. WEITMAN:  In addition, Your Honor, the

23  Court may recall that there were various appraisals that were

24  introduced into evidence by Mr. Buncher toward the end of the

25  hearing.  Wells Fargo thereafter conditioned more appraisal

1   or updated appraisals.  And these are also referenced in the

2   joint stipulation.  We came up with an aggregate valuation

3   for our collateral as of the petition date with an amount of

4   $8.8 million.  And, again, that's referenced in the joint

5   stipulation.  If I may hand up to the Court these appraisals.

6       Mr. Brown, what are they listed at number wise in our

7   joint stipulation?

8                   MR. BROWN:  You've got my copy of it.

9                   MR. WEITMAN:  Oh, sorry.

10   May I hand these up to the Court?

11                   THE COURT:  Yes.

12                   MR. WEITMAN:  Thank you.

13                   THE COURT:  Thank you.

14   And are these exhibits, as well?

15                   MR. WEITMAN:  Yes.

16                   MR. BROWN:  Those would be 194 through 196.

17                   MR. WEITMAN:  Your Honor, those are really the

18   initial housekeeping matters.  I think where we left things

19   at the close of the last hearing was that I would be able

20   together with the other moving parties proceed with

21   cross-examination, or redirect, pardon me, of Mr. Morgan.

22   In discussions with Mr. Buncher this morning, he indicated

23   that he had some addition topics to cover with Mr. Morgan.

24   And I have no objection to him continuing.  his

25   cross-examination after which the moving parties will then be

NATIONAL COURT REPORTERS (214) 651-8393

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 13 of 94

12

1    able to essentially cross not only on what he said on the

2    3rd, but also the new testimony.

3              MR. BUNCHER:  We'd ask that Mr. Morgan retake

4    the stand, Your Honor.

5              THE COURT:  Mr. Morgan, if you'd come forward.

6    I'm simply going to remind you that you're still under oath.

7         Thank you.

8              MR. BUNCHER:  And just for the record, Your

9    Honor, we'd like Exhibits 1 and 2 that they just referenced,

10   and Exhibits 191, 192, 193, and 194 through 196 to be

11   admitted, please.

12             THE COURT:  Any objection?

13        Those exhibits are admitted.

14             RICHARD MORGAN

15   the witness, having been previously sworn to tell the truth,

16   testified on his oath as follows:

17             DIRECT EXAMINATION

18   BY MR.BUNCHER:

19        Q.   Good morning, Mr. Morgan.

20        A.   Good morning.

21        Q.   You recall you're still under oath?

22        A.   Yes.

23        Q.   Just a few follow-up questions.  You were

24   questioned at the last hearing about whether or not you had

25   any commitments for funding for this bankruptcy case.

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 14 of 94

13

1        Do you recall those questions?

2        A.   Yes.

3        Q.   Has the state of the world changed in that regard

4   since the last hearing?

5        A.   Yes.

6        Q.   And could you please explain to the Court how it's

7   changed?

8        A.   I did an analysis of what would, I call it carrying

9   cost.  Essentially not interest carrying cost, but the cost

10  of the maintenance, of the taxes, and whatever ancillary or

11  other type expenses that are incurred with the properties and

12  came up with a budget.  And we have submitted a commitment

13  letter from TCIF today for 400,000 in DIP funding, which in

14  my estimation is about four months worth of carry on the land

15  for interest, taxes -- not interest, taxes and maintenance on

16  the properties.  Which will give me time to get from this

17  point up to the plan filing and confirmation.

18       Q.   All right.  Just so the Court is clear on what you

19  have here.  The commitment is for what $400,000.  And that

20  amount approximates what?

21       A.   Approximately four -- a little over four months of

22  cost to carry the maintenance on an annual basis the taxes

23  and insurance.  Some cases have water on one.  There's some

24  payments on one of the properties which have some kind of

25  deal or program where we have to -- you know, it's part of

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 15 of 94

14

1   one group.  All of the related expenses I could find,

2   insurance included.  Basically all of the costs of carrying

3   the property, except for the interest on the land, raw land

4   properties.

5      Q.   And what you're talking about as far as the

6   insurance and the taxes and the maintenance, are you speaking

7   of just the raw land properties, or are you speaking of the

8   income producing properties, or both?

9      A.   Just the raw land properties at this point in time.

10      Q.   All right.  As far as the income producing

11   properties, do those properties produce enough cash to pay

12   their own expenses?

13      A.   Yes.

14      Q.   And it's built into the budgets we've submitted to

15   the Court on the income producing properties, is there also

16   sufficient cash where you're escrowing taxes already for 2011

17   on those properties?

18      A.   That is correct.

19      Q.   And with this $400,000 commitment, you say that the

20   debtor will be able to escrow for 2011 monthly taxes for a

21   four-month period?

22      A.   Yes.

23      Q.   As well as covering the maintenance expenses on the

24   raw land properties?

25      A.   Yes.


NATIONAL COURT REPORTERS (214) 651-8393

HC 00673

1     Q.   Is it the intention to go back to January 1 of this

2  year to escrow the taxes for January and then February,

3  March, et cetera?

4     A.   Yes.

5     Q.   All right.  So essentially will the -- the 400,000

6  would get you through to approximately April 30th of this

7  year?

8     A.   Yes.

9     Q.   And would it be your intention between now and

10  April 30th to get a plan on file in this case?

11     A.   As soon as we get this hearing over, I'm ready to

12  work on a plan.

13          MR. BUNCHER:  All right.  May I approach, Your

14  Honor?

15          THE COURT:  You may.

16          MR. BUNCHER:  I've got a couple of books here.

17          THE COURT:  Are these different than what I

18  already have?

19          MR. BUNCHER:  Yes, Your Honor.  The binder,

20  Your Honor, that I just handed the Court are starting with

21  Exhibit P-14.  The last hearing we entered already P-1

22  through 13.  So the first book you have is Exhibit P-14

23  through P-19.  Those are additional appraisals that have been

24  produced by the lenders in this case that have been sent to

25  Mr. Morgan for --

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 17 of 94

16

1       Q.   Mr. Morgan, have you reviewed those appraisals that

2   the lenders have produced?

3       A.   Yes.

4       Q.   And does Exhibit P-14 to 19, that book in front of

5   you, contain more of the appraisals that the lenders

6   produced?

7       A.   Yes.

8            MR. BUNCHER:  Your Honor, we would move to

9   admit P-14 to 19.

10           THE COURT:  Any objection?

11      Hearing none, it's admitted.

12      Q.   All right.  Moving on to the second book.

13      What are the exhibits in that book, Mr. Morgan?  On the

14   cover it lists what the -- look at the cover of the binder.

15      A.   I see it.

16      Q.   What does it say the exhibit numbers are?

17      A.   P-20 through Q.

18      Q.   P-20 through Q.

19      Looking at P-20 through P-28, are those more appraisals

20   that the lenders have produced in this matter that you have

21   reviewed?

22      A.   Yes.

23           MR. BUNCHER:  Your Honor, we'd move to admit

24   P-20 to 28.

25           THE COURT:  Any objection?

NATIONAL COURT REPORTERS (214) 651-8393

1           MR. WEITMAN:  None, Your Honor.

2           THE COURT:  They're admitted.

3      Q.   Turn now if you could, Mr. Morgan, to Tab P-29.

4  And let's look at that.

5           THE COURT:  There is no 29 that I'm -- in

6  these two books.

7           MR. BUNCHER:  I'm sorry.  It's P-28, Your

8  Honor.

9           THE COURT:  All right.

10     Q.   What is Exhibit P-28, Mr. Morgan?

11     A.   This is my summary of the appraisals.  And this was

12  done and has not been updated since the Wells Fargo new

13  appraisal was done.

14     Q.   So that summary that's Exhibit P-28 is a document

15  that you prepared that summarizes the numbers in the

16  appraisals that are already admitted from P-1 through P-27;

17  is that true?

18     A.   Yes.  With the exception of the Wells Faro

19  appraisal.

20     Q.   You're saying that the new appraisal that Wells

21  Fargo just introduced here today for the 8.8 million is not

22  reflected in the summary?

23     A.   That's correct.

24     Q.   But other than that, you've reflected all of the

25  other P exhibits in that summary; is that correct?


NATIONAL COURT REPORTERS (214) 651-8393

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 19 of 94

18

1      A.    That's correct.

2      Q.    And on the summary did you also compare the

3 appraised -- the value numbers in each of the appraisals with

4 the debt on those properties?

5      A.    Yes.

6      Q.    And explain to the Court what that shows.

7      A.    It shows a varying between 100 and -- I'm talking

8 in percentage coverage -- between 135 -- 134 up to about 158

9 percent coverage.

10              MR. BUNCHER:  Your Honor, we'd move to admit

11 P-28.  I think it was already admitted it.

12              THE COURT:  I think I just admitted it.  I

13 think it's been admitted.

14              MR. BUNCHER:  All right.

15      Q.    Even --

16              MR. WEITMAN:  Pardon me, Your Honor.  Just a

17 clarification.  And with just the clarification that it does

18 not include the revised numbers submitted by Wells Fargo in

19 its appraisals.  And if this is equity and coverage, it

20 obviously doesn't cover the ad valorem taxes for 2009, 2010,

21 or 2011, which attached on the first day of the year.  So

22 with that, I have no objection.

23              THE COURT:  Mr. Leninger.

24              MR. LENINGER:  Your Honor, I'm going to

25 reserve the right to question the witness about the debt

1   calculation for Armed Forces Bank.

2                    THE COURT:  All right.

3                    MR. LENINGER:  I don't agree to that number.

4                    THE COURT:  All right.

5        Q.   Where did you get the debt numbers that are on the

6   exhibit, Mr. Morgan?

7        A.   I got the debt numbers off of the transfer

8   documents when the transaction was done.

9        Q.   You heard the testimony or the presentation by

10  Mr. Weitman regarding the new Wells Fargo appraisal at 8.8

11  million today, correct?

12       A.   Yes.

13       Q.   How does that appraisal compare to the Wells Fargo

14  debt?

15       A.   It's still -- it's very slightly over that.  I'm

16  showing 8.5 million.  They're showing 8.8 million.  So it's

17  some coverage, but not much.

18       Q.   All right.  But still over secured?

19       A.   Yes.

20       Q.   All right.  Turn to Exhibit Q, please.  It's in the

21  same binder.

22       What is Exhibit Q?

23       A.   Exhibit Q is the commitment letter for the DIP

24  funding that I obtained yesterday.

25       Q.   All right.  And are there still some details to

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 21 of 94

20

 1   work out with regard to the interest rate, payment terms, et

 2   cetera?

 3        A.   Yes.

 4        Q.   And -- but is it your intention to work those

 5   details out and present a motion to the Court to approve that

 6   DIP funding as soon as practicable?

 7        A.   Yes.

 8             MR. BUNCHER:  Move to admit Exhibit Q, Your

 9   Honor.

10             THE COURT:  Any objection?

11             MR. KINVIG:  Your Honor, I object.  And I'll

12   move a little bit closer to the microphone.

13             THE COURT:  Appreciate that.  Thank you.

14             MR. KINVIG:  Your Honor, while Mr. Morgan has

15   already presented some testimony about a DIP commitment, I

16   think that this DIP commitment letter is essentially hearsay.

17   It's really an out-of-court statement by Transcontinental

18   saying what it may or may not do.  But there's nobody here

19   from Transcontinental to authenticate it.  I don't object to

20   it being admitted for the very limited purpose of Mr. Morgan

21   saying, I received this letter.  But I don't think that it

22   can be admitted without a Transcontinental representative

23   authenticating it for the truth of what's contained within

24   it.

25             THE COURT:  Response?

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 22 of 94

21

1           MR. BUNCHER:  Yes, Your Honor.

2       This is an operative agreement.  It's not an

3   out-of-court statement any more than a contract would be an

4   out-of-court statement.  So I disagree that it's inadmissible

5   and I would ask the Court to admit it.

6           THE COURT:  I'll sustain the objection.  It's

7   hearsay.

8           MR. LENINGER:  Thank you, Your Honor.

9       Q.  All right.  Mr. Morgan, do you believe you have a

10  commitment to $400,000 of debtor in possession financing from

11  Transcontinental Realty?

12      A.  I know I have a commitment.

13      Q.  All right.  And how do you know that?

14      A.  Because I met personally with Mr. Moos and the

15  Transcontinental people.  It was -- and their counsel.  This

16  was an item that was discussed and approved by the board

17  yesterday.  So it was specific board resolution -- not

18  resolution.  But a specific board meeting to discuss this

19  matter and was told it was approved.

20      Q.  All right.  And whose signature appears for TCI on

21  the agreement?

22      A.  Stephen Shelley.

23      Q.  And did you also sign the agreement?

24      A.  Yes.

25          MR. BUNCHER:  I'd move again to admit the

HC 00680

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 23 of 94

22

 1   exhibit, Your Honor.

 2                    MR. LENINGER:  Your Honor, the exact same

 3   objection.

 4                    THE COURT:  The exact same ruling.

 5                    MR. BUNCHER:  Thank you, Your Honor.

 6        Couldn't hurt to try.

 7                    THE COURT:  I agree.

 8                    MR. BUNCHER:  May I approach with another

 9   exhibit?

10                    THE COURT:  You may.

11        Thank you.

12                    MR. BUNCHER:  I'm handing the Court what I've

13   marked as Exhibit R.

14        Q.   Mr. Morgan, what is Exhibit R?

15        A.   This is a contract for purchase and sale of the

16   property, one of the ABC properties.

17        Q.   Is this the contract that was discussed in the last

18   hearing relating to the land in Temple that's subject to a

19   lien of American Bank of Commerce?

20        A.   Yes.

21        Q.   All right.  And do you recognize Mr. Shelley's

22   signature as vice president of Prime Income Asset Management,

23   Inc., on the last page?

24        A.   Mine doesn't have a signature on it.

25        Q.   Last page.

NATIONAL COURT REPORTERS (214) 651-8393

1      A.   Oh, I'm sorry.

2      Q.   There's one more page.

3      A.   Yes.

4      Q.   All right.  And the purchase price under this

5  contract for that Temple land was what?

6      A.   525,000.

7      Q.   525,000?

8      A.   I believe so.  Let me just check and be sure.  I'm

9  going from memory.

10     Q.   First page, paragraph 2.

11     A.   525,000.

12     Q.   All right.  Now, this contract is rather old.  It's

13  in December of 2008.

14          MR. STABER:  Your Honor, I'd like to lodge an

15  objection to this.  He's asking to testify regarding the

16  terms of the contract.  He hasn't offered it for admission.

17  And I will have an objection or two to the admission of it.

18  And prior to further questions, I would like to have that

19  considered.

20          THE COURT:  Sustained.

21          MR. BUNCHER:  Fair enough.

22     I'll move to admit Exhibit R.

23          MR. STABER:  If I may, Your Honor.  David

24  Staber on behalf of Sidney Wicks.

25     Your Honor, I have a three-fold objection to Exhibit R.

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 25 of 94

24

1  One, it was served on us this morning.  It was untimely and

2  it was obviously with the date on it in existence prior to

3  the commencement of the first hearing.  Objection number 2 is

4  lack of proper authentication and completeness.  And I'm

5  combining two there.  But it's importdnt.  The actual

6  contract itself has no signature page, or the copy I have has

7  no signature page on the contract.  No legal description

8  attached to it.

9       The First Amendment is unsigned.  It is only the last

10  page, the Second Amendment that has any signatures on it.

11  And this witness I do not believe is an employee of either of

12  the contracting entities.  So I don't think this one can be

13  authenticated.  It's incomplete and should not be admitted on

14  that ground.  Your Honor, and frankly there may eve be a

15  question -- since it's not even a debtor entity to a party to

16  this, if it has any relevance to this hearing.

17       So I think I have about four grounds, Your Honor.

18       Thank you.

19            THE COURT:  Thank you.

20            MR. KINVIG:  Your Honor, I have an additional

21  objection and kind of a point of clarification.

22       To the extent that this Court overrules those

23  objections, and I would reiterate those objections as my own.

24  But also last time I spoke with Mr. Morgan at I believe the

25  341 Meeting, he stated to me off the record that this

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 26 of 94

25

     1   contract that they're seeking to admit was probably going to
     2   be scrapped and a new contract would be put forward in its
     3   place.  So, you know, I come to the Court this morning not
     4   even knowing whether this is the current contract, whether --
     5   this contract was dated in 2008.  So it is certainly a fairly
     6   aged contract.  I don't know if it's the current contract.
     7   If it has been, you know, relevant for any period of time or
     8   not, if there's other contracts floating around out there.
     9   So I think that goes to lack of authentication.  But it does
    10   provide a little bit of color to that argument.
    11             THE COURT:  Response?
    12             MR. BUNCHER:  I was only talking about this
    13   exhibit so I could lay a foundation to then move on and ask
    14   the witness about what other discussions he's had with this
    15   purchaser since he's been involved.
    16             THE COURT:  Well, but respond to the
    17   objections.
    18             MR. BUNCHER:  He's proved up the contract.  It
    19   is what it is.
    20             THE COURT:  The objections are sustained.
    21   This witness does not have personal knowledge.  There's been
    22   no one here to authenticate this exhibit.  Moreover, it's an
    23   unsigned copy, at least in large part.
    24             MR. BUNCHER:  All right.
    25        Q.   When did you learn about a potential offer on the


                    NATIONAL COURT REPORTERS (214) 651-8393

Case 11-42042-dml11    Doc 30-31    Filed 04/11/11    Entered 04/11/11 15:34:21    Desc
Exhibit U - Part 1 - Hearing Transcript    February 17    2011    Page 27 of 94

26

1    property in Temple.

2        A.    I don't know the exact date, but it was after the

3    last hearing we had.

4        Q.    Okay.  And what did you learn about a potential

5    purchase offer on the Temple property?

6        A.    The purchaser was very surprised because he thought

7    he still had a contract and was not aware of the transfer

8    from Prime to TCI and then to FRE.  And going through the

9    contract, quite candidly, when I mentioned to Mr. Kinvig, the

10   contract itself needs to be redone.  Because there were so

11   many -- it was done at a time when it was for what you call a

12   tax credit facility, which takes a long time to get approved.

13   He now has his funding and is ready to move forward.  So I

14   have marked up a contract for him to resubmit to the Court.

15   Short time frames and all of the outs taken out of the title,

16   although there's stuff taken out so we can have a firm

17   contract for closing.

18       Q.    All right.  So who is this purchaser?

19       A.    The purchaser is a young man named Clifton

20   Phillips, who happens to be the younger son of Gene Phillips.

21   But he has a separate company called Round Stone.  And his

22   job then is to -- his company basically develops tax credit

23   apartments.  And but it is with Clifton Phillips, who is the

24   younger son of Gene Phillips.

25       Q.    All right.  But based upon your discussions

NATIONAL COURT REPORTERS (214) 651-8393

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 28 of 94

27

 1   recently with Mr. Phillips, is it your testimony that the

 2   purchaser is serious about moving forward with the purchaser

 3   of the property?

 4       A.   Well, he has funding for it so, yes, he's very

 5   serous.

 6       Q.   All right.

 7       A.   But the real issue is, I've got a -- I marked up

 8   the contract for him taking out all the outs.  Hopefully by

 9   tomorrow we'll have that done and resubmitted so it will be a

10   contract that can be valid.

11       Q.   Is the purchase price going to stay at 525,000?

12       A.   Yes.

13       Q.   All right.  At the last hearing there was some -- I

14   asked you some questions about how these properties that are

15   collateral for different lenders inter-relate with one

16   anther; do you recall that?

17       A.   I do.

18       Q.   And did you provide to me this morning an aerial

19   photograph of the Mercer Crossing land up near LBJ and 6 --

20   excuse me, LBJ and 35?

21       A.   I did.

22            MR. BUNCHER:   For demonstrative purposes --

23   I've only got one copy.  But if I could hand this to the

24   Court?

25            THE COURT:   Thank you.

HC 00686

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 29 of 94

28

1      Q.    There are a number of colored dots on that picture

2   or on the aerial photograph.

3      What do those dots represent?

4      A.    They basically represents the property location in

5   and around Mercer.  You remember, part of my testimony was

6   that part of the marketing plan of the property is to have

7   some kind of a collaboration between lenders and not have

8   Party A having one broker right next door to Party B who has

9   a listing on a different property.  That is a demonstration

10  of the locations of the various collaterals.  Wells Fargo,

11  for example, has, I believe, five properties that are

12  involved in Mercer.  Armed Forces has one big piece which is

13  all notated with hard dots.  RMR has two pieces.  And it just

14  shows the location of those pieces.  And I believe Aegis

15  Capital has one piece.  All of the properties relate, as far

16  as the aerial is concerned and how they relate to each other.

17     Q.    So even when these properties were in separate

18  entities prior to the transfer to this debtor, were the

19  properties and these lenders nonetheless inter-related

20  somewhat with one another?

21     A.    Well, the properties are inter-related in the sense

22  that they came from the same owning entity and were financed

23  by owning entities, or related owning entities.  As to the

24  lending, the only relations there are, and I think I

25  mentioned it, but there are a couple of pieces that the Payne

```
 1  North Track, which I believe is -- I forget which one It is.

 2  But Payne North Track is one of the lenders.  And then I

 3  believe Aegis Capital controls .65 acres that would be a good

 4  entry to that.  And the -- I did not mark on there, but

 5  NextBank has their piece of land, which is additional

 6  collateral, that's directly adjacent to the west of the

 7  building, one of the buildings that's shown on there.  And I

 8  think that's about it.  Those are two of the main things I

 9  wanted -- oh, and not shown on there is Bridgewood Ranch, I

10  believe is -- the land is by Aegis and the property complex

11  is financed by ABC.

12       Q.   All right.  Just so we're clear, you mentioned --

13  in that answer you mentioned the NextBank property.  Which

14  NextBank property were you referring to that's adjacent to

15  this Mercer Crossing Land?

16       A.   They have a 6.6 acre piece that is additional

17  collateral for the Fenton loan.

18       Q.   And where is the Fenton Building in relation to

19  that aerial map there?

20       A.   I'd have to pinpoint it.  I could mark it on a map

21  right quick for you.

22            MR. BUNCHER:  May I show the witness the

23  exhibit?

24            THE COURT:  Of course.

25       Thank you.
```

NATIONAL COURT REPORTERS (214) 651-8393

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 31 of 94

30

 1      A.    If there's a heavier pen, I can mark all of it for

 2   you, if you'd like.

 3      Q.    Here you go.  If you could just put a circle

 4   wherever the --

 5      A.    This is NextBank here.

 6      Q.    And then the -- this is Fenton here.

 7      Okay.  You -- you drew a circle.  That's the NextBank

 8   raw land property?

 9      A.    Right.

10      Q.    And is that cross-collateralized with the Fenton

11   Center Building?

12      A.    Yes.

13      Q.    And you wrote the word Fenton and drew a line

14   pointing to the Fenton Center Building?

15      A.    Yes.

16              MR. BUNCHER:  I'll had this back to the Court.

17              THE COURT:  Thank you.

18              MR. BUNCHER:  It's a little faint, Your Honor.

19              THE COURT:  I see it.

20      Q.    So in your view is there benefit to the lenders to

21   have a unified plan and a marketing strategy with respect to

22   these properties that are shown on this exhibit?

23              MR. WEITMAN:  Objection; leading.

24              THE COURT:  Sustained.

25      Q.    What benefit, if any, do you find that -- in having

1   all these properties in a single bankruptcy case?

2        A.   The only thing that I mentioned --

3             MR. WEITMAN:   Your Honor, the same objection.

4             THE COURT:   Overruled.

5        A.   The only thing I mentioned previously is that --

6   and that's all I was doing really is preparing this as a --

7   as a discussion tool with the various lenders.   And a

8   decision needs to be made between the various lenders of the

9   parcels, if we're going to put the properties up for market,

10  how do we do that?   And do we do it by having one concentric

11  market firm that handles all of it, or do they want to go and

12  have individual brokers handle their own parcels?   My

13  recommendation would be that we have somebody that works it

14  altogether.   But that's strictly up to the lenders once we

15  get to that point.

16            MR. BUNCHER:   All right.   I think we're done

17  with that.   My intention was to use that as a demonstrative

18  aid.   However, given the witness' testimony, I would move to

19  admit the exhibit as Exhibit S, Debtor Exhibit S.

20            THE COURT:   Any objection?   Do you all want to

21  see this?

22            MR. STABER:   I would at least like to see it

23  before it's in there.

24            THE COURT:   That makes sense.

25            MR. BUNCHER:   And just for the Court, Your

NATIONAL COURT REPORTERS (214) 651-8393

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 33 of 94

32

1   Honor, I understand this was just given to me this morning,

2   but we've also been working around the clock since the last

3   hearing on these stipulations and other exhibits that

4   Mr. Weitman has introduced that I've not objected to on any

5   kind of timeliness grounds.  So I'd ask the Court to take

6   that into consideration on this.

7               MR. WEITMAN:  Your Honor, with respect to the

8   timing of it, it took maybe ten drafts in order to get

9   Mr. Buncher to agree to finalize it.  So it was delayed

10  because of working with Mr. Buncher.  That's the point on why

11  things were just handed up to the Court.

12      Your Honor, I don't know that the debtor's chief

13  restructuring officer can really authenticate this.  But I

14  mean, it is what it is.

15              THE COURT:  So the question is, is there an

16  objection?

17              MR. WEITMAN:  No, Your Honor.

18              THE COURT:  All right.  Debtor Exhibit S is

19  admitted.

20              MR. BUNCHER:  Thank you.

21              THE COURT:  Thank you.

22              MR. BUNCHER:  One minute, Your Honor.  I need

23  to grab a different book.

24              THE COURT:  No problem.  Thank you.

25              MR. BUNCHER:  I think we're back to the book,

HC 00691

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 34 of 94

33

1  the original book of the debtor's exhibits that are A through

2  O.

3              THE COURT:  All right.

4        What exhibit are we looking at?

5              MR. BUNCHER:  I'm going to show the witness

6  what's been marked as Exhibit M.

7        Q.   Mr. Morgan, do you recall some questioning at the

8  last hearing about whether or not the transfers were

9  authorized or not and whether some party could possibly

10  assert a fraudulent conveyance claim against the debtor; do

11  you recall that?

12       A.   I do.

13       Q.   And I know you did not look at all of the

14  transaction documents.  You've testified to that.  But did

15  you look at a representative sampling of the documents to see

16  what documents -- what types of documents were signed in

17  connection with the purchase and sale agreement?

18       A.   I did.

19       Q.   And is Exhibit M a resolution of the -- resolution

20  of TCI Texas Properties, LLC, which is the transferor of the

21  Wells Fargo collateral that was signed in connection with

22  that transaction?

23       A.   Yes.

24       Q.   And did you -- did you skim through and look at the

25  transaction documents signed in connection with the Wells

NATIONAL COURT REPORTERS (214) 651-8393

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 35 of 94

34

1   Fargo transaction?

2      A.   I did.  You know, I apologize to the Court.  I

3   should have known about -- as much real estate experience as

4   I have, I should have know that every contract has a

5   representation that has the authority to do it.  But I did go

6   back through the particular transaction you're talking about.

7   And it seems that, at least what I saw, all of the certifies

8   resolutions for the seller were in place.

9      Q.   Okay.

10               MR. BUNCHER:  I would move to admit Exhibit M.

11               THE COURT:  Any  objection to M?

12               MR. WEITMAN:  None, Your Honor.

13               THE COURT:  It's admitted.

14      Q.   And does this indicate -- does Exhibit M indicate

15   to you that the transferor, at least in the case that of the

16   Wells Fargo collateral authorized the transaction?

17      A.   Yes.

18      Q.   I'm sorry?

19      A.   Yes.

20      Q.   If you also turn over to Exhibit M -- excuse me, N,

21   as in Nancy.

22      Is that a resolution of the debtor, Fenton Real Estate,

23   Inc.  that was also done connection with the transaction

24   transferring the Wells Fargo collateral?

25      A.   Yes.

1               MR. BUNCHER:  Move to admit Exhibit N, Your

2     Honor.

3               THE COURT:  Any objection to N?

4               MR. WEITMAN:  No objection, Your Honor.

5               THE COURT:  It's admitted.

6        Q.   Although the properties -- many of these properties

7     that are now owned by the debtor were in separate entities

8     that transferred the properties to the debtor, were all of

9     those entities that transferred the property subsidiaries of

10    either Transcontinental, American Realty, or Income

11    Opportunity?

12       A.   In some form, yes.

13       Q.   All right.  So indirectly the properties were all

14    owned by common owners, even before they were transferred?

15       A.   Yes.

16              MR. BUNCHER:  Your Honor, I'll pass the

17    witness.

18              THE COURT:  Very well.

19         Mr. Weitman.

20              CROSS-EXAMINATION

21    BY MR. WEITMAN:

22       Q.   Mr. Morgan, do you consider yourself and expert in

23    the purchase and sale of real estate?

24       A.   Yes.

25       Q.   And how many years have you been doing this?


                NATIONAL COURT REPORTERS (214) 651-8393

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 37 of 94

36

```
 1      A.   35 years.

 2      Q.   Did you not mention to the Court last time we were

 3 here that you had filed for personal bankruptcy in 2005?

 4           MR. BUNCHER:  Objection; relevance, Your

 5 Honor.

 6           MR. WEITMAN:  Your Honor, it has ot go with

 7 his credibility and his expertise as a chief restructuring

 8 officer and whether he really is an expert.

 9           MR. BUNCHER:  The fact -- if Mr. Morgan had

10 personal financial problems, that doesn't have anything to do

11 with this case, Your Honor.

12           MR. WEITMAN:  Your Honor, may I have just a

13 little bit of latitude?  It was all on real estate projects.

14           THE COURT:  I'll allow it, briefly.

15      Q.   In fact, weren't -- didn't you invest through

16 various entities in real estate shopping centers?

17    .  A.   Yes.

18      Q.   I'm sorry, I can't hear you.  Yes?

19      A.   Yes.

20      Q.   And as a result of foreclosures or other returns of

21 collateral, did you not leave various secured creditors

22 holding $30 million worth of deficiency claims?

23           MR. BUNCHER:  Your Honor, I'm going to object

24 if we're going to start basically trying issues in his --

25 that were resolved in his personal bankruptcy case.  If the
```

1    Court -- if he wants the Court to take notice of his

2    bankruptcy case, there's filings and there's disputes and

3    there were appeals of those disputes.  And so I object to

4    this line of questioning, other than the fact that he did

5    file bankruptcy and the record speaks for itself with

6    whatever happened and the issues involved in that case.

7              THE COURT:  Overruled.  I'm going to allow it

8    briefly.

9        Q.   Is that not true that you left $30 million worth of

10   deficiency claims owing to secured creditors?

11       A.   It is not true.

12       Q.   Are you not aware of two various opinions from both

13   Judge Jernigan and also, I think it was Judge Kincade,

14   dealing with issues of discharge and your bankruptcy

15   proceedings?

16       A.   I'm aware that in both cases the bankruptcy was

17   rewarded.

18             THE COURT:  The bankruptcy was, I'm sorry?

19             THE WITNESS:  The bankruptcy was, I guess in

20   other words, confirmed.

21             MR. WEITMAN:  Your Honor, just to clarify.  He

22   did get a discharge in bankruptcy.  But there are decisions

23   where essentially --

24             THE COURT:  This is questioning of the

25   witness.  You can make argument later.

NATIONAL COURT REPORTERS (214) 651-8393

 1       Q.   In fact, weren't there questions that were raised

 2   as to whether or not you personally were involved in

 3   fraudulent conveyances which would result in you getting --

 4   not getting a discharge?

 5              MR. BUNCHER:   Same objection.   This is

 6   irrelevant.   It's under 403, the probative value

 7   substantially outweighed by prejudicial value.   And we're

 8   getting into issues that were tried in courts other than this

 9   court.   And I think it's just unfair and inappropriate.

10              MR. WEITMAN:   Your Honor, he claimed to be a

11   witness.   He's a chief restructuring expert.   And he made a

12   shambles of his own personal investments.

13              THE COURT:   I'm going to allow it.   I think it

14   is relevant, at least to a point.

15              MR. WEITMAN:   Your Honor, may I hand up to the

16   Court a copy of the West Law decision?

17              THE COURT:   You may.

18              MR. WEITMAN:   Thank you.

19       Q.   Do you recall there being allegations that you had

20   engaged in fraudulent conveyances?

21       A.   I do.   And I also recall that this case was tried

22   three times through the Appellate Courts and each case was

23   affirmed that there was not fraudulent conveyances.

24       Q.   Do you recall that the Court found that that was

25   not an intent to hinder and delay or defraud creditors, but

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 40 of 94

39

1  that there were -- there was, in fact, strong evidence of

2  constructive fraudulent conveyances?

3           THE COURT:  I can read the opinion.  It speaks

4  for itself.

5      Q.   Do you recall your testimony on February 3 when you

6  explained that you had no problem with these seller notes

7  that were issued by FRE to the transfer entities?

8      A.   I do.

9      Q.   And was it your -- is it now your testimony that

10  those looked like valid transactions to you?

11      A.   I'm sorry, you asked me -- you're going to have to

12  explain valid.

13      Q.   That those were appropriate transactions to be

14  entered into by the transferor and FRE.

15      A.   Yes.

16      Q.   And is it still your testimony that the acquisition

17  of the stock ownership interest in each of the transferor

18  entities was appropriate?

19      A.   I told you, I have no knowledge of that.

20      Q.   But is it your testimony that those were

21  appropriate transactions?

22      A.   I can't testify as to whether it's appropriate or

23  not.  I have no knowledge of it.

24      Q.   Well, if you were to continue as a debtor in

25  possession, as a chief restructuring officer of the debtor in

NATIONAL COURT REPORTERS (214) 651-8393

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 41 of 94

40

1  possession, would you investigate those transactions further,

2  or would you assume that they were they were appropriate

3  since they were authorized by various boards?

4      A.    The debtor, for which I'm in charge, does not own

5  those entities that you're talking about.  It's owned by a

6  parent company.

7      Q.    Would you take a look at the debtor's book, if you

8  will, their exhibits, and Schedule F, if you have that?

9              THE COURT:  Debtor Exhibit F?

10             MR. WEITMAN:  Yes.  It's page 17 of 17.  This

11 is, again, dealing with the unsecured buyer notes payable.

12             THE COURT:  I'm not sure where you're looking,

13 Mr. Weitman.

14             MR. WEITMAN:  In Mr. Buncher's notebook.

15             THE COURT:  I've got Exhibit F.

16             MR. WEITMAN:  And then there is a 30 pager of

17 the creditors holding unsecured, non-priority claims.  And

18 then just before G, there is this Schedule F, unsecured buyer

19 notes payable.

20             THE COURT:  So Exhibit F, Schedule F?

21             MR. WEITMAN:  Yes, Your Honor.  If I may just

22 show Your Honor -- it's at the very end just before G.

23             MR. BUNCHER:  And just for the record, the

24 schedules of the debtor were actually admitted as Armed

25 Forces Exhibit 4 at the last hearing, Your Honor.

1              THE COURT:   Thank you, Mr. Buncher.

2         All right.   I've got it.

3         A.   Yes.

4         Q.   Now, we discussed that footnote 4 before, didn't

5    we?

6         A.   Yes.

7         Q.   And is it not your testimony that in each case

8    the -- if a property is sold, then the administrative -- then

9    the tax, ad valorem tax and then the secured d debt would be

10   satisfied before the seller note would get paid?

11        A.   Yes.

12        Q.   And we've covered this before.   There is no

13   documentation from the -- from Transcontinental or any

14   holders of the notes that evidences your footnote 4, correct?

15        A.   That is correct.

16        Q.   Yet you met with them just yesterday in connection

17   with this debtor in possession financing?

18        A.   Yes.

19        Q.   Did you seek to try to get some documentation from

20   them evidencing that?

21        A.   I -- we clearly outlined the position that's going

22   to have to be taken the timing for putting this, all of it

23   in, I mean, file a plan, which we plan to do very shortly.

24        Q.   So their position is is that in order to try to

25   preserve what they view as $48.8 million worth of notes

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 43 of 94

42

1   payable to them, they would try to support it with $400,000

2   of debtor in possession financing?

3       A.   No, that's not my testimony at all.

4       Q.   Well --

5       A.   No, that's not my testimony at all.

6       Q.   Well --

7       A.   My testimony to you is this.  Was that these notes

8   come junior to the secured and unsecured administrative and

9   priority claims, period.

10      Q.   On a property-by-property basis?

11      A.   On a property-by property basis.

12      We may be able to amplify that.  But that was the plan.

13   At this point in time, until this hearing is over, I don't

14   know how many lenders I'm dealing with, or exactly what we're

15   dealing with.  But I do know that the concept of these notes

16   being taken a junior position, at least on a

17   property-by-property basis and maybe even on the whole is

18   going to have to be for the plan and they understand that.

19      Q.   Did you ask a Transcontinental representative to be

20   here at today's hearing?

21      A.   No.

22      Q.   Don't you think that would have helped explain this

23   footnote 4?

24      A.   I think the footnote 4 would be explained when you

25   file a plan.

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 44 of 94

43

1    Q.   And don't you think it would be helpful to get a

2    commitment with a representative of Transcontinental for a

3    hearing such as this?

4    A.   I just explained to you that the commitment from

5    them is going to be tied to how this situation works out

6    here.  Obviously it has to be -- there's no way that these

7    notes are going to be hold up, in my mind, are going to take

8    a preference.  And I think everybody has already realized

9    that.  We can't -- those notes can't take preference over the

10   lenders getting paid and unsecured lenders getting paid.  So

11   there will have to be a modification.  That's understood, how

12   it's done and the final filing of it will be done in the

13   plan.

14   Q.   Did you do any due diligence on Transcontinental

15   Realty as to whether they have the financial wherewithal to

16   provide some liquidity to the debtor?

17              MR. BUNCHER:  This is repetitive from the

18   hearing last time, Your Honor, about -- I think the exact

19   question --

20              MR. WEITMAN:  Well, Your Honor, now we have

21   the issue of where Mr. Morgan's testimony that they will put

22   in $400,000 --

23              THE COURT:  Overruled.

24   Q.   Did you do any due diligence that they have the

25   liquidity to fund the $400,000?


NATIONAL COURT REPORTERS (214) 651-8393

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 45 of 94

44

1      A.   I met with the chief counsel, the chief financial

2   officer, and the president of the company yesterday, who

3   agreed that they had gone to the board and got it approved.

4   And that was -- that was when they would be willing to commit

5   to meet yesterday.

6      Q.   Did you ask them in any way to provide a wire

7   transfer to the registry of the Court to support their claim

8   they have $400,000?

9      A.   That's not the way it's written.   That's not the

10  way the letter is written.

11     Q.   Did you ask?

12     A.   I didn't ask, because that's not the way the letter

13  is written.

14     Q.   Did you ask for them to wire transfer the funds to

15  the debtor's account to show they have the financial

16  wherewithal?

17     A.   That's not the way the letter is written.

18     Q.   Are you familiar with Transcontinental Realty

19  investor's involvement in the Woodmont Bankruptcy Proceedings

20  before Judge Hale?

21     A.   No.

22     Q.   Are you aware of the fact that they were supposed

23  to provide plan financing in the Woodmont bankruptcy

24  proceedings and they did not come through and the plan went

25  into default?

```
 1      A.   No.

 2                MR. WEITMAN:  Your Honor, may I hand up a copy

 3  of the docket sheet?

 4                THE COURT:  You may.

 5                MR. WEITMAN:  It was a long docket sheet, Your

 6  Honor, so it only covers items 79 and following.  I'm sure

 7  the Court can get on line.  But -- and you can see the

 8  activity there.

 9                THE COURT:  Mr. Weitman, this is the

10  opportunity to ask questions of the witness.

11                MR. WEITMAN:  Forgive me.

12      Q.   You earlier testified that you thought that

13  $400,000 would be provided by Transcontinental, correct?

14      A.   Yes.

15      Q.   And that they would cover taxes?

16      A.   Yes.

17      Q.   Can you tell me where --- how it is that they were

18  cover taxes if those taxes are for 2011 and aren't due until

19  2012?

20      A.   Put it in escrow.

21      Q.   And does it say that anywhere in the -- in this

22  alleged commitment letter?

23      A.   No.  That's my debtor's commitment.  What the

24  letter says is they would fund up to $400,000 as FRE request

25  the money to be funded, which includes when I need to pay the
```

Case 11-42042-dml11    Doc 30-31    Filed 04/11/11    Entered 04/11/11 15:34:21    Desc
Exhibit U - Part 1 - Hearing Transcript    February 17    2011    Page 47 of 94

46

1    bills, they fund it.  And that includes an escrow -- the

2    debtor is going to do one escrow account for each lender's

3    collateral.

4        Q.    Is there any money for adequate protection payments

5    for the lenders with liens on the raw land?

6                MR. BUNCHER:  Objection, Your Honor.  The

7    escrowing of taxes is adequate protection payments.

8                THE COURT:  I don't believe that's the basis

9    for an objection.

10               MR. BUNCHER:  Well, I object to the form of

11   the question.

12               THE COURT:  Overruled.

13       Q.    Can you answer the question, please?

14       A.    If you answer it with a question, is there a

15   provision during this interim period, do we file a plan to

16   pay interest on the loans, no.

17       Q.    And, again, when you make the request, then you

18   think they're going to pay you?

19       A.    Yes.

20       Q.    And you don't know how that $400,000 would be

21   repaid at the time of plan confirmation; do you?

22       A.    No.

23       Q.    And this is something, again, you just came up with

24   yesterday, correct?  You only got this letter yesterday,

25   correct?

1     A.   Yes.

2     Q.   Let's talk a little bit about the Fenton Center

3   lease that you spoke about last time.

4     A.   Yes.

5     Q.   I believe it was your testimony that you thought

6   that with this new lease you were going to bring in, that

7   that would create new value, correct?

8     A.   Yes.

9     Q.   That lease was with -- did you say it was HCA?

10     A.   Yes.

11     Q.   Are you sure it wasn't with HCA's affiliate?

12     A.   I don't remember on that.  It was referred to as

13   HCA.  I haven't gone in -- I don't remember.

14     Q.   And that was a term sheet?

15     A.   Yes.

16     Q.   And did you forward that term sheet to the secured

17   lender?

18     A.   Yes.

19     Q.   NextBank?

20     A.   Yes.

21     Q.   Did NextBank consent to that term sheet?

22     A.   No.  NextBank gave me a letter of support from

23   their counsel that they would back us and welcome the tenant

24   and work with us in every way possible.

25     Q.   And this tenant, you're not sure if it's HCA or an

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 49 of 94

48

1  affiliate, correct?

2      A.    I know it's related to the HCA Hospital corporation

3  of America.

4      Q.    Did you get any financial information or do any

5  other due diligence on this affiliate and its financial

6  wherewithal?

7      A.    Not at this time, because we're still in the term

8  sheet stage.

9      Q.    And were they going to provide any type of a

10  guarantee or letter of credit from HCA to support this lease?

11      A.    Again, we're in the term sheet stage.

12      Q.    Is there not also a requirement that there would be

13  tenant improvements that the debtor, FRE, as landlord would

14  have to fund?

15      A.    Yes.

16      Q.    Would that not equate to $3.5 million?

17      A.    Probably more than that.  It would come close to 4

18  million.

19      Q.    Where is that $4 million coming from?

20      A.    It will come from wherever it has to come from.  It

21  could come from TCI.  It could come from additional

22  financing.  It depends.  I mean, there's certainly a lot of

23  value.  Close to $25 million worth of additional value.

24      Q.    But isn't it true that Transcontinental prior to

25  these transfers of the assets used to fund the shortfalls on

1    the various indebtedness owed by these subsidiaries?

2        A.    I'm sorry, you're going to have to be more

3    specific.

4        Q.    Didn't Transcontinental and American Realty and

5    Income Opportunity fund the various shortfalls on these

6    properties prior to the transfers of December 23rd?

7        A.    Well, these properties, you've got to be more

8    specific.

9        Q.    And they elected to stop funding those; did they

10   not?

11       A.    I don't know when that occurred.

12       Q.    So they now have monetized their alleged equity of

13   48 to $50 million, correct?

14       A.    It's not monetized until it's paid.

15       Q.    Going back to the Fenton Center lease.  There is no

16   source of 3 1/2 to $4 million today to fund the tenant

17   improvements, correct?

18       A.    There is no deal today.

19       Q.    And would you not also give them rent for free for

20   a year, free rent for a year under that term sheet?

21       A.    Yes.

22       Q.    And would you not also be starting the lease at the

23   end of 2011?

24       A.    Correct.

25       Q.    And yet in your expert opinion this is a deal to be

Case 11-42042-dml11 Doc 30-31 Filed 04/11/11 Entered 04/11/11 15:34:21 Desc
Exhibit U - Part 1 - Hearing Transcript February 17 2011 Page 51 of 94

50

1   pursued to create value?

2       A.   We are going to continue to pursue the deal until

3   we get their commitment.  And then we get involved in the

4   commitment and the we get involved in the security and all of

5   the other aspects that goes with it.

6       Q.   And, again, you have not received any consent from

7   NextBank to the transaction, correct?

8       A.   I just got through telling you.  They sent me a

9   letter of support from the counsel supporting the transaction

10  and allowing us to provide that information to the tenant in

11  support so that we didn't have a conflicting -- conflicting

12  issue of worrying about the bankruptcy case.

13      Q.   If you would, sir, could you move to Exhibit D in

14  that same note book?  And it's the Schedule D following the

15  Schedule D, creditors holding secured claims.  This would

16  appear as probably 2 of 5 toward the back.

17               MR. WEITMAN:  Your Honor, may I approach the

18  witness to try to help?

19               THE COURT:  Yes.

20       And I'm sorry, tell me again?

21               MR. WEITMAN:  Pardon me, Your Honor.  It's

22  Schedule F.

23               THE COURT:  What exhibit tab?

24               MR. WEITMAN:  F, pardon me, Schedule D, the

25  exhibit, showing creditors and the property descriptions.

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 52 of 94

51

1                    THE COURT:  So Schedule D?

2                    MR. WEITMAN:  Yes.

3                    THE COURT:  For future reference, it would be

4  very helpful in exhibits as lengthy as this to have them

5  Bate's page numbered so that we aren't searching through

6  hundreds of pages hoping to land on the right spot.

7                    MR. WEITMAN:  I apologize.  And, yes, I will

8  do that in the future.

9       Q.   Mr. Morgan, can you take a look at the creditor

10  that's listed, First Bank & Trust; do you see that?

11      A.   Yes.

12      Q.   Is that a single asset of the Centura land that was

13  owned -- that constitutes the collateral of First Bank &

14  Trust?

15      A.   Yes.

16      Q.   And the Centura property was transferred by a

17  transferor entity to FRE, correct?

18      A.   Correct.

19      Q.   And that as done around December 22nd?

20      A.   Whenever, yeah.

21                    THE COURT:  I'm not sure I'm following the

22  question.  Single --

23                    MR. WEITMAN:  In other words, that there is a

24  secured lender with a single property of the Centura land.

25                    THE COURT:  Right.

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 53 of 94

52

1              MR. WEITMAN:  And that was transferred --

2              THE COURT:  But was it -- are you trying to

3    say that it was in a single asset entity?

4              MR. WEITMAN:  Correct.  Pardon me.

5         Q.   It is your testimony, is it not, that that was

6    owned by Iori, Centura, Inc., correct?

7         A.   I don't recall the exact entity.  We'd have to go

8    back to the chain.

9         Q.   And if Iori Centura, Inc., had not transferred it

10   to FRE, would this not be a single asset bankruptcy

11   proceeding of Iori Centura, Inc.?

12             MR. BUNCHER:  Object to the extent that calls

13   for a legal conclusion.  But I think he can answer whether

14   it's one asset or more than one asset.

15        Q.   Would there have been just one asset --

16             THE COURT:  Sustained.

17        Q.   -- in that bankruptcy?

18        A.   Yes.

19        Q.   I'd then ask you to go to the next one, U.S. Bank.

20   U.S. Bank's secured collateral is the -- collateral is the

21   Parkway North Office Building; is that correct?

22        It's just right beneath the last one, sir.

23        A.   Okay.  Go ahead.

24        Q.   Is that correct?

25        A.   Yes.

1      Q.   And this Parkway North Office Building, was that

2   not owned by Transcontinental Westgrove, Inc., before

3   December 23?

4      A.   Again, I'll have to have some type of chart.  If

5   you have that, I'll be glad to use it.

6      Q.   Can you go to the second page?

7      A.   I got it.

8      Q.   Do you see where it shows the transfer of the

9   Parkway North Office Building from Transcontinental

10  Westgrove, Inc., to FRE Real Estate?

11     A.   Yes.

12     Q.   Now, looking on your schedule, is that not a single

13  asset that was owned by Transcontinental Westgrove, Inc.?

14     A.   It appears to be so, yes.

15     Q.   And then that was transferred, was it not, on the

16  eve of a foreclosure; do you know?

17     A.   I don't know about -- I don't know about the time

18  of the transfer.

19     Q.   Let's go to the next one.

20     A.   The transfer of the property, as far as I'm

21  concerned, happened on the 23rd.  If you're talking about the

22  recording, I don't know about that.

23     Q.   Let's go to Petra Mortgage Capital Corp.  Do you

24  see that, sir?

25     A.   What page are you on?

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 55 of 94

54

1      Q.   If you would go back to Schedule D, the exhibit.

2         Is that not a single asset that constituted the

3    collateral of Petra Mortgage?

4      A.   It is.

5      Q.   And then if you would go to the blue and yellow.

6    Was not the Amaco Office Building owned solely by TCI Amaco

7    Property, LLC?

8      A.   Yes.

9      Q.   And then it was transferred to FRE Real Estate,

10   Inc., around December 22nd, correct?

11     A.   Right.

12     Q.   Had that property not been transferred to FRE Real

13   Estate, Inc., would there have been a bankruptcy of TCI Amaco

14   Property, LLC with that single asset?

15             MR. BUNCHER:   Calls for the witness to

16   speculate, Your Honor.

17             THE COURT:   Sustained.

18     Q.   Is there not just a single asset in TCI Amaco

19   Property, LLC just prior to this foreclosure -- just prior to

20   the transfer?

21     A.   Yes.

22     Q.   Let me ask you to go a little further down, State

23   Bank of Texas.

24     A.   Yes.

25     Q.   Do you not see some property, this Archin-

NATIONAL COURT REPORTERS (214) 651-8393

1   18.8328 -- 8.32 -- 18.832 acres; do you see that, sir?

2       A.   Yes.

3       Q.   And was not the owner of the Archin land Coventry

4   Point prior to the transfer on December 23?

5       A.   I'm sorry.  I'm trying to find it.

6       Q.   I think it's, if you will, the third bubble on the

7   second page, Coventry Point, Inc.

8       A.   Yes, I see that.

9       Q.   So that was just a single asset, was it not, this

10  Archin land within Coventry Point?

11      A.   Yes.  There are some tenant in common interest

12  there that -- regarding some land on any of the parking lot

13  that had some ties.  But, yes, it's single.

14      Q.   And -- so this would have been a single asset in

15  Coventry Point, Inc., prior to this transfer, correct?

16      A.   Yes.

17      Q.   And there would have been a secured creditor, State

18  Bank of Texas, with that first lien on the property, correct?

19      A.   You said, would have been.  There was.

20      Q.   And there still is?

21      A.   Yes.

22      Q.   If you would move two more pages.  Do you see

23  Regions Bank as a secured lender?

24      A.   What property are we talking about?  Are we talking

25  about Parkwood?

NATIONAL COURT REPORTERS (214) 651-8393

Case 11-42042-dml11    Doc 30-31    Filed 04/11/11    Entered 04/11/11 15:34:21    Desc
Exhibit U - Part 1 - Hearing Transcript    February 17    2011    Page 57 of 94

56

1    Q.    No.

2    A.    Oh, down here.

3    Q.    Now there you're showing -- do you see Regions

4   Bank?

5    A.    Yes, I do.

6    Q.    And there was a transfer to -- and is its sole

7   collateral the Westgrove Air Plaza property?

8    A.    Let me get back over here to your bubbles.

9    Q.    Page 5, I believe.

10    A.    Yes, it is.

11    Q.    And was that previously owned by Westgrove Air

12   Plaza Limited?

13    A.    Yes.

14    Q.    And would there have been only a single asset of

15   this Westgrove Airplane office hanger in Westgrove Air Plaza,

16   in that entity prior to its transfer to FRE around December

17   22nd?

18    A.    Is your question was it a single asset that was

19   transferred?

20    Q.    Yes.

21    A.    Yes, it is.

22    Q.    And there was a single asset in Westgrove Air

23   Plaza, correct?

24    A.    Yes.

25    Q.    Now, what is the connection of Gene Bercher to

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 58 of 94

57

1   Prime Income Asset Management?

2        A.    I understand his title was chief financial officer.

3        Q.    And is he -- does he have any connection with the

4   transferor entities?

5        A.    Is he an officer of each entity, I'm not sure about

6   that.

7        Q.    Is he connected with American Realty and

8   Transcontinental?

9        A.    Well, I mentioned to you that Prime is the advisor

10  connected to -- whether he's the official officer of that, I

11  don't know.

12       Q.    Isn't it true that you have Mr. Bercher as one of

13  the authorized signatories on the debtor in possession

14  accounts?

15       A.    No.

16       Q.    Did you not have him as an authorized signer as of

17  the date of a hearing, the 341 Meeting of Creditors?

18       A.    There was an error on that.  The way that I did it

19  was I had Regis as an agent for FRE for the DIP accounts.

20  And as an agent, somebody went around and got a bunch of

21  signatures.  And when I found out that was the case, we

22  changed all of that.  So only Mr. Landers, now, and Rick

23  Coney they're authorized signatures.

24             MR. WEITMAN:  Just one moment, Your Honor.

25             THE COURT:  Yes.

HC 00716

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 59 of 94

58

1                    MR. WEITMAN:  Your Honor, I pass the witness.

2                    THE COURT:  Anyone else have questions for

3    Mr. Morgan?

4        Mr. Leninger.

5                    CROSS-EXAMINATION

6    BY MR. LENINGER:

7        Q.    Mr. Morgan, my name is John Leninger.  I represent

8    Armed Forces Bank.

9        A.    Yes, sir.

10       Q.    I want to talk to you about the proposed financing

11   from TCI.

12       Do you understand the concept of if the collateral is

13   worth more than my debt, I get to accrue interest

14   post-petition?

15       A.    I'm not aware of it.

16                   MR. BUNCHER:  Objection; calls for a legal

17   conclusion.

18       Q.    You're not familiar with that concept?

19       A.    No.

20       Q.    Okay.  I want you to assume that if the collateral

21   is worth more than my debt, I get to accrue post-petition

22   interest.  Can you assume that for me?

23       A.    If you would assume my plan does not support that,

24   yes.

25       Q.    Okay.  What I want to know is, is the financing

NATIONAL COURT REPORTERS (214) 651-8393

HC 00717

1    that's to be provided by TCI prime that interest, to the

2    extent I'm entitled to it?

3         A.   Go a little bit slower, please.

4         Q.   The financing that's being provided by Prime,

5    according to the letter it says that it's behind the first

6    mortgage liens.  Armed Forces Bank is the first mortgage lien

7    holder.

8         A.   That's correct.

9         Q.   If Armed Forces Bank is entitled to accrue interest

10   on its claim post-petition, does the money coming in from TCI

11   prime my right to interest?

12        A.   If you're asking me does this current financing

13   provide for payment of interest, no.  It only provides for

14   the --

15        Q.   Not what I'm asking.

16        A.   Okay.  Then maybe you can ask it different and I

17   can answer it different.

18        Q.   The letter provides that the financing to be

19   provided by TCI is behind the first mortgage lien.

20        A.   That's correct.

21        Q.   Armed Forces Bank has the first mortgage lien.

22        A.   That's correct.

23        Q.   We're going to assume that Armed Forces Bank gets

24   to accrue interest on its claim post-petition.

25        A.   Let's go with that assumption, okay.

HC 00718

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 61 of 94

60

```
 1      Q.   If TCI loans money to Armed Forces Bank collateral,

 2  does the lien given TCI prime the interest that I'm accruing

 3  post-petition?

 4      A.   Absolutely not.

 5      Q.   Excuse me?

 6      A.   No.

 7      Q.   Okay.  Was TCI a borrower from Armed Forces Bank?

 8      A.   I don't know exactly.  I'd have to go to the entity

 9  and see what it was.  But I'm sure it's one of the related

10  entities.

11      Q.   Did TCI own the Kenwest property?

12      A.   Again, I'd have to go back to see who actually

13  owned the pieces of property.  I'm not sure.  I can go back.

14  There's a bubble, if you like and we can go --

15      Q.   Yes.  Why don't you go back to the bubble and

16  refresh your memory on that.

17      A.   Okay.  Now, you're asking first about the Mercer

18  property, right?

19      Q.   I'm asking about Kenwest.

20      A.   Oh, Kenwest, I'm sorry.

21       Okay.  It says ART Collection, Inc.

22      Q.   Was the original owner?

23      A.   Yes.

24      Q.   It wasn't TCI?

25      A.   No.
```

1      Q.    Would you go down to the next level, please.

2      A.    Well, that's the last one on mine.  Kenwest is the

3   last one.

4            THE COURT:  Where are you looking,

5   Mr. Leninger?

6            MR. LENINGER:  I'm looking at page 6.  It

7   appears that they're different copies.  But the stipulation

8   we've entered, Your Honor --

9            THE COURT:  Well, I'm looking at page 6.  And

10  it's the Kenwest land is the last bubble on there.

11           MR. LENINGER:  Correct, Your Honor.  That is

12  not -- the one I have I think is different than the one you

13  have.

14       May I approach?

15           THE COURT:  Uh-huh.

16           MR. BUNCHER:  Well, wait a second.  The one

17  she has is the one that's been entered into evidence.  We

18  can't -- there have been numerous drafts of this thing.  You

19  may have a draft that's not a correct copy.

20           MR. LENINGER:  Well, this one says the

21  Transcontinental.

22           MR. BUNCHER:  If you want to ask the witness

23  about the exhibit that's been admitted, I have no objection

24  to that.

25           MR. LENINGER:  He doesn't have the same

NATIONAL COURT REPORTERS (214) 651-8393

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 63 of 94

62

1   exhibit, Doug.

2             MR. BROWN:  Your Honor, it's Exhibit 192.  And

3   it is the same one that we offered this morning, the one that

4   Mr. Leninger is asking him about.

5             MR. BUNCHER:  Okay.  Well, then I guess give me

6   my copy.  Maybe the one I handed him is the draft.

7             THE COURT:  Oops.

8   A.   Yes.

9   Q.   Okay.  Now, prior to the transfers, as reflected on

10  Exhibit 192, who was the owner of the Kenwest property?

11  A.   Transcontinental Realty Investor, Inc.

12  Q.   And do you know what it would have taken for

13  Transcontinental to bring that note current prior to the

14  transfer?

15  A.   I do not.

16  Q.   So if it was $257,000, you wouldn't be aware of it?

17  A.   No.

18  Q.   So I want you to assume that it was $257,000.

19  A.   Okay.

20  Q.   Why did Transcontinental, if it has this money, not

21  use the money to pay Armed Forces Bank?

22            MR. BUNCHER:  Object to speculation, Your

23  Honor.

24            THE COURT:  I don't think you've laid a

25  predicate for him knowing.  So sustained.


NATIONAL COURT REPORTERS (214) 651-8393


HC 00721

1      Q.   Do you know if Kenwest -- excuse me.  Do you know

2   if TCI has the $400,000?

3      A.   I know the three people in charge of the company --

4           MR. LENINGER:  Objection; non-responsive.

5      Q.   Do you know if TCI has the money?

6      A.   I've already testified that what I know is what was

7   told to me yesterday in the meeting.

8           MR. LENINGER:  Objection; non-responsive.

9           THE COURT:  Sustained.

10      Q.   Do you know if TCI has the money?  It's a yes or

11   no.

12      A.   No.

13      Q.   The letter provides that you have to make a draw

14   request to TCI.

15      A.   Right.

16      Q.   Is TCI required to fund the money after a draw

17   request?

18      A.   Yes.

19      Q.   Is that in the letter?

20      A.   It says they'll pay it as presented.

21      Q.   Is --

22           THE COURT:  One second.  Mr. Kinvig.

23           MR. KINVIG:  I hate to object to what's

24   essentially co-counsel's questions.  But I think that, you

25   know, any time the witness is testifying about the contents

NATIONAL COURT REPORTERS (214) 651-8393

Case 11-42042-dml11    Doc 30-31    Filed 04/11/11    Entered 04/11/11 15:34:21    Desc
Exhibit U - Part 1 - Hearing Transcript    February 17    2011    Page 65 of 94

64

1    of a letter that has been sustained as hearsay, that's really

2    now allowable.

3                THE COURT:  I was wondering where you've been.

4        Yes.

5                MR. LENINGER:  I was going to go with it until

6    you let me get away -- as long as you let me get away with

7    it.

8        Q.    What's the interest rate that you're going to pay

9    TCI for this loan?

10       A.    I'm going to pay -- it's going to accrue 6 percent.

11               MR. KINVIG:  Your Honor --

12               THE COURT:  Mr. Leninger, we've sustained the

13   objection.  This document is not in evidence.

14               MR. LENINGER:  I'm asking him what his

15   understanding is of the interest rate that they have asked

16   for.

17               MR. KINVIG:  Your Honor, there really is no

18   long and no evidence of a loan until they can produce a

19   document that can be authenticated that shows that there is

20   an offer on the table.  Since they've not been able to

21   produce any authenticated document, there is no loan.

22   There's no offer to make a loan.  There's nothing.  And so I

23   don't think there's anything that that can't be testified

24   about.

25               THE COURT:  Well, unfortunately you let

1   Mr. Buncher ask him a bunch of questions about his oral

2   understanding.  Technically, I think you're correct.  But I'm

3   not quite sure what to do now since we've allowed direct

4   examination about something for which a best evidence

5   objection would have been sustainable, but was never made.

6             MR. KINVIG:  Well, Your Honor, I think that

7   Mr. Buncher in going to what Wick's counsel had also said,

8   most of Mr. Buncher's questions or maybe all of Mr. Buncher's

9   questions were when he was technically supposed to be

10  authenticating the document.

11            THE COURT:  No.  Following.  Following my

12  sustaining your objection he asked a bunch of questions about

13  this.

14            MR. KINVIG:  My apologies, then.

15            THE COURT:  So unfortunately I'm going to

16  allow this.  But it is odd.  The movants may want to

17  coordinate a bit, because Mr. Weitman asked a bunch of

18  questions about a document that's not been admitted into

19  evidence.  And now, Mr. Leninger, you are, as well.

20     Q.   Did you say 6 percent?

21     A.   No.  I thought you were talking about something

22  else.

23        The interest rate has not been set.  I have advised,

24  however, and we have to file this with a motion to get the

25  DIP approved, that we have to be governed by the lowest

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 67 of 94

66

1    interest rate on the lands.  And I have a schedule that I've

2    looked at relative to the non-default contract rates on the

3    land loans.  And it will certainly not exceed the lowest

4    contract rate on any of the land loans.

5         Q.   You spoke about a plan.  Have you begun drafting a

6    plan for this debtor?

7         A.   As soon as this is over, I'm ready to start

8    drafting one.

9         Q.   Have you retained an interest rate expert?

10        A.   Not yet, no.

11             MR. LENINGER:  No further questions, Your

12    Honor.

13             THE COURT:  Anyone else?

14       Mr. Buncher, redirect?

15             MR. BUNCHER:  I don't think we have anything

16    further, Your Honor.

17             THE COURT:  All right.  Mr. Morgan, thank you

18    very much.  You may step down.

19             THE WITNESS:  Thank you.

20             MR. WEITMAN:  Your Honor I'd like to call Mr.

21    Greg Crown to the stand.

22             THE COURT:  Mr. Crown, if you'd come forward,

23    please.

24       We'll have you sworn in, please.

25             (The witness was sworn by the courtroom deputy.)

NATIONAL COURT REPORTERS (214) 651-8393

1               GREG CROWN

2  The witness, having been duly sworn to tell the truth,

3  testified on his oath as follows:

4               DIRECT EXAMINATION

5  BY MR. WEITMAN:

6     Q.   Are you not the vice president of Prime Income

7  Management?

8     A.   Prime Income Asset Management, yes.

9     Q.   And was that the financial advisor to each of the

10 transferor entities?

11    A.   It was the advisor to the -- to the parents of the

12 transferor entities in the case that were not TCI or OIRI.

13    Q.   Well, with respect to, say, TCI Texas Properties,

14 TCI Adams --

15    A.   So for all of those that were TCI directly owned,

16 it was the advisor, correct.

17    Q.   And now it's providing financial advisory services

18 to Mr. Morgan and the debtor, correct?

19    A.   Yes.

20    Q.   And there's no money to pay you, correct, or pay

21 Prime Income, correct?

22    A.   That's correct.

23    Q.   You're just doing it for free, correct?

24    A.   That's correct.

25    Q.   And is Gene Bercher the president or an officer of

Case 11-42042-dml11    Doc 30-31    Filed 04/11/11    Entered 04/11/11 15:34:21    Desc
Exhibit U - Part 1 - Hearing Transcript    February 17    2011    Page 69 of 94

68

1    Prime Income?

2        A.    He is.

3        Q.    And was he an authorized signer of the debtor in

4    possession accounts?

5        A.    I believe at the time of the last hearing he was.

6    And I believe that's since been changed.

7        Q.    Now, prior to these transfers on December 22nd,

8    2010, isn't it true that American Realty, Transcontinental,

9    and Income Opportunity would fund the necessary expenses and

10   interest payments and the like on the raw land properties?

11       A.    That is correct.

12       Q.    Do you know how much was being funded by those

13   entities prior to bankruptcy?

14       A.    I do not.

15       Q.    Are you aware that they also restructured the ad

16   valorem taxes on a number of the properties getting financing

17   from Propel?

18       A.    I am aware of that.

19       Q.    And were they making interest and principle

20   payments on the Propel debt prior to bankruptcy?

21       A.    To my knowledge they were.

22       Q.    And they were also paying for, what, the

23   maintenance and insurance on the raw land properties?

24       A.    That's correct.

25       Q.    And yet they decided, did they not, to transfer all

1   of these entities to FRE Real Estate around December 22nd?

2       A.   That's correct.

3       Q.   And these seller notes, do you have any knowledge

4   as to whether those accurately reflect the value or the

5   equity in each of these properties?

6       A.   I was not a party to that decision at all.

7       Q.   In fact you came in later; did you not, in

8   connection with trying to assist Mr. Morgan?

9       A.   Yeah.  I became involved in the FRE related

10  entities after the transfer.  That's correct.

11      Q.   Now, if you consider Transcontinental Realty

12  Investors after the various transfers, okay, it still has

13  property, correct?

14      A.   Yes.

15      Q.   And does American Realty Trust have some other

16  properties, as well?

17      A.   It does.

18      Q.   And does Income Opportunity Realty Trust Investors

19  have properties?

20      A.   Yes.

21              THE COURT:  And this is after December 23?

22              THE WITNESS:  Yes.

23      Q.   They chose not to transfer that into FRE Real

24  Estate, correct?

25      A.   Yes.  There are properties that were not

NATIONAL COURT REPORTERS (214) 651-8393

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 71 of 94

70

1    transferred that they owned.

2       Q.   And the reason for that, was it not, that those

3    were producing properties, they were not troubled?

4       A.   I -- again, I was not a party to the decision as to

5    why it was done for one property and not another.

6       Q.   You don't recall testifying that only the problem

7    properties got transferred?

8       A.   No.   I believe my testimony was that these were

9    problem properties and they were transferred.   I don't -- I

10   did not testify, to my knowledge, that they were -- these

11   were the only problem properties.

12      Q.   So there are still other properties in these after

13   December 22nd that were not transferred into FRE Real Estate?

14      A.   Yes.

15      Q.   Can you describe to the Court what you shared with

16   us at the 341 Meeting.   One of the pressure being faced by

17   Transcontinental and these transferor entities for the last

18   several years?

19      A.   Well, owing to the backdrop of the economic

20   recession, it's had a tremendous negative impact on real

21   estate and financing markets.   In the real estate markets

22   significant fall off in leasing of properties whether they be

23   office or retail.   In the area of land a catastrophic drop

24   off in any land related to residential construction.   And

25   similar though not great a drop off in commercial land.   So

1   those have all put pressure on all real estate companies; not

2   just TCI, ARI, and those who are dependent upon the sale of

3   land and/or the leasing of commercial and/or residential

4   properties.

5        Q.   Now, is it your understanding that Transcontinental

6   Realty Investors has liquidity issues?

7        A.   Yes.   I think that would be a fair statement that

8   that along with most other real estate entities has

9   challenges as far as real estate -- as far as liquidity goes.

10       Q.   Were you involved in the Woodmont bankruptcy

11  proceedings before Judge Hale?

12       A.   I was.

13       Q.   Did you not provide a declaration in support of the

14  plan of reorganization of Woodmont and the affiliated

15  entities?  Do you recall providing a declaration and filing

16  it with the Court?

17       A.   I believe such a filing was made, yes.

18       Q.   Could you share with all of us what role

19  Continental would have provided or was to provide under the

20  Woodmont plan of reorganization as amended?

21       A.   The -- first of all, the Woodmont was a collection

22  of eight raw land properties, no income producing properties

23  administered as one.   But there were eight separate

24  properties.   Eight separate bankruptcies.   TCI was to be the

25  funding source for the payments under the plan.

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 73 of 94

72

1     Q.    And by TCI, you mean Transcontinental?

2     A.    Transcontinental Realty Investors, yes.

3     Q.    Was it supposed to fund interest payments and tax

4  payments and the like?

5     A.    It was.

6     Q.    Do you know what the total amount of its commitment

7  was to the -- in the Woodmont proceedings?

8     A.    Define the word commitment.

9     Q.    How much would it have been obligated to fund?

10    A.    Well, that's kind of an open ended number

11  because --

12    Q.    Just on a yearly basis.

13    A.    Well, it depends on when the properties were sold.

14  The primary effort under the plan was to sell the property.

15  So to the extent a property sold, they would be no longer

16  required to fund that.  So it was actually unknown as to what

17  those would be on a year-to-year basis, because it was

18  unknown when you would sell a property.

19    Q.    Were there projections that you generated to

20  reflect what you thought might be the range of funding

21  necessary by TCI?

22    A.    Yes.  I don't recall them as I sit here.  I'd have

23  to refer to some other --

24    Q.    Would it be in the millions of dollars?

25    A.    Depending on when assets were sold, it could have

1  been in the millions of dollars, correct.

2      Q.   Did TCI default in making its payments causing

3  various creditors to come to the Court and argue that the

4  plan was busted and the case should be dismissed?

5      A.   Well, that occurred on six of those eight

6  bankruptcies.  Two are not in default, six are in default.

7      Q.   And is the result that Judge Hale ordered the

8  dismissal of the cases where the plans went into default

9  without the financing from TCI?

10     A.   You know, to be honest, I do not know what the

11  orders were made by the Court.  I know that they were in

12  default, but I don't know what the final orders were from the

13  Court.

14     Q.   And were you working then with the debtor to try to

15  sell these raw land properties during that time?

16     A.   Yes.

17     Q.   How did those raw land properties compare with the

18  debtor's properties that are here in this proceeding?

19     A.   Generally smaller.  They were -- they ranged in

20  size from two acres to 15 acres.  They're all located in

21  Dallas or Irving.  They are -- were primarily slated for

22  either residential development, multi-family residential, or

23  mixed used commercial.  So there was a site at the Galleria.

24  There was a site up near Bent Tree on the Tollway.  A couple

25  of others just west of the Tollway.  Two out in Las Colinas.

HC 00732

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 75 of 94

74

1     Q.   Is it pretty close to all of the properties we saw

2  in that Google map that was entered before?

3     A.   That Google map concentrates on Las Colinas and the

4  Mercer Crossing area, so it doesn't go as far east as the

5  Galleria.

6     Q.   But would those properties be easier to sell or

7  harder to sell than the properties that are now in the FRE

8  bankruptcy proceeding?

9     A.   It's very tough to gage because each and every

10 property has its own advantages, disadvantages, values, so I

11 couldn't answer that question as to whether it would be

12 easier, harder.

13    Q.   So as recently as January 27th Transcontinental

14 missed payments and just allowed the property, essentially,

15 to be taken by the secured lenders?

16    A.   In the case of the six, that's correct.

17    Q.   I understand that there is an aircraft hanger lease

18 where payments are owed to the Wicks Revocable Trust?

19    A.   That's correct.

20    Q.   We covered a little of this at the 341.  Are there

21 any funds available to make the lease payments to Wicks

22 Revocable Trust?

23    A.   I believe that at least for Hanger Number 1 --

24 there are two of them.  It's one lease, but there are two

25 hangers out there.  Hanger Number 1 is leased and has

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 76 of 94

75

1  available cash to make at least a partial payment on that

2  lease.  Hanger Number 2, as of November of 2010 was vacated.

3  So it no longer has any revenue.  They're in search of a

4  tenant, but at the moment do not have one.  Although I

5  believe there is at least one tenant in the works.

6      Q.   But there are no funds to make those lease

7  payments?

8      A.   None on Addison II.  A partial on Addison I.

9      Q.   In fact, did you have anything to do with the

10 debtor's monthly operating report that was filed yesterday

11 with the Court?

12     A.   Yes.

13     Q.   Is there not a statement that the debtor is

14 deficient in, or delinquent in making its payments to that

15 landlord?

16     A.   Yes, it is.

17     Q.   And, again, no known source of payment now correct?

18     A.   I should point out, though, for the MRI -- MOR

19 filed yesterday for January, the approval of the cash

20 collateral orders was received so late in the month that some

21 of those payments were just not made.

22     Q.   But are any of the secured lenders with income

23 producing properties agreeing to use any of the net operating

24 income to fund lease payments to Wicks Revocable Trust?

25     A.   No.  They all have to stand on their own.

HC 00734

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 77 of 94

76

1      Q.   And likewise with respect to any net operating

2   income from the income producing properties to fund the

3   expenses of the raw land, correct?  They cannot be used.

4      A.   Under the current cash collateral orders, that is

5   correct.

6      Q.   Do you know whether the debtor has any intention to

7   try to use cash collateral from the income producing

8   properties in order to fund the raw land properties?

9      A.   The plan hasn't been finalized yet, so I can't

10   comment on it.

11      Q.   But is there talk about that now?

12            MR. BUNCHER:  Objection to the extent that

13   calls for discussion with counsel.

14            THE COURT:  Sustained.

15      Q.   Can you answer that without revealing

16   attorney/client privilege communications?

17      A.   No.

18      Q.   And it's your position, then, that Mr. Buncher is

19   your counsel?

20      A.   He's the counsel for the debtor.

21      Q.   And then you serve the debtor?

22      A.   And I serve the debtor.

23      Q.   And has there been an application to have your firm

24   retained as financial advisor?

25      A.   To my knowledge, there has not.  Of course, there's

1  no financial arrangement either.

2     Q.   Do you get a success fee like Mr. Morgan thinks he

3  will get from this case?

4     A.   No.

5     Q.   Are you aware of any applications to retain real

6  estate brokers with respect to any of these properties?

7     A.   I'm not aware of it.  But I am not involved in that

8  end of the effort.

9     Q.   Were you involved in any way with the marketing and

10  brokerage efforts at the transferor entities for the year or

11  so before these properties were transferred to FRE on or

12  about December 22nd, 2010?

13     A.   No.  I was not involved in the transferor entities

14  nor their properties at all prior to the -- at or about the

15  time of the petition.

16     Q.   As an officer of Prime Income Management --

17     A.   Asset Management.

18     Q.   -- Asset Management, thank you, were you

19  knowledgeable about the owners of such properties seeking to

20  try to re-finance, market, sell any of the properties that

21  are now part of the debtor's estate?

22     A.   Yes.  Peripherally.  I was not involved directly.

23  But I was -- I office in the approximate area of those people

24  that were.

25     Q.   Is it your view that these properties were marketed

HC 00736

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 79 of 94

78

1   sufficiently during the period prior to this bankruptcy?

2       A.   I know they were marketed.  Again, I'm not familiar

3   with the exact details of that marketing effort.

4       Q.   Is it your understanding that there's any financing

5   available out there to re-finance these properties, either

6   the income producing or the raw land properties?

7       A.   I know there was significant efforts to try to

8   extend and/or restructure the existing loans.  And I also

9   know that there was significant effort to try to replace

10  those loans on various properties.  But I don't know as to

11  the availability.

12      Q.   And they were unsuccessful?

13      A.   Unsuccessful to date, that's correct.

14      Q.   Is it your understanding that the debtor through

15  your efforts at Prime is in any way trying to re-finance

16  these properties based on values that reflect, if you will,

17  the imputed equity values reflected in those seller notes?

18      A.   Restate that question for me, will you?

19      Q.   We understand from earlier testimony that the

20  transferor entities received seller notes that then went

21  upstream to Transcontinental, American Realty, and the

22  others, correct?

23      A.   That's correct.

24      Q.   And there was testimony, as I understand it, that

25  that was a perceived value of the property, maybe book value

1    of the property in excess of the ad valorem tax liens, the --

2    and the secured debt against it?

3         A.    That's correct.

4         Q.    Is the debtor seeking to refinance the property

5    using those values, inclusive of this "alleged equity"?

6         A.    Well, I know they're seeking to refinance the

7    properties at least to replace the existing financing on

8    either more favorable terms or -- probably more favorable

9    terms.  I can't comment as to whether any of those take outs,

10   if you will, were sought to be any higher than the existing

11   loans.  I don't know.

12        Q.    And would they be the same principals at

13   Transcontinental to failed to make the payments in the

14   Woodmont cases?

15        A.    When you say principals --

16        Q.    Would they be the same people working to try to

17   refinance that were in -- that are at Transcontinental and

18   who failed to make the Woodmont payments?

19        A.    Well, the senior management is the same senior

20   management, if that's what you're asking.

21              MR. WEITMAN:  Your Honor, I pass the witness.

22              CROSS-EXAMINATION

23   BY MR. STABER:

24        Q.    Mr. Crown, my name is David Staber.  I represent

25   Sidney Wicks as Trustee.

NATIONAL COURT REPORTERS (214) 651-8393

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 81 of 94

80

1      A.    Uh-huh.

2      Q.    I had a couple of questions for you.

3  Mr. Weitman asked you about Prime's work for the debtor.   Is

4  there any written agreement between the debtor and Prime for

5  the services you're providing?

6      A.    To my knowledge, there is not.

7      Q.    Okay.   Does Prime also provide work for American

8  Realty and Transcontinental?

9      A.    It does.

10      Q.    And prior to the transfer of the debtor's property

11  to the debtor, did Prime provide services to American Realty

12  and Transcontinental relating to any of those properties that

13  were transferred?

14      A.    Well, they provide services related to the overall

15  portfolio.  So I'm sure those properties were included in

16  some of those efforts.

17      Q.    Okay.   And since those properties were transferred

18  to the debtor, has Prime provided any services ot American

19  Realty or Transcontinental relating to those properties?

20      A.    The properties that were transferred?

21      Q.    To the debtor, yes.

22      A.    Yes, that's the rule -- one of the rules that has

23  played is, I think related to -- given the fact that

24  Transcontinental and/or some of those other stated entities

25  are the note holders, if you will, on those notes.   And the

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 82 of 94

81

1   best interest of those note holders, they provided those

2   services to the debtor.

3       Q.   Okay.  I'm going to shift gears on you real quick.

4       A.   All right.

5       Q.   And go quickly into a different area.

6           Did you assist in the preparation of the schedules and

7   statements in this case?

8       A.   I did.

9       Q.   Did you -- were you the primary draftsman of those

10  schedules and statements?

11      A.   Can I describe the process and you can --

12      Q.   Sure.  That would be great.

13      A.   I called upon accounting and legal personnel with

14  Prime and accounting personnel and property management

15  personnel with Regis to provide input information for the

16  SOFA and the schedules.  They provided those in the form of

17  schedules and/or just raw information that I collated,

18  examined, reviewed, questioned, provided in turn to a

19  paralegal at Neligan Foley who prepared the schedules.  I

20  then reviewed those schedules along with other personnel at

21  both Regis and Prime.

22      Q.   Okay.  Did you go over the schedules with

23  Mr. Morgan before you signed them?

24      A.   Yes.

25      Q.   And did Mr. Morgan make any changes to what you had

HC 00740

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 83 of 94

82

1   drafted?

2       A.   To my recollection, no.

3       Q.   Did Mr. Morgan ask you any questions about anything

4   in the schedules?

5       A.   Not at the time I presented them.  But, of course,

6   we had talked about so much of this along the way in terms of

7   values and debt and taxes and what have you.  So we had a

8   lot -- we had discussed a lot of those topis already.

9       Q.   Okay.

10      A.   So when I presented the schedules to him, he had

11  seen a lot of those numbers in one form or another already.

12      Q.   All right.  But he didn't point to anything in

13  particular and ask what it was about, or is that right, or

14  anything?

15      A.   Not to my recollection, no.

16      Q.   Okay.  Now, I noticed that in the schedules broadly

17  the trade creditors were all essentially creditors that the

18  debtor had assumed; is that your understanding?

19      A.   Yes.  Yes.  Well, the debtor, FRE Real Estate,

20  Inc., to the extent that it already owned Fenton Center

21  was -- to the extent that it did own Fenton Center at the

22  time.

23      Q.   Okay.  So other than Fenton Center --

24      A.   Yes.

25      Q.   -- all of the trades assumed.


NATIONAL COURT REPORTERS (214) 651-8393

```
 1        Did you have any roll in the assumption of that debt?

 2    A.   No.

 3    Q.   Are you aware of any trade creditor giving the

 4   prior party it contracted with a release of that party's

 5   obligation on an assumed debt?

 6    A.   I'm not aware of that.

 7    Q.   Okay.  Are you aware of any of the trade debt

 8   consenting to an assumption by FRE?

 9    A.   I'm not aware of that.

10    Q.   Okay.  Did you draft the list of co-debtors?

11    A.   I did.

12    Q.   And did you list every prior entity for these

13   unsecured creditors that had actually incurred that debt?

14    A.   Are you talking about the trade payables?

15    Q.   Yes.

16    A.   No.

17    Q.   And why didn't you do that?

18    A.   My interpretation of that was primarily related to

19   the tax loans and the secured creditors.

20    Q.   Okay.  So -- did you consult legal counsel on

21   whether unsecured creditors whose debt had been assumed, that

22   the prior obligor should be listed or not?

23    A.   I --

24         MR. BUNCHER:  I'd caution the witness not to

25   divulge any communications with counsel.  I don't think his
```

HC 00742

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 85 of 94

84

1    question quite got there.  But --

2                    MR. STABER:  I really tried not to get there,

3    Your Honor.

4                    THE COURT:  Understood.

5        Q.   Did you seek legal advice as to whether those

6    entities should be listed?

7        A.   I did not seek legal advice.

8        Q.   You made that determination on your own?

9        A.   I presented the schedules to my attorney, or the

10   attorney for the debtor.

11       Q.   Okay.  But that was not an area of inquiry to that

12   attorney?

13       A.   No.

14       Q.   Okay.  When did you begin working on the schedules?

15       A.   Began working on the schedules after the petition

16   date.

17       Q.   Mr. Weitman asked you a couple of questions.  And,

18   again, I'm going to try to be precise here on the

19   attorney/client privilege issues about where we are going

20   forward.  In your conversations with the debtor's counsel

21   regarding what's going to happen on these properties, are you

22   acting as a representative of the debtor or of American

23   Realty or Transcontinental?

24       A.   I've been asked to -- by my superiors at Prime to

25   assist the debtor.  So that's what I'm doing.

1     Q.   Okay.   But Prime also does work for American Realty

2   Trust and Transcontinental, right?

3     A.   That's correct.

4     Q.   And as part of that work that Prime is doing for

5   those two entities, does that involve what's going to happen

6   with these debtors' properties?

7     A.   I'm not quite sure what you're asking.   I must --

8           THE COURT:   Repeat your question.

9     Q.   Sure.   The work that Prime is doing regarding what

10   is going to happen to these properties in the bankruptcy, is

11   it providing any of those services for American Realty or

12   Transcontinental?

13     A.   Well, it is -- American Realty and Transcontinental

14   are clients of Prime.   It provides asset advisory services to

15   those -- to those entities.   It is -- to that extent, there

16   is communication back and forth.

17           MR. STABER:   I'm going to object as

18   non-responsive, Your Honor.

19           THE COURT:   Sustained.

20           MR. STABER:   I would ask the Court that the

21   witness answer the question.   I will repeat it, if that will

22   assist the Court.

23     Q.   The services that are being provided regarding what

24   happens to the property going forward by Prime, are those

25   services also being provided to American Realty and


NATIONAL COURT REPORTERS (214) 651-8393

Case 11-42042-dml11    Doc 30-31    Filed 04/11/11    Entered 04/11/11 15:34:21    Desc
Exhibit U - Part 1 - Hearing Transcript    February 17    2011    Page 87 of 94

86

1    Transcontinental?

2        A.    With respect to these properties?

3        Q.    With respect to these properties.

4        A.    And when you say services, do you mean my services?

5        Q.    I mean the services of Prime, your employer.

6        A.    Well, there are -- there are people at Prime who

7    work because they have an interest in these properties based

8    on those seller notes that are working -- because they're top

9    clients, TCI, IORI, ART, have interest, are overseeing that

10   interest, yes.

11       Q.    And what happens to those properties in the future?

12       A.    Absolutely a great interest to them.

13       Q.    Okay.  When you are having conversations with

14   debtor's counsel regarding what happens to those properties

15   in the future, are you representing ART and Transcontinental,

16   or are you representing the debtor?

17       A.    I've never thought of it that way, so I'm trying to

18   think of what I -- what I truly am doing there.

19       I've been asked to assist the debtor.  I'm not a

20   decision maker in any respect.  Dave Morgan and others are.

21   So when I provide -- when I provide services to them, it's

22   primarily to do this or analyze this, or what have you.  So

23   I'm not providing any recommendations whatsoever to, you

24   know, to them in terms of strategies or what have you.  So I

25   have to say I'm an employee of Prime.  And my -- and Prime is

 1   an advisor to TCI and ARI and OIRI.

 2        Q.   So when you're having conversations regarding the

 3   debtor's properties, you're doing that on behalf of TCI and

 4   ARI?

 5        A.   Yes.  I would have to say that's correct.

 6        Q.   And what were those conversations about what's

 7   going to happen to the debtor's property in the future?

 8             MR. BUNCHER:  I'm not sure -- I object to the

 9   form.  I'm not sure what conversations he's asking about.

10        Q.   Do you recall --

11             MR.STABER:  I can clarify.

12        Q.   Do you recall Mr. Weitman asking you about

13   conversations a moment ago about what's going to happen to

14   the debtor's property in the future?

15        A.   Okay.

16        Q.   And do you recall at that time the Court sustained

17   an objection that those conversations involved

18   attorney/client privilege?

19        A.   Okay.

20      . Q.   Okay.  Now, I am asking the same question.  What

21   were those conversations?

22             MR. BUNCHER:  If he's asking about

23   conversations with counsel, Your Honor, I object.  That's

24   attorney client.  Mr. Crown has given testimony that he is

25   assisting the debtor.  He's the agent of the debtor in

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 89 of 94

88

1  connection with the work he's doing on this bankruptcy case.

2  I think he's getting privileged communications.

3         THE COURT:  Unfortunately I'm going to have to

4  overrule.  The witness just said that when he's having

5  conversations about the debtor's property, he's representing

6  the parent and not the debtor.

7         MR. BUNCHER:  I understand what he just said.

8  But, Your Honor, a few questions ago he said it differently.

9  And so I do object.  And to the extent the Court would allow

10 Mr. Staber to question this witness about communications he's

11 had with debtor's counsel, I think that's attorney/client

12 privilege.  He's testified -- if you read his testimony as a

13 whole, he has clearly said he is acting in a capacity as an

14 agent for the debtor.  Now, he may be in certain instances

15 also acting for Prime as an agent for TCI and ART.  But I do

16 not think that this questioning permits this lawyer to pierce

17 the privilege with the debtor at this point in time.

18        THE COURT:  Response?

19        MR. STABER:  Your Honor, I believe his

20 testimony has been clear that discussing what's going on

21 going forward on these properties, part of the hat, or at

22 least one hat he's wearing is as a representative of the note

23 holders who are either unsecured creditors or subordinated to

24 unsecured creditors as to what happens here and, therefore,

25 those conversations when he's wearing that hat, he is not

HC 00747

1   wearing the client hat as to what goes forward.  And,

2   therefore, I don't think any privilege attaches to those

3   conversations based on the record we've established on

4   relationships, Your Honor.

5            THE COURT:  I happen to agree.  The objection

6   will be overruled.  I think, Mr. Buncher, that's what happens

7   when the debtor doesn't have its own professionals and has an

8   exclusive relationship.  I don't think you can sustain

9   privilege on the basis of the testimony that this witness has

10  given.  He's wearing too many hats in this case.

11           MR. BUNCHER:  I respectfully disagree.  But on

12  the other hand, I don't -- the question asked is so broad in

13  terms of conversations.  I don't know what specific

14  conversation he's asking about on what specific date and who

15  was present and who wasn't present.  And also whether he has

16  established in connection with whatever specific conversation

17  he wants to ask the witness about whether Mr. Crown would

18  acknowledge he was acting in any capacity other than as an

19  agent for the debtor.  So I still do not think he has gotten

20  to where he's trying to get.  I respect the Court's ruling.

21  But I respectfully disagree.

22           THE COURT:  Understood.

23      You may proceed.

24           MR. STABER:  Thank you, Your Honor.

25      Q.  Have you had discussions with the debtor about how

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 91 of 94

90

1    they're going to reorganize these properties?

2         A.    Yes.

3         Q.    And in connection with those discussions, what is

4    the basic outline that the debtor plans to do?

5         A.    Well, I think it still has to -- all of the details

6    still have to be worked out.  But it's primarily what one

7    might expect.  For the income producing properties, a

8    strategy of continuing to improve leasing activities.

9    Seeking to re-finance properties, to the extent that they can

10   be re-financed.  Or seeking to sell properties.  As related

11   to the non-income producing properties, the land, again as

12   you might expect, the primary effort will be to sell those

13   properties.  A concurrent effort to re-finance the

14   properties, if that's possible.  So there's not rocket

15   science associated with it.  You've got these assets.  You

16   can improve their performance, sell them, and/or re-finance

17   them.

18        Q.    And these assets Prime is well familiar with,

19   correct?

20        A.    Yes.

21        Q.    And it's well familiar with efforts to sell these

22   properties that were transferred into the debtors, correct?

23        A.    Yes.

24        Q.    And is it safe to say that over the past year, 18

25   months, there have been efforts to, especially the unimproved

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 92 of 94

91

1   property to sell them?

2       A.   I'm sure there have, yes.

3       Q.   Okay.  And since they were transferred to a debtor

4   that is now in bankruptcy, I think it's pretty safe to say

5   those efforts were unsuccessful?

6       A.   Well, I think it's safe to say that those efforts

7   were unsuccessful.  But that the --

8       Q.   Thank you.  That was my question.

9       A.   All right.

10       Q.   Other than that broad outline, are there any

11   specifics about what the debtors are going to be doing?

12       A.   No.

13       Q.   Did you have any involvement with the decision to

14   put these properties into the debtor?

15       A.   I did not.

16       Q.   Okay.  Did anyone at Prime have involvement with

17   that?

18       A.   Well, I'm sure there were those at Prime that had

19   involvement with that.

20       Q.   Okay.  And have you had discussions with anyone at

21   Prime about why these properties were put into bankruptcy, or

22   put into this debtor?

23       A.   No.  I have not.

24               MR. STABER:  I'll pass the witness, Your

25   Honor.

HC 00750

Case 11-42042-dml11   Doc 30-31   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 1 - Hearing Transcript   February 17   2011   Page 93 of 94

92

1              THE COURT:  Very well.  Thank you.

2      Anyone else?

3      Mr. Kinvig.

4              CROSS-EXAMINATION

5  BY MR. KINVIG:

6      Q.   Just a few brief questions, Mr. Crown.  My name is

7  Cameron Kinvig.  I represent American Bank of Commerce.

8      And I thought that I would go over a couple of

9  questions that you were asked and you answered at the 341

10 Meeting.

11     Do you remember being at the 341 Meeting?

12     A.   I do.

13     Q.   Talking about your preparation of the schedules and

14 the debtor's SOFA, when you were preparing those, did you

15 come up with the sale numbers kind of out of whole cloth, or

16 the valuation numbers, I apologize, or were those given to

17 you?

18     A.   Those were given to me.

19     Q.   And who gave those to you?

20     A.   Those were the values as per the transfers of those

21 assets to the -- to FRE.

22     Q.   But what entity or what person gave you those

23 numbers?

24     A.   I believe I was given those numbers in a schedule.

25 The schedule was handed to me by John Daugherty with Prime.

NATIONAL COURT REPORTERS (214) 651-8393

1    Q.    Okay.  So you were just told what numbers to put

2    in, essentially?

3    A.    Yes.  I was told that these were the numbers upon

4    which this -- the numbers that were utilized in the transfer

5    documents, correct.

6    Q.    And did you do any independent due diligence based

7    on those numbers?  Did you question them at all?

8    A.    No, I did not.

9    Q.    Did you look at any appraisals that were performed

10   by third parties in order to value those properties before

11   you put them down on the schedules?

12   A.    I did not, no.  I know other's did.  But I did not.

13            MR. KINVIG:  No further questions, Your Honor.

14   Thank you.

15            THE COURT:  Thank you.

16       Mr. Warner?  No.  Mr. Leninger.

17            CROSS-EXAMINATION

18   BY MR. LENINGER:

19   Q.    Mr. Crown, in your capacity with Prime Asset, were

20   you an advisor for TCI prior to the transfers?

21   A.    Yes.  That's one of the rules that Prime has.

22   Q.    But were you specifically?

23   A.    Yes.

24   Q.    Okay.  And did you advise TCI with respect to the

25   Kenwest property?