Case 11-42042-dml11   Doc 30-32   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 2 - Hearing Transcript   February 17   2011   Page 1 of 93

94

```
 1      A.   I did not.

 2      Q.   Did not?

 3      Did you recommend to TCI that they fund the DIP that's

 4  been talked about this morning?

 5      A.   I did not.

 6                MR. LENINGER:  No further questions.

 7                THE COURT:  Anyone else?

 8      All right.  Mr. Buncher -- I'm sorry, Mr. Olson.

 9                MR. OLSON:  I'm sorry.

10                THE COURT:  No problem.

11                CROSS-EXAMINATION

12  BY MR. OLSON:

13      Q.   Mr. Crown, I'm Dennis Olson.  I met you at the

14  Meeting of Creditors, right?

15      A.   Yes, I remember.

16      Q.   And I asked you some questions about your footnote

17  4 in the schedules.  And I believe your explanation was, the

18  intent was when a single property was sold, the cost of sale

19  and the lienholder and the taxes would be paid.  And then the

20  vendors for that property would be paid.  And then the rest

21  of the money, if there was money left over, would go to the

22  seller note holder.

23      Do you remember that line of questions?

24      A.   Yes.  I believe that's the way that note reads,

25  yes.
```

Case 11-42042-dml11   Doc 30-32   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 2 - Hearing Transcript   February 17   2011   Page 2 of 93

95

1     Q.   And do you recall my saying that I thought that was

2   indicative of bad faith?

3     A.   I remember that, yes.

4     Q.   Do you remember my saying that I would ask you

5   again today if your answer today would be any different?

6     A.   My answer --

7     Q.   Is your explanation as to what would happen to the

8   proceeds of the property any different than what you gave at

9   the meeting?

10    A.   No.   I know that has been discussed.   But I don't

11  think a decision has been made as to whether to broaden

12  that -- change that commitment in any way.

13    Q.   All right.   So it's still property-by-property

14  basis?

15    A.   As we sit here today, as far as I know.

16    Q.   All right.   Let me shift gears with you.   Earlier

17  this morning, I think you were present when I believe it was

18  Exhibit S was introduced, the properties around Mercer

19  Crossing.

20    A.   The map area?

21    Q.   Yes.

22    A.   Yes.

23    Q.   You're familiar with my client's property, the land

24  on the Iori Centura property?

25    A.   Yes.

NATIONAL COURT REPORTERS (214) 651-8393

Case 11-42042-dml11   Doc 30-32   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 2 - Hearing Transcript   February 17   2011   Page 3 of 93

96

```
 1      Q.   It's not on that map, is it?

 2      A.   No, it is.

 3                MR. OLSON:  No further questions.

 4                THE COURT:  All right.  Mr. Buncher.

 5                MR. BUNCHER:  I don't think I have a whole lot

 6  here, Judge.

 7                THE COURT:  All right.

 8                CROSS-EXAMINATION

 9  BY MR. BUNCHER:

10      Q.   Mr. Crown, you were here and testified in front of

11  the Court in the first cash collateral hearing; is that true?

12      A.   I did.

13      Q.   And I believe --

14                MR. BUNCHER:  Well, I'd just ask the Court to

15  take notice of his prior testimony as far as his background

16  and so forth.

17                THE COURT:  Very well.

18      Q.   Just briefly, so as not to repeat all of that,

19  briefly describe your education and work background,

20  Mr. Crown.

21      A.   Bachelor of Science degree from Cornell University.

22  And MBA from Michigan State University.  I spent about 38

23  years in the real estate business and development.  Probably

24  developed a billion dollars worth of primarily hotel assets.

25  I've spent six years in public accounting, the management
```

NATIONAL COURT REPORTERS (214) 651-8393

1    services side of that practice.  And I've operated hotels,

2    developed hotels, and developed other forms of real estate

3    enterprises.

4        Q.   One of the things I was going to ask you about was

5    your effort in preparing the schedules and statements of

6    financial affairs.  Some of that has already been gone over.

7    But do you believe -- well, just generally describe the

8    process and diligence you went through to try to ensure that

9    the schedules and the statements of financial affairs fairly

10   and accurately represented the financial condition of this

11   debtor.

12       A.   Well, I was -- the schedules are pretty specific in

13   terms of what they're asking for.  So as I requested that

14   information from the accounting and operation staff at Regis

15   and Prime.  Prime related to the land.  Regis related to the

16   operating properties.  I received that information.  Had

17   quite a few discussions with accounting and operations

18   personnel to verify that it was reasonable and accurate.  I

19   had a prior year and prior recent financial performance on

20   the operating property.  So I knew exactly how they performed

21   in the past so I could stack that up against some of the

22   materials that I was receiving.  So I reviewed them on

23   several occasions with several different personnel before

24   they went into final form.

25       Q.   Do you believe the schedules and statements are

NATIONAL COURT REPORTERS (214) 651-8393

HC 00756

Case 11-42042-dml11   Doc 30-32   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 2 - Hearing Transcript   February 17   2011   Page 5 of 93

98

1    true and accurate?

2        A.   I do.

3        Q.   With regard to the values you placed on the real

4    property, you said you just used the values that were in the

5    transaction documents; is that correct?

6        A.   I did.

7        Q.   Since that point in time, lenders have produced

8    appraisals from their files.  We've asked for them to do

9    that.  You understand that?

10       A.   I do.

11       Q.   All right.  With regard to the questioning about

12   the cold weather, or not, the original transferor should be

13   listed as a co-debtor.  Is that something you considered at

14   the time you prepared these schedules or not?

15       A.   As concerns the trade payables we were talking

16   about?

17       Q.   Yes, sir.

18       A.   I did not consider it.

19       Q.   Why not?

20       A.   For two reasons.  Well, one primary reason and that

21   was I knew that those -- those transferor entities in many

22   cases had no assets after the transfer.  The asset that they

23   transferred to FRE was the lone asset that they held, in many

24   cases.  And, therefore, any -- any debt related to that

25   asset, it was the intent of the parties I knew when they

Case 11-42042-dml11   Doc 30-32   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 2 - Hearing Transcript   February 17   2011   Page 6 of 93

99

1   transferred the assets that they would go with them.   The

2   even mentioned that as part of the transfer documents to

3   adjust the notes, the seller notes using the trade payables.

4   So I knew that that was the intent of the parties was that

5   they would go with the properties.

6      Q.   If you could, there's a book here, which is

7   Debtor's Exhibits A through O.   And if you could turn to Tab

8   F, which is the schedules.

9      A.   All right.

10      Q.   This has been admitted under Armed Forces Exhibit

11   4.

12            THE COURT:   All right.

13      Q.   For ease of reference here.

14            THE COURT:   Thank you.

15      Q.   Let's look at Schedule D.   And Schedule D, of

16   course, is creditors holding secured claims.   And then

17   there's an exhibit following that that lists the various

18   creditors and the properties that serve as collateral.   It's

19   after the end of Schedule D.

20      A.   I've got both of those.

21      Q.   There you go.

22         It looks like this.   Are you there?

23      A.   I got it.

24      Q.   All right.   If you look at the -- did you prepare

25   this?

NATIONAL COURT REPORTERS (214) 651-8393

Case 11-42042-dml11   Doc 30-32   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 2 - Hearing Transcript   February 17   2011   Page 7 of 93

100

1      A.   Yes.  I prepared this based upon materials given me

2  by accounting personnel and Regis and Prime.

3      Q.   And turn to the last page of that exhibit, if you

4  would.

5      There's a footnote 6 on there that says, Groups of

6  properties that are cross-collateralized and cross-defaulted

7  and then there's the numbers for the properties listed above

8  are shown in parenthesis; do you see that?

9      A.   I do.

10      Q.   And in each instance where there's numbers in a set

11  of parentheses, does that mean those debts are

12  cross-collateralized, or the properties are

13  cross-collateralized?

14      A.   Yes.  That's correct.

15      Q.   And the numbers actually refer to the properties,

16  right?

17      A.   Property numbers on that exhibit, yes.

18      Q.   All right.  So if the Court wants to find out which

19  properties are cross-collateralized with one another, this

20  would show that; is that correct?

21      A.   Yes, it would.

22      Q.   There's been a lot of discussion about footnote 4

23  on Schedule F with regard to the treatment of these -- with

24  regard to the treatment of the seller notes.

25      A.   Uh-huh.


NATIONAL COURT REPORTERS (214) 651-8393

Case 11-42042-dml11   Doc 30-32   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 2 - Hearing Transcript   February 17   2011   Page 8 of 93

101

1    Q.   Do you recall the questions about that?

2    A.   I do.

3    Q.   Has there been ongoing discussion with regard to

4 the treatment of those notes?

5    A.   Yes.  I know there has, yes.

6    Q.   All right.  Regardless of what TCI or the holder of

7 those notes will agree to -- well, strike that.

8       Do you know whether or not it's the debtor's intention

9 to file a plan that subordinates those notes to every other

10 claim in this bankruptcy case?

11    A.   I know such a stance has been discussed.  I don't

12 know whether it's finally been agreed to.  But I know

13 Mr. Morgan and others have discussed it.

14    Q.   But regardless of whether TCI agrees to it or not,

15 this debtor can file a plan that completely subordinates

16 those claims; isn't that correct?

17    A.   Yes.  Because they're the claims of the debtor.

18    Q.   Right.  Do you know whether TCI would object to

19 such treatment or not?

20    A.   I really don't know.

21    Q.   If you could back up to Schedule A.  And there's an

22 exhibit to Schedule A, as well.

23    A.   Yes, I've got it.

24    Q.   And that one is organized by property, correct?

25    A.   It is.


NATIONAL COURT REPORTERS (214) 651-8393

Case 11-42042-dml11   Doc 30-32   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 2 - Hearing Transcript   February 17   2011   Page 9 of 93

102

1      Q.    And that exhibit on footnote 2, does it also show

2   which properties are cross-collateralized and

3   cross-defaulted?

4      A.    It does.

5      Q.    Did you prepare that?

6      A.    I did.

7      Q.    And to the best of your knowledge, is it true and

8   accurate?

9      A.    Yes.    These -- it is true and accurate as of the

10   petition date.

11     Q.    Go to Schedule B, please.

12     A.    All right.

13     Q.    Specifically item 2 which lists all of the

14   different accounts.    And it continues over on the second page

15   of Schedule B.

16        Do you see there are certain tax escrow accounts held

17   by lenders listed there?

18     A.    Yes.    I believe there's four of them.

19     Q.    And what properties are those?

20     A.    Anoco Parkway North, Fenton Center, and Arkon.

21     Q.    Is it your understanding that the lender on Fenton

22   Center actually went ahead and paid the 2010 property taxes

23   prior to the filing of this bankruptcy case?

24     A.    I don't know the exact date.    But I've been told

25   and I've been shown that they have to pay it, yes.

1       Q.   So the -- is it your understanding on the Fenton

2   Center building that the 2010 taxes were paid?

3       A.   Yes.

4       Q.   Do you know if those funds that are shown on

5   Schedule B still remain in escrow, or are those the funds

6   that you've now learned they used to pay the taxes?

7       A.   Well, they pay taxes in the amount of 1,458,000 and

8   change.  I don't know what funds they used to pay those

9   taxes.  So I don't know.

10      Q.   But as to Amoco, Parkway North, and Arcon, it's

11  your understanding that money is still sitting in escrow

12  accounts for the purpose of payment of property taxes?

13      A.   Well, it's my understanding as of the date of the

14  filing of the schedules that that's where it sat.  Whether it

15  still sits there or not, I can't comment.

16      Q.   And are those escrow accounts accounts in the

17  debtor's name, or are they accounts in -- are these funds

18  held by the banks?

19      A.   Yes.  There are all held by the banks in some for

20  of an escrow account is my presumption.

21      Q.   So the Arcon land, that would be State Bank,

22  Mr. --

23      A.   Yes.

24      Q.   Mr. Stromberg's client?

25           Parkway North, which bank is that?


NATIONAL COURT REPORTERS (214) 651-8393

Case 11-42042-dml11   Doc 30-32   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 2 - Hearing Transcript   February 17   2011   Page 11 of 93

104

1        A.    Parkway North, is that U.S. Bank?  You'll have to

2   forgive me.  There's a lot of numbers on these pages.

3        Q.    Go back to Schedule D, again.

4        Yes.  I believe Schedule D reflects Parkway North.  The

5   lender is U.S. Bank.

6        A.    Okay.

7        Q.    And the Amoco property --

8        A.    Is Petra.

9        Q.    You were asked about the use of cash collateral

10  across properties.  And you indicated that you were keeping

11  things separate --

12       A.    That's correct.

13       Q.    -- on each property.  However, in the instance

14  where certain properties are cross-collateralized, is it your

15  understanding that the cash collateral order allows cash from

16  one property to be used on another property?

17       A.    That's my understanding, yes

18       Q.    All right.

19             MR. BUNCHER:  Your Honor, I have no further

20  questions.

21             REDIRECT EXAMINATION

22  BY MR. WEITMAN:

23       Q.    Mr. Crown, did you earlier testify that you're

24  familiar with the leasing operations of Fenton Center?

25       A.    No, I'm not familiar with the lease operations of

NATIONAL COURT REPORTERS (214) 651-8393

Case 11-42042-dml11   Doc 30-32   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 2 - Hearing Transcript   February 17   2011   Page 12 of 93

105

1    Fenton Center.

2        Q.   So you don't know about leases on the property and

3    the rents?

4        A.   No.   Other than what I've seen as part of the

5    submittals in terms of leasing reports and things like that.

6    But I've never been involved in the operation of any of the

7    operating assets.

8        Q.   Have you ever evaluated what the rental rates have

9    been for recent leases at Fenton Center?

10       A.   I have not.

11       Q.   Let me ask you to look at the statement of

12   financial affairs, which I think is at -- let me see if I do

13   better this time -- Armed Forces Notebook -- excuse me,

14   Debtor's Notebook G, and answer to question 5 dealing with

15   foreclosures.

16       A.   Okay.

17       Q.   And was it not your testimony that you worked in

18   connection with preparing the statement of financial affairs?

19       A.   I did.

20       Q.   I see all of these entities that had posted these

21   properties for foreclosure, correct?

22       A.   Yes.

23       Q.   And they were foreclosing on it on January 4th, the

24   date the debtor filed its petition in bankruptcy, correct?

25       A.   That's correct.


NATIONAL COURT REPORTERS (214) 651-8393

Case 11-42042-dml11   Doc 30-32   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 2 - Hearing Transcript   February 17   2011   Page 13 of 93

106

1      Q.    Have you since learned whether RMR Investments,

2  Mr. Andrews' client, also had property that was posted for

3  foreclosure?

4      A.    I have seen the communications back and forth

5  suggesting that was the case.  This lists I got from the

6  legal department at Prime and it does not appear to be on

7  that list.

8      Q.    Have you investigated it further to see if, in

9  fact, RMR had posted property for foreclosure?

10     A.    I have not as we sit here.

11     Q.    Are  you familiar with Regions Bank?

12     A.    I am familiar with Regions Bank.

13     Q.    Are you aware of whether Regions Bank also had

14  posted the property for foreclosure?

15     A.    I am not aware one way or the other.  Other than it

16  was not on this list.

17     Q.    And you haven't investigated that since, correct?

18     A.    Nobody has even raised the issue that it should be

19  on the list to me.

20              MR. WEITMAN:  One moment, Your Honor?

21              THE COURT:  Uh-huh.

22              MR. WEITMAN:  Your Honor, I don't know if it's

23  the appropriate time, but I would just like to get a couple

24  of items admitted into evidence.

25              THE COURT:  Have you used them in the

1  examination of this witness?

2           MR. WEITMAN:  Yes.  Well, Your Honor, I had

3  the docket sheet in connection with Woodmont.  And I would

4  like to have that admitted as Wells Fargo Exhibit 198.  And

5  then earlier Mr. Morgan was Wells Fargo 197, the bankruptcy

6  case before Judge Jernigan.  And if I can hand up to the

7  Court, this would be Mr. Crown's declaration from the

8  Woodmont case.

9           THE COURT:  What exhibit is it?

10          MR. WEITMAN:  199, Wells Fargo 199.

11          THE COURT:  Any objection to the admission of

12  Wells Fargo 197, 198, or 199?

13          MR. BUNCHER:  I'm not sure I know what the

14  exhibits are, because I don't have them.

15          THE COURT:  197 is the case decided by Judge

16  Jernigan in Mr. Morgan's personal case.  198 is the docket

17  sheet in Judge Hale's Woodmont TCI Group case.  And 199 is

18  Mr. Crown's declaration in that case.

19          MR. BUNCHER:  With regard to Exhibit 197, is

20  it okay if I stand here, Your Honor?

21          THE COURT:  It is.  SO long as we can hear

22  you.

23          MR. BUNCHER:  I object to the relevance of

24  Exhibit 197.  It just doesn't have anything to do with this

25  case, Judge.

NATIONAL COURT REPORTERS (214) 651-8393

HC 00766

Case 11-42042-dml11   Doc 30-32   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 2 - Hearing Transcript   February 17   2011   Page 15 of 93

112

1              THE COURT:  Mr. Andrews.

2              MR. ANDREWS:  Good morning, Your Honor.

3    I have one exhibit.  I've already tendered this to debtor's

4    counsel and he's agreed to its admission.  It will be styled

5    RMR 1.  I'd like to hand it to the Court and I'll simply

6    refer to it in argument.

7              THE COURT:  Very well.

8        Mr. Buncher, any objection to RMR Number 1?

9              MR. BUNCHER:  No, Your Honor.

10             THE COURT:  It's admitted.

11       Anyone else?

12       Mr. Olson.

13             MR. OLSON:  If I could confer for just about a

14   minute with Mr. Buncher?

15             THE COURT:  You may.

16             MR. OLSON:  Your Honor, I've got a stipulation

17   that we would like to present when we come back from the

18   lunch break.  We're very close, but he needs to talk to his

19   associate.

20             THE COURT:  All right.

21             MR. BUNCHER:  I'm going to need time to review

22   this, Your Honor.  I can't just on the spot -- I need to

23   compare and talk to people on this issue.

24             THE COURT:  Fair enough.  Then we will --

25   well, let me ask, does any other movant have any further


NATIONAL COURT REPORTERS (214) 651-8393

1    evidence?

2        All right.  Then the movants have rested, subject to

3    Mr. Olson having the opportunity to add what he needs to add

4    once Mr. Buncher has had an opportunity to review that and

5    either agree or not agree.  But we'll take up Mr. Olson's

6    additional evidence.  So the statement by the Court that the

7    movants have rested is subject to Mr. Olson's right to

8    attempt to introduce some further evidence.

9        All right.  Where are we time wise, Mr. Buncher?

10            MR. BUNCHER:  In light of the fact that

11    Mr. Weitman called both of my witnesses on his case and we've

12    essentially questioned them, I believe fully, I might since

13    we are close to the lunch hour, I may like the opportunity to

14    confer with my client over the lunch hour.  But I think I'm

15    done.  I just want to have an opportunity to talk to my

16    client.

17        And then we had reserved our opening statement,

18    although I think at this point in time we're essentially to

19    closing arguments.  So unless I have a few clean up

20    questions, I would be prepared to just do our closings.

21            THE COURT:  All right.  And so any -- do the

22    movants anticipate any rebuttal?  I mean, you might

23    cross-examine --

24            MR. WEITMAN:  Yes.  Just to the extent that we

25    hear new matters.


NATIONAL COURT REPORTERS (214) 651-8393

Case 11-42042-dml11   Doc 30-32   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 2 - Hearing Transcript   February 17   2011   Page 17 of 93

114

1           THE COURT:  Fair enough.  Then why don't we

2    take an hour recess at this time.  We'll come back at 10 of 1

3    and we'll finish up and do closing and see where we are.

4        Thank you all very much.

5                      (Lunch recess ensued.)

6           THE COURT:  Mr. Buncher, are we ready?

7           MR. BUNCHER:  Yes, Your Honor.  I think so.

8        Your Honor, this thing has been changed again.  And I'm

9    not trying to be difficult --

10          THE COURT:  What thing?

11          MR. BUNCHER:  The stipulation Mr. Olson sent

12   to my office last night.  We've been trying to confirm some

13   facts, but they -- the facts at issue have to be confirmed

14   through counsel, Mr. LaJone, that was communicating with the

15   Trustee that was conducting the foreclosure sale on his

16   client's property.  And I'm just very reluctant to just sign

17   off on something that's been changed now this morning again.

18   And so --

19          MR. OLSON:  If I can have just a minute?

20          THE COURT:  Of course.

21          MR. OLSON:  Your Honor --

22          THE COURT:  Yes, sir.

23          MR. OLSON:  -- the only evidence I want to put

24   in is contained in this stipulation of facts that

25   Mr. Buncher has just signed.

1        May we hand up your copy?

2                THE COURT:  Please?

3                MR. BUNCHER:  Did you sign it, Dennis?

4                MR. OLSON:  I did.

5                THE COURT:  All right.

6                MR. OLSON:  And I have no other evidence and

7    I'm ready to argue.

8                THE COURT:  Very well.  I'll accept that

9    stipulation as additional evidence.

10                MR. WEITMAN:  Pardon me, Your Honor.  Is it

11    possible to read that, in as much as no one else has seen a

12    copy?

13                MR. OLSON:  It pertains to the chronology of

14    the sale that we conducted.  But I've got a copy for anybody

15    that wants it.

16                MR. WEITMAN:  Okay.  Thank you.

17                THE COURT:  All right, Mr. Buncher.

18                MR. BUNCHER:  We've already put our

19    questioning on of Mr. Morgan and Mr. Crown during

20    Mr. Weitman's case, so we have no further evidence.  We've

21    also put our exhibits in already, so we rest, as well.

22                THE COURT:  Very well.  Do all sides agree the

23    evidence is closed.

24                MR. WEITMAN:  Yes, Your Honor.

25                MR. BUNCHER:  Yes.


NATIONAL COURT REPORTERS (214) 651-8393

1                    THE COURT:  All right.  Then I'll take closing

2      arguments.

3                    MR. BROWN:  Your Honor, Chris Brown for Wells

4      Fargo Capital Finance.

5                    THE COURT:  All right.  Thank you, Mr. Brown.

6                    MR. BROWN:  If I may?

7                    THE COURT:  Please.

8                    MR. BROWN:  Just by way of background, the

9      debtor filed its petition in this case on January 4, 2011.

10     Wells Fargo filed its motion to dismiss the case for bath

11     faith filing on January 10th, 2011.  We've proceeded very

12     quickly to this point.  And I hope that we will continue to

13     do so and wrap this up in an orderly and quick fashion.

14          At this point the evidence now shows that we've got a

15     joint stipulation that explains the various transactions

16     entered into by the various transferor entities on the, what

17     we've collectively called the Transcontinental side;

18     Transcontinental, American Realty Trust, and Income

19     Opportunity Realty Investors, IORI.  Transferring all of the

20     assets, or I'm sorry, most but not all of the assets of those

21     entities, but then all of the assets of the various

22     subsidiary entities over to the ABC LE Income side of the

23     chart that was entered this morning at Exhibit 191, the big

24     multi-colored chart.

25                    THE COURT:  Yes.

HC 00771

1          MR. BROWN:  With the debtor receiving all of

2    the various properties, the ownership interest in the debtor

3    being moved from Transcontinental to ABC LD Properties, LLC,

4    and the ownership interest in each of the transferor entities

5    being moved over the ABC LD Income.  So what we've had is a

6    divestiture of assets and ownership in the subsidiary

7    entities by the public companies on the Transcontinental side

8    over to ABC LD Properties and ABC LD Income.

9          The debtor filed its bankruptcy within weeks of those

10   transfer.  And as part of those transfers you'll see on what

11   we've called the blue and yellow chart, Exhibit 192, each of

12   the transfers from the various transferring entities to FRE

13   immediately prior to the bankruptcy.  The issuance of the

14   seller notes back to the transferring entities.  And the

15   assumption of debt, as represented by those transaction

16   documents.

17         Exhibit 193, the list of transferor entities, excuse

18   the notes on this one, but the clean copy that the Court has

19   then reflects the amount of each of those seller notes, who

20   the properties were transferred to, and the amount of trade

21   debt that was assumed on each.  And we've included a total of

22   that trade debt as represented by the debtor at $1.4 million.

23         THE COURT:  And the amount of the seller note

24   purports to be the equity value?

25         MR. BROWN:  They contend that the amount of

Case 11-42042-dml11   Doc 30-32   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 2 - Hearing Transcript   February 17   2011   Page 21 of 93

118

1    the seller note, the face value of the seller notes which now

2    stands at about $48 million is reflective of what was the

3    book value of the equity in those assets that were

4    transferred.

5              THE COURT:  So -- all right.

6              MR. BROWN:  The issue that remains is whether

7    that equity --

8              THE COURT:  The value after the secured debt,

9    though, is taken into consideration?

10             MR. BROWN:  That is their contention.  That's

11   correct, Your Honor.

12             THE COURT:  All right.

13             MR. BROWN:  The loan documents, as reflected

14   in the stipulations and as entered into evidence in the giant

15   volumes of exhibits that we submitted show that the loan

16   documents of each of the secured lenders represented in the

17   various motions that are presented to the Court require prior

18   written consent from the secured lenders for the transfers of

19   these assets.  In each instance, consent was not requested

20   nor received by the debtor or by the transferring entity or

21   by the parent.  There as no consent.

22        With respect to Wells Fargo, our documents reflected

23   that there had to be written consent to transfer the

24   ownership interest in our borrower, TCI Texas Properties,

25   LLC.  And no consent was, again, requested or received prior

1   to the transfer of that ownership interest to ABC LD Income.

2       The debtor, as reflected in the stipulations,

3   maintains, no harm, no foul.  You know, we're going to take

4   care of you guys in this bankruptcy.  There's -- this isn't a

5   big deal that we didn't get consent.  The reality is to the

6   contrary.

7       We had a right to consent or not consent to a transfer.

8   Had we not consented and had they abided by the documents, we

9   would have been in a bankruptcy, potentially, with TCI Texas

10  Properties and our eight individual tracts of land.  Instead

11  we're now in a bankruptcy with various secured and unsecured

12  lenders.

13              THE COURT:  So is all of Wells Fargo -- were

14  all of Wells Fargo's properties in TCI Texas Properties?

15              MR. BROWN:  That's correct.

16      And so now we're in this bankruptcy that was filed by

17  the debtor basically as a litigation tactic so they could

18  roll all of this stuff up together, claim that the equity

19  that they had in the gross amount of the properties offsets

20  any deficiency that exists on other properties.  And although

21  they've committed to not using funds from one to satisfy

22  expenses on another, we're in this situation where people's

23  interest, especially at the unsecured level are going to be

24  diluted, possibly by other unsecured creditors, possibly by

25  deficiency claims that exist for the secured lenders.  So

HC 00774

Case 11-42042-dml11   Doc 30-32   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 2 - Hearing Transcript   February 17   2011   Page 23 of 93

120

1   it's not a no harm/no foul this will all come out in the

2   wash.

3       Moreover, the filing of the bankruptcy frustrated the

4   lenders, not particularly Wells Fargo in this instance. But

5   who were foreclosing on properties on January 4th. And --

6           THE COURT: But Wells did not have properties

7   posted --

8           MR. BROWN: Wells had not posted properties

9   for foreclosure. But Wells was frustrated in the sense that

10  our properties were in default. The loans were in default.

11  We had notified them of those defaults. And we were at

12  liberty to exercise post-default rights and remedies that

13  were stayed by the filing of the bankruptcy. So accordingly

14  you've got prejudice to the secured lenders, prejudice to the

15  unsecured creditors who are now diluted by unsecured

16  deficiency claims and possibly other trade creditors.

17          THE COURT: Well, but, we don't know any of

18  that yet, do we? We don't know that there will be deficiency

19  claims. We don't know if there will be dilution. Certainly

20  things have changed. Don't get me wrong. But do we know

21  enough to know that there will be dilution to these

22  creditors?

23          MR. BROWN: I think we know that there are

24  properties that are under secured. Coming in it was Wells

25  Fargo's contention that we were under secured by a million to

NATIONAL COURT REPORTERS (214) 651-8393

1  half a million dollars.  I think at the end of the day it may

2  be that we're marginally over secured.  But when you factor

3  in the ad valorem tax liens, it's probably a wash.  On other

4  properties, and I'm at a lost to tell you exactly which ones,

5  But I believe there are properties that are under secured and

6  so there may be deficiency claims at the end of the day.

7               THE COURT:  But that's my point, may be.

8               MR. BROWN:  That's correct.

9               THE COURT:  You just said, as if you knew,

10  that there were harms to the unsecureds who are now going to

11  be diluted by deficiency claims.  And I'm trying to pick at

12  that a little bit.  So what entities were under secured, from

13  your perspective, if any?

14               MR. BROWN:  I think the point that I was

15  trying to make is that the filing of the bankruptcy can

16  prejudice unsecured creditors who might be subject to a

17  dilution of their claim where they might have gotten --

18               THE COURT:  It could.  Or it could actually

19  help them.  If they were in an entity where there was no

20  value and now that there is excess equity at FRE --

21               MR. BROWN:  I agree.  If you accept the

22  debtor's position --

23               THE COURT:  So in theory it could be a benefit

24  or a burden.

25               MR. BROWN:  It could be a benefit or a burden.


NATIONAL COURT REPORTERS (214) 651-8393

Case 11-42042-dml11    Doc 30-32    Filed 04/11/11    Entered 04/11/11 15:34:21    Desc
Exhibit U - Part 2 - Hearing Transcript    February 17    2011    Page 25 of 93

122

1    But let's, you know, if there are some that are over secured

2    and there are some that are under secured, if you're an

3    unsecured creditor in an under secured property, then you may

4    be burdened -- I'm sorry.  If you're an unsecured creditor in

5    an over secured property, you may be burdened by a deficiency

6    claim that someone else may have on an under secured property

7    and --

8             THE COURT:  I'm sorry, say that again.  You

9    lost me.  If you are a --

10            MR. BROWN:  I may not be saying this exactly

11   right.  But I believe if you are an unsecured creditor in a

12   property that is over secured, or maybe if you're an

13   unsecured creditor in Wells Fargo's property that's a wash,

14   for argument sake, then if there's under secured properties

15   over here where a secured creditor is not going to be able to

16   get the full amount of their claim and they have a deficiency

17   that then gets satisfied out of this whole estate and you

18   treat everyone as equal, all of the unsecureds as equal and

19   all of the secureds as equal, if I'm an unsecured on a

20   property that's a wash or marginally over secured, then I'm

21   going to be diluted by a deficiency claim made by someone on

22   our property that was under secured.

23            THE COURT:  Yeah.  But again, we don't know

24   what we're going to have.

25            MR. BROWN:  And I acknowledge that.  The point

1   is the way that they rolled all of these properties together,

2   putting properties that may be over secured may be under

3   secured in one big pot puts those people at risk.  And I'm

4   saying that there's a risk.

5           THE COURT:  But when I ask you who's over

6   secured and who's under secured, you equivocate.  And that's

7   what I'm trying to figure out.  Is this a hypothetical that

8   we're talking about, or is this a real problem here?

9           MR. BROWN:  I believe that there are secured

10   creditors here today that will tell you that they are under

11   secured on their properties.  I am not in a position standing

12   before the Court now to tell you which of those secured

13   creditors they are.

14           THE COURT:  Okay.

15           MR. BROWN:  And not only have all of these

16   assets moved to the debtor, as I stated earlier, all of the

17   ownership interests were transferred.  And so you've got

18   transferor entities that no longer have any assets.  And

19   their condition is, Yes, but they also have no liabilities.

20   But they ignore the fact that none of the secured creditors

21   consented or released those debts.  And so, yes, each of

22   those transferor entities do still owe those debts and they

23   have no assets from which to satisfy them.  Their position

24   is, Well, you'll be satisfied out of the debtor's estate.

25   And that, again, is to the prejudice of each of the secured

Case 11-42042-dml11   Doc 30-32   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 2 - Hearing Transcript   February 17   2011   Page 27 of 93

124

1   lenders.

2        If you look at the joint stipulation and you look at

3   the two charts, the before and after, and the transfer of

4   assets, and the assumptions of debts, you'll see that this

5   was just a scheme to roll all of these non-performing

6   properties, or marginally performing properties out of

7   Transcontinental's side, move them all over into the ABC LD

8   side under the debtor.  And put us all under this one big --

9   this one mega debtor bankruptcy.

10       Interestingly, when they did all of that they

11   upstreamed all of the seller notes to the public entities.

12   Each of the seller notes that FRE gave back to the transferor

13   entities were transferred up to Transcontinental, ART, and

14   IORI, so that they wouldn't have to write down their under

15   performing assets, at least until something happens down the

16   road and maybe they're not satisfied on these seller notes.

17       The Court has the transcript from the February 3rd

18   hearing with Mr. Morgan's testimony regarding the meeting

19   that he had with Mr. Moos on the TCI side and Mr. Akin on the

20   FRE side.  He talked about how he learned of the events.  He

21   was told, We've done this.  This is a done deal.  We've done

22   these transactions.  Do you agree that this was proper and

23   will you step in as vice president and chief restructuring

24   officer?

25       He said he looked at a sampling of the documents.

1    Didn't review them all.  Couldn't testify as to what happened

2    among these transactions between these companies.  And said,

3    Sure, I'll come in as vice president and chief restructuring

4    officer.  And I'll find a way to add value.

5        Now, there's no money in the debtor to pay Morgan, so

6    he's working for free.  The debtor has no employees, other

7    than Morgan.  They use Regis as property manager.  They use

8    Prime Income Asset Management for financial advising

9    services.  The same property manager and financial advisory

10   company that provided those services to the Transcontinental

11   entities prior to the transfer over to the debtor.  And he

12   says, I'm going to add value and I'm going to get a success

13   fee.

14       There's been no application for his retention.  There's

15   been no application for approval of a success fee for Mr.

16   Morgan.  He couldn't tell us what it would be.  What

17   percentage it would be.  He's just out of the goodness of his

18   heart and in the hopes that he'll get a success fee going to

19   try to add value to the debtor's estate.

20       He couldn't, however, give specifics as to how he was

21   going to do that without a significant influx of money.  And

22   I think that's significant when you compare what's going on

23   in this case to, for instance, the cases that the debtor

24   cites in its response to our motion to dismiss.  In each of

25   those cases there were commitments for significant additional

Case 11-42042-dml11    Doc 30-32    Filed 04/11/11    Entered 04/11/11 15:34:21    Desc
Exhibit U - Part 2 - Hearing Transcript    February 17    2011    Page 29 of 93

126

1    capital, or equity to be pumped into the debtor to satisfy

2    the needs of the debtor to get the assets out through the

3    bankruptcy and out.  And in this case we simply do not have

4    that.  There's no evidence of a commitment to do that at this

5    point.  He talked about a significant influx of capital to do

6    the upgrade to the Fenton building.  And we don't know where

7    that's going to come from.  I think his testimony was, I'll

8    just have to -- we'll have to figure that out.  We'll have to

9    figure that out.  It's almost as though they went into this

10   thing with their eyes wide shut.  You know, he steps in in

11   December 23.  Bankruptcy is filed on January 4th.  And there

12   really is no plan.  This was simply done to frustrate the

13   creditors.

14       The debtor has not filed any application to retain

15   brokers to sell the properties and, yet, that is also part of

16   Mr. Morgan's "plan".  On the management side, there's no

17   money to pay Prime.  There's no application to retain Prime

18   or Mr. Crown in this case.  And let's not forget Mr. Crown's

19   testimony before lunch that he wears a number of hats.  And

20   at any give time he's not exactly sure who he may be

21   representing or where his duties of loyalty may lie.  And

22   that is further indicia of the bad faith in which this

23   bankruptcy was filed, because he's providing services for the

24   entities on the transferring side and on the receiving side.

25       There are no unencumbered funds to pay taxes,

HC 00781

1    insurance, maintenance, or adequate protection to lenders on

2    the non-income producing raw land.  And no evidence that any

3    will be forthcoming.  There's no commitment letter from

4    Transcontinental.

5         In relation to the testimony about possible financing,

6    you have to recall Mr. Crown's testimony that

7    Transcontinental suffers from a lack of liquidity.  And his

8    testimony about the failure to fund the Woodmont bankruptcy

9    under the amended plan of reorganization that resulted in

10   plan defaults and dismissal of 6 of the 8 cases.

11        And as for Morgan, the Court should also keep in mind h

12   is relationship with the transferor entities.  Because even

13   though he stepped in on December 23rd to represent the debtor

14   as its vice president and chief restructuring officer, he has

15   long-standing relationships with entities on the

16   Transcontinental side.  He testified about business deals

17   that he had with entities in the ART family of companies.

18   And his long-standing relationship with the Phillips family

19   and services that he's provided for them over that past 35 or

20   40 years, I believe he testified.  And then consider his

21   expertise in restructuring.

22        What is the plan and outcome at the end of the day?  He

23   says he wants to get these properties sold.  These entities

24   have been trying to sell these properties for a number of

25   years, so he proposes to repackage, hopefully work with the

HC 00782

Case 11-42042-dml11    Doc 30-32    Filed 04/11/11    Entered 04/11/11 15:34:21    Desc
Exhibit U - Part 2 - Hearing Transcript   February 17   2011   Page 31 of 93

128

1   lenders to allow him to put them in together with one broker

2   to sell packages of tracts of land that may be centrally

3   located.   But consider his personal bankruptcy in which he

4   testified and the evidence showed that he was invested in

5   retail shopping centers that failed and led to multi-million

6   dollar deficiencies and his seeking a contested discharge in

7   that bankruptcy.

8        And then if you look at the Schedule D to the debtor's

9   schedules -- in the debtor's schedules, you've got the

10   exhibit of the creditors holding secured claims.   And it

11   reflects a total of $181.5 million.   That number should

12   include an additional 15 million for Armed Forces' debt which

13   was under stated.   I believe it was stated at 57, which

14   should have been $72 million.   And you consider the amount

15   of the secured debt, whether it's 181 or 196, relative to the

16   mere 1.4 million in unsecured debt and, again, you're lining

17   right up with the Little Creek factors, once again.

18        Each of the following secured creditors joined in Wells

19   Fargo's motion to dismiss, or filed their own, or filed

20   pleadings to annul the stay, to terminate exclusivity.   And

21   in each, allegations of bad faith filing were alleged, were

22   made.

23        American Bank of Commerce, Armed Forces Bank, First

24   Bank & Trust, NextBank, Petra, Regions Bank, RMR Investments,

25   State Bank of Texas, and Wells Fargo.   And those secured

HC 00783

1   creditors represent 97 percent of the secured debt scheduled
2   by the debtor.  And it's not just the secured creditors who
3   are here asking for this relief, Your Honor.  Mr. Staber's
4   client, Wicks Sidney -- Sidney Wicks, I'm sorry, has a claim
5   of $153,000 out of the 1.4 million of unsecured debt.
6   They're here asking that this be dismissed for bad faith.

7        If you look at the standards under 1112(b), once the
8   creditors show, or a creditor shows that the case has been
9   filed in bad faith, or makes a prima facia case of bad faith,
10  which all of the evidence that we've just discussed and have
11  been presented to the Court clearly shows, the burden shifts
12  to the debtor to show that there are unusual circumstances.
13  We've supplied the Court authority that in some cases you
14  don't even get a chance to show unusual circumstances.  The
15  showing of bad faith is enough.  But here there are no
16  unusual circumstances that warrant relief not being granted,
17  because it's not in the best interest of creditors or the
18  estate.  The creditors are all here asking for this relief,
19  secured and unsecured.  So the creditors have spoken loudly
20  in favor of dismissal of this case.

21       The only other things that I would mention, Your Honor,
22  the debtor relies heavily on this argument that they've made
23  in footnote 4 to their schedule that all of the seller notes
24  are super subordinated and no one is getting paid off on
25  those and they're not going to dilute the unsecured creditors

NATIONAL COURT REPORTERS (214) 651-8393

HC 00784

Case 11-42042-dml11    Doc 30-32    Filed 04/11/11    Entered 04/11/11 15:34:21    Desc
Exhibit U - Part 2 - Hearing Transcript    February 17    2011    Page 33 of 93

130

1    in any of these properties.  There's no documentation.

2    Again, they went into this with out a plan and they're trying

3    to clean it up.  And it's evidenced that it was filed in bad

4    faith and that's the standard that the Court has to consider.

5        The last thing I would point out, our -- again with

6    respect to the Little Creek factors, there are single asset

7    transfers in this case.  Mr. Weitman questioned Mr. Morgan

8    this morning about five of them where there were secured

9    lenders whose rights and protections under 362(d)(3) have now

10   been hijacked by the roll up of all of these properties into

11   this mega debtor and throwing them in with the other secured

12   lenders' collateral.  And the Court should not tolerate that

13   type of conduct.  This is an abuse of the bankruptcy process.

14   And the case should be dismissed for its being filed in bad

15   faith.

16       Thank you.

17              THE COURT:  Thank you.

18       Other movants, please.

19              MR. STABER:  Thank you, Your Honor.  David

20   Staber on behalf of Sidney Wicks, who is the Trustee of the

21   Sidney Wicks Revocable Trust.

22       We've heard the Little Creek factors discussed here.

23   And I'm not going to go into detail and repeat that.  You'll

24   probably hear them again before oral arguments are through

25   here.  But I want to highlight three issues for the Court

1  that relate to my client and unsecured creditors that I think

2  might not be covered by some of the secured lenders.

3          THE COURT:  What entity was your client a

4  creditor of prior to the transfers?

5          MR. STABER:  Transcontinental Realty, the

6  publicly held company.

7          THE COURT:  Okay.  So you're at that level.

8          MR. STABER:  I'm at that level, Your Honor.

9      My first point is the debtor is not fulfilling its

10 obligations as a debtor in possession.  And this is directly

11 on point with my client.  As observed on our first day of

12 hearings, the debtor has not paid post-petition rent as

13 required by 365.  The testimony given by the debtor was, I'm

14 waiting for cash collateral to be resolved.  But thereafter

15 the debtor admitted into evidence Exhibits D and E, the cash

16 collateral budgets.  And I searched and I searched and there

17 is no rent in those budgets.  So the debtor's testimony is

18 inaccurate.  The documents show no use of cash -- somebody

19 else's cash collateral to pay the rent they're supposed to

20 pay.

21     The testimony this morning about this possible

22 financing was it was to be used for unimproved property, the

23 raw land, and that it would relate -- be specific to raw

24 land.  Well, that's not my client's situation either.  So

25 there's no funds coming in to pay that from source, as the

NATIONAL COURT REPORTERS (214) 651-8393

Case 11-42042-dml11    Doc 30-32    Filed 04/11/11    Entered 04/11/11 15:34:21    Desc
Exhibit U - Part 2 - Hearing Transcript    February 17    2011    Page 35 of 93

132

1    testimony -- in fact, the only testimony was Mr. Crown who

2    said, Well, one of them is leased out, so we have a little

3    money.  But, again, there's been no effort to pay the rent.

4    If you're not going to fulfill the duties of a debtor in

5    possession, you should not be in Chapter 11.  And that's been

6    the evidence from the debtor's testimony and documents they

7    have submitted.  They're not acting like a fiduciary in a

8    debtor in possession, particularly with my client.

9        The other area I tended to go into with both of the

10    witnesses, and I know it may sound a little bit odd, was the

11    co-debtor situation.  And you asked questions about unsecured

12    creditors.  What's the situation here?  And as I looked at

13    that, the debtor's schedules are inaccurate in that regard.

14    And they give a false impression to the Court that there's

15    about 1.4 million with no recourse out there.  And I'm going

16    to tell the Court there's two groups of unsecured creditors

17    here.  There are people like my client who are unsecured, who

18    have a lease with a publicly traded entity that we have never

19    released.  We are suing.  And we will continue to sue for

20    rent.  So if this case gets dismissed, now I've got two

21    pockets I can go after in my litigation.  And the charts are

22    wonderfully done and I have not memorized them.  But you're

23    going to be able to see the trade creditors that fall under

24    those categories, the people that dealt with ART,

25    Transcontinental, et cetera.

HC 00787

1        You're also going to see what I think Mr. Weitman had

2    brought forth the evidence on is you have the raw land single

3    asset entity that flipped their property over into this

4    debtor to get the advantage of the stay.  Well, as a general

5    rule, other than the tax creditors and sometimes  the person

6    that mows the grass, there's not a lot of assumed debt out

7    there.  And those, I'm going to be candid with the Court,

8    they've got a situation.  They may have somebody to sue

9    there, but there wasn't much there to start with any way.

10   And your question was on point to Mr. Brown, could they

11   possibly, this small group of creditors with small claims get

12   some distribution some day in a case like this.  And

13   candidly, they might.  But they might also be able to go pick

14   it up simply because they're necessary to maintain the

15   properties, no matter who's out there.  And it's a relatively

16   small number.

17       And I don't want to mislead the Court.  We're all in

18   the same boat there, because we're not.  But the vast

19   majority of the unsecured creditors fit in the situation my

20   client is in where if this case is dismissed, I've got two to

21   go after and collect the money.  So dismissal is not harmful

22   to a large portion of the unsecured body.

23       The final point I want to make actually was not one I

24   walked in here intending to make this morning.  But as I

25   heard the testimony, the blurring of the debtor, of ART, and

HC 00788

Case 11-42042-dml11   Doc 30-32   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 2 - Hearing Transcript   February 17   2011   Page 37 of 93

134

1   Transcontinental, Mr. Crown not knowing who he's working for,

2   actually working for all of the entities.  Mr. Crown's

3   testimony that Prime is not -- doesn't have a written

4   agreement with the debtor, is not getting paid by the debtor,

5   but is providing services related to these properties and the

6   investments of ART and TCI and has been providing services

7   even pre-petition and pre-formation of this entity, I think

8   it's a pretty easy inference where he's getting paid for all

9   of this.

10       It's a blurring and a benefit to TCI and ART.  And I

11   think the evidence this morning shows that.  And ultimately

12   what we have here is the new debtor syndrome, or what I used

13   to call the flip and file.  Flip the property into the entity

14   and file it.  And that certainly happened here.  And the only

15   response I'm hearing on why we shouldn't throw this out is,

16   Well, we got everybody here.  And we'll put out a plan.  But

17   when the testimony came down to it, what's your plan?

18   Because we've been in this over a month now and there is no

19   plan.  It's the obvious stuff.  Mr. Crown was correct.  Yeah,

20   you take income producing property and try to increase the

21   income.  You take the raw land and try to sell it.  Except

22   that hasn't worked for months, over a year is the testimony

23   we have here.

24       This was a delay, a hinder case.  And ultimately I

25   would harken back a few years here.  The concept seems to be

NATIONAL COURT REPORTERS (214) 651-8393

1    you take the bad stuff in ART, you take the bad stuff in

2    Transcontinental, you add some bad stuff from little

3    entities, you create one big mess and hope to buy some time

4    that the market turns and maybe you can sort it out.  And it

5    reminds me of kind of the last time we did this where we take

6    the bad stuff in InterFirst and the bad stuff in Republic

7    Bank and a couple of other ones, combine them and make it

8    First Republic.  But it doesn't solve the problem.  It

9    increases the cost.  It increases the mess.  And the remedy

10   here, Your Honor, which I think clearly on a new debtor flip

11   and file type case here is, let's dismiss this.  Let the

12   parties that had foreclosed because they didn't get notice of

13   the flip or of the file, affirm their foreclosures.  Let the

14   other secured lenders go out and do their foreclosures.  And

15   if there's value there that Transcontinental or ART wants to

16   realize, then they can put money together.  They can go bid

17   at those foreclosure sales.  And the unsecured creditors can

18   go after the people they assigned their original contracts

19   to.  And that's the best result.  And you haven't heard from

20   a single creditor that they want something different.

21        Thank you, Your Honor.

22             THE COURT:  Mr. Stromberg.

23             MR. STROMBERG:  Thank you, Your Honor.  I'm

24   going to try real hard not to go over ground that's been

25   dealt with sufficiently by other counsel.

HC 00790

Case 11-42042-dml11   Doc 30-32   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 2 - Hearing Transcript   February 17   2011   Page 39 of 93

136

1                    THE COURT:  All right.

2                    MR. STROMBERG:  Mark Stromberg on behalf of

3     State Bank of Texas.

4          I think there was mention made about the problems that

5     are created by the title issues from creating this super

6     debtor.  The issues about the violation of the loan covenants

7     and the issues about avoiding the effects of Section 362(d).

8     There was some discussion, however, about the cash collateral

9     concerns that this bankruptcy has created based on the way in

10    which it was generated by taking all of these entities and

11    turning all of their property over into one super debtor on

12    the eve of bankruptcy.  And I think that's really the

13    question.  Because if we had separate bankruptcies for all of

14    these entities, then they would be in bankruptcy.  They would

15    be dealing with their own issues.  We wouldn't have this

16    issue or problem created by the consolidation, in effect,

17    pre-bankruptcy of all of these entities.  So really the first

18    starting point here is what's wrong with how we got here?

19    And I think that's really the question that I've been

20    struggling with and it may be the one Your Honor is

21    struggling with, as well.

22         And in that regard, Your Honor, I want to start by the

23    TCI/Woodmont bankruptcies that the Court heard a little bit

24    of testimony about today.  There were eight entities.  They

25    all filed separate bankruptcies.  They were jointly

1   administered and came up with a joint plan of reorganization

2   in Judge Hale's court, just right across the hall.

3        Now, it seems to me that the question that the debtor

4   should be answering for Your Honor and hasn't answered yet is

5   why are we doing this as opposed to that.  Because a lot of

6   the issues that we have here, like, for example, the cash

7   collateral concerns, the issues about whether or not some

8   unsecured creditors are going to be benefited and other's are

9   going to be burdened.  We wouldn't be dealing with those

10  issues at all.  So why not?  It was possible for

11  Woodmont/TCI, it should have been possible for this debtor,

12  as well.

13       I would also point out that these notes that we've

14  talked about here, Your Honor, they're a pretty important

15  piece of this because they were created for the purposes of

16  creating this whole transaction.  And the debtor tells you in

17  their testimony that these notes were really intended, though

18  they don't say it, to be notes that relate to the specific

19  properties.  That the income from these properties and all of

20  these things is related to those properties.  That the

21  creditors related to those properties will be the sole

22  beneficiaries until there's any excess, if any, there is.

23  They depend, coincidentally, on counsel for Prime or TCI to

24  tell them that.  But nevertheless, that's what they claim.

25  That's their position here.  But that's really not even

HC 00792

138

1   fairly characterizes an interpretation because it's not in

2   the documents.

3       The concern that I have about this is that a Chapter 11

4   Trustee, or for that matter, a Chapter 7 Trustee wouldn't

5   fell themselves at all bound by these interpretation of the

6   documents that are for the first time and perhaps the only

7   time, other than in testimony in this court, mentioned in a

8   footnote in a cash collateral pleading.

9       Indeed, if the debtor in possession were truly

10  independent, and we're going to talk a little bit more about

11  that in just a minute or two, then perhaps the debtor in

12  possession might not be depending on this footnote either.

13  It might be actually looking at the documents themselves that

14  don't say this.  This lack of independence is critical.  I

15  think it's clear from what we've heard that the debtor has

16  been dependent on the entities that created this set of

17  transactions from the get go.  The plan was created before

18  Mr. Morgan ever agreed to take over, before all of these

19  transfers took place.  And by the time that he was getting

20  involved, it had already happened.  There were no

21  alternatives considered by Mr. Morgan to the roll up.  That

22  happened and it was a done deal.  Fate a complete by the time

23  he got there.

24      His arrangements, as Mr. Brown pointed out, for payment

25  are dependent on his long-standing business relationship with

NATIONAL COURT REPORTERS (214) 651-8393

HC 00793

1    Mr. Phillips and/or the TCI entities.  But in all deference

2    to Mr. Morgan, he has no prior chief restructuring officer

3    experience in a bankruptcy.  There was no indication as to

4    why somebody outside of the TCI family was not considered for

5    this job, as opposed to somebody who offices in the same

6    building and who does business with these same entities.

7         If the debtor, indeed, had a case for that, for why

8    Mr. Morgan was the best person for this job, other than the

9    fact that he was there, I would have expected that it would

10   have come out in the context of the evidence.  So there were

11   no alternatives considered.  And more importantly, Mr. Morgan

12   himself foreclosed several of the options that he himself

13   thought were the most likely options for this debtor to

14   reorganize, namely, asking TCI for financing.  That

15   discussion apparently did not happen until very recently and

16   after questions were asked about this in the first part of

17   this hearing that took place weeks ago.

18        So it was only on the eve of this hearing that the

19   discussion of TCI putting any money into this case, even

20   though Mr. Morgan saw it as a critical component of

21   reorganization was ever brought up to TCI.  And even then, as

22   of today, there still has not been any investigation as to

23   TCI's wherewithal or capability to fund, assuming arguendo

24   that they were willing and interested.  Which, of course,

25   they weren't willing and interested to do before the

NATIONAL COURT REPORTERS (214) 651-8393

HC 00794

Case 11-42042-dml11   Doc 30-32   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 2 - Hearing Transcript   February 17   2011   Page 43 of 93

140

1   bankruptcy because if that had been the case, then perhaps

2   this case might have looked different.

3       He depends upon TCI for a lot of things, Mr. Morgan

4   does, or its affiliates, Prime Income Asset Management,

5   including their lawyers for interpretation of the transfer

6   documents.  He depends upon them for the values of the

7   properties, which was the values that came off of the public

8   companies books so that they could make these transfers look

9   like they were zero sum on the total books of the entities

10  that are publicly traded.

11      He depends upon them for information that goes into the

12  schedules and did no due diligence himself.  He depends upon

13  them for the property records that relate to the properties

14  that he inherited on December 23, 2010.  He depends upon them

15  for the marketing of the property.  He depends upon them for

16  the financing of the property, even if it comes from third

17  parties.  So clearly there are serious issues here about

18  independency.

19      But talking specifically about the issues that Little

20  Creek raises.  The question that the Court asked, and I think

21  this is probably a fair question and even though it's just

22  step one of a two-step process is when you get to bankruptcy

23  is there any reasonable prospect for reorganization, or is it

24  just the terminal euphoria of the debtor, to quote the 5th

25  Circuit.

1          Rather than offer a specific plan, the debtor has

2   offered every kind of plan.  They've said, Well, we're going

3   to restructure, or we're going to refinance, or we're going

4   to get new capital, or we're going to sell some properties,

5   or we're going to just operate.  So rather than have a

6   specific plan, especially in a case of this kind where the

7   debtor could reasonably have anticipated that given the

8   circumstances of these transfers pre-bankruptcy,

9   pre-foreclosure, the creditors would be concerned and upset.

10  There is no specific plan.  And it bears mention that when

11  you talk about the different things that the debtor has

12  proposed, for example the property sales, there were none in

13  prospect immediately prior to bankruptcy or in the year prior

14  to bankruptcy, there are none in prospect now.  When you talk

15  about refinancing with one of -- or restructuring the debt

16  with these creditors, there were none immediately in prospect

17  before the bankruptcy and there were none in prospect right

18  now.

19          You talk about the possibility of infusion of capital.

20  We already talked about TCI.  What about the possibility that

21  third parties were going to infuse capital?  None in prospect

22  before the bankruptcy, and none in prospect now.  So really

23  what is it, if it's not terminal euphoria that the debtor's

24  proposition of a plan is based on?

25          Then we talk about the issues of motive.  The fact that

NATIONAL COURT REPORTERS (214) 651-8393

Case 11-42042-dml11    Doc 30-32    Filed 04/11/11    Entered 04/11/11 15:34:21    Desc
Exhibit U - Part 2 - Hearing Transcript    February 17    2011    Page 45 of 93

142

1    these entities transferred these assets to another entity

2    that did not bear the name TCI, the fact that they used these

3    transfers of the notes back upstream to TCI so they could

4    show that there had been no loss on the books, that they

5    could make this a zero sum transaction so they wouldn't have

6    to perhaps report this to their public shareholders.  These

7    are all issues, issues that bear on bad faith.

8        And then finally there's the question about the

9    upstreaming of the notes.  And really the first question that

10   one might ask is why are we even doing this?  If this doesn't

11   illustrate that we're protecting only the guarantors, I'm not

12   sure what does.  The debtor determines what they believe to

13   be fair market value based on the book value of the asset.

14   Then they record an obligation where they assume the debt.

15   Then they take a note for the balance, which is the alleged

16   equity and that gets transferred out of the debtor.  So if

17   the equity has left the debtor in the form of this note,

18   which at least the documents themselves reflect, what are we

19   here to protect?  But more important than that, if we had an

20   independent DIP in this case, one that didn't depend on the

21   debtor for literally everything, whether it's payment, or

22   documents, or information, or schedules, or what have you,

23   then perhaps we would have a situation where the question

24   might be asked and one might ask this question, would it be

25   that Mr. Morgan would sue the people that worked down the

HC 00797

1   hall from him, if it turns out that these transfers of the

2   notes, or perhaps these transfers overall were improper.  I'm

3   not so sure even that the question would come up.  I've seen

4   no indication in these hearings, and I suspect Your Honor

5   hasn't either that the question has come up for Mr. Morgan or

6   the people who represent the debtor.  It has come up for the

7   creditors, but not for the debtor.

8        So finally, Your Honor, I conclude by asking this

9   question.  I think I've argued this in a positive way.  I

10  think the evidence is pretty clear that this is a case that

11  brings all of the concerns of bad faith into play.  But I ask

12  it the other way.  If this isn't that case, I suspect Your

13  Honor is having the same trouble I am envisioning what the

14  case would look like that does bring those issues into play.

15  And so asking the question in the negative, if not this case

16  then what case?  I think the answer is clear.  The answer is

17  that bad faith has been shown.  That the debtor has not

18  provided critical explanations as to why they didn't do these

19  cases as separate bankruptcy cases where there would be no

20  allegation of impropriety with respect to the transfers and

21  the effects on other creditors.  There would be no argument

22  about impropriety in terms of a violation of the loan

23  covenants.  None of those issues would have come up.  And the

24  debtor has never once in this hearing answered that question.

25  And in as much as they haven't, dismissal is appropriate.

# Transcript of the Testimony of **fre ruling217**

**Date:** February 22, 2011
**Volume:** I

**Case:**

Printed On: March 11, 2011

National Court Reporters
Phone:214 651-8393
Fax:214 651-6068
Email:NCRDEPO@AOL.COM
Internet: NCRDallas.com

HC 00799

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

IN RE:                          )   BK. NO: 11-30210-BJH-11

                                )

FRE REAL ESTATE, INC.           )

    D E B T O R                 )

* * * * * * * * * * *

TRANSCRIPT OF PROCEEDINGS

* * * * * * * * * * *

BE IT REMEMBERED, that on the 17th day of February, 2011, before the HONORABLE BARBARA J. HOUSER, United States Bankruptcy Judge at Dallas, Texas, the above styled and numbered cause came on for hearing, and the following constitutes the transcript of such proceedings as hereinafter set forth:

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)

074a5ddc-2f03-4017-bb10-7707746b075f

HC 00800

Page 2

1                    *   *   *   *   *   *

2                    THE COURT:  Nothing further.  I don't need to

3       hear further argument.

4             I have given this case a lot of thought.  I gave it a

5       lot of thought following the February 3rd commencement

6       hearing.  Let me back up.

7             Certainly as soon as this case came to my attention

8       very shortly after the filing, and the request by the debtor,

9       of course, as always comes up for interim authority to use

10      cash collateral and we started preparing for that hearing and

11      we saw motions to dismiss come flying in by a variety of

12      secured creditors and joinders in motions to dismiss, it

13      became apparent to me that we had a difficult situation

14      brewing.

15            Ultimately at the interim cash collateral hearing I

16      believe I suggested that what occurred certainly had caused

17      red flags to arise.  And that perhaps I would hear evidence

18      that would explain and that I would look forward to hearing

19      that evidence.  Now, I haven't gone back to review the

20      transcript of the hearing, but I think I pretty much said

21      words to that effect.  Which was my way, Mr. Buncher, of

22      telling you that I really needed to understand why these

23      entities chose to do this in the face of motions to dismiss

24      for bad faith filings and the heat that the case was

25      generating literally from virtually day one.

NATIONAL COURT REPORTERS (214) 651-8393

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)                    074a5ddc-2f03-4017-bb10-7707746b075f

HC 00801

Case 11-42042-dml11   Doc 30-32   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 2 - Hearing Transcript   February 17   2011   Page 50 of 93

Page 3

1          And so it is disappointing to me that I've now had a

2     day and a half of evidence and the masterminds of this

3     structure chose not to appear at the hearing to explain why

4     this made some sense.

5          Maybe it's as simple as they didn't have bankruptcy

6     counsel and they didn't realize that this was going to create

7     all of the red flags and all of the hubbub that it has.  I

8     have no idea if they did or didn't have bankruptcy counsel.

9     But for publicly traded entities of the sophistication that I

10    think I appreciate here, it would be surprising to me if that

11    were the case.  But, again, I simply don't know.  Because,

12    frankly, I didn't hear from anybody who has personal

13    knowledge of what was hoping to be accomplished here.

14         Now, as most all of you are experienced enough lawyers,

15    I'll say it that way, to know that as a lawyer I preferred

16    the debtor's side of the case.  Some would say I was a

17    debtor's lawyer.  So it has caused me to have, as I said, a

18    few sleepless nights thinking about this, because I heard

19    Mr. Morgan loud and clear the first day, that he believes

20    there is enormous equity value in these properties.   $48

21    million was the number he offered.  And, again, that may be

22    quibbled with by certain parties.  But nevertheless, I heard

23    him loud and clear the first day that he believed there was

24    substantial equity that could be and should be preserved

25    here.  And as some would say, a former debtor's lawyer, I

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)                    074a5ddc-2f03-4017-bb10-7707746b075f

HC 00802

Page 4

1      think bankruptcy is about preserving that value and having

2      the opportunity to restructure obligations in order to

3      successfully reorganize.

4          The problem that I have here, though, is there are too

5      many red flags and no explanations.  And that's about as

6      succinct as I can state it.  We have a sophisticated

7      structure, as evidenced by Wells Fargo Exhibit 191, that

8      existed as of December 22nd, 2010.  And, again, it's a

9      structure of the Transcontinental Realty Investors, Inc.,

10     American Realty Trust, Inc., and Income Opportunity Realty

11     Investors' choice.  They structured their public entity as

12     they saw fit.  And they structured it in a fashion that had a

13     number of subsidiary entities to each of those three parents

14     entities.  And at least five of those subsidiaries were, as

15     we bankruptcy lawyers would call them, single asset real

16     estate entities.  And, again, this was the structure of

17     choice for Transcontinental Realty Investors, American Realty

18     Trust, and Income Opportunity Realty Investors.

19         And for some unexplained reason, after a number of the

20     properties previously held in these subsidiary entities had

21     been posted for foreclosure and virtually all, if not all, of

22     the properties at issue in our debtor, FRE Real Estate, Inc.,

23     were in default and thus foreclosure was in all likelihood

24     imminent for those properties for which they had not yet been

25     posted for foreclosure, we have transfers of the properties'

NATIONAL COURT REPORTERS  (214) 651-8393

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)                    074a5ddc-2f03-4017-bb10-7707746b075f

HC 00803

Case 11-42042-dml11   Doc 30-32   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 2 - Hearing Transcript   February 17   2011   Page 52 of 93

Page 5

1    assets into this, while it's not a new entity because it did

2    exist and it had an office building of its own, but all of

3    the other properties that are at issue in this bankruptcy

4    case were transferred into the debtor on December 22nd, 2010,

5    or at least documentation was signed as of that date.  There

6    is some fuss as to when deeds were actually transferred, et

7    cetera.  And the rights of the creditors of those entities

8    have been changed.

9         Now, in some instances I can unequivocally state that

10   the rights have been changed to the detriment of the

11   creditors.  In other instances, it is premature to know if

12   the rights have been changed to the detriment or potentially

13   to the benefit of the creditors.  But certainly with respect

14   to Petra and the Amaco Office Building; State Bank and the

15   Arcon land;  U.S. Bank and the Parkway North Office Building;

16   Regions Bank and the Westgrove Air Plaza Office Hanger; and

17   First Bank & Trust Centura land; we know for a fact that the

18   rights of those creditors have been adversely effected by the

19   orchestration that occurred with respect to these assets

20   immediately prior to the debtor's bankruptcy filing.

21        Now, with respect to those five creditors and those

22   five assets, had the transfer not occurred, those creditors

23   and those assets would have had to have been filed in what

24   the Bankruptcy Code calls a single asset real state case.

25   Congress has seen fit to provide special protections to

NATIONAL COURT REPORTERS (214) 651-8393

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)                    074a5ddc-2f03-4017-bb10-7707746b075f

HC 00804

Page 6

1      lenders in single asset real estate cases.  Section 362(d)(3)

2      of the Bankruptcy Code requires specific things to occur in

3      order for the automatic stay to remain in place in a single

4      asset real estate case.  Other provisions of the Code give a

5      single asset real estate entity a more limited period of time

6      in which to propose and confirm a plan of reorganization.

7          By undertaking the orchestration that occurred here,

8      each of those five secured creditors have been denied their

9      rights pursuant to those provisions of the Bankruptcy Code.

10         Now, as I indicated in my colloquy with Mr. Roberts, I

11     could fix that problem, because I have given thought to the

12     potential from the debtor's perspective, harshness of

13     dismissing this case and the chaos that they fear will occur

14     upon a dismissal of the case.  And how I could fix that

15     problem is by simply, coincidentally upon those creditors'

16     request for adequate protection, fashioning an adequate

17     protection order that simply happened to track the

18     requirements of Section 362(d)(3).

19         But what I can't fix for those creditors is the fact

20     that with respect to a bankruptcy filing -- and I'll pick

21     State Bank, as an example.  With respect to a bankruptcy

22     filing of what would have been on December 22nd Coventry

23     Point Inc., State Bank of Texas would have been the

24     substantial creditor in that case, with a secured claim of

25     roughly $3.9 million and tax debt of roughly a quarter of a

NATIONAL COURT REPORTERS  (214) 651-8393

Case 11-42042-dml11   Doc 30-32   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 2 - Hearing Transcript   February 17   2011   Page 54 of 93

Page 7

1     million dollars, and trade debt of $22,000.

2          Now, while I suppose it's theoretically possible that

3     $22,000 of unsecured claims could be an impaired accepting

4     class so that I would cram down a plan on a $4 million

5     creditor.  The simple fact remains that that is always a

6     better argument than it is a likely outcome, for a lot of

7     reasons.  State Bank could go up and buy the $22,000 of

8     unsecured claims, if worse comes to worse and completely

9     control the class and the case.

10          But my point being is there's no way to return those

11     secured lenders to the position that they would have enjoyed

12     had these orchestrated transfers not occurred.  They would

13     have been substantially in control, if not completely in

14     control, of the fate of the bankruptcy of their single asset

15     entity and would have had considerable powers.  And now that

16     the eggs all got scrambled as a result of the orchestrated

17     transfers that occurred here, I have no way of unscrambling

18     those eggs in the context of a confirmation process to put

19     those parties back to the relative position they would have

20     had before.  Because now they are simply one of dozens of

21     secured creditors of a single debtor, my debtor.  And they

22     don't enjoy the same, for lack of a better word, power that

23     Congress gave them under the Bankruptcy Code in an entity

24     which has lesser creditor and lesser debt levels.  So there

25     is no question but those creditors have been, for lack of a

NATIONAL COURT REPORTERS (214) 651-8393

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)                    074a5ddc-2f03-4017-bb10-7707746b075f

HC 00806

Page 8

1    better word, irreparably damages by the orchestration of

2    transfers that occurred here.

3         Now, one suggestion was, Well, just let those

4    properties go.  Well, that's really not something that's

5    before me today.  What's before me today is dismiss this case

6    for a bad faith filing, or find that it was an appropriate

7    filing and decline to dismiss.  It's the only issue that's

8    before the Court today.

9         Now, it's possible that other creditors are damaged, as

10   well.  Certainly the facts have changed for virtually every

11   creditor.  Instead of the entity to which they made a loan,

12   they now, other than NexBank who loaned to FRE Real Estate,

13   Inc., all of the other secured creditors are now with a

14   borrower that they didn't lend to and never consented to

15   assuming their debt.  The unsecured creditors may be

16   benefited or hurt, depending upon the circumstances present

17   for each of the prior entities prior to transfer.  And at

18   this point in the case, the Court simply can't tell if

19   unsecured creditors are benefited or burdened.  But what the

20   Court can say is that essentially the effect of this

21   orchestrated transfer was to effect a substantive

22   consolidation of what should have been a, I guess I didn't

23   count, 15 or 18 entity bankruptcy filing into a single

24   bankruptcy filing.  And the creditors now have no ability to

25   object to such a substantive consolidation, because it

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)                    074a5ddc-2f03-4017-bb10-7707746b075f

HC 00807

Case 11-42042-dml11   Doc 30-32   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 2 - Hearing Transcript   February 17   2011   Page 56 of 93

Page 9

1    occurred essentially in the dark of night without the

2    opportunity for them to have knowledge or to have an

3    independent third party, such as a judge in a bankruptcy case

4    in which substantive consolidation is proposed, apply the

5    legal test for such a substantive consolidation.

6         So what we have here is virtually all, if not all of

7    the properties in default.  We have a substantial number of

8    those properties posted for foreclosure.  We have transfers

9    of the assets in violation of every secured lenders' loan

10   documents without their consent, and, frankly, without their

11   knowledge.  We have five creditors, at least, for whom their

12   special rights created by the Bankruptcy Code have been

13   irretrievably lost.  And we have the rights of virtually

14   every other creditor changes, as a result of the action that

15   has occurred.  And, again, that change may be positive or

16   negative.  It's premature for the Court to really know.

17        And, as I've indicated, the Court is simply left

18   hanging as to what the business justification for this was,

19   if any there was.  Even after hinting that I looked forward

20   to hearing the explanation for the orchestrated transfers as

21   the initial cash collateral hearing, and after the better

22   part of a day and a half of testimony, I still have

23   absolutely no idea why the principals of these entities

24   believed that this orchestrated process made sense.

25        As a result of the fact that no explanation was

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)                    074a5ddc-2f03-4017-bb10-7707746b075f

HC 00808

Page 10

1    offered, the Court is left, I believe, with the only logical

2    conclusion.  And that is, this was done to attempt to

3    circumvent the requirements of the Bankruptcy Code.  That, of

4    course, is very troubling to the Court, both in the context

5    of this case and in the context of any other case that might

6    be filed before the Court.

7        I'm also troubled because of what I believe to be

8    essentially a lack of independent parties.  All of the assets

9    are operated by essentially independent contractors.  That

10   prior to the orchestrated transfer and subsequent, continued

11   to work for Transcontinental Realty Investors, Inc., American

12   Realty Trust, Inc., and Income Opportunity Realty Investors.

13       So as the evidence with respect to Mr. Crown suggests,

14   we have people who are wearing too many hats here.

15   Mr. Crown's company -- Mr. Crown has been asked by his

16   employer, Pryme, to assist the debtor as its financial

17   advisor.  Now, normally when you have a financial advisor in

18   a bankruptcy case, there is an application to employ that

19   person under Sections 327 or 328 of the Bankruptcy Code.

20   Affidavits of disinterestedness are filed.  And the Court

21   holds a hearing with respect to the retention.  None of that

22   has occurred here in this case.  And when asked about it,

23   Mr. Crown says, Well, he's not really getting paid by the

24   debtor, so why should he have to file anything to be

25   employed?  Well, the answer to that is because you're working

NATIONAL COURT REPORTERS (214) 651-8393

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)

074a5ddc-2f03-4017-bb10-7707746b075f

HC 00809

1      for a debtor, apparently, and the debtor and its

2      professionals are fiduciaries.

3           And as the cross-examination by Mr. Staber suggests,

4      Mr. Crown is wearing a couple of hats here, or at least his

5      employer is wearing a couple of hats that probably precludes

6      him from being retained in this case as a disinterested

7      professional.  He was asked specifically that when there's

8      discussions about what's going to happen to the debtor's

9      properties, who are you representing, and the answer was,

10     Transcontinental Realty Investors, American Realty Trust, and

11     Income Opportunity Realty Investors.  And from this Court's

12     perspective, that's the wrong answer.  You're representing

13     the debtor.

14          Now, certainly the ultimate holder has an interest.

15     And they may have an interest as the holder of these crafted

16     seller notes.  So they may be interested in what's going to

17     happen to the property, but that's not who you're accountable

18     to for what's going to happen to the properties.  You're

19     accountable to the debtor and the debtor alone.  And so that

20     is of concern here.

21          Mr. Morgan is also of concern, but in a slightly

22     different way.  Because Mr. Morgan appears to be an

23     experienced person in real estate.  He certainly -- he nor

24     Mr. Crown can be painted with the orchestration that occurred

25     here as they both unequivocally testified that they got

NATIONAL COURT REPORTERS (214) 651-8393

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)                    074a5ddc-2f03-4017-bb10-7707746b075f

Page 12

1    involved subsequent, although it appears, perhaps, that

2    Mr. Crown's company was involved in this process.  He just

3    simply wasn't.  But in any event, Mr. Morgan is new to this.

4    He came in, in fact, on December 23rd after it had all

5    occurred.  But, again, I have to say that the structure of

6    his involvement is odd.  There's no money to pay him.  He

7    doesn't expect to be paid for his time.  But he expects that

8    he will get some sort of a success fee that cannot yet be

9    described and is not written down.  But because of his prior

10   relationships with Mr. Akin, who as Mr. Buncher and I

11   discussed appears on a number of the entities as president

12   and director, because he has a history with Mr. Akin and he

13   trusts him, he thinks it will be fair.

14        Well, I appreciate that they have a friendship that

15   goes back for many years.  I appreciate that he trusts him.

16   But I will tell you that it is odd that we have the person

17   who is going to be responsible for the debtor's

18   reorganization who isn't getting paid and who can't disclose

19   to the Court or the creditors what the structure of his

20   expected compensation is.  That causes me to say that if he

21   were a professional person that had to be retained under the

22   Bankruptcy Code, he would likely not get retained.  And if he

23   is just an employee of the debtor, the issues surrounding the

24   potential divided loyalty might be grounds for the

25   appointment of a Chapter 11 Trustee so that, in fact, an

NATIONAL COURT REPORTERS (214) 651-8393

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)                    074a5ddc-2f03-4017-bb10-7707746b075f

HC 00811

Case 11-42042-dml11   Doc 30-32   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 2 - Hearing Transcript   February 17   2011   Page 60 of 93

Page 13

1    independent person would have the opportunity to decide what

2    makes sense here and not someone who made well because of

3    years of friendship and close relationships be beholding to

4    parties that they should be directly beholden to.

5        So I'm not sure we have an independent debtor in

6    possession.  And I'm not sure we have an independent

7    financial advisor advising the debtor.  Those are very

8    troubling to the Court.

9        As I mentioned previously, I am troubled by what has

10   essentially effected a substantive consolidation of multiple

11   entities pre-petition without compliance with the

12   requirements of the Bankruptcy Code, had that same

13   transaction been attempted pursuant to a plan of

14   reorganization.  And, again, it might well have been approved

15   as part of a plan.  But creditors would have had the

16   opportunity to vote.  And the Court would have required

17   extensive evidence with respect to whether or not there was

18   someone's ox getting gored as a result of the transaction.

19       Finally, I am very troubled by the precedent this

20   creates.  I do not believe that these types of transfers

21   should occur immediately prior to a bankruptcy filing without

22   a good business justification being provided to the Court

23   that the Court finds credible such that the Court can find

24   that this wasn't simply bad faith, that this wasn't an

25   attempt to circumvent specific provisions of the Bankruptcy

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)                    074a5ddc-2f03-4017-bb10-7707746b075f

HC 00812

Page 14

1      Code.

2          Moreover, while I have given this a lot of thought, I

3      do not think it's my problem to fix. And so the debtor's

4      request that I not throw the baby out with the bath water

5      because there's something that could actually have been

6      reorganized here, that argument I appreciated it in the

7      briefs. It kept me awake often. But I don't think it

8      outweighs the fact that this Court believes that it must send

9      a message that this cannot be tolerated. And, again, perhaps

10     if there had been a good business explanation offered by a

11     credible witness such that the Court could find no attempt to

12     circumvent the provisions of the Code, no bad faith, perhaps

13     that would make a difference. But I don't have that here.

14         So I recognize this is going to be a heck of a mess.

15     But unfortunately this is a heck of a mess of the parties who

16     created it. And that is not the creditors and that is not

17     the Court. For those reasons, I will grant the motions to

18     dismiss this bankruptcy case.

19         Now, I don't know quite what to do, Mr. Olson, with

20     your request. So I'm prepared to entertain further argument

21     about that.

22              MR. WEITMAN: Your Honor, if I may, I have

23     been thinking about that issue. And if Your Honor were to

24     first find that there was bad faith and cause for the

25     annulment of the automatic stay, then we would have, if you

NATIONAL COURT REPORTERS (214) 651-8393

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)                          074a5ddc-2f03-4017-bb10-7707746b075f

Case 11-42042-dml11   Doc 30-32   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 2 - Hearing Transcript   February 17   2011   Page 62 of 93

Page 15

 1    will, an annulment of the automatic stay --
 2              THE COURT:  But I haven't had a hearing on
 3    that motion yet.  That's the problem.
 4              MR. WEITMAN:  I hear you.
 5              THE COURT:  I hear you.  But unfortunately, we
 6    haven't yet heard those motions.  I can't make that finding,
 7    at least not at the moment, I don't think.
 8         Mr. Olson?
 9              MR. OLSON:  Your Honor, if I could give my two
10    cents worth?
11              THE COURT:  Please.
12              MR. OLSON:  I wouldn't want to come back later
13    to make that argument.  I wouldn't want to slow down the
14    dismissal of the case.  We brought that up simply because we
15    anticipated that a dismissal would preclude our ability to be
16    heard on the motion to annul.  And I asked for that language
17    only on the slim basis that if you find that this was done in
18    bad faith, perhaps a sanction, if you will, would be to say,
19    then it was a nullity and it's of no effect.  And the people
20    who conducted sales can record their deed and it's simply the
21    fact that the bankruptcy was filed and dismissed will have no
22    effect on the validity of the sale and the deed.  I think
23    that's all this Court could do.
24              THE COURT:  Let me hear from others.
25              MR. STROMBERG:  Thank you, Your Honor.

NATIONAL COURT REPORTERS (214) 651-8393

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)

074a5ddc-2f03-4017-bb10-7707746b075f

HC 00814

Page 16

1          On behalf of State Bank of Texas, we have a hearing

2    scheduled, I believe it's the 28th, on our motion to annul

3    the automatic stay.  And  you'll forgive me because this

4    probably comes from my being a bankruptcy lawyer and not a

5    real estate lawyer, but I'm not sure what the effect would be

6    if the case is dismissed before a determination on annulment

7    is made.  Because as I understand the Texas cases from the

8    state courts, they regard any action that is taken in

9    violation of the Bankruptcy stay as not merely voidable, but

10   void.  Not recognizing, perhaps, the distinction that the 5th

11   Circuit has made about the difference between annulment and

12   lifting of the automatic stay.

13         So I am in the position of having a client who without

14   notice of the bankruptcy foreclosed in the morning and got

15   notice in the afternoon.  And we have the 5th Circuit

16   authority, it was a Mississippi case, but nevertheless,

17   talking about the fact that if you were a creditor who

18   happens to be in that situation, the effect of the recording

19   statute may be such with annulment that you would end up with

20   valid title, but first the Bankruptcy Court has to make a

21   determination.  So I'm stuck in the unenviable position of

22   probably having an incurable defect of title, unless the real

23   estate lawyer tells me I'm completely wrong.  And that's

24   quite possible.

25         So unless I can be heard on the annulment issue, then I

NATIONAL COURT REPORTERS (214) 651-8393

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)                    074a5ddc-2f03-4017-bb10-7707746b075f

HC 00815

Case 11-42042-dml11    Doc 30-32    Filed 04/11/11    Entered 04/11/11 15:34:21    Desc
Exhibit U - Part 2 - Hearing Transcript    February 17    2011    Page 64 of 93

Page 17

1    run the risk that having first foreclosed without notice of

2    the bankruptcy and having messed up the title, in effect,

3    because the bankruptcy for an entity that we didn't recognize

4    for a case that we didn't know about, and our connection to

5    which we didn't know about took place, then I'll be penalized

6    a second time by not being able to clear title before the

7    case exits the bankruptcy court.

8           So I don't know what Your Honor can do about that.  I'm

9    not necessarily asking that the brakes be put on the train

10   here.  But on the other hand, I would like the opportunity,

11   if it's at all possible, to get the annulment issue heard and

12   determined.

13                  THE COURT:  When is that heard?

14                  MR. STROMBERG:  The 28th, Your Honor.

15                  THE COURT:  Well, but that is going to -- I

16   mean, I hear you.  But I don't know which of the two you're

17   saying.  You say, Don't put the brakes on dismissal.  But

18   don't dismiss until after the 28th.

19                  MR. STROMBERG:  If Your Honor were inclined to

20   give us until the 28th, I'd be happy to have it after that

21   date.  As I said, this motion has been pending for a while.

22                  THE COURT:  No, I know.

23                  MR. STROMBERG:  So I'd be happy to have the

24   issue determined at that time.  Unless the debtor is prepared

25   to agree under the circumstances.  But if not, then I'd

NATIONAL COURT REPORTERS (214) 651-8393

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)                 074a5ddc-2f03-4017-bb10-7707746b075f

HC 00816

Page 18

1    probably need to have my hearing before the dismissal, just

2    to be able to cure the title issues.  I don't know any other

3    way to deal with this because, as I think about it, if Your

4    Honor dismisses, then the question of whether or not you have

5    jurisdiction to rule on the annulment is an open question.

6                    THE COURT:  Mr. Kinvig.

7                    MR. KINVIG:  Your Honor, my client is in a

8    very similar situation to Mr. Stromberg and we're both in a

9    little bit different situation from Mr. Olson.

10         My client ended up posting for foreclosure,

11   foreclosing, and then we found out about the bankruptcy.  And

12   then we found out about the transfers.  In that order.  And

13   as Mr. Stromberg eluded to, I believe it's the Pinetree case,

14   the 5th Circuit case that is in my pleadings and I believe

15   maybe in his pleadings, as well.  But we both rely on.  And

16   just if I could give a little bit more color to that case.

17         What ended up happening is the Court focused on the

18   timing issue.  And the Court essentially found that if you

19   foreclose without notice of a transfer and without notice of

20   any bankruptcy filing, you're essentially a bona fide

21   purchaser for value.  And as a PFV, you're therefore not

22   really effected by the automatic stay.  And so while the

23   Court -- the 5th Circuit used the term annulment to say,

24   Well, the Court would go back and annul the automatic stay to

25   effectively bless the foreclosure, it's not a traditional

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)
074a5ddc-2f03-4017-bb10-7707746b075f

HC 00817

Case 11-42042-dml11    Doc 30-32    Filed 04/11/11    Entered 04/11/11 15:34:21    Desc
Exhibit U - Part 2 - Hearing Transcript    February 17    2011    Page 66 of 93

Page 19

1          annulment in the sense that there's separate factors that a

2          Court would normally go through to grant an annulment of the

3          automatic stay, which the Court might need to, or want to, or

4          have to do for Mr. Olson's client.  Mr. Stromberg's client

5          and my client are in the different situation, the different

6          paradigm of the 5th Circuit case in Pinetree where even

7          though the Court called it an annulment, it's not necessarily

8          an annulment.  The Court essentially just blesses the

9          foreclosure and says, This timing issue seems to make you a

10         BFP.  And as a BFP, the stay didn't really involve you.  It

11         didn't really effect you.  So to put that color on it, we do

12         want to make sure that we're protected in that instance so

13         that we don't -- our position is we've already foreclosed.

14         And we believe we have good title to the property.  We don't

15         want to have this case dismissed and all of a sudden we have

16         to foreclose again or we end up in a single asset bankruptcy,

17         even after we've foreclosed a second time.

18             Also as I mentioned in my pleadings on the motion to

19         annul, and I believe I also mentioned it in our joinder to

20         the motion to dismiss, one of our properties produces

21         substantial cash flow, roughly 45 to $50,000 a month.  And

22         according to the debtor's cash collateral budget, they have

23         just sort of been hording that cash.  And I would imagine

24         that there's roughly $100,000 in some bank account somewhere

25         that is my client's cash collateral.  And so when the Court

NATIONAL COURT REPORTERS (214) 651-8393

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)                    074a5ddc-2f03-4017-bb10-7707746b075f

HC 00818

Page 20

1    dismisses the case, whatever day the Court chooses, and

2    however the Court decides how you want to do that, we'd like

3    to make sure that that cash collateral is also protected or

4    at least in a paradigm to where we can maybe go and get a

5    state court receiver or something to seize our cash

6    collateral, which we're entitled to via contract.

7         Thank you.

8              MR. LINEGAR:  Your Honor, my issue is somewhat

9    a little bit simpler.  It's an issue of time.

10        I need to take my clients to the airport so they can

11   catch their plane back home.

12        With respect to the motions, do you want us to prepare

13   orders dismissing the case, or will the Court prepare its own

14   order?

15             THE COURT:  Well, I want -- I'm going to ask

16   somebody to prepare the order.  But we're going to have to

17   figure out what the timing of the dismissal is, vis-a-vis

18   these other issues.

19             MR. LINEGAR:  I'll just check with

20   Mr. Weitman.

21        May I be excused?

22             THE COURT:  Of course.  Thank you.

23             MR. STABER:  Your Honor, I want this case

24   dismissed as quickly as possible.  So I'm going to offer you

25   a solution of how we get the results to protect these three

NATIONAL COURT REPORTERS (214) 651-8393

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)

074a5ddc-2f03-4017-bb10-7707746b075f

HC 00819

Case 11-42042-dml11   Doc 30-32   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 2 - Hearing Transcript   February 17   2011   Page 68 of 93

Page 21

1    entities.  Not because I represent them, but because this is

2    in my client's interest to go ahead and get this dismissed.

3         Again, the reference has been made.  Actions take in

4    violation of the automatic stay in the 5th Circuit are

5    voidable and not void.  And there has been no such action

6    being brought to avoid those transfers.

7         Moreover, Section 349 of the Bankruptcy Code provides

8    that unless you order otherwise, 349(b)(1), it reinstates any

9    transfer that would otherwise be avoided, including 549

10   post-petition transfers, which I guess technically that's

11   what we have here.  So I don't see a problem fashioning

12   relief under 349(b) in this instance, having the Court

13   recognize that if they had been avoided, these post-petition

14   transfers, they would have been reinstated.  And since no

15   action was brought under 5th Circuit case law, they're not

16   avoided.

17                  THE COURT:  But --

18                  MR. STABER:  And, therefore, you're -- this

19   case and the dismissal of it does not in any manner avoid

20   those foreclosures and they can remain in place.  It's a

21   little bit of a stretch, Your Honor.  And I'm trying to find

22   something that works for the Court and for the parties here

23   to avoid delay.  And as I look at what happens on dismissal,

24   it's supposed to reinstate any of these type of transfers

25   that would have otherwise been avoided.

NATIONAL COURT REPORTERS (214) 651-8393

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)                    074a5ddc-2f03-4017-bb10-7707746b075f

Page 22

1              THE COURT:  But they haven't avoided.  I'm not

2      sure 349(b) -- I mean, I'll give it some thought, but --

3              MR. STABER:  I thought it might be a way,

4      especially in light of the case law, that the Court could

5      make a finding.  These transfers were not avoided.  Therefore

6      the bankruptcy under the 5th Circuit case law, the bankruptcy

7      and the dismissal does not effect that they occurred.

8      Moreover, if --

9              THE COURT:  But the first biggest problem is,

10     I haven't had a hearing on these motions.

11             MR. STABER:  I understand, Your Honor.  And

12     that's why I was looking at 349 and hoping and hoping that

13     that could provide some help.  Because even if there were

14     something wrong with the transfers and foreclosures, the

15     actual legal effect of your dismissal would be to reinstate

16     them, even though they occurred post-petition, if they had

17     otherwise been avoided.

18          Again, it's not my client's position.  I was trying to

19     find --

20             THE COURT:  No.

21             MR. STABER:  -- a legal mechanism to expedite

22     getting this dismissed.  And one of the other things, Your

23     Honor, we're talking about fashioning orders and issues that

24     may arise.  I am waiting for the U.S. Trustee at some point

25     to say, We need to get fees paid.  I am waiting for the U.S.

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)                    074a5ddc-2f03-4017-bb10-7707746b075f

HC 00821

Page 23

1    Trustee at some point to say, We need to get fees paid, U.S.

2    Trustees.  I don't want that holding up the order.  I had a

3    nice suggestion that there's $100,000 retainer out there that

4    would be a good source of paying those.  But that's another

5    issue as we look at timing, since we're dismissing the case.

6    But, again, Your Honor, I want that on the table for the

7    Court because I don't want an order to come through and then

8    suddenly we have this issue of how are those going to be

9    paid.  So, again, I'm not trying to complicate it, but

10    actually trying to move it along so we can go ahead and see

11    dismissal here.

12         Thank you, Your Honor.

13         MR. SAKONICK:  Your Honor, Steve Sakonick

14    again for Parkway North.  I remember at the opening

15    statements somebody had made request regarding cash

16    collateral.  I know it was mentioned by one of the prior

17    creditors here.

18         Under state law you have to take possession of the

19    rents in order to enforce your assignment of rents.  Under

20    546(b), we do that automatically with filing of the notice of

21    perfection, which my client invoked through a filing of a

22    notice of perfection.  What we'd like to see in the order is

23    that the cash collateral be surrendered.  I mean, Parkway

24    North, according to their budgets would generate about

25    $20,000 a month in excess cash flow after escrowing 9,000 and

NATIONAL COURT REPORTERS (214) 651-8393

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)                    074a5ddc-2f03-4017-bb10-7707746b075f

HC 00822

Page 24

1    change for taxes.  So that's about 30,000 a month we're

2    looking to be returned to the secured creditor.  What we

3    would like to see is that the order include not only the

4    transfer, but that the 546(b) have taken effect so that the

5    creditors are deemed to have taken control over the cash

6    under the applicable state law.

7                    THE COURT:  Mr. Weitman.

8                    MR. WEITMAN:  Your Honor, we haven't discussed

9    this.  You obviously cannot pressure the debtor to do this.

10   But I presume, you know, based on 102 and the debtor's

11   consent, the debtor could consent to the annulment of the

12   automatic stay.

13                    THE COURT:  Oh, of course the debtor could.

14                    MR. WEITMAN:  I mean, I just -- that is --

15   granted, it's not within the Court's power, but it certainly

16   is within the Court's maybe request, kind request to stop the

17   bleeding in this case.

18        I would also point out, Your Honor, I've drafted a

19   proposed order that basically states that we incorporate by

20   reference the Court's findings of fact and conclusions of

21   law.  I had some language dealing with what I thought might

22   be cause, which has now been removed with respect to the

23   annulment of the stay.  And since the U.S. Trustee hasn't

24   shown up, I removed any provision for payment of the U.S.

25   Trustee's fees.  And I've also included something that

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)                    074a5ddc-2f03-4017-bb10-7707746b075f

HC 00823

Page 25

1    basically the debtor with its officers will cooperate fully

2    to basically get back to the secured lenders of the income

3    producing property their cash so that we can have an orderly

4    transition.

5              THE COURT:  I don't know what you mean by --

6    you didn't have the cash in the first place.

7              MR. WEITMAN:  Not me.  But I'm thinking for

8    all of the group here.  If we have --

9              THE COURT:  They didn't have the cash.  The

10   debtor had the cash.

11             MR. WEITMAN:  Right.  Correct.  For the debtor

12   to turn over to the respective secured creditors --

13             THE COURT:  Why should I order that?  The

14   secured creditors didn't have the cash when the debtor filed.

15   So why should I order that it be turned over?

16             MR. WEITMAN:  Only because we've been

17   operating under cash collateral orders.  And I would think

18   that with the dismissal of the case it might provide for an

19   orderly transition of the respective creditors collateral.

20   If Your Honor doesn't wish to do that, so be it.  I'm just

21   saying that it was among the things to try to "have a softer

22   landing" if this case were to be dismissed.

23             THE COURT:  Well, but a softer landing for

24   who?

25             MR. WEITMAN:  The secured lenders.

NATIONAL COURT REPORTERS (214) 651-8393

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)                    074a5ddc-2f03-4017-bb10-7707746b075f

HC 00824

Page 26

1               THE COURT:  I mean obviously the secured

2    lenders like that.  I'm guessing the debtor won't consent to

3    that.  I don't know.  Have you asked Mr. Buncher?

4               MR. WEITMAN:  I thought I shouldn't bring that

5    up until after the Court ruled.

6               MR. BUNCHER:  I would like to be heard.  But I

7    was waiting for everybody --

8               THE COURT:  A break?

9               MR. WARNER:  Good afternoon, Your Honor.

10              THE COURT:  Mr. Warner.

11              MR. WARNER:  Michael Warner, Cole Schotz on

12   behalf of HCM LP.

13        Not my motion, but my issue now.  And Mr. Weitman has

14   raised the issue.  And I'm not sure he articulated the issue

15   that's important to me and my client.

16        On the date of the filing of the petition, the debtor

17   had no cash from the Fenton property, my property.  It was in

18   a rock box.  We had swept it.  We had swept it and have taken

19   the position pre-petition as well as post-petition that it

20   was an absolute assignment.  I don't need to debate the legal

21   issue.

22        On the date of the petition the debtor sought to use

23   cash collateral.  We said it's not cash collateral as defined

24   under the Code.  We said it is our cash.  We entered into an

25   agreement on an interim basis to use our cash.  And the words

NATIONAL COURT REPORTERS (214) 651-8393

1   carefully said, It's the cash use agreement, not the cash

2   collateral agreement.  Very technical.  The language in the

3   agreement said that we took the position that it was

4   absolutely and unconditionally assigned to us, the lenders,

5   before January 4, 2011.  Notwithstanding that, the order goes

6   on to say, We will allow your use.  We allowed them to use

7   January and February.  And interesting to note, about 280

8   grand, roughly, January and February were the budgeted

9   expenses.  The operating report for the month of January

10  showed expenses of 95,000 actually being used.  So in excess

11  of 180, we'll call it, from January was not used.  Now, it

12  may have been used in February.  We haven't seen an operating

13  report.  But we also gave them the February money of another

14  280.  If this case is dismissed today, tomorrow, or whatever

15  the date it is --

16              THE COURT:  You want your money back.

17              MR. WARNER:  -- I want my money back.

18              THE COURT:  It hasn't been spent.

19              MR. WARNER:  It hasn't been spent as of the

20  date of the dismissal, because that money was not the

21  debtor's, it was given to them pursuant to an agreement to

22  use, assuming this case was going forward.  So the order to

23  that extent needs my protection.

24        Thank you.

25              THE COURT:  I hear you.

NATIONAL COURT REPORTERS (214) 651-8393

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)          074a5ddc-2f03-4017-bb10-7707746b075f

HC 00826

Page 28

1          Mr. Franke.

2                    MR. FRANKE:  Your Honor, for Regions Bank.

3     Again, I find myself me too.

4          Regions actually didn't do a post-petition foreclosure.

5     Actually recorded the deed.  I am favorable --

6                    THE COURT:  With or without knowledge.

7                    MR. FRANKE:  Without knowledge, Your Honor.

8     We didn't have knowledge of the case until two days ago.

9                    THE COURT:  Oh, that's right.  You told me

10    that.  Sorry.

11                   MR. FRANKE:  We are the ones that are real

12    late to the game.

13         I liked Mr. Staber's argument.  I liked his position.

14    I liked what Mr. Stromberg just proposed.  I like what

15    Mr. -- the proposal agreeing to the annulment.  To the extent

16    that this Court would entertain, since it's not

17    Mr. Staber's client's issue, the Court would entertain some

18    type of research on 349 that would assist in that, happy to

19    provide it since we're late to the game.  We haven't filed a

20    motion to annul the stay.  Anything along those lines, if I

21    asked, would be significantly delaying.  And I could hear a

22    loud groan behind me if I asked for that.  But if it would

23    help expedite that, I want to protect Regions.  They're one

24    of those five creditors who have the single asset.  And they

25    didn't have knowledge and they did foreclose and they did

NATIONAL COURT REPORTERS (214) 651-8393

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)                    074a5ddc-2f03-4017-bb10-7707746b075f

HC 00827

Case 11-42042-dml11   Doc 30-32   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 2 - Hearing Transcript   February 17   2011   Page 76 of 93

Page 29

1    record the deed.  And I could find myself in a single asset

2    case back here months from now doing the same exact thing and

3    I want to avoid that.  So if the Court will entertain, I'm

4    happy to provide under short notice while everybody is

5    negotiating the order.

6                   THE COURT:  Please.  That would be great.

7                   MR. FRANKE:  Thank you, Your Honor.

8                   THE COURT:  Mr. Buncher.

9                   MR. BUNCHER:  I'm not trying to be flippant

10   here.  But what comes to mind a little bit is, be careful

11   what you ask for here.  Okay.  Because they want the case

12   dismissed and thrown out immediately, but then they say,

13   Well, wait a minute.  We didn't think about the fact that the

14   Court hasn't ruled on the stay issues and so forth.  And I

15   can appreciate that.  But that's where we are.  And, frankly,

16   we had significant issues, factual issues with regard to

17   precisely timing of emails that were sent to the Trustees

18   that were foreclosing, phone calls that were placed.  So

19   these are -- they're not lengthy facts, but there are facts

20   specific, relevant to that decision of whether legal title

21   existed in the debtor at the time of this bankruptcy filing

22   and prior to the foreclosures.

23         There's a decision from Judge Lynn in Fort Worth, the

24   in re Nguyen, N-g-u-y-e-n, I believe, decision, wherein he

25   held that legal title -- in order to transfer title under

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)                    074a5ddc-2f03-4017-bb10-7707746b075f

HC 00828

Page 30

1    Texas law, there has to be actual delivery of the title --

2    excuse me, of the deed to the bank that's doing the

3    foreclosing.  And in that particular case he could not

4    determine from the facts on the record whether the title --

5    whether the deed was -- whether the agent, the Trustee that

6    was conducting the sale had sufficient authority to actually

7    receive to take delivery of title, as opposed to having to

8    deliver it to the bank.  So I would object to any findings of

9    annulment of stay, or retroactive annulment of stay without

10   having had hearings with regard to the facts of each specific

11   foreclosure.  And Mr. Olson's client admitted in the

12   stipulation having not actual knowledge of the bankruptcy and

13   the transfer.  I think, frankly, they have to go through the

14   process of re-posting the properties for foreclosure.

15              THE COURT:  Well, no if I annul the stay.

16              MR. BUNCHER:  True.  And if we want to delay

17   dismissal and have hearings on that, I guess that's the

18   Court's prerogative to do so.  I'm not following at all this

19   349/549 argument.  549 is where the debtor avoids a -- it's

20   an avoidance of a post-petition transfer of -- by the debtor

21   to somebody.

22              THE COURT:  I'm not following it either.

23              MR. BUNCHER:  So as far as what happens with

24   the cash, I mean, you know Mr. Warner, most of the cash, I

25   believe, is sitting in his lock box.  The reason for the

NATIONAL COURT REPORTERS  (214) 651-8393

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)

074a5ddc-2f03-4017-bb10-7707746b075f

HC 00829

Case 11-42042-dml11   Doc 30-32   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 2 - Hearing Transcript   February 17, 2011   Page 78 of 93

Page 31

1    discrepancy between the cash collateral budget and what the

2    MOR says is because by the time the orders got entered and

3    the money got transferred, a lot of the January bills ended

4    up getting paid in the first month of February -- first part

5    of February.

6        I really think a number of these issues are going to

7    just have to be sorted out.  If the Court wants to take up

8    the stay issues before dismissing, I guess we will come down

9    and try all of that.  With respect to what happens with

10   properties and where we go from here, honestly, I've got to

11   visit with my client in terms of what we're going to do.  And

12   whether they're going to try to take further actions to

13   protect these properties.  And, you know, whether they're

14   going to try to talk to some of the lenders about maybe

15   working something out with respect to certain properties, or

16   just try to do some things with a subset of these properties.

17   So I really can't speak to these -- all of these issues here

18   today, Your Honor.

19              THE COURT:  I appreciate that.

20              MR. WEITMAN:  Just a last comment, Your Honor,

21   to make it absolutely clear.

22       I think based on what I'm hearing Mr. Buncher say, this

23   could be a protracted period of review, et cetera, with

24   respect to each of the parties that are seeking annulment of

25   the automatic stay.  And I think everyone is of the view that

NATIONAL COURT REPORTERS (214) 651-8393

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)

074a5ddc-2f03-4017-bb10-7707746b075f

Page 32

1      these cases should be dismissed.  They should be dismissed

2      immediately.

3                    THE COURT:  Well, I'm not sure everybody is of

4      that view, Mr. Weitman.

5                    MR. WEITMAN:  Pardon me.  I would just say

6      Wells Fargo is of the view, forgive me, that these cases

7      should be dismissed.  That if we keep the case alive to have

8      six evidentiary hearings as to the kinds of issues that

9      Mr. Buncher intends to bring before the Court --

10                   THE COURT:  Well, it's not Mr. Buncher.  Other

11     parties, secured creditors.

12                   MR. WEITMAN:  The -- we have the issue of the

13     annulment of the automatic stay.

14                   THE COURT:  Yes.

15                   MR. WEITMAN:  And what was known and what was

16     not known by each of the entities, which would be, I believe,

17     a long evidentiary hearing.

18                   THE COURT:  But, Mr. Weitman, you know, you're

19     not telling me anything I don't know.

20                   MR. WEITMAN:  I would just ask Your Honor if

21     Your Honor would consider granting a dismissal immediately

22     and let everything else follow its course with what needs to

23     be done outside of bankruptcy.

24         Thank you.

25                   THE COURT:  And I'm sure that is your client's

NATIONAL COURT REPORTERS (214) 651-8393

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)                    074a5ddc-2f03-4017-bb10-7707746b075f

Page 33

1    position.  But I've got other people who are worried about

2    other things, too.  So what's the -- I mean, I don't think I

3    can do anything today to deal with the annulment of the stay.

4    There are motions on file that the debtor is contesting some

5    of those motions.  I think they've got to be heard.  So I

6    don't know what parties want me to do.  I am going to dismiss

7    this case.  Whether I dismiss it today or in two weeks is

8    going to be dependent upon trying to minimize prejudice to

9    everyone.  Everybody is in this case that I have found

10   shouldn't be in the situation they're in.

11       And so, Mr. Weitman, while I appreciate that Wells

12   Fargo would like the case to be dismissed today, I don't

13   think there is unanimity among the movants that that is

14   appropriate.  So what is -- I mean, anybody got any

15   suggestions?

16       I mean, we could hear all of the annulled stays.  I

17   don't know if I have time to add them all to the --

18   somebody's setting is the 28th.  I don't know if I have time

19   to add all of them to that setting and to hold the dismissal

20   in abeyance until after that settling.  I don't know.

21                  MR. OLSON:  Could I?

22                  THE COURT:  Please.

23                  MR. OLSON:  Your Honor, if you'll recall when

24   we were here last time, there was discussion of pushing the

25   motions to lift stay back to the 28th.  Mr. Stromberg had

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)                    074a5ddc-2f03-4017-bb10-7707746b075f

HC 00832

Page 34

1       gone first and had gotten a setting for his client on the

2       28th.  And a couple of us, I've forgotten who the third

3       fellow was, said, Well, we'll get those on the 28th, as well.

4       Mr. Buncher said, Wait a minute.  The Court's not going to

5       have time to hear three contested final hearings on the 28th.

6       So I have not set mine.  But with the evidence that has come

7       in on February 3rd and today, particularly the stipulations,

8       it may be that we could try all of that on the 28th on just

9       the, what's your chronology on the 4th and let the Court take

10      it from there since the Court has found the bad faith.  That

11      might help compress it.  And I'd be willing to work toward

12      trying to get it all heard on one day.

13          I sympathize with Mr. Weitman.  And, frankly, my client

14      doesn't want it to drag on, either.  But we would like to

15      avoid re-posting, if we could.

16                    THE COURT:  Understood.

17                    MR. STROMBERG:  Your Honor, I echo the

18      sentiments from Mr. Olson.  You know, in a case many years

19      ago in which Mr. Neligan's firm was involved where he was

20      representing the debtor, it was a trucking case, and Judge

21      Abramson asked me whether or not in that case we should just

22      give the parties the benefit of their bargain.  And my

23      response to him was, Well, we've been subject to the

24      automatic stay and we didn't necessarily like it.  Don't make

25      it any worse by pulling the wheels off at the last minute.

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)                    074a5ddc-2f03-4017-bb10-7707746b075f

HC 00833

Case 11-42042-dml11  Doc 30-32  Filed 04/11/11  Entered 04/11/11 15:34:21  Desc
Exhibit U - Part 2 - Hearing Transcript  February 17  2011  Page 82 of 93

Page 35

1    And I ask the same of Your Honor here.  I realize that we've

2    been here supporting dismissal.  But on the other hand,

3    Mr. Kinvig did say in his opening remarks that he wanted

4    to -- he was alerting the Court to this issue and we had

5    filed our motions, respectively, to annul the automatic stay

6    well before the first hearing on February 3rd.  So anything

7    that the Court can do to hear these motions before dismissal

8    occurs, before jurisdiction is gone, and before we suffer

9    additional prejudice as a result of the transactions that

10   brought us here in the first place, we would appreciate it.

11        Thank you.

12             MR. FRANKE:  Your Honor, it sounds like my

13   time might be better served researching getting an expedited

14   motion on file, if I can do that for relief from stay for

15   Regions.  I'd be willing to go forward with that on the 28th,

16   as well.  And I'm more than happy to do that.  I don't want

17   to delay it any longer than that.

18             MR. KINVIG:  Your Honor, I'd echo what

19   Mr. Stromberg said without repeating it.  We do not actually

20   have a hearing set currently.  But we would be happy to do it

21   on the 28th.  As I mentioned, because of the two branches of

22   sort of the annulment case law and us being on a much shorter

23   branch, as opposed to Mr. Olson, I think that we could really

24   get things done pretty quickly because it's -- there are

25   factual issues, but they're not many.  And it's a pretty

NATIONAL COURT REPORTERS (214) 651-8393

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)                    074a5ddc-2f03-4017-bb10-7707746b075f

Page 36

1       short subject to work through.

2                   MS. HARTWICK:  Your Honor.  Jo Hartwick for

3       Petra.  We, like Wells Fargo, Petra would like the case

4       dismissed immediately.  But we can also appreciate that the

5       Court has to consider everybody's situation.

6            Thank you.

7                   THE COURT:  Thank you, Ms. Hartwick.

8            Please, Mr. Buncher.

9                   MR. BUNCHER:  Your Honor, just -- I would just

10      point out that we have agreements with counsel for I think

11      Mr. Stromberg and Mr. Kinvig for discovery to be taking

12      place, including a couple of depositions that have been

13      scheduled.  And I'm not giving up my right to take that

14      discovery.  of the Trustee that was conducting the

15      foreclosure sale and a corporate rep --

16                  THE COURT:  Of course not.  Until the case is

17      dismissed, you're free to do --

18                  MR. BUNCHER:  The only reason I'm bringing

19      this up is, we had agreement -- I think one of them is set

20      the 28th.  But we had not agreed to set the others on the

21      28th only because it places potentially an undue burden on

22      our side to have to do a bunch of discovery by the 28th.  But

23      whatever the Court sets as the time frame, we'll comply with

24      it.  You know, I don't see why it's that big of a deal that

25      they re-post the properties for foreclosure, frankly.

NATIONAL COURT REPORTERS (214) 651-8393

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)                    074a5ddc-2f03-4017-bb10-7707746b075f

Page 37

1          THE COURT:  Because they're afraid your client

2    is going to try and put the properties back and file again,

3    is my guess.

4          MR. BUNCHER:  I understand.  And the Court has

5    ruled that the way they did it -- they shouldn't have done it

6    the way they did it.  But as I said in my closing remarks,

7    there is -- first of all, the lenders are in no different

8    position as far as the foreclosures, and the timing, and what

9    happened if we had filed all of the different entities in the

10   bankruptcy.  And so, you know, we will be considering whether

11   or not we're going to try to re-file something here.

12          THE COURT:  Of course.

13          MR. BUNCHER:  If they want the case dismissed,

14   the case should just be dismissed, is I guess my point.  I

15   don't think we should have to keep doing work in a case that

16   the Court has dismissed.

17          THE COURT:  Well, but the filing of the case

18   has caused these problems.  And so the Court is going to deal

19   with them.

20       Here's what we're going to do.  I'm not going to

21   dismiss the case today.  I'm going to hear all of the motions

22   to annul on the 28th.  And you all just pack your toothbrush

23   and your lunch, because it's going to be piecemeal.  You have

24   25 minutes, whoever had the motion set on the 28th at 25

25   minutes, which was not much.  We have 50 more minutes that

NATIONAL COURT REPORTERS  (214) 651-8393

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)                    074a5ddc-2f03-4017-bb10-7707746b075f

HC 00836

Page 38

1    morning.  And then that afternoon we have our U.S. Trustee

2    and our Chapter 13 docket.  Ms. Durham's U.S. Trustee's

3    docket is not terribly lengthy and often those things come

4    off.  So we'll just keep hearing it during the day, as best

5    we can.  I will tell you that I will take up my 13 docket at

6    2.  And I have -- I will not know how many cases on are on

7    that docket until about 1:00 that afternoon.  So there might

8    be 5 cases, there might be 40 cases.  So we're just going to

9    see what we can do.  And I guess for lack of a better word,

10   hope for the best.  Hope that there will be enough time that

11   day that we can hear the motions to annul.

12        So I've got motions to annul by Mr. Kinvig's client,

13   Mr. Stromberg's client, Mr. Olson's client, Mr. Franke,

14   you're going to file one?

15              MR. FRANKE:  Yes, Your Honor.

16              THE COURT:  Anybody else?  Am I overlooking

17   anybody else?

18              MR. WATSON:  RMR Your Honor.

19              THE COURT:  Come to the podium, Mr. Watson,

20   please.

21              MR. WATSON:  Jermaine Watson on behalf of RMR.

22   We have a motion for stay relief on file, as well.

23              THE COURT:  Well, but for what?  Did you

24   foreclose?

25              MR. WATSON:  No, we did not foreclose.

NATIONAL COURT REPORTERS  (214) 651-8393

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)        074a5ddc-2f03-4017-bb10-7707746b075f

HC 00837

Case 11-42042-dml11   Doc 30-32   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit U - Part 2 - Hearing Transcript   February 17   2011   Page 86 of 93

Page 39

1          THE COURT:  So what -- help me.  You've got to

2    tell me more.

3          MR. WATSON:  I'm sorry.  I'm sorry, Your

4    Honor.

5          THE COURT:  These are requests to annul the

6    stay where the lender foreclosed prior to the bankruptcy, or

7    the same day as the bankruptcy filing.

8          MR. WATSON:  Yes.  We had our sale posted, but

9    we didn't foreclose.

10          THE COURT:  You didn't foreclose.

11          MR. WATSON:  We did not foreclose, Your Honor.

12          THE COURT:  So there's nothing to worry about.

13    Once the case is dismissed, you go do whatever you want to

14    do.

15          MR. WATSON:  Okay.  Thank you.

16          THE COURT:  The people that I'm concerned

17    about are the people who took action either property or

18    improperly and we'll figure that out.

19          MR. BUNCHER:  What time is the first hearing?

20          THE COURT:  9.

21      Now, Mr. Warner, I don't know what to do with you.  I

22    think you need to talk to the debtor about where your cash

23    collateral -- where your cash is, from your perspective and

24    how much is left over from February, January and February.

25          MR. WARNER:  As of what date?  That's the

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)                    074a5ddc-2f03-4017-bb10-7707746b075f


HC 00838

Page 40

1      problem.

2                   THE COURT:  Well, until the case is dismissed

3      they have authority per your agreement to use cash -- to use

4      your cash.

5                   MR. WARNER:  Right.

6                   THE COURT:  So I think there's also going to

7      have to be a reconciliation.  Now, ideally, I'm hoping that

8      we'll be able to dismiss the case promptly following the

9      hearing on the 28th.  But --

10                  MR. WARNER:  And here's what I'll do, Your

11     Honor.  I will get with the debtor prior to the 28th and get

12     the cash from us and cash out so that I'll know.  And then on

13     a daily basis we'll account so that the order I can give --

14     that the order that's given to the Court on dismissal

15     includes a paragraph that reads, Cash in/cash out, net back

16     to us.

17                  THE COURT:  Well, I'm not going to say yes to

18     that.  Obviously that will be your position that the order

19     should say that.  You need to talk to the debtor to see if

20     the debtor is agreeable to that being a part of the order.

21                  MR. BUNCHER:  I would also --

22                  MR. WARNER:  I apologize, Mr. Buncher.  But

23     assume that the debtor is not agreeable.  That's an issue to

24     address at the time of the dismissal.

25                  THE COURT:  Of course.  Yes.

NATIONAL COURT REPORTERS  (214) 651-8393

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)          074a5ddc-2f03-4017-bb10-7707746b075f

HC 00839

Page 41

1              MR. WARNER:  Thank you.

2              THE COURT:  I mean, if the debtor doesn't

3    agree, then we'll hear about objections to the form of the

4    order at that 28th hearing.

5              MR. WARNER:  Very good.

6              THE COURT:  But in the mean time, I do want a

7    proposed form of order circulated.  And if there are

8    problems, I want to hear about them before the 28th so that I

9    have an opportunity to understand what the fuss about the

10   form of the order is going to be prior to during the hearing

11   itself.

12             MR. WARNER:  As to my straightforward issue,

13   I'll circulate proposed language to Mr. Buncher that would be

14   asserted in whomever is drafting the dismissal order.  And

15   we'll either alert the Court that it's agreeable or it's not.

16             THE COURT:  Perfect.

17             MR. WARNER:  Thank you.

18             MR. WEITMAN:  Your Honor, one question.  With

19   respect to the hearing on the 28th, are you then going to

20   cover at the back end of the hearing the dismissal issues and

21   how you intertwine that?

22             THE COURT:  That's my thinking.

23             MR. WEITMAN:  And is there an estimated time

24   when that -- or I need to be there the whole day?

25             THE COURT:  Well, I would hope not.  But

NATIONAL COURT REPORTERS (214) 651-8393

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)                     074a5ddc-2f03-4017-bb10-7707746b075f

HC 00840

Page 42

1    perhaps one of your colleagues can call you as we're winding

2    up on the annulment issues.  Because, Mr. Weitman, I have no

3    idea.  It may well be that we can finish this up quickly and

4    we'll reach it in the morning.  It may well be that it's

5    tedious and we aren't going to reach it until later in the

6    afternoon.  I just have no way of knowing right now.

7            MR. WEITMAN:  Well, possibly Mr. Buncher, who

8    has been so kind during these proceedings, will notify me

9    before we get to that point with a little bit of notice.

10    Thank you.

11            MR. BUNCHER:  I would only point out that we

12    have another cash collateral hearing on February 22nd,

13    because our current order expires at the end of February.

14    And, you know, I don't think anybody -- it's in anybody's

15    interest to have us unable to pay the operational expenses at

16    the properties if, for example, the Court doesn't enter an

17    order on February 28th finally disposing of the case.  We

18    still may need to have some interim relief in that event.  So

19    I just bring that to the Court's attention.  We may be here

20    on the 22nd if we can't work something out.  There --

21            THE COURT:  It seems to me that -- I mean,

22    I'll just offer my view.  It seems to me that we could

23    continue the interim order pending the conclusion of the

24    issues on dismissal.

25            MR. BUNCHER:  And we'll get -- Mr. Crown can

NATIONAL COURT REPORTERS (214) 651-8393

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)              074a5ddc-2f03-4017-bb10-7707746b075f

HC 00841

Page 43

1    supply the March budgets to people.  But, I mean, we can't

2    have a situation where we can't pay the bills on Fenton

3    Center, for example.

4              MR. WARNER:  Your Honor, I'm happy to address

5    it with counsel and not do it here in front of the Court as

6    to what we do vis-a-vis March.  Because if it's dismissed on

7    the 28th, I don't want to be having money out there.

8              THE COURT:  Understood.  Understood.

9              MR. WARNER:  Nor do I want bills pre-paid.

10   Nor do I want expenses in advance of a budget.  So we'll talk

11   about it.  We have a hearing on the 22nd.  Just so the

12   Court's aware, there's a  hearing on March the 3rd on my

13   motion, as the Court is aware, to terminate exclusivity.  So

14   if the Court wants to clean it calendar a little bit, given

15   that this case is being dismissed, I'm going to assume we're

16   not going to have that hearing.  I'm going to assume that I

17   won't file my witness and exhibit list and all of that and

18   get prepared for it.  So we'll consider that off, since the

19   Court has ruled that the case is being dismissed.

20             THE COURT:  Fair enough.

21             MR. WEITMAN:  Your Honor, if I may just

22   interject, only because there was a point Mr. Staber brought

23   up earlier.  And that is that in order to dismiss, there may

24   need to be U.S. Trustee fees paid.  It seems like the folks

25   that have the income, okay, that is the basis from which you

NATIONAL COURT REPORTERS (214) 651-8393

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)                    074a5ddc-2f03-4017-bb10-7707746b075f

HC 00842

Page 44

1        calculate, as I understand it the U.S. Trustee's fees, if

2        there might be a line item for an allocation among the income

3        producing properties for the U.S. Trustee fees through the

4        date of dismissal.

5                    THE COURT:  Well, you all talk about that.

6        Clearly the U.S. Trustee fees are going to have to be dealt

7        with.  And I think you all should talk about how you're going

8        to do that.

9                    MR. WEITMAN:  Okay.  Thank you.

10                   THE COURT:  What else?

11                   MR. BUNCHER:  I'm sorry.  I guess we are still

12       having -- we are still having a hearing on February 22nd

13       because there are open issues.  I don't know if we're going

14       to get them resolved or not, Your Honor, on the cash

15       collateral.

16                   THE COURT:  I understand.  I'm not taking that

17       one off the docket.  My hope is though between now and then

18       you all will agree to an interim that gets us to the date of

19       dismissal.  But if you don't, we'll have a contested hearing.

20       But --

21                   MR. BUNCHER:  Honestly, I think that

22       Mr. Warner and I should be able to work something out, I

23       would hope.

24                   MR. WARNER:  The Court's looking at me as if I

25       should respond.

---

NATIONAL COURT REPORTERS (214) 651-8393

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)

074a5ddc-2f03-4017-bb10-7707746b075f

HC 00843

Page 45

1          THE COURT:  No, I'm not.  I hear you.  I wish

2     everybody could always work things out.  Sometimes that

3     happens and sometimes it doesn't.

4          All right.  Thank you all very much.  We are in recess.

5     You're excused.  I'm going to be out here a minute.

6          Thank you.

7                    (End of Proceedings.)

8

9

10

11

12

13

.4

15

16

17

18

19

20

21

22

23

24

25

NATIONAL COURT REPORTERS (214) 651-8393

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)

074a5ddc-2f03-4017-bb10-7707746b075f

HC 00844

Page 46

1               C E R T I F I C A T E

2          I, CINDY SUMNER, do hereby certify that the

3    foregoing constitutes a full, true and complete transcription

4    of the proceedings as heretofore set forth in the

5    above-captioned and numbered cause in typewriting before me.

6

7

8

9

10

11

12

13

14

15                     CINDY SUMNER, CSR #5832
                       Expires 12-31-11
16                     National Court Reporters
                       16 Gettysburg Lane
17                     Richardson, Texas 75080
                       214 651-8393
18                     Firm #417

19

20

21

22

23

24

25

NATIONAL COURT REPORTERS (214) 651-8393

Electronically signed by Cindy Sumner (201-144-852-6878)
Electronically signed by Cindy Sumner (201-144-852-6878)                    074a5ddc-2f03-4017-bb10-7707746b075f

HC 00845