# Exhibit V

HC 00846

Morgan, Richard 01-27-11.txt

```
0001
 1                IN THE UNITED STATES BANKRUPTCY COURT
 2                 FOR THE NORTHERN DISTRICT OF TEXAS
 3                           DALLAS DIVISION
 4
 5      IN RE:                    )  CASE NO. 11-30210-BJH-11
                                  )
 6      FRE REAL ESTATE, INC., F/K/A)
        TCI PARK WEST, II, INC.,  )  CHAPTER 11
 7      Debtor.                   )
 8
 9        -----------------------------------------
10                         ORAL DEPOSITION OF
11                       RICHARD DAVID MORGAN
12                         JANUARY 27, 2011
13        -----------------------------------------
14
15           ORAL DEPOSITION of RICHARD DAVID MORGAN, produced
16      as a witness at the instance of Wells Fargo Capital
17      Finance, Inc., and duly sworn, was taken in the
18      above-styled and numbered cause on Thursday, the 27th
19      day of January, 2011, from 9:33 a.m. - 4:12 p.m., before
20      Holly B. Smith, CSR No. 2853, in and for the State of
21      Texas, reported by machine shorthand, at the law offices
22      of K&L Gates, 1717 Main Street, Suite 2800, City of
23      Dallas, County of Dallas, State of Texas, in accordance
24      with the Federal Rules and the provisions stated on the
25      record.
0002
 1                      A P P E A R A N C E S
 2      FOR THE DEBTOR FRE REAL ESTATE, INC.:
 3           MR. DOUGLAS J. BUNCHER
             NELIGAN FOLEY, LLP
 4           325 NORTH ST. PAUL
             SUITE 3600
 5           DALLAS, TEXAS  75201
             PHONE: 214-840-5300
 6           FAX  : 214-840-5301
             dbuncher@neliganlaw.com
 7
 8      FOR WELLS FARGO CAPITAL FINANCE, INC.:
 9           MR. DAVID WEITMAN AND
             MR. CHRIS BROWN
10           K&L GATES, LLP
             1717 MAIN STREET
11           SUITE 2800
             DALLAS, TEXAS  75201
12           PHONE: 214-939-5427
             FAX  : 214-939-5849
13           david.weitman@klgates.com
14
        FOR HIGHLAND CAPITAL MANAGEMENT/NEXBANK:
15
             MR. JAMES T. KIM
16           COLE SCHOTZ
             25 MAIN STREET
17           COURT PLAZA NORTH
             HACKENSACK, NEW JERSEY  07601
18           PHONE: 201-489-3000
             FAX  : 201-678-6210
19           jkim@coleschotz.com
20
        FOR ARMED FORCES BANK:
                                      Page 1
```

Morgan, Richard 01-27-11.txt

```
21
               MR. WILLIAM JEFFREY MALONEY
22             BRYAN CAVE, LLP
               1200 MAIN STREET
23             SUITE 3500
               KANSAS CITY, MISSOURI  64105
24             PHONE: 816-374-3303
               FAX  : 816-374-3300
25             wjmaloney@bryancave.com
0003
 1                    A P P E A R A N C E S
 2     FOR PETRA CRE CDO 2007-1, LTD.:
 3             MS. JO E. HARTWICK
               STUTZMAN, BROMBERG, ESSERMAN & PLIFKA
 4             2323 BRYAN STREET
               SUITE 220
 5             DALLAS, TEXAS  75201
               PHONE: 214-969-4900
 6             FAX  : 214-969-4999
               hartwick@sbep-law.com
 7
 8     FOR AMERICAN BANK OF COMMERCE:
 9             MR. CAMERON KINVIG
               HUNTON & WILLIAMS, LLP
10             1445 ROSS AVENUE
               SUITE 3700
11             DALLAS, TEXAS  75202
               PHONE: 214-979-3700
12             FAX  : 214-880-0011
               ckinvig@hunton.com
13
14     FOR STATE BANK OF TEXAS:
15             MR. MARK STROMBERG
               STROMBERG STOCK
16             5420 LBJ FREEWAY
               SUITE 300
17             TWO LINCOLN CENTRE
               DALLAS, TEXAS  75240
18             PHONE: 972-458-5335
               FAX  : 972-770-2156
19             mark@strombergstock.com
20
21
22
23
24
25
0004
 1                       I N D E X
 2                                              PAGE
 3     Appearances ...................................  2-3
 4     Stipulations ..................................    8
 5     Witness sworn .................................    9
 6     RICHARD DAVID MORGAN
 7        Examination by Mr. Weitman..................   10
 8        Examination by Mr. Kim......................  146
 9        Examination by Mr. Maloney..................  172
10        Examination by Ms. Hartwick.................  190
11        Examination by Mr. Kinvig...................  196
12        Further Examination by Mr. Weitman..........  217
13        Examination by Mr. Stromberg................  223
14        Examination by Mr. Buncher..................  263
15        Further Examination by Mr. Stromberg........  265
```

                              Page 2

HC 00848

Morgan, Richard 01-27-11.txt

16  Witness' Signature Page and Changes ...........  267
17  Reporter's Certificate........................  269
18
19              EXHIBITS
20  NO.    DESCRIPTION                    PAGE
21  10 -- Purchase Agreement......................  85
22  11 -- Promissory Note.........................  87
23  14 -- Purchase Agreements.....................  61
24  16 -- Purchase Agreement......................  59
25
0005
1               EXHIBITS
2   NO.    DESCRIPTION                    PAGE
3   166 -- Notice of Deposition and Request for
          Production of Documents...................  21
4
    167 -- Information for Initial Debtor Interview  21
5
    168 -- Property Name/Information sheet.........  51
6
    169 -- Statement of Financial Affairs..........  107
7
    170 -- Statement of Financial Affairs..........  107
8
    171 -- Summary of Schedules...................  109
9
    172 -- Summary of Schedules...................  109
10
    173 -- Matrix of creditors....................  110
11
    174 -- Emergency Motion for Interim and Final
12         Orders Authorizing Debtor to use Cash
           Collateral..............................  119
13
    175 -- Letter to Lisa Dedonato from Richard
14         Morgan, 12/27/10........................  195
15  176 -- Emails between John Daugherty and Dave
           Morgan, 1/3/11..........................  219
16
17         REQUESTED DOCUMENTS/INFORMATION
18  NO.    DESCRIPTION                    PAGE
19  1 -- Parties within corporate structure of
         Energy Advisors...........................  12
20
    2 -- Management agreement between Regis/FRE...  46
21
    3 -- Delineated amount of unsecured debt to
22       each entity...............................  73
23  4 -- Promissory notes issued..................  110
24  5 -- Insurance policy on properties...........  145
25  6 -- HCA and Devon Securities proposals.......  151
0006
1          REQUESTED DOCUMENTS/INFORMATION
2   NO.    DESCRIPTION                    PAGE
3   7 -- Information on transfer of stock.........  203
4   8 -- Documents executed on December 23rd......  223
5
6
7
8
9
10
11

HC 00849

Morgan, Richard 01-27-11.txt

12
13
14
15
16
17
18
19
20
21
22
23
24
25
0007
1                    P R O C E E D I N G S
2                    (9:33 a.m.)
3                    THE REPORTER:  Today is January 27, 2011.
4    The time is approximately 9:33 a.m.  We are located at
5    the office of K&L Gates, 1717 Main Street, Suite 2800,
6    Dallas, Texas.
7                    This is the deposition of Richard David
8    Morgan in the matter of In Re:  FRE Real Estate, Inc.,
9    f/k/a TCI Park West II, Inc., in the United States
10   Bankruptcy Court, Northern District of Texas, Dallas
11   Division, Cause No. 11-30210-BJH-11.
12                   My name is Holly Smith, certified
13   shorthand reporter, representing Lockwood & Associates.
14                   Will all persons present please state
15   their appearances and whom they represent.
16                   MR. WEITMAN:  David Weitman and Chris
17   Brown with the law firm of K&L Gates here on behalf of
18   Wells Fargo Capital Finance, Inc.
19                   MR. MALONEY:  William Jay Maloney on
20   behalf of Armed Forces Bank, successor by merger to Bank
21   Midwest.
22                   MR. KINVIG:  Cameron Kinvig, Hunton &
23   Williams, here to represent American Bank of Commerce.
24                   MR. KIM:  James Kim, Cole, Schotz,
25   Meisel, Forman & Leonard, on behalf of Highland Capital
0008
1    Management, LP.
2                    MS. HARTWICK:  Jo Hartwick, Stutzman,
3    Bromberg, Esserman & Plifka, on behalf of Petra CRE CDO
4    2007-1, Limited.
5                    MR. BUNCHER:  Doug Buncher for the debtor
6    FRE Real Estate, Inc.
7                    THE WITNESS:  Dave Morgan, debtor, FRE
8    Real Estate, Inc.  Richard D. Morgan.  I'm sorry.
9                    THE REPORTER:  Would counsel please state
10   any new agreements on the record.
11                   MR. WEITMAN:  If we could, what I would
12   like to have done is that all of the objections will be
13   reserved until the time of the hearing, other than the
14   objections to form.
15                   Given the fact that we have a hearing on
16   February 3rd, I would ask that the court reporter
17   expedite turning around this transcript and that the
18   deponent review it, make changes, and return it to us
19   say, within, 36 hours of sending it to you, Mr. Buncher.
20                   MR. BUNCHER:  As far as the objections,
21   we would obviously reserve and will make privilege
22   objections to the extent any privileged matters are
                           Page 4

Morgan, Richard 01-27-11.txt
23    inquired about today.  But, otherwise, that's fine.
24                    As far as him reading and signing, I
25    think we will do it by the Rules.  If he doesn't return
0009
1    and sign by the time of the hearing, I think the Rules
2    allow you to use the unsigned copy anyway.  So we will
3    endeavor to get, obviously, him to review it and to make
4    any corrections within the time frame that you have
5    indicated.  But to the extent that isn't possible for
6    one reason or another, then you can just use an unsigned
7    copy.
8                    MR. WEITMAN:  And do we also have his
9    agreement that he will appear at the hearing on February
10    3rd and any subsequent dates that the hearing will be --
11    may be continued?
12                    MR. BUNCHER:  Well, I believe Mr. Morgan
13    will definitely appear on February 3rd.  And then we
14    will just -- and I'm assuming he will appear at any
15    subsequent hearing depending upon when that occurs.
16                    MR. WEITMAN:  Would you swear in the
17    witness, please.
18                    RICHARD DAVID MORGAN,
19    having been first duly sworn, testified as follows:
20                    MR. BUNCHER:  Just before we get started,
21    as I indicated before we went on the record, the Federal
22    Rules, Rule 30(d) indicate, unless otherwise stipulated
23    or ordered by the Court, a deposition is limited to one
24    day of 7 hours.  And so I would ask the court reporter
25    to keep track of how much time is on the record in the
0010
1    deposition.
2                    I will conclude the deposition at the end
3    of 7 hours on the record.  And if any party has any
4    issue with that, they can take it up with Judge Houser.
5                    And I think in keeping with her
6    indication that time is split equally at the hearing
7    between the debtor and the various creditors who have
8    joined in, I think the creditors need to talk among
9    themselves and figure out how they are going to divvy up
10    the 7 hours under the Rules, to the extent they have not
11    already done so.
12                    MR. WEITMAN:  Yeah.  And just for the
13    record, I would dispute your contention that each of us
14    is limited to 7 hours.  And we can take that up with the
15    Court.
16                    EXAMINATION
17    BY MR. WEITMAN:
18        Q.    Would you state your name for the record,
19    please?
20        A.    Richard D. Morgan.
21        Q.    Who are you employed by?
22        A.    Energy Advisors, LLC.
23        Q.    And how long have you been there?
24        A.    Been with this company you mean?
25        Q.    Yes.
0011
1        A.    It is approximately two years old.
2        Q.    And what is its connection to the debtor
3    entity FRE Real Estate, Inc.?
4        A.    None.
5        Q.    There's no connection to FRE Real Estate,
6    Inc.?
7        A.    No, huh-uh.
                        Page 5

Morgan, Richard 01-27-11.txt

```
 8          Q.  Are you aware that you have been designated as
 9     the corporate representative to speak --
10          A.  Oh, I am, yeah.  You asked about Energy
11     Advisors.  I work for Energy Advisors.  It has no
12     relationship to FRE.  I do because I'm an accepted
13     officer of FRE Real Estate as an individual.
14          Q.  What are your job responsibilities for FRE
15     Real Estate in your capacity through Energy Advisors,
16     LLC?
17               MR. BUNCHER:  Object to the form.
18     Misstates his testimony.
19          Q.  (BY MR. WEITMAN)  What functions do you
20     perform for FRE Real Estate?
21          A.  I'm basically considered a restructuring
22     officer.
23          Q.  Is there a contract that you have with FRE
24     Real Estate?
25          A.  No.
0012
 1          Q.  Who are the officers and directors or managers
 2     of Energy Advisors, LLC?
 3          A.  I am the operations manager; and I run,
 4     totally, operations.
 5          Q.  So there are no other managers, no other --
 6          A.  No.
 7          Q.  -- officers within Energy Advisors, LLC?
 8          A.  I'm sure there are some other officers.  I
 9     don't know who they are.
10          Q.  When you read this deposition transcript, will
11     you please advise us on other parties that are within
12     the corporate structure of Energy Advisors?
13          A.  Yes.
14     INFORMATION REQUESTED: _____
15          Q.  How long has Energy Advisors been the
16     operations person, if you will, for FRE Real Estate?
17               MR. BUNCHER:  Misstates his testimony.
18     He said he was the operations manager for Energy
19     Advisors.  He said he's the restructuring officer of
20     FRE, the debtor.  And you also, I believe, know he's a
21     vice president of FRE.
22               MR. WEITMAN:  No, he didn't say that
23     though.
24               MR. BUNCHER:  I know he didn't say it,
25     but I think you know that already.
0013
 1               MR. WEITMAN:  I only know what he says on
 2     the record.
 3               MR. BUNCHER:  Okay.
 4          A.  I am, as an individual, not related to Energy
 5     Advisors, a vice president of FRE Real Estate, Inc.
 6          Q.  (BY MR. WEITMAN)  And how long have you been a
 7     vice president of FRE Real Estate, Inc.?
 8          A.  Since December 23rd.
 9          Q.  Have you been deposed before?
10          A.  Yes.
11          Q.  When?
12          A.  I don't recall.  Just I have been deposed
13     several times.
14          Q.  And you also went through personal bankruptcy,
15     correct?
16          A.  That's correct.
17          Q.  And during that time, were you deposed
18     numerous times and also testified --
```

Page 6

Morgan, Richard 01-27-11.txt

```
19        A.    Yes.
20        Q.    -- before the Bankruptcy Court?
21        A.    Yes.
22              (Mr. Stromberg present.)
23        Q.    And were the proceedings before the Bankruptcy
24   Court, did they involve fraudulent conveyances and the
25   like with entities of Transcontinental?
0014
 1              MR. BUNCHER:   Objection to form,
 2   ambiguous.
 3        Q.    (BY MR. WEITMAN)   What were some of the issues
 4   involved in your personal bankruptcy proceedings?
 5        A.    There was a contingence of fraudulent
 6   conveyances, but all of that was overturned --
 7   overruled.
 8        Q.    As to the issues as to your discharge,
 9   correct?
10        A.    Yes.
11        Q.    But, nonetheless, was there not a trustee
12   appointed who brought actions against various parties,
13   including Transcontinental affiliates, for fraudulent
14   conveyances?
15        A.    I don't know about that specifically.
16        Q.    How long have you had a relationship with
17   Transcontinental and its affiliates?
18        A.    Since about 1980.
19        Q.    Can you share with us what those connections
20   were, please?
21        A.    Primarily, they were a lender.  They were --
22   they are -- Transcontinental had some -- or some of the
23   affiliates had -- were a lender or a joint venture
24   partner in an operation that I acquired a bunch of
25   assets.
0015
 1        Q.    And what was the name of that enterprise?
 2        A.    It was an individual company.  But it was
 3   acquiring the DeBartolo portfolio, which was a bunch of
 4   land when Eddie DeBartolo was about to be indicted under
 5   the -- in Louisiana.
 6        Q.    And then Transcontinental was a lender or a
 7   joint venturer in those --
 8        A.    You said affiliates.  I cannot specifically --
 9   you said and/or affiliates.  I have to speak in the
10   affiliate frame because I can't give you a specific
11   Transcontinental.
12        Q.    Do you remember which entities in the
13   Transcontinental family were involved in your
14   transactions?
15        A.    I do not.  I think it was -- the main one, I
16   think, was National Operating, LP, which was then rolled
17   into one of the companies, American Realty Trust, I
18   believe.
19        Q.    Can you share with us your educational
20   background?
21        A.    Yes.  I was -- when I graduated high school,
22   graduated from the farm, went to Atlanta, Georgia, went
23   to a business college, which was like an 18-month course
24   in business, included accounting.
25              Went from there to -- back to Griffin,
0016
 1   Georgia, to work for -- try to make a job locally and
 2   just couldn't make a living there.  Decided to go back
 3   to Atlanta to attend Georgia State College.  Took a job
```

Page 7

HC 00853

Morgan, Richard 01-27-11.txt

```
 4   as an accountant with Oxford Industries and within about
 5   nine months was promoted to division controller for
 6   Oxford in Gaffney, South Carolina. So I only got about
 7   20 hours of actual college credit, in addition to the
 8   accounting training I had from the business college.
 9        Q.   So you are not a college graduate?
10        A.   No.
11        Q.   Where was your first job?
12        A.   Pardon?
13        Q.   What was your first job? It is the one you
14   just described.
15        A.   No, no, I took a job as an office manager of a
16   ladies' dress manufacturer.
17        Q.   And how many years were you employed there?
18        A.   About two years.
19        Q.   And what was your next job?
20        A.   Then I went directly to Oxford from that and
21   was with Oxford up until 1968. That was about a
22   seven-year stint.
23        Q.   And between '68 and '80, what did you do?
24        A.   Various and sundry things. I worked as a vice
25   president of a company called Phillips Development,
0017
 1   which was related to Gene Phillips, until 1973. And in
 2   '73, I went to work for a managing partner of a
 3   partnership in Orlando, Florida, called Holicheck,
 4   Bolivian and Wipperwurth.
 5             Came back to South Carolina in 19 -- I'm
 6   getting my years mixed up now a little bit -- '75, '76,
 7   something like that. Then in 1977, I went back to work
 8   for Syntek, S-y-n-t-e-k, as a -- in charge of shopping
 9   centers.
10        Q.   And that was an affiliate of Gene Phillips?
11        A.   Yes, uh-huh.
12             MR. BUNCHER: Let me just make a comment
13   on the record. Whenever you use the term affiliate, are
14   you using it as defined in the bankruptcy code or just
15   generically? Because the witness --
16             MR. WEITMAN: Just generically.
17             MR. BUNCHER: Okay. I just -- the
18   witness is not a lawyer, and so he's not -- by whatever
19   he says about something being an affiliate, we are not
20   admitting that it is an affiliate as defined under the
21   bankruptcy code.
22             MR. WEITMAN: I understand.
23        A.   We were at Syntek at the time, right? And I
24   was in charge of developing shopping centers. In 1980,
25   I formed -- in 1979, I formed a company called Tara
0018
 1   Group, which was a joint venture with Gene Phillips and
 2   his partner, and operated and built and developed
 3   shopping centers throughout the Southeast.
 4             And in 1980 -- '80, early '81, Tara Group
 5   was bought by the Southmark Corporation, which was,
 6   again, a Gene Phillips organization, related
 7   organization, affiliate, whatever you want to call it.
 8   And continued to develop shopping centers for a while.
 9             And then starting in about 1982, I
10   started picking up troubled assets and working on
11   troubled assets. And moved to Dallas in 1983 and worked
12   in doing the managing and -- managing or primarily
13   leasing of shopping centers. And then in 1984 was made
14   president of the commercial -- of the shopping center
```
                              Page 8

HC 00854

                          Morgan, Richard 01-27-11.txt
15    division of Southmark.
16                In 1986, I went back to being a
17    troubleshooter.  I was doing --
18        Q.  (BY MR. WEITMAN)  For whom, please?
19        A.   Again, for Southmark.  Basically, I was in
20    charge of looking after some major portfolios that were
21    loans of San Jacinto Savings & Loan and being sure that
22    the developers or owners were doing what they should be
23    doing and help them promote and so forth.
24                Then I left -- I left the -- let me see.
25    I'm back into 1980, 1982.  I worked as a consultant.
0019
1     And then I broke off from -- and formed the Tara Group,
2     I believe, in '85, '86, in that area.
3         Q.   Was your major client, again, affiliates of
4     Southmark or Gene Phillips?
5         A.   No, no -- my clients were affiliates of
6     Southmark, yes.  And I believe it was 19 -- let me start
7     over.
8         Q.   Is it fair to say that for probably thirty
9     years now you have done work for Gene Phillips or his
10    affiliates either directly or through various other
11    entities that you have worked for?
12        A.   Or owned.
13        Q.   Or owned?
14        A.   Yes.  Yes, it is.
15        Q.   And today, if you would, can you help me
16    understand the kind of corporate chart of FRE, who owns
17    it?  If I can just hand you a sheet of paper and ask if
18    you would just sort of draw out for me FRE in the center
19    and who the owners are, please.
20        A.   It is a fairly simple piece.
21        Q.   Thank you.  And we can have that marked as --
22        A.   If you are going to -- pardon me.  I will have
23    to look at the documents because it starts with the
24    alphabet.  I'm just going to call it the ABC now.  ABC
25    is the parent of FRE Real Estate.
0020
1         Q.   Excuse me.  What does ABCLD Properties stand
2     for?
3         A.   Absolutely no idea.  It is just a name.  And
4     there is an ownership above that.  I don't know what
5     that is.  I do know the commonality.  And the
6     commonality is that my friend Ron Akin is one of the
7     owners of ABCLD.
8         Q.   I'm sorry.  The owner of ABCLD Properties is
9     what?
10        A.   The parent of ABCLD Properties.  And I'm not
11    sure what the name of --
12        Q.   What's the owner of ABCLD Properties?
13        A.   I'm not sure.  I'm not sure.
14        Q.   Is there something you can look at to tell me
15    who the --
16        A.   I don't have a chart that would show that.
17        Q.   Would you insert that in the --
18        A.   I will.
19        Q.   You can identify that, correct?
20        A.   I know that Ron Akin is the president of both
21    the parent and the ABCLD.
22            MR. BUNCHER:  I thought I gave you the
23    sheets from the interviews with the --
24            MR. WEITMAN:  Yeah, but there's no
25    corporate chart.  I'm just trying to get him to develop
                          Page 9

HC 00855

Morgan, Richard 01-27-11.txt

0021
1   a corporate chart.
2         Q.   (BY MR. WEITMAN)  At the very top, I think you
3   said, it is Ron Akin.  Is he also someone who has worked
4   for Gene Phillips for thirty years or more?
5         A.   Worked with --
6         Q.   Or the affiliates?
7         A.   Worked with is a loose term.  He is an
8   individual property manager.  He owns his own company
9   and has for a good number of years.  I don't know how
10  many years, at least twenty years.  And I have known him
11  through that association, never worked directly with
12  him.  But I have known him for that period of time,
13  twenty or thirty years.
14              MR. BUNCHER:  Exhibit 1 to the
15  Information for the Initial Debtor Interview states who
16  owns what of FRE Real Estate, Inc.
17              MR. WEITMAN:  But it doesn't go further
18  up the chain.
19              MR. BUNCHER:  Yes, it does.
20              MR. WEITMAN:  Let's have this marked as
21  Wells Fargo 166, which is the Notice of Deposition.  And
22  167 will be the Debtor Interview.
23              (Exhibits 166-167 marked.)
24        Q.   (BY MR. WEITMAN)  Do you know when ABLCD --
25  ABLCD Properties was formed?
0022
1         A.   No, I do not.
2         Q.   Do you know when ABC Land & Development, Inc.,
3   was formed?
4         A.   No.
5         Q.   Do you know when DTS Holdings was formed?
6         A.   No.
7         Q.   And, again, you were hired on December 23,
8   2010, to come in as the chief restructuring officer?
9         A.   Of FRE.
10        Q.   Of FRE?
11        A.   Yes.
12        Q.   And that's also when you accepted the position
13  as vice president, correct?
14        A.   That's correct.
15        Q.   Prior to that time, were you involved at all
16  with FRE or any of the affiliates of Transcontinental
17  that transferred property into FRE?
18        A.   No.
19        Q.   What did you -- tell me about the first
20  meeting or how it came to be that you were retained.
21        A.   I had a meeting with Daniel Moos of
22  Transcontinental and Ron Akin.
23        Q.   Where was that meeting, please?
24        A.   It was in my office.
25        Q.   And where is your office?
0023
1         A.   My office is at 1800 Valley View Lane, Suite
2   300.
3         Q.   Is that not also the same office space as the
4   Transcontinental folks?
5         A.   It is.
6         Q.   So you lease from them?
7         A.   No.  Energy Advisors does, but I don't.
8         Q.   Okay.  So your company that you are with
9   leases space from Transcontinental?
10        A.   Yes -- no, not from Transcontinental.  I don't
                        Page 10

Morgan, Richard 01-27-11.txt

11    know who -- whoever owns the office building.  I don't
12    even know who owns the office building.  Whoever the
13    office building owner is.
14         Q.   But other tenants in that building are various
15    Transcontinental entities; is that correct?
16         A.   Yes.
17         Q.   And prior to December 23, were you doing work
18    for any of the affiliates of Transcontinental?
19         A.   No.
20         Q.   Okay.  So continue with your meeting, please.
21         A.   That is not entirely correct.  On or about
22    19 -- I mean 2006, there was a -- I took an opportunity
23    to put together what we call a play in the oil and gas
24    field and structuring -- or focusing on the area which
25    was east of the airport and started with the assets of
0024
1    Mercer Crossing and all of those areas that are owned by
2    Transcontinental, American Realty Trust, and Income
3    Opportunity Realty Trust, using that as a hub.
4              From that there was a company called ATI
5    Mineral Holdings.  That is a joint
6    venture by the three entities -- the three trusts based
7    on the amount of acreage that they had in the deal to
8    begin with.
9              I then spearheaded a leasing effort for a
10    short period of time and realized that the project was
11    just too big for what I could see as our resources to --
12    or resources that I could gain to help do it.  So I then
13    negotiated a joint venture with a company called
14    Keystone Exploration out of Fort Worth.
15              So to the extent that those assets --
16    those assets -- ATI Mineral Holdings assets owns the
17    mineral rights underneath the various and sundry
18    properties owned by those three people, I do represent
19    that affiliate or have in negotiating the joint venture
20    and the subsequent operations from that point forward.
21         Q.   So you were doing work with these folks that
22    pulled -- that asked to meet with you to talk about FRE,
23    correct?  You were doing work with them previously?
24         A.   I knew Danny Moos from that -- from the
25    Mineral Holdings aspect of it.  I have known Ron Akin
0025
1    just as a friend for a long time.  I have never worked
2    directly with Ron.
3         Q.   And the Shumates, how do you know him?
4         A.   I have known Shumate for years.  He has been
5    retired now for several years.
6         Q.   Do the Shumates have any connection with
7    Transcontinental and the Transcontinental affiliates?
8         A.   I don't know.
9         Q.   So you don't know whether in any of the
10    transactions they acted for or with Transcontinental?
11         A.   I can't speak for the Shumates.  I don't know.
12    I don't know about that.
13         Q.   Because are they not the ultimate owner of FRE
14    way up at the top, based upon this Debtor Interview?
15         A.   That's correct.
16         Q.   Have you met with these people and know them
17    pretty well or not?
18         A.   I know them very well.
19         Q.   Okay.
20         A.   But I met with Ron Akin.
21         Q.   And does Ron Akin -- does he have involvement
                              Page 11

Morgan, Richard 01-27-11.txt

```
22   with Transcontinental and its affiliates for years as
23   well?
24        A.    As I told you, he has his own company,
25   property management company.
0026
1         Q.    What's the name of that company?
2         A.    Sunset.  I believe Sunset.  But he manages
3    apartment properties for various and sundry entities.
4    And I'm sure some of those are under Transcontinental,
5    but I'm not sure.  I'm not sure about that.
6         Q.    Okay.  So Daniel Moos comes into your office.
7    And what does he tell you?
8         A.    He and -- he and Ron Akin came together and
9    told me that the plan was to develop the -- to put these
10   properties into the -- into this FRE entity, for me to
11   look at it and see if I was comfortable with it relative
12   to the values that were there and the concept under
13   which it was done.  I took a weekend to do that and came
14   back and told them I was.
15        Q.    And Daniel Moos and Ron Akin, what
16   relationship did they have -- or were they FRE?  Or were
17   they the transferor and these --
18        A.    Ron Akin is president of the -- of the -- now
19   the debtor.  And Daniel Moos represented the transferor.
20        Q.    Did they tell you that these properties were
21   subject to foreclosure proceedings?
22                    MR. BUNCHER:  Object to form.  Which
23   properties?
24        Q.    (BY MR. WEITMAN)  Did they tell you that many
25   of the properties that would be transferred into FRE
0027
1    were subject to pending foreclosure proceedings?
2                    MR. BUNCHER:  Object to form.
3         Q.    (BY MR. WEITMAN)  What were you told about
4    whether these problems -- whether there were problems
5    with the properties?
6         A.    Well, problems with the property, they did
7    tell me that there was an ongoing litigation with
8    NexBank.  And the -- I did not know about the other
9    relative -- you know, what the problems were or not.
10   Since then I have known that there are some issues, but
11   I don't know the full scope of those issues.
12                    I was primarily looking at the concept.
13   The concept is, is there enough combined value to bring
14   everybody out whole?  I think there is.  And is there a
15   methodology to improve the assets?  I think there is.
16   And is there a methodology to provide some adequate
17   protection?  I think there is.  That was my synopsis.
18   So, yes, will I take it on?  Yes, I did.
19        Q.    And it was with respect to only one property
20   you understood?
21        A.    No, the whole --
22        Q.    I thought you said the NexBank property is
23   what you understood.
24        A.    Oh, NexBank.
25        Q.    Did you understand all of the other properties
0028
1    that would be transferred in?
2         A.    Actually, I understood most of them.  And most
3    of these properties that were transferred in were --
4    Parkway I knew.  I live right up the street.  Westgrove,
5    I had actually owned that at one time and owned a small
6    portion of interest on it.  The Fenton building, I had
```

Page 12

```
                          Morgan, Richard 01-27-11.txt
 7     known it.  I didn't know a lot of details about it, but
 8     I knew of the Fenton property enough to look at the
 9     financial statements and see where I thought it was and
10     where it could go.
11               Most of the land parcels, with the
12     exception of three pieces that are in your portfolio --
13     in the Wells Fargo portfolio, I knew from working
14     through the energy sector.  Because I had to not only
15     find leases, I had to find drill sites.  So I had some
16     idea where they were and how they were located and what
17     the values were because I had to --
18          Q.   How long did this meeting last?
19          A.   Pardon?
20          Q.   How long did the meeting last?
21          A.   It lasted about an hour and a half.
22          Q.   Were there any notes from the meeting?
23          A.   No.
24          Q.   You weren't handed any documents at the
25     meeting?
0029
 1          A.   I was handed a document.  The document was a
 2     spreadsheet showing what the -- you know, what the
 3     properties were, where they were, how much the debt was,
 4     what the proposed note -- promissory note was, the
 5     purchase was, what the basis in the property was.  So I
 6     had that as a starting point.
 7          Q.   When you say the basis in the property, what
 8     do you mean?
 9          A.   What was on the books for Transcontinental.
10          Q.   So when they established the note that would
11     be issued, was that based upon the basis in the
12     property?
13          A.   No, not always.
14          Q.   What was it based on?
15          A.   It was a combination.  It was a combination.
16     There were some cases, such as the Amoco Building with
17     Petra, where the basis was very low because of some
18     damage that had been done by Katrina.  But it was
19     transferred basically at the debt.  So there was a
20     bigger gap between the book value and the debt value.
21          Q.   So you didn't look at any appraisals,
22     correct --
23          A.   No.
24          Q.   -- of the property?
25          A.   No.
0030
 1          Q.   You didn't look at any of the underlying loan
 2     documents, correct?
 3          A.   That's correct.
 4          Q.   Did you have any concerns as to whether this
 5     was permitted under the loan documents of the various
 6     lenders?
 7          A.   No.
 8          Q.   Were you in a position to negotiate the terms
 9     of these notes or the assumptions?
10          A.   I'm in a position to negotiate them now, yes.
11          Q.   No.  I'm saying, you are there, you are asked
12     if you would assume the position as vice president --
13          A.   Right.
14          Q.   -- of FRE Real Estate?
15          A.   Yes.
16          Q.   And to act as the chief restructuring officer
17     through your affiliated entity?
                             Page 13
```

HC 00859

Morgan, Richard 01-27-11.txt
18          A.   Right -- through myself individually.  I don't
19    want to get that confused.
20          Q.   Well, there's an entity you have, correct,
21    that is --
22                MR. BUNCHER:  He has said this five
23    different times.  Energy Advisors doesn't have anything
24    to do with FRE.  He's already told you that three
25    different times.  So I don't know why we keep going back
0031
1     on that.
2          Q.   (BY MR. WEITMAN)  Daniel Moos, does he have
3     any connection now with FRE Real Estate?
4          A.   No.
5          Q.   And the other officers and directors or
6     managers of the transferor entities, are they still in
7     any capacity working for FRE Real Estate or
8     Transcontinental?
9          A.   You are getting -- I don't want to get you
10    confused, but I don't want to get confused either.
11                FRE Real Estate is Craig Landess, who is
12    the vice president; myself, the vice president; and Ron
13    Akin as the president.  I'm sure there's others.  But
14    those are the three that I focus on.
15                And my accepting the position, basically,
16    was to take not quite a COO role, but effectively a
17    restructuring officer role.  So I have the authority to
18    do what has to be done.
19          Q.   who is counsel to the transferor entity in the
20    various documents?  Was that Jay LaJone's firm?
21          A.   Jay LaJone actually prepared the documents,
22    yes.
23          Q.   Whose counsel was he?
24          A.   I do not know which one he worked for.  I
25    don't know.
0032
1          Q.   Well, who was your counsel to receive and
2     assume these various debts and the properties?
3          A.   The transfers were made -- if you will look at
4     all the documents, all the transfers were made before I
5     actually took charge of the company.
6          Q.   Well, I believe the documents are dated
7     December 23.
8          A.   I know.  I didn't accept full charge of the
9     company until January the -- after January -- I didn't
10    get involved in it until -- we made the deal prior to
11    the Christmas holidays.  But over the Christmas
12    holidays, not a lot was done.  I really got active the
13    4th of January -- right about the 4th of January.  I
14    went through it, but I didn't get really active into it
15    until after the holidays.
16          Q.   Are you the party that attended the debtor
17    interview and completed --
18          A.   Yes.
19          Q.   -- these sheets?
20          A.   Yes.
21          Q.   And that's --
22          A.   I did not complete the sheets.
23          Q.   But you reviewed the work?
24          A.   I reviewed the sheets, yes.
25          Q.   In the course of the various emails that you
0033
1     would receive on this project, who was your counsel
2     prior to this bankruptcy?
                              Page 14

Morgan, Richard 01-27-11.txt

3              MR. BUNCHER:  His personal counsel?
4        Q.   (BY MR. WEITMAN)  Who was the counsel to FRE?
5        A.   I don't know.
6        Q.   You don't know who the law firm was that was
7    representing your interests -- or FRE's interests in
8    connection with the negotiation of the operative
9    documents?
10       A.   That's correct.
11       Q.   Did you ever see another law firm involved,
12   other than Jay LaJone's firm?
13       A.   I just spoke to you a moment ago to that
14   issue.  I got involved from a physical management
15   standpoint after the transfer was made.
16       Q.   When you had questions regarding the
17   documents, the transfer documents, whom did you speak
18   to?  Jay LaJone or some other law firm?
19              MR. BUNCHER:  Objection.  Assumes he had
20   the questions to start with.  So object to form.
21       Q.   (BY MR. WEITMAN)  Whom did you view as your
22   counsel to help you understand these documents prior to
23   the bankruptcy of FRE?
24       A.   I didn't focus on the documents.  I focused on
25   the concept.  The only document I focused on was one
0034
1    that I thought was important in my position for FRE, and
2    that is the combination of the purchase contract and the
3    notes.  And I took one sample of the purchase contract
4    and the notes.
5              My concern was whether or not the way
6    that the purchase contract was done, did it, in fact,
7    bind FRE to the purchase -- to the promissory notes.
8    And I found that there was sufficient language in the
9    contract that would allow some flexibility, as far as
10   the management was concerned, of FRE to utilize that,
11   quote, unquote, equity spread, if you would call it, for
12   the benefit of the debtor.
13              So that if -- I called it -- I look at it
14   as sort of an -- in terms of the real estate, sort of a
15   soft second.  Essentially, I do what has to be done for
16   the debtor and the lenders.  And whatever is left over,
17   if any, goes to payment of the promissory note.  So I
18   can focus on the value to the debtor and the value to
19   the lenders without having to concern myself about the
20   promissory notes.
21       Q.   So the promissory notes in the aggregate are
22   what, about $50 million?
23       A.   I didn't say it would.  I just said --
24       Q.   Do you know what the aggregate amount of the
25   promissory notes --
0035
1        A.   Oh.  It is 59 million, something like that.
2        Q.   59 million?
3        A.   Uh-huh, that's from my memory.  I may be a
4    little bit off.  There's a spreadsheet that I had to
5    work with.
6              MR. BUNCHER:  He may be referring to the
7    spreadsheet I emailed you last night, David.
8        Q.   (BY MR. WEITMAN)  Can you take a look at
9    Exhibit 6 of the Debtor Interview, please?
10       A.   Okay.  One of the things was that there was
11   one note for the Fenton note.  I considered that to be
12   an FRE note, but it turns out it wasn't.  Because Fenton
13   was purchased by -- directly by the ABC, whatever that
                           Page 15

Morgan, Richard 01-27-11.txt
14    was.  And it actually issued the note to purchase stock.
15    So it actually issued the note directly to
16    Transcontinental for that acquisition.
17                So I was looking in 49 plus about 5- or 6
18    million at the time.  I thought it was about $54
19    million.  But this number is right.
20         Q.   So 49,172,931 --
21         A.   Because there's a $5 million promissory note
22    from ABC on the Fenton project also, roughly 5 million,
23    maybe 6 million.  But there's a note there.
24         Q.   And in your talks with Mr. Moos in this
25    meeting, what did he tell you; that he would oblige your
0036
1     needing to restructure that debt?  Is that what you just
2     said that --
3          A.   That wasn't what I said at all.
4          Q.   Well, explain to me what your arrangement was
5     on these notes.
6          A.   There is no arrangement.  The notes are -- the
7     notes and the purchase contract is what it is.  I
8     interpreted that the purchase money -- that the purchase
9     contract and the promissory notes were done at one time,
10    one document.  And, therefore, the conditions of the
11    contract, which specifically provides that there are
12    some offsets -- in other words, the property was
13    purchased as is, so there are some offsets against that.
14    And those offsets can be equal to the total amount of
15    the promissory note.
16                So I'm not guided by the promissory note.
17    I'm not focused on that.  I'm focused on the value to
18    the debtor and the value to the lenders.  Obviously, the
19    bankruptcy isn't successful unless everything is paid.
20         Q.   Why did -- if you know, what was the reasoning
21    offered for TCI to sort of monetize their interest with
22    taking notes; where previously, you know,
23    Transcontinental and TCI were the owners of these
24    various properties?
25         A.   Well, first of all, there were three entities
0037
1     involved.  It wasn't just Transcontinental.
2          Q.   What three entities?
3          A.   I believe American Realty Trust, Income
4     Opportunity Trust, and TCI were all parties to that.
5     And that should be on the sheet that was provided you
6     yesterday.
7          Q.   Please continue.
8          A.   Oh.  The monetization is strictly -- from
9     their standpoint, there is a note.  And that note,
10    together with the -- with the first mortgage, allows it
11    to be transferred from the public entity without a
12    write-down.  The write-down may have to occur at some
13    point in time, but it does delay that aspect of it.
14         Q.   So it was done, in some respects, in order to
15    avoid the write-down of the assets that might affect
16    these publicly-held companies?
17         A.   I'm sure that was -- that was a concern, I'm
18    sure.  But I can't speak to them.  That's the deal they
19    have to -- the transferors have to --
20         Q.   Was that expressed to you?
21         A.   No.  I just perceived, since it was a book
22    value and I was taking it at book value or above, that
23    that had something to do with it.  That was a
24    perception, not a direction.
                              Page 16

```
                              Morgan, Richard 01-27-11.txt
25          Q.    These were all troubled properties, correct,
0038
 1   with debt that was in default?
 2          A.    Not necessarily.
 3          Q.    Okay.  So you are not aware of a number of
 4   these properties, the vast majority of the properties --
 5          A.    Your question was not some, you said all.
 6          Q.    The vast majority of them were subject to --
 7          A.    I can't speak to that either.
 8          Q.    Well, we will go one by one.
 9                MR. BUNCHER:  Rather than trying to put
10   words in his mouth, why don't you just ask him a
11   question that he can answer as to what his perception
12   was about what, you know, portion of the properties were
13   troubled and maybe you will get an answer.
14                MR. WEITMAN:  Fair enough.
15          Q.    (BY MR. WEITMAN)  Please, if it is easier
16   listening to Mr. Buncher, answer that question.
17          A.    I cannot speak to a total amount of -- or even
18   a percentage of a ratio that was in trouble.  It is
19   quite obvious that a great deal of the portion was land.
20   And it was also obvious that the land debt, even if it
21   wasn't in default, was in danger of being in default
22   because there was no income to cover it.
23                So from that aspect of it, I assumed that
24   there were some troubled properties.  I didn't go one by
25   one.  That wasn't what I was trying to do.
0039
 1          Q.    What is your understanding as to how these
 2   transactions that you've just described, how they were
 3   being reported by these various public entities?
 4          A.    Outside of my scope.
 5          Q.    So you never read anything to see whether
 6   these transfers and, you know, taking these new notes
 7   had been reported?
 8          A.    Not my scope.  That's not my job.
 9          Q.    So you have never checked that out?
10          A.    It is not my job to check it out.
11          Q.    And you have had no discussions with anyone --
12          A.    Not my job to do that.
13          Q.    I understand it may not be your job.  I'm
14   asking if you have an understanding or if you have
15   spoken to anyone regarding how this has affected, either
16   positively, negatively, or not at all, what is being
17   reported in each of these publicly-held companies?
18          A.    Quite candidly, I don't think I would ever
19   want to ask that question.
20          Q.    Why?
21          A.    Because that would be insider information of
22   knowing something that maybe I shouldn't know.  I didn't
23   ask that question.
24          Q.    In your talks with Daniel Moos, did you talk
25   to him after December 23, after this one-hour meeting?
0040
 1          A.    Yes.
 2          Q.    Can you summarize those discussions in the
 3   days --
 4          A.    Basically, I just -- I basically looked at the
 5   sheet.  I told you over the weekend I studied it.  And
 6   after that, I told him I would take it on and that I
 7   felt that there was enough value there to make something
 8   work, and I would take it on.
 9          Q.    And how are you compensated?
                              Page 17
```

```
                       Morgan, Richard 01-27-11.txt
10        A.   I'm not.  There will be a success fee, if
11   there is success, somewhere down the road, not yet
12   negotiated.  Obviously, it all has to settle down and
13   see what assets are there and how it is all going to
14   work out.
15        Q.   Who would provide that success fee to you?
16        A.   It would be whatever the value of FRE Real
17   Estate is at the end of the day, the net value.
18        Q.   After paying the $50 million of unsecured debt
19   owed to the TCI affiliates?
20        A.   Or whatever it is adjusted.
21        Q.   What else did Mr. Moos tell you over the
22   subsequent days?
23        A.   That was it.  He did provide me with some
24   assistants.  I do have Greg Crown, who is a TCI -- or
25   Prime Asset employee.  He is working with me on
0041
1    providing all the details, so I didn't have to get
2    involved in preparing all the schedules and working all
3    of that stuff.
4         Q.   Pardon me.  Prime Asset Real Estate
5    Management; is that correct?
6         A.   Yes.
7         Q.   Is that an affiliate of Transcontinental?
8         A.   Affiliated how, I don't know.  I know there's
9    some relationship, but I don't know what they are.
10        Q.   And that provides the financial advisory
11   services?
12        A.   Yes.
13        Q.   And they were providing those services to each
14   of the transferor entities?
15        A.   I do not know whom Mr. Crown worked for.  I
16   don't know -- I don't know what his job was exactly at
17   the time.  I just know that he was experienced in this
18   area, and they offered him to me for free, so I took it.
19        Q.   And the he offered it for free is Mr. Moos --
20        A.   Yes.
21        Q.   -- from -- who ran the transferor entities?
22        A.   He's --
23        Q.   The TCI entities?
24        A.   He's the president of Prime, yes.
25        Q.   I'm sorry.  He's the --
0042
1         A.   He's the president of Prime Asset Management,
2    Inc.
3         Q.   Post bankruptcy, are you continuing to use --
4    maybe you have answered this -- the services of Prime
5    Asset Management?  They are going to help you in this
6    regard?
7         A.   I am continuing to use the services of Greg
8    Crown.
9         Q.   And his company?
10        A.   Pardon?
11        Q.   And his company?
12        A.   Yes.
13        Q.   Is there a contract that's out there?
14        A.   No.
15        Q.   And he's providing these services for free?
16        A.   Yes.
17        Q.   Okay.  Then there's a company called Regis
18   Management?
19        A.   Regis Management is -- and, again, I don't
20   know the total ownership of that.  But I know that they
                              Page 18
```

HC 00864

```
                        Morgan, Richard 01-27-11.txt
21    are a property management company.
22         Q.    Were they providing the property management
23    for the transferor entities?
24         A.    They were.
25         Q.    Are they providing the property management for
0043
 1    now FRE?
 2         A.    Yes.
 3         Q.    And how do they get paid?
 4         A.    They get paid a management fee, roughly about
 5    3 percent of the gross income.
 6         Q.    And is Regis Management related to Prime
 7    Asset?
 8         A.    I don't know the ownership relationship.  I
 9    know it works -- I know it has to be related in some
10    form, but I don't know what it is.
11         Q.    Where are the -- are the offices of Prime
12    Asset in the same offices as Transcontinental?
13         A.    Yes.
14         Q.    Is that also the same offices of where you
15    office?
16         A.    And Regis offices.
17         Q.    And Regis offices in the same location?
18         A.    Uh-huh.
19         Q.    And the transferor entities, were they not
20    also operating in that same location on Valley View
21    Lane?
22         A.    Yes.
23         Q.    I'm sure I have covered this.
24    Transcontinental, same thing, same offices, same
25    location?
0044
 1         A.    Transcontinental and American Realty Trust and
 2    Income Opportunity have very, very little -- I mean,
 3    almost no people, maybe a treasurer or maybe an
 4    accountant here or there.  But, essentially, all the
 5    employees are paid and run by -- that are advisors are
 6    under Prime Asset Management.  So it provides all the
 7    advisory services.
 8              So to the extent that there are service
 9    people around, other than the Regis people, they work
10    for Prime, which provides services then to the various
11    entities.
12         Q.    How many employees are there right now of FRE
13    Real Estate?
14         A.    Me.
15         Q.    You?
16         A.    Well, as far as functioning?
17         Q.    Right.
18         A.    Me.
19         Q.    No one else in the field?  Everything is
20    outsourced through Prime or Regis, correct?
21         A.    Well, there is nothing outsourced through
22    Prime, other than the services of Greg Crown.
23              MR. BUNCHER:  Just so the record is
24    clear, I mean, when you ask about employees, are you
25    distinguishing between employees and officers?  Because
0045
 1    we have already given you information that shows there's
 2    like, I think, four different officers of FRE.
 3              MR. WEITMAN:  Thank you for clarifying
 4    the record.
 5         Q.    (BY MR. WEITMAN)  Are any of those officers
                              Page 19
```

Morgan, Richard 01-27-11.txt

6   getting paid?
7        A.   Not to my knowledge.
8        Q.   Are there any employees, to speak of, that are
9   getting paid off of the FRE revenues?
10       A.   No.
11       Q.   Is there a lease that FRE has with the
12   landlord at Valley View?
13       A.   No.
14       Q.   Is there a -- and I think you have already
15   answered.  There is -- is there a management agreement
16   between Regis and FRE for the properties?
17       A.   There is.
18       Q.   Is this the same management agreement that
19   existed between the transferor entities and Regis?
20       A.   Same form.  I don't know about the -- the same
21   agreement.  But the form is there.
22            MR. WEITMAN:  Could you make that
23   available to me, Mr. Buncher?
24            MR. BUNCHER:  Make what available?
25            MR. WEITMAN:  He just described the
0046
1   management agreement between Regis and FRE.
2            MR. BUNCHER:  Yeah, I don't have a
3   problem giving that to you.
4            MR. WEITMAN:  Thank you.
5   INFORMATION REQUESTED:_____
6        A.   Yes.  What I'm saying, I don't know what the
7   other compensation was prior to this.  I know what the
8   compensation is with this.  It is a straight 3 percent
9   management fee.
10       Q.   (BY MR. WEITMAN)  Are you aware of the credit
11   facility that Wells Fargo had with TCI Texas Properties?
12       A.   I'm aware that Wells Fargo has loans on a
13   specific group of properties, yes.
14       Q.   Is there something you can look at so it would
15   refresh your recollection as to the amount of
16   indebtedness owed to Wells Fargo?
17       A.   I don't have it particularly with me.  I don't
18   know.
19       Q.   Is it not in this?
20       A.   I remember the number of about $8-1/2 million.
21       Q.   Thank you.  If you would look at Exhibit 3 on
22   the Debtor Interview.
23       A.   8.362.
24       Q.   And do you know who the owner of TCI Texas
25   was?  Was that not Transcontinental?
0047
1        A.   I'm assuming it was Transcontinental.
2        Q.   And Transcontinental, is it true that they
3   executed a guaranty in favor of Wells Fargo for the full
4   amount of debt?
5        A.   You are asking me a question I can't answer.
6        Q.   Well, it is going to be part of the things
7   that we are going to ask you to look at so you can --
8   you know, we can expedite this.
9            MR. BUNCHER:  I'm sorry.  What are we
10  talking about here?
11           MR. WEITMAN:  We are taking his
12  deposition.  Okay.  Are you aware of that?  I'm sorry.
13  It looks like you just phased off or something.
14       Q.   (BY MR. WEITMAN)  Mr. Morgan, are you aware of
15  the credit agreements that were executed by the various
16  transferor entities?

Page 20

HC 00866

Morgan, Richard 01-27-11.txt

```
17        A.   I am not.
18        Q.   Do you know whether or not --
19             MR. BUNCHER:  I was actually -- just for
20   the record, I was actually going to type an email to
21   request somebody to send me the Regis contract that you
22   just asked for.  So I would appreciate it if you would
23   use a little more courtesy when speaking to me in the
24   future.  Can you do that, please?
25             MR. WEITMAN:  If you would like to take a
0048
1    break to send an email, that's fine.  But we are -- we
2    have got a lot of people here that need to get questions
3    answered.
4              MR. BUNCHER:  David, can you please be
5    courteous, is what I'm asking you?  Could you do that?
6              MR. WEITMAN:  I will continue to show the
7    courtesies you are showing me.
8              MR. BUNCHER:  Yeah, please do.
9         Q.   (BY MR. WEITMAN)  You are aware of the ten
10   properties that were subject to the deeds of trust liens
11   in favor of Wells Fargo, correct?
12        A.   I don't remember there being that many.  I
13   remember the list of properties, the three in Kaufman,
14   two in Valley View.  And that's five.
15        Q.   Were you aware that the debt --
16        A.   Payne-South is six.  And there's another one.
17   So I thought there were seven pieces.
18        Q.   There are ten, but we don't need to get into
19   it now.
20        A.   Maybe you have got them separated in different
21   parcels.  I think we talked about that once before.  I
22   think what you have -- maybe you have got that -- like
23   that 2500 acre piece over in Forney broken into three
24   different loans.
25        Q.   That may be it.
0049
1         A.   Yeah.
2         Q.   Were you aware that the loans were in default?
3         A.   No.
4         Q.   And you were not aware that the debt had come
5    due?
6         A.   No.
7         Q.   You are aware, however, that there were
8    transfers made by TCI Texas Properties, Wells Fargo's
9    borrower, into FRE, correct?
10        A.   Yes.
11        Q.   And those transfers occurred on December 23;
12   is that correct?
13        A.   Yes.
14        Q.   And I think you said that you did not sign any
15   of the documentation in connection with those transfers
16   or the assumption of debt, correct?
17        A.   That's correct.
18        Q.   And the signatory to those documents was whom,
19   please?
20        A.   Mr. Akin.
21        Q.   Who is the ultimate owner of the entity FRE --
22        A.   Right.
23        Q.   -- Real Estate?
24             MR. BUNCHER:  Object to form.  He's one
25   of the owners.
0050
1         Q.   (BY MR. WEITMAN)  The structure, was it not,
                              Page 21
```

Morgan, Richard 01-27-11.txt

```
 2    was that FRE would assume the existing indebtedness of
 3    Wells Fargo in connection with the acquisition of this
 4    land?
 5         A.   As I understand it, yes.
 6         Q.   Is there something you can look at that would
 7    refresh your recollection as to the note that was
 8    thereafter issued by FRE to the transferor TCI Texas?
 9         A.   Well, the schedule again.
10         Q.   Would you look at Exhibit 6 that's on the
11    Debtor Interview?
12         A.   Which one?
13         Q.   The Debtor Interview, Exhibit 6 to it.  Very
14    end, sir.  Do you see a note for 15,291,999?
15         A.   Yes.
16         Q.   Is that the note that was issued by FRE Real
17    Estate to --
18         A.   I would assume this to be correct.  It is not
19    the document I looked at.  But I would assume it to be
20    correct.
21         Q.   And when you look at your transcript, if you
22    would, just check that, please.
23         A.   Yes.
24         Q.   So the borrower entity transferor was Texas
25    Properties -- TCI Texas Properties, LLC, correct?
0051
 1         A.   There again, I would have to go back and
 2    verify that for you later.
 3         Q.   It did a name change, did it not?
 4         A.   There again, I would have to defer to that --
 5    to documentation later.
 6         Q.   Are you aware of other name changes that
 7    occurred between December 23 and the bankruptcy filing
 8    as to various of these entities?
 9         A.   No.
10              MR. WEITMAN:  Can I have this marked as
11    Wells Fargo, the next number, 168.
12              (Exhibit 168 marked.)
13         Q.   (BY MR. WEITMAN)  Are you more familiar with
14    this chart here?
15         A.   Yes.
16         Q.   And was this the chart that was handed to you
17    on December 23 by Mr. Moos and Mr. Akin when they met
18    with you?
19         A.   With some other information, yes.
20         Q.   What other details were on your chart?
21         A.   I knew what the basis was.
22         Q.   And by basis, that was --
23         A.   The book value.
24         Q.   As reported by the various public entities?
25         A.   Yes.
0052
 1         Q.   Did you rely on those book values in looking
 2    at the -- considering the fairness of these
 3    transactions?
 4         A.   I didn't -- what -- did I rely on what they
 5    showed as their book value as a -- no.
 6         Q.   Well, I think I heard -- and Mr. Buncher, I'm
 7    sure, will correct me -- that there was some concern by
 8    Mr. Moos not to have to write down the assets.
 9         A.   You heard that incorrectly.
10         Q.   What was the concern?
11         A.   It wasn't my concern at all.
12         Q.   No.  I said -- I didn't ask if it was your
```

Page 22

Morgan, Richard 01-27-11.txt

```
13    concern.  Did you not hear Mr. Moos express to you a
14    concern by those entities, for which he was a principal,
15    that he did not want the assets written down?
16         A.   If I said that, I said it in error.  And let
17    me correct it.  I did not worry about the concern.  You
18    asked me my assumption.  My assumption is that they
19    didn't want to write it down because everything that I
20    took was at or above book value.
21         Q.   And in each case, it was a done deal before it
22    even came to you.  Because documents had already been
23    executed, and they were just summarizing what had
24    occurred, correct?  And they wanted you to step in as a
25    vice president and restructuring person, correct?
0053
 1         A.   Correct.
 2         Q.   So in the Wells Fargo situation, there was an
 3    assumption of the roughly $8.5 million of Wells Fargo
 4    debt, correct?
 5         A.   Right.
 6         Q.   And another note was issued by FRE --
 7         A.   Right.
 8         Q.   -- the debtor to TCI Texas, correct?
 9         A.   Right.
10         Q.   But that note didn't stay there, did it?
11    Didn't it get upstreamed to Transcontinental?
12         A.   I have no idea.
13         Q.   Are you familiar at all with what was called a
14    distribution agreement by which the transferor entity
15    upstreamed it to the owner of that transferor entity?
16              MR. BUNCHER:  Object to form.
17         Q.   (BY MR. WEITMAN)  They never shared with you
18    the distribution agreement?
19         A.   I don't want to be curt with you.  But you
20    have to understand, I don't have anything at all to do
21    with anything Transcontinental Realty Investors or
22    American or Income Opportunity Realty Trust and their
23    inner workings at that.  I'm not involved in that.  I
24    don't know anything about that, including this what you
25    are talking about.
0054
 1         Q.   So no one told you, nor did you see any
 2    document relating to the upstreaming of the notes from
 3    the transferor entity to their parent?
 4              MR. BUNCHER:  Object to form.
 5         A.   Correct.
 6         Q.   (BY MR. WEITMAN)  I'm sorry.  Was your answer
 7    yes?
 8              MR. BUNCHER:  Go ahead.  I think he said
 9    correct.
10         A.   Yeah.
11         Q.   (BY MR. WEITMAN)  Did you see the various
12    warranty deeds that were executed by TCI Texas in favor
13    of FRE Real Estate?
14         A.   Not that particular one.
15         Q.   But you knew that the operative documents were
16    a purchase agreement, correct?
17         A.   Right.
18         Q.   A note, correct?
19         A.   Right.
20         Q.   A warranty deed, correct?
21         A.   Right.
22         Q.   But you --
23         A.   May I correct?  I don't think it was a
                              Page 23
```

```
                         Morgan, Richard 01-27-11.txt
24    warranty.  I think it was a limited warranty, but
25    whatever.
0055
 1          Q.   I see general warranty deed.
 2          A.   Okay.  Okay.
 3          Q.   And you were never informed of a distribution
 4    agreement --
 5          A.   For what?
 6          Q.   -- by which that note, the TCI Texas for which
 7    you are obligated to pay 15 million and change, the TCI
 8    Texas would be upstreamed to Transcontinental?
 9               MR. BUNCHER:  Object to form.
10          Q.   (BY MR. WEITMAN)  You were not aware of that,
11    correct?
12          A.   Maybe I can -- I'm going to let my attorney
13    answer that.
14               MR. BUNCHER:  The reason I'm objecting to
15    form is he is saying whereby it is upstreamed.  I doubt
16    the word upstream appears anywhere in the documents.  It
17    is not a legal term.  And so I object to that.
18               MR. WEITMAN:  Was it transferred --
19               MR. BUNCHER:  I'm not telling you not to
20    answer.  But it is just the way he's characterizing the
21    distribution agreement that I object to.
22               It speaks for itself.  Whatever the -- I
23    don't know why we need to have a deposition about what
24    the -- whether he knows about it or not.  He said he
25    doesn't know.  He never looked at it.  So whatever it
0056
 1    says it says, David.
 2          Q.   (BY MR. WEITMAN)  Are you familiar with the
 3    transfer of the note by TCI Texas Properties to
 4    Transcontinental?
 5          A.   No.
 6          Q.   And you didn't know that that was going to
 7    occur, correct?
 8          A.   As politely as I can, I have already told you
 9    three times, I don't have any knowledge of the inner
10    working relationships within Transcontinental Realty,
11    American Realty, or Income Opportunity Realty Trust.
12    What was done with this note, how it was handled, I have
13    no knowledge of that.
14          Q.   So when you write over here on this sheet, on
15    Exhibit 6, Texas Portfolio, LLC, as the note holder, as
16    far as you know, that has not been transferred to anyone
17    subsequently, correct?
18               MR. BUNCHER:  Object to form.  You said
19    when he wrote on this sheet.
20               MR. WEITMAN:  I'm sorry.
21          Q.   (BY MR. WEITMAN)  Looking at this, did you not
22    prepare Exhibit 6 working with your counsel?
23          A.   I mentioned to you that Mr. Greg Crown
24    prepared these exhibits for me.
25               The question is, do I know of any
0057
 1    transfer?  No.
 2          Q.   Earlier you said that you were very
 3    comfortable with the transactions as described to you by
 4    Mr. Moos and Mr. Akin?
 5          A.   Yes.
 6          Q.   Would that change your view as to your comfort
 7    and whether these transactions were appropriate if these
 8    notes were transferred to the parent of the transferor?
                              Page 24
```

```
                         Morgan, Richard 01-27-11.txt
 9        A.   No.
10                  MR. BUNCHER:   Is now a good time to take
11   a break?
12                  MR. WEITMAN:   No.  May we go --
13                  MR. BUNCHER:   We have been going an hour.
14   I just figured -- I wouldn't mind going to the restroom.
15   But that's fine.  Go ahead.
16                  MR. WEITMAN:   May we go off the record
17   for a moment.
18                  (Recess, 10:36 a.m. to 10:41 a.m.)
19        Q.    (BY MR. WEITMAN)  Were you aware of the fact
20   that the membership or ownership interests in TCI Texas
21   Properties was thereafter transferred to ABCLD
22   Properties, the parent of FRE Real Estate?
23        A.    You are going to have to get more specific
24   than that.  I don't know.  The entities are confusing.
25        Q.    Okay.  We have Wells Fargo's borrower, TCI
0058
 1   Texas Properties, correct?
 2        A.   Right.
 3        Q.    It later does a name change to Texas
 4   Portfolio, LLC, correct?
 5        A.   I see that on the sheet.
 6        Q.    The assets are transferred into FRE Real
 7   Estate, correct?
 8        A.   Right.
 9        Q.    There's an assumption of debt by FRE Real
10   Estate, and FRE Real Estate issues a note back to TCI
11   Texas Properties, correct?
12        A.   Right.
13        Q.    You did not know that TCI Texas sent the
14   note -- transferred the note to the parent of TCI Texas
15   Properties.  You have said that already, correct?
16        A.   Correct.
17                  MR. BUNCHER:   Object to form.
18        Q.    (BY MR. WEITMAN)  Are you aware of the fact
19   that the ownership interest in TCI Texas was then
20   transferred to FRE Real Estate's parent company ABCLD
21   Properties?
22                  MR. BUNCHER:   Object to form.  I don't
23   know where you are getting that.  If we can see a -- if
24   we could see a document that would show --
25                  MR. WEITMAN:   Yeah.
0059
 1        Q.    (BY MR. WEITMAN)  There's a purchase agreement
 2   by which there's an assignment of a membership interest.
 3   Were you aware of that?
 4        A.   I don't recall that specific document.
 5        Q.    And no one informed you that the parent of
 6   your company -- of FRE Real Estate now owns the
 7   transferor entities, correct?
 8        A.   Are you speaking on a global scale?
 9        Q.    With respect to TCI Texas right now.
10                  MR. BUNCHER:   I'm going to object to the
11   form.  I would like to see that document.
12                  MR. WEITMAN:   This has already been
13   marked as Wells Fargo 16.
14        Q.    (BY MR. WEITMAN)  Let me hand you 16, Wells
15   Fargo.  This is one of the documents that were provided
16   to us as far as one of the transfer documents.
17                  MR. BUNCHER:   This is the ownership
18   interest transfer in TCI Park West II, which is the
19   entity that owns the Fenton building.  And you were
                                Page 25
```

Morgan, Richard 01-27-11.txt
```
20   asking about --
21               MR. WEITMAN:  Oh, sorry.  You are
22   correct.
23               MR. BUNCHER:  So I'm not aware of
24   anything transferring the stock of TCI Portfolio, Texas
25   Properties, or whatever it is, that owed you -- your
0060
1    client the money.
2         Q.   (BY MR. WEITMAN)  Let me ask a different
3    question.  Are you aware of the fact that on December 22
4    the ownership interests in the debtor were acquired by
5    ABCLD Properties from Transcontinental?
6         A.   I don't understand the question, so you are
7    going to have to --
8         Q.   Again, the parent company of the debtor is
9    ABL -- ABCLD Properties, Inc., correct?
10        A.   Yes.
11        Q.   Did they always own -- did ABCLD Properties
12   always own FRE Real Estate or was it recently acquired?
13        A.   I mentioned that to you earlier.  I mentioned
14   to you that there was a separate note.  My confusion
15   about the 4. -- 49 million or 50 million was relative to
16   a separate note whereby ABCLD, whatever the name of it
17   is -- it is ABCLD -- ABCLD bought the stock of whatever
18   the company -- FRE Real Estate --
19        Q.   Uh-huh.
20        A.   -- and issued a direct note back to either
21   TCI -- one of the entities for that -- for that
22   membership interest.
23        Q.   Okay.  And is that the $5.3 million note?
24        A.   Correct.
25        Q.   Okay.  And is that not reflected in the
0061
1    document you are looking at now where ABCLD Properties
2    acquired the interests in FRE from Transcontinental?
3               MR. BUNCHER:  Yeah, I mean, we don't --
4    that's what this Purchase Agreement is.
5         Q.   (BY MR. WEITMAN)  Let me hand you Wells Fargo
6    Exhibit 14.  And, again, Mr. Morgan, you knew about
7    Transcontinental having sold the interests in FRE to
8    ABCLD Properties prior to your stepping in on
9    December -- excuse me -- at the meeting, you learned
10   that on December 23?
11        A.   Shortly thereafter because I was trying to tie
12   the notes together; and then I saw that note, yes.
13        Q.   But you didn't negotiate any of the terms of
14   any of these transfer agreements or other documents,
15   correct --
16        A.   That's correct.
17        Q.   -- that are referenced here?
18        A.   That's correct.
19               MR. BUNCHER:  Exhibit 14 has multiple
20   different Purchase Agreements.  Is that intended?
21               MR. BROWN:  I think it is, but I can flag
22   the relevant agreement.
23        Q.   (BY MR. WEITMAN)  This is one of the Purchase
24   Agreements.  Have you seen that document before today?
25        A.   As I told you, I looked at one or two Purchase
0062
1    Agreements.  I didn't go through the whole aspect of it.
2    And I'm not an attorney, so I will let my attorney --
3         Q.   Do you understand that, pursuant to that
4    Agreement, the ownership interests in TCI Texas
                            Page 26
```

HC 00872

                        Morgan, Richard_01-27-11.txt
 5    Properties were transferred to the affiliate of the
 6    debtor FRE Real Estate?
 7              MR. BUNCHER:  Object to form.
 8         Q.   (BY MR. WEITMAN)  ABCLD Income, what
 9    connection does that have to ABCLD Properties?
10         A.   I don't know.
11         Q.   Do you know who owns ABCLD Income?
12         A.   I do not.
13         Q.   Are you aware that ABCLD Income now owns these
14    various transferor entities, including TCI Texas
15    Properties?
16         A.   You are talking about two different issues
17    now.  I'm aware of the transfer of the real estate.  I'm
18    not familiar with the transfer of ownership interest of
19    properties.
20         Q.   Ownership interest --
21         A.   I'm not familiar with the transfer of
22    ownership entities or the membership's interest, if you
23    will, of the properties to ABCLD Income.
24         Q.   Of the ownership interests in the transferor
25    entities, is that what you are saying?
0063
 1         A.   My understanding was the actual real estate
 2    was transferred, not the entity, with the exception of
 3    the Fenton -- of the FRE Real Estate.  I'm not aware of
 4    the -- of what the relationship is.  And I haven't had
 5    time to read this document.  So I'm just going to have
 6    to defer because I don't know.
 7         Q.   Well, you are the restructuring expert.  Can
 8    you offer any views as to why the ownership interests in
 9    the transferor entity would be transferred to ABCLD
10    Income?
11         A.   The only reason I could think of is that it
12    would be -- it would require -- it would -- if you
13    transfer the ownership, you don't have to transfer the
14    deed.  But I thought we had the deeds.  So I don't
15    understand the --
16         Q.   Yeah, I don't either.  I'm just trying to
17    understand why everything moved over, if you will, to
18    the right side, as I look at it.  It is FRE Real Estate,
19    above it ABCLD Properties, and then ABC and the other
20    entities that you have got described.  I don't know
21    where -- and maybe you can answer this -- where ABCLD
22    Income fits in.
23         A.   I don't either.  And I'm really in charge of
24    the assets themselves, so I don't know.
25         Q.   Do you know or did you ever discuss with
0064
 1    anyone, I guess it would be Mr. Moos or Mr. Akin, as to
 2    whether wells Fargo consented to the transfer of their
 3    collateral into FRE Real Estate?
 4         A.   I do not know.
 5         Q.   Have you looked at any loan documents to
 6    determine whether such consent was required?
 7              THE WITNESS:  Haven't we already
 8    stipulated to that?
 9              MR. WEITMAN:  Can you stipulate that
10    consent was required and no consent was ever given?
11              MR. BUNCHER:  I cannot do that at this
12    time, David.  But -- no.
13              MR. WEITMAN:  We may need --
14              MR. BUNCHER:  I assume that's the case.
15    I told you -- you delivered a stipulation of facts that
                        Page 27

HC 00873

Morgan, Richard 01-27-11.txt
16   we told you we would review at 6 something p.m. last
17   night.  And I told you we would get around to looking at
18   it.
19              But I'm not going to sit here and make
20   stipulations on the record here today.  And I'm not
21   being deposed.  So I will get back to you on your
22   requests and stipulations, including that one.
23              MR. WEITMAN:  Okay.  Let me move on to
24   the next one.
25              One of the other things is, you know,
0065
1    the membership interests in our borrower, TCI Texas
2    Properties, was transferred to ABCLD Income.  We would
3    like you to look -- or, Mr. Buncher, if you could
4    stipulate that that too was prohibited under our loan
5    documents and was never consented to.  I mean, we are
6    going to really need that as to each of the nineteen
7    transfers.
8              MR. BUNCHER:  Okay.
9              MR. WEITMAN:  And if you need --
10             MR. BUNCHER:  We will consider any
11   request for a stipulation you make with a reasonable
12   amount of time in order to review such stipulation.  I
13   received a stipulation that's --
14             MR. WEITMAN:  -- probably ten pages or
15   more.
16             MR. BUNCHER:  I don't know how many pages
17   it is because it is not page numbered.  But it is
18   twenty-five or thirty pages long at 6:30 last night.
19   And we will consider your request for stipulations.
20             The purpose of the deposition is to ask
21   the witness what he has knowledge of.  And if he says he
22   doesn't have knowledge of something, then let's move on
23   and ask him something he knows about.  And we will get
24   around to your stipulations in due course.
25             But I'm not -- there's no need to sit
0066
1    here and talk about the stipulations on the record here
2    today.
3              MR. WEITMAN:  Okay.
4         Q.   (BY MR. WEITMAN)  Is it fair to say, Mr.
5    Morgan, that if I wanted to understand the transfers
6    that occurred, since you came in after the transfers had
7    occurred, that the most knowledgeable person would be
8    Mr. Moos?
9              MR. BUNCHER:  Objection.  You already
10   have asked for a deposition of a TCI representative.
11   This man is a representative of the debtor.  Okay.  The
12   document you have put in front of him, Exhibit 14, is a
13   document that's a Purchase Agreement between
14   Transcontinental Realty Investors, of which he is not a
15   representative here today, and another entity for which
16   he also is not a representative.  And he's indicated he
17   has no knowledge of any of the documents in Exhibit 14.
18             MR. WEITMAN:  And he's indicated --
19             MR. BUNCHER:  So let's move on.
20             MR. WEITMAN:  Thank you.
21             MR. BUNCHER:  Okay.  Ask TCI about the
22   document.  They are a party to it.
23        Q.   (BY MR. WEITMAN)  So you had this meeting on
24   December 23 where you were -- they summarized to you the
25   transactions, Mr. Moos and Mr. Akin, correct, as you
0067

Page 28

HC 00874

Morgan, Richard 01-27-11.txt
1  said earlier?
2       A.   They summarized to me the real estate
3  transactions.  And I had a chance to review the real
4  estate, the values, the book values, the promissory
5  notes, the debts, those type things from a curs -- from
6  a broad-range standpoint.
7       Q.   You signed no documents, correct?
8       A.   That's correct.
9       Q.   So the kinds of things that I'm getting at in
10  terms of transfers of ownership interests in stock and
11  transfers of notes and things of that nature, that was
12  not shared with you --
13            MR. BUNCHER:  Object to form.
14       Q.   (BY MR. WEITMAN)  -- at that meeting; is that
15  correct?
16            MR. BUNCHER:  Object to form.
17       A.   My only focus and my only concern and the only
18  thing that was shared with me was about the assets
19  themselves and the structure that is already before us
20  in Exhibit 168.
21       Q.   (BY MR. WEITMAN)  Okay.  Let's talk for a few
22  moments about the transfers made by Transcontinental to
23  the debtor, okay, with respect to various properties.
24            Are you aware of additional transfers
25  that were made of real estate that were subject to the
0068
1  liens of NexBank into FRE?  Is there a document you can
2  look at that will help you?
3       A.   I'm sorry.  You are going to have to -- you
4  took me off base.  I thought we were talking about Wells
5  Fargo.
6       Q.   No, we are moving on past Wells Fargo.
7       A.   Okay.
8       Q.   Now we would like to talk about other
9  transfers that occurred.  Okay.  NexBank.  Let's talk
10  about NexBank for a moment.
11       A.   Okay.
12       Q.   Had NexBank posted the property or certain
13  property for foreclosure that was owned by FRE Real
14  Estate?
15       A.   I'm not aware.
16       Q.   You weren't aware of any foreclosure
17  proceedings that were pending against any of the twelve
18  lenders whose lien --
19            MR. BUNCHER:  That's a different
20  question.
21            MR. WEITMAN:  I know, yes.  That's why it
22  is a new question.
23       Q.   (BY MR. WEITMAN)  Are you aware of any
24  pending --
25       A.   No.
0069
1       Q.   -- foreclosure proceedings?
2       A.   No.
3       Q.   Were you aware that any of the debts were in
4  default and that there had not been any payments made on
5  various debt -- various secured debt?
6       A.   That's too broad of a question.
7       Q.   Were you aware that Transcontinental was in
8  default of its debt to NexBank?
9       A.   That may be an interpretation, so I can't
10  verify that.
11            MR. WEITMAN:  Could you hand to the
                              Page 29

Morgan, Richard 01-27-11.txt
12  witness this joint stipulation?  It may help as we move
13  through some of these things.
14          MR. BUNCHER:  Well, I'm not going to let
15  you examine the witness over your own drafted
16  stipulation that you created.  That's not a document
17  that is properly used to examine the witness.  You can
18  examine him about the documents that the debtor is a
19  party to that we have produced.
20          I mean, I guess he can look at it if it
21  helps.  What do you want him to look at?
22          MR. WEITMAN:  Roman Numeral II, please.
23          MR. BUNCHER:  What paragraph number?
24          MR. WEITMAN:  23.
25          MR. BUNCHER:  Okay.
0070
1       Q.    (BY MR. WEITMAN)  If you would look at A
2  through I, sir.
3       A.    I was looking at 23.
4          MR. BUNCHER:  23A.
5          THE WITNESS:  Okay.
6       Q.    (BY MR. WEITMAN)  There are a whole series of
7  descriptions of real estate that were transferred to FRE
8  Real Estate.  Are you familiar with these transfers?
9       A.    Just a moment.
10          MR. BUNCHER:  He just wanted you to go to
11  here.
12          THE WITNESS:  I know.
13       A.    These are -- I'm assuming for the moment that
14  all of these are in various and sundry lenders.
15       Q.    (BY MR. WEITMAN)  Correct.  And had liens on
16  the property.
17       A.    Okay.
18          MR. BUNCHER:  I mean, if this will
19  shortcut the deposition, we admit that all the
20  properties described on Exhibit 168 were transferred.
21  So I don't know why we need to go through -- to the
22  debtor.  So I don't know why we need to go through all
23  that in the deposition.  That's undisputed.  It is also
24  evidenced by all the documents that you already have.
25          So there's no need to question the
0071
1  witness ad nauseam today about each and every individual
2  transfer and who was the lender and that sort of thing.
3  It is all on there, on the record, in the documents.
4       Q.    (BY MR. WEITMAN)  So you were aware of
5  numerous transfers of real estate from Transcontinental
6  to FRE Real Estate prior to the FRE Real Estate
7  bankruptcy filing, correct?
8       A.    I'm aware of transfers into FRE Real Estate of
9  various and sundry parcels of land.  I did not focus on
10  where it was coming from.
11       Q.    And were you aware, then, of the respective
12  first lien indebtedness owed to the various lenders
13  secured by that real estate?
14       A.    Only to the extent that it was outlined in the
15  transfer -- in this such schedule.
16       Q.    Were you aware -- since you did an assumption
17  of the various debts owed by the transferor entities,
18  were you aware of the unsecured creditors that existed
19  as to TCI Texas Properties or Transcontinental?
20       A.    Remember, I didn't sign the documents.  So
21  that's -- that was not my knowledge or concern.
22       Q.    Well, I'm -- I believe there's somewhere over
                              Page 30

Morgan, Richard 01-27-11.txt

23    here where there is an indication that there's -- well,
24    let me ask you:  What's the total amount of unsecured
25    debt, trade debt that was assumed by FRE Real Estate
0072
 1    under these transactions?
 2         A.    I will go to the schedule if you want me to.
 3              MR. BUNCHER:  On No. 8 of Exhibit 167 it
 4    indicates that there was $1,406,195.75 of unsecured
 5    debt.  However, the debtor is still preparing its final
 6    schedules to be filed pursuant to a Court Order that
 7    allowed us additional time to file the schedules.  So --
 8         Q.    (BY MR. WEITMAN)  Do you know the amount of
 9    the unsecured debt assumed with respect to the TCI Texas
10    acquisition of that real estate?
11         A.    No.
12         Q.    Do you know the amount of unsecured debt or
13    who the creditors are when there was the assumption of
14    the trade debt owed by TCI Adams?
15         A.    I think we are getting to the same thing.
16    There was one global schedule prepared.  The other
17    schedules are being prepared.  And until they are
18    finished, I won't know the details of that.
19         Q.    Are you going to, in your schedules and
20    statement of financial affairs, delineate the amount of
21    unsecured debt, trade debt as to each of the transferor
22    entities?
23              MR. BUNCHER:  I can answer.  Probably
24    not.  I don't know -- I don't think we have any
25    obligation to do that.  We will list the debt that
0073
 1    was of the -- the unsecured debt of the debtor.
 2              MR. WEITMAN:  Right.  But it was part of
 3    the purchase price, was not only the assumption of the
 4    secured debt, but also the assumption of the trade debt.
 5    Is there -- are there books and records that detail that
 6    that you could give me so I can have that question
 7    answered so I know how the trade creditors in each
 8    transferor entity are affected?
 9              MR. BUNCHER:  I'm sure that that
10    information exists, David.  I believe this witness
11    doesn't have that level of detail in terms of what
12    portion of the 1.4 million of unsecured debt came from
13    each individual transferring entity.  But I'm sure that
14    that information from -- that accounting information
15    exists.
16              MR. WEITMAN:  Would you try to make that
17    available to me so I can have that answer?  That's one
18    of the kind of insert items that I have here that I
19    would like you to consider.
20              MR. BUNCHER:  We will take it under
21    advisement.
22    INFORMATION REQUESTED: _____
23              MR. WEITMAN:  Okay.
24              MR. BUNCHER:  You have asked -- just for
25    the record, you have asked for expedited discovery.  And
0074
 1    there's limitations on that discovery as agreed to
 2    between the parties.  You are now making new discovery
 3    requests.
 4              And you insisted upon having a hearing on
 5    February 3rd or some date very soon.  So there is a
 6    limit to the amount of discovery you can ask me for and
 7    expect me to respond to within the time frame.
                              Page 31

HC 00877

Morgan, Richard 01-27-11.txt

```
 8              MR. WEITMAN:  Well --
 9              MR. BUNCHER:  So I will --
10              MR. WEITMAN:  I think that's all --
11              MR. BUNCHER:  I will take your request
12   under advisement, and I will see if I can get that
13   information for you.
14              MR. WEITMAN:  Yeah.  I mean, I would just
15   say that I think those issues have been resolved by
16   virtue of the order that was entered that raised the,
17   quote, email and the subsequent agreements of the
18   parties.  So, I mean, it is a continuing, rolling
19   production and not simply what we have received to date.
20              But you can look at the transcript of the
21   hearing and get -- or discuss this further with Mr.
22   Brown.
23              And, again, with respect to the transfers
24   from Transcontinental into FRE Real Estate, subject to
25   liens, a question that we would like to have answered by
0075
 1   someone is whether this was consented to by the
 2   respective lenders.  If that could be something that
 3   could be answered.  If you need to get loan documents, I
 4   can -- whether it is prohibited.
 5              MR. BUNCHER:  I'm not going to sit here
 6   and have dialogue between you and I about what we may or
 7   may not stipulate to.  The witness is here to answer
 8   questions that the witness knows about, so let's ask the
 9   witness questions.
10       Q.     (BY MR. WEITMAN)  Do you have any knowledge as
11   to whether the transfers from Transcontinental into FRE
12   of the various real estate was consented to by the
13   respective lenders?
14       A.     I do not.
15       Q.     Do you know whether the lenders consented
16   to -- excuse me.  Are you aware of whether that was
17   prohibited under the respective loan documents of those
18   lenders?
19       A.     I am not.
20       Q.     And you never investigated whether it had been
21   consented to or whether it was prohibited when you took
22   this assignment, correct?
23       A.     Correct.
24       Q.     With respect to the transfers of real estate
25   from TCI Adams to the debtor --
0076
 1              MR. BUNCHER:  Can I ask for a
 2   clarification?  As far as the unsecured debt at each
 3   entity that you have requested, I assume you just want
 4   the total amount.  You are not asking me for a list of
 5   each -- every individual creditor at each entity, are
 6   you?
 7              MR. WEITMAN:  It would be helpful just so
 8   I can identify common creditors among the various
 9   entities, please.
10       Q.     (BY MR. WEITMAN)  With respect to the real
11   estate owned by TCI Adams, are you familiar with that?
12       A.     You will have to enumerate the assets
13   themselves.
14       Q.     I'm sorry?
15       A.     I need an enumeration of the assets.
16       Q.     Could you look at paragraph 29, please?
17       A.     Of?
18       Q.     Of which -- the joint stipulation.
```

Page 32

HC 00878

                         Morgan, Richard 01-27-11.txt
19             MR. BUNCHER:  I'm not going -- no.
20             MR. WEITMAN:  It is just a description of
21    the real estate on -- now it is paragraph 32.
22             MR. BUNCHER:  You are assuming that your
23    stipulation is correct.
24             MR. WEITMAN:  No, I'm not.  I'm just
25    asking if he can recall that.  It is 193.731 acres in
0077
1     Kaufman County.
2              MR. BUNCHER:  What paragraph?
3              MR. WEITMAN:  32.
4         Q.   (BY MR. WEITMAN)  Alternatively, can you look
5     at Exhibit 168, which your counsel sent to us last
6     night.  Do you see a TCI Adams there?
7         A.   Just a moment.
8         Q.   TCI Adams, LLC, on the -- it is about the
9     third one down.  It says Kaufman Adams, second page.
10    Sorry.
11        A.   Okay.  All right.
12        Q.   Do you know how that purchase price was
13    established?
14        A.   I do not know exactly.  I know -- I believe
15    most of this -- most of this, everything you see, with
16    minor exceptions, is the seller financing note, plus a
17    debt assumed by buyer, is pretty close to the basis in
18    the property.
19        Q.   Okay.  Do you know whether the indebtedness
20    secured by that real estate was in default?
21        A.   I do not.
22        Q.   Did you do anything to -- any investigation to
23    determine whether it was in default?
24        A.   No.
25        Q.   Did you do anything to determine whether the
0078
1     property had been posted for foreclosure?
2         A.   No.
3         Q.   Do you know whether it was prohibited by the
4     loan documents to transfer that property into FRE from
5     TCI Adams?
6         A.   I do not.
7         Q.   Do you know whether there was any consent by
8     the lender to the transfer?
9         A.   I do not.
10        Q.   And none of those questions were asked in your
11    meeting on December 23 before you took the engagement?
12        A.   No.
13        Q.   Let's look at TCI Amoco, please.  I believe
14    that's on the first page.
15             THE WITNESS:  We are doing the same thing
16    over and over again.
17             MR. BUNCHER:  Yeah.  I thought I said on
18    the record that we admit that these properties on
19    Exhibit 168 were transferred to the debtor.  I don't
20    know why we need to keep asking these questions.  But if
21    you want to use up your 7 hours doing that, that's fine
22    with me.
23        Q.   (BY MR. WEITMAN)  Can you look at the Amoco
24    Building, which is the last item on this 168, the first
25    page, sir?
0079
1         A.   Yes.
2         Q.   Were you aware that this property was subject
3     to the first lien of Petra Mortgage?
                              Page 33

Morgan, Richard 01-27-11.txt

```
 4        A.    I didn't know the lender.  I didn't know the
 5   lender, but I'm aware of the first lien.
 6        Q.    Were you aware whether that property had been
 7   posted for foreclosure?
 8        A.    No.
 9        Q.    Were you aware that the indebtedness had been
10   outstanding and they were exercising rights and remedies
11   at the time of this transfer?
12        A.    No.
13        Q.    Did you investigate as to whether such
14   transfer was permitted under the loan documents?
15        A.    No.
16        Q.    Do you know whether the lender ever consented
17   to the transfer?
18        A.    No.
19        Q.    If I was to go property by property, lender by
20   lender, as evidenced by 168, would you answer the same
21   way as to the preceding questions?
22              And I can summarize them again.  One, you
23   were not aware, were you not, that all of this property
24   was subject to first lien indebtedness and the debt was
25   in default?  Correct?
0080
 1        A.    I understand the question.  I'm now going to
 2   defer to my counsel as to whether I can stipulate that
 3   that is a blanket all the way across.
 4              MR. BUNCHER:  Well --
 5              MR. WEITMAN:  Or we can go one by one.
 6              MR. BUNCHER:  I'm a little confused.
 7   There were some extra nots in the question, two nots
 8   that made it sort of a double negative.  So I'm not sure
 9   exactly what you are asking.
10              But are you asking him whether he knows
11   if any of the loans were in default for any of these
12   properties?
13              MR. WEITMAN:  Correct.  That's the first
14   one.
15        A.    No.
16        Q.    (BY MR. WEITMAN) And you didn't investigate
17   to see if they were in default, correct?
18        A.    Correct.
19        Q.    Did you investigate to see if these transfers
20   were permitted under the loan documents?
21        A.    No.
22        Q.    Did you investigate or learn as to whether the
23   lenders consented to these transfers?
24        A.    Two questions.
25        Q.    Did you investigate?
0081
 1        A.    No.
 2        Q.    Do you know whether they ever consented to
 3   these transfers?
 4        A.    Same answer, no.
 5        Q.    And as to each of these transfers -- this is
 6   dealing with the real estate transfers -- we then are
 7   left with the, quote, selling entity in this chart?
 8        A.    Yes.
 9        Q.    I think it was your testimony, and now I ask
10   you as to each of these entities, were you aware that
11   the ownership interests in these selling entities were
12   transferred to an affiliate of ABCLD Properties?
13              MR. BUNCHER:  I'm going to object on that
14   one because we don't know the relationship between ABCLD
```

Page 34

                         Morgan, Richard 01-27-11.txt
15    Properties and ABCLD Income at this point from the
16    witness's testimony.
17              MR. WEITMAN:  All right.
18         Q.   (BY MR. WEITMAN)  Let's then change it to the
19    question from ABCLD Properties affiliate to:  Were you
20    aware that all of the membership interests in these
21    transferor entities that are referenced as selling
22    entities were transferred to ABCLD Income?
23         A.   I'm not aware of the transfer of any of those
24    to Income.
25         Q.   And as to -- we have a listing of all of these
0082
1     notes.  Do you see them, sir, on the far right?
2          A.   Yes, sir.
3          Q.   You were not aware that these -- were you
4     aware that these notes were transferred by the selling
5     entities to their parent?
6          A.   No.
7          Q.   So you looked at -- if we can look at the
8     totals here, sir.
9          A.   Yes, sir.
10         Q.   So there was roughly $234 million worth of
11    transactions --
12         A.   Right.
13         Q.   -- that occurred with the transfer of the real
14    estate.  And you didn't make any inquiries as to whether
15    the lenders consented to these transfers, correct?
16         A.   Correct.
17         Q.   Nor did you make any inquiries as to whether
18    the respective loan documents prohibited the transfers,
19    correct?
20         A.   I think that's the same question you have
21    already asked.  But, correct again.
22         Q.   Nor whether those properties or their
23    respective debts were in default, you didn't make any
24    inquiry as to that, correct?
25         A.   Correct.
0083
1          Q.   Nor did you know whether any of these
2     properties were subject to foreclosure proceedings?
3          A.   Correct.
4          Q.   And yet --
5               MR. BUNCHER:  I'm sorry.  When you say
6     did he know, are you -- are all these questions asking
7     for his knowledge as of December 23rd?
8               MR. WEITMAN:  Yes, when he took the
9     assignment to become the chief --
10              MR. BUNCHER:  Right.  I just wanted to
11    clarify that.
12              MR. WEITMAN:  -- restructuring officer.
13              MR. BUNCHER:  Because he may have more
14    knowledge now than he did then.
15              MR. WEITMAN:  Right.
16         A.   As of the 23rd, correct.
17         Q.   (BY MR. WEITMAN)  And yet you thought all of
18    these transactions looked appropriate and fair, correct?
19         A.   Not my testimony.
20         Q.   Do you think those transactions were
21    appropriate and fair?
22         A.   Not my testimony.
23         Q.   I'm asking you now.  Do you think that those
24    transactions were appropriate and fair?
25              MR. BUNCHER:  And I'm going to object to
                              Page 35

Morgan, Richard 01-27-11.txt

0084
1    the form because it is compound, No. 1, appropriate and
2    fair.  No. 2, if you are meaning by appropriate whether
3    it was legally permissible under the loan documents, it
4    asks this witness to reach a legal conclusion.  And so
5    it is vague and ambiguous too about what you mean by
6    fair and appropriate.
7         Q.   (BY MR. WEITMAN)  You are a vice president of
8    FRE Real Estate; you are also the chief restructuring
9    officer of the debtor, correct?
10        A.   Correct.
11        Q.   Based on your experience, do these
12   transactions appear to you to be appropriate?  And you
13   can, you know, explain it any way you like, how you view
14   the word appropriate.
15             MR. BUNCHER:  And I voice the same
16   objection.  You have eliminated the compound aspect of
17   it.  I still think it is vague and it asks for,
18   potentially, a legal conclusion.
19             MR. WEITMAN:  No, I'm just asking for his
20   opinion of --
21             MR. BUNCHER:  As you interpret the
22   question, you can answer.
23        A.   Well, I interpret the question with the same
24   answer I have already given.  And, that is, I looked at
25   the real estate.  I knew most of it firsthand.  And what

0085
1    I didn't know, I had a chance to go down and review the
2    financials and the 2011 budgets and deemed that the
3    value of these assets were far in excess of the first
4    mortgage debt and possibly equal to the second mortgage
5    or the promissory notes.  But the promissory notes were
6    of no concern of mine.  I was only concerned about
7    whether they were the first mortgage.
8         Q.   (BY MR. WEITMAN)  I need help understanding
9    why you say the promissory notes of 50 million roughly
10   were of no concern.
11        A.   If you look at the purchase contract, I have
12   got a right of specific provision in there that if there
13   are some unknown questions, if there's other issues and
14   the note can't be paid, it can't be paid.
15        Q.   Let me hand you what's been marked as Wells
16   Fargo Exhibit 10, sir.
17        A.   Okay.  Yes, sir.
18        Q.   Take me through the provision that you think
19   means to you that you need to be less concerned about
20   that note.
21        A.   Starting at the last line of page -- 1.3,
22   starting with, the note.  The note shall be adjusted to
23   be an amount equal to the difference between the
24   purchase price and the property obligations as of the
25   effective date.

0086
1         Q.   What does that mean, please?
2         A.   It simply means that whatever I -- whatever I
3    incur that was undisclosed on these properties, whatever
4    was undisclosed, the transfer documents were sort of an
5    all assets type deal.  It also meant all liabilities.
6              So to the extent that there were
7    undisclosed liabilities, to the extent there's problems
8    with it, to the extent there's foreclosures, whatever
9    happens in these particular assets, to the extent that
10   this buyer incurs any additional liabilities, that
                              Page 36

Morgan, Richard 01-27-11.txt
11    reduction goes directly against the note itself.
12        Q.   The definition of property obligations is
13    trade debt and the mortgage debt means property
14    obligations.
15        A.   Right.
16        Q.   So the trade -- let's use an example, if we
17    may.  All right.  In the case of TCI Texas Properties,
18    you have got 8.5 million of secured debt owed to Wells
19    Fargo.
20        A.   Right.
21        Q.   Let's use the following example that -- say, a
22    half million dollars of trade debt.  Okay.  And the
23    purchase price is 24,050,000.  Why is it not, the note
24    shall be adjusted to an amount equal to the difference
25    between that 24,050,000 and those two items, 8.5 million
0087
1    and 5 or 9 million?
2                  Where are you getting this additional
3    definition that it's whatever the trouble is or whatever
4    problems may develop with the property equals trade
5    debt?
6        A.   That's the way I interpret it.  Because I was
7    concerned about -- the note itself didn't have that
8    language in it.  And I was concerned about the fact that
9    since it was an all inclusive transfer -- it doesn't
10    just mean liabilities.  It includes other things too
11    that are not a normal part of a real estate transaction.
12                  So to offset -- I had made it clear with
13    Mr. LaJone -- I called Mr. LaJone and I said, I'm
14    concerned about this.  He said, don't be concerned about
15    it because the contract rules and the contract says you
16    have the right to adjust the notes.
17        Q.   Let me hand you Wells Fargo Exhibit 11.  By
18    the way, when was your discussion with Mr. LaJone?  What
19    date roughly?
20        A.   Sometime around the 23rd to the 4th.  I'm not
21    sure what date it was.
22        Q.   And he was your counsel or counsel to the
23    seller?
24        A.   He was counsel to the seller.  But I called
25    for an interpretation of this note because I was
0088
1    concerned about the language in it.
2        Q.   And you didn't talk to your own counsel?
3        A.   No.
4        Q.   Because you don't know who your own counsel
5    was then, do you?
6             MR. BUNCHER:  Well, I'm his counsel --
7             MR. WEITMAN:  No, I'm sorry.  Back then.
8             MR. BUNCHER:  -- now.  And I'm not going
9    to let him answer whether he's talked -- or what he has
10    talked to me about.
11             MR. WEITMAN:  No, no.  I'm asking him,
12    did he know who his counsel was during that same period,
13    from December 23 through January 4th.
14        A.   No.
15        Q.   (BY MR. WEITMAN)  So if you look at the
16    promissory note you have -- and you didn't know that
17    that got transferred to TCI Texas Properties' parent,
18    correct?
19        A.   Correct.
20        Q.   Is there any such adjustment language in the
21    promissory note?
                                        Page 37

HC 00883

Morgan, Richard 01-27-11.txt
```
22        A.    I just spoke to you about that.
23        Q.    And there isn't?
24        A.    That's correct.
25                MR. BUNCHER:   I'm going to object to the
0089
 1   form.  The note speaks for itself.
 2        Q.    (BY MR. WEITMAN)  What's your understanding?
 3   Is there any adjustment to that $15.5 million note for
 4   such of the things that you have just described?  What
 5   is your understanding?
 6        A.    Of that note, I agree.  I don't see the
 7   adjustment.
 8        Q.    And is this the same problem or same issue you
 9   have on every one of the roughly nineteen notes that
10   were issued, and purchase agreements?
11        A.    Right.  I have to make one exception to that.
12        Q.    Please.
13        A.    There was one note issued, not from Fenton,
14   not from FRE, but from ABC on the acquisition of the
15   Fenton property stock or the stock of the -- to that,
16   that's not part of the deal -- what I was dealing with.
17        Q.    I would like to spend a little more time
18   understanding your earlier answer where you thought that
19   it's not a bad thing for you to step into acting as the
20   chief restructuring officer because you -- I think you
21   said you saw equity.
22                What are you trying to do in these
23   proceedings where you think you may be able to, quote,
24   use that equity?  Can you explain that a little more for
25   me?
0090
 1        A.    In the proceedings?
 2        Q.    Yes.
 3        A.    I am not an attorney.  What I am is a person
 4   who has a great knowledge of real estate and knows how
 5   to -- as the guy who invented that vacuum cleaner, I
 6   know how to address the problems that others seem to
 7   ignore, and I know how to fix those things.  That's what
 8   I do.
 9                So my goal, my expertise to be applied --
10   I can't speak to the proceedings and how the proceedings
11   are going to go and who is going to win, who is not
12   going to win, what's going to be foreclosed, what's not
13   going to be foreclosed.  I can't speak to that.
14                I can speak to whatever else is left in
15   my portfolio at the end of the proceedings.  My job is
16   to create enough value to make sure everybody gets paid.
17   Now, if that payment runs short of paying off the
18   promissory note -- of the secured note -- it is not even
19   a secured note, just a promissory note.  If the proceeds
20   wind up short of that, it winds up short on an
21   individual asset basis.  If it creates surplus above the
22   whole thing, then the surplus is there.
23                The advantage of the way it is structured
24   here is that if I should happen to sell, for example, a
25   property just enough to cover your debt, then that
0091
 1   promissory note goes away.  Now, I'm focused with what's
 2   left with whatever is created value where Fenton and the
 3   other lenders are concerned.
 4                So the -- my job is to create value.  And
 5   that's where I'm focusing.  I'm leaving the proceedings
 6   and the -- and the documentation and all of this
                          Page 38
```

Morgan, Richard 01-27-11.txt
```
 7   stuff -- I have to sign it, I have to know what it is, I
 8   have to understand it.  But I'm already focusing on how
 9   to create value on the properties, how to make them
10   better, and how to focus and market them in a way that's
11   going to make you whole and all of these gentlemen
12   whole.
13        Q.   Where does the money come from in order to
14   keep this case going and fund the necessary costs of the
15   case?
16        A.   There are two questions -- two answers to
17   that.  Okay.  There are two vacant buildings in this
18   deal, the Teleport building and the Thermalloy building.
19   It so happens that the Teleport building is additional
20   collateral for ABC Commerce Bank.  The Thermalloy
21   building is extra collateral for the NexBank situation.
22            So to the extent they are vacant
23   buildings, there is really only -- if there is really
24   any expense, those can be covered by the cash collateral
25   of the two -- of the secured income producing assets,
0092
 1   Fenton Square, for example, on the NexBank, and on the
 2   Bridgewood on the ABC Commerce Bank, Bridgewood Ranch
 3   Apartments.  Both of them have a great -- a good income,
 4   enough to pay adequate protection, enough to have some
 5   extra cash to do that.
 6            The land is another issue.
 7        Q.   Excuse me.  Are you suggesting that the cash
 8   collateral generated from certain properties, say it's
 9   Fenton Centre or the Amoco Building, that you would want
10   to use that cash in order to support the operations of
11   other properties?
12        A.   Nothing I said suggested that.  And I'm
13   certainly not suggesting that.  I think the plan is that
14   the cash generated by the assets that are collateralized
15   by these lenders stays within the use of collateral for
16   that particular asset base that's under its collateral,
17   whether it be additional collateral or primary
18   collateral.  Very simple.
19            MR. BUNCHER:  What he's saying is the
20   NexBank loan is cross-collateral.  To the extent a
21   lender's loan is cross-collateralized where the
22   collateral is an income producing property in one
23   instance, Fenton Centre for NexBank, and on the other
24   they have a vacant building as collateral, that we will
25   be seeking permission to use the cash on one property to
0093
 1   pay expense on another property to the -- only to the
 2   extent, though, that --
 3            MR. WEITMAN:  Same lender.
 4            MR. BUNCHER:  -- the properties are
 5   collateralized with the same lender.  That's what he was
 6   speaking about.
 7            MR. WEITMAN:  Okay.
 8        Q.   (BY MR. WEITMAN)  There was a cash collateral
 9   motion and some statements, I think, from Mr. Buncher on
10   the record reflecting a view requesting, not now, but in
11   the future, to use $20,000 a month in order to maintain,
12   protect, insure the raw land property subject to liens
13   of other lenders.  Is that off the table now?
14            MR. BUNCHER:  No.  That -- if you will
15   recall, Mr. Crown testified that that 20,000 a month was
16   expense related to the vacant buildings.  It was not
17   expense related to the land.  You asked him
```
Page 39

Morgan, Richard 01-27-11.txt

18  specifically, and he clarified that that was the case.
19  And --
20              MR. WEITMAN:  I wasn't at the hearing.
21              MR. BUNCHER:  Well, somebody asked him.
22              MR. WEITMAN:  Okay.
23              MR. BUNCHER:  You weren't at the cash
24  collateral hearing?  Okay.  Well, somebody -- whoever
25  was -- I guess it was Warner -- I'm sorry.  You are
0094
1   right.  Mike Warner questioned Mr. Crown at the cash
2   collateral hearing about the 20,000 a month.  Because in
3   some of the pleadings, it had indicated that was with
4   expense related to the land.
5              Mr. Crown explained that actually is the
6   expense related to the vacant buildings, not the land.
7   And that there's really no expense related to the land
8   at this particular time of year because they are not
9   mowing the grass at the land.
10             MR. WEITMAN:  Okay.
11             MR. BUNCHER:  So he was -- it was
12  clarified that the 20,000 a month didn't have to do with
13  the land, is the point.
14         Q.   (BY MR. WEITMAN)  Can you just corroborate
15  that or state on the record that that is your
16  understanding as well, as the debtor's representative?
17         A.   That's correct.
18         Q.   There's a statement in the Debtor's Emergency
19  Motion to use Cash Collateral --
20             MR. BUNCHER:  That's the statement Mr.
21  Warner specifically --
22             MR. WEITMAN:  I'm going to the next
23  piece.  Please, if you would allow me to ask the
24  question.
25             MR. BUNCHER:  Sure.  Sorry.  I just
0095
1   thought that's what you were asking.
2         Q.   (BY MR. WEITMAN)  It says the fair value of
3   the debtor's real properties is approximately $234
4   million.  The amount of secured claims representing the
5   first lien debt on the debtor's properties to be
6   scheduled in this case will be approximately $182
7   million.  Thus the debtor believes there is
8   approximately $50 million of equity in its properties
9   beyond the first lien secured debt.
10            It is not equity, is it?  It's really you
11  have got 50 million of unsecured debt, correct?
12         A.   Yeah.
13         Q.   Is that a yes?
14         A.   Correct.
15         Q.   So it is incorrect to say equity, correct?
16         A.   It is not incorrect to say equity in the
17  extent -- from the first lender standpoint.  First
18  lender standpoint, there's a value over and above the
19  loan.  And that's the way it should have been done.
20         Q.   Can we go back to the Purchase Agreement,
21  please, Wells Fargo Exhibit 10.
22             MR. BUNCHER:  That's Exhibit 10 right
23  there.
24         Q.   (BY MR. WEITMAN)  In the example we used, Mr.
25  Morgan, we spoke of there being a $24,050,000 purchase
0096
1   price, less than, my example, if you recall, 9 million
2   of trade debt and mortgage debt.  Do you remember that
                              Page 40

Morgan, Richard 01-27-11.txt

```
 3   example?
 4        A.   Right.
 5        Q.   Tell me, again, how you view the adjustment
 6   under the note to allow you to do just about -- I mean,
 7   tell me how that adjustment works.  I still am lost on
 8   that.  I'm sorry.
 9        A.   Let me look at it from your perspective.
10   That's what I want you to look at.  From your
11   perspective, you have got 8.35 million of debt.  The
12   question is, is this asset worth more than that.  You
13   don't have to trouble yourself with what this, quote,
14   unquote, equity in the notes are.  Because if it comes
15   down to the end of the day and I can only produce 8.352
16   million in sales, the note goes away.
17        Q.   What do you mean?  What provision of this
18   document says that the note has no effect; that they are
19   not still in there as an unsecured creditor against the
20   FRE Real Estate?
21        A.   It is a promissory note.  It is a note for
22   this particular property against that particular asset,
23   an unsecured note.
24        Q.   It is not against the particular asset.  It is
25   an entity.  FRE Real Estate is obligated to pay roughly
0097
 1   15.5 million.  It is not solely as to that entity,
 2   unless there's something else you know about.
 3             In other words, we now have a $15.5
 4   million obligation of FRE -- excuse me -- of FRE in its
 5   bankruptcy proceeding.
 6        A.   Right.
 7        Q.   Right.  So it doesn't -- I don't understand
 8   how it goes away.
 9        A.   It goes away because that promissory note is
10   issued from FRE -- an individual note is issued to the
11   seller on that particular property.
12        Q.   No, it isn't, sir.  It is a general obligation
13   of FRE Real Estate.  So if there should be any -- any
14   equity from any of the other properties transferred,
15   this 15 million -- $15.5 million obligation has a right
16   to those dollars from other properties that have been
17   transferred in, does it not?
18        A.   You are making a legal interpretation.  I'm
19   telling you --
20        Q.   I'm trying to understand --
21        A.   Well, I'm telling you how I understood it.
22        Q.   -- your explanation.
23        A.   That's all I can do.  Okay.
24             MR. BUNCHER:  The note does refer to the
25   assumption of the mortgages.  But he's just telling you
0098
 1   what his understanding -- I think we are getting into
 2   argument now with the witness.  The note says what it
 3   says.  So what do you want -- what do you want to ask
 4   him?
 5             MR. WEITMAN:  What I'm trying to
 6   understand is Mr. Morgan's statement that if there's --
 7   that if the Wells Fargo collateral gets sold for an
 8   amount insufficient to pay the entire secured debt of
 9   Wells Fargo, then that $15.5 million obligation goes
10   away and it is not against the general bankruptcy
11   estate.  I believe that's his testimony.
12             THE WITNESS:  That's the way I understand
13   it.
```

Page 41

HC 00887

Morgan, Richard 01-27-11.txt

14        Q.   (BY MR. WEITMAN)  Okay.  Is there any
15   provision you see in that Purchase Agreement that
16   suggests that that is correct; that that understanding
17   is correct?
18                  MR. BUNCHER:  The Purchase Agreement?
19        Q.   (BY MR. WEITMAN)  Or the note, for that
20   matter?
21        A.   I have spoken to the note already.  I agree
22   the note --
23        Q.   The note doesn't have it.
24        A.   I just -- the note -- what I'm saying, the
25   note -- I interpreted the note as being a promissory
0099
1    note against that particular entity for that particular
2    property and it had to be paid.  The question is, what
3    offset rights do I have.  And I looked at the -- the one
4    I just read you back, and I interpreted that to be an
5    offset right.  I could be wrong.  That's the way I
6    understood it, and that's the way I'm proceeding with
7    it.
8         Q.   Now, if, of course, the seller -- excuse me.
9    If the structure was such that the seller was just
10   entitled to a residual interest after the secured debt
11   and the trade debt, I could, you know, understand that.
12   But it is not a residual interest.  You have an FRE note
13   created, which is now sort of a general obligation of
14   FRE in the case.
15        A.   I can't -- you are providing me with a legal
16   interpretation.  I'm not an attorney.
17        Q.   And, again, this structure, the Purchase
18   Agreement and the note, as summarized in your schedule,
19   168, you think it works that way for every seller note,
20   correct?
21        A.   That's the way I understand it.
22        Q.   And this is based on your talking to Mr.
23   LaJone, seller's counsel?
24        A.   I have not covered the aspect you just brought
25   about.  My question to him was, if I run into problems
0100
1    relative to Fenton, for example, and there is obviously
2    some stuff that we should not have assumed or shouldn't
3    have taken on, undisclosed items, do I have a right to
4    adjust the purchase note.  And he said the contract
5    prevails.  So your rights under the contract prevail.
6                  MR. BUNCHER:  Can we have another break?
7    It is a quarter to 12.
8                  MR. WEITMAN:  You are right.  I need to
9    go to my meeting.  Thank you.
10                 (Lunch recess, 11:43 a.m. to 12:31 p.m.)
11        Q.   (BY MR. WEITMAN)  Mr. Morgan, earlier you said
12   that you are not getting paid by FRE --
13        A.   Correct.
14        Q.   -- for your services?
15        A.   Correct.
16        Q.   You were just going to negotiate some type of
17   success fee?
18        A.   Exactly.
19        Q.   And whom will you negotiate that with?
20        A.   Mr. Akin.
21        Q.   Mr. Akin?
22        A.   Uh-huh.
23        Q.   How are you presently getting paid?
24        A.   I mentioned to you, I'm getting paid through
                        Page 42

HC 00888

Morgan, Richard 01-27-11.txt
25   two sources.  Energy Advisors pays me a small paycheck,
0101
1    like $2800 a month.  My wife owns a company called FNX.
2    And I work for her under that.  And it gets a consulting
3    fee of about $12,200 a month, something like that.
4         Q.   And where does that business come from?  Is
5    that --
6         A.   I work for her, so it is still -- it is still
7    all my efforts.  It is just the way it is taken.
8         Q.   And are those clients of -- what do you call
9    it, Energy Advisors?
10        A.   Energy Advisors.
11        Q.   And your wife's company, are the clients
12   Transcontinental affiliates?
13        A.   No.
14        Q.   Or nothing connected with Transcontinental?
15        A.   No.
16        Q.   And nothing connected with --
17        A.   when you say nothing, let's be sure.
18        Q.   I'm sorry.  The consulting work is not for
19   these real estate companies that we have been discussing
20   today, correct, or any of their related entities?
21        A.   I mentioned to you about the ATI Mineral
22   Holdings earlier.  That ATI Mineral Holdings is a joint
23   venture between Transcontinental, American.  And all it
24   does is it holds -- it holds two things.  It holds the
25   mineral leases underneath the particular areas that were
0102
1    owned by those three entities.  It also now owns a
2    vested interest to the extent of their ownership in
3    some -- a promissory note, but it's cash due.
4         Q.   But is it -- is it accurate to say that the
5    income you are receiving, while you are on this
6    engagement as vice president and also restructuring
7    officer, comes from your advisory firm, which has a
8    business venture or ventures with Transcontinental?
9         A.   No.
10        Q.   well, did you not say earlier that this Energy
11   Advisors has ventures of some sort with the
12   Transcontinental folks?
13        A.   Again, only to the extent that I mentioned to
14   you a moment ago.  Only to the extent of ATI Mineral
15   Holdings, Inc., which is a joint venture -- a joint
16   venture -- in a joint venture with Keystone Exploration
17   called Trinity East, LLC.
18        Q.   And the owners of that entity, are they Gene
19   Phillips related or not?
20        A.   Owners of what entity?
21        Q.   This ATI that you just described.
22        A.   I explained that again.  Transcontinental
23   Realty is the T -- ATI Mineral Holdings:  American
24   Realty Trust, Transcontinental, and Income Opportunity
25   Realty Trust.  Those three own their respective
0103
1    percentage interest in the membership of that entity.
2         Q.   Are they also on -- managers or any kind of
3    management role in that entity?
4         A.   No.
5         Q.   And are any of the consulting fees that your
6    wife has, are they coming from any of the
7    Transcontinental or American Realty entities?
8         A.   No.
9         Q.   What business is she in?
                              Page 43

HC 00889

Morgan, Richard 01-27-11.txt

10      A.   It all comes -- as I mentioned to you, it is
11  the way -- I'm 71; she's 55.  So when I turned 65, we
12  set up an FNX, LLC.  That's her company.  So part of the
13  fees come in to her company, which then she reports the
14  maximum security -- social security holdings.  And
15  because I'm over 65, I just take my social security and
16  a small salary.
17      Q.   There are two other entities that Mr. Lewis
18  represents you in in the bankruptcy proceedings,
19  separate other debtor entities.  Do you recall?
20      A.   Yes.
21      Q.   Signature Athletic Limited Partnership?
22      A.   Right.
23      Q.   And the other one is --
24      A.   NLP Cooley.
25      Q.   -- NLP Cooley?
0104
1       A.   Uh-huh.
2       Q.   And in each case, you are a vice president of
3   the debtor entity, correct?
4       A.   Correct.
5       Q.   And in each case, kind of like what we have
6   been talking about, there were transfers, were there
7   not, into these entities around December 23 --
8       A.   Correct.
9       Q.   -- into these respective debtor entities?
10      A.   Correct.
11      Q.   And they were subject to secured debt,
12  correct?
13      A.   Yes.
14      Q.   But yet you filed these as single asset real
15  estate cases.  Why were these two, Signature Athletic
16  and NLP Cooley Associates, why weren't those assets, if
17  you will, put into FRE with a large FRE bankruptcy?
18      A.   I can't tell you that.  I don't know.  The --
19  I know that John Lewis, when we have been discussing --
20           MR. BUNCHER:  Well, wait a second.
21  Anything that you know as to why it was done that comes
22  from your counsel Mr. Lewis, don't tell him about that.
23      A.   Yeah, I don't know.
24      Q.   (BY MR. WEITMAN)  When you met with Mr. Akin
25  and Mr. Moos, December 23, did they discuss these two
0105
1   other properties?
2       A.   No.
3       Q.   When was it discussed that you would also be
4   the chief restructuring officer and principal of these
5   two new debtor entities?
6       A.   At the same -- at the same meeting.
7       Q.   So it was discussed?
8       A.   Uh-huh.  That wasn't the question.  You asked
9   me why, and I don't know the answer.
10      Q.   So, if you will, we have got the nineteen
11  transferor entities into FRE Real Estate, and then we
12  have two others for which there are special purpose
13  entities or single real estate entities for Signature
14  and NLP Cooley, right?
15      A.   Right.
16      Q.   And in each case, you have got separate
17  unsecured creditors in each of Signature and NLP,
18  correct?
19      A.   Right.
20      Q.   You have got separate secured debt of each,
                          Page 44

```
                          Morgan, Richard 01-27-11.txt
21   correct?
22        A.   Right.
23        Q.   Do you know, were they subject to foreclosures
24   or anything like that?
25        A.   I don't.
0106
 1        Q.   Were there also notes that were issued back to
 2   the transferor entity?
 3        A.   They were.  I don't have the specific dollar
 4   amounts on them.
 5        Q.   And yet you have no understanding as to why
 6   these two entities could file as single asset real
 7   estate cases and FRE filed with nineteen transfers in
 8   their -- nineteen transferor entities having transferred
 9   their assets into FRE before bankruptcy?
10        A.   Well, the reason why they could -- they could
11   have been filed in nineteen different bankruptcies.  The
12   question as to why those two were separate, I don't
13   know.
14        Q.   Did you consider doing nineteen separate
15   bankruptcies for the FRE?
16        A.   No, that wasn't the way it was presented to
17   me.  No.
18        Q.   So it was -- it had already been accomplished
19   at the time, correct?
20        A.   What?
21        Q.   At the time that they hired you or offered the
22   job to you, the transfers had already occurred into FRE,
23   correct?
24        A.   That's correct.
25        Q.   Had the transfers already occurred with
0107
 1   respect to these two other entities, Signature Athletic
 2   and NLP?
 3        A.   I believe so.
 4        Q.   In the Statement of Financial Affairs, NLP
 5   Cooley Associates, it says that the owner of this LP --
 6   there's a general partnership interest of 1 percent
 7   owned by ABCLD Properties and also owned -- a limited
 8   partnership interest of 98 percent owned by ABCLD
 9   Properties, LLC.  Do you recall that or not?
10        A.   I don't recall the details of that.
11        Q.   And ABCLD Income is referenced as having a 1
12   percent limited partnership interest.  Let me show you,
13   if I may.
14             MR. BROWN:  Let's go ahead and mark this.
15             (Exhibit 169 marked.)
16        A.   And may I see the other one also?
17        Q.   (BY MR. WEITMAN)  Sure.
18             MR. WEITMAN:  Make this 170.
19             (Exhibit 170 marked.)
20        A.   The question was, why two bankruptcies?
21        Q.   (BY MR. WEITMAN)  Yes.
22        A.   They came from three different sellers.
23        Q.   And is that the structure that you are
24   familiar with, with the relationship at ABCLD Income
25   and --
0108
 1        A.   I'm not familiar with the structure in toto.
 2   But the point is that EQK Holdings was the seller of
 3   one, and some other entity was the seller of the other
 4   one.
 5        Q.   And like the others, you don't know, do you,
                              Page 45
```

Morgan, Richard 01-27-11.txt
6   whether those transfers into these respective entities
7   was prohibited under the loan documents?
8        A.   That's correct.
9        Q.   And you don't know whether the properties were
10  posted for foreclosure?
11       A.   Correct.
12       Q.   And you don't know whether the notes that were
13  issued to the sellers -- you didn't negotiate those
14  notes, correct?
15       A.   Correct.
16       Q.   Do you know whether you listed the seller
17  entity as a creditor in the bankruptcy case?
18       A.   The seller entity?
19       Q.   Yes, since you gave them a note.
20       A.   You are inserting something I didn't say.  I
21  didn't say I gave them a note.
22       Q.   I said, do you know?
23       A.   Well, I don't want to argue with you.  But you
24  said, did you give them a note.  I said I'm assuming
25  there was.  I don't remember the transaction.  So that's
0109
1   what I remember -- that's what I know.
2        Q.   Well, let me hand you the Summary of Schedules
3   and assets and liabilities, 171, on Signature Athletic
4   Limited Partnership.
5             (Exhibit 171 marked.)
6        Q.   This is creditors holding unsecured priority
7   claims.  Do you see the seller entity as a creditor?
8        A.   No.
9             (Exhibit 172 marked.)
10       Q.   And here is the 172, the Summary of Schedules
11  for NLP Cooley Associates.
12       A.   Okay.
13       Q.   Do you see -- do you see anywhere where the
14  selling entities are listed as unsecured creditors?
15       A.   No.
16       Q.   But I think it may have been your testimony
17  that you were informed that there would be a similar
18  structure to your -- to these respective entities
19  receiving the assets of the transferor entities --
20       A.   I had a schedule.
21       Q.   -- on the note.
22       A.   I had a schedule.  I can't attest to you at
23  this moment that the transaction included a promissory
24  note back to these entities, okay, the selling entities.
25  I don't know that for certain.
0110
1        Q.   Do you think that there's equity beyond the
2   secured debt that's reflected in the Schedules?
3        A.   Yes.  With the debt, yes.
4        Q.   Would you be kind enough to try to answer that
5   question for me after you look at the transcript to
6   determine --
7        A.   Yes.
8        Q.   -- whether or not there were notes that were
9   issued?
10       A.   Yes.
11       Q.   Thank you.
12  INFORMATION REQUESTED: _____
13            (Exhibit 173 marked.)
14       Q.   Let me hand you Exhibit No. 173.  This is the
15  matrix list of creditors for FRE Real Estate.  It was
16  filed as document 26 with the Court.  I would like you
                              Page 46

                         Morgan, Richard 01-27-11.txt
17    to look at that at the same time you look at Exhibit
18    168, which is this chart that Mr. Buncher was kind
19    enough to share with me last night.
20         A.   Right.
21         Q.   Can you -- and I will give you some time.  Can
22    you locate the selling entities that got the notes on
23    the matrix list of creditors?  And if you want, maybe
24    what we will do is we will go through -- I mean, since
25    they are all alphabetical, let's go Income Opportunity
0111
1     Realty Investors, are they there?  Could you just answer
2     that since it is alphabetical, sir?
3          A.   No.
4          Q.   Is IORI Centura, later changed to Centura Land
5     Corporation, are they there on the list?
6               MR. BUNCHER:  Next page.  No.
7          A.   No.
8          Q.   (BY MR. WEITMAN)  Transcontinental Realty
9     Investors, Inc., are they there?
10              THE WITNESS:  Which one?
11              MR. BUNCHER:  (Indicating.)
12         A.   No.
13         Q.   (BY MR. WEITMAN)  TCI McKinney Ranch, Inc., is
14    that there?
15         A.   No.
16         Q.   TCI 109 Belt Line?
17         A.   No.
18         Q.   Coventry Point?
19         A.   No.
20         Q.   Thornwood Land and Cattle, LLC?
21         A.   No.
22              MR. BUNCHER:  Louder.
23         A.   No.  I'm sorry.
24         Q.   (BY MR. WEITMAN)  Transcontinental Westgrove,
25    Inc., later changed the name to Parkway North?
0112
1          A.   No -- well, let me check Parkway North.  No.
2          Q.   TCI Texas Properties?  And then also look for
3     Texas -- or TX Portfolio.
4          A.   TX what?
5          Q.   Well, if you would, look at your list with Mr.
6     Buncher, please.
7               MR. BUNCHER:  Well, if you already -- are
8     they on there or not?  If you look --
9               MR. WEITMAN:  I need to get his answer.
10              MR. BUNCHER:  Okay.
11         A.   Okay.  Now, let's go to the one we were
12    looking for.
13         Q.   (BY MR. WEITMAN)  TX Portfolio, LLC?
14         A.   No.
15         Q.   Or TCI Texas Properties, do you see that?
16         A.   No.
17         Q.   TCI Hunters Glen?
18         A.   No.
19         Q.   Or BW Ranch?
20         A.   B?
21         Q.   B, as in boy, W Ranch?
22         A.   No.
23         Q.   TCI Amoco Property, LLC?
24         A.   No.
25         Q.   1340 Poydras, P-o-y-d-r-a-s, LLC?
0113
1          A.   No.
                              Page 47

HC 00893

Morgan, Richard 01-27-11.txt

```
 2      Q.   Westgrove Air Plaza, Ltd?
 3      A.   No.
 4      Q.   TCI Bridgewood, LLC?
 5      A.   No.
 6      Q.   TCI Adams, LLC?
 7      A.   No.
 8      Q.   TCI Pantaze, P-a-n-t-a-z-e, LLC?
 9      A.   No.
10      Q.   TCI Ridgepoint?
11      A.   No.
12      Q.   N, as in Nancy, V, Victor, Bridgewood, LLC?
13      A.   No.
14      Q.   NV Adams, LLC?
15      A.   No.
16      Q.   NV Pantaze, LLC?
17      A.   No.
18      Q.   NV Ridgepoint, LLC?
19      A.   No.
20      Q.   ART Collection, Inc.?
21      A.   No.
22      Q.   ART Palm, LLC?
23      A.   Pardon me.  Are you saying A-R-C or A-R-T?
24      Q.   ART, A-R-T, Collection or A-R-T Palm?
25      A.   No.
0114
 1      Q.   American Realty Trust?
 2      A.   No.
 3      Q.   Or Seniac, S-e-n-i-a-c, LLC?
 4      A.   No.  I think that should be Senlac.  I think
 5   that's a typo.
 6      Q.   Or I'm reading it wrong.  It may be Senlac
 7   too.  Sorry.
 8      A.   No.
 9      Q.   So roughly $49-, $50 million worth of
10   unsecured creditors' claims are not reflected or the
11   names of those creditors aren't listed on the matrix
12   list?
13      A.   Not on the matrix list.  I believe --
14      Q.   Can you account --
15      A.   I believe it was stated earlier that the
16   actual total list is now being compiled.  It is not
17   done.
18           THE WITNESS:  Is that right?
19           MR. BUNCHER:  We said the schedules
20   weren't done yet.
21      A.   The schedules.
22      Q.   (BY MR. WEITMAN)  But this is something
23   different.  This is a matrix list of creditors --
24      A.   Right.
25      Q.   -- to notify creditors to -- it is usually
0115
 1   used for sending out the notices for the meetings of
 2   creditors to attend the meeting.
 3           You have attended a bunch of those,
 4   haven't you?
 5      A.   Yes, sir.
 6      Q.   Because you not only have your individual
 7   bankruptcy, but you have really been a restructuring
 8   person for numerous other Transcontinental affiliate
 9   bankruptcies, haven't you?
10      A.   No.
11      Q.   Oh, this is your first one?
12      A.   Yes.
```

Page 48

HC 00894

Morgan, Richard 01-27-11.txt

13        Q.   Would Mr. Moos and Mr. Akin, in your opinion,
14   know the reason why you have separate bankruptcies for
15   NLP Cooley and Signature Athletic Limited Partnership?
16        A.   No.  But I can perceive that there were two
17   different entities -- there were two different sellers.
18   This was EQK Holdings was one and some other entity was
19   the other.  Total -- two different entities.  And I
20   don't know how they relate to Transcontinental or if
21   they are even a part of it.  But there were two -- there
22   were different sellers for those different ones.
23        Q.   So is it your view that if there are different
24   sellers, there should be a separate bankruptcy?
25        A.   No.  My view is that there was a reason -- it
0116
 1   looks like there were different sellers.  It may not
 2   even be related to those two entities.  I'm not sure.
 3        Q.   Is it your testimony that if the former
 4   officers and directors of the transferor entity for
 5   Signature Athletic, if they were related to
 6   Transcontinental, they should have been in the FRE
 7   bankruptcy?
 8        A.   That's not my --
 9        Q.   I think you were saying if there were
10   different sellers -- explain that again, please.
11        A.   There are two entities.  EQK Holdings was one
12   seller; and the other one was some other entity,
13   Continental something.  There was different entities
14   that sold the properties.
15        Q.   But there were different entities in FRE that
16   transferred properties into FRE?
17        A.   Which is all related to those public trusts.
18   I don't know how those two properties' sellers related
19   to ARI, ART, and TCI.  I don't know the relationship.
20        Q.   Well, there were transfers also on December
21   23, 2010, correct?
22        A.   Correct.
23        Q.   So you don't -- and it says that EQK Holdings
24   has an address at 1800 Valley View Lane, Suite 300,
25   Dallas  75234, correct?
0117
 1        A.   If that's what it says, yes, sir.
 2        Q.   That's the home of everyone we have been
 3   talking about in this case this morning?
 4        A.   It doesn't change my testimony.  The question
 5   is:  Do I know why, I don't.  But from the evidence of
 6   the two -- the fact that there were two separate
 7   sellers, how they are related to the three -- the three
 8   entities that were part of this deal, I don't know.  I
 9   don't know if they are public or they are private.  I
10   don't know exactly what the relationship was.
11        Q.   And with respect to Signature Athletic, it
12   says that the -- the prior party involved was
13   Continental Signature that withdrew as of December 23,
14   2010.  Are you aware of that?  So we have got the EQK
15   Holdings as to NLP.  And in Signature, we have got
16   Continental Signature, Inc.
17        A.   Uh-huh.
18        Q.   As presumably the transferor entities in each
19   case, correct?
20        A.   Right.
21        Q.   And you cannot explain why these were separate
22   bankruptcies.  And yet we have a consolidated one for
23   all these other transferor entities in FRE, correct?
                                Page 49

HC 00895

Morgan, Richard 01-27-11.txt

```
24          A.   I don't know how explaining means to you.  I
25     have told you that it is evident that those two sellers
0118
 1     were separate entities from these -- from these three.
 2     These three are public companies.  Okay.  I don't
 3     know -- it doesn't appear that those are public
 4     companies, so I'm sure there was some reason.  But I
 5     don't know the reason.
 6          Q.   Well, it wouldn't appear to me one way or the
 7     other on any of these as to whether they were owned by
 8     public companies, the transferor entities.
 9          A.   It doesn't appear that way to me either.  So I
10     can't testify as to why it was done.
11          Q.   Okay.  And, again, you are the chief
12     restructuring officer for these two entities, as well as
13     FRE, correct?
14          A.   That's correct.
15          Q.   How do you propose to reorganize NLP Cooley
16     Associates?
17          A.   Reorganizing?
18          Q.   Yeah.  Are you going to try to sell the assets
19     and --
20          A.   Yes.
21          Q.   -- pay off the secured lender?
22          A.   Yes.
23          Q.   And then you pay the unsecured creditors to
24     the extent there's equity, correct?
25          A.   Correct.
0119
 1          Q.   And you will check at some point and find out
 2     if there was a note and whether you need to pay the
 3     transferor entity, correct?
 4          A.   We will check that when we ask -- when they do
 5     the responding to.
 6               (Exhibit 174 marked.)
 7          Q.   Mr. Morgan, I'm going to show you Exhibit 174.
 8     That's the Debtor's Cash Collateral Motion.  And I would
 9     ask you to move to the very end of it where there's an
10     Exhibit B.
11          A.   Okay.
12          Q.   I'm sorry.  It is toward the middle.  Forgive
13     me.
14          A.   What exhibit?  Because there's a bunch of
15     Exhibit B pages.
16          Q.   I'm sorry.  It is the first one dealing with
17     Fenton Centre I and II.  I'm sorry.  On the top it will
18     show Exhibit B, 2 of 26.
19          A.   I'm looking at it, yes.
20          Q.   And then if you would, sir, this would be
21     helpful -- pardon me while I reach -- this one here,
22     which is the Debtor Interview Page, Exhibit 5.  Now, as
23     I understand it, as to Fenton Centre I and II, the
24     secured lender is NexBank, correct?
25          A.   Right.
0120
 1          Q.   And NexBank, according to an earlier schedule
 2     that's in the Debtor Interview, is owed roughly $61.5
 3     million.  Is that your understanding?
 4          A.   Right.
 5          Q.   Now, it says on this Exhibit 5 that we have
 6     that there are unpaid real estate taxes owing on this
 7     property of $1.458 million.  Do you see that?
 8          A.   Yes.
```

Page 50

HC 00896

Morgan, Richard 01-27-11.txt

```
 9        Q.   Yet there's net cash flow of -- for the next
10    three months of anywhere from 234,000 to about 281,000,
11    correct?
12        A.   Yes. Well, I'm sorry. Okay. Go ahead.
13        Q.   Do you know where the money will come from in
14    order to pay the old taxes?
15        A.   Come from to pay the old taxes?
16        Q.   Yes.
17        A.   Well, it all depends. There was a sweep of
18    assets in October 14 by NexBank that swept a bunch of
19    cash out of the Fenton Centre property. At that time
20    there was $1.13 million in the tax escrow account, which
21    is now gone.
22             The answer to the question, though, in
23    most of these, is that real estate taxes, as I
24    understand it, can be financed over a five-year period
25    under the bankruptcy code.
0121
 1        Q.   Okay. So there's no present intention to pay
 2    these taxes from any source of income, correct, other
 3    than you --
 4        A.   To pay the past due taxes.
 5        Q.   To pay the past due.
 6        A.   I understood our obligation right now is to
 7    set this aside and to deal with the taxes separately,
 8    but to be sure to escrow on a monthly basis the taxes
 9    for the future.
10        Q.   So you are escrowing 2011, correct?
11        A.   That's what this real estate taxes is.
12        Q.   The 113,158 --
13        A.   Right.
14        Q.   -- is the go forward, post petition taxes,
15    correct?
16        A.   Right, that's per -- that's right. That's
17    correct.
18        Q.   Do you know what the principal and interest
19    payments were on this loan before it went into default?
20        A.   I don't know exactly.
21        Q.   But the property produced insufficient
22    revenues in order to service the principal and interest
23    on it; is that correct?
24        A.   Well, tell me what it is, and I can tell you
25    whether that's the case or not.
0122
 1        Q.   Well, suffice it to say, there wasn't enough
 2    money to pay taxes last year either, correct?
 3        A.   That's not necessarily so.
 4        Q.   Well, how do you account for the fact that
 5    there is a 1,458,000 owed prepetition on the taxes?
 6        A.   Well, from a normal lender's protected
 7    standpoint, the lender is responsible to be sure there
 8    is taxes. And the way you do it is you escrow the
 9    taxes, which was done. So I can't say to this
10    particular property what happens between -- what happens
11    to the over $1 million that was swept out for the
12    purpose of taxes, where does that go. Does it come back
13    to the debtor, in which case the debtor can pay the
14    taxes. Or is it swept against the loan, in which case
15    it reduces principal balance.
16        Q.   Do you envision NexBank -- excuse me. Would
17    the debtor, at any point in time, to the best of your
18    knowledge, be seeking to use any of this net operating
19    income or net cash flow in order to maintain, protect,
                          Page 51
```

HC 00897

Morgan, Richard 01-27-11.txt

20  or ensure other lenders, such as Wells Fargo, as to
21  their real estate collateral?
22       A.   Every lender and the assets underneath that
23  lender has its own cash pool; and it stays within the
24  confines of that lender's collateral, period.
25       Q.   Has FRE received any capital infusions from
0123
1   its parent or does it have any other sources of -- you
2   know, for a capital infusion of some sort in order to
3   restructure or refinance these obligations?
4        A.   Which obligations?
5        Q.   Owed to -- let's try, the obligations owed to
6   NexBank.
7        A.   On the NexBank.
8        Q.   Yes.
9        A.   The answer there is to create more value, to
10  make the property more valuable.  And I'm in the process
11  of getting that -- I'm in the process of working on
12  that.
13       Q.   How will you create value on this property?
14       A.   By adding tenants.
15       Q.   I'm sorry?
16       A.   Adding tenants.
17       Q.   And this is an office building.  Do you know
18  what the percentage of occupancy is?
19       A.   Roughly 57 percent.
20       Q.   This was one of the assets that belonged or
21  started in FRE, correct?  Or was this transferred into
22  FRE?
23       A.   No, this was -- this was a company that owned
24  FRE all along.
25       Q.   And were there other assets in FRE prior to
0124
1   December 23?
2        A.   No.
3        Q.   So absent the transfer of all of the other
4   assets, okay, would this not be like your other
5   bankruptcies where this would be a single asset real
6   estate case?
7        A.   Absent what?
8        Q.   Absent your transferring in the other assets
9   from the other nineteen transferor entities, wouldn't it
10  be just like NLP Cooley and Signature with a single
11  asset -- as a single asset real estate filing?
12       A.   Well, if your question is, was it filed as a
13  single asset, it would be the same as a single asset,
14  yes.
15       Q.   Do you know how long FRE was trying to
16  refinance or sell this property?
17       A.   Do not.
18       Q.   Did they hire a broker to try to sell it?
19       A.   I don't know.
20       Q.   Are you intending to hire a broker to sell it?
21       A.   Not now.
22       Q.   What's your intention now?  Just to improve
23  tenant occupancy and keep it?
24       A.   Well, the intention is to improve occupancy.
25  If the proper tenancy is there, then the value is there,
0125
1   the income is there, we have a whole different ball
2   game.
3        Q.   Let's go to the Amoco Building, please, which
4   is like three pages later, if you would, sir.  I looked
                          Page 52

*(handwritten margin notes:)* NO CROSS lepdon Use of $

*(handwritten margin notes:)* NO Asset prior to 12/23 other than fork )

*(handwritten margin notes:)* only intent to improve tennet in force)

HC 00898

Morgan, Richard 01-27-11.txt

```
 5    on this Exhibit 5, your information list, sir -- do you
 6    see that?
 7        A.   Yes.
 8        Q.   I could not find the Amoco Building there.  Is
 9    it your position that they are current with the 2010 ad
10    valorum taxes?
11        A.   If it is not, it is my position somebody
12    screwed up on the list.  I didn't see it -- I don't
13    know -- I can't tell you.  But if it was not and if it
14    is past due taxes, it should have been on the list.
15        Q.   Do you recall from any other schedules you
16    looked at where any of the properties had their ad
17    valorum taxes paid before it went into bankruptcy?
18        A.   Mr. Crown worked on those schedules.  And I
19    can't basically -- without going back and reviewing each
20    one, I can't tell you the accuracy of that.
21        Q.   Okay.  And here you are showing, as I
22    understand it, net operating income of roughly, oh, 104-
23    to 114,000 per month; is that correct?
24        A.   Right.
25        Q.   And as you said before, that money stays with
0126
 1    this property and goes nowhere else?
 2        A.   That's correct.  There's no other
 3    cross-collateral with that, to my knowledge.
 4        Q.   And you don't know whether it was posted for
 5    foreclosure, correct?
 6        A.   Right.
 7        Q.   And I think you assert there's a value of
 8    23,500,000?
 9        A.   Right.
10        Q.   And, again, is that the, quote, basis table
11    you looked at on December 23 --
12        A.   Right.
13        Q.   -- to form that opinion?
14        A.   Right.
15        Q.   Moving then on to Parkway North, sir.  That's
16    page 8 of 26.  There it shows net cash flow of anywhere
17    from 20,000 or so to about 30,000, if you kind of move
18    around between the three pages.
19        A.   Right.
20        Q.   Here you have got an escrow, I presume, of
21    roughly $9500, correct, per month for 2011 taxes?
22        A.   Right.
23        Q.   But then if you look at the Exhibit 5, you are
24    showing unpaid taxes of $110,061.38?
25        A.   Right.
0127
 1        Q.   Is your answer sort of the same, that you just
 2    pay that out over five years under a plan?  Or is there
 3    another source of payment?
 4        A.   No, there's not another source of payment.
 5        Q.   Oh, forgive me.  On Amoco, have you been
 6    trying to sell or refinance that property for some time?
 7        A.   I don't know.  I haven't.  I have only had it
 8    for a few days.
 9        Q.   But as the chief restructuring officer, you
10    will be charged -- is not part of your responsibilities
11    to, quote, fix it, restructure, sell, refinance the
12    properties?
13        A.   It is.
14        Q.   And as to each of these assets, you have that
15    same role, correct?
```
                              Page 53

Morgan, Richard 01-27-11.txt

16    A.    Right, uh-huh.
17    Q.    The folks that put you in place, the folks --
18  the officers and directors at FRE, are they engaged in
19  other full-time activities so you are really the person
20  charged with this role?
21    A.    Yes.
22    Q.    So if I were to depose them on the properties
23  and where these things are going and what's happened,
24  they would say that you are the knowledgeable person, in
25  your opinion?
0128
1     A.    In my opinion, that's what they would say.
2     Q.    By the way, has Mr. Moos, who used to be the
3   principal of the seller entities, has he offered any
4   transition services to help you get up to speed on each
5   of these debt properties and the debt securing it?
6     A.    Most assuredly, yes.
7     Q.    When has he provided that service to you?
8     A.    Well, I've been able to have free access to
9   Regis Management.  I've been able to have free access to
10  the Sunchase, I believe it is, Mr. Akin's company, that
11  runs the apartment complex down in Kaufman.  I have free
12  access to Henry Butler and the land crew.  Free access
13  to all the brokers that handle the land and have
14  prospects to go with it.  So I have free access to
15  everybody within the organization to go sit down and
16  gather what information I want.
17    Q.    And they are all in the same building with
18  you, aren't they?
19    A.    That's correct.
20    Q.    By the way, there are two addresses, 1750
21  Valley View and 1800 Valley View.  Are they just
22  connected buildings or --
23    A.    Not connected, but they are separate
24  buildings.
25    Q.    Okay.  And next door, presumably?
0129
1     A.    Yes, sir.
2     Q.    Okay.  Back to Parkway North, you don't know
3   how long the loan was in default, correct?
4     A.    No.
5     Q.    You don't know whether it was posted for
6   foreclosure, correct?
7     A.    Correct.
8     Q.    And your game plan for Parkway North is what?
9     A.    Again, to raise the occupancy.  There are some
10  tenants working right now that will raise up the
11  occupancy.  My goal is -- the first goal is to get them
12  up to the market and --
13    Q.    Again, this is an office building?
14    A.    Office building.
15    Q.    Right.
16    A.    So that building is performing approximately
17  12 percent occupancy under the market right now.  There
18  are enough tenants in place -- that are in the works
19  right now to bring it up to the 79 percent for that
20  particular market.  That's the first step.  Get it
21  stabilized, and then start looking for the -- you know,
22  for the prospective tenants that will make it even
23  better.
24    Q.    Now, there the secured debt is roughly 2.9
25  million, correct?
0130

Page 54

HC 00900

Morgan, Richard 01-27-11.txt

```
 1        A.    Right.
 2        Q.    And the value that has been established is
 3   4.75 million, correct?
 4        A.    Right.
 5        Q.    And that differential, again, the chart, you
 6   got December 23, correct?
 7        A.    Right.
 8        Q.    But you had no independent appraisals or
 9   anything of that nature to review when you confirmed
10   those numbers, correct?
11        A.    I don't have independent appraisals.  But I
12   basically did my own analysis of, this is where it is,
13   these are the tenants that are working for it, we are
14   just going to create -- and I think it will be within a
15   short period of time.  And then the spread of between
16   that and where I think it is going to be in a short
17   period of time.
18        Q.    By the way, if you recall, you sort of took
19   the job or got the facts on December 23, 2010?
20        A.    Shortly, yeah.
21        Q.    How many hours a week are you working?
22        A.    Do I work?
23        Q.    Yeah, on these FRE matters.
24        A.    Right now, about 40 hours a week.
25        Q.    And you say you are 71 years of age?
0131
 1        A.    Yes.
 2        Q.    Are you spending any time working on any other
 3   business projects?  Or is this your exclusive --
 4        A.    I still run the Energy, but everything is
 5   moving real well right now.
 6        Q.    How many hours a week do you spend on your
 7   advisory company?
 8        A.    15, 20.
 9        Q.    But you have always sort of worked those kinds
10   of hours, right?
11        A.    Yes.
12        Q.    Okay.  If you look at Westgrove Air Plaza,
13   going a little further, page 11 of 26, here it shows
14   Regions Bank as the first lienholder, correct?
15        A.    Where are you seeing that?
16        Q.    I think you have to go to your chart from the
17   Debtor Interview --
18        A.    Okay.
19        Q.    -- Exhibit 3.
20        A.    Right, Regions Bank.
21        Q.    And then, again, the same thing with --
22   showing a value of 4.5 million based on the chart,
23   correct?
24        A.    Uh-huh.
25        Q.    Is that a yes?
0132
 1        A.    Yes.
 2        Q.    I also see that you have got unpaid taxes of
 3   74,125.37?
 4        A.    Right.
 5        Q.    Same situation as before, you just stretch
 6   them out over five years?
 7        A.    Yes.
 8        Q.    Because you have no other source of payment,
 9   correct?
10        A.    Or sell it.
11        Q.    Or sell it?
```

                              Page 55

Morgan, Richard 01-27-11.txt

12        A.   Uh-huh.
13        Q.   Is this the only asset that is being financed
14   by Regions Bank?
15        A.   I don't know.
16        Q.   Well --
17        A.   You mean outside of this entity?
18        Q.   Yeah, with this FRE.
19        A.   FRE, as far as I know.
20        Q.   Would this have been -- it is just a single
21   office building, correct?
22        A.   Yes -- well, single office building and
23   hangars.
24        Q.   I mean, that would have been a single asset
25   real estate filing, would it not, if it hadn't been
0133
1    transferred into FRE?
2              MR. BUNCHER:  Object --
3         Q.   (BY MR. WEITMAN)  I mean, wouldn't it be just
4    like NLP and Signature if it hadn't been transferred
5    into FRE?
6              MR. BUNCHER:  Object to the extent your
7    question calls for a legal conclusion.
8              MR. WEITMAN:  Yeah, that's fine.
9         A.   The same answer for the others.  Could it have
10   been a single filing under FRE or some other entity?
11   That would have been -- that would have been a
12   possibility.
13        Q.   (BY MR. WEITMAN)  But it is just a sole office
14   building and hangars, correct?
15        A.   Right.
16        Q.   And Parkway North, that's a sole office
17   building?
18        A.   Right.
19        Q.   With U.S. Bank as the lienholder, correct?
20             MR. BUNCHER:  I have got RMR Advisors or
21   RMI or whatever.
22             MR. WEITMAN:  On which one, please?
23             MR. BUNCHER:  On Parkway North is what we
24   are talking about, right?
25             MR. WEITMAN:  Oh, I have U.S. Bank.
0134
1              THE WITNESS:  I have U.S. Bank.  On this
2    schedule, it says U.S. Bank.
3              MR. WEITMAN:  Which one is wrong?
4              MR. BUNCHER:  Maybe my -- that was just
5    my notes, so maybe I'm wrong.
6              MR. WEITMAN:  Is that a sheet of paper
7    you gave us?
8              MR. BUNCHER:  No, that's my own notes.
9              MR. WEITMAN:  Okay.  I didn't know if it
10   was based on 168.
11             MR. BUNCHER:  No, it is my own
12   handwritten notes.
13             MR. WEITMAN:  Okay.
14             THE WITNESS:  Is a representative of RMR
15   here?
16             MR. BUNCHER:  No, they are not.
17             THE WITNESS:  I think in some cases RMR
18   may be a servicing agent rather than just a direct
19   lender, but I don't know that for sure.
20        Q.   (BY MR. WEITMAN)  Right.  But we are talking
21   about U.S. Bank as the lienholder, correct?
22        A.   Right.
                              Page 56