Morgan, Richard 01-27-11.txt
23          MR. BUNCHER:  RMR shows up here.  I think
24   my notes are wrong.
25      Q.   (BY MR. WEITMAN)  The Teleport building,
0135
1    that's 20 of 26.
2       A.   Yes, sir.
3       Q.   Is it correct that there are unpaid taxes of
4    25,368.35?
5       A.   I have got to go back to another schedule.
6    Yes.
7       Q.   And, you know, given the fact that it's a
8    negative cash flow, there's no source of payment there
9    either, correct?
10      A.   No, not necessarily.  This is a
11   cross-collateral with the Fenton Square under the
12   NexBank collateral.
13      Q.   And this is American Bank of Commerce that's
14   got the first lien on Teleport?
15      A.   Oh, you are right.  You are right.  Let's see.
16          MR. BUNCHER:  Thermalloy is the --
17      A.   Teleport is on ABC, you are correct.
18      Q.   (BY MR. WEITMAN)  So that's indebtedness of
19   about 4.4 million, right?
20      A.   You mean the indebtedness with ABC Commerce?
21      Q.   American Bank of Commerce.
22      A.   Let's get the schedule on -- but the answer to
23   the question is that it is cross-collateralized with
24   Bridgwood Ranch Apartments, so there is money to pay.
25   I'm showing the American Bank of Commerce, 4,999,000.
0136
1       Q.   Right.  And they have got a first lien on
2    Teleport, and they have got a first lien on
3    Bridgeport --
4          MR. BUNCHER:  Bridgewood.
5       Q.   (BY MR. WEITMAN) -- Ranch Apartments, correct?
6    I'm sorry.  Bridgewood.
7       A.   And some additional land.
8       Q.   Okay.  And, again, unpaid taxes of thousands
9    of dollars as to each, correct?
10      A.   Thousands of dollars --
11      Q.   Well, 124,083 as to Bridgewood, correct?
12          MR. BUNCHER:  Now we are back on this
13   one.
14      A.   Yeah, the one thing that I do not know at this
15   point in time -- and I have got -- looking into it to
16   see what escrows there are, if any, already placed with
17   the lenders for the purpose of these taxes.  And I don't
18   know that yet.
19      Q.   (BY MR. WEITMAN)  You have been involved in
20   other bankruptcies.  If the loan is in default, is it
21   typical that lenders will offset those funds that are
22   held in escrow?
23      A.   I can't speak to the typical of that.
24      Q.   Okay.  Can you take the Notice of Deposition,
25   which is 166, and then turn to page 11?
0137
1       A.   (Complies.)
2       Q.   Would you take a look, along with your
3    counsel, if possible, on item 1, paragraph 1(ix).  Do
4    you have knowledge as to whether these transfers were
5    with the authority or not with the authority under the
6    relevant loan documents with respect to each of these
7    transfers?  I think you earlier said you didn't have
                              Page 57

```
                          Morgan, Richard 01-27-11.txt
 8      knowledge of that, correct?
 9                          THE WITNESS:  Didn't we stipulate to
10      that?
11                          MR. BUNCHER:  I think we discussed the
12      fact we will see if we can't stipulate to that.  So we
13      don't need to have anybody really testify about that.
14      But I will get back to you on that.
15                          MR. WEITMAN:  Okay.  And the same thing
16      for item (x) as well.
17                          MR. BUNCHER:  Well, I think that's a
18      matter of record in the --
19                          MR. WEITMAN:  Right.  But I need someone
20      who can testify to that.
21                          MR. BUNCHER:  You don't need anybody that
22      can testify to it because I think three parties have
23      filed motions to lift stay on the basis of claiming they
24      have foreclosed.
25                          MR. WEITMAN:  Right.
0138
 1                          MR. BUNCHER:  And those parties --
 2                          MR. WEITMAN:  But I'm entitled --
 3                          MR. BUNCHER:  It is a matter of record in
 4      the bankruptcy case.
 5                          MR. WEITMAN:  But I'm entitled --
 6                          MR. BUNCHER:  And it is in dispute too,
 7      by the way.
 8                          MR. WEITMAN:  As to whether there's
 9      authority to annul the automatic stay, yes.  I just need
10      someone -- and you did designate this gentleman as
11      having knowledge -- to tell me whether the properties'
12      transfer was subject to a pending foreclosure
13      proceeding.
14                          MR. BUNCHER:  Right.  I think --
15                          MR. WEITMAN:  And all I would ask is if
16      you would stipulate to it so I don't have to call
17      another witness.  That's all I ask.
18                          MR. BUNCHER:  I think we can stipulate as
19      to which properties were in foreclosure because, as I
20      said, it is a matter of record in the bankruptcy
21      already.
22                          MR. WEITMAN:  Fine.  Yeah, I'm going to
23      need to have someone either testify to or stipulate as
24      to when FRE knew of these pending foreclosures.
25                          MR. BUNCHER:  When FRE knew?  Well, I
0139
 1      think some of those documents -- the notices of
 2      foreclosure may actually be attached, for example, to
 3      Mr. Stromberg's motion.  But, anyway, I understand your
 4      position.
 5                          MR. WEITMAN:  Well, I'm just saying right
 6      now --
 7                          MR. BUNCHER:  I'm not answering your
 8      question right now.
 9                          MR. WEITMAN:  That's fine.
10                          MR. BUNCHER:  You said on the record you
11      either have to have a stipulation or you need a witness.
12      You have made your record.  We will deal with it.
13                          MR. WEITMAN:  Great.  And then as to item
14      2, we asked for, and you designated, Mr. Morgan; that he
15      was knowledgeable about the debtor's participation in or
16      receipt of the transfers received from the debtor's
17      affiliates in the six-month period immediately preceding
18      the petition date.  Yet, I believe, Mr. Morgan has
                                    Page 58
```

Morgan, Richard 01-27-11.txt

```
19    testified that all he knew is that as of December 23 the
20    transactions had occurred already.
21              So I need -- I need you to provide a
22    witness who can tell me when this whole thing came
23    about, that these transfers would occur, someone other
24    than Mr. Morgan since he doesn't -- it was a fait
25    accompli by the time Mr. Morgan came on board.
0140
 1              MR. BUNCHER:  I guess we will take that
 2    up.  I mean, I'm not aware of any other transfers that
 3    occurred prior to December 23.  Those are the transfers
 4    at issue in the bankruptcy and in your motion to
 5    dismiss.  So my position would be, I have produced a
 6    witness that has knowledge of the transfers that have
 7    occurred.
 8              MR. WEITMAN:  Okay.
 9         Q.   (BY MR. WEITMAN)  There is a statement, Mr.
10    Morgan, in one of the pleadings which suggests that FRE
11    received or owned, effective as of December 23, stock,
12    notes, leases, and other assets.  And all we have been
13    talking about are, really, the real estate transfers.
14    Is there something you have that summarizes those other
15    transfers?
16         A.   Well, those leases go to the buildings.
17         Q.   So those are the Addison hangar leases?
18         A.   No, no.  The leases that went with the real
19    estate --
20         Q.   Oh, that's what you are talking about.  I'm
21    sorry.
22         A.   Yeah.  Yeah.  There were two master leases,
23    Addison Hangar 1 and Addison Hangar 2.  And stock is an
24    additional collateral to one of the ABC loans, which is
25    securing some additional collateral -- it is 200 and
0141
 1    something thousand shares of TCI stock that was already
 2    as collateral to the ABC under some additional
 3    collateral.
 4         Q.   Explain that a little more.  Is there a
 5    document that evidences that?
 6         A.   ABC has the document.  They had the
 7    collateral.
 8              MR. BUNCHER:  There's information on the
 9    Debtor Interview, Exhibit 167, about some loans secured
10    by stock of TCI.  It is on item f on page 3.  There's
11    information on item g on the same page about the Addison
12    Hangar 1 and 2 leases, and some notes payable on an
13    attached Exhibit 5.
14              MR. WEITMAN:  So on Exhibit 4 -- could
15    you hand that to Mr. Morgan?
16              MR. BUNCHER:  Exhibit 4?
17              MR. WEITMAN:  Yeah, Exhibit 4 on --
18              MR. BUNCHER:  Right.
19         A.   Yes.
20         Q.   (BY MR. WEITMAN)  So tell me, again, this TCI
21    stock that you received, what was involved?
22         A.   I didn't receive it.
23         Q.   I'm sorry.  FRE had transferred into it?
24         A.   No, no.
25         Q.   Let's start again.
0142
 1         A.   What I mentioned, part of the -- part of the
 2    taking of the ABC loan also took with it the fact that
 3    there was --
```
                              Page 59

HC 00905

Morgan, Richard 01-27-11.txt

4    Q.   By the way, when you say ABC loan --
5    A.   ABC Commerce.
6    Q.   American Bank of Commerce?
7    A.   American Bank of Commerce.
8    Q.   I was lost.
9    A.   ABC's loan is securitized by these two -- the
10   TCI stock and this note receivables from Woodmont TCI
11   Group, LP.  That was additional collateral to the asset
12   to the extent we own it.  But we don't own it, we don't
13   control it because that's extra collateral to the ABC
14   Bank.
15   Q.   Have there been any discussions since you have
16   got -- do you remember we talked about this basically,
17   like, three public companies that are obligated on the
18   various debt?  Will they provide any kind of financial
19   support to FRE in the chapter proceedings?
20   A.   In what form?
21   Q.   In any form.  I mean, they are co-obligors,
22   are they not, or original obligors on various debt
23   instruments in favor of the secured lenders?
24   A.   Yes.
25   Q.   Are they going to provide any financial
0143
1    support?  Have they offered anything?
2    A.   I have not asked for anything yet.
3    Q.   But if you were to need something, you could
4    probably just go to one of the floors in the building
5    where those folks are?
6    A.   I don't know.  I don't know how simple it is.
7    You know, I am -- I'm faced with, you know, the fact
8    that if every property has -- if every lender's
9    collateral stays -- the money stays within that pool,
10   then I am faced with the land, your loan, that have no
11   income.
12        So if there's going to be an adequate
13   protection order, then it has to come from somewhere.
14   Either I have to do an investor package to put it
15   together to provide that, or TCI or someone is going to
16   have to come to the table and help fund that.  And
17   that's not resolved yet.
18   Q.   Mr. Buncher said that you gave insurance
19   certificates to the U.S. Trustee's Office during the
20   debtor interview to show that all of the property has
21   all the required insurance?
22   A.   That's correct.
23   Q.   What is the premium for all of this property
24   that's insured?
25   A.   Everything is shown on the individual
0144
1    schedule.
2    Q.   I'm sorry.  There's a schedule that details
3    the insurance premiums for all of the thirty properties?
4    A.   No, on all the cash collateral.
5    Q.   The insurance premiums, I think, relate to the
6    operating entities --
7    A.   It does, yes.
8    Q.   -- the operating properties.  What about the
9    nonoperating properties, where is that insurance --
10   A.   The liability insurance?
11   Q.   Yeah, if someone gets hurt falling on a
12   property.
13   A.   I will have to get that.  I'm not sure if we
14   have provided a policy for that.  I will have to get
                    Page 60

HC 00906

Morgan, Richard 01-27-11.txt

15  that.
16       Q.   But do you think it is insured?
17       A.   Yes.
18       Q.   And does it show the new owner of the property
19  as being FRE?  Have you transferred all of that over as
20  the new owner?
21       A.   It should.  It should.
22       Q.   And does it show who the loss payees are in
23  the event of some damage, i.e., maybe it is Petra
24  Mortgage or NexBank or any of these others?
25       A.   Well, you are asking me to testify what a
0145
1   policy says that I don't know exists.  So I will tell
2   you, all the things you are asking should be included in
3   the policy.
4        Q.   Okay.  If you would be able to look into that
5   for me --
6        A.   We will certainly do that.
7        Q.   -- because I would like to know everything is
8   insured; that the, you know, premiums have been paid.
9   And I would like to know, you know, what the -- you
10  know, that there's a source of payment for the premiums
11  in the future if someone were to get hurt on my
12  property.  Okay?
13       A.   Okay.
14  INFORMATION REQUESTED: _____
15            MR. WEITMAN:  Mr. Buncher, I would like
16  to, if it is agreeable to you, pass the witness with the
17  right to recall him with additional questions just so we
18  can move things along.
19            MR. BUNCHER:  Sure.  I'm not waiving my 7
20  hour --
21            MR. WEITMAN:  No, I understand that.
22            MR. BUNCHER:  -- statement.  But that's
23  fine.  I mean, if you want to let others ask questions
24  and if there's time left on my 7 hours, to come back and
25  you want to ask a few more, I don't have an issue with
0146
1   that.
2            MR. WEITMAN:  Sure.  Very good.  And,
3   again, it is premised upon, if you will, the cooperation
4   I'm sure you will provide in connection with a lot of
5   the stipulated facts that we are hoping to get and other
6   things that are here.  Just so we can present to the
7   Court, in the most expedited way possible, the documents
8   and the story of the transfers.
9            MR. BUNCHER:  I have told you I will work
10  with you on the stipulations.  I'm not certain we need
11  the length of stipulations you guys have drafted.  But
12  you have obviously put a lot of work into that.  And I
13  have already got somebody looking that over at the
14  office, so we will work on that.
15            MR. WEITMAN:  Great.  Thank you.
16            MR. BUNCHER:  Can we take 10 seconds?
17            (Recess, 1:32 p.m. to 1:40 p.m.)
18                 EXAMINATION
19  BY MR. KIM:
20       Q.   Good afternoon, Mr. Morgan.  My name is James
21  Kim.  I'm with the law firm of Cole, Schotz, Meisel,
22  Forman & Leonard.  And we represent Highland Capital
23  Management, LP.  Okay?
24       A.   Okay.
25       Q.   Good afternoon.  Earlier today when Mr.
                         Page 61

HC 00907

Morgan, Richard 01-27-11.txt

0147
1   Weitman was asking you questions regarding the Fenton
2   building, you mentioned something about your goal being
3   to increase the tenants of that building, correct?
4       A.   Yes.
5       Q.   And what, if anything, have you done to date
6   to increase the tenants at that building?
7       A.   Actually, there are two deals right now.  I
8   have to get them to the point where I have total
9   commitment.  But we have 100,000 square foot tenant,
10  HAC, which is Hospital -- HCA, Hospital Corporation of
11  America.  They are already on MacArthur Boulevard in
12  that same general area.  We were competing with a
13  building at Belt Line and 635.  And they have come back
14  with a request -- a second request for proposal, a
15  counter to the proposal, which we are working on right
16  now.  That will define the scope of the tenant finish
17  and so forth that has to be put into it.  But it's
18  effectively a contribution of about $21 a square foot.
19  So that puts about 2 million 1 to the bottom line.
20               There's another tenant called Devon
21  Securities, which are very close to getting.  That is
22  an occupancy in and around September, October, 25,000
23  square feet.
24               Again -- and when I use numbers, I'm
25  using gross.  It is really 19 plus and the common area

0148
1   makes it maybe a little bit more than 21.  So let's just
2   use the 19 base rent because that's what goes to the
3   bottom line.  It is 25,000 square feet.  Again, the
4   tenant finish is being negotiated.
5               But those are two right now that are on
6   the -- so it is 125,000 square feet.
7       Q.   Let me just make sure I understand it.  HCA is
8   a current tenant at the building?
9       A.   No.  HCA is a new prospective tenant.  They
10  love the fact -- and I forget which one or two -- but
11  they love the fact that there are two floors, two 50,000
12  square foot floor plates, where they can put all of
13  their employees on two things.
14               You know, the competition factor is that,
15  first of all, you have got the food service.  You have
16  got the atrium.  You have got covered parking.  None of
17  which is enjoyed at the other building.  And we have --
18  basically, we are leasing at about -- we think at about
19  a $1 a square foot less than the other place because it
20  is a brand-new building up there.
21               So I'm very hopeful about getting those
22  two tenants.
23      Q.   And who has been negotiating with HCA?
24      A.   It is a broker.  Grubb & Ellis is the actual
25  broker.

0149
1       Q.   And who at Grubb & Ellis?
2       A.   I don't know.
3       Q.   Have you been involved in the negotiations?
4       A.   No.  Actually, see, Regis is doing the --
5   Regis is doing -- they already generated this tenant
6   before I got there.  Scott Porter is the coordinator.
7   And Scott is preparing a counter -- an RFP right now
8   that I can actually review and go back to on.
9               And Devon, we are working on the final
10  proposal, so it is something I can review.
                        Page 62

HC 00908

                          Morgan, Richard 01-27-11.txt
11        Q.   Have you seen these written proposals?
12        A.   Pardon?
13        Q.   Have you seen any written proposals?
14        A.   I have not seen it.  But there's an RFP --
15   what do you call them -- second request for proposal
16   down on Mr. Porter's desk right now.  And he's working
17   on it.  He's going to bring me what they offered and
18   what he's countering back.  I will have that by Monday.
19        Q.   Let me ask you what you know and what you have
20   seen.  With respect to HCA, you have not seen any
21   written proposals?
22        A.   No.
23        Q.   Okay.  What about with respect to Devon --
24   Devon Securities, is it?
25        A.   I went through the original proposal, went
0150
1    through the details and the 25,000 square foot and so
2    forth.
3         Q.   Who prepared the original proposal for Devon
4    Securities?  Who prepared it?
5         A.   Initially, it was prepared before -- Devon
6    Securities -- all of this was in the works before the
7    23rd of December.
8         Q.   Okay.
9         A.   And Scott Porter is the leasing agent for --
10   all of the properties are leased by outside brokers, by
11   third-party brokers.  So Scott Porter is the coordinator
12   with the -- I believe it is Grubb & Ellis.
13        Q.   Okay.  So who prepared the first written
14   proposal for Devon Securities?
15        A.   Prior to the bankruptcy, Mr. Porter did.
16        Q.   And your testimony is that you have seen that
17   written proposal?
18        A.   No, my testimony -- on HCA?
19        Q.   No, on Devon Securities.
20        A.   On Devon Securities, I glanced at it.  I just
21   took a look at it and got an idea.  I saw the 25,000
22   square feet.  And we just -- he said he's going to get
23   the rest of it to me for approval.
24             Because, bear in mind, when I get to that
25   point, now we have got to talk about who is going to pay
0151
1    for the tenant finish.  So I want to be sure they have
2    got everything pinned down before I do that.
3         Q.   Okay.  I'm going to make a request for
4    production of a copy of the written proposals for Devon
5    Securities and HCA.
6         A.   No problem.
7    INFORMATION REQUESTED: _____
8         Q.   Let's talk about those tenant finishes.  What
9    is HCA requesting?
10        A.   Requested?
11        Q.   What are they requesting?
12        A.   In tenant finish?
13        Q.   Yes, before they move in.
14        A.   $25 a square foot.
15        Q.   Okay.  But what are they asking in the way of
16   building out the space?
17        A.   $25 a square foot.
18        Q.   Okay.  Who is going to pay for that?
19        A.   That's my question.  That's the issue -- the
20   issue now is, now that we have got a tenant, how do we
21   pay -- now that we have got a prospective tenant, how do
                             Page 63

Morgan, Richard 01-27-11.txt
22    we pay for it.  And I have to present a plan to the
23    Court to do it.
24          Q.    But based on your understanding, when would
25    HCA move into the building?
0152
1           A.    It would be about somewhere in the
2     neighborhood of May, June, something like that.
3           Q.    And how long would it take, assuming you had
4     the funds to build out that space?
5           A.    About that -- it would take about 60 days, 60
6     to 90 days total.
7           Q.    What would be required to build out that
8     space?
9           A.    In what sense?
10          Q.    How much money?
11          A.    Maybe you are not listening to me.  The
12    allowance is $25.  If they spend 40, it doesn't matter.
13    The landlord's responsibility is $25.
14          Q.    Okay.  You weren't clear.  What about with
15    respect to Devon Securities?  What did the tenant --
16          A.    I don't remember the tenant finish on that.  I
17    will get you the proposal.  We will get that to you.
18          Q.    Okay.  When is Devon Securities proposing to
19    move in?
20          A.    September, October.
21          Q.    Of 2011?
22          A.    Yes, uh-huh.
23          Q.    Okay.  So at this point in time there are no
24    signed leases with HCA, correct?
25          A.    Couldn't.
0153
1           Q.    And same with Devon Securities, there are
2     no --
3           A.    I couldn't.
4           Q.    -- signed leases?
5           A.    Understand the process.  I can't sign a lease
6     right now.  What I have to do is get the tenants, get
7     the business plan tied down, come up with a plan that I
8     can go to the Court with, this is how we are going to
9     pay for it.  And I can't do that until I have got the
10    proposal.
11          Q.    As you sit here today, do you have a plan on
12    how you are going to pay for those --
13          A.    Not yet.
14          Q.    -- expenses?
15          A.    Not yet.  I think the answer is going to have
16    to come in some type of debtor in possession financing,
17    but I don't -- I don't have that plan.
18          Q.    Okay.  Besides these two tenant issues, what
19    else have you done with respect to trying to increase
20    the tenants at the Fenton building?
21          A.    Increase the tenants?
22          Q.    Yes.
23          A.    Well, we are working with Grubb & Ellis.  We
24    are working with the actual brokers.  Those are the two
25    prospects.  I have not gone through the total market.
0154
1           What I was focusing on, if you look at
2     the 125,000 square foot, that's about 15 percent
3     occupancy.  So that brings us up into the 72, 73 percent
4     range.  As I mentioned earlier, my focus is to get it to
5     79 percent.  That's what the market is right now.
6     That's the primary goal is to get it up to 79 percent
                          Page 64

Morgan, Richard 01-27-11.txt

7  initially.  And at 79 percent, it will be a very
8  valuable property.
9        Q.    Let's assume you can get it up to that 72
10 percent occupancy, what would you do next?
11       A.    Most likely sell it.  I think that the --
12 there is -- there is a thin line between the value that
13 a buyer is going to put on leasing vacant space, a thin
14 line there.  Much as if I was selling you something, you
15 would only accept so much risk in the process.  And
16 that -- that risk has to be reduced to the point where
17 the seller feels -- the buyer feels he's getting a
18 decent cap rate on today's income and sees the future.
19 And I think that is an 80 percent range.
20       Q.    And when do you believe you would want to sell
21 the property?
22       A.    If all of this happens, we would be ready to
23 talk about selling it somewhere around the end of the
24 year, the third quarter, or putting it up for the
25 market.  You don't sell it right away.
0155
1         Q.    What is your plan if HCA and Devon Securities
2  do not agree to become tenants at this property?  What
3  would you do next?
4         A.    Keep marketing.
5         Q.    And when you say keep marketing, you are
6  talking about marketing tenant space or marketing the
7  sale of the building?
8         A.    Marketing the tenant space.  I don't think it
9  is a marketable property right now.
10        Q.    At this -- as you sit here today, you have not
11 taken any efforts to sell the building?
12        A.    No.
13        Q.    You have not retained a broker to sell the
14 building?
15        A.    No.
16        Q.    You have not spoken with any potential
17 buyers --
18        A.    No.
19        Q.    -- for the building?
20        A.    No.
21        Q.    And you have not personally spoken with HCA --
22        A.    No.
23        Q.    -- as the chief restructuring officer?
24        A.    You don't do that.  That's just not -- that's
25 not the way --
0156
1         Q.    I'm just asking the question.
2         A.    No, you don't.  I mean, you let the broker --
3  the broker is the intermediary, and he's dealing with
4  another broker from HCA.  So you have to let the brokers
5  do their job.
6         Q.    And I assume you have also not spoken with
7  anybody at Devon Securities?
8         A.    Beg your pardon?
9         Q.    You have not spoken with anybody at Devon
10 Securities?
11        A.    No, that's, again, another broker situation.
12        Q.    Earlier today Mr. Weitman spent some time
13 talking to you about the -- what we have marked as, I
14 think, Wells Fargo 167.  If you can turn your attention
15 to Exhibit 3.
16        A.    Okay.
17             THE WITNESS:  Can you help me get that?
                        Page 65

HC 00911

Morgan, Richard 01-27-11.txt

```
18        Q.   (BY MR. KIM)  This is information for initial
19   debtor interview.  I believe it was marked as 167,
20   Exhibit 3.
21                MR. BUNCHER:  It is right here.
22                THE WITNESS:  Okay.  Sorry.
23        A.   Yes, sir.
24        Q.   (BY MR. KIM)  I want to direct your attention
25   to the column where it says value, the second column.
0157
1    Do you see it?
2         A.   Yes.
3         Q.   Okay.  Do you know who reviewed or prepared
4    the numbers that were inserted into the value column?
5         A.   Yes.  This was a combination of the -- to the
6    best of my knowledge, I don't remember the exact detail
7    of the -- of what they had on the books as the equity in
8    the building and the -- and the debt.
9         Q.   Okay.  who actually prepared Exhibit 3, if you
10   know?
11        A.   Greg Owen.
12        Q.   I'm sorry?
13        A.   Greg Crown.  I'm sorry.
14        Q.   Greg Crown --
15        A.   Yes.
16        Q.   -- prepared this exhibit?
17        A.   Yes.
18        Q.   And who is Greg Crown?
19        A.   Greg is an employee of Prime Asset assigned to
20   me to prepare all the schedules.
21        Q.   Did you do anything to assist Greg in
22   preparing the numbers set forth in the value column?
23        A.   No.  The value column, as I mentioned earlier,
24   all of those values were set relative to the way the
25   deal was going to be structured coming down, which I had
0158
1    an opportunity to review and see if I conceded -- I
2    agreed that those values were indeed there.
3         Q.   What is the date of value reflected in this
4    column?
5         A.   The date of the value?
6         Q.   Yes.
7         A.   Would be as of the 23rd of December.
8         Q.   Do you know if there are any appraisals that
9    Mr. Crown reviewed in preparing his valuation numbers?
10        A.   I'm not saying Mr. Crown did prepare the
11   valuation numbers.
12        Q.   I'm not asking that question.  I'm asking, do
13   you know if he reviewed any appraisals?
14        A.   I do not know.
15        Q.   Okay.  Have you reviewed any appraisal
16   reports --
17        A.   No.
18        Q.   -- for any of the properties?
19        A.   No.
20        Q.   Have you reviewed an appraisal report for the
21   Fenton property?
22        A.   No.
23        Q.   So where it says -- it provides a value of
24   $67,000 for the Fenton Centre building, you have not
25   reviewed any documentation to --
0159
1                MR. WEITMAN:  67 million.
2         Q.   (BY MR. KIM)  I'm sorry.  -- 67 million, you
```

Page 66

Morgan, Richard 01-27-11.txt
3   have not seen any appraisal reports or any other
4   documents to support that valuation number?
5        A.   Oh, quite contrary.  I have reviewed the
6   operating statements, and I have reviewed the budgets.
7   And I have seen what the impact of increased occupancy
8   would do to the value.
9        Q.   But you just testified --
10            MR. BUNCHER:  Let him finish his answer,
11   please.
12            MR. KIM:  I'm sorry.
13       A.   I have seen what the increased occupancy would
14   do to the value.  And based on the current interest we
15   have right now -- plus you may have seen this, but there
16   was an article about four weeks ago talking about the
17   Dallas market overall.  And it essentially said that
18   there would be a rebuilding -- building should be
19   started somewhere in the late 2011, early 2012.
20            This particular property sits in a unique
21   position because there is about to be a major
22   reconstruction of 635 running from Interstate 35
23   slightly to the east all the way over to Interstate 75.
24   That's going to be a major upheaval.
25            So it mentioned in this report -- and I
0160
1   will try to find that article and send it to you, if you
2   would like.  It mentions that the submarket, the Las
3   Colinas and this particular market we are in right now,
4   are in a perfect position to gain the lion's share of
5   that because we won't be hampered by all of that
6   construction.
7            This property also sits right in the
8   apex -- or in the congruent -- where it all comes
9   together of Highway 116, which is the Bush Freeway, and
10  635 and 35 to the west.  So it's a -- and 6.7 miles to
11  the airport, maybe 10 miles.  But it is within the heart
12  of what we think is going to be the coming market and to
13  take advantage of the new tenants that are coming in.
14       Q.   (BY MR. KIM)  Besides this report that you are
15  referring to, what other documents did you review that
16  leads you to believe that the building has a current
17  value of $67 million?
18       A.   Value is construed by an appraiser.  Value is
19  a function of three components, as you know.  Do I need
20  to explain this to you?
21       Q.   Yes.
22       A.   Good.  There are -- the three components are:
23  Comparables, what other buildings have sold for.  Very
24  few buildings have been sold.  The second is a
25  combination of the replacement value.  And, quite
0161
1   candidly, you couldn't replace that property right now.
2   700,000 square feet with parking garages would be in the
3   $135-, $140 million range.  And the third category is
4   economics.
5            But balanced with those economics and the
6   numbers we are looking at today is what value do you
7   place on the vacant space?  Because regardless of the
8   fact that $25 has to be spent to bring in a tenant, it
9   also means that $140 had already been spent creating the
10  infrastructure and the parking garages and everything
11  that makes it work.  Okay.
12            So how do you value it?  You have to
13  value it with a combination of all those three.
                    Page 67

HC 00913

Morgan, Richard 01-27-11.txt

```
14        Q.   But you have not conducted that valuation
15   process, correct?
16        A.   I certainly have.
17        Q.   You have?
18        A.   I certainly have.
19        Q.   And who did you commission to do that
20   valuation?
21        A.   I didn't commission to do it.  I'm an
22   experienced real estate -- experienced in managing and
23   developing real estate.  So I knew from the standpoint
24   of just looking at the economics alone, if you use a 7
25   cap, which I did, if those two tenants go in, that
0162
1    raises the value -- the sale value -- forget the value
2    of the vacant space -- to $81 million.  Just those two
3    tenants alone at a 7 cap rate, which is a reasonable
4    rate to expect if you are buying on income alone in that
5    kind of area.
6         Q.   But you are not a licensed real estate
7    appraiser, correct?
8         A.   I have bought and sold over 600 million square
9    feet of real estate as principal and as exclusive
10   representative.
11        Q.   But the question is:  You are not a licensed
12   real estate appraiser, correct?
13        A.   I am not a licensed real estate appraiser.
14        Q.   Mr. Morgan, who do you report to on a daily
15   basis?
16        A.   Pardon?
17        Q.   who do you report to on a daily basis at FRE?
18        A.   I don't have to report to anybody on a daily
19   basis.
20        Q.   And who reports to you at FRE?
21        A.   Nobody.  I'm it.
22        Q.   Who is --
23        A.   Who reports to me -- I stand corrected.  Regis
24   Property Management reports to me and eventually the
25   brokers that work for them report to me.  The -- as we
0163
1    get involved in marketing the land, those brokers will
2    eventually report to me and whoever is coordinating
3    those land sales will report to me.
4              But I don't have anybody on a payroll.
5    I'm not burdening this debtor with a bunch of overhead.
6         Q.   So you do not report to anybody?
7         A.   I report to Ron Akin.  But Ron Akin has got
8    his own world, and he's depending on me to handle it.
9         Q.   How often do you speak to Ron Akin about FRE
10   matters?
11        A.   Not very often.  I have known Ron for
12   thirty-five years.  And we can talk in the hallway and I
13   can catch him up.  But he's not a micromanager.
14        Q.   How about Craig Landess?
15        A.   Craig Landess is a vice president, but he's
16   not involved in the management at all.
17        Q.   How often do you speak with Craig?
18        A.   Very infrequently.
19        Q.   what is Craig's current duties and
20   responsibilities with respect to the --
21        A.   He doesn't have a direct responsibility as far
22   as what I'm doing.
23        Q.   How about Terry Shumate?
24        A.   Terry is a retired director, retired owner and
```

Page 68

HC 00914

Morgan, Richard 01-27-11.txt
25      director. So he's not involved on a daily basis.
0164
1           Q.   He's not involved in the day-to-day business
2       of FRE?
3           A.   No.
4           Q.   And who comprises your staff at FRE?
5           A.   Me.
6           Q.   Just you?
7           A.   Me.
8           Q.   You are the only person in the office?
9           A.   Yes.
10          Q.   You don't have a secretary?
11          A.   No.
12          Q.   You don't have a clerk? You don't have
13      anybody that helps you in the office?
14          A.   Well, I told you -- I mentioned ago, I have
15      Greg Crown, who is at my disposal, to prepare all the
16      schedules. I have got the land people, Henry Butler,
17      that is familiar with most of these lands, and R.L.
18      Lemke, who put the land together. I have got the Regis
19      people downstairs and their leasing people that I know
20      very well. And all of those people are at my disposal.
21      But I don't have to go -- and I don't -- you know, I
22      don't have to get involved in the technical presentation
23      of these schedules and so forth. Greg and his assistant
24      does that.
25          Q.   Let me turn your attention to Exhibit 3 again,
0165
1       part of the Exhibit Wells Fargo 167.
2           A.   Yes, sir.
3           Q.   How many of these properties are income
4       producing?
5           A.   Roughly seven.
6           Q.   Which seven? Can you identify them?
7           A.   I can. They are Fenton Centre, Amoco
8       Building --
9           Q.   Hold on. I'm sorry.
10          A.   Fenton, Amoco Building --
11          Q.   Can you do it by looking at the list?
12          A.   Oh, sure. Just go down the list?
13          Q.   Yes.
14          A.   So Fenton Centre is the first. Parkway is the
15      second.
16          Q.   Parkway North Office Building?
17          A.   Okay. Bridgewood Ranch Apartments, which is
18      on the second page.
19          Q.   Okay. That's three.
20          A.   Amoco Building.
21          Q.   Four.
22          A.   Westgrove Air Plaza.
23          Q.   Okay.
24          A.   That's it.
25          Q.   So five?
0166
1           A.   Yeah.
2           Q.   We already talked about Fenton Centre. I want
3       to talk to you about the other four income producing
4       properties you just mentioned. What is your plan with
5       respect to those four income producing properties, as
6       you sit here today?
7           A.   All right. I will address them one by one.
8           Q.   Yeah. Let's start with the Parkway North
9       office Building.
                                Page 69

HC 00915

Morgan, Richard 01-27-11.txt

10      A.    Parkway North Office Building.  I don't
11   remember the exact occupancy.  We have about 17,000
12   square feet working right now.  When that happens, it
13   will bring it on up to 79, 80 percent occupancy and I
14   think it will be in a position to sell.
15      Q.    Well, hold on, before we move on.
16      A.    Pardon?
17      Q.    I didn't understand.  You are looking for
18   tenants for that building?
19      A.    No, we have tenants in the works.  We have
20   17,000 square foot of tenants in the works right now,
21   7,000 of which are on the verge of being done.  It is a
22   very simple deal.  10,000 square foot tenant will
23   require some tenant finish.
24            The Amoco Building, there's about 14- to
25   16,000 square feet of tenants working right now that --
0167
1    in the process of getting approval and getting done.
2    That will take it up to -- the market there is 88
3    percent.  And that will take it up to, I think, about
4    86, 87 percent, something like that.
5       Q.    You are talking about occupancy?
6       A.    Yeah.
7       Q.    Okay.
8       A.    Westgrove is more of a challenge.  It shows at
9    57 percent, but it is partial hangar and partial office.
10   And if you separate the hangars, which are full, from
11   the office, that's more of a challenge.  And I just have
12   not had time to focus on that one.
13      Q.    And what about Bridgewood Ranch Apartments?
14      A.    Bridgewood Ranch Apartments is 90 percent
15   occupied.  There's not much more you can do to make it
16   better.  The only thing -- basically, it is
17   cross-collateralized with ABC on some other assets,
18   apartment land primarily.  So my focus is to pay -- I'm
19   going to focus selling the apartment land first.
20      Q.    The Bridgewood?
21      A.    No, no.
22      Q.    I'm sorry.
23      A.    Bridgewood has -- it has a piece adjacent to
24   it, which is not part of the -- not part of the ABC
25   collateral, another collateral, just 5 acres next to it.
0168
1    I want to get that sold to an apartment developer.
2            Limestone, which is part of the ABC
3    collateral, that's adjacent to a very successful
4    Limestone Apartments.  I will be marketing that as
5    quickly as I can.
6       Q.    Marketing for sale?
7       A.    Yes, marketing for sale.
8            There is 10 acres in Temple, Texas, which
9    was bought for an apartment complex, zoned for that.  It
10   was just never done.  I will be trying to market that.
11           And then the Thermalloy building is a
12   unique little concept.  It is about a 6,000 square foot
13   building on 3-1/2 acres.  But it sits just right on the
14   outer edge of Las Colinas.  It is really a unique
15   situation for an architectural office or a single user.
16      Q.    You are talking about Thermalloy?  I'm sorry.
17      A.    No, I'm talking about the Teleport building.
18      Q.    The Teleport building?
19      A.    Thermalloy building is really a land --
20      Q.    Yeah.  I thought I heard you say Thermalloy.
                          Page 70

Morgan, Richard 01-27-11.txt
21    I'm sorry.
22        A.    I may have said Thermalloy.
23            The Teleport building is 3.6 acres and it
24    sits at the corner of -- it is at Senlac and -- Senlac
25    and Valley View.  It is a warehouse -- a big warehouse.
0169
1    You might find a user for it.  I don't know.  But it is
2    a big warehouse.
3        Q.    Just going back to the four properties you
4    just talked about, Parkway North Office Building,
5    Bridgewood, Amoco, and Westgrove.
6        A.    Right.
7        Q.    Is it fair to say that your goal is ultimately
8    to sell those properties?
9        A.    Yes.
10        Q.    At this point in time, have you retained a
11    broker to assist you in connection with the potential
12    sale of those buildings?
13        A.    No.  I'm hampered with the Bridgewood because
14    this other collateral is there.  I need to reduce -- I
15    can't sell just Bridgewood because I have got that other
16    cross-collateral with it.  So we are going to have to
17    get that worked out somehow.  My goal is to sell the
18    apartment land first and then market Bridgewood.
19    Because if we have the money to reduce the first lien
20    debt, that makes the sell of Bridgewood more profitable.
21        Q.    But as you sit here right now, you don't have
22    a real estate broker that's working with you in
23    connection with any of these properties?
24        A.    I think I explained --
25        Q.    The ones you just mentioned.
0170
1        A.    All of them are like that.  I can't tell
2    you -- except Bridgewood.  The rest are just not quite
3    ready.  They need a little more work to get them ready.
4        Q.    Now, is it fair to say, besides the five you
5    just mentioned, all the other properties listed in
6    Exhibit 3 are raw land properties?
7        A.    No.  The Thermalloy building, which I
8    mentioned to you, is cross-collateralized with the
9    NexBank collateral, your collateral.  If a property
10    goes, the sale of property, that should be one of the
11    first ones to go.
12        Q.    So your goal with respect to Thermalloy is to
13    sell it?
14        A.    My goal for Thermalloy is to sell the land.
15        Q.    Sell the land?
16        A.    It is worth more as land than it is a
17    building.
18        Q.    But the Thermalloy property?
19        A.    Thermalloy property.  And to sell the land,
20    the 6.6 acres that you have for collateral -- as
21    additional collateral.  That's my goal.
22        Q.    But you don't have a broker retained at this
23    point in time?
24        A.    I do not.  I do not.  And that's an aspect of
25    what we are having to review right now.
0171
1            Because I'm anticipating that we are
2    going to have to reach some agreement with everybody as
3    to who markets what.  There's some -- you know, there's
4    some cross-pollination there of assets that we will have
5    to decide.
                            Page 71

HC 00917

Morgan, Richard 01-27-11.txt

```
 6          It would be improper to have somebody
 7   else market, for example, the Armed Forces' property at
 8   Mercer Crossing.  It would be improper to have somebody
 9   market that and then have a competing broker marketing
10   your land.  We have to come to some concert of who is
11   going to be the first person to market the property.
12        Q.   So are you saying that you would like to
13   engage in discussions with the lenders on the process
14   for marketing these properties?
15        A.   I don't think I have any choice.  Yes.
16        Q.   Okay.
17        A.   Actually, you are not saying you want to be a
18   partner; but we are.  If we are going to make it
19   better -- we are going to have to do two things.  We
20   have got to create value.  If we don't create value,
21   then your value is not there to pay off your loan.  So
22   working together in trying to create value to pay you
23   off, that's my goal.  And, hopefully, there will be
24   something left on the back side.
25        Q.   For your success fee?
0172
 1        A.   Yes.
 2             MR. KIM:  I think I'm done.  I reserve
 3   the right to come back if I have any other questions.
 4                    EXAMINATION
 5   BY MR. MALONEY:
 6        Q.   I'm William Maloney representing Armed Forces
 7   Bank.
 8        A.   Okay.
 9        Q.   I would like to use as a reference the cash --
10   I think this is in several different places -- but the
11   Cash Collateral Motion, I think, is Wells Fargo Exhibit
12   174, if I made a proper note of that.
13        A.   You did.
14        Q.   And Exhibit A is, I think, the same thing you
15   were just looking at a few minutes ago with a different
16   number.  But I would like to use the one that's attached
17   to the Cash Collateral Motion.  It is also labeled
18   Information for Initial Debtor Interview, Question No.
19   7.
20        A.   Okay.  I'm with you.
21        Q.   Okay.  The Armed Forces properties on this are
22   the McKinney Ranch, Kinwest Tract, Payne-North, Pioneer
23   Crossing, and Valwood Mercer Crossing.
24        A.   Yes.
25        Q.   And none of those were identified by you a few
0173
 1   minutes ago as an income producing property.
 2        A.   Let me find that Valwood Mercer Crossing.  I
 3   need to --
 4        Q.   It is on the last page.
 5        A.   I just want to refresh my memory.  Okay.
 6   That's your -- okay.  I'm with you now.
 7        Q.   Okay.  None of these were identified as income
 8   producing properties when you identified income
 9   producers a few minutes ago.
10             Can you describe the nature of each of
11   these properties, if you know them?
12        A.   I do.  Are you ready?
13        Q.   Yes, sir.
14        A.   All right.  You call them out and I will give
15   you the nature of --
16        Q.   McKinney Ranch?
```

Page 72

HC 00918

Morgan, Richard 01-27-11.txt
17       A.   McKinney Ranch is sitting next to a very
18  successful development.  Of all the properties that will
19  probably move fast, I think that would be it.  It is
20  properly zoned.  And looking at it just from an aerial
21  standpoint, it is a very marketable property.
22       Q.   But its present state is undeveloped ground?
23       A.   Adjacent to developed property, yes.
24       Q.   How about the Kinwest?
25       A.   Kinwest is a small tract -- it is a small
0174
1   strip of land, not very deep, but it's in and around the
2   Columbia exit over there -- all fronting on 635.  It
3   backs up to Hackberry Creek, which is a very successful
4   single family subdivision.  Obviously, the exposure -- I
5   mean, the traffic count on that thing is absolutely
6   horrendous.  The exposure is good.  Coming up with a
7   plan to use it is the next thing.  And I have to work
8   very carefully finding the right user who will build it
9   for things like offices.
10            Or one of the big things going right now
11  is the individual condo offices where you come in in
12  situations like this and you build an office and you
13  sell off four units within that.  That's a very hot
14  thing that I think might work for it.
15            But it has tremendous exposure right off
16  635 and good access.  There's another piece, which is
17  not in your collateral, called Hunters, which ties in to
18  the Columbia Road access and provides access to this
19  piece of property.
20       Q.   Payne-North, also undeveloped?
21       A.   Payne-North is -- that is a great tract.  It
22  is at the intersection of 114 and Belt Line.  And it is
23  a great tract of land.  There is actually some interest
24  on that right now.
25       Q.   Pioneer Crossing, undeveloped?
0175
1       A.   Pioneer Crossing, I'm not that familiar with.
2   It is -- I know it is on Lamar Boulevard in Austin,
3   Texas.  It is part of a master planned deal.  It is very
4   close to the Samsung plant down there.  But I haven't
5   been to see that to get a specific feel on that.
6       Q.   And then finally there's the Valwood/Mercer
7   Crossing, 257 acres.  What's it -- do you know anything
8   about it?
9       A.   I know all about it.  It is a
10  conglomeration -- not a conglomeration.  It is a piece
11  of land, which a part of it was on Mercer Crossing
12  complex.  It basically starts on -- fronts on Valley
13  View and winds around and comes down the existing,
14  already improved boulevard, and comes in behind the
15  existing 1800 building, sort of an odd shape piece.  But
16  that's the way it was zoned.
17       Q.   You were careful to explain with regard to the
18  income producing properties that -- where you had
19  cross-collateralization, you might use income from one
20  property to pay the expenses of a cross-collateralized
21  property owned by -- or pledged to the same lender?
22       A.   I think we said the same thing.  I'm not going
23  to allow -- I'm not going to get the casket outside of
24  their collateral pool.
25       Q.   Okay.  What are you going to do with these
0176
1   five properties which don't have any income coming in?
                          Page 73

HC 00919

Morgan, Richard 01-27-11.txt
2        A.   I think I mentioned that briefly to Mr.
3   Weitman.  There's -- the challenge there, obviously, we
4   have to provide some kind of adequate protection.  So
5   providing adequate protection comes from one or two
6   sources.  It either comes from an investor pool that I
7   put together that does that in anticipation of getting
8   some part of the profit, or it has to come from TCI or
9   one of their related entities.  I'm pursuing the first.
10       Q.   This would be -- your initial effort is going
11  to be to find new blood that wants to put cash into
12  this?
13       A.   Exactly.
14       Q.   And how far are you along on that path?
15       A.   Only on a concept standpoint.  I have only had
16  this, you know, just a few days.  So the -- I do have
17  the concept plan put together and am in the process of
18  testing the waters on how that will go.
19       Q.   And why are you looking there first instead of
20  a TCI entity?
21       A.   Well, I said that -- bear in mind that there's
22  a note from TCI.  Now, that note has to be -- if they
23  want to protect it, then they are going to have to put
24  up more money to protect it if I can't raise it from
25  another source, or not.  And if they don't, then the
0177
1   next step is very simple.
2                MR. WEITMAN:   That's a note to TCI, not
3   from.
4                THE WITNESS:   That's right.
5        Q.   (BY MR. MALONEY)  But at the present time you
6   don't have any commitment for additional capital?
7        A.   I do not have a written commitment for
8   additional capital at this time.
9        Q.   Has anybody given you a verbal commitment for
10  additional capital?
11       A.   No.
12       Q.   You described your initial meeting with -- I'm
13  sorry -- I believe it was Mr. Moos and Mr. -- who was
14  the other person on the 23rd of December?
15       A.   Ron Akin.
16       Q.   Ron Akin.  At that time they had already made
17  the transfers.  We now have the written documents from
18  that.  They are all dated on the 23rd of December.  And
19  you said you looked over it basically the Christmas
20  weekend, communicated to them your interest in taking
21  the assignment, then proposed.  And then I think you
22  said you didn't do much until January 4th?
23       A.   No, I just said I didn't get real active until
24  January 4th.  Active in the sense of, I evaluated it.
25  But spending a lot of time on it, I didn't.  The
0178
1   Christmas holidays were there, and I just didn't spend a
2   lot of time on it.
3        Q.   Even on the very first discussion on the 23rd,
4   was it made clear that bankruptcy was one of the first
5   orders of business for the FRE Real Estate?
6        A.   Yes.
7        Q.   Okay.  So you knew from the beginning that it
8   was headed to bankruptcy court?
9        A.   Right.
10       Q.   Were you involved much in the -- it was filed
11  on the 4th.  Were you involved much in the preparation
12  of that?
                                    Page 74

Morgan, Richard 01-27-11.txt

```
13        A.    In the preparation of the bankruptcy filing?
14        Q.    Yeah.
15        A.    Most of that was done by Mr. Crown and whoever
16   he had working with him.
17        Q.    And then the attorney at that time was a Mr.
18   Lewis?
19        A.    Right.
20        Q.    By the time -- you know, if I understand it
21   right, the bankruptcy was filed on Tuesday, the first
22   Tuesday of the month, which is the Texas day of
23   foreclosure sales.
24              By the time January 4th came around, were
25   you aware that at least some of these properties had
0179
1    been posted for foreclosure on that day?
2         A.    I was not.
3         Q.    You were not.  I apologize.  I can see you
4    with my glasses on.  I can see the paper with them off.
5    I have to switch back and forth.
6         A.    I hear you.
7         Q.    As far as what was communicated to you, you
8    didn't -- you were the restructuring officer at this
9    time.  But as of January 4th was anybody saying to you
10   that we need to file bankruptcy in order to avoid losing
11   this property?
12        A.    No.
13        Q.    And just for the record, you are saying no?
14        A.    I'm saying no.  There is --
15        Q.    You were shaking your head.  That's why I said
16   that.
17        A.    No, I'm not shaking my head.  I'm just saying,
18   no one mentions specifically the bankruptcy.  Obviously,
19   they don't go into this pool for that purpose unless
20   there are troubled properties in some fashion, or about
21   to be.
22        Q.    You explained to Mr. Kim -- I want to make
23   sure I understood something.  You said as early as the
24   23rd you knew that a bankruptcy was in the works for
25   FRE?
0180
1         A.    Yes.
2         Q.    And on the 4th you knew it was being filed?
3         A.    Yes.
4         Q.    And you signed the --
5         A.    Yes.
6         Q.    -- petition.
7               Back on the Exhibit A to the Cash
8    Collateral Motion, I don't want to retread ground, but
9    there for the first time is a column with the label
10   value on it.
11        A.    Right.
12        Q.    Because there is a sale summary, I believe,
13   that was prepared, perhaps by your attorney, that's
14   Exhibit No. 168 that provides similar, but a little bit
15   different, information.  It provides, you know, for each
16   one the property name, the selling party, purchasing
17   entity.  And its first column of numbers is sale price
18   rather than value.  But at least on the five properties
19   my client has an interest in, the sale price and value
20   are always the same.  You know, for instance, McKinney
21   Ranch on Exhibit 167 has a $5.4 million value --
22              MR. BUNCHER:   168.  Exhibit 168.
23              MR. MALONEY:   168 is the sale.
                          Page 75
```

HC 00921

Morgan, Richard 01-27-11.txt
```
24                  MR. BUNCHER:  Right.
25                  MR. MALONEY:  No, I think I said it
0181
 1    right.  On 167, it is a $5.4 million value --
 2                  MR. BUNCHER:  No, 174 is the other one,
 3    Cash Collateral exhibit.
 4                  MR. MALONEY:  Yes, you are right.  Thank
 5    you.
 6          Q.   (BY MR. MALONEY)  Where Exhibit 174, which is
 7    Exhibit A to the Cash Collateral Motion, just, for
 8    example, using the McKinney Ranch, $5.4 million value
 9    and the Exhibit 168, $5.4 million sale price, can you,
10    in a nutshell -- because I know you have explained some
11    of this before in a little bit different
12    circumstances -- how you came up with those two numbers?
13    They are the same number, but --
14          A.   No.  As I mentioned, the value that we put on
15    it almost goes straight to what we paid for it.  The
16    value here is what we paid for the deal.
17          Q.   Yes.
18          A.   So we are not contending anything is worth
19    more than what we paid for it initially, I don't think.
20          Q.   And whereas to the previous -- to Mr. Kim, you
21    gave a fairly detailed explanation of how you came up
22    with these value figures -- and so we don't have to
23    repeat it -- is that the same process you came up with
24    to reach the sale price?
25          A.   Say that again.
0182
 1          Q.   Mr. Kim was asking you questions and you
 2    explained how you came up with the value number on
 3    Exhibit 174?
 4          A.   No, it is a different process.  You know,
 5    there are so many factors involved in evaluating
 6    improved real estate, as I mentioned to you.  There's a
 7    lot of factors.  The only value relative to the land is
 8    either what the comparables are or what the -- what is
 9    perceived to be the going rate per square foot in these
10    cases as to what the land is going for.
11                  The comps in that case show that the
12    sales were in excess of the $5 a square -- roughly $5 a
13    square foot this land was.  And I'm using a rough
14    calculation as far as McKinney Ranch is concerned.
15                  But sales had occurred in this area in
16    excess of that area right adjacent to it that was sold
17    also by whoever the entity owning it was.
18          Q.   Are you saying you used two different
19    processes and in every instance came up with, for each
20    property, the same number as a value and the same number
21    as a sale price?
22          A.   No.  There are two different values.  Okay.
23    The value that we reported for the Bankruptcy Court is
24    the value we paid for it.  My perceived value as to what
25    this land could be worth is a whole different number.
0183
 1                  My question was:  Can I make any money
 2    doing this?
 3                  MR. BUNCHER:  I think he's just asking if
 4    the value number on this Exhibit 174 was just the same
 5    number you had as the sales price on --
 6                  THE WITNESS:  It should be purposely the
 7    sales price.
 8          Q.   (BY MR. MALONEY)  On the portion of Exhibit
                          Page 76
```

Morgan, Richard 01-27-11.txt

9   174 that we have been looking at, which is also Exhibit
10  A to the Motion For Use Of Cash Collateral, you have got
11  lienholders listed and --
12      A.   You have got to get me to the right schedule
13  now.  I'm looking at this -- are we looking at the same
14  page?
15      Q.   I believe so.  It is not the sale report.  It
16  is the exhibit to Cash Collateral --
17          MR. BUNCHER:   174, right here.
18      A.   Okay.
19      Q.   (BY MR. MALONEY)  McKinney Ranch entry shows
20  Armed Forces Bank, NA, as a lienholder?
21      A.   Uh-huh.
22      Q.   It also shows Propel Financial Services.  Do
23  you know what that is?
24      A.   Yes.  Propel is the company that basically
25  buys the tax and refinances them.
0184
1       Q.   There's a $67,000 and change entry on McKinney
2   Ranch.  Was that for the 2009 taxes that became due in
3   2010?
4       A.   I can't tell you that.  I don't know
5   specifically.
6       Q.   Was that lien there at the time of the
7   bankruptcy filing?
8       A.   As far as I know.
9       Q.   Yes, it would have been.
10               Do you know -- I looked at their website.
11  And from what it looked to me -- maybe they do two
12  different things -- it looks like they market themselves
13  for people to say, come loan us money to pay our
14  property taxes.  I have heard other people describe it
15  that under Texas law, you can go pay somebody's property
16  tax and stand in the shoes of the Government with the
17  lien.
18               Do you know how Propel came to be
19  involved on these properties?
20      A.   I know they are being perceived -- in my mind,
21  they are perceived as a financing entity, not owning the
22  lien, not owning the tax lien, but financing to pay off
23  the taxes.  It could be -- it could be incorrect.  I'm
24  not sure.
25      Q.   How do you think -- if you know, how does
0185
1   their lien compare in priority with the Armed Forces
2   Bank lien?
3       A.   I don't know.  But if it is a tax lien, they
4   are ahead of you.
5       Q.   Yes.  Do you know if -- as regarding to
6   McKinney Ranch, whether the taxes that became due
7   January 31, 2010, were paid?
8       A.   I don't know that.
9       Q.   Do you mind, if for convenience sake, I'm
10  going to refer to the Armed Forces Bank's property as --
11  by that, I mean the five that we have looked at,
12  McKinney Ranch, Kinwest, Payne-North, Pioneer Crossing,
13  and Valwood/Mercer Crossing.
14               As to the Armed Forces Bank property, do
15  you have any wherewithal to pay the taxes or income due
16  in about a week from now, January 31st, for the 2010
17  taxes?
18      A.   Not to my knowledge.
19      Q.   Is there any plan to seek some sort of
                              Page 77

HC 00923

Morgan, Richard 01-27-11.txt
20  financing again for, you know, a post petition loan to
21  pay these taxes?
22      A.    I'm speaking as a layman who understands
23  something legal.  Okay.  As I understand it, the real
24  estate taxes are automatically financeable for a
25  five-year period from the due date at 6 percent
0186
1   interest.  That's an automatic in Texas.
2       Q.    But each year they go -- well --
3       A.    You have to keep the taxes current and then
4   pay up -- I understand.
5       Q.    And until it is paid, do they constitute as a
6   tax lien that would be of higher priority than a
7   voluntary lien that was granted to a bank?
8       A.    That's getting to an issue I don't know.
9       Q.    The transfer documents are dated December
10  23rd, the -- there were deeds executed, at least the
11  ones I have looked at.  I haven't looked at anybody's.
12  But as to the Armed Forces Bank properties, there was a
13  warranty deed -- I forget if it was general or
14  limited -- signed on December 23rd for each of the
15  properties that secure our loans.  And they were all
16  filed on January 4th rather than closer to the time they
17  were executed.
18          Do you know why there was a delay in
19  filing each of those -- and when I say filing, I mean,
20  recording each of those deeds?
21      A.    Well, I can't attest that that was the case.
22  If you are telling me that is the case, I don't have an
23  expectation for it.
24      Q.    Were you involved in recording them?
25      A.    No.
0187
1       Q.    Do you know if there was any similar documents
2   as in a -- the bank of -- I'm sorry -- the Armed Forces
3   Bank documents, basically a sale agreement, by which the
4   FRE purchases the assets and assumes the liabilities of
5   the previous borrowers, do you have any knowledge of
6   similar agreements that were executed but never
7   recorded?
8       A.    You mean outside the bankruptcy?
9       Q.    Right.  I'm saying, for all I know, there are
10  ten more companies with those agreements executed that
11  something changed, they were never recorded, and now
12  they are gone.  And I'm asking you -- you know, they
13  only became public knowledge on January 4th when they
14  were recorded.
15          Were there any other similar arrangements
16  that were --
17      A.    I don't understand your question.
18      Q.    -- never recorded?
19      A.    I really don't.
20          MR. BUNCHER:  Yeah, I don't understand it
21  either.  Maybe you can rephrase it.
22          MR. MALONEY:  I will.
23      Q.    (BY MR. MALONEY)  There were transfers on the
24  23rd, you say before you were engaged in this, by way of
25  which the original borrowers -- and we will just talk
0188
1   about, you know, the loans from my client -- original
2   borrowers sell their real property to FRE Real Estate.
3   And part of the price, as set out in a written
4   agreement, is they assume the mortgage debt, they assume
                        Page 78

Morgan, Richard 01-27-11.txt

```
 5   the trade debt, and then they issue a note for the
 6   balance.  Those were executed on December 23rd, at least
 7   the five I have seen.
 8        A.   Right.
 9        Q.   Nobody else really knows about it until they
10   are recorded on January 4th.
11             MR. BUNCHER:  Well, I object to that as
12   a -- I don't agree with that.  But okay.
13        Q.   (BY MR. MALONEY)  Well, they were recorded
14   January 4th.  Do you know, were there any transactions
15   of a similar nature executed around December 23rd that
16   were never -- whereas a deed was never recorded?
17        A.   I don't know.
18        Q.   So you don't know of any additional
19   transactions --
20        A.   That were never recorded?
21        Q.   Correct.
22        A.   No.
23             MR. BUNCHER:  Are you talking about
24   transactions beyond the transfers that are listed here
25   on Exhibit 168?  Or are you suggesting that some of
0189
 1   these transfers themselves were not recorded?
 2             MR. MALONEY:  No, not at all.  There
 3   could have been a change of circumstances where other
 4   loans reached some other arrangement and did not -- were
 5   not part of a bankruptcy and, therefore, never recorded.
 6        A.   I would have no knowledge of that.
 7        Q.   (BY MR. MALONEY)  Other than taxes, as with
 8   the Armed Forces Bank property, are there other carrying
 9   costs?
10        A.   There will be come spring.  There will be
11   mowing costs and trimming costs and so forth.  And
12   that's -- we prepared budgets for the first three
13   months.  And then the next four budgets will show -- and
14   I'm not only going to prepare it, I have got to show how
15   I'm going to pay for it.
16        Q.   Did you prepare budgets for these properties?
17        A.   We didn't prepare budgets for the land because
18   there's no expense.
19        Q.   Right.  But that will change?
20        A.   Yeah, it will change come growing season.
21        Q.   Is there any rule of thumb as to what it costs to
22   maintain this property by acre?  Or how do you estimate?
23        A.   That's a good question, depending on whether
24   you are using a Snapper or a tractor.
25        Q.   Yeah.  So?  You can tell what the taxes are
0190
 1   going to be.
 2        A.   Quite candidly, I don't know what it costs by
 3   acre to mow right now.  I don't know that.  But I can
 4   find out.  That's not a problem.
 5        Q.   The taxes can accrue and whatever happens to
 6   them is whatever happens to taxes.  You think they can
 7   be financed for five years.  I'm not sure about that.
 8   What about getting stuff mowed?
 9        A.   That's what I'm saying, the care of the
10   property, the mowing is a cost that I'm going to have to
11   come up with the money to pay for outside of the secured
12   collateral of the income producing property.
13        Q.   I think that's all that I want to ask you.
14   Thank you.
15                       EXAMINATION
                          Page 79
```

HC 00925

Morgan, Richard 01-27-11.txt

```
16    BY MS. HARTWICK:
17         Q.   Good afternoon, Mr. Morgan.
18         A.   Yes, ma'am.
19         Q.   My name is Jo Hartwick.  I'm with Stutzman,
20    Bromberg, Esserman & Plifka.
21         A.   Yes, ma'am.
22         Q.   And I represent Petra.
23         A.   Petra.  Okay.
24         Q.   Sir, if I understood you correctly earlier
25    today, you testified that when you were looking at the
0191
1     chart, for lack of a better word, that showed the
2     properties and the values and the like, that the book
3     value on the Amoco Building was low due to Katrina
4     damage.  Did I understand that correctly?
5          A.   Yes.
6          Q.   What do you consider or define book value --
7          A.   Book value --
8          Q.   -- to mean?
9          A.   -- is the number that -- which is not on their
10    chart, but was represented to me was what it was on the
11    books of the seller, what the actual carrying cost was
12    for the seller.
13         Q.   And based on your lengthy experience in real
14    estate, do you know what all goes into determining the
15    carrying costs that's normally recorded on the seller's
16    books?
17         A.   Sure.  It is the -- it is the purchase price,
18    plus any capital expenditures put into it, less
19    depreciation.  And in most cases also, reduced by the
20    amount of cash that the property has generated.
21         Q.   You testified just a few minutes ago, sir,
22    that it is your goal to sell the Amoco Building just as
23    it is with several of the other buildings?
24         A.   Yes.
25         Q.   And that you -- and that you have -- and I
0192
1     don't want to put words in your mouth.  I may have just
2     done some shorthand of my own -- something in the works
3     in the neighborhood of 14,000 to 16,000 --
4          A.   Right.
5          Q.   -- square feet.  What's the status of that
6     effort?  Where are you?
7          A.   I have to bring that up to date.  One of the
8     bigger tenants was wanting 9,000 square feet.  And I
9     don't remember who the other one was.  But both of them
10    were rather imminent with very little tenant finish.  I
11    haven't followed up on those two.  That was my interview
12    in between the 23rd and the 4th just to get a feel of
13    the thing.
14         Q.   Sir, are you aware that there is a tenant
15    currently in the Amoco Building that I believe is
16    related to the debtor that has 19,468 square feet of
17    space, I'm informed, and that pays no rent?
18         A.   I don't think that's the case.  Certainly not
19    on my rent rolls.
20         Q.   Well, if you would like to check, I know my
21    client would be delighted if they would start paying.
22    It is Continental Baronne, I'm told, is the name of
23    the --
24         A.   It is not on my rent roll and not included in
25    my analysis.
0193
```

Page 80

HC 00926

Morgan, Richard 01-27-11.txt
1    Q.   But it may be in the building?
2    A.   I don't know.  It is not on my rent roll or on
3  my analysis.
4    Q.   It would just seem if we are all trying to
5  maximize the amount of money that's coming in --
6    A.   Yeah, I understand.
7    Q.   -- it would be worth having them start paying.
8         And are you aware, sir, of any appraisal
9  that's been done on the Amoco Building?
10   A.   Not by us, no.
11   Q.   You said, sir, that the properties -- like I
12 said, as I understood your testimony, several of the
13 properties are income producing properties, it is your
14 goal to sell them, but some of them need a little more
15 work.  And I understood the Amoco Building is one of
16 those that needs a little more work?
17   A.   Not as much as the others; but, yeah, it does.
18   Q.   What work does it need?
19   A.   When I say work, I'm talking about to raise it
20 up to -- what I was trying to explain a few minutes ago
21 is that there's -- when you are a buyer, there are --
22 there's a level of risk that you put to the vacant
23 space.  And the level of risk you put to the vacant
24 space is sort of how the property is already competing
25 in the market.
0194
1         So if this market -- if I get it to 88
2  percent, which is what this market is, if I get it to 88
3  percent, then a buyer might attribute more value to the
4  other because it is all upside.  It is upside less the
5  capital he has to put to it.  But he has a decent return
6  on his cash going in and -- you know, in a 7 percent
7  range, cash going in.  So that makes it a much more
8  feasible plan for someone to do.
9         If you have got the cash flow, it
10 satisfies the need for the requirement.  Everything is
11 upside at that point.
12   Q.   And you mentioned earlier that you had seen a
13 newspaper article about the kind of good news for the
14 Dallas market?
15   A.   Yes, uh-huh.
16   Q.   Do you have your finger on the pulse of New
17 Orleans?
18   A.   I do have the market report.  I went through
19 it.  But I did not spend a lot of time on it.  It is
20 quite obvious that nothing was going to be built for a
21 long time in New Orleans, I don't think.  The only
22 building that is comparative, and I know that it is
23 being worked, was some kind of deal where the Saints
24 buyer bought a building and gutted it and is leasing it
25 to some of the, you know, affiliated Government
0195
1  entities.  I don't know the total details of that.
2         Other than that, I don't foresee any
3  building in the New Orleans market.  So whatever is
4  there is going to be prime for whatever happens.
5    Q.   Mr. Morgan, when did you become vice president
6  of ABCLD Properties, LLC?
7    A.   That would have had to have come at the same
8  time.  I don't remember all of those transactions.
9    Q.   Did you make the decision in that capacity
10 that the debtor -- that the -- I think -- I'm not sure
11 if it was a sole independent director, but I believe it
                          Page 81

HC 00927

Morgan, Richard 01-27-11.txt

```
12   was -- that the independent director of the debtor
13   should be terminated; that their service should be
14   terminated?
15       A.   First of all, I'm going to have to -- I'm not
16   for sure I am the vice president.  If that's of record,
17   it is.  Okay.  I will do ABCD, whatever it is.  I'm not
18   sure I am.
19             Now to your second question.
20       Q.   Okay.  Let me help refresh your recollection.
21             MS. HARTWICK:  Let's mark this Wells
22   Fargo whatever the next number is.
23             THE REPORTER:  175.
24             (Exhibit 175 marked.)
25       Q.   (BY MS. HARTWICK)  Would you look at what's
0196
1    been designated as Wells Fargo 175.  That appears, sir,
2    to be a letter from you to a Ms. Lisa Dedonato --
3        A.   Dedonato, yes.
4        Q.   -- terminating her service as sole
5    shareholder -- or her company's service, it may well be,
6    Corporate Staffing Team 1 -- terminating her services as
7    sole shareholder of the debtor.
8        A.   Uh-huh.
9        Q.   Is that correct?
10       A.   Uh-huh.
11       Q.   Do you recall signing this letter, sir?
12       A.   I do recall signing the letter.
13       Q.   Did you make the decision to terminate the
14   independent director?
15       A.   I can't remember whether it was Mr. Lewis
16   or -- I don't remember.  But I was advised that it
17   needed to be done as far as the filing.
18       Q.   Okay.
19             MS. HARTWICK:  I will reserve the right
20   to come back with just a very few questions if I see
21   that I missed something when I look at my notes.  But I
22   will pass the witness.
23                     EXAMINATION
24   BY MR. KINVIG:
25       Q.   Afternoon, Mr. Morgan.  My name is Cameron
0197
1    Kinvig.  I'm with the firm Hunton & Williams.  And I
2    represent American Bank of Commerce.
3        A.   Okay.
4        Q.   From here on out, just because it is sort of a
5    wordy name, if I refer to American Bank of Commerce as
6    ABC, you would know what I mean, correct?
7        A.   Unless you put LD behind it.
8        Q.   Hopefully, not.  We will just refer to my
9    client as ABC from here on out in the questioning and in
10   the transcript.
11             Just a few questions for you.  And I
12   think we have touched a little bit on this, but maybe
13   not to the full extent.  If we look to, I think, what
14   was previously marked as Wells Fargo Exhibit 168, which
15   is what your attorney provided all of us.
16       A.   This chart?
17       Q.   Yeah, last night.  And we look in the column
18   that says sales price specifically.  How did the debtor,
19   or whoever reached those values, how were those values
20   reached?  And as a follow-up question, who were the
21   entities or who was the individual that assigned those
22   values?
```

Page 82

HC 00928

Morgan, Richard 01-27-11.txt
23       A.   In most cases -- I can't give a general
24  specific without looking at the other chart.  In most
25  cases, it was a representation of the difference between
0198
 1  the debt and the -- combination of debt and the book
 2  value.
 3             So let's take specifically one of your
 4  properties.  The Thornwood properties are -- basically
 5  it is a difference -- you see that your seller
 6  financing, you only have $2971 of debt against that.  So
 7  the mortgage -- the second -- not secured note, but the
 8  promissory note is 1.667 million.  That represents the
 9  fact that they have it on the books for 1.670 million.
10       Q.   And when you say promissory note, you mean to
11  Thornwood itself or the entity that used to be called
12  Thornwood?
13       A.   Yes.
14       Q.   I guess it is still called Thornwood after the
15  sale.
16             And similarly on the Bridgewood Ranch
17  Apartments, then you look at it and you say, well, the
18  debt that was outstanding is $5.188 million.  We believe
19  the book value to be, you know, 7.15 million.
20       A.   In that case I had a little bit stronger deal
21  because I had the financial statements.  I had the
22  budget.  And I don't remember the cap rate.  But it was
23  a very attractive cap rate, save and except the other
24  cross-collateral you had.
25       Q.   Okay.  So for the Bridgewood Ranch Apartments,
0199
 1  you would say that the sales price on Exhibit 168 is
 2  more of a value based on a cap rate based on the number
 3  of tenants and things?
 4       A.   No, I would not say that.  I'm saying it still
 5  should be a representation of what it was on the books
 6  for.  My value would be higher than what we paid for it.
 7       Q.   Okay.  What do you believe -- well, scratch
 8  that.
 9             Going to something that you actually just
10  touched on really quickly on the Thornwood Properties,
11  specifically the debt assumed by the buyer, you
12  mentioned it is $2971.  How was that number reached?
13       A.   I'm assuming, just on what I have seen so far,
14  and I will have to go back, it may be a Propel debt.  I
15  don't know what it is quite candidly.
16       Q.   Are you aware that ABC has a $4.3 million lien
17  against those properties lumped together?
18             MR. BUNCHER:   You mean
19  cross-collateralized or --
20             MR. KINVIG:   No.
21       Q.   (BY MR. KINVIG)  And just to be clear, ABC
22  actually has two loans.  ABC has one loan for a little
23  over $4.3 million, almost $4.4 million.  And that is
24  secured by the Thornwood Property -- the Thornwood
25  Properties, the Limestone Canyon II, the Temple land,
0200
 1  and the Teleport building.
 2       A.   The $4.3 million.
 3       Q.   Yeah.  And it is also collateralized by
 4  another property that I do not believe is in the
 5  debtor's estate right now.  It is a Dallas property
 6  that --
 7       A.   Copper Ridge.

Page 83

HC 00929

Morgan, Richard 01-27-11.txt

8      Q.   Well, it is sort of a derelict building that
9  actually should be -- or will be torn down.
10     A.   Yeah, it has got to be torn down.
11     Q.   And then it is also collateralized by a second
12  lien in the Bridgewood Branch Apartments?
13     A.   That's correct.  And I believe it also has the
14  stock --
15     Q.   And it also has the stock.
16     A.   -- and a receivable from one of these entities
17  that actually owned Copper Ridge.
18     Q.   Yeah, yeah.  Separate and apart from that, ABC
19  is also owed a little over $5 million.  And the only
20  collateral, that at least I'm aware of, that
21  collateralizes that particular loan is a first lien on
22  the Bridgewood Ranch Apartments.
23     A.   May be true.  My representation to me was
24  that -- was that the two loans were
25  cross-collateralized.  And the filings that have been
0201
1  made -- and I discovered that I don't know exactly what
2  day, but we've got to redo our filings because that 4.3
3  million was not done -- was not listed.  And it wasn't
4  because when the transfer was done it was done in a --
5  you see the notes on the bottom, sort of in a convoluted
6  fashion, you have got to get this and this and this.  We
7  didn't talk about the debt that went with it.  So we
8  have to refile that.
9      Q.   So it is your testimony then that that will be
10  corrected on --
11     A.   Exactly.
12            MR. BUNCHER:  I assume it will be on the
13  schedules that are going to get filed.
14            MR. KINVIG:  Right.  But for purposes
15  of -- if the schedules aren't -- I can't remember when
16  they are due.  But if it is --
17            MR. BUNCHER:  Tomorrow.
18            MR. KINVIG:  Oh, well, then, there you
19  go.  It will be before the hearing.
20     A.   And, quite candidly, I don't have any
21  information, if you can help with that aspect, as to
22  whether or not Bridgewood is a stand-alone first lien
23  asset not encumbered by the others.
24     Q.   (BY MR. KINVIG)  Okay.  I believe that we
25  talked about what assets FRE had before all of these
0202
1  December 23rd transfers were made.  But just so I can
2  clarify -- and correct me if I'm wrong -- the only asset
3  FRE had pre-December 23rd, to your knowledge, was the
4  Fenton Centre property?
5      A.   Fenton Centre and two properties that were
6  cross-collateralized or additional collateral for the
7  loan.
8      Q.   Oh, okay.  To your knowledge, does the
9  debtor -- you mentioned the Transcontinental stock that
10  is collateral for one of my client's loans.  Was that
11  also transferred into the debtor or was that not
12  transferred?
13     A.   Yes, it was.
14     Q.   It was.  And when was that transfer made?
15     A.   The same day.
16     Q.   On December 23rd?
17     A.   Uh-huh.
18            MR. KINVIG:  Okay.  Just as a request for
                         Page 84

HC 00930

Morgan, Richard 01-27-11.txt
```
19   production, if I could get any information related to
20   that transfer.
21              MR. BUNCHER:  I actually have asked Mr.
22   Roberts to communicate with you and some other firm that
23   sent a notice of foreclosure indicating they were going
24   to foreclose on that stock.  And so Mr. Roberts is
25   supposed to be getting the documentation to you guys on
0203
 1   that.
 2              MR. KINVIG:  Yeah, that would be great.
 3   Because, to my knowledge, up until this line of
 4   questioning, I wasn't even aware that it had been
 5   transferred into the debtor.  So if we could work out
 6   some dialogue on that, that would be great.
 7   INFORMATION REQUESTED:_____
 8        Q.   (BY MR. KINVIG)  You mentioned using cash from
 9   the Bridgewood Apartments previously to cover a lot of
10   the expenses on some of the other properties, including
11   this Irving property, this Teleport property.  And you
12   mentioned that they are sort of cross-collateralized,
13   right?
14        A.   That was my understanding.
15        Q.   Okay.  Have you -- have you viewed any
16   cross-collateralization agreement?
17        A.   No.  I was basically -- that may have been a
18   presumption, but that was the way I understood it.
19        Q.   So your testimony, then, is you are not 100
20   percent clear whether there is a cross-collateralization
21   agreement between the one loan, let's call it the $5
22   million loan that has the first lien on Bridgewood, and
23   the $4.3 million loan that has the second lien on
24   Bridgewood, correct?
25        A.   Right -- well, that is sort of a
0204
 1   cross-collateralization, is it not?
 2        Q.   Well, I mean, if there is a
 3   cross-collateralization agreement.  But they are --
 4        A.   The fact that you have the second -- you have
 5   got a second mortgage on the other loan, that is
 6   effectively a cross-collateralization, is it not?
 7        Q.   Not necessarily.  Because I would say that --
 8   I mean, and we can get into an argument about it.  But I
 9   would say that the cash flow -- the majority of the cash
10   flow that comes in from Bridgewood belongs towards going
11   to pay down the first lien.
12              And so I guess what I'm getting at is, if
13   it became clear that there was no
14   cross-collateralization agreement -- and you know how
15   banks work where they may have different loan
16   participants for different loans.  So just because a
17   bank makes two loans, it doesn't mean that you can rob
18   Peter to pay Paul.
19              If it became clear that there was no
20   cross-collateralization agreement between the one loan,
21   the $5 million loan and the other loan, the $4.3 or $4.4
22   million loan, would it still be your plan to use cash
23   just in toto from Bridgewood to pay some of these
24   expenses, like for Teleport?
25        A.   That's an interesting question.  I don't know
0205
 1   the answer.  Is a second mortgage on parcel B
 2   cross-collateralizing parcel A?  I don't know.  You are
 3   asking a question I don't know the answer to.
```
                              Page 85

HC 00931

Morgan, Richard 01-27-11.txt

```
 4                The intent was that -- as far as ABC on a
 5   global standpoint, none of the cash or the collaterals
 6   that go to that loan would ever be used for anything
 7   other than ABC's collateral in toto.
 8         Q.    So really what I think I heard you just say
 9   is, the only cash you want to use to support any of
10   these raw pieces of land are cash that would be
11   attributable from another property, an income producing
12   property, but the cash that is attributable from that
13   property only to that loan?
14         A.    Exactly.
15         Q.    So in ABC's situation, if it was shown that
16   all the cash attributable -- that came into net cash
17   from Bridgewood was attributable to the first loan, the
18   $5 million loan, and none was attributable to the second
19   loan, the $4.3 or $4.4 million loan, then you wouldn't
20   use the loan -- or the cash attributable from the first
21   loan to pay the second loan?
22                MR. BUNCHER:  Well --
23         A.    You are really getting into --
24                MR. BUNCHER:  Hold on.  I think your
25   whole -- that line of questioning -- that question gets
0206
 1   into a legal conclusion.  Because we may, in fact, take
 2   the position contrary to what you are saying.  You may
 3   take the position it is not cross-collateralized and,
 4   therefore, we shouldn't use Bridgewood cash to support
 5   Teleport's expenses.  We may disagree with your legal
 6   analysis and argue --
 7                MR. KINVIG:  I understand that.
 8                MR. BUNCHER:  -- to the Judge that we
 9   should be allowed to do that.  And then the Judge will
10   just decide on that.  Our intention would be to present
11   that issue to the Judge on a final cash collateral
12   hearing.
13                MR. KINVIG:  Okay.
14                MR. BUNCHER:  Because under the current
15   interim order, we expressed --
16                MR. KINVIG:  That's not done.
17                MR. BUNCHER:  -- indicated to the Judge
18   we would only use cash on property A to pay property A's
19   expenses.  We didn't get into this whole
20   cross-collateralization thing.  And so for right now, we
21   are not -- we are not going to do that.
22                MR. KINVIG:  Okay.
23         Q.    (BY MR. KINVIG)  Staying on the Bridgewood
24   property -- I call it the Kaufman property.  So if I do
25   slip up sometimes and call it the Kaufman property, I'm
0207
 1   not talking about the raw land.  I'm talking about the
 2   apartments.
 3         A.    I understand.
 4         Q.    Going back to Exhibit 168 -- or Wells Fargo
 5   168, that chart, when we look at the debt assumed by
 6   buyer and it is listed at 5.188 million -- or
 7   5.188070 --
 8         A.    Right.
 9         Q.    -- where exactly did that number come from?
10         A.    That should have been the -- it was at least a
11   record of what was owed as far as the company books was
12   concerned.
13         Q.    Okay.
14                MR. KINVIG:  And I guess I can talk with
                              Page 86
```

HC 00932

Morgan, Richard 01-27-11.txt
```
15   you, Doug.  I think that just doesn't show the second
16   lien on it, which I believe is around $400,000 or so.
17   But we can chat afterwards about that.
18                 MR. BUNCHER:  The second lien?  You said
19   there was a $4.4 million loan and $5 million loan.
20                 MR. KINVIG:  I believe that the second
21   lien is capped at $400,000 or something like that.  I
22   could be wrong.  But, anyway, just wanted to clarify.
23                 MR. BUNCHER:  Okay.
24        A.   May I ask something?
25        Q.   (BY MR. KINVIG)  Sure.
0208
1         A.   Is that second lien, then, a first lien on the
2    other properties?
3         Q.   Yeah, from my understanding, it is a first
4    lien on the Thornwood Properties and a first lien on the
5    stock and I guess on this -- on this receivable.
6                 That does bring up a good question.  Was
7    the receivable also transferred into the debtor, then,
8    from whatever entity --
9         A.   Yes.
10        Q.   -- held that?
11        A.   Yes.
12        Q.   Was that a Thornwood receivable?
13        A.   Pardon?
14        Q.   What entity generated the receivable that was
15   then transferred --
16        A.   It is on the back side of that schedule listed
17   there.
18        Q.   Oh, okay.  Going to the -- kind of the
19   financing aspect.  You briefly talked about maybe some
20   future attempt to get financing.  Have you talked to any
21   entity about getting DIP financing for --
22        A.   Not yet.
23        Q.   -- any of the properties?
24        A.   Because each case is separate as far as the
25   way I would have to approach it.  I don't need it -- I
0209
1    don't see any need, for example, for DIP financing on
2    your particular project, if, in fact, all cash goes to
3    pay.  If it doesn't, then there's an issue of the
4    Teleport cost, which it does cost something to keep the
5    insurance going, keep the -- not the lights on, but just
6    basic maintenance.  So that's an issue we will have to
7    address once we decide about how the assets are going.
8         Q.   Okay.  When did FRE become aware that there
9    were foreclosures or potential foreclosures that were
10   going to occur on the property?
11        A.   I can't speak to FRE.  I mentioned to you that
12   I wasn't aware at the time when I signed on to take this
13   job of any particular ones that were happening.
14   Obviously, since then, I have become aware of some that
15   were attempted to do, some were trying to do, this kind
16   of stuff.
17        Q.   So between -- and you previously testified you
18   are kind of it at FRE?
19        A.   Right.
20        Q.   You are sort of the employee, right?
21        A.   Right.
22        Q.   So between December 23rd when you started your
23   job, officially at least, and when the foreclosures
24   happened on January 4th, were you aware that any
25   foreclosures were going to occur?
```
                              Page 87

HC 00933

Morgan, Richard 01-27-11.txt
0210
1        A.    No.
2                    MR. BUNCHER:  Object to form that
3      foreclosures, quote, happened.
4        Q.    (BY MR. KINVIG)  Assuming that foreclosures
5      happened, were you aware between those dates?
6        A.    I wasn't aware of any foreclosures that were
7      going to happen on January 4th.
8        Q.    And you only then learned that any alleged
9      foreclosures happened after January 4th or on --
10       A.    On or after.
11       Q.    Okay.  And did you see any of the notices that
12     were sent to FRE about potential foreclosures?
13                   MR. BUNCHER:  Objection to form because I
14     don't know that any notice was sent to FRE.
15       Q.    (BY MR. KINVIG)  To the extent any notice was
16     sent to FRE, did you see any notice?
17       A.    I haven't seen any.
18       Q.    Okay.  Speaking about the guarantors -- and
19     I'm sure some of the other collateral had guarantors on
20     it.  I know my client's collateral did as well.
21                   Are any of those guarantors for either
22     the Thornwood Properties or the TCI Hunters Glen
23     property, have they come to debtor and said, we would
24     like to contribute to the debtor's bankruptcy?
25       A.    I don't know specifically who those are.
0211
1        Q.    Okay.  Have any parties come forward and said,
2      you know, we may be interested in investing money or
3      providing some sort of cash financing, whatnot?
4        A.    Not yet.
5        Q.    Okay.  We talked about the debtor's sort of
6      future plans for reorganizing a lot of collateral.  And
7      you said, you know, it is different depending on the
8      various pieces of property.  What about the Limestone
9      Canyon II property, the Austin raw land?
10       A.    Your particular collateral, I'm putting a
11     priority on, in particular, the Limestone.  I think
12     that's a hot property.  Temple is going to be a little
13     bit less.  But as far as being ready to sell -- you
14     know, when you sell a property, if you are going to
15     build apartments and it is already zoned, it has already
16     got utilities, it has already got all the stuff, it
17     makes it easy, that property does.  So those are going
18     to be my first two priorities.
19                   Teleport could probably be sold to a
20     user/occupier.  And that's going to be what I try to do.
21     I have got a 6,000 square foot building, very specialty
22     use.  If I find somebody today, for example, that was
23     like a -- wanted to be like a server operation where
24     they could have a server in there and then some service
25     personnel, it would be perfect for it because it has
0212
1      already got the raised floor and all that stuff in it.
2                   So those extra collaterals, if you will,
3      will be the first thing to go.
4        Q.    Okay.
5        A.    In my mind.  I can't put a time frame on it.
6      But that's where I think we have some real expectations
7      of getting it sold.
8        Q.    Okay.  Do you know what the monthly cash flow
9      is for Bridgewood, for the apartments?
10       A.    I do not right off my hand.  It is in our cash
                            Page 88

HC 00934

Morgan, Richard 01-27-11.txt
```
11   collateral --
12        Q.    Yeah.  If I represented to you that the net
13   cash flow after you take out all of the operating
14   expenses paid to the management company and things was
15   between $45- and $50,000 a month, would you roughly
16   agree with that?
17        A.    I would rather go to the cash collateral, if
18   you don't mind.
19        Q.    Okay.  That would be fine.
20        A.    Whatever it says.  Because I did pay some
21   attention to that and tied it to the budget.
22        Q.    I believe it is the very last page in that.
23             MR. BUNCHER:  What are we talking about?
24             MR. KINVIG:  The Bridgewood Ranch
25   Apartments.
0213
 1        Q.    (BY MR. KINVIG)  It is the very last page of
 2   that.
 3        A.    Yeah.
 4        Q.    So what's sort of the low number and what's
 5   the high number on that?
 6        A.    45 low, 49 high.
 7        Q.    And when you say 45 --
 8        A.    Average about 47,000.
 9        Q.    47,000?
10        A.    Yeah.
11        Q.    Okay.  And do you know what the debt service
12   is pre-petition on that for the first lien?
13        A.    I don't know exactly.
14        Q.    Okay.  Do you know that -- do you know whether
15   or not the difference between that 45- to 49,000 and the
16   debt service, if there's any net cash flow on the
17   property per month?
18        A.    Well, without knowing what the debt service
19   is, I couldn't tell you.
20        Q.    Okay.  So you don't know if the property was
21   cash flow positive or cash flow negative pre-bankruptcy?
22        A.    I can't testify to that.  I would be glad to
23   go back and look at my budgets and so forth.  I can't
24   say just off the hand.
25        Q.    Now, you mentioned before that you had some
0214
 1   interest in taking the land that's adjacent to the
 2   Bridgewood Ranch Apartments and selling that, correct?
 3        A.    Yes.
 4        Q.    Okay.  And you previously mentioned -- and
 5   correct me if I'm wrong -- that you said you would sell
 6   that and use some of that cash to pay down ABC's loan?
 7        A.    Who -- no.  It would have to be paid down
 8   whoever the debtor is.  I don't remember who holds that
 9   as collateral, but it is not you.
10        Q.    Okay.  I just wanted to clarify because I know
11   we do not hold that as collateral.
12        A.    Yeah.
13        Q.    So if that's the case then, what is your plan
14   for the Bridgewood Ranch Apartments?  You previously
15   said there's not a lot of improvement that can be done
16   on that property.
17        A.    No, I think that the -- there is -- in my
18   mind, there's a couple of things that can be done which
19   will help it.  You know, it has -- it is on a road
20   frontage but doesn't have rights.  You enter it through
21   a back way.  So I'm going to encourage them to put up a
                           Page 89
```

HC 00935

Morgan, Richard 01-27-11.txt

```
22   good sign there saying this is Bridgewood Ranch.  The
23   first time you see that, you have got to go in past the
24   that star that say -- sign that says Five Star and to
25   get past that and turn left and then you see Bridgewood
0215
 1   Ranch.  I think it ought to be very, very prominent.
 2              But bear in mind, it is in a secondary
 3   market.  It is 90 percent occupied.  It is not a bad
 4   situation right now.
 5       Q.   So what do you plan to do with it in this
 6   bankruptcy?
 7       A.   Oh, eventually we will sell it.  I have got to
 8   get untangled -- I have got to get all this
 9   cross-collateral stuff untangled and see how that comes
10   out.  If, in fact, we have got to sell it for your loan
11   plus 400,000, then that's the price we will see if we
12   can attain.
13       Q.   Okay.  And you had previously testified you
14   weren't aware of any pending foreclosures, correct?
15       A.   Uh-huh.
16       Q.   Did you ever provide -- between when you
17   started your job on December 23rd and the bankruptcy
18   petition date, did you ever provide any creditor with
19   kind of a heads-up, any sort of notice saying, I don't
20   know if you are going to foreclose, but we are planning
21   to file bankruptcy on January 4th?
22              MR. BUNCHER:  You are asking if he
23   personally did?
24              MR. KINVIG:  For this question, yes.
25       A.   Did I personally?
0216
 1       Q.   (BY MR. KINVIG)  Yes.
 2       A.   No.
 3       Q.   Did you make any lender aware that FRE was
 4   contemplating bankruptcy?
 5              MR. BUNCHER:  Again, you are asking you
 6   as him personally?
 7       Q.   (BY MR. KINVIG)  Did you personally make any
 8   lender aware that FRE was planning a bankruptcy filing
 9   on January 4th?
10       A.   No.
11       Q.   No.  Are you aware of whether FRE made any
12   lender aware that they were contemplating bankruptcy?
13       A.   I'm not.
14       Q.   Okay.  And sort of similar to that, did you
15   personally tell any or communicate to any lender or any
16   other party in interest, for that matter, the fact that
17   all of these properties have been sold into FRE -- or
18   allegedly sold into FRE on December 23rd?
19       A.   No.
20       Q.   And are you aware of any other representative
21   of FRE giving any party of interest a similar notice?
22              MR. BUNCHER:  And -- well --
23       A.   I can't speak to what any other party might
24   have done.
25       Q.   (BY MR. KINVIG)  Okay.  But you are the
0217
 1   corporate representative of FRE?
 2       A.   You asked, was I aware.  No, I'm not aware.
 3   It doesn't mean it hasn't happened.  I'm just not aware.
 4              MR. KINVIG:  As everyone else said, I
 5   reserve the right to ask a couple of follow-up
 6   questions.  But I believe that I'm done here.
```

Page 90

HC 00936

Morgan, Richard 01-27-11.txt
```
 7                   MR. WEITMAN:  If I may just ask a few
 8     follow-up questions.
 9                   MR. STROMBERG:  And just for the record,
10     he's coming in ahead of me.  I still have some questions
11     of my own.  Okay.
12                          FURTHER EXAMINATION
13     BY MR. WEITMAN:
14          Q.   Mr. Morgan, you are also vice president of
15     ABCLD Properties, correct?
16          A.   That was sort of news to me.  I'm not sure.
17     Well, not news to me.  I signed some letters I saw a
18     moment ago, I think, ABC, ABCLD, whatever it was.
19          Q.   Did you earlier sign a document accepting that
20     position?
21          A.   I don't recall that.  I don't recall doing it.
22     I do see where I signed a letter a few moments ago.
23          Q.   In that capacity?
24          A.   Yeah.
25          Q.   Are there other things in relation to your
0218
 1     positions as officers -- as an officer in the various
 2     entities that you haven't checked out?  I mean, could
 3     you be a director and officer of any other affiliated
 4     entities?
 5          A.   I'm almost certain I'm not of any affiliated
 6     entities.
 7          Q.   But the document by which you became an
 8     officer of ABCLD Properties, was that something that Mr.
 9     LaJone handed to you to sign?
10          A.   I do not recall.  I don't recall.
11          Q.   I believe earlier you said that at this
12     December 23 meeting with Mr. Moos and Mr. Akin, they
13     spoke of transfers that had occurred already and then
14     asked you if you would step in as VP of FRE and act as
15     chief restructuring officer, correct?
16          A.   Right.  Right.
17          Q.   Were you aware then that all of those
18     transfers would be made or had been made and that FRE
19     would be going into bankruptcy with all of those
20     different assets?
21          A.   I was aware very shortly after that, that was
22     the plan.  On the 23 -- I'm using 23, 24 -- it had to be
23     the 23rd, the conversation was relative to, this is a
24     list of properties and everything is going into here and
25     there may be a possibility of a bankruptcy filing.  That
0219
 1     was on the 23rd.
 2          Q.   Did you sign documents on the 23rd?
 3          A.   Only to the standpoint of accepting
 4     whatever -- I don't recall what I signed on the 23rd, to
 5     be candid with you.  I think I -- all I remember seeing
 6     was some -- where I had been elected vice president of
 7     the FRE.  I don't remember all the documents.
 8          Q.   But you didn't sign any documents -- transfer
 9     documents?
10          A.   No.
11          Q.   I think you said that was done already,
12     correct?
13          A.   It was done by separate parties.
14          Q.   Right.  Let me hand you what I would ask to
15     have marked as Wells Fargo 176.
16                   (Exhibit 176 marked.)
17          Q.   (BY MR. WEITMAN)  These are two emails that
                             Page 91
```

HC 00937

Morgan, Richard 01-27-11.txt

18  were sent. One by you on January 3rd at 11:55 in the
19  morning and the other one by Mr. Daugherty of Prime
20  Income.
21       A.   Uh-huh.
22       Q.   Let me read the first sentence.  When I
23  executed documents last week, I was of the impression
24  that the Amoco Building and the Fenton building were
25  going into bankruptcy.  Late Thursday afternoon, I was

0220
 1  advised it is much larger and, to my knowledge, I have
 2  not signed on the major entity that is to be filing
 3  [sic].
 4            What does that mean?
 5       A.   I was not aware that the whole thing was
 6  rolling under the FRE scenario.  I wasn't aware of the
 7  total scope of it at the time I was presented that.  At
 8  the time I had the conversation, which I don't know
 9  exactly when it was, that was last week, that would have
10  been sometime around Christmastime.
11       Q.   But wasn't all this on the spreadsheet that
12  you got on December 23rd showing all the transfers in?
13       A.   Well, the last week is a -- is a generic term.
14  Obviously, I knew about it at the time I saw the
15  spreadsheet.  This was in a concept stage where I was
16  just basically advised that there was a transfer of
17  properties going on, they wanted me to be the vice
18  president.  That was it.
19       Q.   Of the debtor entity that would go into
20  bankruptcy?
21       A.   Of the debtor entity.
22       Q.   And you knew then it was going into
23  bankruptcy?
24       A.   Pardon?
25       Q.   And you knew then --

0221
 1       A.   I did not know then until I got this schedule
 2  and then talked a little bit further with Danny Moos.
 3  The person who gave me a whisper that something was
 4  going on was Gene Bertcher, who is the chief financial
 5  officer of Prime, who is a good friend.  And he just
 6  mentioned it was coming down and they wanted me to
 7  handle it.  And that's just about all I knew at that
 8  point in time.
 9       Q.   You also say, please provide me copies of all
10  the documents I executed this past week.  I will need
11  full disclosure on any future documents that need to be
12  executed.
13            Which documents did you execute this past
14  week?
15       A.   I don't know.  It was a bunch of documents I
16  executed that particular week.  I don't know what they
17  were.  I just hadn't -- at that point I didn't have a
18  file of everything I executed.  And I was asking to get
19  my file straight.
20       Q.   So you were an officer of FRE at that point,
21  correct?
22       A.   Yes.
23       Q.   And you were an officer of ABCLD Properties at
24  that time, correct?
25       A.   That I will have to verify.  That one -- my

0222
 1  memory doesn't click on that one.
 2       Q.   If you could, I'm just trying to understand,
                          Page 92

Morgan, Richard 01-27-11.txt

```
 3   you know, what documents were executed by you at the
 4   different points in time because your earlier testimony
 5   was that the transfer documents had already been
 6   executed.
 7        A.   That's correct.
 8        Q.   And if you are made an officer, that doesn't
 9   require you to execute anything, right?
10        A.   Well, I don't know what date I signed that
11   letter, for example, that the Amoco lady just showed me.
12   Whatever date that was, it was.  I just don't remember
13   everything I signed.  Whatever I signed that day, I
14   wanted to just get a copy for my files.
15        Q.   I mean, those could have been letters that you
16   sent causing folks to resign.  Do you view that as a
17   document executed?
18        A.   You are getting very -- you are covering a
19   wide scope.
20        Q.   Would you be kind enough to place as an
21   insert, you know, for you to go back and detail what
22   documents you executed so we can get a better idea as to
23   what you did versus what you kind of stepped into,
24   please?
25        A.   Okay.
0223
 1        Q.   Thank you.
 2   INFORMATION REQUESTED:_____
 3             MR. BUNCHER:   Just as a point of
 4   clarification, do you know actually when the documents
 5   that are dated December 23rd that accomplished these
 6   transactions were actually executed by Mr. Akin and the
 7   other person that signed them?
 8             THE WITNESS:   No.
 9             MR. STROMBERG:   Doug, this is a good time
10   to take a break.  Do you want to take a break?
11             THE WITNESS:   I'm fine if you guys want
12   to keep going.
13             MR. BUNCHER:   I would ask that we try not
14   to have like two -- like three and four rounds.  This is
15   not like sudden death where he tries to score and then
16   he gets a chance to score and so on.
17             MR. STROMBERG:   That would more resemble
18   death than sudden death.
19                  EXAMINATION
20   BY MR. STROMBERG:
21        Q.   Mr. Morgan, my name is Mark Stromberg.  I
22   represent State Bank of Texas.
23        A.   Yes.
24        Q.   Let me ask you, just following up briefly on
25   Mr. Weitman's last question, if bankruptcy, when you
0224
 1   were first consulted about this engagement as chief
 2   restructuring officer for FRE Real Estate, was a
 3   possibility, but not a certainty, what did you envision
 4   your nonbankruptcy responsibilities would be on that day
 5   before you found out about the bankruptcy?
 6        A.   The concept did not change.  You have seen the
 7   movie The Mechanic, someone who gets it done.  That's
 8   the way I'm perceived is the mechanic.  So the concept
 9   doesn't change whether it was going to bankruptcy or not
10   going to bankruptcy.  My job was to find ways to improve
11   it to make it better.
12        Q.   Okay.  Now, in terms of your preparation for
13   your deposition today -- this is a long table, I've been
```

Page 93

HC 00939

Morgan, Richard 01-27-11.txt

```
14    at the other end of it, so I may have missed this.  Were
15    you asked what you did, other than talking to Mr.
16    Buncher or your attorneys, to prepare yourself for your
17    deposition today as the CRO of FRE?
18         A.   CRO of FRE?
19         Q.   I'm sorry.
20         A.   CEO of FRE, right, is what you --
21         Q.   Yeah.  I heard you were the chief
22    restructuring officer so --
23         A.   Well, I'm actually vice president.
24         Q.   Let me rephrase the question so we are clear.
25              MR. BUNCHER:  And the mechanic.
0225
1         Q.   (BY MR. STROMBERG)  And the mechanic.  As
2    the -- in whatever capacity you are appearing in your
3    deposition today, what did you do to prepare yourself to
4    testify, other than speaking to your attorneys?
5         A.   Two things to prepare myself.  One was I went
6    and consulted with Henry Butler, who is a friend of some
7    forty years and who was responsible for a great deal of
8    putting this land together and so forth, and R.L. Lemke,
9    who basically is the engineer and in charge of the
10   Mercer Crossing.  And both of them to talk with, not
11   only what was -- what was the market then, I didn't care
12   about that, what is it really worth now.  And so I
13   deduced a great -- I summarized a great deal of the
14   properties.
15              And based on what we have either an
16   interest in or what it is just reasonably worth, based
17   on what I know, I came up with what I thought was a
18   value of -- against the existing debt.  I excluded the
19   Wells Fargo properties because I was not familiar with
20   this 2500 acres that much.  I excluded that.  But all of
21   the rest that you have already, I pretty well know the
22   properties very well.  So I was able to make my own
23   conclusions.
24              In addition to that, as I mentioned to
25   you, I have been part of the structure of the Barnett
0226
1    play.  In doing that, I had to look for drill sites.
2    And in doing drill sites, I had to get, okay, what do
3    you have in this thing, where can I put a drill site.
4    And I found out, well, this is $4 land, $6 land, $12
5    land.  And I had to restructure the drill sites so that
6    I would minimize the value impact of the property.
7    Because part of ATI's responsibility was to provide
8    eight, nine drill sites out of this entire program.
9         Q.   Can I ask you to give me a time frame on when
10   you were doing this drill site analysis?  When relative
11   to now?
12        A.   '06 to mid 2010.
13        Q.   Okay.  Insofar as determining the property
14   values was concerned, your discussions were with Mr.
15   Butler and Mr. Lemke?
16        A.   Henry Butler and R.L. Lemke, yeah.
17        Q.   All right.  Does Mr. Butler have any sort of a
18   title with any of the TCI entities?
19        A.   No, he's with Prime Asset.
20        Q.   Okay.  And Prime Asset is --
21        A.   Let me say this.  I don't know that.  I know
22   what his job is and I know that he works for Prime
23   Asset.  I can't say whether he may or may not be an
24   officer or anything else.  I don't know that.
```
                              Page 94

HC 00940

Morgan, Richard 01-27-11.txt

25      Q.   What is his job for Prime Asset?
0227
1       A.   To handle certain portions of the land.
2       Q.   Okay.  And Prime Asset has a relationship with
3  TCI, does it not?
4       A.   It is an advisor to TCI.
5       Q.   Is it owned by some of the same entities or
6  persons that own TCI?
7       A.   I think not.  I think not.  And I think
8  there's some -- I believe it is owned by some type of
9  trust.  But I don't know the total details on that.
10      Q.   Okay.  And is that a trust for Mr. Phillips or
11 his family?
12      A.   I don't know.
13      Q.   Okay.  Who would know the answer to that
14 question?
15      A.   We could get it revealed to you.  I can get
16 the structure if it is important.  If it is relevant to
17 the case, we can get it for you.
18      Q.   I would like to know that because I'm
19 interested in finding out whether this information was
20 coming from somebody who was associated in some way or
21 another through Prime Asset with TCI or the --
22      A.   Oh, absolutely, no question.  I mean, he's
23 been in charge of marketing those properties.  So he's
24 associated with it in the sense of that he -- but you
25 are talking two different things.
0228
1       Q.   Okay.  Well, I just want to talk about
2  preparation right now.
3       A.   No, I'm getting to that.  There are two
4  different people you talk to.  There's the Henry Butler,
5  who represents -- that might talk to you about what it
6  is worth and the Henry Butler who will talk to his
7  friend of forty years and tell you what he thinks it is
8  worth.  We talked as friends.
9       Q.   Okay.  Insofar as your discussions with Mr.
10 Butler were concerned, when did these take place?
11      A.   About a week ago.
12      Q.   And Mr. Lemke, when did those discussions take
13 place?
14      A.   The same day.
15      Q.   About how long was this meeting with Mr.
16 Butler and/or Mr. Lemke?
17      A.   Actually, Mr. Butler was -- he would call Mr.
18 Lemke in at various times when he needed.  It was about
19 a 2-hour session.  Because I wanted to focus on -- at
20 that time I was looking at, okay, what is a specific
21 lender's collateral, what do you have underneath your
22 collateral, and looking to see what I thought the value
23 was against the loan against that collateral.
24      Q.   What does Mr. Lemke do insofar as the TCI,
25 Prime Asset entities?
0229
1       A.   He is basically the supervisor or project
2  manager for Mercer Crossing, which is that big
3  development at the intersection of 35 and 635.  If you
4  look at the signs, the sign has got his name and number
5  on it as the person to contact if you want to know
6  something about Mercer Crossing.
7       Q.   But he's not an independent broker for the
8  properties?
9       A.   No.

                              Page 95

HC 00941

Morgan, Richard 01-27-11.txt

```
10          Q.    He works within the TCI companies?
11          A.    Right.
12          Q.    Am I right?
13          A.    That's right.
14          Q.    Do you know what his title or titles may be?
15          A.    I do not.
16          Q.    Did you consult with anybody outside the TCI
17   companies, again excluding your lawyers, concerning the
18   value of these properties or regarding any other aspect
19   of this case to prepare for your deposition?
20          A.    You are talking about two things.  You are
21   talking about the land?
22          Q.    I'm talking about what you did to prepare for
23   your deposition today.
24          A.    No, I didn't consult with anyone, other than
25   the announced people.
0230
1           Q.    Okay.  Thank you.  There's been a lot of
2    discussion to the exhibit to -- I believe it is 174,
3    which is the Cash Collateral Order.  And I want to have
4    you look at that, if you wouldn't mind.
5           A.    Can you refresh me as to what your collateral
6    is?
7           Q.    Well, we will take a look at it because I
8    think it will become clear from this exhibit.
9           A.    Okay.
10          Q.    Take a look at the exhibit to the Cash
11   Collateral Order that I think Mr. Buncher has put in
12   front of you.  It has the Information for the Initial
13   Debtor Interview, and it is also attached to the Cash
14   Collateral Order that describes the value, the debt, and
15   the lienholder on the property.
16          A.    Okay.
17          Q.    If you will look in the middle of the very
18   first page where it says Archon -- am I pronouncing that
19   right?
20          A.    Archon, yeah.
21          Q.    Archon.  Thank you.  I will ask you to look to
22   the far right column.  Do you see the two lenders that
23   are identified there?
24          A.    I do.
25          Q.    And one of them is State Bank of Texas.  Am I
0231
1    right?
2           A.    Right.
3           Q.    The other is Access 1 Capital --
4           A.    Yes.
5           Q.    -- or Access 1st Capital.  Is it Access 1st
6    Capital?
7           A.    Yes.
8           Q.    I'm not terribly familiar with them, but I
9    understand that they are a bank in Denton; is that
10   right?  Do you know?
11          A.    I don't know.
12          Q.    Okay.  While we are talking about them, they
13   are reflected here as having a debt.  And the debt
14   that's listed out beside Access 1st Capital is
15   $687,931.58.  Do you see that?
16          A.    Uh-huh.
17          Q.    Is that a yes?
18          A.    Yes.
19          Q.    Okay.  Thank you.  And do you know when the
20   Access 1st Capital loan was made?
```

Page 96

HC 00942

Morgan, Richard 01-27-11.txt

```
21        A.   I don't.
22        Q.   Do you know whether that lien is prior to or
23   subordinate to that of State Bank of Texas?
24        A.   I do not.
25        Q.   Do you know what that money was borrowed by
0232
 1   the -- what is the -- Crown Point?  Is that the name of
 2   that particular transferor?
 3        A.   Subsequent to this filing, I am now of the
 4   impression that the Archon land, with the State Bank
 5   collateral and the Las Colinas 5.307, was Access 1st
 6   Capital collateral; and it should have been separated as
 7   to the lenders -- as to the value and the lenders.  It
 8   should have been a separate issue.
 9        Q.   Okay.  While we are talking about that, you
10   see in parentheses it says TIC --
11        A.   Yes.
12        Q.   -- in the description?
13        A.   Uh-huh.
14        Q.   And that relates to the 5.307 acres.  Am I
15   right?
16        A.   Right.  Right.
17        Q.   Is that the property on which a parking garage
18   is located?  Do you know?
19        A.   I don't think so.  I think -- you are talking
20   a parking garage next to what?  Next to what?
21        Q.   I'm not sure.  I'm asking.  These are the
22   debtor's properties.  I'm just learning about this case
23   as well.
24        A.   Yeah.  I don't think the 5.307 is yours.  The
25   24.139 acres, that's basically at 114 and Belt Line.
0233
 1        Q.   The -- I was given the impression by my client
 2   that they had a security interest in a tenant in common
 3   property.
 4             Have you done anything to investigate
 5   whether or not State Bank of Texas has any interest in
 6   this 5.307 acres?
 7        A.   Maybe that's what it is.  I don't know.  I
 8   will find out.
 9        Q.   Okay.  And tenant in common, do you have an
10   understanding as to what that means?
11        A.   Yes, uh-huh.
12        Q.   What does that mean to you?
13        A.   My understanding is some type of property
14   adjacent to or something that would basically make them
15   have to use one another's property in order to make it
16   work.
17        Q.   Okay.  Am I correct also in my understanding,
18   Mr. Morgan, that the 24.139 acres are vacant undeveloped
19   land at this point?
20        A.   Correct.
21             (Mr. Weitman departs room.)
22        Q.   Am I also correct in my understanding that
23   there is no income and no immediate prospect for income
24   from that 24.139 acres at the present time you are aware
25   of?
0234
 1        A.   Correct.
 2        Q.   Okay.  And there hasn't been any income from
 3   that property for some period of time?
 4        A.   Correct.
 5        Q.   And am I also correct in my understanding that
```

Page 97

HC 00943

Morgan, Richard 01-27-11.txt

```
 6    when you talked about properties that are going to need
 7    some input of capital at some point in the near future
 8    because of the need just to mow the property, that this
 9    24.139 acres in Las Colinas is one of those properties
10    that will need that?
11         A.   Yes.
12         Q.   Am I also correct in my understanding that
13    there are some unpaid ad valorum taxes with respect to
14    this property?
15         A.   Another schedule, please.
16         Q.   I'm not sure.  I'm asking.
17         A.   I don't know.
18              MR. BUNCHER:  I think it is in here too.
19              MR. STROMBERG:  Is that also in 174?
20              MR. BUNCHER:  No.  167, which is the
21    debt -- complete debtor interview package, Exhibit 5.
22         A.   This schedule file shows 242,430.
23         Q.   (BY MR. STROMBERG)  Okay.  Does Archon -- let
24    me put it another way.  Does FRE or did Crown Point have
25    a dedicated bank account in which there was
0235
 1    cash that the debtor now controls for the purposes of
 2    paying these $242,000 in taxes?
 3         A.   I do not know about the past.
 4         Q.   Is there one right now, that --
 5         A.   No.
 6         Q.   -- you are aware of?
 7         A.   No.
 8         Q.   Now I want to ask you some questions about
 9    values.  This value that's reflected for the Archon
10    property in Exhibit 174, the $6.7 million --
11         A.   Uh-huh.
12         Q.   -- is this the value that you computed for the
13    bankruptcy case?  Or is this the one that you were
14    talking about when you had your discussions with Mr.
15    Butler, your friend-to-friend value?
16         A.   No, this is for the bankruptcy case.
17         Q.   Okay.  And you mentioned that your methodology
18    for determining this value, as I understand it -- and,
19    again, I was at the end of the table -- had to do
20    something with the debt perceived value of comparable
21    sales and the book value of the property.  Did I more or
22    less get that right?
23         A.   No.
24         Q.   Okay.  Help me out.
25         A.   What is filed on these filings should, in most
0236
 1    part, equal -- if you go back to the other column that
 2    you haven't seen -- what it was carried on the books
 3    for.  So it was on the books for 6.7.  You had a certain
 4    amount of debt.  And the note was carried somewhere
 5    along in there.  And your land is different.  It is
 6    4,695,000.  If you add up on this schedule, schedule
 7    168, the combination of the seller financing and the
 8    debt assumed equals the 6.7.
 9         Q.   Okay.  So in looking at this $6.7 million
10    number, you are telling us that, to the best of your
11    understanding, this represents the book value of the
12    property?
13         A.   No.  It represents what was on the books of
14    TCI or whatever entity it was that transferred it out.
15    That's what it was on the books for.
16         Q.   Okay.  How is that different than book value?
```

Page 98

HC 00944

Morgan, Richard 01-27-11.txt

17      A.   Same thing.
18      Q.   Okay.  Now, this $6.7 million number, are you
19  telling the Court that you have in mind a different
20  number for the value of this property?
21      A.   I haven't spent that much time on this
22  particular one.  I have got to go look at it.  I knew
23  the Payne-North and the Payne-South because I had
24  already spent some time on that.  But I don't know this
25  one that well.
0237
1                There is one little piece of property
2   that is tied up in one of the other collaterals that is
3   actually an access piece.  And it is a very small piece
4   of land.  But I have got to go over there and physically
5   see it.  I know we have some interest in it already.
6   There's an interested party looking at it right now.
7       Q.   Who is that, by the way?
8       A.   I don't know.  I mean, I just was told that
9   there's somebody kicking tires right now.
10               MR. BUNCHER:  Interested in the Archon
11  land or the access piece?
12               THE WITNESS:  Archon land.  The access
13  piece just has to go with the land.
14      Q.   (BY MR. STROMBERG)  You don't know, as you sit
15  here today, which of the other parcels the access piece
16  is associated with?
17      A.   I think I can pinpoint it.  It is a very small
18  piece.  It is called Ridgepoint -- here it is.
19  Ridgepoint Drive, Irving, Texas.  That's now -- it is
20  only $92,000 worth of debt.  And I'm not sure who has it
21  right now.  But it is the .65 acres under page 2, about
22  the fifth one down.
23      Q.   And absent that property, there is no direct
24  roadway access to --
25      A.   I didn't say that.  I'm saying this was
0238
1   represented to me by Mr. Butler as being a key part
2   of -- the Payne-North needs to have that piece in order
3   to make it a sellable project because it provides the
4   right access, not necessarily the access, but the right
5   access.
6       Q.   Do you know of any other access to the 24.139
7   acres other than the --
8       A.   I haven't --
9       Q.   I'm sorry.  Let me --
10      A.   -- had it very long --
11      Q.   Let us have an agreement so that we don't have
12  an unclear record.  I definitely owe it to you to let
13  you finish your answers, if you will do me that same
14  courtesy.  And I know it is late in the day.  Will you
15  try to --
16      A.   No, that's okay.  I'm not married to you, so I
17  don't have any right to interrupt you.
18      Q.   Okay.  Thank you.  So I'm trying to finish
19  this question here and make sure I understand the
20  answer.
21               On the Ridgepoint property, are you aware
22  of any other access other than through the Ridgepoint
23  property to the 24.139 acres?
24      A.   I have seen the aerial.  I do not recall
25  specifically.  I was focusing on the fact that, in
0239
1   looking at the aerial, Mr. Butler says, this piece
                           Page 99

HC 00945

Morgan, Richard 01-27-11.txt
```
 2   should go with this piece in order to provide the best
 3   access.
 4        Q.   I see.  Do you know, traditionally, who has
 5   been paying for maintenance on the 24.139 acres?
 6        A.   Whatever the owner entity was.
 7        Q.   And if I represent to you that entity was
 8   called Crown Point, Inc., formerly known as
 9   Transcontinental Crown Point, would that be the party
10   who you would think would be doing that?
11        A.   Whoever the owner was.
12        Q.   Okay.  Do you know, as you sit here today, who
13   the previous owner was?
14        A.   No, not without looking at some documentation.
15   No.
16        Q.   Okay.  Do you know if the property at Archon,
17   the 24.139 acres, is actually listed by an outside
18   broker?
19        A.   Not to my knowledge.
20        Q.   Did Crown Point, to your knowledge, have any
21   other properties, other than the property listed here as
22   Archon, prior to the transfer of the properties to
23   Fenton Real Estate, or FRE, and before the bankruptcy?
24        A.   No familiarity.
25        Q.   Do you know whether or not it had any
0240
 1   employees prior to that time?
 2        A.   No familiarity.
 3        Q.   Do you know whether or not Crown Point had any
 4   other business --
 5        A.   No familiarity.
 6        Q.   -- prior to that time.
 7             Are you aware that there was a stock sale
 8   on December 27 for the stock of Crown Point to be sold
 9   to ABCLD Income?  Are you familiar with that?
10        A.   Tell me about it.  I'm not familiar with it.
11        Q.   You were referring to some documents, Mr.
12   Morgan, in -- pursuant to which there was a sale of the
13   Crown Point stock to an entity known as ABCLD Income
14   that we have been talking about earlier in the
15   deposition.
16        A.   Okay.
17        Q.   Are you familiar with that transaction?
18        A.   I'm not familiar with any of those Income
19   transactions.
20        Q.   Okay.  There is a resuscitation that in
21   exchange for the sale of that stock there was $1,000
22   paid at closing.  Do you know if that $1,000 was paid
23   and to whom?
24        A.   I don't know about the deal, so I can't tell
25   you.
0241
 1        Q.   Okay.  And just to clarify, do you know
 2   whether or not there was even a closing on December
 3   27th?
 4        A.   I don't know about that transaction.
 5        Q.   Fair enough.  There was also, among the
 6   documents that were produced to us, an Allonge to the
 7   promissory note between Coventry Point, Inc., and Fenton
 8   Real Estate, Inc.  And I want to know if you are
 9   familiar with that document.
10        A.   I'm not.
11        Q.   The Allonge purports to endorse the promissory
12   note to Transcontinental Realty Investors, Inc.  Are you
```
Page 100

HC 00946

Morgan, Richard 01-27-11.txt

13  familiar with that?
14      A.   Promissory note on what?
15      Q.   On Coventry Point, the 2,004,000 -- excuse me.
16  Looking at -- do you have 168 there in front of you?
17      A.   Sure.
18      Q.   Take a look at the Archon property on the
19  first page of Exhibit 168.  Are you looking at that?
20      A.   I gotcha.  Okay.
21      Q.   And in the column that says selling financing
22  note, 5 years at 6 percent --
23      A.   Uh-huh.
24      Q.   -- do you see where it says $2,004,039?
25      A.   Uh-huh.
0242
1       Q.   Is that a yes?
2       A.   Yes, I see.
3       Q.   Okay.  And are you familiar with the fact that
4   there was an Allonge of that note which transfers or
5   endorses the note to Transcontinental Realty Investors
6   on December 27, 2010?
7       A.   As I told you, I wasn't aware of any of those.
8       Q.   Okay.  I just have to ask.
9       A.   Yes.
10      Q.   Do you know -- and, again, you may not know
11  the answer to this, but I need to ask you.  Do you know
12  whether or not that this transaction, which apparently
13  divested Fenton Real Estate, Inc., of the note, was for
14  any consideration at all, paid to Fenton Real Estate by
15  Transcontinental Realty Investors?
16      A.   If it is an obligation of Fenton Realty
17  Investors and they got rid of it, why would it be paid
18  for?
19      Q.   Okay.  Do you know what the consideration on
20  either side of that transaction was?
21      A.   No.
22           MR. BUNCHER:  I'm sorry.  I need to take
23  a break because we got a call from the Court, and I need
24  to contact the Court.
25           MR. STROMBERG:  Oh.  Very good.
0243
1            (Recess, 3:35 p.m. to 3:43 p.m.)
2       Q.   (BY MR. STROMBERG)  Did I understand
3   correctly, Mr. Morgan, before we left off, that you
4   don't have in mind a different appraised value for the
5   Archon property?
6       A.   That's correct.
7       Q.   Okay.  Do you know whether or not there
8   exists, in either the Crown Point files or in the files
9   that you inherited as the chief executive officer of
10  FRE, any appraisal for that property?
11      A.   Do not know.  But that's one of the properties
12  from my focus.  I have not had time to focus on that
13  before today.
14      Q.   Related to that, did you actually receive
15  files from Crown Point, Inc., or TCI Crown Point when
16  the transfer of the property from TCI Crown Point or
17  Crown Point took place?
18      A.   No.
19      Q.   Do you know whether or not there are separate
20  files maintained in regards to Crown Point, Inc., that
21  you still have not received from TCI?
22      A.   If I understood your first question, have I
23  received it; and the next question was, do I know where
                              Page 101

HC 00947

Morgan, Richard 01-27-11.txt
24    they are if I haven't received it, I don't understand --
25        Q.   No.  Do you know if there exists any file
0244
1     related to the Archon property maintained by Crown
2     Point, Inc., that has not been conveyed to FRE at this
3     time?
4         A.   I just really can't answer that question.
5         Q.   Let me make sure I understand why you can't
6     answer it.  Because you do not know if there exists such
7     a file?  Or is there some other reason?
8         A.   No, I have told you I have never seen it.  And
9     then your question was, does it exist.  I don't know.
10    Under the normal course of business, it would exist.
11        Q.   I see.
12        A.   And I'm sure that will be part of my
13    revelations.
14        Q.   Which don't end in this case.
15             Have you made a request for all files
16    related to the properties that have been conveyed by the
17    various TCI entities into FRE Real Estate since you
18    became the chief executive officer?
19        A.   No.  You were on the other end of the table,
20    but the question was, who is FRE.  I are it.  And so I
21    know where they are when I need to go get them.  I can
22    access them.  But I have not specifically set up a
23    specific area in which the files are being moved to.
24        Q.   So as of right now, if there exists a file
25    with respect to the Archon property or Crown Point,
0245
1     Inc., that file exists in the custody of TCI or one of
2     its related entities?
3         A.   Right.
4         Q.   And when do you plan, if at all, to go get
5     that file for -- and put it some place where you have
6     control of it?
7         A.   Within the next 30 days.  I'm going to have
8     to -- I have tagged an assistant that I'm either going
9     to have to pay for myself or have somebody fund.  And
10    once I get her on board, I plan to separate a location
11    for FRE over in Fenton Centre and get everything in one
12    place where I can have access to it.
13        Q.   This may have also been something -- well, I
14    know it is something that you covered in some
15    discussions earlier in your deposition.  But we talked
16    about these promissory notes and the amounts of these
17    notes.
18             Am I correct in my understanding as to
19    what you think they do and how they work when I say that
20    the note's amount is really tied back in a way to the
21    value of the property that it relates to?  So that if
22    you don't sell the property for what the note is equal
23    to, you get to reduce the note.  Is that your
24    understanding?
25        A.   That's the understanding.
0246
1         Q.   So then as a practical matter, if I understand
2     that correctly, it really doesn't matter whether that
3     note is $2 million in the case of Archon or $4 million
4     or $8 million.  Because if the property doesn't generate
5     that amount, then you get to reduce it down to whatever
6     the property does generate.  Right?
7         A.   More succinctly put, my first job is to pay
8     you.
Page 102

HC 00948

Morgan, Richard 01-27-11.txt
```
 9      Q.   I understand.  That's a good thing.
10      A.   Okay.
11      Q.   But my question is:  If the value of this note
12  were -- or the amount of this note rather were not --
13      A.   You are correct.  I didn't mean to be curt.
14  You are correct.  If it comes out and I sell it and half
15  the note can be paid, then maybe half the note is paid.
16  But I'm not -- it is not a situation where it just keeps
17  going on and becomes a general obligation of the
18  company.  It is tied in asset by asset.
19          MR. BUNCHER:  I will just state, for the
20  record, it is our understanding that the notes will
21  not -- there will be no payment on the notes unless the
22  secured debt on the property that that note goes with
23  and any unsecured debt that got transferred along with
24  that property is paid off.  Then any excess money will
25  be paid on the note.
0247
 1              THE WITNESS:  Or some retained for
 2  operating, administrative expenses.
 3              MR. BUNCHER:  Sure.
 4      Q.   (BY MR. STROMBERG)  What is your understanding
 5  if, for example -- looking at Archon.  The Archon
 6  property carries a seller financing note for $2,004,000,
 7  right?
 8      A.   Let me go back to your land again.  Archon
 9  property.  It says 6,700,000.
10      Q.   Oh, I'm sorry.  I think we are looking at the
11  wrong thing.  Archon that I'm seeing shows a seller
12  financing note for 2,004,039 --
13      A.   Oh, okay.  You are correct.
14      Q.   So just to use this as an example --
15      A.   Yes.
16      Q.   -- if the property were sold for 5,700,000,
17  then the first lien would be paid first, right?
18      A.   That's correct.
19      Q.   And then the note would be paid second leaving
20  $1 million owing?
21      A.   Second is any unsecured debtors.
22      Q.   Oh, okay.  And then the note would be paid
23  third?
24      A.   Right, to whatever is left.  And then that
25  note -- that portion of the note goes away.
0248
 1      Q.   So if it is sold for 5,700,000, relative to
 2  the note balance, you would be short $1 million, but
 3  then that million would go away?
 4      A.   Right.
 5      Q.   Now, if, suppose, for the sake of discussion,
 6  the property were to sell for $8,700,000 as opposed to
 7  $6,700,000.  Then what, in your understanding and
 8  appreciation, would happen to the $2 million excess over
 9  the amount of the debt and the note?
10      A.   That would become property of the debtor.
11      Q.   All right.  Other than your counsel, who, as
12  the chief restructuring officer, do you consult with
13  regarding this case?  Is there anybody?
14          MR. BUNCHER:  He already indicated.  He
15  talked about Prime, he talked about Regis, he talked
16  about Greg Crown, talked about a number of people that
17  he works with on this matter.  So are you asking for
18  something different?
19          MR. STROMBERG:  I'm just asking if we
                        Page 103
```

Morgan, Richard 01-27-11.txt
20   have named everybody that he consults.
21       Q.   (BY MR. STROMBERG)  And I guess you can answer
22   that question.
23       A.   Yes.  If there's a sale coming up, if there's
24   a pending sale, then, obviously, I will talk to Mr. Moos
25   about it before we do the sale -- because it is going to
0249
1    affect his note -- and get his blessing, get his
2    sign-off on it before I go charging down the way.
3             Even though I have got the right to do
4    it, it would be unfair for me to just go out and take a
5    lowball offer just to get you paid off and wipe out the
6    note.
7        Q.   And in the capacity in which you would talk to
8    Mr. Moos, that's in his capacity as an officer of
9    Transcontinental Realty Investors?
10       A.   Right.
11       Q.   Because -- I understand your comment earlier,
12   because they have, under the Allonge, the note.  And
13   they are the ones who stand to get paid if there's
14   excess proceeds.  Am I right?
15       A.   I don't know who has the note.  I'm not
16   familiar with that.  But if that's the case, yes.
17       Q.   All right.  And that's why you would have to
18   contact Mr. Moos?
19       A.   Yes.
20       Q.   Anybody outside of your counsel or the people
21   who work with the associated entities of
22   Transcontinental Realty Investors or Prime Asset that
23   you confer with for advice regarding your CRO
24   responsibilities for FRE?
25       A.   On a friendly basis, just as a friend, not as
0250
1    counsel, I'm a good friend of Henry Simon's.  And
2    sometimes we will just go and sit and chat about
3    concepts and not particular actions just to be sure.
4        Q.   Have you had any discussions with Mr. Simon
5    about this case since it was filed on January 4th?
6        A.   No.
7        Q.   When I asked you before about what you did to
8    prepare for your deposition and you told me about your
9    discussions with Mr. Butler and Mr. Lemke, did you look
10   at any documents that you can recall as you sit here
11   today?
12       A.   No.
13       Q.   You told us earlier in your deposition that
14   you sought advice from Mr. LaJone acting as counsel for
15   the transferor entities when you wanted information
16   about what the agreement that you were signing provided
17   and implied.  Am I right?
18       A.   Well, my first -- my first contact, and I
19   believe this email states that, is not to Mr. LaJone.
20   It is to John Daugherty and Lou Corna, who are in the
21   legal department.
22       Q.   Legal department of?
23       A.   Of Prime.
24       Q.   Prime Asset?
25       A.   Yeah.
0251
1        Q.   Anyone else?
2        A.   That's it.  And I forgot the question.  Ask it
3    again, please.  I really did forget the question.
4        Q.   Oh, I'm sorry.  Well, my question was, was
                          Page 104

HC 00950

Morgan, Richard 01-27-11.txt

5   there anybody else that you consulted regarding the
6   impact or meaning of the agreement pursuant to which you
7   have the right to deal, as you do, with these promissory
8   notes?
9          A.    Oh, okay.  On that issue -- I was getting
10  confused as to...  Greg Crown was the one putting
11  everything together.  And I questioned Greg -- because
12  it was explained to me the way Greg explained it to me,
13  and he had gone through the documentation, then I
14  challenged or questioned that.  And we got Mr. LaJone on
15  the phone between the two of us on a speaker phone so we
16  could understand what the intent was.
17         Q.    Now, in response to a question from Mr.
18  Weitman, and at the risk of asking the same question in
19  a slightly different way, you were brought in to be the
20  chief restructuring officer for FRE to supervise what,
21  in effect, was an already implemented plan for how the
22  restructuring was going to occur with a possibility of
23  bankruptcy.  Am I right?  Did I understand that
24  correctly?
25                MR. BUNCHER:  I'm going to object to the
0252
1   form.
2          Q.    (BY MR. STROMBERG)  Set me straight then.
3          A.    Okay.  I was brought in primarily to do
4   exactly what I do and that's increase value of assets.
5   Administration of some of the works is -- that's just
6   part of the process.  But my primary focus is on
7   creating value of the properties.
8          Q.    But on the day that you were first consulted
9   about this, if I understand correctly, which was
10  December 23rd, the transfers of these properties were
11  already -- to the entity that you were going to be the
12  chief restructuring officer for, were already in the
13  process of taking place?
14         A.    That's correct.
15         Q.    As the chief restructuring officer, what other
16  reorganization opportunities did you consider, other
17  than transferring all of the properties to FRE, if any
18  there were?
19         A.    It was all done at that time -- it was either
20  done or in the process of being done.  I was -- when I
21  agreed to take it, I had to look at the whole ball of
22  wax, what do I have, what am I going to do with it.
23         Q.    Were you consulted about the possibility of
24  transferring some, but not all of the properties that
25  got transferred into FRE?
0253
1          A.    No.
2          Q.    Were you consulted about other options or
3   prospects for reorganization or for refinancing that may
4   have been under consideration before December 23, 2010?
5          A.    No.
6          Q.    Did you have any discussions with any of the
7   principals of Transcontinental Realty Investors or
8   anybody else that you have spoken to about this case
9   regarding these properties that were transferred into
10  FRE before December 23, 2010?
11         A.    No.
12         Q.    Was your first knowledge of these properties
13  as a -- being transferred as a unit to FRE on that date?
14         A.    Somewhere about that date, the day I got this
15  schedule.  And I'm not sure exactly when it was.
                              Page 105

Morgan, Richard 01-27-11.txt

16     Q.   Okay.  Are you familiar with or have you
17  familiarized yourself with the loan agreement between
18  State Bank of Texas and Crown Point, Inc.?
19     A.   No.
20     Q.   There was a loan modification executed in
21  September of 2010.  Were you aware of that?
22     A.   No.
23     Q.   Other than what you've received from third
24  parties, do you have personal familiarity with the
25  amount of the debt to State Bank of Texas?
0254
1     A.   No.
2     Q.   Do you have any reason to know of any basis to
3  contest the validity of State Bank of Texas'
4  pre-bankruptcy lien, as you sit here today?
5     A.   I think that's a legal question.  And I can't
6  answer that.
7     Q.   No.  I'm asking you if you are aware of any
8  basis to contest the validity of that lien.  This is
9  about your awareness, as you sit here today.
10     A.   I mean, in my mind, that's a legal conclusion.
11          THE WITNESS:  Is it not?
12          MR. BUNCHER:  Well, he's just asking you
13  if you know of any.  I mean, we may know of something
14  or -- but he's just asking --
15     A.   No, I don't.
16          MR. BUNCHER:  -- you whether you do.
17     A.   No, I don't.
18     Q.   (BY MR. STROMBERG)  Thank you.  Do you know or
19  have any reason to believe that whether or not the loan
20  to State Bank of Texas was or was not in default prior
21  to the filing of the bankruptcy by FRE?
22     A.   No.
23     Q.   Do you have any knowledge as to whether or not
24  the property was posted for foreclosure prior to the
25  filing of bankruptcy by FRE?
0255
1     A.   No.
2     Q.   Do you know when it was that State Bank of
3  Texas first became aware of the general warranty deed
4  executed on December 23, 2010, conveying the Archon
5  property into FRE?
6     A.   No.
7     Q.   Do you know when it was that State Bank of
8  Texas first became aware of the conveyance of their
9  properties to FRE?
10     A.   No.
11     Q.   Do you know when it was that State Bank of
12  Texas first became aware of the conveyance of the
13  Coventry Point shares to ABCLD Income?
14     A.   No.
15     Q.   Do you know when it was that State Bank of
16  Texas first became aware of FRE's bankruptcy filing?
17     A.   No.
18     Q.   Or how they became aware of it?
19     A.   No.
20     Q.   Do you know whether or not State Bank of Texas
21  actually foreclosed on the Archon real estate?
22     A.   No.
23     Q.   And do you know whether or not State Bank of
24  Texas or any of its representatives had actual awareness
25  of the FRE bankruptcy on January 4, 2010, at any time
0256

Page 106

HC 00952

Morgan, Richard 01-27-11.txt

```
 1   before 1:00?
 2       A.   No.
 3                MR. BUNCHER:  You mean 2011.
 4       Q.   (BY MR. STROMBERG)  Excuse me.  2011 --
 5       A.   No.
 6       Q.   -- before 1:00?
 7       A.   No.
 8                MR. STROMBERG:  Thank you.  I appreciate
 9   that.
10       Q.   (BY MR. STROMBERG)  You talked earlier in your
11   deposition about adequate protection for some of these
12   properties.  Do you recall that discussion?
13       A.   I do.
14       Q.   In that discussion you mentioned that there
15   were two places that you thought you might look for
16   adequate protection:  One being investor pools and the
17   other being to TCI.  And?
18       A.   And/or whatever entity they came from.
19       Q.   Okay.  That's fine.  Thank you.  But if I can
20   refer to TCI to include any and all of those entities.
21   Can we do that --
22       A.   Yes.
23       Q.   -- just for the purpose of these questions.
24   Okay.  Thank you.
25                I also understood your testimony to be
0257
 1   that you weren't aware of any particular investors with
 2   respect to the property you were being asked about at
 3   the time who were available to provide adequate
 4   protection money for those properties.  Would the same
 5   be true of the Archon property?
 6       A.   True.
 7       Q.   And have you inquired, since you have taken
 8   the responsibility of chief restructuring officer for
 9   the debtor, as to whether or not TCI has the ability or
10   the willingness at this point in time to fund any
11   adequate protection payments in relation to the Archon
12   property?
13       A.   I have not.
14       Q.   You have not.  Just to clarify then, when you
15   answered that question I have not, that means you
16   haven't inquired as of this time.  Am I right?
17       A.   That's correct.
18       Q.   Okay.  Mr. Weitman asked you a question
19   about --
20       A.   Can I ask a question?
21       Q.   Sure.
22                MR. STROMBERG:  Off the record.
23       (Witness and counsel confer, 4:00 p.m. to 4:01 p.m.)
24       Q.   (BY MR. STROMBERG)  Did you have something you
25   wanted to clarify about your prior answer, Mr. Morgan?
0258
 1       A.   No.
 2       Q.   Okay.  Let me ask you, then, what do you know
 3   about the ability of TCI to fund any form of investment
 4   into the debtor in relation to any specific property or
 5   generally at this point in time?
 6       A.   All right.  Ask the question again because I'm
 7   probably going to answer it in two parts.  Okay.  Would
 8   you ask it again?
 9       Q.   I would be happy to.  As you sit here today,
10   what do you know about the ability of TCI to fund any
11   form of adequate protection for either any specific
                          Page 107
```

Morgan, Richard 01-27-11.txt

```
12   properties that are owned by FRE or for FRE in general
13   as of this day?
14         A.   Okay.   I think TCI certainly is a big company.
15   To the extent of their financial condition and their
16   cash flow, I have no knowledge.   In the end, any support
17   that I get from TCI would be most likely to protect
18   their best interests, which is the note.   Pure and
19   simple.
20         Q.   But you don't have any opinion, as you sit
21   here today, as to what amount of adequate protection
22   they have the present ability to fund if needed?
23         A.   I do not.   You know, I think that this is a
24   general understanding, okay, not anything legal.   That I
25   should be prepared to put at least 3 percent adequate
0259
1    protection against the first mortgage debt to make it
2    acceptable to the Court.   And that's just a general
3    understanding, and not necessarily anything anybody has
4    told me.
5          Q.   Looking at Exhibit 168.
6          A.   Yes, sir.
7          Q.   That debt, as it appears to me -- unless you
8    can tell me I'm wrong in assuming this -- appears to be
9    $178,176,947.   Am I right?
10         A.   Well, you have got to bifurcate the income
11   properties and the collateral that goes with those
12   income properties.
13         Q.   Okay.   Let me seek a clarification then on
14   what you were saying.   You had said something about a 3
15   percent number?
16         A.   No.   I'm saying that I know that on land -- on
17   the land in general, that's you and Armed Forces and
18   everyone that is holding land, Wells Fargo included --
19         Q.   And by land, you mean undeveloped land?
20         A.   Right, undeveloped land.
21         Q.   Okay.   Go ahead.
22         A.   That's not tied to an income producing asset,
23   that it is going to have to be some adequate protection
24   rate on that -- on that line.
25         Q.   Okay.   So you would back out of those figures
0260
1    whatever the income producing -- the five income
2    producing properties that you identified before?
3          A.   I think that number is about $80 million, just
4    in round numbers is what I estimate it to be.   The land
5    debt is about $80 million.
6          Q.   So then --
7          A.   That was before I knew some of it was tied in
8    to other assets.   I haven't done an analysis since then.
9          Q.   Yeah.   Assuming no cross-collateralization,
10   then the land alone is an $80 million --
11         A.   No, no, no.   I am just saying that that was
12   before I knew some of the parcels, like the Limestone
13   parcel, all of that was tied into other assets.   I will
14   have to go back and redo the -- redo the -- but let's
15   just -- probably $70 million is probably a number close
16   to it.
17         Q.   Okay.   And that's the number you are figuring
18   the 3 percent number for?
19         A.   Right.
20         Q.   And you don't have any knowledge, at this
21   point at least, as to whether or not, if that was
22   required to be funded by TCI, it could be?
```

                              Page 108

HC 00954

Morgan, Richard 01-27-11.txt
23      A.   That's going to be at the meeting that I will
24   have to have next week relative to each asset and their
25   commitment to do it.
0261
1        Q.   Mr. Weitman also asked you about your chief
2    restructuring officer experience with other TCI
3    entities, and you said you didn't have any.  Am I right?
4        A.   No.
5        Q.   I want to broaden that question a little bit
6    and just ask:  Do you have any similar experience for
7    any nonTCI entities?
8        A.   Actually, I do.  I actually bought a company
9    out of bankruptcy, which was the old Carl E. Smith
10   Company.  I say bought it.  I didn't buy it.  It was a
11   company called New Concept Energy.  I bought it, which
12   is a related entity.  But I bought through -- I bought
13   it out of the bankruptcy process in 2008, late 2008.
14       Q.   And New Concept Energy was an acquisition, if
15   I understand what you just --
16       A.   No.  New Concept Energy is a publicly traded
17   company.  It is another entity that has never been
18   mentioned to you.  It is a publicly traded company on
19   the American Stock Exchange and the GPR.
20            And as part of my role in energy, I sold
21   land.  I had some -- I put some -- or got cooperation
22   with one of the entities to sell it some land on a note
23   for $4,000 -- mineral leases in Arkansas.  That was
24   4,000 acres at $4,000 an acre.  I sold it for $32
25   million.  So I had $16 million extra cash out of that
0262
1    sale.  And I invested thirteen of that into the -- into
2    buying the property out of -- in West Virginia called
3    the Carl E. Smith Company, renamed it, and walked
4    through that whole deal from the inception to the
5    negotiations to the bankruptcy court through the plan
6    approval and operating.  And I still do.
7        Q.   But you weren't representing or an officer of
8    the debtor in that situation.  Am I right?
9        A.   No, I have not been on the debtor side.  No.
10   I've been on the buying side, but not the debtor side.
11       Q.   So for purposes of being on the debtor side,
12   forgive the expression, is this your first rodeo?
13       A.   Well, you know, I filed bankruptcy myself in
14   2005.  So, no, it is not my first rodeo.
15       Q.   I mean, in the capacity of a chief
16   restructuring officer?
17       A.   No, not at all.
18       Q.   I didn't mean to bring that up again.
19            Are you a member of any organizations
20   that deal with restructuring or bankruptcy or have a
21   focus on that?
22       A.   No.
23       Q.   And I assume, then, that you don't advertise
24   your services as a chief restructuring officer, at least
25   not at this point?
0263
1        A.   I don't advertise my services.  I think
2    that -- I used to have a joke that if you went to Herb
3    Weitzman and told him that you had a rundown center that
4    you wanted him to buy, he would say, go see Dave Morgan.
5    If you came to me and said, I have got a center I want
6    you to build, I would say go see Herb.  And it was sort
7    of a -- I was a turnaround specialist since 1990.
                            Page 109

HC 00955

Morgan, Richard 01-27-11.txt
```
 8        Q.   But you haven't had any special memberships or
 9   anything like that in the nature of a turnaround
10   specialist?
11        A.   You mean like an organization of turnaround
12   specialists?
13        Q.   Exactly.
14        A.   No.
15        Q.   We have a turnaround management association
16   here in the area.  You are not a member of that, are
17   you?
18        A.   No.
19        Q.   Okay.
20             MR. STROMBERG:  Pass the witness.  Thank
21   you, Mr. Morgan.
22                      EXAMINATION
23   BY MR. BUNCHER:
24        Q.   Just to clarify, describe, generally, your
25   experience with working out troubled loans and assets in
0264
 1   the real estate context.
 2        A.   Working -- I have never worked that much with
 3   loans.  I have worked a lot of assets.  And I started in
 4   1990.  And I took over -- when Southmark and Phillips
 5   parted ways, he took with him the advisorships to
 6   several real estate trusts.  And I was the first of the
 7   shopping center division.  So I knew a lot about those
 8   shopping centers.  And I went to him as -- when he did
 9   that.  And I said, look, there are nine properties that
10   your people don't know how to do.
11             And this is the same situation here.
12   They don't have anybody in that organization.  They have
13   box checkers and daily managers and budget cutters.  But
14   they don't have anybody that can use their creative
15   juices to make things happen.
16             And so I took over those nine properties
17   to turn around.  And then I bought four on my own.  I
18   bought them and then turned them around and renovated
19   them and resold them.
20             And that took me up until the DeBartolo
21   deal, which was in 1998.  That was all land.  I did
22   buy -- I did buy the Gainesville Outlet Mall up in
23   Texas -- up in Gainesville, Texas, for New Concept.  And
24   we kept it for a while and it just -- I had it up and
25   going from a standpoint for a while, but it was -- the
0265
 1   market just went to hell, so I didn't hold on to that
 2   one.  I let it go.
 3             And then I started restructuring
 4   companies basically.  When I took over the management of
 5   New Concept, the founder died, it was in the Centura
 6   building, $35,000 a month rent, no income.  And now it's
 7   a $20 million value, and stock is -- about $11 million
 8   of that is reserves so -- and making about $50,000 a
 9   month.
10             MR. STROMBERG:  May I ask a follow-up
11   question?
12             MR. BUNCHER:  Sure.
13                  FURTHER EXAMINATION
14   BY MR. STROMBERG:
15        Q.   Given what you have told us about the fact
16   that you have these people who lack the creative genius
17   to put reorganizations together, doesn't it trouble you
18   a bit that the reorganization that you have been asked
```
                          Page 110

HC 00956

```
                         Morgan, Richard 01-27-11.txt
19    to run basically was already, more or less, set up
20    before you got here?
21         A.   No, it doesn't trouble me at all.  Because I'm
22    looking at -- I'm looking at the -- I'm looking at this
23    side of the sheet.
24         Q.   The properties themselves?
25         A.   What can I do with it, how can I make it work.
0266
1     And I think I can make it all work given the right time
2     and structure to make it work.
3               MR. STROMBERG:  Pass the witness.
4               MR. BROWN:  We are done.
5               MR. BUNCHER:  Done.
6               (Deposition concluded, 4:12 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
0267
1               CHANGES AND SIGNATURE
2     WITNESS NAME:Richard David Morgan
3     DATE OF DEPOSITION:January 27, 2011
4     PAGE   LINE        CORRECTION              REASON
5     _____
6     _____
7     _____
8     _____
9     _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19    _____
20    _____
21    _____
22    _____
23    _____
24    _____
25    _____
0268
1          I, RICHARD DAVID MORGAN, have read the foregoing
2     deposition and hereby affix my signature that same is
3     true and correct except as noted above.
                         Page 111
```

HC 00957

Morgan, Richard 01-27-11.txt

4
5

6          _____
7                   RICHARD DAVID MORGAN
8
9      THE STATE OF TEXAS    )
10     COUNTY OF             )
11          Before me, _____, on this day
12     personally appeared, RICHARD DAVID MORGAN, known to me
13     (or proved to me under oath of through            )
14     (description of identity card or other document) to be
15     the person whose name is subscribed to the foregoing
16     instrument and acknowledged to me that they executed the
17     same for the purposes and consideration therein
18     expressed.
19          Given under my hand and seal of office this _____
20     day of _____ 2011.
21
22          _____
23                Notary Public in and for the State of Texas
24
25
0269
1      STATE OF TEXAS     )
2      COUNTY OF DENTON    )
3           I, Holly B. Smith, Certified Shorthand Reporter
4      duly qualified in and for the State of Texas, do hereby
5      certify that there came before me on the 27th day of
6      January 2011, at the offices of K&L Gates, 1717 Main
7      Street, Suite 2800, Dallas, Texas, the following named
8      person, to wit: RICHARD DAVID MORGAN, who was duly sworn
9      to testify the truth, the whole truth, and nothing but
10     the truth of his knowledge concerning the matters in
11     controversy in this case; and that he was thereupon
12     carefully examined upon his oath, and his examination
13     reduced to typewriting by me or under my supervision;
14     that the deposition is a true record of the testimony
15     given by the witness, same to be sworn to and subscribed
16     by said witness before any Notary Public pursuant to the
17     agreement of the parties.
18          I further certify that I am neither attorney nor
19     counsel for nor related to or employed by any of the
20     parties to the action in which this deposition is taken,
21     and further that I am not a relative or employee of any
22     attorney or counsel employed by the parties hereto or
23     financially interested in the action.
24          Given under my hand on this the 29th day of January
25     2011.
0270
1
2
3
4          _____
5                Holly B. Smith, Texas CSR
5                Date of Expiration:  12/31/11
           Lockwood & Associates
6          Firm Registration No. 425
           7548 Preston Road
7          Suite 141, PMB 102
           Frisco, Texas  75034
8          Phone: 214-705-0141
           Fax  : 214-705-0501
                        Page 112

HC 00958

Morgan, Richard 01-27-11.txt

```
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 113

HC 00959