# Exhibit W

HC 00960

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

IN RE:

FRE REAL ESTATE, INC.,

                Debtor.

)  Case No. 11-30210-bjh11
)  Chapter 11
)
)  Courtroom 2
)  1100 Commerce Street
)  Dallas, Texas 75242-1496
)
)  February 28, 2011
)  9:08 A.M.

TRANSCRIPT OF **[1]** MOTION FOR RELIEF FROM STAY (TO ANNUL, OR ALTERNATIVELY) FILED BY STATE BANK OF TEXAS (56). **[2]** MOTION FOR RELIEF FROM STAY (TO RETROACTIVELY ANNUL THE AUTOMATIC STAY FILED BY FIRST BANK & TRUST CO. (46). **[3]** MOTION FOR RELIEF FROM STAY/ MOTION TO ANNUL THE AUTOMATIC STAY FILED BY AMERICAN BANK OF COMMERCE (83). **[4]** MOTION FOR RELIEF FROM STAY FILED BY RMR INVESTMENTS, INC. (136). **[5]** MOTION FOR RELIEF FROM STAY FILED BY RMR INVESTMENTS, INC. (136).
BEFORE HONORABLE BARBARA J. HOUSER
UNITED STATES CHIEF BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor:          Neligan Foley LLP
                         By:  DOUGLAS JAMES BUNCHER, ESQ.
                              JOHN D. GAITHER, ESQ.
                              SEYMOUR ROBERTS, ESQ.
                         325 N. St. Paul, Suite 3600
                         Dallas, Texas 75201

ECRO:                    NICOLE WHITTINGTON

**TRANSCRIPTION SERVICE:**   **TRANSCRIPTS PLUS, INC.**
**435 Riverview Circle**
**New Hope, Pennsylvania 18938**
**Telephone: 215-862-1115**
**Facsimile: 215-862-6639**
**e-mail CourtTranscripts@aol.com**

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

HC 00961

2

APPEARANCES:
(Continued)

| | |
|---|---|
| For First Bank & Trust Co.<br>and The Bank of Weatherford: | Olson, Nicoud & Gueck, LLP<br>By:  DENNIS OLIVER OLSON, ESQ.<br>1201 Main Street, Suite 2470<br>Dallas, Texas 75202 |
| For Highland Capital<br>Management, LP: | Cole Schotz Meisel<br>Forman & Leonard PA<br>By:  MICHAEL D. WARNER, ESQ.<br>1700 City Center Tower II<br>301 Commerce Street<br>Fort Worth, Texas 76102 |
| For American Bank of Commerce: | Hunton & Williams, LLP<br>By:  CAMERON W. KINVIG, ESQ<br>1445 Ross Avenue, Suite 3700<br>Dallas, Texas 75202 |
| For Petra CRE Ltd.: | Stutzman Bromberg Esserman & Plifka<br>By:   JO E. HARTWICK, ESQ.<br>2323 Bryan Street, Suite 2200<br>Dallas, Texas 75201 |
| For Regions Bank: | Strasburger & Price, LLP<br>By: ROBERT P. FRANKE, ESQ.<br>901 Main Street, Suite 4300<br>Dallas, Texas 75202 |
| For Wells Fargo Capital<br>Finance, Inc.: | K & L Gates LLP<br>By:  DAVID WEITMAN, ESQ.<br>1717 Main Street Suite 2800<br>Dallas, Texas 75201 |

HC 00962

3

## INDEX

| WITNESS FOR FIRST BANK & TRUST | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| TERRY GRANTHAM | | | | |
| By Mr. Olson | 10 | | | |
| By Mr. Gaither | | 17 | | |

| WITNESS FOR THE DEBTOR | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| JAY LaJONE | | | | |
| By Mr. Gaither | 25 | | | |
| By Mr. Olson | | 28 | | |

| FIRST BANK & TRUST'S EXHIBITS | | Marked | Received |
|---|---|---|---|
| 14 | Restraining order | 10 | 11 |
| 16 | Modification renewal and extension agreement | 11 | 11 |
| 19 | Restraining order | 12 | 12 |
| 20 | Notice of acceleration and demand letter | 13 | 13 |
| 21 | E-mail | 18 | 18 |

HC 00963

4

1           THE COURT:  We have matters in FRE Real Estate this
2   morning.
3           I'll take appearances from the parties, please.
4           MR. GAITHER:  Good morning, Your Honor.  John
5   Gaither, Seymour Roberts, and Doug Buncher for the debtor, FRE.
6           THE COURT:  Mr. Olson?
7           MR. OLSON:  Good morning, Your Honor.  Dennis Olson
8   for the First Bank and Trust, and the Bank of Weatherford.
9           MR. WARNER:  Good morning, Your Honor.  Michael
10  Warner Cole Schotz Meisel Forman & Leonard on behalf of HCM,
11  LP.
12          MR. KINVIG:  Good morning, Your Honor.  Cameron
13  Kinvig on behalf of American Bank of Commerce.
14          THE COURT:  Ms. Hartwick.
15          MS. HARTWICK:  Good morning, Your Honor.  Jo
16  Hartwick on behalf of Petra.
17          THE COURT:  Mr. Franke?
18          MR. FRANKE:  Good morning, Your Honor.  Bob Frank on
19  behalf of Regions Bank.
20          MR. WEITMAN:  Good morning, Your Honor.  David
21  Weitman with the law firm of K&L Gates for Wells Fargo Capital
22  Finance.  I think we'll take up the dismissal order afterward,
23  but I did want to appear early.
24          THE COURT:  All right.
25          MR. WEITMAN:  Thank you.

HC 00964

5

1          THE COURT:  Thank you.  All right.  Who wants to
2   start?  Mr. Kinvig?
3          MR. KINVIG:  Well, Your Honor, I will start, but I
4   will not be long.  We reached an agreement with the debtor on
5   Friday late to -- a global agreement actually that dealt with
6   many of our issues, but one of those things is that the debtor
7   has agreed to annul the automatic stay.  And we have uploaded a
8   proposed order that we would ask Your Honor to consider.
9          Both parties agree to the substance of the proposed
10  order, and it's actually quite short.  It just simply says that
11  the automatic stay is annulled, that the motion is granted.
12  So, we would ask that you sign that.
13         Thank you.
14         MR. ROBERTS:  Seymour Roberts for FRE.  That's
15  correct, Judge.  We reached an agreement on Friday.
16         We've also reached an agreement with Regions Bank,
17  and we've uploaded a -- I believe Mr. Franke has either
18  uploaded an order or he's got it here.
19         MR. FRANKE:  Your Honor, I have -- Regions Bank.  I
20  have it here.  I will upload it when I get back to my office.
21         THE COURT:  And is it similarly --
22         MR. ROBERTS:  Yes.
23         THE COURT:  -- short and sweet?
24         MR. ROBERTS:  Yes.  Very.
25         MR. FRANKE:  Similarly short and sweet.  Just

6

1 | basically says that the stay is annulled.

2 | THE COURT: All right.

3 | MR. ROBERTS: We've got -- and also an agreement, I

4 | think, with First -- what's the name of the bank?

5 | MR. GAITHER: State Bank, Your Honor. Mark

6 | Stromberg's client. He's not here this morning, but he asked

7 | me to announce the settlement in his stead. We reached an

8 | agreement to annul the stay, and uploaded Friday afternoon a

9 | simple order that just states that the motion is granted.

10 | THE COURT: Very well.

11 | MR. GAITHER: I believe that leaves Mr. Olson's

12 | motion, Your Honor. And since it's his motion, I'll allow him

13 | to proceed first. I don't know if you would like to take that

14 | up prior to the issues on the dismissal order.

15 | THE COURT: I think so.

16 | MR. GAITHER: Okay.

17 | THE COURT: That may help simplify some of the issues

18 | on the dismissal order, or not, but --

19 | MR. GAITHER: Okay.

20 | THE COURT: All right. Mr. Olson, please.

21 | MR. OLSON: Your Honor, you may have seen where Mr.

22 | Neligan uploaded the list of exhibits for the hearing. And I

23 | had joined in that, and said that I would provide the Court

24 | with a copy of those exhibits that we were actually going to

25 | use.

7

1          THE COURT:  All right.

2          MR. OLSON:  I've distilled it down to four.  May I

3    approach?

4          THE COURT:  You may, please.  Thank you.

5          MR. OLSON:  And we've continued the same numbering

6    that we had in the exhibits attached to our motion.  So, what I

7    should have handed you would be Exhibits 14, 16, 19, and 20.

8          THE COURT:  All right.

9          MR. OLSON:  We'd ask the Court to take judicial

10   notice of the evidence that was received on the motion to

11   dismiss, particularly the stipulation that Mr. Buncher and I

12   entered into in open Court.  That was attached as an exhibit to

13   the response filed by Mr. Gaither.

14          And in the big stipulation that was filed with the

15   Court, I have copied those pages that pertain to the Iori

16   Centura (phonetic) property.  Just for your reference, if I

17   could hand those up.

18          THE COURT:  Please.

19          MR. OLSON:  Your Honor, they're on Pages 19, 20, and

20   21.

21          MR. GAITHER:  Do you have a copy for me, Mr. Olson?

22          MR. OLSON:  No, I don't even have one for me.

23          MR. GAITHER:  Okay.

24          MR. OLSON:  May I proceed?

25          THE COURT:  You may, please.

HC 00967

8

1        MR. OLSON:  I'd like to call my first witness.  I'll

2   skip opening statement.  Mr. Gaither, would you like to --

3        MR. GAITHER:  Your Honor --

4        MR. OLSON:  -- say anything before I do that?

5        MR. GAITHER:  I can make a short opening.  We have a

6   stipulation that was attached to our motion as Exhibit A, which

7   Mr. Olson has just handed you.  I think that's sufficient to

8   decide the issues on this motion myself because that

9   stipulation shows that Mr. Olson's client had actual notice of

10  both the conveyance of their collateral to FRE and FRE's

11  bankruptcy prior to the time they foreclosed, and that they

12  proceeded to foreclose anyway.

13        I would submit that that is sufficient evidence to

14  allow the Court to make a decision to disallow -- deny Mr.

15  Olson's motion.  I guess that would be the content of my

16  opening, as well.  But if he would like to proceed with his

17  witness, we can do that, as well.

18        THE COURT:  All right.

19        MR. OLSON:  Your Honor, we would call Terry Grantham.

20        THE COURT:  Mr. Grantham, if you'd come forward and

21  be sworn.  You're going to take this witness chair right here.

22  And before you sit down, if you'd raise your right hand and be

23  sworn in by the Court Reporter.

24        TERRY GRANTHAM, FIRST BANK'S WITNESS, SWORN

25        THE COURT:  Please.

HC 00968

Grantham – Direct                              9

1                          DIRECT EXAMINATION

2   BY MR. OLSON:

3   Q    Please state your name.

4   A    Terry Grantham.

5   Q    And where do you reside?

6   A    Lubbock, Texas.

7   Q    And how are you employed?

8   A    I'm an attorney with the firm of Craig, Terrill, Hale &

9   Grantham.

10  Q    And how long have you been licensed to practice law in the

11  State of Texas?

12  A    Since 1982.

13  Q    And what's your primary focus of your practice?

14  A    Real estate, oil, gas, and banking.

15  Q    Are you familiar with the FRE Real Estate, Inc.

16  bankruptcy?

17  A    Yes, sir.

18  Q    And when did you first hear that name?

19  A    When I first heard that name would be on foreclosure day

20  in January.

21  Q    Of this year?

22  A    Yes, sir.

23  Q    And on that day, was your firm conducting a foreclosure of

24  property involved in this bankruptcy?

25  A    Yes, sir.

HC 00969

Grantham - Direct                                10

1  Q    Who was your client?

2  A    My client was First Bank & Trust, Lubbock, and Bank of

3  Weatherford.

4  Q    And what was the shorthand name of the property that you

5  were attempting to foreclose that day?

6  A    Iori Centura.

7  Q    And had you had dealings with -- previous attempts to

8  foreclose the Iori Centura property?

9  A    Yes, sir, two separate times.

10 Q    All right.  Do you have with you a set of the exhibits

11 that I handed up to the Court?

12 A    Yes, sir.

13 Q    If you would, sir, look a Exhibit 14 and tell us if you

14 can identify that.

15 A    Yes, sir.

16 Q    And what is it?

17 A    It's a temporary restraining order issued to stop the

18 foreclosure -- to stop the foreclosure of the property we're

19 talking about.

20 Q    And when was that particular temporary restraining order

21 issued?

22 A    August 28th, 2009, 11:30 A.M.

23        MR. OLSON:  Your Honor, at this point, we would offer

24 Exhibit 14.

25        THE COURT:  Any objection?

HC 00970

Grantham - Direct                                    11

1              MR. GAITHER:  No, Your Honor.

2              THE COURT:  It's admitted.

3  BY MR. OLSON:

4  Q    And if you would, sir, look at Exhibit 16, and tell me if

5  you can recognize that?

6  A    Yes, sir.

7  Q    And what is that?

8  A    It's a modification renewal and extension agreement by and

9  between First Bank & Trust Company as lender and Iori Centura,

10 Inc., Nevada Corporation as borrower.

11 Q    And what's the date of that document?

12 A    September 21st, 2009.

13 Q    Would that then be the way the first attempt to foreclose

14 the property got resolved?

15 A    Yes, sir.

16 Q    With the entry of that agreement?

17 A    Yes, sir.

18             MR. OLSON:  We would offer Exhibit 16.

19             THE COURT:  Any objection?

20             MR. GAITHER:  No, Your Honor.

21             THE COURT:  It's admitted.

22 BY MR. OLSON:

23 Q    If you would, sir, look to Exhibit 19 and tell me if you

24 can identify that exhibit?

25 A    Yes, sir, I can.

HC 00971

Grantham - Direct                                    12

1  Q    What is that?

2  A    It's a second restraining order followed by -- excuse me -

3  - issued in the District Court of Dallas County against First

4  Bank & Trust Company and the Bank of Weatherford.

5  Q    And is that the restrain --

6  A    Restrains the second attempt at foreclosure.

7  Q    Of the Iori Centura --

8  A    Of the subject property, yes, sir.

9  Q    What was the date of that restraining order?

10 A    I don't have that date there.   It looks like it was

11 December 3rd.

12 Q    What year?

13 A    But I can't really read it.

14 Q    What year?

15 A    2010.

16 Q    All right.  And is that what stopped your second attempt

17 to foreclose the property?

18 A    Yes, sir.

19        MR. OLSON:  We would offer Exhibit 19.

20        THE COURT:  Any objection?

21        MR. GAITHER:  No, Your Honor.

22        THE COURT:  Admitted.

23 BY MR. OLSON:

24 Q    Finally, sir, if you would, look at Exhibit 20.

25 A    Yes, sir.

Grantham - Direct                    13

1  Q    What is that?

2  A    It's a notice of acceleration and demand letter addressed

3  to Iori Centura, prepared by my firm.

4  Q    Does it bear your signature?

5  A    Yes, sir.

6  Q    What's the date of that letter?

7  A    December 13th, 2010.

8  Q    This is the posting for the January, 2011 sale?

9  A    Correct, sir.

10            MR. OLSON:  We would offer Exhibit 20.

11            THE COURT:  Any objection?

12            MR. GAITHER:  No, Your Honor.

13            THE COURT:  It's admitted.

14 BY MR. OLSON:

15 Q    All right.  On January 4th, we've entered into a

16 stipulation as to the chronology of events.  I don't know if

17 you've seen that stipulation or not.

18 A    No, I have not.

19 Q    But the first notice that I want to focus on came in

20 before noon that day.  Are you familiar with that notice?

21 A    I'm familiar with the fact that our firm received a phone

22 call.

23 Q    Informing you of what?

24 A    That the property that we were attempting to foreclose,

25 that a bankruptcy had been filed by FRE.

HC 00973

Grantham - Direct                                    14

1  Q    By FRE.

2  A    Yes, sir.

3  Q    All right.  And did -- at that point, in that call, were

4  you given a bankruptcy case number of the filing by FRE?

5  A    No, sir, I was not at the office then.  My secretary

6  contacted me on the road.  I do my out-of-County foreclosures

7  in the mornings.  I do my in-County in the afternoons.  And she

8  called me and said she just received a call informing us of

9  that.  And I said, well, get us something that proves it up

10 because I'll be back shortly.

11 Q    And when did you get back to the office?

12 A    Right -- a little -- about ten or 15 til 1.

13 Q    All right.  And what was the next contact you had from

14 people trying to notify you of the bankruptcy?

15 A    I got an e-mail from a Mr. LaJone telling me that here's -

16 - here are the things proving up that you've -- that the

17 bankruptcy has been filed.  And that the property is owned by

18 FRE.

19 Q    All right.  And what was enclosed in that e-mail?

20 A    In that e-mail was a blank page of the -- it looked to be

21 the front page of the bankruptcy petition, no file mark, no

22 case number.  And a deed that had not -- did not bear a file

23 mark.

24 Q    All right.  The petition was signed and the deed was

25 signed, but neither one of them had a file mark.

HC 00974

Grantham - Direct                    15

1 | A     That's correct.

2 | Q     All right.  And that came in just before 1 o'clock?

3 | A     Correct.

4 | Q     All right.  What was the next thing that happened in

5 | chronological sequence that bears on this attempted

6 | foreclosure?

7 | A     Well, I called the gentleman who sent me the e-mail and

8 | said I need something else.  I need some -- something that

9 | proves to me that this property has been transferred, and that

10 | this bankruptcy case has been filed.

11 | Q     And did he agree to get that for you?

12 | A     Yeah.

13 | Q     In the meantime, did you do some checking on your own?

14 | A     Yes, I --

15 | Q     What did you do?

16 | A     I was rather upset because I was unaware of any transfer

17 | of the property.  So, I called the title company in Dallas that

18 | had given me the title evidence for my foreclosure.  And I got

19 | the guy on the phone and said, you know, I'm sitting here

20 | looking at your work, and you're showing me that this is Iori

21 | Centura, and I've been told that there's been a deed filed that

22 | the property has changed hands.

23 |        He was very apologetic, said he would call me back.

24 | And in five minutes or so, literally, he calls me back and

25 | said, I don't know what you're looking for, but I don't find

HC 00975

Grantham - Direct                              16

1 anything filed.

2 Q    All right.  And in the meantime, was the sale conducted?

3 A    Yes, sir.

4 Q    Who actually conducted the sale on the ground here in

5 Dallas?

6 A    David Garvin (phonetic).

7 Q    And had you contacted Garvin and told him to stop the

8 sale?

9 A    No, sir.

10 Q   And why had you not done that?

11 A   I hadn't been able to confirm anything.

12 Q   All right.  Now, after the sale was conducted, did you

13 notify Mr. LaJone that the sale had been conducted?

14 A   Yes, I did.

15 Q   And subsequent to that, did you get an e-mail that gave

16 you the proof of the filing of the bankruptcy and the case

17 number?

18 A   At some point, yes.  That afternoon, I did.

19 Q   And at a later point that afternoon, did you also get

20 proof of the filing of the deed?

21 A   Yes, sir.

22 Q   And when was the deed recorded?

23 A   The deed was recorded around 2:45 the day of the -- of the

24 foreclosure sale.

25 Q   So, the deed was recorded after the sale?

HC 00976

Grantham - Direct/Cross                        17

1   A    Yes, sir.

2   Q    And after your last conversation with Mr. LaJone?

3   A    It appeared that way, yes, sir.

4   Q    All right.  Once you learned that the bankruptcy had been

5   filed, and that the deed had been recorded, did you prepare

6   your trustee's deed and file it, and deliver it?

7   A    No, sir.

8   Q    To this day, you've still not prepared your trustee's

9   deed?

10  A    No, sir.  I told Mr. LaJone I would not, and I have not.

11           MR. OLSON:  I'll pass the witness.

12           THE COURT:  Cross examination.

13                    CROSS EXAMINATION

14  BY MR. GAITHER:

15  Q    Good morning, Mr. Grantham.  My name is John Gaither.  I

16  represent the debtor in this case.

17  A    Mr. Gaither.

18  Q    What time on January 4th was the foreclosure scheduled to

19  begin, do you recall?

20  A    All my out of -- this particular one?  Or are you talking

21  about my personal ones?

22  Q    The foreclosure of the property we're talking about today.

23  A    1 o'clock.

24  Q    1 P.M. on January 4th?

25  A    Yes, sir.

HC 00977

1  Q    I will hand you what's been marked as the Movant's Exhibit

2  21.

3  A     Okay.

4          MR. GAITHER:  It's attached to Mr. Olson's motion as

5  Exhibit 21.

6          THE COURT:  All right.

7          MR. GAITHER:  I would move for the admission of

8  Exhibit 21.

9          MR. OLSON:  No objection.

10         THE COURT:  21 is admitted.

11 BY MR. GAITHER:

12 Q    What I've handed you -- what I've handed you is an e-mail.

13 A     Yes, sir.

14 Q    From Mr. Jay LaJone.

15 A     Yes, sir.

16 Q    Did you receive this e-mail?

17 A     I sure did.

18 Q    At about what time did you receive this e-mail?

19 A     I would assume I got it around 12:55.

20 Q    Okay.  And what is attached to this e-mail?

21 A     A general warranty deed.

22                       (Pause)

23 Q    Okay.  Attached is a general warranty deed for Iori

24 Centura to Fenton Real Estate, Inc., executed by Steven

25 Shelley, with no file mark.  And a B-1 Official Form 1, United

HC 00978

Grantham - Cross                                     19

1  States Bankruptcy Court, appears to be a front page of a

2  voluntary petition filed by FRE Real Estate, Inc., again with

3  no file mark.  Signed by Mr. John P. Lewis, Junior.

4  Q    So, at 12:55 P.M., prior to the time the foreclosure was

5  scheduled to begin, you received an e-mail that contained the

6  deed evidencing a conveyance of the property for which you were

7  scheduled to foreclose, Iori Centura's property, conveying that

8  to an entity named FRE and a petition filed -- a petition

9  signed by FRE that would suggest that bankruptcy had been

10 filed, is that true?

11 A    I would -- I would say that your words suggest as true.

12 It would suggest that, yes, sir.

13 Q    Did you check the Pacer records to confirm whether or not

14 a bankruptcy had actually been filed?

15 A    Not until much later, no, sir.

16 Q    You didn't check the Pacer records prior to the time you

17 foreclosed?

18 A    No, sir.

19 Q    Did you ask anyone to confirm that at your office?

20 A    No, sir.  I asked Mr. LaJone to do that.

21 Q    When did you ask him to do that?

22 A    When I talked to him the very first time.  I said I need

23 something that shows this property's been transferred and that

24 bankruptcy has been filed.

25 Q    But after that time, he e-mailed you these documents, is

HC 00979

Grantham - Cross                                    20

1  that correct?  After the time you asked him to send these
2  documents.

3  A     Right.  This is what he sent me were unfiled --
4  Q     Right.
5  A     -- were unfiled documents.

6  Q     Thank you.  Is it your opinion or did you believe at the
7  time that this unrecorded warranty deed would not have been
8  effective to convey this property to another entity, and that
9  if that entity had filed bankruptcy -- if this deed purported
10 to transfer the property for which you were scheduled to
11 foreclosure to FRE, and FRE subsequently filed bankruptcy, do
12 you believe that that property would have been property of
13 FRE's estate?

14 A     I'm not sure I follow your question, sir.  I'm sorry.
15 Q     Do you believe that the automatic stay -- had there
16 actually been a bankruptcy filed -- and I understand that you
17 did not know at the time because you had not checked -- do you
18 believe that the bankruptcy would have operated to prevent you
19 from foreclosing on this property?

20 A     No, sir.

21 Q     You don't believe that, had the property been conveyed to
22 FRE, and FRE filed bankruptcy, the automatic stay would not
23 have prevented you from foreclosing?

24 A     Well, what I believe is that if the property had been
25 properly conveyed to any entity, and that entity files

HC 00980

Grantham - Cross                                    21

1  bankruptcy, the automatic stay comes into play.

2           But I -- I've been doing this a very long time, and I

3  always request proof of conveyance, proof of filing of a

4  bankruptcy, proof of the filing of a temporary restraining

5  order.  Because in my experience, many times I've been given

6  blank documents, and I've pulled sales down, and then I've had

7  to explain to my clients later why they get to hold this asset

8  for another month when nothing occurred.

9  Q    Were you given a blank document this time?

10 A    Well, as far as I'm concerned, yes, sir.  There's no file

11 marks on these.

12 Q    When you're given documents in other cases, do you usually

13 do any independent checking?  Do you check -- if you're told

14 that there's a bankruptcy, do you ever check yourself?

15 A    Generally --

16 Q    Or do you rely on the creditor -- or the debtor?

17 A    Sir, this is the only time I've ever received a blank one.

18 Q    You just testified that you routinely receive blank

19 documents.

20 A    No, I receive blank deeds before showing the conveyances

21 or document of a property that did not occur.  I've gotten

22 blank judge's orders where I was assured that had been signed

23 and entered, and it hadn't been.

24           But the people that I've dealt with in the years that

25 I've done foreclosures, when they file bankruptcy, they shoot

HC 00981

Grantham - Cross                    22

1  us a copy of the bankruptcy where it's been filed and a case

2  number.  We call our clients, or if it's my client, then I'll

3  pull it down.

4  Q    Whose decision was it to proceed to foreclosure after you

5  received this e-mail?

6  A    Well, I guess you would say it was my decision because I

7  did not do anything other than attempt to verify whether or not

8  the property had been conveyed.  And when I couldn't verify

9  that the property had been conveyed, I didn't do anything.  I

10 guess you could say I allowed things to go forward.

11 Q    Are you aware that a delivery of an executed deed -- as a

12 real estate attorney --

13 A    Yes, sir.

14 Q    -- are you aware that delivery of an executed deed

15 constitutes the sale and conveyance of a property, rather than

16 the recording of that executed deed?

17 A    Well, I think -- I think that that question's rife with

18 lots of different issues.

19 Q    It's a yes or no question.

20 A    Delivery -- delivery of a deed may or may not convey

21 property.

22 Q    Delivery of a signed deed does not convey property?

23 A    May not.  Because delivery has to be voluntary, it has to

24 be willful.  It has to be from the proper party also, generally

25 speaking.  You have to look at whether or not the consideration

HC 00982

Grantham - Cross                23

1  was actually passed, received, and approved.  There's a lot of

2  other things that happen in conveyance of real property other

3  than just delivery.

4  Q    But you didn't think it necessary to check into any of

5  those things prior to --

6  A    Oh, I did check.

7  Q    -- conducting the foreclosure.

8  A    I called.

9  Q    Within the few minutes, you checked into all those things

10 within the few minutes.

11 A    No, no, no.

12 Q    Between the time that you received this e-mail and the

13 time you --

14 A    No, sir.  I believe Mr. --

15 Q    -- conducted the foreclosure sale?

16 A    I believe Mr. LaJone had given me a copy of -- the only

17 copy of the deed he had.  So, I called the title company to get

18 me a copy.  They said there wasn't one.

19 Q    They didn't have a copy because the deed had not been

20 recorded, is that true?

21 A    Yes, sir.

22 Q    I think that goes to my original question.  Could the deed

23 have been effective to convey the property to FRE without it

24 having been recorded?

25 A    As between those two parties, yes, sir.  But not as

HC 00983

Grantham - Cross                                24

1  between other parties.

2  Q    And you've testified that if it was effective between

3  those two parties, that the grantee -- the grantee's subsequent

4  bankruptcy would have operated to prevent this foreclosure

5  sale, is that true?

6  A    I believe what I testified is if it had been properly

7  recorded, that it would.  I believe that's what I said.

8  Q    Well, just to clarify.  Had this deed been effective to

9  convey the property to FRE, and had FRE filed bankruptcy prior

10 to the time you foreclosed, or were even scheduled to

11 foreclosure, would that bankruptcy have operated to prevent you

12 from foreclosing on the property?

13 A    If it had gone in the order you said, I guess the answer

14 would be yes.

15         MR. GAITHER:  Nothing further, Your Honor.

16         THE COURT:  Redirect?

17         MR. OLSON:  No redirect.  And I have no further

18 evidence to present.

19         THE COURT:  All right.  Let me excuse the witness.

20 Thank you very much.  You may step down.

21         MR. OLSON:  I have no further evidence.  I'm prepared

22 to argue whenever Mr. Gaither's done.

23         MR. GAITHER:  Your Honor, we do have one final

24 witness.  Mr. Jay LaJone.

25         THE COURT:  Mr. LaJone, if you'd come forward,

HC 00984

LaJone – Direct                                                     25

1  please.  Take the witness chair.  Raise your right hand, and be

2  sworn in.

3                 JAY LaJONE, DEBTOR'S WITNESS, SWORN

4                          DIRECT EXAMINATION

5  BY MR. GAITHER:

6  Q    Good morning, Mr. LaJone.

7  A    Good morning.

8  Q    Please state your full name.

9  A    Jay Allen LaJone.

10 Q    What was your role with FRE prior to this bankruptcy?

11 A    Actually I was counsel for the transferor.

12 Q    Okay.

13 A    Iori Centura, Inc.

14 Q    Okay.  And in that capacity, did you work with FRE at all?

15 A    Yes.

16 Q    And you worked with them to convey the properties?

17 A    Yes.

18 Q    Was the -- what we've been referring to today as the Iori

19 Centura property included in the properties that you worked

20 with to convey to FRE?

21 A    Yes.

22 Q    On January 4th, did you speak with Mr. Grantham?

23 A    Yes.

24 Q    Did you speak with him by telephone?

25 A    Yes.

HC 00985

1  Q    What time was that, do you remember

2  A    I spoke -- well, I first spoke with Mr. Grantham's

3  secretary sometime shortly before noon.  And I subsequently

4  talked with Mr. Grantham, I believe, sometime between 12:30

5  and 1.

6  Q    Okay.

7  A    And then I spoke with him again later that afternoon.

8  Q    Right.  But prior to 1 P.M., you spoke with him.  You

9  spoke with his secretary once, and you spoke with him once

10 prior to 1 P.M.

11 A    Yes.

12 Q    What did you tell him prior to 1 P.M., and what did you

13 tell his secretary?

14 A    I told -- I told both Mr. Grantham and his secretary that

15 the property had been conveyed to FRE.  And that FRE had filed

16 for bankruptcy that morning.

17 Q    Did you e-mail him prior to 1 P.M.?

18 A    Yes.

19 Q    I will hand you what's been marked as Movant's 21 and

20 admitted.  Is this the copy of the e-mail you sent Mr. Grantham

21 that morning?

22 A    Yes, it is.

23 Q    Did you speak with other creditors on the morning of

24 January 4th?

25 A    I did.

HC 00986

LaJone - Direct                                    27

1   Q    Did you speak with the Armed Forces Bank?

2   A    Yes.

3   Q    Was the -- was Armed Forces Bank's collateral part of the

4   property that you worked with FRE to convey that --

5   A    Yes, it was.

6   Q    -- prior to the bankruptcy?

7   A    It was the largest portion of the property conveyed.

8   Q    Had Armed Forces noticed that property foreclosure on

9   January 4?

10  A    Yes, it had.

11  Q    When you spoke with Armed Forces Bank that morning, what

12  did you tell them?

13  A    I told the attorney who was representing Armed Forces Bank

14  exactly what I told Mr. Grantham.  That is that the property

15  had been conveyed from the owners of that particular property

16  to FRE, and that FRE had filed a voluntary petition in

17  bankruptcy that morning.

18  Q    And what did they do?

19  A    They asked -- the attorney asked me to send her a copy of

20  the deeds because there were several tracts, and a copy of the

21  petition, which I did.

22  Q    Thereafter, what did Armed Forces Bank do?

23  A    She indicated to me that based upon that information, she

24  would pass the foreclosure.

25  Q    And did they tell you why?

LaJone - Direct/Cross                                    28

1   A    Because she felt that the automatic stay prevented her

2   from going forward.

3            MR. GAITHER:  Nothing further, Your Honor.

4            MR. OLSON:  Cross?

5            THE COURT:  Please.

6                        CROSS EXAMINATION

7   BY MR. OLSON:

8   Q    Mr. LaJone, I think you and I just met today, but we've

9   spoken before, correct?

10  A    Yes.

11  Q    At the time you had the conversation with the attorney

12  representing Armed Forces Bank, had the deeds involving their

13  collateral actually been recorded?

14  A    No.

15  Q    Did you prepare all of the deeds for all of the transfers

16  to FRE?

17  A    Either I or other attorneys in my office, yes.

18  Q    So your firm --

19  A    Yes.

20  Q    -- prepared all of the deeds.

21  A    That is correct.

22  Q    When were they prepared?

23  A    They were prepared -- the -- most of them were prepared

24  the Wednesday or Thursday prior to the Tuesday of foreclosure.

25  Q    All right.  So, the Tuesday of foreclosure was January

LaJone – Cross                                                29

1   4th.

2   A    Yes.

3   Q    So, January 3rd would have been a Monday.  The 2nd, a

4   Sunday.  The 1st a Saturday.  Friday would have been December

5   31st.  So, you're saying they would have been prepared the 30th

6   or the 29th?

7   A    Yes, or slightly earlier.  But right about that time.

8   Q    When were they signed?

9   A    They were signed -- most of them were signed Thursday

10  evening.

11  Q    So, on December the -- now I've lost track.  29th?

12  A    29th.

13  Q    The 30th?

14  A    I'm sorry, I don't have a calendar.

15  Q    I don't either.  But the 29th or 30th.

16  A    Yes.

17  Q    Whatever that Thursday night was.

18  A    Yes.

19  Q    All right.  You say most of them.

20          THE COURT:  Thursday was the 30th.

21          THE WITNESS:  The 30th, okay.

22          MR. OLSON:  Thank you, Your Honor.

23  BY MR. OLSON:

24  Q    So, others were signed at a different time?

25  A    If -- they -- they may have been signed earlier in the

HC 00989

LaJone - Cross                                          30

1  day.  Several of them were signed earlier in the day on

2  Thursday.

3  Q    All right.  Now, were they all delivered to somebody at

4  that point?

5  A    Absolutely.

6  Q    Well, when you say "absolutely," who signed all these

7  deeds?

8  A    Mr. Steven Shelley.

9  Q    And Mr. Shelley then, as transferor, did what with the

10 deeds that he had executed?

11 A    The deeds -- well, my office had them, and we delivered

12 the original to the representative of FRE to whom we had been

13 instructed.

14 Q    Who is that?

15 A    Mr. Dave Morgan.

16 Q    So, all the deeds were delivered to Mr. Morgan when?

17 A    I believe they were delivered on -- well, they weren't

18 delivered Thursday night.  They would have been delivered

19 Friday.

20 Q    December 31st?

21 A    Yes.  And I apologize.  Not the originals, but -- because

22 the originals on -- no, actually they were -- they were -- the

23 originals were delivered to Mr. Morgan on the 31st.

24 Q    All right.  So, FRE had the deeds on the 31st, Mr. Morgan.

25 A    Yes.

HC 00990

LaJone - Cross                                31

1  Q    But on January 4th, the deeds had still not been filed.

2  A    Correct.

3  Q    Why?

4  A    The Recorder's Office closed.  This was the New Year's

5  holiday.  The Recorder's Office -- title companies wouldn't

6  even take the deeds for recording by the afternoon Thursday.

7  Friday, the title companies did not take deeds.  Monday, the

8  title companies did not take deeds.  Which meant Tuesday was

9  the first day after their execution and delivery that we were

10  able to record them.

11  Q    Well, your bankruptcy petition was filed at 6:43 in the

12  morning --

13  A    Yes, sir.

14  Q    -- according to that exhibit.  Why weren't the deeds

15  recorded at 9:01 before the 10 o'clock sales began?

16  A    The deeds were submitted for recording at about the same

17  time.

18  Q    How do you know that?

19  A    Because my office did it.

20  Q    But I thought you were the transferor?

21  A    We are.  We were.

22  Q    And I thought you had delivered the deed on the week

23  before.

24  A    That's right.  We delivered it to Mr. Morgan, whose office

25  is adjacent to ours.  As an accommodation, we got them back and

32

1  recorded them.

2            MR. OLSON:  I'll pass the witness.

3            MR. GAITHER:  Nothing further, Your Honor.

4            THE COURT:  Thank you, Mr. LaJone.  You may step

5  down.

6            MR. LaJONE:  Thank you.

7            THE COURT:  All right.  Any further evidence from the

8  parties?

9            MR. OLSON:  Nothing.

10           MR. GAITHER:  No, Your Honor.

11           THE COURT:  Very well.  I'll entertain closing

12 arguments, please.

13           MR. OLSON:  Thank you, Your Honor.  In today's high

14 volume foreclosure practice, it's not at all unusual for the

15 people conducting a sale to be told that somebody has obtained

16 a TRO, or has transferred a property, or has filed a bankruptcy

17 when, in fact, they haven't.

18           Now, the first thing we know is that in a good faith

19 filing, it truly doesn't matter.  The fact is that the sale is

20 stayed, whether they know it or not.  And in this case, when

21 the deed was recorded later that afternoon, I'm satisfied --

22           THE COURT:  Well, but the deed recording is

23 irrelevant.

24           MR. OLSON: What I was going to say, Your Honor, is --

25           THE COURT:  The deed, as between the parties to it,

HC 00992

33

1 was effective when it was signed.  The recording may be helpful

2 vis-a-vis third parties, but we aren't worried about third

3 parties in this context.

4        MR. OLSON:  No.  As I was going to say, Your Honor, I

5 think that when it was filed that afternoon, it's 541 property

6 of the estate by that point, if not before.  It just truly

7 doesn't matter in a good faith filing.

8        THE COURT:  Well, it was property of the estate when

9 it was signed.

10        MR. OLSON:  Well --

11        THE COURT:  It was effective --

12        MR. OLSON:  And -- and --

13        THE COURT:  -- between the parties to the conveyance.

14        MR. OLSON:  And I'm truly not quarreling with you on

15 that.  I think that's a bit of a red herring because, again, if

16 this had been a good faith filing, we wouldn't be here.

17        THE COURT:  Well, but Mr. Olson, I've got to tell

18 you, the secured parties have persuaded me to hold the debtor's

19 feet to the fire.

20        MR. OLSON:  Yes, ma'am.

21        THE COURT:   That this was not a good faith filing.

22        MR. OLSON:  That's right.

23        THE COURT:  There was too much shenanigans going on

24 prior to the filing to not dismiss this case.

25        But conversely, I am very troubled by the fact that

HC 00993

34

1  notice was given of a transfer of the property and of a

2  bankruptcy filing, and nevertheless, the creditor here went

3  forward in the face of that notice and wants me to look the

4  other way.  It feels like what was good for the goose has to be

5  good for the gander.

6           Yes, I've concluded that there were too many things

7  that happened prior to this filing for this to be a good faith

8  bankruptcy filing.

9           But conversely, your client knew that there had been

10 a bankruptcy filing.  And your client knew that, in fact, the

11 property had been transferred, and he went ahead and

12 foreclosed.  And that precedent is equally inappropriate in a

13 bankruptcy context.  The stay has to be honored.

14           MR. OLSON:  Well --

15           THE COURT:  Doesn't it?

16           MR. OLSON:  I'm not quarreling with you about that

17 either.

18           And, again -- when all this took place in that very

19 compressed time frame between 11:55 and 1:55, I don't think

20 anybody was acting in a sinister or black-hearted way.

21           THE COURT:  I don't either.

22           MR. OLSON:  And, again, what happens so frequently is

23 you don't prepare the deed, you don't do anything, you file

24 your motion to lift stay, and you go on down the road.  And

25 that's what would have happened here, but for all the claim or

HC 00994

Case 11-42042-dml11   Doc 30-35   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit W - Hearing Transcript   February 28   2011   Page 36 of 92

35

1   as the other creditors began to perceive the big picture

2          Now, I think that when you look at 362(d), if you

3   find the bad faith filing, it says you shall give certain

4   relief.  It's your discretion as to what you do.

5          THE COURT:  All right.

6          MR. OLSON:  And one of the forms for relief that we

7   had asked for was dismissal, and we're getting that.

8          The question is in the Court's discretion, does the

9   Court feel that the bigger picture is that maybe that's not

10  enough, maybe an annulment also is just a fact.  That's what

11  we're here talking about.

12         THE COURT:  I understand.

13         MR. OLSON:  The thing that concerns me is if you find

14  that there was a bad faith filing, shouldn't the Court put the

15  creditors back where they would be had there been no filing?

16  Had there been no filing, then our sale would stand up.

17         That is something that is troubling to the Court, and

18  I understand that.  And I don't know how the Court comes out on

19  that discretion wise.  But two things:

20         Again, as Ronald Reagan used to say, "Trust but

21  verify."  And as a real estate lawyer, Mr. Grantham's focus was

22  on "where's the deed?"

23         Now, they did later find that both were as

24  represented by Mr. LaJone.  But if you take his word for it,

25  and you pull the sale, the question is would they have ever

HC 00995

36

1   recorded the deed.  That's the problem we've got.  We've had

2   prior TROs with these people, a long history, a long attempt to

3   foreclose.

4           THE COURT:  But why --

5           MR. OLSON:  And if you --

6           THE COURT:  Why do you care if they record it or

7   didn't record the deed?

8           MR. OLSON:  Well, because --

9           THE COURT:  What skin off your nose is that?

10          MR. OLSON:  Because if -- and now I've forgotten the

11  man's name.  Mr. Morgan says, "Well, you know, we were in such

12  a rush, we were moving so many properties around, we lost track

13  of where we were at, that one Iori Centura, that's not part of

14  the bankruptcy, we didn't record that deed."  There's real

15  credibility issues that we're concerned about --

16          THE COURT:  Well, but that --

17          MR. OLSON:  -- in that time frame on January 4.

18          THE COURT:  Well, but that would not have -- I mean I

19  would have -- you would have then come to me to have me decide

20  whether or not, given the fact that a deed had been signed,

21  whether it was or wasn't property of the estate.  There are

22  simple ways to fix uncertainty.

23          MR. OLSON:  There are.  But your posting has this

24  language in it that the sale is going to be conducted between

25  these hours.

HC 00996

37

1          THE COURT:  Of course.

2          MR. OLSON:  If you pull the sale and tell the client

3  you pulled the sale at a time when you couldn't verify, and

4  then it turns out that it's not factually true, how do you

5  explain to your client, "Well, we've got to come back next

6  month, they were just kidding."

7          THE COURT:  Well -- I mean, Mr. Olson, I hear you.

8  But conversely, that's why the stay is automatic.

9          MR. OLSON:  That's right.  It's automatic whether we

10 have notice or not.

11         THE COURT:  Congress said debtors get it, period.

12         MR. OLSON:  Whether they -- whether the creditor

13 knows or not.

14         THE COURT:  And so my struggle is that after being

15 told it had happened, you went ahead and foreclosed.

16         MR. OLSON:  Well --

17         THE COURT:  I mean, again, that's -- I appreciate

18 that this is the third foreclosure, two TROs.  But, quite

19 frankly, the TROs were real.

20         MR. OLSON:  They were.

21         THE COURT:  And you had no reason to think this

22 wasn't real.  I mean, quite frankly, the fact that they had

23 pulled this stuff on you twice before should have caused you to

24 think they probably had done it again, here we go again.

25         MR. OLSON:  Well --

HC 00997

38

1          THE COURT:  But, instead, you all decided to exercise

2  self-help.  And just go ahead and hope for the best, and that's

3  the problem.  Because there are literally thousands of

4  bankruptcy filings on foreclosure Tuesday.

5          MR. OLSON:  No question about it.

6          THE COURT:  And if everybody says, "Well, they could

7  just be kidding when they told me they filed bankruptcy, so I'm

8  going to go ahead," you know, that's equally as poor policy as

9  far as this Court is concerned as the transfer -- as the new

10 debtor syndrome is.

11         MR. OLSON:  No, I understand.  I understand.  It's a

12 problem.  But, again, my point is I'm not so sure it's black-

13 hearted.

14         It's what do you do in a compressed time frame when

15 you're trying to verify, and you don't --

16         THE COURT:  You don't foreclose --

17         MR. OLSON:  Well --

18         THE COURT:  -- is my answer to that is what you do.

19         MR. OLSON:  But --

20         THE COURT:  When you've got a signed petition, and

21 you've got a signed deed that say that this property has been

22 transferred to an entity, and that entity is in bankruptcy, you

23 stop.

24         MR. OLSON:  Well --

25         THE COURT:  And I think that's what the law requires.

HC 00998

39

1          MR. OLSON:  That's certainly what the law

2    contemplates.  And, again, that is the law if they give us

3    notice or not.

4          THE COURT:  Because I might have disagreed with the

5    secured creditors that this was a bad faith filing.

6          MR. OLSON:  That's right.

7          THE COURT:  And that's why --

8          MR. OLSON:  And then they would say it would be a

9    nullity.

10         THE COURT:  -- again, self-help doesn't work.  You

11   all had to come here and ask me to determine that what the

12   debtor did constitutes bad faith.  I've made that finding.

13         MR. OLSON:  Certainly.

14         THE COURT:  But conversely, creditors aren't supposed

15   to exercise self-help.

16         MR. OLSON:  And I know that, Your Honor.  And in an

17   instance where you've got a good faith filing, they don't do

18   anything but just realize it's a nullity, and they go on down

19   the road.

20         THE COURT:  The Code doesn't say that the stay only

21   applies in good faith filings.

22         MR. OLSON:  No, it doesn't.

23         THE COURT:  And Congress could have said that.

24         MR. OLSON:  And the law is clear, though, that they

25   don't have to give us any notice at all, and the stay is in

HC 00999

40

1  effect.

2          THE COURT:  Right.  But you wouldn't have been found

3  to have violated the stay.  And, quite frankly, if they hadn't

4  given you notice, given what we've seen this morning, I'm

5  guessing that the debtor would have conceded that your

6  foreclosure was valid.  They did with three other secured

7  creditors to whom they gave no notice, and the foreclosure sale

8  occurred.

9          So, the problem here is, and the principle that the

10 debtor is standing upon, is "you got notice, and you went

11 ahead."  And that's incorrect.

12         MR. OLSON:  I understand.  And I'm not quarreling

13 with the Court.  I think the question is what relief are we

14 entitled to.

15         THE COURT:  Right.

16         MR. OLSON:  We're entitled to the dismissal, no

17 question about it.

18         THE COURT:  And you're getting that.

19         MR. OLSON:  And the only question is whether we were

20 also entitled to the annulment.  And I don't think anybody can

21 quarrel with the Court how the Court comes on the exercise of

22 its discretion.

23         But my concern is in an instance where there is a bad

24 faith filing, looking at two wrongs, if you will, shouldn't the

25 focus be to put creditors where they would have been had there

HC 01000

Case 11-42042-dml11   Doc 30-35   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit W - Hearing Transcript   February 28   2011   Page 42 of 92

41

1 | not been a filing?

2 |          THE COURT:  I hear you.

3 |          MR. OLSON:  And it doesn't set a bad precedent in

4 | that creditors do not get a leg up in good faith cases.  And --

5 |          THE COURT:  Except that reads a requirement into the

6 | Code that's not there.

7 |          MR. OLSON:  No, no --

8 |          THE COURT:  Congress has put a requirement in the

9 | consumer context of if you file more than once within a year,

10 | there's a presumption of bad faith.  But even in that

11 | circumstance, the stay goes into effect.

12 |          MR. OLSON:  No question.  And --

13 |          THE COURT:  And it only -- but it only lasts for 30

14 | days.  So, essentially what you want me to do conditions

15 | receipt of the stay upon a good faith filing.  And --

16 |          MR. OLSON:  Well --

17 |          THE COURT:  -- Congress hasn't ever said that.

18 |          MR. OLSON:  No, the law doesn't require that.  The

19 | law doesn't require that, and I understand that.

20 |          What I'm saying is in trying to figure out how you

21 | exercise your discretion --

22 |          THE COURT:  Congress hasn't ever said that.

23 |          MR. OLSON:  No, the law doesn't require that.  The

24 | law doesn't require that.  And I understand that.

25 |          What I'm saying is in trying to figure out how you

42

1  exercise your discretion --

2        THE COURT:  No, no --

3        MR. OLSON:  -- one of the factors, I think, to

4  consider is "do I put these creditors where they would have

5  been, had there not been a filing?"

6        THE COURT:  No, I under --

7        MR. OLSON:  Because --

8        THE COURT:  I understand your argument.

9        MR. OLSON:  And if -- that's all I'm saying.  That

10 doesn't change the law.

11       THE COURT:  But all I'm saying is the implication of

12 your argument does change the law.

13       MR. OLSON:  Well, I suspect --

14       THE COURT:  Because you can't get around the fact

15 that you exercised self-help.  You knew you should stop, and

16 you didn't.  And by "you," I mean your client.

17       MR. OLSON:  No, I understand.  I understand.

18       THE COURT:  Obviously not you personally.

19       MR. OLSON:  And I think it's a -- it is -- Senator

20 Baker wanted to know there in Watergate, "What did he know, and

21 when did he know it?"

22       But the man on the ground, Garvin, actually conducted

23 the sale without knowing any of this was going on.  He was not

24 notified by --

25       THE COURT:  Understood.

HC 01002

43

1        MR. OLSON:  -- Mr. Grantham because Grantham didn't

2   want to call it off yet because he hadn't been able to verify

3   it yet.

4        THE COURT:  Right.

5        MR. OLSON:  I don't think that the Court's rationale

6   for the exercise of its discretion has to be precedent for

7   anything.  I think it goes --

8        THE COURT:  Oh, Mr. Olson --

9        MR. OLSON:  -- any time -- any time you're exercising

10  your discretion.

11       THE COURT:  Sit in this chair.  The next time, you

12  know -- it's amazing what you lawyers tell each other, and how

13  many times this judge and my colleagues here, "Well, you did it

14  in such and such a case."  And so there really is a big old

15  secret.  It seems that lawyers figure out what's happened in

16  other cases, and that's the concern I've got is --

17       MR. OLSON:  I understand.  And I'm saying that in

18  cases where you've got debtor conduct as egregious as it was in

19  this case, does it override that?  I don't know.  One other

20  thing to look at.

21       The testimony this morning, contrary to what we heard

22  in the motion to dismiss, this deed was not executed and

23  delivered on December 23rd, although that's what the notary

24  said.

25       THE COURT:  It says it's dated as of.

HC 01003

44

1            MR. OLSON:   But the notary says actually signed

2   December 23rd.

3            THE COURT:   I don't --

4            MR. OLSON:   It was actually a week later according to

5   the testimony this morning.   And look at all the events that

6   hinged on December 22nd, 23rd in that testimony in the prior

7   weeks.   I think a legitimate question is if we hadn't conducted

8   our sale, would they have recorded our deed.

9            THE COURT:   But, again, I -- no offense, who cares?

10           MR. OLSON:   Oh, I think the position would be that's

11  Iori Centura's property, they're not in bankruptcy --

12           THE COURT:   Oh, I don't --

13           MR. OLSON:   -- we get another month --

14           THE COURT:   After you had received the deed, they

15  were going to try and come in and tell me that that deed was

16  ineffective?

17           MR. OLSON:   I -- I don't know what they would have

18  done, that's not the facts we've got.

19           THE COURT:   Well, but you're just --

20           MR. OLSON:   But my argument is --

21           THE COURT:   You're just -- you're speculating that

22  they never would have.

23           MR. OLSON:   I am.   I am.   Their conduct is so

24  manipulative.   You've got a guy walking around with a deed that

25  he may use, may not use.   We just feel --

HC 01004

45

1           THE COURT:   There's no evidence that they may or may

2   not use.   I mean --

3           MR. OLSON:   Well --

4           THE COURT:   -- help me with that.   Because you're

5   just -- you're just saying it.

6           MR. OLSON:   I have never seen a case where you file

7   the bankruptcy, then record the deed.   I've seen lots of cases

8   where they record the deed, then file the bankruptcy.

9           And there was so much going on here, I still don't

10  think we have a full handle on what was really going on.   Don't

11  know.

12          And I'm not saying that Mr. Grantham had the benefit

13  of that knowledge.   All I'm saying is when you're trying to

14  verify, and you're requesting documents, and you let the sale

15  go through, and then you opt to stop there, and say, "Well, I

16  guess it was just all a nullity," and he's prepared to live

17  with that until all these other motions start getting filed,

18  and all the creditors begin to see the big picture and the big

19  plot.   I don't think there's anything sinister in going forward

20  until you get verification, and then stop wherever you are at

21  the time you actually know.

22          Thank you.

23          THE COURT:   Thank you, Mr. Olson.

24          MR. GAITHER:   Thank you, Your Honor.

25          In light of your comments, I will keep this fairly

HC 01005

46

1 short because I tend to agree with the questions that you

2 raised with Mr. Olson.

3        He made, I would say, wide-ranging remarks.  But to

4 me, the evidence in this case is simple and straightforward.

5        This creditor had actual notice of the conveyance to

6 the property.  Had actual notice of the bankruptcy prior to the

7 time the foreclosure sale was even scheduled to begin.  And

8 without any effort to confirm whether or not there actually had

9 been a bankruptcy, they proceeded to foreclose anyway.  I think

10 that's a clear, willful violation of the automatic stay.

11        I think if you grant Mr. Olson's motion, you will

12 sanction that conduct.  I think it does set a dangerous

13 precedent.  And I think you expressed the same concern in your

14 ruling on the motions to dismiss in this case.

15        Simply put, I think the equities do not support

16 annulment with automatic stay in this instance.

17        And, as you mentioned, we have agreed with several

18 other creditors who have acted in good faith and without notice

19 of the bankruptcy, we have agreed to those annulments.

20        I would suggest that we would probably be in the same

21 situation here, had Mr. Olson's client not received notice

22 prior to the foreclosure.  Given that they did, we just simply

23 can't agree that he's entitled to annulment.

24        Even had they not received the documents, I think the

25 case law is clear that oral notice of bankruptcy would be

HC 01006

Case 11-42042-dml11   Doc 30-35   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit W - Hearing Transcript   February 28   2011   Page 48 of 92

47

 1  sufficient to require them to observe the automatic stay, or at
 2  least put them on inquiry notice so that they might undertake
 3  an independent inquiry to confirm whether or not there actually
 4  had been a bankruptcy.

 5          Given all the evidence, given the Court's concern
 6  about dangerous precedent, we would request the Court deny Mr.
 7  Olson's motion.

 8          Thank you.

 9          THE COURT:  Thank you.  Mr. Olson, I understand your
10  argument.  But I think the broader principle here is that the
11  automatic stay has to be honored.

12          It's one thing to proceed without knowledge of the
13  bankruptcy filing, or that what you're foreclosing on has been
14  transferred to a third entity, and that entity has filed for
15  bankruptcy.  From the Court's perspective, it's quite a
16  different thing to proceed with knowledge simply because you
17  haven't yet been able to verify.

18          From the Court's perspective, all the verification
19  that was needed was a bankruptcy petition and the deed; and you
20  got that in advance.  I appreciate the testimony that has been
21  offered with respect to why the attorney made the decision that
22  he made to proceed.  But, quite frankly, that was an erroneous
23  decision.

24          Once a petition had been provided, and once a deed
25  had been provided that were executed, then the automatic stay

48

1  says everything stops.  This Court simply cannot, in the

2  exercise of its discretion, look the other way when we have

3  what would, in any other circumstances, have been an

4  intentional violation of the automatic stay.

5          At the time the decision was made to proceed, no one

6  knew that there was a bad faith filing.  No one knew that there

7  had been 20 plus transfers of similar properties.  And that's

8  what is significant to the Court.  All of the debtor's bad acts

9  became apparent to parties subsequent to the decision that was

10 made and, quite frankly, cannot be used to justify that

11 decision.

12         So, the Court will not grant your motion to annul the

13 stay because, in fact, your client had notice of the bankruptcy

14 filing, had notice of the fact that the property had been

15 transferred to FRE.  And, therefore, your motion will be

16 denied.

17         Which I think brings us to the squabbles over the

18 form of the dismissal order.  So, let's take that up.

19         MR. BUNCHER:  Your Honor, Doug Buncher for the

20 debtor.

21         I submitted to Holly over the weekend an order as

22 requested, I don't know if the Court received it.

23         THE COURT:  I did.

24         MR. BUNCHER:  Which the request was made to send the

25 form of order and redline the disputed language, which we did.

HC 01008

49

1        One concern here with the order, Your Honor -- and I
2   think it's taken care of in this form of order.  There was a
3   form of order circulating that would dismiss this case with
4   prejudice, and that language has been removed from the order.
5   Because as I indicated in my closing remarks when the -- before
6   the Court ruled, there is a possibility that some of these
7   properties may end up the subject of another bankruptcy, not a
8   conglomerate bankruptcy, as has been filed here, but separate
9   bankruptcies.  We actually considered the fact -- Fenton Centre
10  was actually part of this entity before --

11        THE COURT:  Correct.

12        MR. BUNCHER:  -- this case was filed, before the
13  other properties were put into this debtor.  I don't know if
14  there's a procedural way to permit this case to somehow go
15  forward with only the property and debt that the entity started
16  with.

17        Where we have come down on that issue, Your Honor --
18  and as the form of order is drafted now --

19        THE COURT:  I'm not sure I've seen the current.
20  Because both of the ones that I have say it's dismissed with
21  prejudice.

22        MR. BUNCHER:  Okay.  Let me hand up the one that I e-
23  mailed over the weekend.  And if you'll look on Page 2, the
24  first paragraph of the order says, "Ordered the bankruptcy case
25  shall be dismissed."

HC 01009

50

1          THE COURT:  Shall be dismissed, right.

2          MR. BUNCHER:  So, the "with prejudice" is gone.

3          THE COURT:  All right.

4          MR. BUNCHER:  Your Honor, rather than try to monkey

5   with some procedural mechanism that I'm not sure how the Court

6   would actually fashion in terms of saying, for example, "Give

7   the debtor ten days to transfer the stuff that didn't start

8   with FRE out of this estate, and leave the case pending as FRE

9   in this Court with just the property and debt that this debtor

10  started with," I don't know if that's possible.  It would be a

11  little strange, frankly, because normally the only way to get

12  property out of the estate would be --

13         THE COURT:  Yes, I know.

14         MR. BUNCHER:  -- by a motion.  So, where I've come

15  down on that, I just want the Court to know so -- and the

16  parties to be on notice that there may be another filing of

17  this exact entity once the case is dismissed and the properties

18  are reconstituted the way they were to start with.  And my

19  understanding of the Court's ruling is the Court is not

20  suggesting that cannot happen.

21         THE COURT:  I'm not suggesting it can or cannot.

22         MR. BUNCHER:  Okay.  So, aside from that issue, Your

23  Honor, if you'd look at the bottom of Page 2, we have some

24  language that Mr. Sakonchick requested by a letter that he sent

25  to the Court.  Mr. Sakonchick indicated he had a prepaid trip,

HC 01010

51

1  he's not going to be here.  But he wanted this language about

2  his 546(b) notice.

3          While the language is not terribly controversial, I

4  don't think, I just -- I don't understand why it's necessary in

5  the order.  Because the bankruptcy case is going away.  So, the

6  fact he filed a 546(b) notice to, as he says, "Perfect his

7  interest in the rents on the particular property that his

8  client," U.S. Bank, had an interest in, which was Parkway

9  North, I believe, I'm not sure what the effect of this language

10 being in the order would be once the case is dismissed.  The

11 fact he filed a 546(b) notice in a case that's subsequent

12 dismissed, I don't know what he's trying to accomplish there.

13         And that's -- my position would be that the parties

14 ought to be left where they are.  If he didn't perfect under

15 state law before the case was filed, and the case is being

16 dismissed, then he needs to take whatever action he needs to

17 take to perfect his security interest.

18         THE COURT:  Well, I assume this is directed to he

19 wants to be perfected in what was accumulated post petition.

20 That's --

21         MR. BUNCHER:  That's --

22         THE COURT:  That's what I assumed --

23         MR. BUNCHER:  That's --

24         THE COURT:  -- the language was designed to do was to

25 make it clear that you didn't cut off his prior state

HC 01011

52

1   perfection by the bankruptcy filing, and that he perfected

2   again during the case.

3          MR. BUNCHER:  Well, I'm not sure that's the case,

4   Your Honor.  Because the way he argues this is he says, "Well,

5   I would have had to seize control of the rents pre -- outside

6   of bankruptcy.  I had to take possession or control of the

7   rents."

8          THE COURT:  Right.

9          MR. BUNCHER:  "I didn't do that.  But when the

10  bankruptcy case was filed, I filed this 546(b) notice.

11  Therefore, I'm now perfected in the rents, even though I

12  didn't" --

13         THE COURT:  With respect to post petition --

14         MR. BUNCHER:  Right.

15         THE COURT:  Well, I don't have a problem with this if

16  it's simply that he took the action to perfect against the post

17  petition rents without prejudice to whether or not that has any

18  impact outside of the bankruptcy process itself.

19         MR. BUNCHER:  Okay.

20         THE COURT:  So, if he was unperfected prior to the

21  filing, and now that the case is being dismissed, if state law

22  would require him to do something further, but --

23         MR. BUNCHER:  All right.  If that's how the Court

24  interprets that, that's fine.  I, frankly, didn't -- I didn't

25  quite understand what he was trying to accomplish by this, Your

HC 01012

Case 11-42042-dml11   Doc 30-35   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit W - Hearing Transcript   February 28   2011   Page 54 of 92

53

1 | Honor, or what the effect of it would be upon the dismissal.
2 | And, therefore, I didn't want it in the order.
3 | THE COURT: Okay.
4 | MR. BUNCHER: But whatever the Court wants to do on
5 | this.
6 | It appears -- I mean I'll just say, the way I read
7 | this, it appears to me what he's saying is based on this
8 | language in the order, he's deemed to have perfected his
9 | security interest in the rent as of the date he filed the
10 | 546(b) notice. And, therefore, I think what he's trying to do
11 | by the --
12 | THE COURT: Well, how about as to the post petition
13 | rents? Well, it's --
14 | MR. BUNCHER: My concern is he's going to try to
15 | argue after the case is dismissed that, "Well, I've already
16 | perfected my security interest because I filed a 546(b) notice,
17 | and, look, the Court has recognized it in its order" --
18 | THE COURT: Yes, I hear you.
19 | MR. BUNCHER: -- and, therefore, in State Court, he's
20 | going to say, "those rents are mine," or he's going to demand
21 | the debtor return the rents, or whatever. And I'm just saying
22 | I think the parties need to deal with that outside the
23 | Bankruptcy Court.
24 | THE COURT: All right.
25 | MR. BUNCHER: Second point, the next paragraph,

HC 01013

54

1   rather lengthy paragraph on Page 3 is requested by Mr. Warner.

2   And essentially, Mr. Warner wants the debtor to return all the

3   cash that's in the Fenton Centre DIP account.

4        Our position, Your Honor -- and I think Mr. Weitman

5   tried to bring this up when the Court ruled, that "Well, the

6   Court ought to put in the order that the debtor has to give all

7   the money back."  And the Court, at that time, commented,

8   "Well, the lender didn't have the money to start with."  I mean

9   the debtor, FRE, had cash from the Fenton Centre in its own

10  bank account when the case was filed.

11       There was a lockbox arrangement, but there was also

12  certain cash that was in the debtor's possession that --

13       THE COURT:  Well, the bank -- as I recall it, the

14  bank actually turned over cash to you from the lockbox.

15       MR. BUNCHER:  They did turn over cash from the

16  lockbox.  But there was also a bank account that preexisted the

17  case filing.

18       THE COURT:  So, how much was in that account versus

19  what was turned over in the lockbox?

20       MR. BUNCHER:  I don't have the schedules with me

21  here, Your Honor, to know exactly what the balance of the cash

22  was on January 4th; I could find that out.

23       THE COURT:  But shouldn't -- I mean at a minimum,

24  shouldn't the parties be put in the position -- if there were

25  funds that came from the lockbox that you got as a result of

HC 01014

55

1  this filing that you otherwise didn't have, shouldn't that be

2  returned to the lockbox?

3      MR. BUNCHER:  Arguably that would be one way to deal

4  with this, Your Honor.  I'm not sure where the number comes

5  from that Mr. Warner has included, this 122,394.  I was trying

6  to get confirmation from Mr. Kraun (phonetic) just this morning

7  because we did give Mr. Warner a bank statement last week that

8  showed a balance in the account.

9      My understanding is there may only be some $5,000 in

10 the debtor in possession account based upon other bills that

11 have been paid.  But I would need to get -- I would need to

12 have time to get further confirmation of that.  But this number

13 I don't think is correct in terms of what the balance of the

14 funds are.

15     I would also need to look at the schedules to see

16 what the balance of the account was at the time.

17     But, frankly, I'm not sure why the debtor should have

18 to return any of the cash a this point in time, Your Honor.

19 The lenders asked for this case to be dismissed, and then now

20 they want to come back and say, "Well, wait a minute, we want

21 to ask for more relief from this Court that we just asked to be

22 dismissed from."

23     THE COURT:  Well, but in fairness, you got the relief

24 of making me give them -- make them give you the money.

25     MR. BUNCHER:  I understand.  I think most of that

HC 01015

56

1  money has been spent.  Because, as you'll recall, the cash

2  budgets were exactly the -- I mean they are budgets, so there

3  could be some variance.  But my understanding is most all of

4  that cash has been spent.  I would need -- I would need to

5  verify that with the client.

6          THE COURT:  But is that -- I mean, Mr. Warner, is

7  that the issue?  You want the cash that hasn't been spent back,

8  to the extent it came from the lockbox.

9          MR. WARNER:  That's not a one-word answer.  It's not

10 a yes or a no.

11         And so if Mr. Buncher is done --

12         THE COURT:  All right.

13         MR. WARNER:  -- I'll respond to the Court.  But the

14 answer is "it's not that simple, Your Honor."

15         THE COURT:  All right.

16         MR. WARNER:  And I'm happy to address it when it's my

17 opportunity at the podium.

18         THE COURT:  All right.

19         MR. BUNCHER:  I guess the only other point we'd make

20 there, Your Honor, is Mr. Warner's client wasn't even a movant

21 on the dismissal of this bankruptcy case.  And now he's asking

22 for relief to be put into the order on behalf of his client.  I

23 understand he's a party in interest, but I think that point

24 should be noted.

25         The last provision in the order, Mr. Weitman

HC 01016

Case 11-42042-dml11   Doc 30-35   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit W - Hearing Transcript   February 28   2011   Page 58 of 92

57

 1  requested that the order take immediate effect.  And I don't

 2  believe that relief was even requested.  I understand the

 3  Court, under certain circumstances, has discretion to do that.

 4        However, I would ask that the Court just enter the

 5  order and allow the order to run the time period required under

 6  the rules and the code to become a final order.  I don't think

 7  we intend to appeal this, but I just -- I don't think there's a

 8  need to have this become immediately effective.  It's already

 9  too late to post the property for foreclosure on -- I think the

10  only reason perhaps that he wants that is so that they can post

11  for foreclosure again.  It's already too late to post for March

12  anyway.

13        So, we would just ask that the Court not include the

14  "immediate effect" language at the end of the order.

15        THE COURT:  Thank you, Mr. Buncher.

16        MR. WEITMAN:  Your Honor, David Weitman for Wells

17  Fargo.

18        I believe the only issue that I have with Mr.

19  Buncher's comments is with respect to when the order becomes

20  effective.  And presently, I had submitted language that said

21  that, "All stays otherwise applicable to the effectiveness of

22  this order shall be inapplicable and waived for cause."

23        And actually I did a little bit more research on

24  that.  And under -- it's actually in the Advisory Committee

25  notes, a Rule 9014 that makes clear that, in fact, the ten-day

Case 11-42042-dml11   Doc 30-35   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit W - Hearing Transcript   February 28   2011   Page 59 of 92

58

1  stay period for a 14 days now is inapplicable with respect to

2  motions to dismiss.

3          THE COURT:  Where is -- where did you say?

4          MR. WEITMAN:  Does Your Honor have a West edition

5  possibly?

6          THE COURT:  Yes.

7          MR. WEITMAN:  Page 656.  In addition, a quick bit of

8  research indicated that Judge Clark said exactly the same thing

9  in May of 2010.  May I hand up to the Court a copy of the

10 memorandum opinion?

11         THE COURT:  You may.

12         MR. WEITMAN:  Thank you.

13         THE COURT:  I'm not sure we are looking at the same

14 version.  So what rule are you looking at?

15         MR. WEITMAN:  It's the Advisory Committee notes.

16         THE COURT:  I know.  What rule?

17         MR. WEITMAN:  At 9014, it's on Page 656.

18         THE COURT:  Not in my version.

19         MR. WEITMAN:  Okay.  Well, Your Honor, if I may just

20 read from Judge Clark's --

21         THE COURT:  Well, just hang on a second, Mr. Weitman,

22 please.

23         MR. WEITMAN:  There's another section that refers to

24 the 1999 amendments, which says that basically Rule 706.2

25 provides that Rule 62 Federal Rule of Civil Procedure, which

HC 01018

59

1  governs stays of proceedings, it references that.  And then

2  says, "Further, although there are these contested hearings,

3  it's clear from 1017(b) that this is a contested hearing unless

4  there is a specific provision of the rule or the code that

5  grants additional time" --

6          THE COURT:  Well, then --

7          MR. WEITMAN:  -- "these things are immediately

8  effective."

9          THE COURT:  If you're right, you don't need anything

10 in the order.

11         MR. WEITMAN:  Correct.  I just need to say that it's

12 immediately effective upon entry.  And, Your Honor, just

13 reading --

14         THE COURT:  No, you don't even need that.  Judge

15 Clark is saying that it is, just as a matter of law.  Right?

16         MR. WEITMAN:  That would work, as well, Your Honor.

17 And that I don't need to -- just say it's -- it's effective,

18 it's a final order.

19         And then as it makes clear, as I'm reading here, and

20 this is in the paragraph on Page 5 of the Judge's memorandum

21 opinion, "The flaw in plaintiff's argument is that an appeal

22 does not automatically stay the effectiveness of an order, nor

23 is there an automatic stay of the effectiveness of an order in

24 bankruptcy case for a period under Rule 62(a).  The Bankruptcy

25 Rules now provide that Rule 706.2 no longer applies in

HC 01019

60

1  contested matters.  See Federal Rule Bankruptcy Procedure 9014.

2  With a result that stays only apply to orders in contested

3  matters in two circumstances, a specific stay is supplied in a

4  specific bankruptcy rule," moving a little further, "or the

5  court orders that a stay will apply.  The rule regarding

6  dismissal of bankruptcy cases, Bankruptcy Rule 1017, does not

7  supply a specific stay as to orders of dismissal. Thus, the

8  order of dismissal was effective upon its entry."  And, again,

9  that's picked up in the Advisory Committee notes.

10             And I apologize, Your Honor, I --

11             THE COURT:  The Advisory Committee notes to what?

12             MR. WEITMAN:  To Rule 9014, it references that -- may

13  I hand up to Your Honor my version of West, it may be easier?

14             THE COURT:  Okay.  So, where are you looking?

15             MR. WEITMAN:  Just the sections, Your Honor, that

16  reference how there are only certain contested matters that

17  have hearings at a time in which the stay is not -- is

18  effective for some ten days, later 14.  And there is no

19  specific stay under 1117(d) applicable to dismissals.

20             THE COURT:  Well, but then my point is you don't need

21  anything in the order.

22             MR. WEITMAN:  Just --

23             THE COURT:  If you're right, then I just sign a

24  dismissal order and you're done.

25             MR. WEITMAN:  Just say it's a final order, and that

HC 01020

61

1   works.

2            THE COURT:   I don't even know that I have to do that.

3            MR. WEITMAN:   Fair enough, Your Honor.   I just -- I

4   would just like to reflect that there is no ten or 14-day

5   period.   It's immediately effective under the rules.

6            Thank you.

7            MR. BUNCHER:   I have received an e-mail confirmation,

8   Your Honor.   There is only -- after payment of the February

9   bills under the budget, there's $5,044.18 in the Fenton Centre

10  DIP account at this point in time.

11           THE COURT:   Well --

12           MR. WARNER:   Good morning, Your Honor.   Michael

13  Warner on behalf of HCM, LP.

14           Your Honor, I really think I have sort of three

15  comments:

16           First, the money in the account should be returned.

17  I think as the Court recognized, the dismissal of the case, by

18  case law, puts the parties back to their prepetition status.

19  Interestingly enough, in our situation, HCM, LP's situation,

20  there's no cash collateral order.   There's a cash agreement.

21           THE COURT:   Right.

22           MR. WARNER:   And the distinction s are very obvious.

23  And I brought both orders in case the Court wants to look at

24  them, and we can go through them.

25           Between the "everybody else order" and the Fenton

HC 01021

1  order.  So, if I may, I'd like to approach, and I'll give the

2  Court a copy of each of the two orders -- or one of each of the

3  orders.

4          THE COURT:  Thank you.

5          MR. WARNER:  The first and obvious distinction is in

6  the order entitled, "Interim Order Authorizing the Debtor to

7  Use Cash From Fenton Centre Property and for Related Relief."

8          THE COURT:  Yes.

9          MR. WARNER:  The title says "to use cash from".

10         THE COURT:  Right.

11         MR. WARNER:  Whereas in the second one, it's

12  entitled, "Interim Order Authorizing the Debtor to Use Cash

13  Collateral and Provide," et cetera, et cetera.

14         THE COURT:  Right.

15         MR. WARNER:  So, one is a cash use, and one is a cash

16  collateral.

17         Intentionally done because my client said, "We take

18  the position there was an absolute assignment prepetition.  Do

19  you want to fight about that now, Debtor, or do you want to get

20  an interim order, keep it alive."

21         The debtor said, "We'll take the latter.  We won't

22  fight about it now."  And we said, "Fine."

23         So, if the Court would then turn to Page 2 of the

24  Fenton order --

25         THE COURT:  Yes.

HC 01022

63

1          MR. WARNER:  -- staying in the first paragraph at the

2   last section after "Fenton Centre cash" is defined, it says,

3   "From the real property securing HCM, LP lender's secured claim

4   were absolutely and unconditionally assigned to the HCM, LP

5   lenders before January 4th, and are not property of the estate

6   (debtor disagrees)."

7          THE COURT:  Right.

8          MR. WARNER:  So, we acknowledge that it was not cash

9   collateral, at least for purposes of an argument.

10         But we then went ahead and said, "We'll propose you

11  can use some of it, and we will actually" as the Court

12  recognized, "transferred funds."

13         If you read through this, you'll recognize that the

14  funds had to be used according to the budget, and it remained

15  in the debtor's DIP account, to the extent it wasn't used.

16         So, comparing that to the other order for everybody

17  else, you'll see that it clearly acknowledges cash collateral

18  in the other order.

19         THE COURT:  Right.

20         MR. WARNER:  It uses that term.  So, we start

21  initially with the concept of "it's arguably not cash

22  collateral."

23         We then take -- and look at what Judge Kiener

24  (phonetic) said on what we do with a dismissal.  And we restore

25  parties to their prepetition status.  349 says that.  (b)(3)

HC 01023

64

1 says that.

2          So, then the question becomes, "How much money do you

3 turnover?"  Okay.

4          So, we, in recognizing this, sent an e-mail on the

5 23rd of February to Mr. Buncher saying, "Give us an accounting

6 of what you've used."

7          And so if I might, I will hand the Court --

8          THE COURT:  Thank you.

9          MR. WARNER:  Thank you.  This is an e-mail from my

10 office to Mr. Buncher at 11:05 A.M. on the 23rd, followed by

11 Mr. Buncher's e-mail at 4:57, the same day, saying, "Here's the

12 accounting and line items."

13          So, lo and behold, we get an accounting of their bank

14 account on the 23rd.  That's all we know, and that's the only

15 evidence before the Court.

16          THE COURT:  Well, it's not evidence before the Court.

17          MR. WARNER:  I appreciate that.

18          THE COURT:  You've handed it up, but it's not been

19 admitted into evidence.

20          MR. WARNER:  No, no, no.  And I'm happy -- I'm happy

21 to make it a record, and put Mr. Buncher on, and ask him if he

22 sent this e-mail to me.  We can go through that effort, and I'd

23 like to so that the record is clear.  Because that's what we

24 have.

25          In fact, my e-mail says -- or my firm's e-mail says,

HC 01024

65

1   "Give us dailies so that when we get to this hearing, we're not

2   having this dispute."

3           And I will ask the Court for permission to put Mr.

4   Buncher on.

5           If you take the debtor's numbers as valid, and don't

6   -- I don't want the record to reflect that my comment means I

7   agree that they're valid.

8           But if you do it, their own accounting says there's

9   122,394.11 in the bank on this date.

10          Now, the Court asked a question:  How much was in the

11  account -- I don't think the Court said it this way.  "How much

12  did the debtor put into the account to open the account?"  In

13  other words, what was the debtor really holding on the date of

14  the petition that it deposited that it didn't get from HCM, LP?

15  And the answer is very simple:  It's 36,189.85.

16          If the Court looks at -- one, two, three, four -- the

17  fifth page of the e-mail, there's a date of 1/21/2011, it's the

18  second line item.

19          THE COURT:  Yes.

20          MR. WARNER:  It says, "Transfer to DIP account."

21          THE COURT:  Correct.

22          MR. WARNER:  And that's for 36,189.

23          THE COURT:  Right.

24          MR. WARNER:  I absolutely agree that money was not

25  transferred from my client.

HC 01025

Case 11-42042-dml11   Doc 30-35   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit W - Hearing Transcript   February 28   2011   Page 67 of 92

66

1           Now, notwithstanding it came from rents,

2    notwithstanding it may have violated prepetition agreements, I

3    understand that.  So, I've done the quick math.  Instead of

4    122,394.11, if you deduct 36,189.85, the number is 86,204.26.

5    That's what we believe should be turned over.

6           THE COURT:  But the debtor is telling me they don't

7    have that much, Mr. Warner.

8           MR. WARNER:  The debtor is telling you via Mr.

9    Buncher, without evidence, that they have that --

10          THE COURT:  There's no evidence before me right now.

11          MR. WARNER:  Fine.  If I  might, I'd like to call Mr.

12   Buncher to the stand.

13          THE COURT:  Well, you may, but -- Mr. Buncher, do you

14   have a client representative here?  And if not, can you get one

15   here?  I mean, Mr. Warner, let's be practical.  I am not going

16   to order the debtor to turnover more cash than it has.  If it

17   has used the cash to pay bills relating to your client's

18   collateral, which it was authorized to do pursuant to an order

19   of this Court, I am not going to require the debtor to give you

20   more cash than it has.

21          MR. WARNER:  I appreciate that.

22          THE COURT:  And you shouldn't expect me to --

23          MR. WARNER:  And I don't.

24          THE COURT:  -- from my perspective.

25          MR. WARNER:  I don't.

HC 01026

Case 11-42042-dml11   Doc 30-35   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit W - Hearing Transcript   February 28   2011   Page 68 of 92

67

1       THE COURT:  But that's where your argument is going
2  is that you think there should be 86,000 because you asked him
3  to give you dailies, and he didn't.  And, frankly, he should
4  have.  But -- and I want to put you back in the position you
5  were in.  But I also don't want to put you into a better
6  position than you were in, which is that if rents had been used
7  for the property, you agreed they could be on an interim basis
8  while we sorted out this fuss.

9       And -- now I don't know what number is there.  I know
10  Mr. Buncher has gotten an e-mail that says it's $5,000, and
11  maybe it is, and maybe it's not.  But --

12       MR. WARNER:  I'll tell you what, Your Honor -- and I
13  fully appreciate the Court's comment, and I want the order
14  entered dismissing this case.  I'll change the number to
15  5,044.18 because -- and I want to make sure that I am reading
16  this right.  This Court retains jurisdiction over that number
17  by virtue of the language in the proposed order.  So, that if
18  we get some accounting, and it turns out to be inappropriate, I
19  can be back here saying, "The number should have been larger."
20  Is that how the Court interprets the order on the retention of
21  jurisdiction?

22       THE COURT:  I don't know.

23       MR. WARNER:  And I appreciate that.

24       THE COURT:  I mean I --

25       MR. WARNER:  The second paragraph -- second ordered

HC 01027

68

1  paragraph of the proposed order reads, "This Court shall have

2  continuing jurisdiction to decide disputes relating to the

3  matters."

4         I'm going to assume that the dollar amount turned

5  over is a dispute.  And, frankly, I'd like the record to

6  reflect that.  And we'll take the $5,000 in accordance with

7  this paragraph.

8         THE COURT:  Well -- Mr. Buncher?

9         MR. BUNCHER:  What Mr. Warner has just said is they

10 ought to be restored to the position they were in before the

11 bankruptcy.  Well, before the bankruptcy, the debtor had

12 36,189; now the debtor has less than that.

13        It spent the money on whatever bills it was

14 authorized to spend it on under the cash collateral --

15        THE COURT:  well, how do I know that?

16        MR. BUNCHER:  We'd have to get Mr. Kraun, who sent me

17 the e-mail, who has testified here, who has prepared the

18 monthly operating reports, and have him testify about it.  And

19 I've sent him another e-mail saying, "how did you get from 122

20 on February 23rd to" -- I mean perhaps we could take a recess

21 and Mr. Warner and I could get on the phone with Mr. Kraun and

22 try to sort this out where Mr. Warner is comfortable about the

23 accounting.

24        THE COURT:  No offense:  Why didn't you do that

25 before the hearing?  I mean Mr. Warner has been asking for

HC 01028

69

1  this.

2       MR. BUNCHER:  Your Honor, my position is that he's

3  not entitled to this in the order, to get -- to get the cash.

4  I mean first of all, the debtor disputes, as was indicated in

5  the parenthetical in the order, he wanted a separate order

6  because he contended that there was an absolute assignment of

7  rents.  I said:  We disagree with that.  But rather than have a

8  big fight about that, let's -- I just want to get an order

9  entered that allows us to use the cash.  So, we did a separate

10 order.

11      I don't think we're here today to litigate the

12 absolute assignment issue.  And if we are, then we would have

13 matters we would present on that.

14      I, frankly, just don't think he's entitled to the

15 relief he wants in the order.  Period.

16      THE COURT:  Well, I appreciate that.  But the reality

17 is I'm going to try and restore people to where they should

18 have been, absent this filing.

19      Now, it's undisputed that a whole bunch of money was

20 sitting in a lockbox that you didn't have access to.  And

21 pursuant to an order of this Court, I directed that that be

22 turned over to the debtor for use.

23      MR. BUNCHER:  Right.

24      THE COURT:  So, now the issue is -- and I appreciate

25 that there is no pleading specifically on file asking for this.

HC 01029

70

1  But it appears to me that as part of trying to restore the

2  parties to the position they were in, that monies that I

3  required to be turned over to the debtor should go back.

4          And to be blunt, I don't know if I'd do that on a

5  first in/last out sort of basis, or what basis.  And that makes

6  this far more complicated than it needs to be.

7          So, I guess -- is there some reason why the request

8  for periodic updates, since you knew we were going to argue

9  about this, why you didn't provide periodic updates?  I mean

10 obviously a whole bunch of money has apparently gone out of

11 this account in a relatively short period of time, which isn't

12 completely surprising.  I mean there are bills to pay.

13         MR. BUNCHER:  Right.

14         THE COURT:  But nevertheless, to go from 122,000 on

15 the 22nd, down to 5,000 in less than week is a little

16 startling.

17         MR. BUNCHER:  Your Honor, I can't -- I can't speak to

18 this.  I -- if the Court wants testimony from Mr. Kraun about

19 what happened to the cash, I mean I'll have to get Mr. Kraun

20 down here.  You know, Mr. -- the Court has observed Mr. Kraun.

21 I think Mr. Kraun is a credible person.  There's no reason to

22 think he stole the money, or did anything improper.

23         THE COURT:  And I don't think Mr. Warner is thinking

24 that either.  But -- so --

25         MR. BUNCHER:  I guess I don't understand why we need

HC 01030

Case 11-42042-dml11   Doc 30-35   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit W - Hearing Transcript   February 28   2011   Page 72 of 92

71

 1  to go through all this.  The debtor had 36,000 in its own

 2  account that he didn't have control over when the case was

 3  filed.

 4          THE COURT:  But where did it come from?  Was that --

 5  whose money -- how did you have 36,000?

 6          MR. BUNCHER:  I have no idea.

 7          THE COURT:  And I assume --

 8          MR. WARNER:  Your Honor --

 9          THE COURT:  -- under the loan documents, that all the

10  funds were supposedly going into the lockbox.

11          MR. BUNCHER:  I believe there was a cash collateral

12  agreement that Mr. Warner sent to me.  Yes, I -- these are

13  questions I can't answer, Your Honor.  But, again, the reason I

14  wanted to bring the $5,000 balance to the Court's and Mr.

15  Warner's attention is, to me, this is sort of -- we're wasting

16  a lot of -- pardon me.  I'm not suggesting --

17          THE COURT:  No, no, no.

18          MR. BUNCHER:  -- is wasting time.  I think we're all

19  wasting a lot of time about $5,000 is my point.

20          And if the debtor had 36, how it had it, I don't

21  know.  These parties have been in litigation in State Court

22  for, I don't know how long.  There was allegations the debtor

23  took money prepetition that it shouldn't have taken.  There was

24  counterclaims filed back against his client by the debtor to

25  the effect, well, you improperly swept all kinds of money out

72

1   of our account to the tune of several million dollars and paid

2   down the debt.

3        So, to me, the case is being dismissed.  The parties

4   are in litigation in State Court.  And obviously the building

5   needs to be run.

6        So, these parties are going to have to figure out

7   what happens to the cash and who is going to pay the bills over

8   there at the Fenton Centre building, or else the building is

9   going to go dark.  So --

10       THE COURT:  Or you're going to file another

11  bankruptcy case --

12       MR. BUNCHER:  True.

13       THE COURT:  -- and --

14       MR. BUNCHER:  Right.  Then we'll be back here talking

15  about whether it's an absolute assignment or -- in any event,

16  if we need to get more detail, I can get Mr. Kraun on the phone

17  with Mr. Warner.  If Mr. Warner wants -- or the Court wants me

18  to get Mr. Kraun down here to figure out where the money went

19  back 122 to five, I'll be happy to do that.  Whatever the Court

20  wants.

21       THE COURT:  Well, it's not what I want.  I mean the

22  reality is is there is a request to require you to turn over

23  $122,000.  And --

24       MR. BUNCHER:  But --

25       THE COURT:  So, it's what you want in order to make a

HC 01032

73

1   record as to what the amount of the cash currently is.

2           MR. BUNCHER:  Well --

3           THE COURT:  It's not what the Court wants.

4           MR. BUNCHER:  As Mr. Warner said.  I sent an e-mail

5   with information that said that the client gave me last week

6   that's no -- he's willing to trust that information, that it

7   was accurate, it was 122 --

8           THE COURT:  No, not really.  Not really.

9           MR. BUNCHER:  Okay.

10          THE COURT:  Because, I mean, he made that caveat

11  first.  That he wasn't necessarily prepared to agree that was

12  the right amount, it's just the best he had because he

13  obviously has no knowledge of what the amount actually is,

14  other than what the debtor tells him it is.

15          MR. BUNCHER:  Sure.  Well, my only point is that

16  information, from his perspective, is no better than the

17  information I gave this morning.  They're both from me and my

18  client, and they're -- the source is the same.

19          I'll -- again, I -- my position is he's not entitled

20  to the relief he wants in this order, period.  But if we want

21  to have --

22          THE COURT:  I'm going to give him some relief.

23          MR. BUNCHER:  All right.

24          THE COURT:  So, now the issue is do you want me to

25  give it to him on the basis of last week's information, which,

HC 01033

74

1  frankly, is harsh given the fact that your client would testify

2  if a client were here that it's not that amount of money today.

3             MR. BUNCHER:  Well --

4             THE COURT:  So, I'm actually trying to help you, not

5  hurt you.

6             MR. BUNCHER:  I understand.

7             MR. WARNER:  And I'm willing to take an order that

8  says five grand.

9             MR. BUNCHER:  Well --

10            MR. WARNER:  Because I'm willing to believe the e-

11 mail Mr. Buncher has.  Not that it's accurate, but that's the

12 number so that it's not a harsh result.

13            MR. BUNCHER:  Fair enough.  I don't think he's

14 entitled to that, and it's not consistent with the 349 argument

15 he made, which is restore everybody back to where we started,

16 which the 5,000 is less than what we started with.

17            THE COURT:  Well, except how do I know that -- I mean

18 then we're down to whose 5,000 is the 5,000 that's left.  Does

19 it come form his lockbox, or was it part of the 36 that was

20 there first.  That gets to my first in/last out, who the heck

21 knows.

22            MR. BUNCHER:  Okay.  Well --

23            THE COURT:  And it's conceivable that the debtor

24 spent 36,000 of its own money, and then started spending

25 lockbox funds.  Conversely, it's possible that they spent the

HC 01034

75

1  lockbox funds first hoping to preserve their own cash.  I have
2  no way of knowing.

3        MR. BUNCHER:  Fair enough.  We'll just agree that the
4  5,044.18 will be returned.

5        THE COURT:  All right.  Fair enough.  Then here's
6  what we're going to do on the order.

7        MR. BUNCHER:  To the lockbox, I'm assuming we're
8  talking about.

9        MR. WARNER:  No.  In accordance with the order.  I
10 don't mean to talk to Mr. Buncher, I'm talking to the Court.
11 We've given a procedure that it needs to be issued either to --
12 either wired --

13        THE COURT:  His point is is you're going to put it
14 back in the lockbox.

15        MR. WARNER:  Oh, yeah, put it back in the lockbox.  I
16 just want it, and I want it timely.  I don't -- because we now
17 have been told there might be another filing, I want it
18 immediately so that I can get into the lockbox.

19        THE COURT:  All right.  Delete the -- Mr.
20 Sakonchick's request, and he can prove up later the fact that
21 he filed his notice, and you all can argue about what effect
22 that has or didn't have.

23        With respect to Mr. Warner's request, we will change
24 the 122 to 5,044.18.  And we don't need the "This Court shall
25 retain jurisdiction there" because we've got a jurisdiction

HC 01035

76

1  provision earlier.

2          And we'll delete Mr. Weitman's request because if his

3  argument this morning is correct, and I'm not saying it is or

4  isn't.  I have not had time to consider that carefully.  But if

5  his argument is correct, he doesn't need anything from the

6  Court in the order because he believes that the law is clear

7  that the order will be effective immediately.

8          So, can you make those changes, Mr. Buncher, to the

9  order and upload it to the Court?  And I will sign it today.

10         MR. BUNCHER:  Yes, Your Honor.  Just -- the reason --

11 on the provision Mr. Warner wants, it says that the debtor

12 shall transfer.  It doesn't say where to transfer, and I'm

13 assuming we're talking about transferring to the lockbox.  I

14 think that needs to be put in there.

15         THE COURT:  Okay.  Fine.

16         MR. BUNCHER:  All right.

17         THE COURT:  I don't see where it says that it will be

18 deposited into the lockbox, so I think that's a fair request.

19         MR. BUNCHER:  All right.

20         THE COURT:  All right.

21         MR. BUNCHER:  we'll fix that.

22         THE COURT:  All right.  Now, I have -- I need an

23 order denying Mr. Olson's stay relief request, and then -- and

24 I -- frankly, I want to sign the stay annulment orders prior to

25 signing the dismissal order.

HC 01036

Case 11-42042-dml11   Doc 30-35   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit W - Hearing Transcript   February 28   2011   Page 78 of 92

77

1        So, if you all could time -- I mean if you could send

2  both the denial of the annulment motion and the dismissal

3  motion simultaneously, upload them both simultaneously, and

4  then let Ms. Salcido know when you've done that so that she can

5  then directly -- I'll instruct her to send them directly to my

6  order box so that I can get the stay order signed prior to the

7  dismissal order, and we'll enter them in that fashion, as well.

8  So -- but just let us know.

9        And I correctly understand from the other three

10  movants that your orders either have been uploaded already or,

11  Mr. Franke, you're going to do that as soon as you get back to

12  the office.

13        All right.  So, I'm going to be looking for five

14  orders total:  Four on stays, and one on the dismissal.

15        MR. BUNCHER:  Yes.  And we'll get you the denial of

16  the -- the First State for that motion and the revised

17  dismissal order like right when we get back to the office, Your

18  Honor.

19        THE COURT:  All right.  It sounds good.  Mr. Olson?

20        MR. WARNER:  Mr. Buncher -- can he circulate that

21  order to us, please?

22        THE COURT:  Sure.

23        MR. WARNER:  Thank you.

24        MR. OLSON:  I do not need to see either the order

25  denying the First State Bank motion or the order of dismissal.

HC 01037

78

1  I'm not available this morning --

2          THE COURT:  All right.

3          MR. OLSON:  -- so I don't want to hold that up.

4          THE COURT:  All right.

5          MR. OLSON:  Just like the other annulments are

6  granted, this one will just say it's denied.

7          THE COURT:  Correct.

8          MR. OLSON:  In that long redline motion to dismiss

9  that you were looking at, the first page and a half or so that

10 was not in red was perfectly fine with me.  And the stuff in

11 red doesn't pertain to me.  So --

12         THE COURT:  You're okay with that.

13         MR. OLSON:  -- don't let my unavailability hold up

14 anything.

15         THE COURT:  All right.  Fair enough.  Thank you, Mr.

16 Olson, I appreciate it.

17         All right.  Thank you, all, very much.  I appreciate

18 it.

19         MULTIPLE SPEAKERS:  Thank you, Your Honor.

20      (Whereupon, at 10:49 A.M., the hearing was adjourned.)

21

22

23

24

25

HC 01038

79

1

2

3                              CERTIFICATE

4

5       I certify that the foregoing is a correct transcript from

6   the electronic sound recording of the proceedings in the

7   above-entitled matter.

8

9

10   /s/ *Karen Hartmann*     AAERT CET**D0475 Date: March 13, 2011

11   TRANSCRIPTS PLUS, INC.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HC 01039

Case 11-42042-dml11  Doc 30-35  Filed 04/11/11  Entered 04/11/11 15:34:21  Desc
Exhibit W - Hearing Transcript  February 28  2011  Page 81 of 92

80

**$**

$122,000- 72:23
$5,000- 55:9
67:10 68:6 71:14,
19
$5,044.18- 61:9

**&**

&- 4:10 9:8 10:2
11:9 12:4

**/**

/S/- 79:11

**1**

1- 14:12 15:2
17:23,24 18:25
26:5,8,10,12,17
1/21/2011- 65:17
10- 31:15
1017- 60:6
1017B- 59:3
10:49- 78:20
1117D- 60:19
11:05- 64:10
11:30- 10:22
11:55- 34:19
122- 68:19 72:19
73:7 75:24
122,000- 70:14
122,394- 55:5
122,394.11- 65:9
66:4
12:30- 26:4
12:55- 18:19 19:4
13- 79:11
13TH- 13:7
14- 7:7 10:13,24
58:1 60:18
14-DAY- 61:4
15- 14:12
16- 7:7 11:4,18
12:19
1982- 9:12
1999- 58:24
1:55- 34:19
1ST- 29:4

**2**

2- 49:23 50:23
62:23
20- 7:7,19 12:24
13:10 48:7
2009- 10:22 11:12

2010- 12:15 13:7
58:9
2011- 13:8 79:11
21- 7:20 18:2,5,
8,10 26:19
21ST- 11:12
22ND- 44:6 70:15
23RD- 43:23 44:2,
6 64:5,10,14
68:20
28TH- 10:22
29TH- 29:6,11,12,
15
2:45- 16:23
2ND- 29:3

**3**

3- 54:1
30- 41:13
30TH- 29:5,13,15,
20,21
31ST- 29:5 30:20,
23,24
349- 63:25 74:14
36- 71:20 74:19
36,000- 71:1,5
74:24
36,189- 65:22
68:12
36,189.85- 65:15
66:4
362D- 35:2
3RD- 12:11 29:3

**4**

4- 27:9 36:17
4:57- 64:11
4TH- 13:15 17:18,
24 25:22 26:24
29:1 31:1 54:22
63:5

**5**

5- 59:20
5,000- 70:15
74:16,18
5,044.18- 67:15
75:4,24
541- 33:5
546B- 51:2,6,11
52:10 53:10,16

**6**

62- 58:25
62A- 59:24
656- 58:7,17

6:43- 31:11

**7**

706.2- 58:24
59:25

**8**

86,000- 67:2
86,204.26- 66:4

**9**

9014- 57:25
58:17 60:1,12
9:01- 31:15

**A**

ABLE- 16:11
31:10 43:2 47:17
ABSENT- 69:18
ABSOLUTE- 62:18
69:6,12 72:15
ABSOLUTELY- 30:5,
6 63:4 65:24
ACCELERATION-
13:2
ACCESS- 69:20
ACCOMMODATION-
31:25
ACCOMPLISH-
51:12 52:25
ACCORDANCE- 68:6
75:9
ACCORDING- 31:14
44:4 63:14
ACCOUNT- 54:3,10,
16,18 55:8,10,16
61:10,16 63:15
64:14 65:11,12,
20 70:11 71:2
72:1
ACCOUNTING- 64:5,
12,13 65:8 67:18
68:23
ACCUMULATED-
51:19
ACCURATE- 73:7
74:11
ACKNOWLEDGE- 63:8
ACKNOWLEDGES-
63:17
ACTED- 46:18
ACTING- 34:20
ACTION- 51:16
52:16
ACTS- 48:8
ACTUAL- 8:9 46:5,

6
ADDITION- 58:7
ADDITIONAL- 59:5
ADDRESS- 56:16
ADDRESSED- 13:2
ADJACENT- 31:25
ADJOURNED- 78:20
ADMISSION- 18:7
ADMITTED- 11:2,
21 12:22 13:13
18:10 26:20 64:19
ADVANCE- 47:20
ADVISORY- 57:24
58:15 60:9,11
AFTERNOON- 6:8
16:18,19 26:7
31:6 32:21 33:5
AFTERNOONS- 14:7
AGAINST- 12:3
52:16 71:24
AGREE- 5:9 15:11
46:1,23 65:7,24
73:11 75:3
AGREED- 5:7
46:17,19 67:7
AGREEMENT- 5:4,5,
15,16 6:3,8 11:8,
16 61:20 71:12
AGREEMENTS- 66:2
AHEAD- 34:11
37:15 38:2,8
40:11 63:10
ALIVE- 62:20
ALLEGATIONS-
71:22
ALLEN- 25:9
ALLOW- 6:12 8:14
57:5
ALLOWED- 22:10
ALLOWS- 69:9
AMAZING- 43:12
AMENDMENTS- 58:24
AMERICAN- 4:13
AMOUNT- 68:4
73:1,12,13 74:2
ANNOUNCE- 6:7
ANNUL- 5:7 6:8
48:12
ANNULLED- 5:11
6:1
ANNULMENT- 35:10
40:20 46:16,23
76:24 77:2
ANNULMENTS-
46:19 78:5

Case 11-42042-dml11   Doc 30-35   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit W - Hearing Transcript   February 28   2011   Page 82 of 92

81

38:18 56:9,14
65:15 71:13
ANYWAY- 8:12
46:9 57:12
APOLOGETIC- 15:23
APOLOGIZE- 30:21
60:10
APPARENT- 48:9
APPARENTLY- 70:10
APPEAL- 57:7
59:21
APPEAR- 4:23
APPEARANCES- 4:3
APPEARED- 17:3
APPEARS- 19:1
53:6,7 70:1
APPLICABLE-
57:21 60:19
APPLIES- 39:21
59:25
APPLY- 60:2,5
APPRECIATE-
37:17 47:20
64:17 66:21
67:13,23 69:16,
24 78:16,17
APPROACH- 7:3
62:1
APPROVED- 23:1
AREN'T- 33:2
39:14
ARGUABLY- 55:3
63:21
ARGUE- 24:22
53:15 70:8 75:21
ARGUES- 52:4
ARGUMENT- 42:8,
12 44:20 47:10
59:21 63:9 67:1
74:14 76:3,5
ARGUMENTS- 32:12
ARMED- 27:1,3,8,
11,13,22 28:12
ARRANGEMENT-
54:11
ASSET- 21:7
ASSIGNED- 63:4
ASSIGNMENT-
62:18 69:6,12
72:15
ASSUME- 18:19
51:18 68:4 71:7
ASSUMED- 51:22
ASSUMING- 75:7
76:13

ATTACHED- 7:6,12
8:6 18:4,20,23
ATTEMPT- 11:13
12:6,16 22:7 36:2
ATTEMPTED- 15:5
ATTEMPTING- 10:5
13:24
ATTEMPTS- 10:7
ATTENTION- 71:15
ATTORNEY- 9:8
22:12 27:13,19
28:11 47:21
ATTORNEYS- 28:17
AUGUST- 10:22
AUTHORIZED-
66:18 68:14
AUTHORIZING-
62:6,12
AUTOMATIC- 5:7,
11 20:15,22 21:1
28:1 37:8,9
46:10,16 47:1,11,
25 48:4 59:23
AUTOMATICALLY-
59:22
AVAILABLE- 78:1
AWARE- 22:11,14

B

B-1- 18:25
B-3- 63:25
BACK- 5:20 14:10,
11 15:23,24
31:25 35:15 37:5
54:7 55:20 56:7
61:18 67:4,19
70:3 71:24 72:14,
19 74:15 75:14,
15 77:11,17
BAKER- 42:20
BALANCE- 54:21
55:8,13,16 71:14
BANK- 4:8,13,19
5:16,19 6:4,5
10:2 11:9 12:4
27:1,11,13,22
28:12 51:8 54:10,
13,14,16 55:7
64:13 65:9 77:25
BANK'S- 8:24 27:3
BANKING- 9:14
BANKRUPTCIES-
49:9
BANKRUPTCY- 8:11
9:16,24 13:25
14:4,14,17,21

15:10 16:16 17:4
19:1,9,14,24
20:9,11,16,18,22
21:1,4,14,25
22:1 24:4,9,11
25:10 26:16 27:6,
17 31:11 32:16
34:2,8,10,13
36:14 38:4,7,22
44:11 45:7,8
46:6,9,19,25
47:4,13,15,19
48:13 49:7,8,24
51:5 52:1,6,10,
18 53:23 56:21
59:24 60:1,4,6
68:11 72:11
BASED- 27:23
53:7 55:10
BASIS- 67:7 70:5
73:25
BEAR- 13:4 14:22
BEARS- 15:5
BECAME- 48:9
BECOME- 57:6,8
BECOMES- 57:19
64:2
BEGAN- 31:15 35:1
BEHOLD- 64:13
BELIEVES- 76:6
BENEFIT- 45:12
BETWEEN- 11:9
23:12,25 24:1,2
26:4 32:25 33:13
34:19 36:24 61:25
BIG- 7:14 35:1
43:14 45:18 69:8
BILLS- 55:10
61:9 66:17 68:13
70:12 72:7
BIT- 33:15 57:23
58:7
BLACK- 38:12
BLACK-HEARTED-
34:20
BLANK- 14:20
21:6,9,17,18,20,
22
BLUNT- 70:4
BOB- 4:18
BORROWER- 11:10
BOTH- 5:9 8:10
26:14 35:23
49:20 61:23
73:17 77:2,3
BOTTOM- 50:23

BOX- 77:6
BRINGS- 48:17
BROADER- 47:10
BROUGHT- 61:23
BUDGET- 61:9
63:14
BUDGETS- 56:2
BUILDING- 72:4,8
BUNCH- 69:19
70:10
BUNCHER- 4:5
7:11 48:19,24
49:12,22 50:2,4,
14,22 51:21,23
52:3,9,14,19,23
53:4,14,19,25
54:15,20 55:3,25
56:11,19 57:15
61:7 64:5,10,21
65:4 66:9,12,13
67:10 68:8,9,16
69:2,23 70:13,17,
25 71:6,11,18
72:12,14,24 73:2,
4,9,15,23 74:3,6,
9,11,13,22 75:3,
7,10 76:8,10,16,
19,21 77:15,20
BUNCHER'S- 57:19
64:11

C

CALENDAR- 29:14
CALL- 8:1,19
13:22 14:3,8
15:23 22:2 43:2
66:11
CALLED- 14:8
15:7,17 23:8,17
CALLS- 15:24
CAMERON- 4:12
CAN- 8:5,17
10:14 11:5,24,25
40:20 50:21
57:10 61:24
63:11 64:22
66:14 67:19
72:16 75:18,20,
21 76:8 77:4,6,20
CAN'T- 12:13
42:14 46:23
70:17 71:13
CANNOT- 48:1,10
50:20,21
CAPACITY- 25:14
CAPITAL- 4:21

Case 11-42042-dml11   Doc 30-35   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit W - Hearing Transcript   February 28   2011   Page 83 of 92

82

CARE- 36:6 49:2
CAREFULLY- 76:4
CARES- 44:9
CASE- 14:4,22
15:10 16:16
17:16 22:1 32:20
33:24 43:14,19
45:6 46:4,14,25
49:3,12,14,24
50:8,17 51:5,10,
11,15 52:2,3,10,
21 53:15 54:10,
17 55:19 56:21
59:24 61:17,18,
23 67:14 71:2
72:3,11
CASES- 21:12
41:4 43:16,18
45:7 60:6
CASH- 54:3,9,12,
14,15,21 55:18
56:1,4,7 61:20
62:7,9,12,15
63:2,8,17,21
66:16,17,20
68:14 69:3,9
70:19 71:11 72:7
73:1 75:1
CAUSE- 57:22
CAUSED- 37:23
CAVEAT- 73:10
CENTRE- 49:9
54:3,9 61:9 62:7
63:2 72:8
CENTURA- 7:16
10:6,8 11:9 12:7
13:3 15:21 18:24
25:13,19 36:13
CENTURA'S- 19:7
44:11
CERTAIN- 35:3
54:12 57:3 60:16
CERTAINLY- 39:1,
13
CERTIFICATE- 79:4
CERTIFY- 79:6
CETERA- 62:13
CHAIR- 8:21 25:1
43:11
CHANGE- 42:10,12
67:14 75:23
CHANGED- 15:22
CHANGES- 76:8
CHECK- 19:13,16
21:13,14 23:4,6
CHECKED- 20:17

23:9
CHECKING- 15:13
21:13
CHRONOLOGICAL-
15:5
CHRONOLOGY- 13:16
CIRCULATE- 77:20
CIRCULATING- 49:3
CIRCUMSTANCE-
41:1
CIRCUMSTANCES-
48:3 57:3 60:13
CIVIL- 58:25
CLAIM- 34:25 63:3
CLARIFY- 24:8
CLARK- 58:8 59:15
CLARK'S- 58:20
CLEAR- 39:24
46:10,25 51:25
57:25 59:3,19
64:23 76:6
CLEARLY- 63:17
CLIENT'S- 66:17
CLIENTS- 21:7
22:2
CLOSED- 31:4
CLOSING- 32:11
49:5
CODE- 39:20 41:6
57:6 59:4
COLE- 4:10
COLLATERAL- 8:10
27:3 28:13 61:20
62:13,16 63:9,17,
22 66:18 68:14
71:11
COLLEAGUES- 43:13
COME- 8:20 24:25
36:19 37:5 39:11
44:15 49:17
50:14 55:20 71:4
74:19
COMES- 21:1
35:18 40:21 55:4
COMFORTABLE-
68:22
COMMENT- 65:6
67:13
COMMENTED- 54:7
COMMENTS- 45:25
57:19 61:15
COMMERCE- 4:13
COMMITTEE- 57:24
58:15 60:9,11
COMPANIES- 31:5,

COMPANY- 11:9
12:4 15:17 23:17
COMPARING- 63:16
COMPLETELY- 70:12
COMPLICATED- 70:6
COMPRESSED-
34:19 38:14
CONCEDED- 40:5
CONCEIVABLE-
74:23
CONCEPT- 63:21
CONCERN- 40:23
43:16 46:13 47:5
49:1 53:14
CONCERNED- 21:10
36:15 38:9
CONCERNS- 35:13
CONCLUDED- 34:6
CONDITIONS- 41:14
CONDUCT- 43:18
44:23 46:12
CONDUCTED- 16:2,
4,12,13 23:15
36:24 42:22 44:7
CONDUCTING- 9:23
23:7 32:15
CONFIRM- 16:11
19:13,19 46:8
47:3
CONFIRMATION-
55:6,12 61:7
CONGLOMERATE-
49:8
CONGRESS- 37:11
39:23 41:8,17,22
CONSIDER- 5:8
42:4 76:4
CONSIDERATION-
22:25
CONSIDERED- 49:9
CONSISTENT- 74:14
CONSTITUTES-
22:15 39:12
CONSUMER- 41:9
CONTACT- 14:13
CONTACTED- 14:6
16:7
CONTAINED- 19:5
CONTEMPLATES-
39:2
CONTENDED- 69:6
CONTENT- 8:15
CONTESTED- 59:2,
3 60:1,2,16
CONTEXT- 33:3

CONTINUED- 7:5
CONTINUING- 68:2
CONTRARY- 43:21
CONTROL- 52:5,6
71:2
CONTROVERSIAL-
51:3
CONVERSATION-
17:2 28:11
CONVERSELY-
33:25 34:9 37:8
39:14 74:25
CONVEY- 20:8
22:20,22 23:23
24:9 25:16,20
27:4
CONVEYANCE- 8:10
19:6 21:3 22:15
23:2 33:13 46:5
CONVEYANCES-
21:20
CONVEYED- 20:21,
25 22:8,9 26:15
27:7,15
CONVEYING- 19:7
COPIED- 7:15
COPY- 6:24 7:21
22:1 23:16,17,18,
19 26:20 27:19,
20 58:9 62:2
CORPORATION-
11:10
CORRECT- 5:15
13:9 15:1,3 20:1
28:9,21 31:2
49:11 55:13
59:11 65:21 76:3,
5 78:7 79:6
CORRECTLY- 77:9
COULDN'T- 22:8
37:3
COUNSEL- 25:11
COUNTERCLAIMS-
71:24
COUNTY- 12:3
COURSE- 37:1
COURT'S- 35:8
43:5 47:5,15,18
50:19 67:13 71:14
CRAIG- 9:8
CREDIBILITY-
36:15
CREDIBLE- 70:21
CREDITOR- 21:16
34:2 37:12 46:5
CREDITORS- 26:23

Case 11-42042-dml11   Doc 30-35   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit W - Hearing Transcript   February 28   2011   Page 84 of 92

83

35:1,15 39:5,14
40:7,25 41:4
42:4 45:18 46:18
CROSS- 17:12,13
28:4,6
CURRENT- 49:19
CURRENTLY- 73:1
CUT- 51:25

_____

D

DAILIES- 65:1
67:3
DALLAS- 12:3
15:17 16:5
DANGEROUS- 46:12
47:6
DARK- 72:9
DATE- 11:11 12:9,
10 13:6 53:9
65:9,13,17 79:11
DATED- 43:25
DAVE- 30:15
DAVID- 4:20 16:6
57:16
DAY- 9:19,23
10:5 13:20 16:23
17:8 30:1 31:9
64:11
DAYS- 41:14 50:7
58:1 60:18
DEAL- 53:22 55:3
DEALINGS- 10:7
DEALT- 5:5 21:24
DEBT- 49:15 50:9
72:2
DEBTOR- 4:5 5:4,
6 17:16 21:16
38:10 39:12 40:5,
10 43:18 48:20
49:13 50:7,9
53:21 54:2,6,9
55:10,17 62:6,12,
19,21 63:6 65:12,
13 66:6,8,16,19
68:11,12 69:4,22
70:3 71:1,20,22,
24 73:14 74:23
76:11
DEBTOR'S- 25:3
33:18 48:8 54:12
63:15 65:5
DEBTORS- 37:11
DECEMBER- 12:11
13:7 29:4,11
30:20 43:23 44:2,
6

DECIDE- 8:8
36:19 68:2
DECIDED- 38:1
DECISION- 8:14
22:4,6 47:21,23
48:5,9,11
DEDUCT- 66:4
DEED- 14:22,24
15:21 16:20,22,
23,25 17:5,6,9
18:21,23 19:6
20:7,9 22:11,14,
16,20,22 23:17,
19,22 24:8 31:22
32:21,22,25
34:23 35:22 36:1,
7,14,20 38:21
43:22 44:8,14,15,
24 45:7,8 47:19,
24
DEEDS- 21:20
27:20 28:12,15,
20 30:7,10,11,16,
24 31:1,6,7,8,14,
16
DEEMED- 53:8
DEFINED- 63:2
DELETE- 75:19
76:2
DELIVER- 17:6
DELIVERED- 30:3,
11,16,17,18,23
31:22,24 43:23
DELIVERY- 22:11,
14,20,22,23 23:3
31:9
DEMAND- 13:2
53:20
DENIAL- 77:2,15
DENIED- 48:16
78:6
DENNIS- 4:7
DENY- 8:14 47:6
DENYING- 76:23
77:25
DEPOSITED- 65:14
76:18
DESIGNED- 51:24
DETAIL- 72:16
DETERMINE- 39:11
DIDN'T- 19:16
22:9 23:4,19
36:7,14 42:16
43:1 50:7 51:14,
25 52:9,12,24
53:2 54:8 55:1

65:14 67:3 68:24
69:20 70:9 71:2
75:22
DIFFERENT- 22:18
29:24 47:16
DIP- 54:3 61:10
63:15 65:20
DIRECTED- 51:18
69:21
DIRECTLY- 77:5
DISAGREE- 69:7
DISAGREED- 39:4
DISAGREES- 63:6
DISALLOW- 8:14
DISCRETION- 35:4,
8,19 40:22 41:21
42:1 43:6,10
48:2 57:3
DISMISS- 7:11
33:24 43:22
46:14 49:3 58:2
78:8
DISMISSAL- 4:22
6:14,18 35:7
40:16 48:18 53:1
56:21 60:6,7,8,
24 61:17 63:24
76:25 77:2,7,14,
17,25
DISMISSALS- 60:19
DISMISSED- 49:20,
25 50:1,17 51:10,
12,16 52:21
53:15 55:19,22
72:3
DISMISSING- 67:14
DISPUTE- 65:2
68:5
DISPUTED- 48:25
DISPUTES- 68:2
69:4
DISTILLED- 7:2
DISTINCTION-
61:22 62:5
DISTRICT- 12:3
DOCUMENT- 11:11
21:9,21
DOCUMENTS- 19:25
20:2,5 21:6,12,
19 45:14 46:24
71:9
DOESN'T- 32:19
33:7 34:15 39:10,
20,22 41:3,18,19,
23,24 42:10 76:5,
12 78:11

DOLLAR- 68:4
DOLLARS- 72:1
DOUG- 4:5 48:19
DRAFTED- 49:18

_____

E

EACH- 43:12 62:2
EARLIER- 29:7,25
30:1 76:1
EARLY- 4:23
EASIER- 60:13
EDITION- 58:4
EFFECT- 40:1
41:11 51:9 53:1
57:1,14 71:25
75:21
EFFECTIVE- 20:8
23:23 24:2,8
33:1,11 57:8,20
59:8,12,17 60:8,
18 61:5 76:7
EFFECTIVENESS-
57:21 59:22,23
EFFORT- 46:8
64:22
EGREGIOUS- 43:18
ELECTRONIC- 79:7
EMAIL- 14:15,19,
20 15:7 16:15
18:12,16,18,20
19:5 22:5 23:12
26:17,20 61:7
64:4,9,11,22,25
65:17 67:10
68:17,19 73:4
EMAILED- 19:25
EMPLOYED- 9:7
ENCLOSED- 14:19
ENTER- 57:4 77:7
ENTERED- 7:12
13:15 21:23
67:14 69:9
ENTERTAIN- 32:11
ENTITLED- 40:14,
16,20 46:23 62:6,
12 69:3,14 73:19
74:14
ENTITY- 19:8
20:8,9,25 38:22
47:14 49:10,15
50:17
ENTRY- 11:16
59:12 60:8
EQUALLY- 34:12
38:8
EQUITIES- 46:15

Case 11-42042-dml11   Doc 30-35   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit W - Hearing Transcript   February 28   2011   Page 85 of 92

84

ERRONEOUS- 47:22
ESSENTIALLY-
41:14 54:2
ESTATE- 4:1 9:14,
15 18:24 19:2
20:13 22:12 33:6,
8 35:21 36:21
50:8,12 63:5
ET- 62:13
EVENING- 29:10
EVENTS- 13:16
44:5
EVERYBODY- 38:6
61:25 63:16 74:15
EVERYTHING- 48:1
EVIDENCE- 7:10
8:13 15:18 24:18,
21 32:7 45:1
46:4 47:5 64:15,
16,19 66:9,10
EVIDENCING- 19:6
EXACT- 50:17
EXACTLY- 27:14
54:21 56:2 58:8
EXAMINATION- 9:1
17:12,13 25:4
28:6
EXAMPLE- 50:6
EXCEPT- 41:5
74:17
EXCUSE- 12:2
24:19
EXECUTED- 18:24
22:11,14,16
30:10 43:22 47:25
EXECUTION- 31:9
EXERCISE- 38:1
39:15 40:21
41:21 42:1 43:6
48:2
EXERCISED- 42:15
EXERCISING- 43:9
EXHIBIT- 7:12
8:6 10:13,24
11:4,18,23,24
12:19,24 13:10
18:1,5,8 31:14
EXHIBITS- 6:22,
24 7:6,7 10:10
EXPECT- 66:22
EXPERIENCE- 21:5
EXPLAIN- 21:7
37:5
EXPRESSED- 46:13
EXTENSION- 11:8
EXTENT- 56:8

63:15

**F**

FACE- 34:3
FACTORS- 42:3
FACTUALLY- 37:4
FAIR- 61:3 74:13
75:3,5 76:18
78:15
FAIRLY- 45:25
FAIRNESS- 55:23
FAITH- 32:18
33:7,16,21 34:7
35:3,14 39:5,12,
17,21 40:24 41:4,
10,15 46:18 48:6
FAR- 21:10 38:9
70:6
FARGO- 4:21 57:17
FASHION- 50:6
77:7
FEBRUARY- 61:8
64:5 68:20
FEDERAL- 58:25
60:1
FEEL- 35:9 44:25
FEELS- 34:4
FEET- 33:19
FELT- 28:1
FENTON- 18:24
49:9 54:3,9 61:9,
25 62:7,24 63:2
72:8
FIFTH- 65:17
FIGHT- 62:19,22
69:8
FIGURE- 41:20,25
43:15 72:6,18
FILE- 14:21,22,
25 17:6 18:25
19:3 21:10,25
34:23 41:9 45:6,
8 69:25 72:10
FILED- 7:13,14
13:25 14:17
15:10,21 16:1
17:5 19:2,8,10,
14,24 20:9,11,16,
22 22:1 24:9
26:15 27:16 31:1,
11 32:16 33:5
38:7 45:17 47:14
49:8,12 51:6,11,
15 52:10 53:9,16
54:10 71:3,24
75:21

FILES- 20:25
FILING- 14:4
16:16,20 21:3,4
32:19 33:7,16,21,
24 34:2,7,8,10
35:3,14,15,16
39:5,17 40:24
41:1,15 42:5
47:13 48:6,14
50:16 52:1,21
54:17 55:1 69:18
75:17
FILINGS- 38:4
39:21
FINAL- 24:23
57:6 59:18 60:25
FINALLY- 12:24
FINANCE- 4:22
FIND- 15:25 35:3,
13,23 54:22
FINDING- 39:12
FINE- 52:24
62:22 66:11
76:15 78:10
FIRE- 33:19
FIRM- 4:21 9:8,
23 13:3,21 28:18
FIRM'S- 64:25
FIRST- 4:8 6:4,
13 8:1,24 9:18,
19 10:2 11:9,13
12:3 13:19 19:22
26:2 31:9 32:18
49:24 61:16 62:5
63:1 69:4 70:5
73:11 74:20 75:1
77:16,25 78:9
FIVE- 15:24
72:19 74:8 77:13
FIX- 36:22 76:21
FLAW- 59:21
FOCUS- 9:13
13:19 35:21 40:25
FOLLOW- 20:14
FOLLOWED- 12:2
64:10
FORCES- 27:1,3,8,
11,13,22 28:12
FORECLOSE- 8:12
10:15 8 11:13
12:17 13:24 19:7
36:3 38:16 46:9
FORECLOSED- 8:11
19:17 24:10
34:12 37:15
FORECLOSING-

20:19,23 24:12
47:13
FORECLOSURE-
9:19,23 10:18
12:6 15:6,18
16:24 17:18,22
19:4 20:11 22:4
23:7,15 24:4,11
27:8,24 28:24,25
32:14 37:18 38:4
40:6,7 46:7,22
57:9,11
FORECLOSURES-
14:6 21:25
FOREGOING- 79:6
FORGOTTEN- 36:10
FORM- 18:25
48:18,25 49:2,3,
18 74:19
FORMAN- 4:10
FORMS- 35:6
FORWARD- 8:20
22:10 24:25 28:2
34:3 45:19 49:15
FOUND- 40:2
FOUR- 7:2 65:16
77:14
FRAME- 34:19
36:17 38:14
FRANK- 4:18
FRANKE- 4:17,18
5:17,19,25 77:11
FRANKLY- 37:19,
22 40:3 47:22
48:10 50:11
52:24 55:17 67:3
68:5 69:14 74:1
76:24
FRE- 4:1,5 5:14
8:10 9:15 13:25
14:1,4,18 19:2,8,
9 20:11,22 23:23
24:9 25:10,14,20
26:15 27:4,16
28:16 30:12,24
48:15 50:8 54:9
FRE'S- 8:10 20:13
FREQUENTLY- 34:22
FRIDAY- 5:5,15
6:8 29:4 30:19
31:7
FRONT- 14:21 19:1
FULL- 25:8 45:10
FULLY- 67:13
FUNDS- 54:25
55:14 63:12,14

Case 11-42042-dml11   Doc 30-35   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit W - Hearing Transcript   February 28   2011   Page 86 of 92

85

71:10 74:25 75:1
FURTHER- 24:15,
17,21 28:3 32:3,
7 52:22 55:12
59:2 60:4
FUSS- 67:8

### G

GAITHER- 4:4,5
6:5,11,16,19
7:13,21,23 8:2,3,
5 11:1,20 12:21
13:12 17:14,15,
17 18:4,7,11
24:15,23 25:5
28:3 32:3,10
45:24
GAITHER'S- 24:22
GANDER- 34:5
GARVIN- 16:6,7
42:22
GAS- 9:14
GATES- 4:21
GAVE- 16:15 40:7
73:5,17
GENERAL- 18:21,23
GENERALLY- 21:15
22:24
GENTLEMAN- 15:7
GET- 5:20 14:9,
11 15:11 16:15,
19 21:7 23:17
37:11 41:4 42:14
44:13 45:20
50:11 55:6,11,12
62:19 64:13 65:1,
14 66:14 67:18
68:16,19,21 69:3,
8 70:19 72:16,18
75:18 77:6,11,15,
17
GETS- 74:20
GIVE- 35:3 39:2,
25 50:6 54:6
55:7,24 62:1
64:5 65:1 66:19
67:3 73:22,25
GIVEN- 14:4
15:18 21:5,9,12
23:16 34:1 36:20
40:4 46:22 47:5
74:1 75:11
GLOBAL- 5:5
GO- 22:10 34:24
37:24 38:2,8
39:18 45:15

49:14 61:24
64:22 70:3,14
71:1 72:9
GOING- 6:24 8:21
28:2 32:24 33:4,
23 36:24 38:8
42:23 44:15 45:9,
10,19 51:1,5
53:14,20 66:15,
19 67:1 68:4
69:17 70:8 71:10
72:6,7,9,10
73:22 75:6,13
77:11,13
GONE- 24:13 50:2
70:10
GOOD- 4:4,7,9,12,
15,18,20 17:15
25:6,7 32:18
33:7,16,21 34:4,
5,7 39:17,21
41:4,15 46:18
61:12 77:19
GOOSE- 34:4
GOT- 5:18 6:3
11:14 14:15
15:18 18:19
31:25 33:17 36:1
37:5 38:20,21
39:17 40:10
43:16,18 44:18,
24 47:20 54:25
55:23 75:25
GOVERNS- 59:1
GRAND- 74:8
GRANT- 46:11
48:12
GRANTED- 5:11
6:9 78:6
GRANTEE- 24:3
GRANTEE'S- 24:3
GRANTHAM- 8:19,
20,24 9:4,9
17:15 25:22 26:4,
14,20 27:14 43:1
45:12
GRANTHAM'S- 26:2
35:21
GRANTS- 59:5
GROUND- 16:4
42:22
GUESS- 8:15 22:6,
10 24:13 45:16
56:19 70:7,25
GUESSING- 40:5

### H

HADN'T- 16:11
21:23 40:3 43:2
44:7
HALE- 9:8
HALF- 78:9
HAND- 7:17 8:22
18:1 25:1 26:19
49:22 58:9 60:13
64:7
HANDED- 7:7 8:7
10:11 18:12 64:18
HANDLE- 45:10
HANDS- 15:22
HANG- 58:21
HAPPEN- 23:2
50:20
HAPPENED- 15:4
34:7,25 37:15
43:15 70:19
HAPPENS- 34:22
72:7
HAPPY- 56:16
64:20 72:19
HARSH- 74:1,12
HARTWICK- 4:14,
15,16
HASN'T- 41:17,22
56:7
HAVEN'T- 32:17
47:17
HCM- 4:10 61:13,
19 63:3,4 65:14
HE'S- 5:18 6:6
45:16 46:23 51:1,
12 53:7,8,10,14,
19,20 56:21,23
69:2,14 73:6,19
74:13
HEAR- 9:18 37:7
41:2 53:18
HEARD- 9:19 43:21
HEARING- 6:22
59:3 65:1 68:25
78:20
HEARINGS- 59:2
60:17
HEARTED- 38:13
HECK- 74:20
HELP- 6:17 45:4
74:4
HELPFUL- 33:1
HERE'S- 14:15
64:11 75:5
HERRING- 33:15

HIGH- 32:13
HINGED- 44:6
HISTORY- 36:2
HOLD- 21:7 33:18
78:3,13
HOLDING- 65:13
HOLIDAY- 31:5
HOLLY- 48:21
HONORED- 34:13
47:11
HOPE- 38:2
HOPING- 75:1
HOURS- 36:25
HURT- 74:5

### I

IDEA- 71:6
IDENTIFY- 10:14
11:24
IMMEDIATE- 57:1,
14
IMMEDIATELY-
57:8 59:7,12
61:5 75:18 76:7
IMPACT- 52:18
IMPLICATION-
42:11
IMPROPER- 70:22
IMPROPERLY- 71:25
IN/LAST- 70:5
74:20
INAPPLICABLE-
57:22 58:1
INAPPROPRIATE-
34:12 67:18
INC- 9:15 11:10
18:24 19:2 25:13
79:12
INCORRECT- 40:11
IN-COUNTY- 14:7
INDEPENDENT-
21:13 47:3
INDICATED- 27:23
49:5 50:25 58:8
69:4
INEFFECTIVE-
44:16
INFORMATION-
27:23 73:5,6,16,
17,25
INFORMING- 13:23
14:8
INITIALLY- 63:21
INQUIRY- 47:2,3
INSTANCE- 39:17

Case 11-42042-dml11   Doc 30-35   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit W - Hearing Transcript   February 28   2011   Page 87 of 92

86

INSTEAD- 38:1
66:3
INSTRUCT- 77:5
INSTRUCTED- 30:13
INTEND- 57:7
INTENTIONAL- 48:4
INTENTIONALLY-
62:17
INTEREST- 51:7,8,
17 53:9,16 56:23
INTERESTINGLY-
61:19
INTERIM- 62:6,12,
20 67:7
INTERPRETS-
52:24 67:20
IORI- 7:15 10:6,
8 11:9 12:7 13:3
15:20 18:23 19:7
25:13,18 36:13
44:11
IRRELEVANT- 32:23
ISN'T- 70:11 76:4
ISSUE- 49:17
50:22 56:7 57:18
69:12,24 73:24
ISSUED- 10:17,21
12:3 75:11
ISSUES- 5:6 6:14,
17 8:8 22:18
36:15
IT'S- 5:10 6:12
10:17 11:2,8,21
12:2 13:2,13
18:4 22:1,2,19
32:14 33:5 35:4
37:4,9 38:11,12,
14 39:18 42:19
43:12,25 47:12,
15 49:2,20 51:4
52:16 53:13 56:9,
14,16 57:8,11,24
58:15,17 59:3,11,
17,18 60:25 61:5
62:11 63:21
64:16,18 65:15,
17 67:10,11
69:19 72:15,21,
25 73:3,12 74:2,
11,12,14,23,25
78:6

ITEM- 65:18
ITEMS- 64:12

_____
          J
_____
JANUARY- 9:20

13:8,15 17:18,24
25:22 26:24 27:9
28:25 29:3 31:1
36:17 54:22 63:5
JAY- 18:14 24:24
25:3,9
JO- 4:15
JOHN- 4:4 17:15
19:3
JOINED- 6:23
JUDGE- 5:15
43:13 58:8,20
59:14 63:23
JUDGE'S- 21:22
59:20
JUDICIAL- 7:9
JUNIOR- 19:3
JURISDICTION-
67:16,21 68:2
75:25
JUSTIFY- 48:10

_____
          K
_____
K&L- 4:21
KIDDING- 37:6
38:7
KIENER- 63:23
KINDS- 71:25
KINVIG- 4:12,13
5:2,3
KNOWING- 42:23
75:2
KNOWLEDGE- 45:13
47:12,16 73:13
KNOWS- 37:13
74:21
KRAUN- 55:6
68:16,21 70:18,
19,20,21 72:16,18

_____
          L
_____
LAJONE- 14:15
16:13 17:2,10
18:14 19:20
23:16 24:24,25
25:3,6,9 28:8
32:4,6 35:24
LANGUAGE- 36:24
48:25 49:4 50:24
51:1,3,9,24 53:8
57:14,20 67:17
LARGER- 67:19
LARGEST- 27:7
LASTS- 41:13
LATE- 5:5 57:9,11
LATER- 16:19

19:15 21:7 26:7
32:21 35:23 44:4
60:18 75:20
LATTER- 62:21
LAWYER- 35:21
LAWYERS- 43:12,15
LEARNED- 17:4
LEAVE- 50:8
LEAVES- 6:11
LEFT- 51:14 74:18
LEG- 41:4
LEGITIMATE- 44:7
LENDER- 11:9 54:8
LENDER'S- 63:3
LENDERS- 55:19
63:5
LENGTHY- 54:1
LEONARD- 4:10
LET'S- 48:18
66:15 69:8
LETTER- 13:2,6
50:24
LEWIS- 19:3
LICENSED- 9:10
LIFT- 34:24
LIGHT- 45:25
LINE- 64:12 65:18
LIST- 6:22
LITERALLY- 15:24
38:3
LITIGATE- 69:11
LITIGATION-
71:21 72:4
LO- 64:13
LOAN- 71:9
LOCKBOX- 54:11,
14,16,19,25 55:2
56:8 69:20 71:10
74:19,25 75:1,7,
14,15,18 76:13,18
LONG- 5:4 9:10
21:2 36:2 71:22
78:8
LONGER- 59:25
LOOK- 10:13 11:4,
23 12:24 22:25
34:3 35:2 43:20
44:5 48:2 49:23
50:23 53:17
55:15 61:23 63:23
LOOKED- 14:20
LOOKING- 15:20,
25 40:24 58:13,
14 60:14 77:13
78:9

LOT- 23:1 71:16,
19
LOTS- 22:18 45:7
LP- 4:11 61:13
63:3,4 65:14
LP'S- 61:19
LUBBOCK- 9:6 10:2

_____
          M
_____
MAIL- 74:11
MAILED- 49:23
MAKING- 55:24
MAN- 42:22
MAN'S- 36:11
MANIPULATIVE-
44:24
MANY- 5:6 21:5
34:6 36:12 43:13
MARCH- 57:11
79:11
MARK- 6:5 14:21,
23,25 18:25 19:3
MARKED- 18:1
26:19
MARKS- 21:11
MATH- 66:3
MATTER- 32:19
33:7 59:15 79:8
MATTERS- 4:1
60:1,3,16 68:3
69:13
MEANS- 65:6
MEANT- 31:8
MEANTIME- 15:13
16:2
MECHANISM- 50:5
MEISEL- 4:10
MEMORANDUM-
58:10 59:20
MET- 28:8
MICHAEL- 4:9
61:12
MILLION- 72:1
MINE- 53:20
MINIMUM- 54:23
MODIFICATION-
11:8
MONDAY- 29:3 31:7
MONEY- 54:7,8
55:24 56:1 61:16
64:2 65:24 68:13
69:19 70:10,22
71:5,23,25 72:18
74:2,24
MONIES- 70:2

HC 01046

Case 11-42042-dml11    Doc 30-35    Filed 04/11/11    Entered 04/11/11 15:34:21    Desc
Exhibit W - Hearing Transcript    February 28    2011    Page 88 of 92

87

MONTH- 21:8 37:6
44:13
MONTHLY- 68:18
MORGAN- 30:15,16,
23,24 31:24 36:11
MORNING- 4:2,4,7,
9,12,15,18,20
6:6 17:15 25:6,7
26:16,21,23
27:11,17 31:12
40:4 43:21 44:5
55:6 61:12 73:17
76:3 78:1
MORNINGS- 14:7
MOTION- 5:11 6:9,
12 7:6,10 8:6,8,
15 18:4 34:24
43:22 46:11 47:7
48:12,15 50:14
77:2,3,16,25 78:8
MOTIONS- 45:17
46:14 58:2
MOVANT- 56:20
MOVANT'S- 18:1
26:19
MOVANTS- 77:10
MOVE- 18:7
MOVING- 36:12
60:4
MUCH- 19:15
24:20 33:23 45:9
54:18 64:2 65:10,
11 66:7 78:17
MULTIPLE- 78:19

N

NAMED- 19:8
NECESSARILY-
73:11
NECESSARY- 23:4
51:4
NEEDED- 47:19
NEITHER- 14:25
NELIGAN- 6:22
NEVADA- 11:10
NEVER- 44:22 45:6
NEVERTHELESS-
34:2 70:14
NEW- 31:4 38:9
NIGHT- 29:17
30:18
NOON- 13:20 26:3
NOR- 59:22
NORMALLY- 50:11
NORTH- 51:9
NOSE- 36:9

NOTARY- 43:23
44:1
NOTED- 56:24
NOTES- 57:25
58:15 60:9,11
NOTICE- 7:10 8:9
13:2,19,20 34:1,
3 37:10 39:3,25
40:4,7,10 46:5,6,
18,21,25 47:2
48:13,14 50:16
51:2,6,11 52:10
53:10,16 75:21
NOTIFIED- 42:24
NOTIFY- 14:14
16:13
NOTWITHSTANDING-
66:1,2
NULLITY- 39:9,18
45:16
NUMBERING- 7:5
NUMBERS- 65:5

O

OBJECTION- 10:25
11:19 12:20
13:11 18:9
OBSERVE- 47:1
OBSERVED- 70:20
OBTAINED- 32:15
OBVIOUS- 61:22
62:5
OBVIOUSLY- 42:18
70:10 72:4 73:13
OCCUR- 21:21
OCCURRED- 21:8
40:8
OFFENSE- 44:9
68:24
OFFER- 10:23
11:18 12:19 13:10
OFFERED- 47:21
OFFICE- 5:20
14:5,11 19:19
28:17 30:11 31:4,
5,19,24 64:10
77:12,17
OFFICIAL- 18:25
OIL- 9:14
OLD- 43:14
OLSON- 4:6,7
6:20,21 7:2,5,9,
19,21,22,24 8:1,
4,7,19 9:2 10:23
11:3,18,22 12:19,
23 13:10,14

17:11 18:9 24:17,
21 28:4,7 29:22,
23 32:2,9,13,24
33:4,10,12,14,17,
20,22 34:14,16,
22 35:6,13 36:5,
8,10,17,23 37:2,
7,9,12,16,20,25
38:5,11,17,19,24
39:1,6,8,13,16,
22,24 40:12,16,
19 41:3,7,12,16,
18,23 42:3,7,9,
13,17,19 43:1,5,
8,9,17 44:1,4,10,
13,17,20,23 45:3,
6,23 46:2 47:9
77:19,24 78:3,5,
8,13,16
OLSON'S- 6:11
8:9,15 18:4
46:11,21 47:7
76:23
ONE- 5:6 7:22
14:25 17:20
21:17 23:18
24:23 35:6 36:13
42:3 43:19 47:12
48:5,6 49:1,22
55:3 62:2,11,15
65:16 66:14
77:14 78:6
ONES- 17:21 49:20
ONE-WORD- 56:9
OPEN- 7:12 65:12
OPENING- 8:2,5,16
OPERATED- 20:18
24:4,11
OPERATING- 68:18
OPINION- 20:6
58:10 59:21
OPPORTUNITY-
56:17
OPT- 45:15
ORAL- 46:25
ORDER- 4:22 5:8,
10,18 6:9,14,18
10:17,20 12:2,9
21:5 24:13 48:18,
21,25 49:1,2,3,4,
18,24 51:5,10
53:2,8,17 54:6
56:22,25 57:1,5,
6,14,19,22 59:10,
18,22,23 60:8,21,
24,25 61:20,25

62:1,6,12,20,24
63:16,18 66:16,
18 67:13,17,20
68:1 69:3,5,8,10,
15,21 72:25
73:20 74:7 75:6,
9 76:6,7,9,23,25
77:6,7,17,21,24,
25
ORDERED- 49:22
67:25
ORDERS- 21:22
60:2,5,7 61:23
62:2,3 76:24
77:10,14
ORIGINAL- 23:22
30:12
ORIGINALS- 30:21,
22,23
OTHERWISE- 55:1
57:21
OURS- 31:25
OUT- 14:6
OVERRIDE- 43:19
OWN- 15:13 54:9
65:8 71:1 74:24
75:1
OWNED- 14:17
OWNERS- 27:15

P

PACER- 19:13,16
PAID- 55:11 72:1
PARENTHETICAL-
69:5
PARKWAY- 51:8
PARTICULAR-
10:20 17:20
27:15 51:7
PARTICULARLY-
7:11
PARTIES- 4:3 5:9
23:25 24:1,3
32:8,25 33:2,3,
13,18 48:9 50:16
51:13 53:22
54:24 61:18
63:25 70:2 71:21
72:3,6
PARTY- 22:24
56:23
PASS- 17:11
27:24 32:2
PASSED- 23:1
PAUSE- 18:22
PAY- 66:17 70:12

Case 11-42042-dml11   Doc 30-35   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit W - Hearing Transcript   February 28   2011   Page 89 of 92

88

72:7
PAYMENT- 61:8
PENDING- 50:8
PEOPLE- 14:14
21:24 32:15 36:2
69:17
PERCEIVE- 35:1
PERFECT- 51:6,14,
17 52:16
PERFECTED- 51:19
52:1,11 53:8,16
PERFECTION- 52:1
PERFECTLY- 78:10
PERHAPS- 57:10
68:20
PERIOD- 37:11
57:5 58:1 59:24
61:5 69:15 70:11
73:20
PERIODIC- 70:8,9
PERMISSION- 65:3
PERMIT- 49:14
PERSON- 70:21
PERSONAL- 17:21
PERSONALLY- 42:18
PERSPECTIVE-
47:15,18 66:24
73:16
PERSUADED- 33:18
PETITION- 14:21,
24 19:2,8 27:16,
21 31:11 38:20
47:19,24 51:19
52:13,17 53:12
65:14
PETRA- 4:16
PHONE- 13:21
15:19 68:21 72:16
PICKED- 60:9
PICTURE- 35:1,9
45:18
PLACE- 34:18
PLAINTIFF'S-
59:21
PLAY- 21:1
PLEADING- 69:25
PLOT- 45:19
PM- 17:24 19:4
26:8,10,12,17
PODIUM- 56:17
POLICY- 38:8
POOR- 38:8
PORTION- 27:7
POSITION- 44:10
51:13 54:4,24

68:10 69:2 70:2
73:19
POSSESSION- 52:6
54:12 55:10
POSSIBILITY- 49:6
POST- 51:19
52:13,16 53:12
57:9,10,11
POSTING- 13:8
36:23
PRACTICAL- 66:15
PRACTICE- 9:10,
13 32:14
PRE- 52:5
PRECEDENT- 34:12
41:3 43:6 46:13
47:6
PREEXISTED- 54:16
PREJUDICE- 49:4,
21 50:2 52:17
PREPAID- 50:25
PREPARE- 17:5
28:15 34:23
PREPARED- 13:3
17:8 24:21 28:20,
22,23 29:5 45:16
68:17 73:11
PREPETITION-
61:18 62:18
63:25 66:2 71:23
PRESENT- 24:18
69:13
PRESENTLY- 57:20
PRESERVE- 75:1
PRESUMPTION-
41:10
PREVENT- 20:18
24:4,11
PREVENTED- 20:23
28:1
PREVIOUS- 10:7
PRINCIPLE- 40:9
47:10
PRIOR- 6:14 8:11
19:4,16 23:5
24:9 25:10 26:8,
10,12,17 27:6
28:24 33:24 34:7
36:2 44:6 46:6,
22 51:25 52:20
76:24 77:6
PROBABLY- 37:24
46:20
PROBLEM- 36:1
38:3,12 40:9
52:15

PROCEDURAL-
49:14 50:5
PROCEDURE- 58:25
60:1 75:11
PROCEED- 6:13
7:24 8:16 22:4
47:12,16,22 48:5
PROCEEDED- 8:12
46:9
PROCEEDINGS-
59:1 79:7
PROCESS- 52:18
PROOF- 16:16,20
21:3,4
PROPER- 22:24
PROPERLY- 20:25
24:6
PROPERTIES-
25:16,19 36:12
48:7 49:7,13
50:17
PROPERTY- 7:16
9:24 10:4,8,18
11:14 12:8,17
13:24 14:17 15:9,
17,22 17:22 19:6,
7 20:8,10,12,19,
21,24 21:21 22:8,
9,15,21,22 23:2,
23 24:9,12 25:19
26:15 27:4,7,8,
12 32:16 33:5,
8 34:1,11 36:21
38:21 44:11 46:6
48:14 49:15 50:9,
12 51:7 57:9
62:7 63:3,5 67:7
PROPERTY'S- 19:23
PROPOSE- 63:10
PROPOSED- 5:8,9
67:17 68:1
PROVES- 14:9 15:9
PROVIDE- 6:23
59:25 62:13 70:9
PROVIDED- 47:24,
25
PROVIDES- 58:25
PROVING- 14:16
PROVISION- 56:25
59:4 76:1,11
PULL- 22:3 35:25
37:2
PULLED- 21:6
37:3,23
PURPORTED- 20:9
PURPOSES- 63:9?

PURSUANT- 66:18
69:21
PUTS- 61:18

Q

QUARREL- 40:21
QUARRELING-
33:14 34:16 40:12
QUESTION'S- 22:17
QUESTIONS- 46:1
71:13
QUICK- 58:7 66:3

R

RAISE- 8:22 25:1
RAISED- 46:2
RATHER- 15:16
22:15 50:4 54:1
69:7
RATIONALE- 43:5
REACHED- 5:4,15,
16 6:7
READING- 59:13,
19 67:15
READS- 41:5 68:1
REAGAN- 35:20
REALITY- 69:16
72:22
REALIZE- 39:18
REASON- 37:21
57:10 70:7,21
71:13 76:10
RECEIPT- 41:15
RECEIVE- 18:16,
18 21:18,20
RECEIVED- 7:10
13:21 14:8 19:5
21:17 22:5 23:1,
12 44:14 46:21,
24 48:22 61:7
RECESS- 68:20
RECOGNIZE- 11:5
63:13
RECOGNIZED-
53:17 61:17 63:12
RECOGNIZING- 64:4
RECONSTITUTED-
50:18
RECORDED- 16:22,
23,25 17:5 23:20,
24 24:7 28:13
31:15 32:1,21
36:1 44:8
RECORDER'S- 31:4,
5
RECORDING- 22:16

Case 11-42042-dml11    Doc 30-35    Filed 04/11/11    Entered 04/11/11 15:34:21    Desc
Exhibit W - Hearing Transcript    February 28    2011    Page 90 of 92

89

31:6,16 32:22
33:1 79:7
RECORDS- 19:13,16
RED- 33:15 78:10,
11
REDIRECT- 24:16,
17
REDLINE- 48:25
78:8
REFERENCES- 59:1
60:12
REFERRING- 25:18
REFERS- 58:23
REFLECT- 61:4
65:6 68:6
REGIONS- 4:19
5:16,19
RELATIVELY- 70:11
RELIEF- 35:4,6
40:13 55:21,23
56:22 57:2 62:7
69:15 73:20,22
76:23
RELY- 21:16
REMAINED- 63:14
REMARKS- 46:3
49:5
REMOVED- 49:4
RENEWAL- 11:8
RENT- 53:9
RENTS- 51:7 52:5,
7,11,17 53:13,20,
21 66:1 67:6 69:7
REPORTER- 8:23
REPORTS- 68:18
REPRESENTATIVE-
30:12 66:14
REPRESENTED-
35:24
REQUEST- 21:3
47:6 48:24 70:7
72:22 75:20,23
76:2,18,23
REQUESTED- 48:22
50:24 54:1 57:1,2
REQUESTING- 45:14
REQUIRE- 41:18,
19,23,24 47:1
52:22 66:19 72:22
REQUIRED- 57:5
70:3
REQUIREMENT-
41:5,8
REQUIRES- 38:25
RESEARCH- 57:23
58:8

RESIDE- 9:5
RESOLVED- 11:14
RESPECT- 47:21
52:13 57:19 58:1
75:23
RESPOND- 56:13
RESPONSE- 7:13
RESTORE- 63:24
69:17 70:1 74:15
RESTORED- 68:10
RESTRAIN- 12:5
RESTRAINING-
10:17,20 12:2,9
21:4
RESTRAINS- 12:6
RESULT- 54:25
60:2 74:12
RETAIN- 75:25
RETAINS- 67:16
RETENTION- 67:20
RETURN- 53:21
54:2 55:18
RETURNED- 55:2
61:16 75:4
REVISED- 77:16
RIFE- 22:17
ROAD- 14:6 34:24
39:19
ROBERTS- 4:5
5:14,22,24 6:3
ROLE- 25:10
RONALD- 35:20
ROUTINELY- 21:18
RULE- 57:25
58:14,16,24,25
59:4,24,25 60:1,
4,5,6,12
RULED- 49:6 54:5
RULES- 57:6
59:25 61:5
RULING- 46:14
50:19
RUN- 57:5 72:5
RUSH- 36:12

S

SAKONCHICK-
50:24,25
SAKONCHICK'S-
75:20
SALCIDO- 77:4
SALE- 13:8 16:2,
4,8,12,13,24,25
22:15 23:15 24:5
32:15,19 35:16,
25 36:24 37:2,3

40:7 42:23 44:8
45:14 46:7
SALES- 21:6 31:15
SANCTION- 46:12
SATISFIED- 32:21
SATURDAY- 29:4
SCHEDULED- 17:18
19:5,7 20:10
24:10 46:7
SCHEDULES- 54:20
55:15
SCHOTZ- 4:10
SECOND- 12:2,6,
16 53:25 58:21
62:11 65:18 67:25
SECRET- 43:15
SECRETARY- 14:5
26:3,9,13,14
SECTIONS- 60:15
SECURED- 33:18
39:5 40:6 63:3
SECURING- 63:3
SECURITY- 51:17
53:9,16
SEE- 45:18 55:15
60:1 63:17 76:17
77:24
SEEN- 6:21 13:17
40:4 45:6,7 49:19
SEIZE- 52:5
SELF-HELP- 38:2
39:10,15 42:15
SENATOR- 42:19
SENT- 15:7 20:3
26:20 50:24 64:4,
22 68:16,19
71:12 73:4
SEPARATE- 10:9
49:8 69:5,9
SEPTEMBER- 11:12
SEQUENCE- 15:5
SET- 10:10 41:3
46:12
SETTLEMENT- 6:7
30:1 46:17 72:1
SEYMOUR- 4:5 5:14
SHALL- 35:3
49:25 50:1 57:22
68:1 75:24 76:12
SHELLEY- 18:25
30:8,9
SHENANIGANS-
33:23
SHOOT- 21:25

SHORTLY- 14:10
26:3
SHOULDN'T- 35:14
40:24 54:23,24
55:1 66:22 71:23
SHOWED- 55:8
SHOWING- 15:20
21:20
SHOWS- 8:9 19:23
SIGN- 5:12 60:23
76:9,24
SIGNATURE- 13:4
SIGNED- 14:24,25
19:3,9 21:22
22:22 29:8,9,24,
25 30:1,6 33:1,9
36:20 38:20,21
44:1 77:6
SIGNIFICANT- 48:8
SIGNING- 76:25
SIMILAR- 48:7
SIMILARLY- 5:21,
25
SIMPLE- 6:9
36:22 46:4 56:14
65:15
SIMPLIFY- 6:17
SIMPLY- 5:10
46:15,22 47:16
48:1 52:16
SIMULTANEOUSLY-
77:3
SINISTER- 34:20
45:19
SIT- 8:22 43:11
SITTING- 15:19
69:20
SITUATION- 46:21
61:19 69:5,9
SKIN- 36:9
SKIP- 8:2
SLIGHTLY- 29:7
SORTED- 67:8
SOUND- 79:7
SOUNDS- 77:19
SOURCE- 73:18
SPEAKERS- 78:19
SPECIFIC- 59:4
60:3,4,7,19
SPECIFICALLY-
69:25
SPECULATING-
44:21
SPEND- 68:14
SPENDING- 74:24

Case 11-42042-dml11   Doc 30-35   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit W - Hearing Transcript   February 28   2011   Page 91 of 92

90

68:13 74:24,25
SPOKEN- 28:9
SQUABBLES- 48:17
STAND- 35:16
66:12
STANDING- 40:10
START- 5:2,3
45:17 50:7,18
54:8 63:20
STARTED- 49:15
50:10 74:15,16,24
STARTLING- 70:16
STATE- 6:5 9:3,
11 25:8 51:15,25
52:21 53:19
71:21 72:4 77:16,
25
STATEMENT- 8:2
55:7
STATUS- 61:18
63:25
STAY- 5:7,11 6:1,
8 20:15,22 21:1
28:1 34:13,24
37:8 39:20,25
40:3 41:11,15
46:10,16 47:1,11,
25 48:4,13 58:1
59:22,23 60:3,5,
7,17,19 76:23,24
77:6
STAYED- 32:20
STAYING- 63:1
STAYS- 57:21
59:1 60:2 77:14
STEAD- 6:7
STEP- 24:20 32:4
30:8
STEVEN- 18:24
STIPULATION-
7:11,14 8:6,9
13:16,17
STOLE- 70:22
STOP- 10:17,18
16:7 38:23 42:15
45:15,20
STOPPED- 12:16
STOPS- 48:1
STRAIGHTFORWARD-
46:4
STRANGE- 50:11
STROMBERG'S- 6:6
STRUGGLE- 37:14
SUBMITTED- 31:16
48:21 57:20
SUBSEQUENT-

16:15 24:3 48:9
51:11
SUBSEQUENTLY-
20:11 26:3
SUBSTANCE- 5:9
SUFFICIENT- 8:7,
13 47:1
SUNDAY- 29:4
SUPPLIED- 60:3
SUPPLY- 60:7
SUPPORT- 46:15
SUPPOSED- 39:14
SUPPOSEDLY- 71:10
SURPRISING- 70:12
SUSPECT- 42:13
SWEET- 5:23,25
SWEPT- 71:25
SWORN- 8:21,23,
24 25:2,3
SYNDROME- 38:10

---

**T**

TELEPHONE- 25:24
TELLING- 14:15
66:6,8
TELLS- 73:14
TEMPORARY- 10:17,
20 21:4
TEN- 14:12 50:7
60:18 61:4
TEN-DAY- 57:25
TERM- 63:20
TERMS- 50:6 55:13
TERRIBLY- 51:3
TERRILL- 9:8
TERRY- 8:19,24
9:4
TESTIMONY- 43:21
44:5,6 47:20
70:18
TEXAS- 9:6,11
THEREFORE- 48:15
52:11 53:2,10,19
THIRD- 33:2
37:18 47:14
THOUSANDS- 38:3
THREE- 40:6
61:14 65:16 77:9
THURSDAY- 28:24
29:9,17,20 30:2,
18 31:6
THUS- 60:7
TIL- 14:12
TIME- 8:11 17:18
18:18 19:4,16,22,

21:2,9,17 23:12,
13 24:10 26:1
28:11 29:7,24
31:17 34:19
36:17 37:3 38:14
43:9,11 45:21
46:7 48:5 54:7
55:12,16,18 57:5
59:5 60:17 61:10
70:11 71:18,19
76:4 77:1
TIMELY- 75:16
TIMES- 10:9 21:5
43:13
TITLE- 15:17,18
23:17 31:5,7,8
62:9
TODAY- 17:22
25:18 28:8 69:11
74:2 76:9
TODAY'S- 32:13
TOOK- 34:18
52:16 71:23
TOTAL- 77:14
TRACK- 29:11
36:12
TRACTS- 27:20
TRANSCRIPT- 79:6
TRANSCRIPTS-
79:12
TRANSFER- 15:16
20:10 34:1 38:9
50:7 65:20 76:12
TRANSFEROR-
25:11 30:9 31:20
TRANSFERRED-
15:9 19:23 32:16
34:11 38:22
47:14 48:15
63:12 65:25
TRANSFERRING-
76:13
TRANSFERS- 28:15
48:7
TRIED- 54:5
TRIP- 50:25
TRO- 32:16
TROS- 36:2 37:18,
19
TROUBLED- 33:25
TROUBLING- 35:17
TRULY- 32:19
33:6,14
TRUST- 4:8 10:2
11:9 12:4 35:20
73:6

TRUSTEE'S- 17:6,8
TUESDAY- 28:24,
25 31:8 38:4
TUNE- 72:1
TURN- 54:15
62:23 72:22
TURNED- 54:14,19
66:5 68:4 69:22
70:3
TURNOVER- 64:3
66:16
TURNS- 37:4 67:18
TWICE- 37:23
TWO- 10:9 23:25
24:3 35:19 37:18
40:24 60:3 62:2
65:16

---

**U**

UNAVAILABILITY-
78:13
UNAWARE- 15:16
UNCERTAINTY-
36:22
UNCONDITIONALLY-
63:4
UNDERSTANDING-
50:19 55:9 56:3
UNDERSTOOD- 42:25
UNDERTAKE- 47:2
UNDISPUTED- 69:19
UNFILED- 20:3,5
UNITED- 18:25
UNLESS- 59:3
UNPERFECTED-
52:20
UNRECORDED- 20:7
UNUSUAL- 32:14
UPDATES- 70:8,9
UPLOAD- 5:20
76:9 77:3
UPLOADED- 5:7,17,
18 6:8,22 77:10
UPSET- 15:16
USED- 35:20
48:10 63:14,15
64:6 66:17 67:6
USES- 63:20

---

**V**

VALID- 40:6 65:5,
7
VARIANCE- 56:3
VERIFICATION-
45:20 47:18
VERIFY- 22:7,8

Case 11-42042-dml11    Doc 30-35    Filed 04/11/11    Entered 04/11/11 15:34:21    Desc
Exhibit W - Hearing Transcript    February 28    2011    Page 92 of 92

91

35:21 37:3 38:15
43:2 45:14 47:17
56:5
**VERSION**- 58:14,
18 60:13
**VERSUS**- 54:18
**VIA**- 66:8
**VIOLATED**- 40:3
66:2
**VIOLATION**- 46:10
48:4
**VIRTUE**- 67:17
**VIS-A-VIS**- 33:2
**VOLUME**- 32:14
**VOLUNTARY**- 19:2
22:23 27:16

---
**W**
---
**WAIT**- 55:20
**WALKING**- 44:24
**WANTS**- 5:1 34:3
51:19 53:4 54:2
57:10 61:23
69:15 70:18
72:17,20 73:3,20
76:11
**WARNER**- 4:9,10
54:1,2 55:5,7
56:6,9,13,16
61:12,13,22 62:5,
9,11,15 63:1,8,
20 64:9,17,20
65:20,22,24 66:7,
8,11,15,21,23,25
67:12,23,25 68:9,
21,22,25 70:23
71:8,12 72:17
73:4 74:7,10
75:9,15 76:11
77:20,23
**WARNER'S**- 56:20
71:15 75:23
**WARRANTY**- 18:21,
23 20:7
**WASN'T**- 23:18
36:21 37:22
56:20 63:15 73:11
**WASTING**- 71:15,
18,19
**WATERGATE**- 42:20
**WAYS**- 36:22
**WE'RE**- 10:18
17:22 35:7,11
36:15 40:16 65:1
69:11 71:15,18
74:18 75:6,7

76:13
**WEATHERFORD**- 4:8
10:3 12:4
**WEDNESDAY**- 28:24
**WEEK**- 31:22 44:4
55:7 70:15 73:5
**WEEK'S**- 73:25
**WEEKEND**- 48:21
49:23
**WEEKS**- 44:7
**WEITMAN**- 4:20,21,
25 54:4 56:25
57:16 58:4,7,12,
15,17,19,21,23
59:7,11,16 60:12,
15,22,25 61:3
**WEITMAN'S**- 76:2
**WELLS**- 4:21 57:16
**WEREN'T**- 30:17
31:14
**WEST**- 58:4 60:13
**WHERE'S**- 35:22
**WHEREAS**- 62:11
**WHEREUPON**- 78:20
**WHOLE**- 69:19
70:10
**WIDE-RANGING**-
46:3
**WILL**- 5:3,4,20
18:1 26:19 40:24
45:25 46:11
48:12,15 60:5
63:11 64:7 65:3
75:4,23 76:7,9,
17 78:6
**WILLFUL**- 22:24
46:10
**WILLING**- 73:6
74:7,10
**WIRED**- 75:12
**WISE**- 35:19
**WITNESS**- 8:1,17,
21,24 17:11
24:19,24 25:1,3
29:21 32:2
**WON'T**- 62:21
**WORD**- 35:24
**WORDS**- 19:11
65:13
**WORK**- 15:20
25:14 39:10 59:16
**WORKED**- 25:16,19
27:4
**WORKS**- 61:1
**WORRIED**- 33:2
**WOULDN'T**- 31:5

**WRONGS**- 40:24

---
**Y**
---
**YEAR**- 9:21 12:12,
14 41:9
**YEAR'S**- 31:4
**YEARS**- 21:24
**YOU'D**- 8:20,22
24:25 50:23
**YOU'LL**- 49:23
56:1 63:13,17
**YOU'RE**- 8:21
15:20,25 21:12,
13 29:5 38:15
40:18 43:9 44:19,
21 45:4,5,13,14
47:13 59:9 60:23,
24 72:10 75:13
77:11 78:12