# Exhibit X

HC 01052

1

1    IN THE UNITED STATES BANKRUPTCY COURT
     NORTHERN DISTRICT OF TEXAS (DALLAS)
2

3

4    In re                          )
                                     )
                                     )   Case No. 11-30210-bjh11
5    FRE REAL ESTATE, INC.,          )   Dallas, Texas
     f/k/a TCI PARK WEST II, INC.,   )
6                                     )   February 3, 2011
                          Debtor.    )   12:05 p.m.
7                                     )
     _____)
8
                    TRANSCRIPT OF HEARING
9
        MOTION TO DISMISS FRE REAL ESTATE, INC.'S
10
     CHAPTER 11 PETITION PURSUANT TO 11 U.S.C. §1112(b)
11
              DUE TO ITS BAD FAITH FILING
12
                 OR, IN THE ALTERNATIVE,
13
        TO CONVERT THE CASE TO A CHAPTER 7 CASE
14
         BEFORE THE HONORABLE BARBARA J. HOUSER,
15
     UNITED STATES BANKRUPTCY COURT, CHIEF JUDGE
16

17

18

19

20

21   Transcription Service:              eScribers
                                         P.O. Box 7533
22                                       New York, NY 10116
                                         (973) 406-2250
23

24       Proceedings recorded by electronic sound recording.

25       Transcript produced by transcription service.

HC 01053

2

```
 1   APPEARANCES:

 2   For the Debtors:          DOUGLAS J. BUNCHER, ESQ.
                               NELIGAN FOLEY LLP
 3                             325 North St. Paul
                               Suite 3600
 4                             Dallas, TX 75201

 5   For Creditor:            DAVID WEITMAN, ESQ.
     Wells Fargo Capital      CHRISTOPHER A. BROWN, ESQ.
 6   Finance, Inc.            K&L GATES LLP
                               1717 Main Street
 7                             Suite 2800
                               Dallas, TX 75201

 8
     For Creditor:            DENNIS O. OLSON, ESQ.
 9   First Bank & Trust Co.   OLSON, NICOUD & GUECK, LLP
                               1201 Main Street
10                             Suite 2470
                               Dallas, TX 75202

11

12   For Creditor:            JO E. HARTWICK, ESQ.
     Petra CRE CDO 2007-1,    RACHAEL L. STRINGER, ESQ.
13   Ltd.                     STUTZMAN, BROMBERG, ESSERMAN &
                               PLIFKA, P.C.
14                             2323 Bryan Street
                               Suite 2200
15                             Dallas, TX 75201

16   For Creditor:            MICHAEL D. WARNER, ESQ.
     Highland Capital         COLE, SCHOTZ, MEISEL, FORMAN &
17   Management, L.P., as     LEONARD, P.A.
     Special Servicer for     301 Commerce Street
18   NexBank                  Suite 1700
                               Fort Worth, TX 76102

19
     For Creditor:            KEITH M. AURZADA, ESQ.
20   Armed Forces Bank, N.A.  BRYAN CAVE LLP
                               2200 Ross Avenue
21                             Suite 3300
                               Dallas, TX 75201

22
     For Creditor:            MARK E. ANDREWS, ESQ.
23   RMR Investments, Inc.    COX SMITH MATTHEWS, INCORPORATED
                               1201 Elm Street
24                             Suite 3300
                               Dallas, TX 75270

25
```

HC 01054

3

```
 1  APPEARANCES, cont'd

 2  For Creditor:              MARK STROMBERG, ESQ.
    State Bank of Texas:       STROMBERG STOCK, PLLC
 3                             Two Lincoln Centre
                               5420 LBJ Freeway
 4                             Suite 300
                               Dallas, TX 75240
 5
    For Creditor:              CAMERON W. KINVIG, ESQ.
 6  American Bank of           HUNTON & WILLIAMS, LLP
    Commerce                   1445 Ross Avenue
 7                             Suite 3700
                               Dallas, TX 75202
 8
    For Unsecured Creditor:    DAVID F. STABER, ESQ.
 9  Sidney Wicks Revocable     AKIN GUMP STRAUSS HAUER & FELD, LLP
    Trust                      1700 Pacific Avenue
10                             Suite 1400
                               Dallas, TX 75201
11
    For Interested Party:      STEPHEN SAKONCHICK II, ESQ.
12  U.S. Bank, National        STEPHEN SAKONCHICK II, P.C.
    Association                6836 Bee Caves Road
13                             Suite 225
                               Austin, TX 78746
14

15

16

17

18

19

20

21

22

23

24

25
```

HC 01055

Colloquy 4

1              P R O C E E D I N G S

2        (Audio starts mid-sentence)

3              MR. BUNCHER:  With me is David Morgan, vice president

4    of the debtor, and Mr. Greg Crown who is with Prime who

5    testified at the last hearing.

6              THE COURT:  Excellent.  Mr. Weitman?

7              MR. WEITMAN:  Good afternoon, Your Honor.  David

8    Weitman and Chris Brown with the law firm of K&L Gates here on

9    behalf of Wells Fargo Capital Finance.  I want to thank Your

10   Honor for allowing us to have the hearing today along with your

11   entire staff in facilitating this.

12             THE COURT:  Appreciate it.

13             MR. BROWN:  Thank you.

14             THE COURT:  Mr. Aurzada?

15             MR. AURZADA:  Good afternoon, Your Honor.  Keith

16   Aurzada on behalf of Armed Forces Bank with the law firm of

17   Bryan Cave.  Also in the courtroom is Douglas Neeve (ph.), in-

18   house counsel for Armed Forces Bank, as well as Brent Parsons

19   and he's a representative of the bank.  Thank you.

20             THE COURT:  Excellent.  Thank you.  Mr. Andrews?

21             MR. ANDREWS:  Good afternoon, Your Honor.  Mark

22   Andrews.  Law firm of Cox Smith and here on behalf of RMR

23   Investments, Inc., one of the lenders to three of the

24   entities --

25             THE COURT:  Very well.

HC 01056

Colloquy                                                      5

1          MS. HARTWICK:  Afternoon, Your Honor.  Jo Hartwick,

2    Stutzman, Bromberg, Esserman & Plifka, on behalf of one of the

3    lenders, Petra CRE CDO 2007-1, Ltd.

4          THE COURT:  Thank you.  Mr. Warner?

5          MR. WARNER:  Afternoon, Your Honor.  Michael Warner,

6    Cole Schotz, on behalf of Highland Capital Management, LP,

7    HCMLP, a special servicer for various secured lenders.

8          THE COURT:  Very well.

9          MR. KINVIG:  Good sunny afternoon, Your Honor.

10   Cameron Kinvig on behalf of American Bank of Commerce.

11         THE COURT:  Good afternoon.

12         MR. SAKONCHICK:  Good afternoon, Your Honor.  Steve

13   Sakonchick, S-A-K-O-N-C-H-I-C-K, for U.S. Bank.  We're a

14   secured creditor in Parkway North appearing as a party in

15   interest.

16         THE COURT:  Excellent.  Mr. Olson?

17         MR. OLSON:  Good afternoon, Your Honor.  Dennis Olson

18   representing First State Bank & Trust and Bank of Weatherford,

19   secured creditors on one piece of land that was transferred on

20   the eve of the filing.

21         THE COURT:  Very well.

22         MR. STABER:  Your Honor, David Staber, on behalf of

23   Sidney Wicks as trustee for the Sidney Wicks Revocable Trust, a

24   landlord on the hangars in Addison Airport.

25         THE COURT:  Very well.  Now I'm surprised not to see

HC 01057

Colloquy 6

1  Mr. Leininger.  Is --

2          MR. WEITMAN:  He works with Mr. Aurzada.

3          THE COURT:  Okay.  All right.  So -- excellent.  So

4  the only person that I'm aware we're missing is Mr. Stromberg

5  who told us he was fine with us going ahead, that he apparently

6  is still iced in and was not able to -- did not think he would

7  be able to make it.

8          MR. WEITMAN:  Your Honor, David Weitman on behalf of

9  Wells Fargo Capital Finance.  We filed a motion to dismiss this

10 case for bad faith filing on January 10th, 2011.  That was

11 after the debtor had filed its petition in bankruptcy six days

12 earlier on the first Tuesday of January, 2011.  And in our

13 understan -- or from our understandings with the debtor's

14 counsel, then Mr. John Lewis, we learned that there had been a

15 number of transfers that had been made into FRE.  We then had

16 the Court set this for hearing.  Initially, it was on January

17 27th.  And then we tried to get some discovery from the debtor

18 and also from TCI Texas Properties.  That's Wells Fargo's

19 borrower which owes us, roughly, 8.2 million dollars.  When we

20 couldn't get that discovery, the Court may recall that we had a

21 hearing on that motion for expedited discovery on January 19th.

22 At that time, everyone -- I think we've got the folks here.  We

23 all agreed, and it's embodied in an order, that we would waive

24 the time requirements that are set forth in 1112(b)(3), I

25 believe it is.  And the Court agreed, and we thank Your Honor,

HC 01058

Colloquy

7

1  to set this for hearing on February 3, 2011, originally 1:15

2  for two and a half hours.  I surmise we now have four hours.

3  And since that time, we have taken discovery and have received

4  discovery.

5          Your Honor, we intended that this was a Little Creek

6  bad faith failing or something along the lines of what Your

7  Honor has previously ruled on.  I guess it was in November of

8  2010 that it certainly fit within the Court's rulings in that

9  case and it's cited in my motion to dismiss.  What we came to

10  understand from looking at documents that were delivered to us

11  just a day before our hearing -- that was on January 19th -- is

12  that it's much worse than a Little Creek.  It is, if you will,

13  Your Honor, Little Creek on steroids.  We had not just G -- a

14  transferor entity, transferred the property without the consent

15  of the lender into the debtor and then filed this petition in

16  bankruptcy.  We have come to learn that there are nineteen

17  transferor entities.  Nineteen transferor entities.

18          Your Honor, may I hand up a list of the transferor

19  entities?

20          THE COURT:  Please.

21          MR. WEITMAN:  Thank you.  We learned that TCI Texas

22  Properties, the first one there, Your Honor, transferred the

23  property into the debtor.  We learned Transcontinental Realty

24  Investors, Inc. -- they transferred their property into the

25  debtor.  That's, if you will, Your Honor, 2A.  Then we go right

HC 01059

Colloquy                                      8

1   through, if you will, to B, to C, if you will.  Those are each

2   from Transcontinental, various properties that are subject to

3   respective secured debt.  There's a TCI Adams LLC; TCI Amoco

4   Property LLC; Coventry Pointe; Transcontinental Westgrove,

5   that's number 6, Your Honor; TCI Pantaze; and IORI Centura

6   Inc., number 8; TCI Bridgewood; TCI Hunters Glen; ART Palm LLC;

7   TCI Ridgepoint; TCI 109 Beltline; Thornwood Landing Cattle;

8   Income Opportunity Realty Investors, Inc., did a transfer,

9   that's number 15; Westgrove Air Plaza Limited; American Realty

10  Trust, Inc.; TCI McKinney Ranch; and ART Collection.

11          The nineteen entities transferred all of their assets

12  into FRE and if Your Honor would look at the debtors' statement

13  of financial affairs, there is a --

14          THE COURT:  Where do I find that?  Is it in your

15  notebooks, I assume?

16          MR. WEITMAN:  If I may hand this up for the Court's

17  convenience?

18          THE COURT:  Thank you.

19          MR. BUNCHER:  Your Honor, if I may, on the first

20  exhibit, I don't know if it's being offered or if it's just a

21  demonstrative exhibit.  But --

22          MR. WEITMAN:  Just a demonstrative.

23          MR. BUNCHER:  -- footnote 3 on the first page

24  indicates that all of the transferor entities are subsidiaries

25  of Transcontinental Realty Investors, Inc.  In fact, there are

HC 01060

Colloquy                                      9

1   a few -- number 8, which is IORI Centura.  I believe that's a

2   subsidiary of a different entity, subsidiary of Investor

3   Opportunity Trust -- Income Opportunity Trust.  Similarly, ART

4   Palm, Inc. -- or, excuse me, ART Palm, LLC, that's number 11,

5   is a subsidiary of American Realty Trust, as well as items 17

6   and 19.  So with that correction --

7            THE COURT:  Thank you.

8            MR. BUNCHER:  And I believe in footnote 2, the

9   principal amount of the secured debt -- I'm not sure that

10  number jives with the debtor's schedules that have been filed

11  which actually shows a secured debt of 181,514,525 dollars.

12           THE COURT:  All right.  Thank you.

13           MR. WEITMAN:  If Your Honor would look at the answer

14  to question 5, which is on page 4 of 11 in the statement of

15  financial affairs --

16           THE COURT:  Yes?

17           MR. WEITMAN:  -- there the debtor, FRE, has listed

18  the number of foreclosure proceedings that were in the midst of

19  being concluded, if you will, Your Honor.  Many of these

20  lenders have filed their own either motions to annul the

21  automatic stay.  Mr. Stromberg's client, I know, has done that.

22  Or, they have filed other pleadings arguing that there was bad

23  faith filing by reason of these transfers on the eve of

24  foreclosure.  I would like the Court to take notice of the

25  number of foreclosure proceedings that were scheduled that now

HC 01061

Colloquy 10

1  the debtor is seeking to contest.

2         THE COURT:  Very well.

3         MR. WEITMAN:  Your Honor, what we have here, which is

4  highly, highly unusual, is not just nineteen transferor

5  entities, transferring their real estate into FRE, but then FRE

6  issued notes back to the transferors.  And Your Honor can see

7  the amounts of the seller notes that are in this fourth column.

8  And they total roughly -- we've heard different numbers --

9  forty-eight to fifty million dollars, the cost of adjustments.

10  So, if you will, Your Honor, forty-eight, fifty million dollars

11  is transferred back to the transferor entities and those

12  transferor entities then transferred these up to the parent

13  entity of the transferor.  And that's why I have, Your Honor, a

14  column of the subsequent transferee of the seller note.  So

15  these went up to the parent, the owners, of the transferor.  We

16  think that would have been enough to say --

17         THE COURT:  So -- hang on.  Just let me make sure I

18  understand.  So when the debtor bought this property, it issued

19  notes payable to the transferor entities who, in turn, have

20  dividended them up --

21         MR. WEITMAN:  Exactly.

22         THE COURT:  -- to their parent entity?

23         MR. WEITMAN:  Correct.

24         THE COURT:  All right.

25         MR. WEITMAN:  And in fact, as Your Honor will see

Colloquy                                              11

1    later on in the voluminous exhibit notebook that we have here,

2    there is actually a distribution agreement by which the

3    transferor sends it on up to the parent.  That would have been

4    bad.  Now here's another one because we just kept looking at

5    more and more documents, just sort of astonished at what

6    occurred here.

7           Then that parent entity then sold the membership

8    interest or the stock ownership interest in these transferor

9    entities and they transferred it to -- called ABCLD Income.

10   The parent entity of the debtor is ABCLD Properties.

11          MR. BUNCHER:  Just so the record's clear, the parent

12   of the debtor is ABCLD Properties LLC.  The parties that

13   received the interest in the transferors was ABCLD Income LLC.

14          THE COURT:  Somebody have a flow chart of all of this

15   for me?

16          MR. WEITMAN:  Some of this --

17          THE COURT:  That's unfortunate.

18          MR. WEITMAN:  We don't necessarily have a flow chart.

19   But we do have a stipulation that kind of sets forth the

20   various transactions.  And I can hand that up to the Court

21   later on.  I think we're in the midst of doing that, of working

22   through it.  And I'm sure we can do that shortly, Your Honor.

23          THE COURT:  All right.

24          MR. WEITMAN:  So, Your Honor, we not only have ABCLD

25   Income LLC receiving the ownership interest of these entities,

HC 01063

1 | okay, we then further have a situation where FRE Real Estate --

2 | I think it was called Fenton Real Estate previously -- it then

3 | sold -- okay, the owner of that was Transcontinental.  Okay,

4 | the owner of the debtor --

5 |         THE COURT:  Okay.  Let me go back just to make sure -

6 | - and somebody should prepare a flow chart so that this can be

7 | shown.  But as I understand it, then the parent entity of the

8 | transferor shown on your demonstrative A was originally, at

9 | least with respect to most of the entities, Transcontinental

10 | Realty Investors, Inc.  And what I'm hearing you tell me is

11 | that basically, Transcontinental Realty Investors, Inc.

12 | transferred its ownership, whatever those might be, in each of

13 | the transferor entities into ABCLD --

14 |         MR. WEITMAN:  Income LLC, which is affiliated with

15 | the debtor's parent --

16 |         THE COURT:  Hang on.  Just --

17 |     (Pause)

18 |         THE COURT:  All right.  And what -- I'm sorry.

19 | What's the relationship of Income LLC to Properties LLC?

20 |         MR. WEITMAN:  Well, we took the deposition of the

21 | debtor's turnaround chief restructuring officer on the 27th.

22 | And the gentleman's name is Mr. Morgan.  And we asked him.  And

23 | he said he didn't know.  But I'm assuming --

24 |         THE COURT:  But you started this by saying that we

25 | transferred it --

Colloquy                                    13

1          MR. WEITMAN:  They're affiliates.

2          THE COURT:  -- to Properties LLC.  And Mr. Buncher

3  corrected you.  So Properties does something.

4          MR. WEITMAN:  Properties is the owner of the debtor.

5          THE COURT:  So ABCLD Properties LLC owns FRE?

6          MR. WEITMAN:  Yes, ma'am.  Yes, Your Honor.

7          THE COURT:  All right.  And is it true that

8  Transcontinental Realty Investors, Inc. is a public company?

9          MR. WEITMAN:  Yes.  That's my understanding, yes,

10 Your Honor.  In addition --

11         THE COURT:  And what about these ABC entities?

12         MR. WEITMAN:  As is in American Realty Trust and --

13 which is another one of the transferees of the notes, Your

14 Honor.  Does Your Honor see that on 11?

15         THE COURT:  Yeah.  Well, 11 is ART Palm.

16         MR. WEITMAN:  Right.  But then to the right of that,

17 the subsequent transferee --

18         THE COURT:  Yes?

19         MR. WEITMAN:  -- is American Realty Investors.

20 That's public.

21         THE COURT:  That's its parent.  That's its parent.

22         MR. WEITMAN:  Correct.  Yes.

23         THE COURT:  And did American Realty Investors

24 transfer its ownership interest to Income as well?

25         MR. WEITMAN:  We believe so.  I haven't seen all the

HC 01065

Colloquy                                        14

1   documents.  We can --

2           THE COURT:  Mr. Buncher?

3           MR. WEITMAN:  I believe that's correct.  I think the

4   public entities that ultimately were the owners of these

5   subsidiaries divested themselves of the ownership interest in

6   these entities that held these properties prior to them being

7   transferred into the debtor, is what he's referring to.  And I

8   believe --

9           THE COURT:  You lost me there.  I understood it to be

10  after.  It's before?

11          MR. BUNCHER:  All of the documents -- well, you're

12  correct that I believe some of the transfers of the ownership

13  interest may be on December 27th as opposed to the transfers of

14  the properties were effective December 23rd.  But nonetheless,

15  looking at it as a whole, the public entities end up divesting

16  themselves of the ownership of the entities that transferred

17  the properties into the debtor.  And they divested

18  themselves --

19          THE COURT:  In exchange for what?  What did they get

20  for that?

21          MR. BUNCHER:  There's a contract, I believe, whereby

22  they -- well, they received a note -- I'm trying to make sure I

23  don't say something that's inaccurate here.  The properties

24  were transferred to the debtor.  The debtor gave promissory

25  notes back to the transferring entity.  That transferring

HC 01066

Colloquy                                    15

1  entity distributed or dividended them up into the parent --

2           THE COURT:  To their parents --

3           MR. BUNCHER:  -- of those entities.

4           THE COURT:  -- which were public entities.

5           MR. BUNCHER:  Right.  The --

6           THE COURT:  And then the public entities transferred

7  their ownership interest in the transferor entities --

8           MR. BUNCHER:  Right.

9           THE COURT:  -- to ABCLD Income --

10          MR. BUNCHER:  Yes, Your Honor.

11          THE COURT:  -- as I understand it.  And my question

12  is what did the public companies get for transferring the

13  ownership interest to ABC?

14          MR. BUNCHER:  The purchase agreements with ABCLD

15  Income provide that they were given a thousand dollars cash at

16  closing for the stock.  Essentially, this -- once the property

17  was transferred out and the debtor assumed all the indebtedness

18  that that entity had associated with the property, that entity,

19  the transferor entity, was nothing but a shell at that point in

20  time.  So the purchase agreements transferring the stock or the

21  membership interest simply recite a thousand dollars cash paid

22  at closing.

23          THE COURT:  And who owns ABCLD Income LLC?

24          MR. BUNCHER:  Your Honor, I believe, ultimately,

25  there's a Mr. Akin and a Mr. Shumate that indirectly own both

HC 01067

Colloquy                                                        16

1   ABCLD Income and ABCLD Properties.  There's some intervening

2   entities between Mr. Akin and Shumate and the ABCLD Income and

3   ABCLD Properties.  But the ultimate owners of those two

4   entities are Mr. Akin and Shumate.  And I believe one --

5          THE COURT:  What happened to the public shareholders

6   of --

7          MR. WEITMAN:  American Realty?

8          THE COURT:  -- ART and Transcontinental Realty

9   Investors?

10         MR. BUNCHER:  Nothing as far as I know.  They're --

11         THE COURT:  Well, except they now own entities that

12  own nothing.

13         MR. WEITMAN:  They've got a seller note, Your Honor.

14         MR. BUNCHER:  The entities -- they own -- they

15  ultimately own the promissory notes that were given back in

16  exchange for the perceived equity value in all these properties

17  that were transferred.  The debtor assumed the debt --

18         THE COURT:  Okay.  So when the parents transferred

19  their ownership interest, they kept the notes.

20         MR. BUNCHER:  Ultimately, yes.  But the public

21  entities --

22         THE COURT:  Kept the notes.

23         MR. BUNCHER:  -- they're -- directly owned the

24  promissory notes, the seller notes as we've called them, that

25  were given back by the debtor --

HC 01068

Colloquy                                                          17

1           THE COURT:  Right.

2           MR. BUNCHER:  -- in exchange for what was perceived

3    by the debtor to be the equity value in the property beyond the

4    debt that was assumed by the debtor.

5           THE COURT:  So when the public entities transferred

6    their ownership interest in the transferor entities, that did

7    not include the notes from the debtor.

8           MR. BUNCHER:  Correct.  The notes had already been

9    distributed under the distribution agreements on 12/23.  I

10   believe the purchase agreements with respect to the transfer of

11   the stock or ownership interest are dated December 27th.

12          MR. WEITMAN:  Then, Your Honor, one other transaction

13   that we would like to share with Your Honor and that we have

14   seen the transaction documents for is that you had, if you

15   will, FRE prior to -- that's the debtor -- prior to December

16   23 -- the owner of FRE is none other than Transcontinental

17   Realty Investors.  Transcontinental Realty Investors then sell

18   its ownership interest in the debtor to ABCLD Income.  And

19   ABCLD Income then is obligated to take this property and,

20   subject to all the debt and all of the trade debt and the like.

21   So again, we have now -- everything has moved completely, if

22   one were to look at this flow chart that Your Honor would like,

23   and we can provide it for the next hearing -- everything is

24   completely moved from the Transcontinental, American Realty and

25   Income Opportunity side, if you will, to ABCLD Income, ABCLD

eScribers, LLC  |  (973) 406-2250
operations@escribers.net  |  www.escribers.net

HC 01069

Colloquy                                    18

1   Properties and FRE.  And in return, what's left here is they'd
2   essentially monetized their equity interest with notes, seller
3   notes, that when Your Honor looks at it, you'll see that it's
4   not subject to adjustments.  They are not subordinated to any
5   of the other unsecured debt.  They've just leveraged the
6   daylights out of FRE Real Estate to the disadvantage of all of
7   the other unsecured creditors of each of the respective
8   nineteen entities.

9           Your Honor, we also would like, just so Your Honor
10  can sort of keep what I kind of call a scorecard -- we've got
11  2.9 million dollars worth ad valorem taxes.  That's across the
12  various properties with respect to 2010.  We came to learn
13  through the depositions that, in fact, roughly, about a million
14  eight, I believe it is, of ad valorem taxes on the various
15  properties for 2009 were not paid.  And the transferor entities
16  basically refinanced it through one of these tax financing
17  entities.  So if Your Honor looks at the schedules and sees an
18  entity called Propel Financial Services, Propel finances first
19  lien ad valorem taxes.  So there's really another -- I think
20  it's another million nine unsecured debt, Your Honor.  The
21  total amount in the entire case now is a million four.  What we
22  wanted to understand was entity by entity, how much is out
23  there.  What's the impact.  So we visited with Mr. Buncher and
24  also with his financial advisory person for the debtor, Mr.
25  Crown, from Prime Asset Management and we've included this

HC 01070

Colloquy                                             19

1   amount on the right-hand column so Your Honor can see a number

2   of these entities have no unsecured trade debt.   Some others

3   have some sizeable unsecured trade debt.   The thinking is, Your

4   Honor, that if an unsecured trade creditor were in one case and

5   the entity went into bankruptcy or the property were to be

6   sold, in this example, they might get a forty percent

7   distribution after the payment of the secured debt and the ad

8   valorem taxes.   Now with this de facto substantive

9   consolidation pre-bankruptcy, they share pro rata with not only

10  the other unsecured creditors from the other cases that are now

11  jumbled in there with the other entities, if you will into FRE,

12  but you also have the deficiency claims of the various

13  undersecured creditors in this case.

14        Your Honor, if you see the summary of schedules --

15     (Pause)

16        MR. WEITMAN:   -- you see, Your Honor, that there

17  are -- and I think Mr. Buncher mentioned this earlier, there's

18  181 million dollars of secured creditors.

19        THE COURT:   Where am I going to find the summary?

20        MR. WEITMAN:   May I hand this up to Your Honor?

21        THE COURT:   You may.

22        MR. WEITMAN:   Thank you.

23        THE COURT:   Thank you.

24        MR. WEITMAN:   Your Honor sees 181 million dollars

25  worth of secured claims.

HC 01071

Colloquy                                                    20

1              THE COURT:  Hang on.  So you're looking at Schedule

2    A?

3              MR. WEITMAN:  Yes, Your Honor.

4              THE COURT:  All right.  So -- I think you gave me a

5    bunch of copies --

6              MR. WEITMAN:  Oh, I'm sorry.

7              THE COURT:  -- of the same thing.

8         (Pause)

9              THE COURT:  All right.  I see 181.

10             MR. WEITMAN:  And then you see on the subsequent

11   pages the various secured creditors and the properties, if you

12   will, Your Honor, that comprise this debt.

13             THE COURT:  Yeah.

14             MR. WEITMAN:  If any of those properties are

15   undersecured, if the creditors are undersecured, that, too,

16   would harm an unsecured creditor who would otherwise be able to

17   get a larger distribution on a case by case or transfer by

18   transfer entity.  So we think that prejudices the unsecured

19   creditors.  And I would point out, Your Honor, that -- again,

20   it was last night so I don't know how much was going to be

21   heard now, but Mr. Staber has come in representing an unsecured

22   creditor with 153,000 dollar unsecured claim who is joined in

23   the dismissal also arguing bad faith because that harms his

24   client's interest.

25             Your Honor, what we also tried to do in looking at

HC 01072

Case 11-42042-dml11   Doc 30-36   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit X - Part 1 - Hearing Transcript   February 3   2011   Page 22 of 118

Colloquy                                                    21

1  Little Creek and our depositions and what the Court will hear
2  today is we want to find out what is behind FRE Real Estate,
3  the debtor.  What we found out is that the chief restructuring
4  officer was told here's the deal, everything's been signed up.
5  He was told this on December 23, 2010.  He had a meeting, the
6  offices, at the same building with the principals of
7  Transcontinental and all of their operations.  The offices --
8  and those are the same offices, I believe, of FRE Real Estate
9  and the same offices of ABCLD Income and Properties.  That's
10  where a Mr. Akin, the principal -- they all hang out at the
11  same location, 1800 or 1750 Valley View Lane.  They had a
12  meeting.  They said do you want to be the chief restructuring
13  officer.  We've done all these things.  We have -- bless these
14  transactions.  There's going to be a seller note.  There's all
15  these different documents.  And we want you to get us through
16  the Chapter proceedings.  Mr. Morgan said he'll look at it and
17  came back and said, hey, I like it.  Looks good.  I'm going to
18  create value.  One, he has no salary and there's no money to
19  pay him a salary.  His financial and advisory services --
20  where's that going to come from?  Well, it comes from none
21  other than Prime Asset Management which is an affiliate of
22  Transcontinental which is Mr. Crown, who is, I think, one of
23  the principals there.  He's testified.  He provided the
24  financial advisory services for the transferor entities prior
25  to December 23.  He is now providing them to the debtor after

HC 01073

Colloquy                                                22

1   December 23 and into the Chapter proceedings. Asked, where's

2   the money going to come from to pay Prime Asset Management?  No

3   charge.  No charge.  Mr. Akin and Mr. Moos, M-O-O-S, at

4   Transcontinental.  It's all in the deposition.  We'll cover it

5   again in the courtroom -- said he'll help you through all this.

6   He can make sense of the finance.  Then we asked well, who's --

7   where's the property manager.  Well, that was Regis Capital

8   Management.  Who was the property manager before December 23,

9   2010?  Regis Capital Management.  What happens effective

10  December 23?  Who's the property manager for all of the same

11  properties?  Regis Capital Management.  How do they get paid?

12  Well, three percent of the gross revenues like most property

13  managers.  Where do they office?  It's either 1750 Valley View

14  Lane or 1800 Valley View Lane.  Who else offices there?  The

15  entire Prime Asset world, if you will, and Transcontinental and

16  the rest.  Are there other employees?  No.  There's some

17  officers.  But, as we covered in the deposition, and we can

18  hear it again either later today or next time we all get

19  together, the principals of FRE are devoted to other tasks and

20  they've said, Mr. Morgan, you run with that.  Find value.  We

21  asked where's the money to pay for all these things.  Well,

22  Your Honor, knows from the cash collateral hearing and the

23  budgets there's no excess cash flow that's not encumbered.

24  Certainly, Mr. Warner, representing NexBank, is not going to

25  allow his net operating income from his office buildings to go

HC 01074

1   for the lenders that have liens on the raw land.  And there's a

2   lot of raw land here, Your Honor.  I think their answer is --

3   and it may sound a little bit humorous is, well, there's

4   nothing to mow.  And that's the only expense.  And if we keep

5   having ice, there'll never be anything to mow around there.  So

6   they wouldn't have a budget to worry about the raw land.

7   That's their answer.  That's what we heard at the cash

8   collateral hearing.  Don't worry.  There's no money.

9        What is the debtor's answer to all of this 'cause,

10  again, they don't pay Prime.  They don't pay Mr. Morgan

11  although he testified, not a problem.  I'm going to get a

12  success fee.  I said, well, how do you get a success fee if

13  you've got as to each property heavily secured ad valorem taxes

14  on the top or, if you will, 2009, 2010, 2011 -- we know under

15  32.01 of the Texas Tax Code automatically attaches on the first

16  of the year.  Then you've got the trade creditor claims.

17  You've got the seller note claims.  How do you get paid, Mr.

18  Morgan and how do you define a success fee?  His answer:

19  they'll work something out with the people that hold the seller

20  notes.  Are there other employees?  No.  Is there money to pay

21  them?  No.  Did they outsource all of their services?  Yes.

22  That looks like Little Creek a lot.  Same issues.

23        I've already discussed the fact that everything was

24  on the brink of -- or many properties were on the edge of

25  foreclosure.  Many of the properties are in default.  Each of

HC 01075

1  the lenders that are here -- I mean, when the Court looks at

2  whether or not the bad faith criteria exist, we look at the

3  employees.  Say, well, was there a two-party creditor dispute,

4  two-party dispute?  Your Honor, I would maintain that what, in

5  fact, we have is we've got nineteen two-party disputes, if you

6  will, with the lenders.  I don't think that's the way you get

7  around the issue of two-party disputes by saying I'm going to

8  aggregate all of these different properties and bring in all

9  these lenders involuntarily.

10          When Your Honor looks at the schedules, and we can go

11  through this in greater detail, we've got a number of entities

12  that really should have been single asset real estate cases --

13  I mean, with the protections of 362(b)(3).  So what ends up

14  happening?  Well, they don't check that box.  Not when you

15  brought in nineteen entities into one.  If what they've done

16  works, Your Honor, they need to be at the next Texas bar

17  business conference to talk about how they're able to pull this

18  off.  I don't think you can.

19          Mr. Andrews pointed out an interesting section of the

20  Code.  I think that is 362(d)(4) where they speak of the stay

21  being lifted with respect to real estate if there has been an

22  intent to hinder, delay or defraud creditors and there have

23  been transfers of the ownership interest in the debtors' -- in

24  the property prior to the bankruptcy without the lender's

25  consent.  I don't know if we're there or not but it certainly

Colloquy                                      25

1  evidences a congressional intent that these types of actions

2  should not be allowed.

3          When Your Honor looks --

4          THE COURT:  Mr. Weitman, I don't want to -- we've

5  been going about forty minutes.

6          MR. WEITMAN:  Oh, we have?  I'm sorry.

7          THE COURT:  And --

8          MR. WEITMAN:  -- last night --

9          THE COURT:  You all are not going to get sixteen

10 hours for this hearing.  We just don't have that kind of time.

11 So --

12         MR. WEITMAN:  I've got one more minute?  Your Honor?

13         THE COURT:  -- I just want you to --

14         MR. WEITMAN:  Thank you.  No.  Thank you very much.

15 Your Honor, the issue is this.  Bad faith filing we think

16 absolutely.  Once the Court determines it is a bad faith filing

17 there's authority that suggests that you don't even look at

18 whether there are unusual circumstances.  It's game, set,

19 match.  There's authority for that.  If Your Honor looks at and

20 determines, gee, can the debtor then meet its burden to show

21 that there are unusual circumstances such that the requested

22 dismissal is not in the best interest of creditors, I would

23 note for Your Honor the number of secured creditors in this

24 courtroom along with Mr. Staber's client that are saying forget

25 it.  Bad faith.  We want out.

HC 01077

Colloquy                                                26

1          Last, the key thing is is what does the debtor hope

2     to do.   The debtor has offered a number of cases that are

3     really different than what we have here.   When Your Honor looks

4     at the debtor's response, you see things of, gee, maybe it

5     isn't so bad, the transfer -- the assets to an entity and then

6     go into bankruptcy.   When Your Honor delves into those cases,

7     you see that in those cases, there was funding who'd handle all

8     these cases.   There was a capital -- a working capital

9     facility, debtor-in-possession financing.   There were

10    commitments from the parents of the transferee entity.   There

11    are all of these things.   Mr. Morgan was questioned at his

12    deposition.   He said, well, if we get into it, I'll try to put

13    together an investor package and see if anyone's interested in

14    coming up with some money.   So he has nothing.   He has nothing

15    beyond what is encumbered.

16          Your Honor, there are other lenders.   I'll let them

17    speak.   And thank you.

18          THE COURT:   Thank you.   Mr. Aurzada?

19          MR. AURZADA:   Thank you, Your Honor.   In my opening,

20    I'd like to do two things.   First, I'd like to introduce who my

21    client is and, second, augment what Mr. Weitman said but I'll

22    try not to be repetitive.

23          THE COURT:   Please.

24          MR. AURZADA:   My client is Armed Forces Bank.   They

25    are a secured creditor of the debtor.   They have liens on six

HC 01078

1  parcels of raw land in Dallas, Travis and Collin Counties.

2  Prior to the petition date, those liens aggregated to just over

3  seventy-two million dollars.  They are now cross-collateralized

4  and cross-defaulted.

5        The way we found our way to this case is by virtue of

6  having posted a for foreclosure sale on January 4, 2011.  We

7  had previously posted the property for foreclosure but had

8  worked out extensions of the foreclosure date at various times.

9        None of the Armed Forces collateral produces income

10 that we are aware of.  It is, in essence, vacant land.  Propel

11 and its successors have tax liens as the debtors have not paid

12 the 2009/2010 taxes.  I think the evidence will show that it is

13 unlikely that there is an ability for the debtors to pay the

14 2011 taxes.

15       If it would please the Court, I'd like to hand up a

16 demonstrative that just kind of demonstrates the liens of Armed

17 Forces Bank.

18       THE COURT:  Please.  Thank you.

19       MR. AURZADA:  And with respect to each of these

20 columns, I'll go through them briefly.  The name of the debtor,

21 that's our debtor.  The common name of the property, the

22 address of the property, which is really just identifying the

23 county; a description of what it is.  And so we're using the

24 vernacular "dirt" and it's describing the size of the parcels.

25       THE COURT:  All right.

**Colloquy** 28

1          MR. AURZADA:  The prior owner, through the secured

2  lender, is the seventy-two million dollar debt.  And then out

3  to the right, we've included the appraised value.  And the one

4  thing I did want to note on the appraised value is that for

5  purposes of the motion to dismiss, we have stipulated with the

6  debtors that they can use our appraisals for this hearing and

7  this hearing only.  They do show that we are marginally

8  oversecured.

9          THE COURT:  What is the aggregate of these appraised

10  values, if you know?

11          MR. AURZADA:  Eighty-six million.

12          MR. BUNCHER:  Your Honor, just for the record, since

13  this is a demonstrative exhibit, our schedules actually

14  schedule 56.788 million as the secured debt for Armed Forces.

15  I'm only pointing out the fact that there may be dispute about

16  total debt owing.

17          MR. AURZADA:  We'll be happy to prove up our debt,

18  Your Honor.  And maybe that's not something we need to do for

19  purposes of the motion to dismiss.  But certainly if we draw an

20  objection to our proof of claim, we'll be happy to prove up the

21  indebtedness.

22          THE COURT:  All right.

23          MR. AURZADA:  The transfers from the prior owners of

24  these properties violated the deeds of trust.  I think that'll

25  be a consistent theme among all of the secured lenders.  And in

HC 01080

1  particular, I did want to note one thing.  The evidence is

2  going to show that on the day of the filing, January 4th, we

3  were very nervous at my shop about whether or not we should or

4  should not foreclose not knowing that these transfers to FRE

5  had occurred.  I had gotten a courtesy call from Mr. Lewis the

6  night before saying I'm getting ready to file the bankruptcies.

7  And I woke up on Tuesday morning, checked PACER, and I didn't

8  find any of my borrowers or any of the property owners.  And

9  so, it was a bit of a leap of faith in talking to Mr. Lewis and

10  him saying, look, I'm serious.  They've been transferred.  I

11  didn't have the deeds.  But we went ahead and postponed the

12  foreclosure sale based upon that.  And so, my point there is at

13  some level, the Court is going to have to evaluate the good

14  faith of the filing.  And the evidence is going to show that in

15  the period of time between December 23rd when the transferred

16  documents were signed -- of 2010 -- and January 3rd of 2011, my

17  client was of the impression that they were still dealing with

18  the prior owners and that there was dialogue back and forth

19  regarding maybe there's a chance we'll be able to work this

20  out; maybe we won't.  But my client was clearly under the

21  impression that the prior owners were in possession of these

22  properties; and number two, FRE never appeared.  No one called

23  and said, hey, I'm the new owner of these properties.  I'd

24  really like to work this out so I can avoid the foreclosure

25  since I just signed a note for the perceived equity of this

HC 01081

Colloquy                                          30

1    property.

2              THE COURT:  When did Armed Forces Bank learn that

3    there was an entity called FRE that was now the purported owner

4    of the property?

5              MR. AURZADA:  The morning of January 4th when I

6    talked to John Lewis.

7              Mr. Weitman's schedule that he handed up, I thought

8    was a very good one as it relates to, for example, American

9    Realty Trust -- that's number 17 on his chart.  The amount of

10   the assumed trade debt is $8,575.01 against seventy-two million

11   dollars of secured debt and a perceived value of that property

12   of fifty-one million.

13             If I look at 18, that's another one of our borrowers.

14   We have zero trade debt assumed and that's a 2.3 million dollar

15   property.  ART Collection, Inc. -- again, zero assumed trade

16   debt and 6.7 million dollar property and a perceived debt of

17   seventy-two million.

18             My point there is when you compare the drastic lack

19   of unsecured debt to the significance of the secured debt, I

20   think the Court's going to find that that factor of relatively

21   little unsecured debtor of the Little Creek factors is

22   satisfied fairly plainly.

23             What the evidence is not going to show, and this may

24   be more important than even some of the evidence that it does

25   show is if there was any purpose of this filing other than to

HC 01082

Colloquy                                                          31

1   stop the foreclosures -- and why do I say that?  It's obvious.
2   Lots of cases start to stop a foreclosure.  What we don't have
3   here but we do have in some of the cases cited by the debtors
4   is we don't have a plan to infuse capital.  There's no equity
5   sponsor saying here's a letter of intent.  Here's a purchase
6   order for the property.  Here's this new additional managerial
7   experience that I'm bringing to this case so that I can perform
8   a workout.

9         We don't have any employees to protect.  We don't see
10  a current business plan.  There hasn't been a disclosure
11  statement.  There hasn't been a plan.  There hasn't been an org
12  chart.  We haven't seen prospects for business.  And we don't
13  have unsecured creditors here protesting the dismissal of these
14  cases.  And as I alluded to earlier, and I got this out of
15  order, FRE didn't show up.  Even though they took the transfers
16  on the 23rd, they didn't show up until the bankruptcy.  And it
17  just doesn't seem right to me that somebody took possession of
18  all of this property on December 23rd and wasn't banging on the
19  doors of the secured creditor saying I have to work something
20  out or I'm going to lose my investment.  That doesn't make
21  sense.  At least, that's not how I would have done it had I
22  have been there.

23        So I think what's clear is that the only benefit of
24  this case is to equity.  And I'm going to wrap up quickly
25  'cause I know we need to get moving.  But if I look through the

HC 01083

Colloquy                                          32

1  Little Creek factors, I think the evidence is going to show to

2  the Court clearly that they've all been met

3          THE COURT:  So what do you think the benefit to

4  equity is?

5          MR. AURZADA:  Time.  I think it's clearly time.  Are

6  these one-assets?  Yes but for the fact that they've been

7  mashed together.  Do the secured creditors' liens encumber the

8  tracks?  Yes.  Are there no employees?  Yes.  Are there few, if

9  any, unsecureds?  Yes.  Were the properties posted for

10 foreclosures?  Yes.  Did the bankruptcy only forestall

11 foreclosure?  Yes, given the absence of any plan, LOI, reason

12 to be here.

13         I've talked about my allegations of wrongdoing.  Mr.

14 Weitman has talked about some of his own.  And this was a one-

15 asset -- or, I guess, technically, it was a two-asset entity.

16 But it was revitalized for purposes of doing this bankruptcy

17 case.

18         The one thing I think the Court's probably going to

19 struggle with in this whole matter is what's the consequence of

20 the dismissal.  We've got a huge mess.  We've got deeds going

21 down to FRE.  We've got notes going up to the parent and

22 they're being transferred off to the side.  I don't think the

23 Court should feel obligated to try to fix that mess.  I really

24 don't.  I think if the Court proceeds -- if I dismiss this

25 case, it's going to unravel and it's going to be a big jumbled

HC 01084

Colloquy                                    33

1    mess.  Well, it probably will be but I don't think the Court

2    needs to feel obligated to try to fix that.

3            This is clearly a self-inflicted wound.  Surely the

4    buyer knew this was a potential in trying to amass these

5    properties into one entity instead of doing an organized series

6    of nineteen bankruptcies.

7            THE COURT:  But the buyer -- I mean, who's the

8    difference from -- I mean, I assume Mrs. Akin and Shuman (sic)

9    were the owners -- the ultimate owners of the prior -- well, I

10   guess not because we had public entities.

11           MR. AURZADA:  Right.

12           THE COURT:  So who are they --

13           MR. AURZADA:  I think -

14           THE COURT:  -- based upon the pre-petition structure?

15           MR. AURZADA:  Who are they?

16           THE COURT:  Yes.

17           MR. AURZADA:  They're all people that work and are

18   affiliated with the same group of entities that had value.  And

19   I will tell you, it will be very hard to unwind all of that

20   because there are so many entities.  And this has been over the

21   course of, quite frankly, my career, starting back in 2000,

22   dealing with the 1800 and 1750 Valley View companies.  They are

23   very sophisticated people when it comes to creating entities

24   and relationships among them.  But one thing that does remain

25   clear is the people involved are always the same people.

HC 01085

Colloquy                                                    34

1           Sure, you can draw the legal distinctions between the

2   entities but for purposes of the Court asking me who is the

3   buyer, I think it's clear the buyer is the same people that

4   were the seller if you look at the true economics of how that

5   transaction was done.  Thank you, Your Honor.

6           THE COURT:  Thank you, Mr. Aurzada.  Anyone else on

7   the movants' side wish to make an opening statement?  Mr.

8   Stromberg?

9           MR. STROMBERG:  Thank you, Your Honor.

10          THE COURT:  Welcome.

11          MR. STROMBERG:  Thank you.  Tough time getting here.

12  I apologize for being a few minutes late.

13          THE COURT:  No problem.

14          MR. STROMBERG:  Mark Stromberg on behalf of State

15  Bank of Texas.  Your Honor, I, too, represent a bank that, like

16  Armed Services Bank, had six parcels under one -- only ours was

17  under one deed of trust.  We had posted our property for

18  foreclosure for January 4.  We actually ended up foreclosing

19  because we didn't get notice of the filing of the bankruptcy or

20  the relationship between the new entity with which we had done

21  no business, FRE Real Estate or Fenton Real Estate, and our

22  client until we found out about these transfers.  So our

23  foreclosures were taking place in the morning.  We found out a

24  little bit after 1:00 in the afternoon.  We had filed a motion

25  to annul the automatic stay.  I'm sure the debtor will contest.

HC 01086

1          MR. BUNCHER:  Your Honor, I'm sorry to interrupt.  I

2   just don't want my silence to be an admission that I agree that

3   they "foreclosed" because we contest that they completed the

4   foreclosure prior to the time we received the transfer of these

5   legal titles to the properties.

6          THE COURT:  All right.

7          MR. STROMBERG:  In any event, Your Honor, our

8   property, like the property that was described by Armed

9   Services Bank, has no income.  It's vacant land with the

10  exception that one of the parcels -- we have a tenants-in-

11  common interest in a parking garage that generates no income

12  that's associated with another building.  But otherwise, all of

13  our property generates no income.  It has tax liens on it.

14  When the conveyance of the property from what was formerly

15  known as Transcontinental Coventry Pointe that was later

16  renamed as Coventry Pointe took place on the December 23rd

17  transfer date, it wasn't recorded until after our foreclosure

18  took place on January 4.  We had no prior dealings with Fenton

19  Real Estate or FRE so we had no way of knowing.

20          I'm not going to go over the territory that's already

21  been very carefully mowed by counsel for the other two parties

22  when instead I want to point out is a couple of things that I

23  think perhaps they didn't touch on.  First, although I think

24  Mr. Weitman talked about this a little bit, I think one of the

25  things the Court could and should think about is what is the

HC 01087

Colloquy                                                36

1  effect of parties who would otherwise be in a 362(d)(3)

2  situation and is it appropriate for the debtor by conveying all

3  of these properties into a super debtor and filing it what

4  amounts to a de facto substantive consolidated bankruptcy case

5  on the eve of foreclosure -- what rights should those creditors

6  have had and how will they be affected.

7          Number two, I want to talk about -- briefly about the

8  issue in Little Creek about the idea of terminal euphoria

9  associated with the possibility of a plan.  And I've been over

10 a lot of this case law.  I haven't found anything that's

11 absolutely definitive.  But my view, in effect, of how a good

12 faith for filing versus good faith for reorganization works is

13 kind of a two-step process.  You can't jump to the second step

14 and say well, we might be able to come up with a plan, even if

15 it's a viable plan, unless you talk about step one, having to

16 do with a good faith in filing of the case.  Okay?  And what I

17 suspect the debtor will tell you is it's possible that we could

18 come up with a plan in this case although I'm not sure that

19 when the Court tests that that's actually going to be a

20 legitimate claim.  But nevertheless, I think what they're going

21 to ask you to do is to forget about all of these other

22 transactions and let them leap up to the top step.

23          But Little Creek also talks about the new debtor

24 syndrome.  And those are important facts that are only

25 considered when talking about whether or not you get to go to

HC 01088

Colloquy                                    37

1   the first step so as to be able to get to go to the second.

2           More importantly, however, related to that, both for

3   the individual entities and the debtor as a collective, when

4   you test the theory as to how it is that they intend to

5   reorganize, what they will tell you is it's going to be one out

6   of four things.  It's either going to be that they're going to

7   sell some property or they're going to restructure the debt;

8   they're going to refinance the debtor or they're going to use

9   the cash from some of the entities that are generating cash, my

10  properties not included evidently, to run the collective debtor

11  until they can do one or several of these things or perhaps

12  indefinite.

13          None of this, I believe, is in reasonable prospect.

14  As counsel for Armed Services Bank stated, there are no sales

15  in prospect.  There is no outside investor standing at the

16  ready to provide financing.  Indeed, I think you'll hear that

17  up until the time this case was filed and thereafter, up until

18  the time of Mr. Morgan's deposition, he was not aware of any

19  specific investor who was prepared to do that.  In fact, up

20  until the time of his deposition, though that may have since

21  changed, Mr. Morgan had not even asked Transcontinental Realty

22  Investors or any of its affiliated entities if it was able or

23  willing to invest any money in this new debtor.  Now, they have

24  personal guaranties -- Transcontinental Realty Investors does

25  for much of this indebtedness, if not all of it.  So it would

HC 01089

Colloquy                                          38

1   seem to me that they would be the logical first place to look

2   for this kind of financing.  And yet, the chief restructuring

3   officer for the debtor had not made that inquiry at least as of

4   a week ago.  And the bankruptcy case had been pending for

5   several weeks at the time.  And this was one of his means by

6   which he was going to provide an exit strategy.

7         So the question of whether or not this is a terminal

8   euphoria situation as described by Little Creek perhaps hinges

9   to some degree on whether or not the debtor has undertaken to

10  even pursue, at this point, any of these options that he's

11  going to have and, more importantly, whether or not there is a

12  reasonable prospect by which one or several of these things

13  will come to fruition.  So I think that's a second thing that

14  the Court needs to look at.

15        The third is that I believe that there's a question

16  here about improper purpose that perhaps the other two counsel

17  didn't touch on which has to do with the fact that I think this

18  bankruptcy was set up to protect Transcontinental Realty

19  Investors.  And as the Fifth Circuit has said in the Canal

20  Place case, that's not an appropriate purpose for a bankruptcy

21  is to protect the guarantor.

22        But I think the reason you can know that is a couple

23  of things.  Number one, these notes that were set up, that were

24  upstreamed to Transcontinental Realty Investors were basically

25  calculated based upon the book value that the public entity had

HC 01090

Colloquy                                          39

1    for the property.  And if you subtract out the amount of

2    existing indebtedness from that book value, the note was the

3    difference.  And then the note was upstreamed so that the

4    parent could say that we got the stock of the entity and we

5    made these transfers so that we didn't lose any value.  And, as

6    a basic point, it basically was there to support the book value

7    of the entity.  Okay?  Which is so as to say they didn't have

8    to report to their shareholders that they had a problem here

9    because they got transferred up what they transferred out.  I

10   think that's a problem.

11        I think it's also a problem that they transferred

12   these entities out of entities that had and bore the

13   Transcontinental name into an entity that didn't.  Now maybe

14   Fenton Real Estate, perhaps because it was one of the entities

15   that was affiliated in some way with Transcontinental, they

16   will argue, well, surely that's not the case.  But I think that

17   the fact that it doesn't bear the name of the public entity is

18   meaningful because all of this relates to what, if anything,

19   Transcontinental had to disclose to its shareholders, its

20   public shareholders, and whether or not this bankruptcy is

21   intended in some part to hide from them the financial effects

22   of this bankruptcy or the existence of the bankruptcy.

23        Finally, Your Honor, I think the Court needs to

24   examine the question of independence.  And this was, to some

25   degree, touched on.  But I do think that in our discussions

HC 01091

Colloquy

40

1  with Mr. Morgan in his deposition, it became pretty clear that

2  he had not made an independent determination as to how it was

3  that this case was going to reorganize at least when he took

4  it.  And the people from whom he seeks advice as to how he's

5  going to manage the assets of the debtor, what those assets

6  consist of, what their values are and how it is that they fit

7  into some kind of a reorganization all are people that come

8  from within the same entity.

9          So apart from the question of whether or not a

10  reorganization is in prospect, one might fairly question

11  whether or not the chief restructuring officer who was, in

12  effect, put into this case by insiders of Fenton Real Estate

13  and their parents and affiliates is truly an independent and

14  can exercise independent reorganizational related judgments.

15          I think for those reasons, Your Honor will find that

16  in this case perhaps, better than many others, there are

17  serious considerations related to good faith and dismissal that

18  need to be addressed.  Thank you.

19          THE COURT:  Thank you, Mr. Stromberg.  Mr. Kinvig?

20          MR. KINVIG:  Your Honor, I don't plan to pile on.  I

21  don't think that's either helpful or a good use of this Court's

22  time.  As mentioned, though, I do represent American Bank of

23  Commerce.  And we have roughly nine and a half million dollars,

24  plus or minus, debt outstanding.  And we're secured by liens

25  and real property which includes raw land, vacant buildings and

HC 01092

Colloquy                41

1    an apartment building, 106-unit apartment building, that does

2    produce fairly significant cash flow.  And then we also have a

3    lien on some Transcontinental real estate stock and also a lien

4    on a note.  And as a point of clarification, we actually did

5    not realize that the stock and the note were even in this

6    bankruptcy until Mr. Morgan's deposition about a week ago.  So

7    we're still trying to sort through some things.  And we learn

8    more about the debtor every day.

9            However, I did want to point out to the Court the

10   fact that we're in a little bit of a different situation.

11   We're very similar to Mr. Stromberg in that what ended up

12   happening with my client is we filed a notice of foreclosure.

13   We sent it to the entities that we believed owned the property

14   at some point in December of 2010, properly noticed it, gave

15   them twenty-one days of notice.  And on January 4th, we

16   foreclosed on certain of our collateral.  We foreclosed on the

17   apartment building.  We foreclosed on two parcels of raw

18   land -- or actually, one parcel of raw land and one parcel of

19   property that's three and a half acres plus a vacant building.

20   And at that point, we completed the foreclosure process.  We

21   were in the process of filing of our deeds.  And we get a

22   telephone call from an individual that said he was FRE's

23   counsel and said stop the presses, we've filed for bankruptcy.

24   And we said, well, who are you?  They said, well, we're the

25   owner of the property.  And it was after everything had

HC 01093

Colloquy                                             42

1   occurred, after the foreclosures had taken place.  So we had no

2   prior knowledge of the transfer that now, we come to find out,

3   was on December 23rd and we had no knowledge of the bankruptcy

4   at the time we foreclosed.

5           So we filed our motion to annul the automatic stay.

6   And under a very, very specific set of circumstances, the Fifth

7   Circuit has said in a situation like ours, the Court should

8   annul the automatic stay.  And that's an issue for a later

9   date.  And I understand the Court doesn't want to hear that

10  before ruling on whether to dismiss the case.

11          I bring that up, though, for the simple fact that if

12  this Court does decide that dismissal is appropriate in this

13  case -- which I believe that the Little Creek factors are

14  certainly met.  I think that this case if any case certainly

15  calls for dismissal.  But if this Court decides that dismissal

16  is appropriate, what we would ask is that the Court do it in a

17  very structured way under a framework that protects individuals

18  or entities like my client where we've already foreclosed.

19  What we would ask in addition to just an outright dismissal is

20  that if this Court decides that dismissal is appropriate that

21  this Court also annul the automatic stay to sort of go back and

22  bless these foreclosures that have already occurred so we don't

23  have to, post-dismissal, go back and re-foreclose on property

24  that we already foreclosed on to beginning with.

25          Aside from that, we also, frankly, ask Your Honor --

HC 01094

1  there's cash collateral issues involved here.  As you've

2  already heard and will hear in the future -- and that's a

3  pretty major part of this case.  My client, according to the

4  budget that the debtor produced at the cash collateral meeting,

5  will be -- I think they will hold around 150,000 dollars of

6  cash collateral by the end of March.  And it's accruing at 45

7  to 55,000 dollars a month.  And so, we would also ask, Your

8  Honor -- and I would imagine that the other lenders that have

9  interest in cash collateral would also support me on this --

10  that if you decide to dismiss the case that you would set in

11  place some framework.  And I'm not even a hundred percent

12  certain of what that framework would look like.  But some

13  framework to where the parties' interest in the cash collateral

14  would be protected so that either a lifting of the automatic

15  stay prior to dismissal to allow us to file a state court

16  receiver action to take possession of the cash or to do

17  something else to allow the parties to quickly and conveniently

18  and efficiently get at its cash collateral post-dismissal.

19        So that's really all that I would have to add.  We do

20  urge that this Court dismiss the case.  But once again, we

21  would urge that the Court dismiss it under a certain framework

22  and do so in a way that protects my client and others like it.

23        THE COURT:  All right.

24        MR. KINVIG:  Thank you.

25        THE COURT:  Thank you.

1          MS. HARTWICK:   Jo Hartwick, Your Honor, for Petra and

2    I will be very brief.  I just want to point out that my client,

3    Petra, has a couple of significant differences and it still

4    shares the same concerns as the other lenders whose counsel

5    have addressed the Court.

6          Petra's loan was secured by the Amoco building which

7    is a large office building in New Orleans.  And it is one of

8    the few income producing properties.  And immediately -- well,

9    another big difference is Petra was not in the process of

10   foreclosing.  They were still, they thought, negotiating in

11   good faith with their borrower.  So they wouldn't have been

12   particularly surprised if they hadn't been successful in

13   reaching an agreement.  They wouldn't have been terribly

14   surprised if their borrower, TCI Amoco Property LLC had filed

15   bankruptcy.

16         But instead, they, too, were shocked to learn that

17   this strange entity called FRE Real Estate somehow had ever

18   owned their interest in the property and was now supposedly the

19   borrower.  Their immediate concern, because they are an income

20   -- we are -- it is an income producing property, the immediate

21   concern was what would happen to the cash collateral.  And, of

22   course, that concern was exacerbated when we saw the cash

23   collateral motion where it said that the intent was to use the

24   income from the cash producing properties to help prop up,

25   essentially, the ones that weren't generating cash.  Although I

1  think at the hearing nobody urged that position, it was

2  interesting that in the two depositions that have been taken so

3  far of the debtor representative and of a representative of a

4  transferor, both gentlemen testified that that was how they

5  understood that was one of the purposes of this bankruptcy --

6  was to make sure that the money that was being generated by the

7  cash producing property could be used to prop up the ones which

8  were not producing income.

9        We agree with the other counsel that have spoken that

10  these meet the Little Creek factors. And we also agree that

11  although we would like to see the case dismissed as a bad faith

12  filing, we would agree that dismissal should be, if possible,

13  done in such a way that individual lenders' cash collateral is

14  protected. Thank you.

15        THE COURT: Thank you. Anyone else? All right. Mr.

16  Buncher?

17        MR. BUNCHER: Our intention was to reserve our

18  opening remarks/argument. I think this has gone beyond opening

19  statements. But we were going to reserve until they've put

20  their case on, Your Honor, if that's okay with the Court.

21        THE COURT: Fine with me. You ready to proceed?

22        MR. WEITMAN: Yes, Your Honor. Mr. Morgan, I call as

23  my first witness.

24        THE COURT: Mr. Morgan, if you'd come forward and

25  take the witness chair, raise your right hand and be sworn in

Colloquy                                         46

1    before you sit down, yes, sir.

2          (Witness sworn)

3                MR. WEITMAN:  Before we start with the witness, Your

4    Honor, has Your Honor seen our amended witness and exhibit

5    list?

6                THE COURT:  No.

7                MR. WEITMAN:  May I hand this up for Your Honor?

8                THE COURT:  You may.

9          (Pause)

10               MR. WEITMAN:  Your Honor, as a matter of background

11   on just the exhibits, we have a number of the transferred

12   documents that Mr. Buncher has agreed could be admitted without

13   any argument as to the verification and authenticity.  And

14   those are in the book that are both before Mr. Morgan and Your

15   Honor.  If I could just very quickly go through these items, I

16   think it will expedite the hearing.  If Your Honor notices --

17   and this is something that we're going to get later on -- and I

18   think the Court was concerned also -- the corporate chart, if

19   you will.  That's number 1 -- and the officers.  Does Your

20   Honor see that general background exhibits on page 2?

21               THE COURT:  I'm sorry.  Where are you?

22               MR. WEITMAN:  I am II, "List of Exhibits".

23               THE COURT:  Yeah.

24               MR. WEITMAN:  The first one is the list of officers,

25   directors or managers of each --

HC 01098

Colloquy                                    47

1            THE COURT:  Yes.

2            MR. WEITMAN:  -- of these entities.  We will have

3    that by the next time of the hearing.  It's just that we rushed

4    things.

5            Your Honor, in addition, we used these exhibits

6    during his deposition and they were premarked.  So that's why

7    the numbers are in this sequence.

8            THE COURT:  All right.

9            MR. WEITMAN:  And we apologize for that.

10           THE COURT:  No problem.

11           MR. WEITMAN:  Your Honor, we've got the credit

12   agreement of Wells Fargo as number 5.

13           MR. BUNCHER:  Excuse me.  Can I get a set of your

14   exhibits, please, if we're going to go through your exhibits?

15           MR. BROWN:  I provided you a complete set of exhibits

16   yesterday, a hard copy.

17           MR. BUNCHER:  Okay.  You gave me the exhibits to a

18   stipulation that we still haven't finalized.  I -- you don't

19   have a set of exhibits with --

20           MR. BROWN:  I gave -- what I had delivered to you is

21   the exact set of exhibits plus any amended exhibits.

22           MR. BUNCHER: ·Do you have -- I do not have those with

23   me.  I assume you'd bring a set of your exhibits but --

24           MR. BROWN:  No.  I have an original set that --

25           MR. BUNCHER:  That's fine.

HC 01099

Colloquy                                    48

1           MR. BROWN:  -- you're more than welcome to use during

2    the hearing if you'd like.

3           MR. BUNCHER:  If there is something I don't recognize

4    here, Your Honor, I'll ask to see it.  But most of this stuff

5    I've seen before.

6           THE COURT:  All right.

7           MR. WEITMAN:  Number 6 is the continuing guaranty of

8    Transcontinental which basically guarantees the debt of TCI

9    Texas Properties to Wells Fargo.  Then we have our list of our

10   collateral.  That's number 7.  We then have this Exhibit 8

11   which Your Honor saw that little chart a little while ago.

12   That Exhibit 8 is really the trade debt per entity.

13          THE COURT:  Right.

14          MR. WEITMAN:  So you'll see that throughout.  Part of

15   what we've been saying, Your Honor -- and this sort of lines up

16   as TCI Texas Properties then did the transfer.  We've got the

17   purchase agreement, Your Honor, by which TCI transfers --

18   agrees to purchase all of that real estate collateral.  That's

19   number 10, Your Honor.  So when Your Honor goes into her

20   exhibit book, you'll see a purchase agreement.  So FRE agrees

21   to buy the TCI Texas Properties, and you see also the aggregate

22   purchase price in the purchase agreement.  There is that

23   promissory note.  We've been calling it number 11, Your Honor.

24   That's what we've been calling the seller note.

25          THE COURT:  Yeah.

HC 01100

Colloquy                                    49

1           MR. WEITMAN:  And that's for the -- what happened

2    here is we've got an original principal amount and then it gets

3    adjusted to the number that Your Honor sees in this chart.

4           THE COURT:  Okay.

5           MR. WEITMAN:  But it's the same seller note.

6    Warranty deeds are in Your Honor's book as well.

7           THE COURT:  Mr. Weitman, I'm not -- are you going to

8    walk me through what each of these exhibits is, as opposed to

9    just offering them or --

10          MR. WEITMAN:  Well, they're all being offered into

11   evidence.  I thought it would be helpful, just in general, to

12   know what these exhibits are that are being admitted into

13   evidence.

14          THE COURT:  Well, but I -- then I'm not sure why we

15   have a witness sitting on the witness stand.

16          MR. WEITMAN:  Well, I'm going through -- I'm going to

17   go through his testimony in just a few moments.  But I think

18   it'd be helpful for Your Honor to have the summary here.

19          THE COURT:  Well, I have it.  I can read what it

20   says, unless -- I mean, again --

21          MR. WEITMAN:  Okay.

22          THE COURT:  -- you all are going to have a limited

23   amount of time.  And if you think walking me through a document

24   I can read is the best use of your time, fine.  I don't care

25   how you use your time.

HC 01101

Richard Morgan - Direct (Wells Fargo)                50

1          MR. WEITMAN:  Okay.  Let me begin.

2    DIRECT EXAMINATION

3    BY MR. WEITMAN:

4    Q.   Mr. Morgan, would you state your name for the record,

5    please?

6    A.   Richard D. Morgan.

7    Q.   And are you the vice president of the debtor, FRE Real

8    Estate, Inc.?

9    A.   Yes.

10   Q.   Have you been that vice pres -- had that position since on

11   or about December 23, 2010?

12   A.   Yes.

13   Q.   You're also the vice president, are you not, of ABCLD

14   Properties, as of December 23?

15   A.   Yes.

16   Q.   Now, you were retained, were you not, as the chief

17   restructuring officer of the debtor?

18   A.   Yes.

19   Q.   You don't have a contract with the debtor as the chief

20   restructuring officer.  Isn't that correct?

21   A.   Correct.

22   Q.   And there's no cash to pay your salary, is there?

23   A.   Nor has been --

24   Q.   As the chief restructuring officer?

25   A.   -- nor has salary been requested.

HC 01102

Richard Morgan - Direct (Wells Fargo)                    51

1  Q.    Is there any cash to pay your salary or give you any

2  compensation as the chief restructuring officer?

3  A.    At this time?

4  Q.    Yes.

5  A.    No.

6  Q.    And you're familiar with the debtor's cash collateral

7  motion and the budgets, correct?

8  A.    Yes.

9  Q.    Is there a line item for such payment to you?

10  A.    No.

11  Q.    Now, you're working, what, forty hours a week as the chief

12  restructuring officer?

13  A.    About.

14  Q.    There's no one else from the debtor's organization that's

15  going to help you on that restructuring effort, is there?

16  A.    No.

17  Q.    Are you essentially the sole person within FRE working

18  through these issues in the bankruptcy?

19  A.    In the decision process, yes.

20  Q.    Are you not also officing at the space occupied by

21  Transcontinental Realty Investors?

22  A.    Yes.

23  Q.    Is that not also the location of American Realty

24  Investors?

25  A.    Yes.

HC 01103

Richard Morgan - Direct (Wells Fargo)                52

1    Q.    Is that also the offices of Income Opportunity Investors?

2    A.    Yes.

3    Q.    And Prime Capital Management, do they office there as

4    well?

5    A.    I don't know that name, but.

6    Q.    I'm sorry, Prime --

7    A.    Prime Asset, yes.

8    Q.    -- Prime Asset Management, excuse me.

9          MR. BUNCHER:  I believe its proper name is Prime

10   Income Asset Management.

11         MR. WEITMAN:  Thank you.

12   Q.    Does the debtor have any type of contractual relationship

13   where it's paying any rent for the office space?

14   A.    No.

15   Q.    And there's no lease, correct?

16   A.    Correct.

17   Q.    And there's no money to pay for the rent either, is there?

18   A.    Well, saying there's no money, there's no money as long as

19   I stick to what I said I was going to do, and that's not take

20   anybody's collateral and move it to another property.

21   Q.    And did you not earlier testify that the way you were

22   going to get compensated down the road is through a success

23   fee?

24   A.    That's correct.

25   Q.    Can you explain to the Court how you get your success fee?

HC 01104

Richard Morgan - Direct (Wells Fargo)                53

1  A.   The success fee is the value of the property at the end of

2  the day.  Basically, when all the assets are sold and all the

3  debts are paid.  And whatever that is, it will be a percentage

4  of that fee -- of that.

5  Q.   But there's ad valorem taxes, about 2.9 million correct?

6  A.   Correct.

7  Q.   There's secured debt of about 181 million, correct?

8  A.   Correct.

9  Q.   There's trade creditor debt of about 1.4 million, correct?

10  A.   Correct.

11  Q.   And there's also fifty million -- or forty-eight to fifty

12  million dollars of seller notes, correct?

13  A.   Seller notes are a different issue.  And the seller notes

14  are, I'm calling them a soft second.  Effectively, as I

15  testified in my deposition, the seller notes are individual

16  notes on individual transfers.  And I know the documents did

17  not reflect that -- the notes did not reflect that.  However,

18  in the filing that Mr. Crown filed for us, we specifically

19  outlined the structure of those notes.  And the structure of

20  the note, for example, if your asset is sold, and there's not

21  enough money to pay you to the unsecured creditors and so

22  forth, then the -- whatever is left available is payable

23  against a note.  Whatever is not paid then rolls up into a

24  secondary pool which comes after all secured, unsecured,

25  priorities, lienholders and the administrative claims are paid.

HC 01105

Richard Morgan - Direct (Wells Fargo)                    54

1   Q.   But that's not reflected in the purchase agreement,

2   correct?

3   A.   It's not reflected in the agreement, but it is --

4   Q.   And it's not --

5   A.   -- reflected in the filings we made.

6   Q.   -- it's not reflected in the various notes, is it?

7   A.   I said it again.  It's reflected in the filing that we

8   just made.

9   Q.   What you're saying is, is that in connection with the

10  debtor's schedules of assets and liabilities, you're now

11  suggesting that they're subordinate?

12  A.   I'm not suggesting, I'm telling you.

13  Q.   Is there a document by which Transcontinental and American

14  Realty and Income Opportunity subordinated their debt to all of

15  these other creditors?

16  A.   It is in the filing that we made.

17  Q.   Sir, is there a document by which these parties agreed to

18  subordinate their fifty million or forty-eight million dollars

19  of notes --

20  A.   Not a --

21  Q.   -- in favor --

22  A.   -- specific document.  But I can get that document.

23  Q.   And the reason you can get that document is because you

24  know the principals of each of those entities to get that?

25  A.   No.  Because it's already put in the filing, so they have

HC 01106

Richard Morgan - Direct (Wells Fargo)                    55

1  to comply with that filing.

2  Q.   I'm sorry.  Are you able to get Transcontinental and

3  American Realty and Income Opportunity to subordinate their

4  debts?

5  A.   Yes.

6  Q.   How long -- excuse me.  Who are the principals that really

7  run Income Opportunity, American Realty and Transcontinental?

8  Is that not Mr. Gene Phillips?

9  A.   No.  I don't know.  I deal with Danny Moos who's the

10  president.

11  Q.   And Danny Moos is the individual that contacted you on

12  December 23 --

13  A.   Correct.

14  Q.   -- to see if you would handle these transactions?

15  A.   Yes.

16  Q.   So if you will, on the -- excuse me.  Mr. Danny Moos, is

17  he also the principal with respect to each of these transferor

18  entities that we've been describing?

19  A.   I don't know specifically about that.

20  Q.   You're now using the services of Prime Capital, correct?

21  A.   Prime Income Asset --

22  Q.   Prime Income, I'm sorry.  Prime Income?

23  A.   Yes.

24  Q.   And that's Mr. Greg Crown, who's in the courtroom?

25  A.   Yes, sir.

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

HC 01107

Richard Morgan - Direct (Wells Fargo)          56

1  Q.   And is that an affiliate of Transcontinental?

2           MR. BUNCHER:  Object to calling for a legal

3  conclusion of the witness, Your Honor.

4           THE COURT:  Sustained.

5  Q.   Is it your understanding that it's related in some manner

6  with Transcontinental?

7  A.   My understanding is it's an advisor to.

8  Q.   Do they handle all of the financial advisory services for

9  Transcontinental and its affiliates?

10  A.   I don't know the scope of that.

11  Q.   Are they officing in the same location as Transcontinental

12  and American Realty?

13  A.   Yes.

14  Q.   And Mr. Danny Moos, did he use the services of Prime

15  Capital for these Transcontinental entities, prior to December

16  23, to assist in the financial advisory services for those

17  entities?

18  A.   I can't say who he used.

19  Q.   So you don't know whether Prime Capital performed similar

20  financial advisory services for the various transferor entities

21  prior to December 23?

22  A.   That's a different question.  I told you, I think Prime

23  Income -- Income Asset Management is the advisor to

24  Transcontinental.  The question I thought you asked me was who

25  within that group advised him.  And I don't know that.

HC 01108

Richard Morgan - Direct (Wells Fargo)                    57

1    Q.   Okay.  And where -- how does Prime Income Capital get

2    paid?

3    A.   I don't know.

4    Q.   Do you have any money in your budget to pay Prime Income

5    Capital?

6    A.   No.

7    Q.   Are you proposing in any subsequent -- in the present cash

8    collateral motion and budgets, is there a line item for the

9    payment of Prime Income?

10   A.   No.

11   Q.   Has Prime Income Capital, have they given you all of the,

12   or provided the data and help you complete the schedules of

13   assets and liabilities and the statement of financial affairs?

14   A.   I don't want to be technical.  But we've called it Prime

15   Income Asset Management one time.  Could we stick with that?

16   Because you keep repeating the wrong name.

17   Q.   I'm sorry.  Prime Income.  I'll call it Prime Income.

18   A.   Okay.

19   Q.   Pardon me.  Did they provide the financial advisory

20   services to construct the schedules of assets and liabilities

21   and statement of financial affairs of this debtor?

22   A.   Yes.

23   Q.   And have they also prepared all the budgets in connection

24   with the cash collateral motion?

25   A.   The budgets had already been prepared as part of the

HC 01109

Richard Morgan - Direct (Wells Fargo)                    58

1    property management schedule.

2              THE COURT:  Mr. Weitman, can you step back so that

3    you speak into the microphone.  We're having a hard time

4    getting you recorded.

5              MR. WEITMAN:  I'm sorry.

6    Q.   You also have, do you not, a company called Regis Property

7    Management that's providing property management services for

8    these properties?

9    A.   Yes.

10   Q.   Did they provide property management services for the

11   transferor entities prior to December 23?

12   A.   Property is a very generic term.  They provide -- they

13   provide property management services for the income-producing

14   and the vacant buildings that are part of the collateral, but

15   not the land.

16   Q.   And that -- Regis, do they office at Valley View with

17   Transcontinental, American Realty, Prime --

18   A.   Yes.

19   Q.   -- Income?  And their compensation that Regis gets is

20   basically three percent of the gross revenues.  Is that

21   correct?

22   A.   That's for -- that's true for the commercial buildings.

23   The apartments are managed directly by a third-party manager

24   called Sunchase.  And Regis or none of those entities gets any

25   income from them.

HC 01110

Richard Morgan - Direct (Wells Fargo)                59

1  Q.   So there was a previous contract with the transferor

2  entities with Regis as to these income producing properties.

3  And after December 23, you then entered into a new contract

4  with Regis to do the same thing, correct?

5  A.   Correct.

6  Q.   Have you -- if you know, have you filed a motion to

7  approve the retention of either Prime Income to provide

8  financial advisory services in these proceedings?

9  A.   I'm not -- they're not charging me anything.

10 Q.   Oh, so if they don't charge, you don't file?

11            MR. BUNCHER:  Objection.  Now, he's asking the

12 witness whether it's required legally that he file a motion to

13 approve the retention of Prime and Regis.

14            THE COURT:  I think the question was simpler.  Have

15 you filed a motion?

16            THE WITNESS:  No.

17            THE COURT:  That's a fact question.

18 Q.   Have you filed a motion to retain Regis Property

19 Management as the property manager?

20 A.   No.

21 Q.   And this success fee that you hope to get, is there any

22 type of a motion that you filed with the Court seeking approval

23 of a success fee along the lines of what you described?

24 A.   No.

25 Q.   Now, you office with Danny Moos, who is the principal of

Richard Morgan - Direct (Wells Fargo)                60

1  Transcontinental and the transferor entities, correct?

2  A.    Right.

3  Q.    You also, I believe, office with Mr. Akin, who is one of

4  the principals at FRE Real Estate, correct?

5  A.    Mr. Akin is in the next door.  He's in the building

6  adjacent to me.

7  Q.    So it's either 1800 Valley View or 1750 Valley View,

8  correct?

9  A.    Yes.

10 Q.    And they came to your office on December 23, 2010, did

11 they not?

12 A.    Yes.

13 Q.    And they said to you, we think we've got a project for

14 you, didn't they?

15 A.    They said we wanted you to take a look at the structure of

16 this project, yes.

17 Q.    And by the way, the -- is Mr. Gene Phillips related in any

18 way to Transcontinental?

19 A.    I don't know the relationship there.

20 Q.    But you've known Mr. Gene Phillips, for what, about thirty

21 years now?

22 A.    Yes.

23 Q.    And did you not also get involved in some type of

24 restructuring work related to South Park, which was run by Mr.

25 Phillips?

HC 01112

Richard Morgan - Direct (Wells Fargo)                    61

1   A.   No.

2   Q.   What was your connection to South Park?

3   A.   I was president of the shopping center division.

4   Q.   And you didn't know who was the ultimate owner of South

5   Park then, or did you --

6   A.   Oh, I knew he was the majority shareholder, yes.

7   Q.   So they came to your office and they asked you, did they

8   not, if you'd be comfortable with various transactions,

9   correct?

10  A.   They asked me to look at the schedule and see if I'd be

11  comfortable doing the restructuring, yes.

12  Q.   And would you assume the role as the chief restructuring

13  officer of the debtor, correct?

14  A.   That word was never mentioned.  That was a title I gave to

15  myself, basically to be the vice president and to supervise the

16  transactions.

17  Q.   And how many years have you known Mr. Moos?

18  A.   I don't know how long.  Maybe four years.

19  Q.   And how many years have you known Mr. Akin?

20  A.   About thirty-five, forty years.

21  Q.   And Mr. Shumate, he's also in the management, is he not,

22  of FRE and the other ABCLD --

23  A.   He's an officer.  But he's been retired for quite some

24  time.

25  Q.   How many years have you known Mr. Shumate?

HC 01113

Richard Morgan - Direct (Wells Fargo)                    62

1   A.   About thirty years.

2   Q.   Now, did they tell you that these transfers had already

3   occurred from the transferor entities into FRE?

4   A.   No.

5   Q.   Did they describe to you that there were various transfers

6   made into FRE?

7   A.   That was a schedule that was given to me.  I wasn't aware

8   that it actually happened at the time.  That was the schedule

9   that was given to me, what would be part of the overall plan,

10  yeah.

11  Q.   And so they handed you this spreadsheet listing all the

12  properties, correct?

13  A.   Right.

14  Q.   If you would hold on one moment, let me get you that

15  spreadsheet to refresh your recollection.

16  A.   Sure.

17  Q.   Just a moment.

18       (Pause)

19  Q.   Mr. Morgan, you've got two notebooks in front of you.  Let

20  me, if I may, help me get to depos -- the Exhibit number 168.

21       (Pause)

22  Q.   Sir, this sheet that they showed to you, it showed the

23  sales prices for each of the transfers or for the sales by the

24  transferor or selling entity to FRE Real Estate, correct?

25  A.   Correct.

HC 01114

Richard Morgan - Direct (Wells Fargo)                63

1  Q.    And that's listed in this whole chart, if you will, or the

2  column that lists the sales price, correct?

3  A.    Right.

4          MR. BUNCHER:  Your Honor, if we're going to examine

5  the witness, I think the exhibit needs to be offered and

6  admitted.

7  Q.    You're familiar with the spreadsheet, and this is true and

8  correct?

9  A.    Yes.

10         MR. WEITMAN:  Your Honor, I'd ask that 168 be

11  admitted.

12         THE COURT:  Any objection?

13         MR. BUNCHER:  No, Your Honor.

14         THE COURT:  It's admitted.

15  (Wells Fargo Exhibit 168, schedule of transfers, was hereby

16  received into evidence as of this date.)

17  Q.    There's also a column for the debt assumed by the buyer.

18  Is that referring to FRE Real Estate?

19  A.    Yes, sir.

20  Q.    Is this a listing of the secured debt that would be

21  assumed?

22  A.    Yes.

23  Q.    And that would be including Wells Fargo Finance -- Capital

24  Finance's secured debt, correct?

25  A.    You're right.  In one of these groupings, yes.

HC 01115

Richard Morgan - Direct (Wells Fargo)                    64

1  Q.   Is that within what we'll call the TCI Land Portfolio II,

2  which is about maybe three or four inches from the bottom?

3  A.   Yes.

4  Q.   And then it also refers on the far right to what we've

5  been calling the seller notes, correct?

6  A.   Yes.

7  Q.   And these are the notes that would be issued by the buyer,

8  correct?

9  A.   Yes.

10 Q.   But to the seller, which total roughly forty-eight to

11 fifty million dollars, correct?

12 A.   In total, yes.

13 Q.   In total.  Now, did you not testify that you thought that

14 these seller notes represented, in some manner, the perceived

15 value after the secured and unsecured debt as to each of these

16 properties?

17 A.   No.

18 Q.   Okay.  What does that represent, in your view?

19 A.   In looking at it, it seemed to be that they were

20 transferred, very similar to the book value that was being

21 shown on the transferor's books.

22 Q.   And help the Court and the rest of us understand, what do

23 you mean by "book value"?

24 A.   There was a separate column, not on this list, that showed

25 what the actual book value was of the -- of the asset.

1   Q.   So Income Opportunity Realty disbursed money, if you will.

2   Is that publicly traded?

3   A.   Yes.

4   Q.   Is Transcontinental Realty Investors Inc. --

5   A.   Yes.

6   Q.   -- publicly traded?

7   A.   Yes.

8   Q.   Is American Realty Investors publicly traded?

9   A.   Yes.

10   Q.   So you view was that these represented the basis of their

11   investments in each of these properties?

12   A.   Not totally.  The Amoco Building was different because the

13   Amoco Building had very little book value, and yet it had

14   considerable debt.

15   Q.   And you didn't look at any appraisals, correct?

16   A.   No.

17   Q.   And --

18   A.   You mean initially, now?

19   Q.   -- well, I mean, when you looked at this chart, did you

20   also ask to see appraisals?

21   A.   No.

22   Q.   So if the aggregate amount of these seller notes is forty-

23   eight or fifty million dollars, you're not suggesting to this

24   Court that that, in fact, represents the equity in all of these

25   properties, is it?

Richard Morgan - Direct (Wells Fargo)                  66

1  A.   I'm considering that the equity is more than that.

2  Q.   I'm sorry?

3  A.   I think the equity is more than the seller notes.

4  Q.   So it's more than the basis in the properties?

5  A.   Yes.

6  Q.   But you have no training in appraising property, correct?

7  A.   I have training in buying properties, which has to use the

8  appraisal process.

9  Q.   But you have no degree or certifications as an appraiser,

10 correct?

11 A.   That's correct.

12 Q.   And you've just been in the buying and selling of real

13 estate business for --

14 A.   Forty years.

15 Q.   -- forty years.  Did you look at any of the underlying

16 loan documents when Mr. Moos, on behalf of Transcontinental and

17 the other entities -- the transferor entities -- and Mr. Akin

18 on behalf of FRE, told you about these transactions?

19 A.   No.

20 Q.   So the various lenders that have been here -- I saw Wells

21 Fargo -- you didn't look to see whether these transfers were

22 permitted under the loan documents, correct?

23 A.   Correct.

24 Q.   And the same for Armed Forces Bank, that transfer, was it

25 consistent with their loan docs?  Was it permissible?

HC 01118

Richard Morgan - Direct (Wells Fargo)                    67

1    A.    I didn't look at that, no.

2    Q.    And that would be the same for every single piece of

3    property subject to a secured lender's liens, correct?

4    A.    Correct.

5    Q.    You didn't know whether there were consents by these

6    secured lenders to these transfers, correct?

7    A.    Correct.

8    Q.    You didn't ask, did you?

9    A.    No.

10        (Pause)

11    Q.    Now, we've been talking about these various transactions

12    whereby the debtor transferred -- excuse me -- where the debtor

13    received transfers of all these properties, subject to the

14    secured debt, correct?

15    A.    Yes.

16    Q.    And there were a number of different, if you will,

17    transaction documents involved in each of these transfers.  Was

18    there not?

19    A.    Yes.

20    Q.    Was there a purchase agreement that was executed in each

21    case by the transferor entity?

22    A.    I believe so.

23    Q.    Was there also a note issued by FRE in favor of the

24    transferring entity?

25    A.    I believe so.

HC 01119

Case 11-42042-dml11   Doc 30-36   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit X - Part 1 - Hearing Transcript   February 3   2011   Page 69 of 118

Richard Morgan - Direct (Wells Fargo)                68

1  Q.   Was there also a distribution agreement by which the notes

2  that were received by the transferor entities were then

3  transferred to the parent of the transferor entity?

4  A.   I've already -- no.  I don't know anything about that.

5  Q.   They didn't share that with you on December 23, 2010, did

6  they?

7  A.   No.

8  Q.   Did they tell you that not only would those notes be

9  transferred up to the parent of each of these transferor

10 entities, but also the ownership interest in the transferor

11 entities would be transferred to ABCLD Income?  Did they tell

12 you that?

13 A.   It's outside the scope of what I was doing, but no.

14 Q.   And you didn't ask?

15 A.   It's not my business to ask.

16 Q.   Why isn't it your business to ask?

17 A.   Because that has to do with the transferor, not me.

18 Q.   And the notes that were issued, roughly forty-eight

19 million dollars, you didn't think it was important to know who

20 were the holders of the notes after those assignments?

21 A.   I didn't know the assignments were being made.

22 Q.   Well, you know about -- we took your deposition --

23 A.   Yes.

24 Q.   -- on January 27, 2011, correct?

25 A.   Correct.

HC 01120

Richard Morgan - Direct (Wells Fargo)                    69

1  Q.   Have you since gone back to look at all of these operative

2  documents to see what transfers occurred?

3  A.   No.

4  Q.   Now, I believe it was your testimony on January 27th when

5  I deposed you, that you looked at the notes and the purchase

6  agreements, correct?

7  A.   I said I looked at one.

8  Q.   One?

9       MR. BUNCHER:  I'm sorry.  I'm going to object to the

10 form of the question with the preface, concerning his

11 deposition testimony.  It's improper to refer to his deposition

12 testimony in the question like that.  If he wants to impeach

13 the witness with his depositions, that's fine.  But I object to

14 the form.

15      THE COURT:  Sustained.

16 Q.   Isn't it true that you did look at a representative note

17 and a representative purchase agreement?

18 A.   I just said that I did.

19 Q.   You did?

20 A.   I did.

21 Q.   And you had concerns with the amount of the debt and

22 whether it could be adjusted, correct?

23 A.   I had concerns with the purchase note, could it be

24 adjusted, yes.

25 Q.   Did you know then who your counsel was for FRE Real

HC 01121

Richard Morgan - Direct (Wells Fargo)                    70

1  Estate?

2  A.    No.

3  Q.    But yet you knew that Jay LaJone drafted all the

4  documents, correct?

5  A.    Yes.

6  Q.    So did you just get on the phone with Jay LaJone and ask

7  him to -- and discuss this with him?

8  A.    I raised a question to Mr. Crown first.

9  Q.    I'm sorry, Mr. Crown is?

10 A.    Greg Crown.

11 Q.    Of Prime Income?

12 A.    Yes.  And then he and I got on the phone and talked to Mr.

13 LaJone.

14            THE COURT:  With Mr. whom?

15            THE WITNESS:  LaJone.  Jay LaJone, L-A-J-O-N-E.

16            THE COURT:  Thank you.

17 Q.    And is he with the same law firm that represents TCI Texas

18 Properties?

19 A.    His firm does work for it.  I don't know how much, but

20 yes.

21 Q.    And you got on the phone with Mr. LaJone and what did he

22 tell you with respect to making these adjustments to the

23 purchase price?

24 A.    There was language in the purchase contract that, in my

25 opinion, allowed me to have the ability to adjust the note

HC 01122

Richard Morgan - Direct (Wells Fargo)                71

1  based on the outcome and the assets and the other findings that

2  I knew at the time.  And the question was what rules?  And he

3  said as far as I'm concerned, the purchase contract rules.

4  Q.  Would you please -- excuse me.  Would you move to Exhibit

5  10, please?

6          MR. WEITMAN:  Your Honor, these have already been

7  shown to debtors' counsel.

8          THE COURT:  All right.

9          MR. WEITMAN:  I'd move for the admission of

10 exhibits -- Mr. Brown tells me -- 5 through --

11         MR. BROWN:  5 through 165, with the exception of 7.

12         THE COURT:  So Exhibits 5, 6, and then 8 through

13 one --

14         MR. BROWN:  -- sixty-five.

15         THE COURT:  -- sixty-five.  Any objection to those

16 exhibits?

17         MR. BUNCHER:  One second, Your Honor.

18         THE COURT:  Of course.

19         MR. BUNCHER:  These are just the transaction

20 documents.  Is that correct?

21         MR. WEITMAN:  That's correct.

22         MR. BUNCHER:  We don't have any objection to the

23 purchase agreements, distribution agreements, notes and deeds

24 of trust, if that's what we're talking about in all these

25 exhibits.  We have no objection.

HC 01123

1          THE COURT:  Very well.  Exhibit 5, 6, and 8 through

2    165 are all admitted.

3    (Wells Fargo Exhibits 5, 6, and 8 through 165, transaction

4    documents, were hereby received into evidence as of this date.)

5    BY MR. WEITMAN:

6    Q.   Now, Mr. Morgan, if you'd look at Exhibit 10, this

7    purchase agreement, this is the purchase agreement by which

8    Fenton Real Estate ended up acquiring the real estate of TCI

9    Texas Properties LLC.  Is that correct?

10   A.   Yes.

11   Q.   Can you help us understand what language it was that you

12   were asking be fixed so that you would be able to adjust this

13   purchase price?

14          MR. BUNCHER:  Object to the question.  Misstates the

15   prior testimony.

16          THE COURT:  Overruled.

17   A.   The one sentence that I read in the contract was the --

18   the note -- starting with "The note," on the end, "shall be

19   adjusted to an amount equal to the difference between the

20   purchase price and the property obligations as of the effective

21   date."

22   Q.   I'm sorry.  That's the last sentence of section --

23   A.   The last sentence --

24   Q.   -- 1.3?

25   A.   -- yes, sir.

Richard Morgan - Direct (Wells Fargo)                73

1   Q.   And it was your view that that meant that it ought to be

2   subordinated to all of the secured debt and unsecured debt from

3   all of the nineteen entities and the debtor in this chapter

4   proceeding?

5   A.   That was a subsequent understanding.

6          THE COURT:  I'm sorry.  Tell me what the sentence is

7   again?

8          THE WITNESS:  It was a subsequent understanding.  You

9   know, the --

10         THE COURT:  No, I understood that.  But what sentence

11  are we looking at?

12         THE WITNESS:  Oh, I'm sorry.  We're looking at the

13  last -- starting with "The note" -- on the bottom of the page

14  at 1.3, carrying over into the second page.

15         THE COURT:  All right.  Thank you.

16  Q.   Are you familiar with the fact that in each case, the

17  transferor entity executed a general warranty deed in favor of

18  the debtor, effective as of December 23, 2010?

19  A.   You mentioned the word "general".  I didn't remember that.

20  But, yes.

21  Q.   Are you aware of the fact that in each case there was a

22  seller note -- if you would, take a look at Exhibit 11, please?

23  This is the note with the debtor in favor of TCI Texas

24  Properties, correct?

25  A.   Yes.

Richard Morgan - Direct (Wells Fargo)                    74

1   Q.   And that's for roughly 15.5 million dollars?

2   A.   Yes.

3   Q.   And in each one of these transfers, was there a similar

4   note executed by the debtor?

5   A.   Correct.

6   Q.   Do you know whether these documents were actually executed

7   on December 23 or some other date?

8   A.   I do not.

9   Q.   But we know that these were to be considered effective as

10  of December 23, 2010, correct?

11  A.   Right.

12  Q.   If you would, take a look at Exhibit 13, please?  This is

13  a distribution agreement by which -- well, TCI Texas Properties

14  would assign that note that we just discussed to its parent

15  company.  Have you seen this before?

16  A.   No.

17  Q.   We covered this subject at the deposition.  Have you since

18  looked at it?

19  A.   No.

20  Q.   And if you were to go through all of these other exhibits,

21  these are all of the various other operative documents in

22  connection with these transfers.  Are you aware of that?

23        MR. BUNCHER:  I'm going to object.  The witness --

24  unless he wants the witness to go through the 165 exhibits --

25        THE COURT:  Sustained.

HC 01126

Richard Morgan - Direct (Wells Fargo)                    75

1            MR. BUNCHER:  -- the documents are what they are.

2   Q.   Are you familiar with the other lenders who are also

3   asserting that this was a bad-faith filing?

4   A.   I'm familiar there are other lenders.

5   Q.   Have you read the pleadings?

6   A.   Pardon?

7   Q.   Have you read the pleadings that have been filed?

8   A.   Not totally.  I saw the general -- various people been

9   filing, but.

10  Q.   You're aware of the fact that Wells Fargo is owed roughly

11  8.2 million dollars.  Is that correct?

12  A.   Yes.

13  Q.   And are you also aware that RMR Investments also supports

14  the dismissal?

15  A.   I haven't gotten involved in those details.

16  Q.   Are you aware that it's owed roughly 7.2 million dollars?

17  A.   RMR?

18  Q.   Yes.

19  A.   I have a schedule I'd have to refer to, but --

20  Q.   Petra Mortgage that has the Amoco Building, have you

21  studied their pleadings?

22  A.   No.

23  Q.   Are you aware that they supported dismissal of this case?

24  A.   As I told you, I haven't paid attention to the various

25  legal maneuverings.

HC 01127

Richard Morgan - Direct (Wells Fargo)                76

1  Q.   And are you aware that they're owed roughly 18.9 million

2  dollars?

3  A.   I remember 19 million, but in that range.

4  Q.   Armed forces bank, are you aware that they also seek the

5  dismissal of this case?

6  A.   I don't mean to be flippant, but I've told you I haven't

7  reviewed any of them, so.

8  Q.   But you're not even aware of the fact -- Mr. -- excuse me,

9  of Armed Forces Bank wanting the case dismissed?

10  A.   I saw some various documentations, but I didn't read them,

11  no.

12  Q.   And American Bank of Commerce, are you aware that they

13  support the dismissal or the annulment of the automatic stay?

14  A.   The same, sir.

15  Q.   And First Bank and Trust, same answer?

16  A.   Yes.

17  Q.   Are you aware also that Sydney Wicks Revocable Trust, an

18  unsecured creditor, recently asked that this case be dismissed

19  for bad-faith filing?

20  A.   I saw an e-mail regarding their coming into the fray.  I

21  didn't know what that meant.

22  Q.   And then State Bank of Texas, they want the case

23  dismissed, correct?

24  A.   I don't know, sir.

25  Q.   Are you aware that NexBank with about sixty-one million

HC 01128

Richard Morgan - Direct (Wells Fargo)                    77

1   dollars, has asserted that all these actions constitute bad

2   faith?

3   A.   I haven't read the documents.

4   Q.   And you are aware, are you not, because you -- pardon me.

5   Did you sign the schedules of assets and liabilities and

6   statement of financial affairs?

7   A.   Yes.

8   Q.   So you are aware that there were numerous foreclosure

9   proceedings that were to occur on January 4, 2011, correct?

10  A.   Yes.

11  Q.   And you're aware, are you not, that by reason of -- pardon

12  me.   You signed also the petition in bankruptcy for FRE Real

13  Estate, correct?

14  A.   Right.

15  Q.   You are aware that the effect of the filing stayed any

16  action for these secured creditors to foreclose on their

17  property, correct?

18        MR. BUNCHER:   Objection, calls for a legal

19  conclusion.

20        THE COURT:   Sustained.

21  Q.   Now, we talked about this previously, but I'll ask you now

22  today, you have no funding in order to pay to preserve, protect

23  the raw land properties, correct?

24  A.   Do I have a commitment for it?   No.

25  Q.   And there is nothing that isn't subject to existing liens

HC 01129

Richard Morgan - Direct (Wells Fargo)                    78

1  with respect to cash flows from the operating properties,

2  correct?

3            MR. BUNCHER:  Objection, legal conclusion, Your

4  Honor.

5            THE COURT:  Sustained.

6  Q.   Are you familiar with the operating properties?

7  A.   Yes.

8  Q.   And the cash flow generated from those properties?

9  A.   Yes.

10 Q.   Do they provide any excess -- excuse me.  Do you know if

11 those lenders have consented to use of cash collateral for you

12 to fund preservation costs for the other raw land?

13 A.   I don't think I've requested that, sir.

14 Q.   Do you have any commitment from the parent of FRE Real

15 Estate to fund this case or these other costs to maintain and

16 protect the raw land properties?

17 A.   Not at this time, no.

18 Q.   Do you have any commitment from Transcontinental, American

19 Realty, or Income Opportunity to fund those types of costs?

20 A.   Not a commitment at this time.  They obviously are the

21 most likely candidates, if I can't find another investor.

22 Q.   So you really don't have any financial support for -- in

23 order to keep this case going or maintaining the raw land,

24 subject to the liens of the lenders, correct?

25 A.   No, that's not correct.  You asked me had I had

Richard Morgan - Direct (Wells Fargo)                    79

1   commitments.  I don't have commitments.  Will I have financial

2   support?  I believe I will.

3   Q.   But you didn't have it at the time you went into

4   bankruptcy, correct?

5   A.   That's correct.

6   Q.   And you had no available working line or commitment going

7   into these Chapter proceedings, correct?

8   A.   For?

9   Q.   The raw land properties?

10   A.   No.

11   Q.   In fact, I think when I asked you about what you were

12   going to do in this case, you said you're either the fixer or

13   the mechanic or both, correct?

14          MR. BUNCHER:  Again, I'm going to object.  I think

15   he's referring back to deposition, and I object to the form of

16   the question.

17          THE COURT:  Sustained.

18   Q.   Is it your intention to create value for these properties

19   by finding new tenants?

20   A.   Are we talking about two different things?  Properties and

21   land.

22   Q.   The income producing properties?

23   A.   Yes.

24   Q.   Are you aware of whether, with respect to the raw land,

25   any efforts were made in the last several years to market and

HC 01131

Richard Morgan - Direct (Wells Fargo)                80

1  sell those properties?

2  A.   I wasn't familiar with those pieces as to what was going

3  on with the marketing.  I knew the parcels themselves, but I

4  didn't know what was going on with marketing.

5  Q.   So you didn't inquire from anyone as to the previous

6  efforts to market and sell the real estate?

7  A.   No.  It's pretty obvious that land sales have been dried

8  up, you know, in a lot of place.  But no, I didn't go

9  specifically property-by-property.

10  Q.   And is it true that the only offer that's been received in

11  two or three years with respect to the Wells Fargo collateral,

12  has been 6.2 million dollars for all the real estate?

13  A.   No, I'm not aware of that.

14          MR. WEITMAN:  Can I have just a moment, Your Honor?

15          THE COURT:  Of course.

16      (Pause)

17  Q.   With respect to the Wells Fargo collateral, do you know if

18  the 2010 taxes have been paid?

19  A.   I don't think so, but that's not -- whatever it is, is

20  revealed on the schedule.

21  Q.   Are you familiar with a company called Propel Financial

22  Services?

23  A.   Yes.

24  Q.   And did they finance ad valorem taxes?

25  A.   I'm not sure exactly how that works.  I know that there's

HC 01132

Richard Morgan - Direct (Wells Fargo)                    81

1   been some cases where Propel is a debtor (sic) on the tax -- on

2   the -- listed on the schedule.

3   Q.   Do you know if they financed the 2009 taxes owing against

4   the real estate that's been pledged to Wells Fargo?

5   A.   I don't recall.

6        (Pause)

7   Q.   Is it your contention that this case can stay in Chapter

8   proceedings because there's fifty million dollars of equity in

9   all these properties?

10            MR. BUNCHER:   Objection, to the extent the questions

11   calls for -- it's what the legal contentions of his counsel are

12   asserting in this matter, Your Honor.

13            THE COURT:   Sustained.

14   Q.   Do you know how these Chapter proceedings -- excuse me.

15   Do you know how you intend to reorganize these companies or

16   this company?

17   A.   In a step-by-step basis?

18   Q.   Yes.

19   A.   Yes, I do.

20   Q.   Could you briefly describe that to the Court?

21   A.   The first thing I focused on, of course, is income

22   producing properties.  And that's where the cash flow is right

23   now, and that's where I see the fastest exit -- or I mean, the

24   fastest creation of value.  I can go through them individually,

25   if you'd like, but --

HC 01133

Richard Morgan - Direct (Wells Fargo)                    82

1  Q.   No, just in general.

2  A.   -- okay.  The land is another issue.  And of course, the

3  land is a -- has to be a program.  It quite candidly has to be

4  a program that is myself sitting down with all the lenders in

5  this group, because each of you have collateral that could very

6  well be next door to the other person's collateral.  So there

7  needs to be some type of concerted marketing effort with a

8  third party, in order to market these properties in the best

9  manner, to be sure that, for example, you don't have a broker

10 on one piece of land, and then two doors over, another broker

11 has that piece of land.  And I'm prepared to sit down --

12 Q.   But you're not aware --

13 A.   -- pardon?

14 Q.   -- pardon me.  You're not aware of whether these

15 properties have been marketed and listed with brokers for

16 several years before you even came on board?

17 A.   There may have been some.  I'm not aware of that.  My

18 point is that -- is that if we're going to hire third-party

19 brokers to market the land, then we need to do in a concentric

20 manner, so that one broker can represent a particular area as

21 opposed to having four brokers on -- step side by side on a

22 piece of piece of property.

23 Q.   Any other way to reorganize this company?

24 A.   Well, the first, of course, is to get the income

25 properties up; get them up and hopefully sell them.  If we sell

1   them, that's going to create value for the debtor.  That stays

2   in the debtor.

3   Q.    Is there any money out there to refinance these

4   properties?

5   A.    You don't refinance properties that refinancing -- there

6   is property for refinancing properties if the income stream is

7   up.  And that's what I'm trying to do is get the income stream

8   up so it would justify refinancing.

9   Q.    And you've been on the job since December 23?

10   A.    Yes.

11   Q.    And you are going to use, are you not, the services of

12   Prime Income, that's been on the job for years, correct?

13   A.    For what purpose, sir?

14   Q.    Did you not -- excuse me.  Isn't it your view that you're

15   going use the various services that Prime has internally to

16   help you with marketing and selling these properties?

17   A.    We need to get the properties segregated.  Can we do that?

18   Can we segregate income properties and land separately?

19   Q.    Do so then.  Explain.

20   A.    Okay.  Good.  From an income property standpoint, Regis

21   Property Management is the property manager.  But in call

22   cases, they are listed with third-party brokers who do do the

23   leasing.  So from the standpoint -- I looked at the leasing

24   people who they had.  Third-party Grubb & Ellis worked

25   excellent -- I think they're doing an excellent job.  And so

HC 01135

Richard Morgan - Direct (Wells Fargo)                84

1   I'm looking to a third-party broker to create the deals and I'm

2   looking to Regis to do the day-to-day management.

3   Q.    But you have no extra dollars around in order to support

4   the raw land properties, correct?

5   A.    Now, we're going to the raw land properties.  Okay.  On

6   the raw land properties, you don't need dollars to support

7   them.  What you need is customers to buy them.  And in the

8   process of trying to do that, we're trying to find a

9   methodology to market it so that it makes a concerted effort in

10  marketing.

11  Q.    But Grubb & Ellis has been trying to market and sell it

12  previously, correct?

13  A.    Maybe so.  But I have -- I've already produced one

14  contract to American Bank of Trust -- American Bank of Commerce

15  for acquisition.  So that was not known to anybody at that time

16  -- at the time it was filing.  I have another offer came in

17  this morning on NexBank -- on the NexBank property.

18  Q.    And are those offers consistent with the "equity" in each

19  of these properties?

20  A.    Actually above.

21  Q.    Okay.

22  A.    That's not -- I stated that incorrectly.  The ABC Bank is

23  above  The NexBank, I don't know what the -- I haven't analyzed

24  the equity on that.  I know what the offer is, but I haven't

25  analyzed how it relates to the note.  I know it's an extra

HC 01136

Richard Morgan - Direct (Wells Fargo)                    85

1   collateral.  It's one of those properties that you mentioned

2   earlier and that has no debt.  And yet, it is part of the

3   bankruptcy.  And it's because it's cross-collateralized with

4   NexBank's note.

5   Q.   In terms of serving as a chief restructuring officer, have

6   you ever served as a chief restructuring officer before?

7   A.   Not in this capacity, no.

8   Q.   And you're not getting paid, correct?

9   A.   Not on a daily basis, no.

10   Q.   And you're -- you haven't made any inquiries as to the

11   other subjects that we've talked about:  the distributions and

12   upstreaming of the notes, correct?

13           MR. BUNCHER:  Repetitive, Your Honor.

14           THE COURT:  Sustained.

15   Q.   Are you aware of the fiduciary obligations that a chief

16   restructuring officer and vice president of the debtor has?

17   A.   Very much so.

18   Q.   Are you aware of the fact that you have a duty to

19   investigate?

20   A.   You're asking about various and sundry things.  Do I have

21   an obligation to investigate what the seller's transferor

22   transferred their notes to another entity?  I don't know.  I

23   would have no way of knowing that.  That's getting into inside

24   information to a public company.  And I don't want to know.

25           MR. WEITMAN:  All right.  Pass the witness.

HC 01137

Richard Morgan - Direct (Wells Fargo)                86

1          THE COURT:  Very well.  Mr. Aurzada?

2          MR. AURZADA:  Yes, Your Honor.  I suspect my cross-

3   examination will be fifteen minutes.  Would the Court want me

4   to go forward, or do you want to take a break at this point?

5   We've been going for two hours.

6          THE COURT:  Does anybody need a break?  All right.

7          MR. AURZADA:  I assume everyone raised their hand.

8          THE COURT:  No, just Mr. Buncher did.  Apparently --

9          MR. BUNCHER:  I had too many glasses of water, Your

10  Honor.

11         THE COURT:  All right.  Let's take a short recess.

12  I'd like to keep moving, so let's say five minutes.

13         THE CLERK:  All rise.

14     (Recess from 2:04 p.m. until 2:09 p.m.)

15         THE CLERK:  All rise.

16         THE COURT:  Be seated, please.  Okay.  All right.

17         MR. AURZADA:  Your Honor, during the break, I took

18  the liberty of approaching and putting my witness -- exhibit

19  list on the bench.

20         THE COURT:  I saw.

21         UNIDENTIFIED SPEAKER:  Sorry, Your Honor.

22         THE COURT:  No problem.  All right, Mr. Aurzada?

23         MR. AURZADA:  Thank you, Your Honor.

24  DIRECT EXAMINATION

25  BY MR. AURZADA:

Richard Morgan - Direct (Armed Forces Bank)                87

1  Q.   Good afternoon, Mr. Morgan.

2  A.   Yes, sir.

3  Q.   My name is Keith Aurzada, and I represent Armed Forces

4  Bank today.

5  A.   Yes, sir.

6  Q.   I think we've met before, but it's been a long time,

7  hasn't it?

8  A.   I don't remember meeting you before.

9  Q.   Okay.  All right.  Well, I remember meeting you.

10  A.   Okay.

11  Q.   I have placed in front of you -- and it's the one standing

12  up on its end -- a binder with exhibits.  It's standing on its

13  end.

14  A.   Here?

15  Q.   Yeah.

16  A.   Okay.

17  Q.   Would you mind turning that to Exhibit 7?

18          THE COURT:  All right.  We're going to have a problem

19  because we've got duplicate exhibits.

20          MR. AURZADA:  I was concerned about that.  May I

21  refer to it as Armed Forces Exhibit 7?

22          THE COURT:  You may.  You may.

23  Q.   So, Mr. Morgan, when we're looking at Exhibits, I'm going

24  to try to refer to them as Armed Forces Exhibit and then the

25  number.  And if I am mistaken and forget, please feel free to

HC 01139

Richard Morgan - Direct (Armed Forces Bank)          88

1  correct me.

2       So do you recognize Armed Forces Exhibit number 7?

3  A.   Maybe I'm looking at the wrong thing.  I see "vendor name"

4  and "address" and -- is this the one you're talking about?

5  Q.   Yes, sir.

6  A.   I don't recognize the document, no.

7  Q.   You do not?

8  A.   No.

9  Q.   You don't recognize it?

10 A.   No.

11 Q.   You don't recognize this as an exhibit which shows the

12 unsecured debt by property --

13 A.   Oh, wait, just like the formatting in which you submitted

14 it.

15 Q.   I'm sorry, I didn't understand you.

16 A.   I don't recognize this as being -- this looks like a copy

17 of a copy of a copy.  And I didn't know what we're talking

18 about.

19 Q.   Okay.

20 A.   If this is an exhibit that's been submitted as far as

21 filings were concerned, I can go to that and look at it.  But

22 go ahead.

23          MR. BUNCHER:  Your Honor, we'll acknowledge this is

24 an exhibit we prepared -- the debtor prepared of the unsecured

25 debt associated with each of the properties that were

HC 01140

Richard Morgan - Direct (Armed Forces Bank)          89

1   transferred.

2          MR. AURZADA:  Your Honor, with that, I'd move for the

3   admission of Armed Forces Exhibit 7.

4          THE COURT:  Any objection?

5          MR. BUNCHER:  No, Your Honor.

6          THE COURT:  It's admitted.

7   (Armed Forces Exhibit 7, unsecured debt associated with each

8   transferred property document, was hereby received into

9   evidence as of this date.)

10  Q.   May I also get you, Mr. Morgan, to turn to Armed Forces

11  Exhibit 4?

12       (Pause)

13  Q.   Does Exhibit 4 appear to be the schedules and statements

14  of financial affairs filed by the debtor in this case?

15  A.   I'm not familiar -- Mr. Crown provided most of the

16  exhibits, so I may not be able to testify to the specific

17  details of it, so.

18  Q.   Okay.

19         MR. AURZADA:  Your Honor, I really just want to admit

20  the schedules and statements.  I believe we can take judicial

21  notice and I'll see if the debtor has any objection to their

22  admission?

23         THE COURT:  Any objection?

24         MR. BUNCHER:  Your Honor, Exhibit G to the debtor's

25  exhibits is also -- or F and G were the schedule and statement

HC 01141

Richard Morgan - Direct (Armed Forces Bank)          90

1  of financial affairs.  I have no problem with them being

2  admitted.  But I haven't compared page by page.  There's many

3  pages.  But subject to that, if they're complete copies, I have

4  no objection.

5          THE COURT:  Very well.

6          MR. AURZADA:  I believe they are, Your Honor.

7          THE COURT:  All right.  They are admitted.

8  (Armed Forces Exhibit 4, schedules and statement of financial

9  affairs of debtor, were hereby received in evidence as of this

10  date.)

11          MR. AURZADA:  Thank you.

12  Q.  So, Mr. Morgan, as I understand it, FRE, the debtor,

13  doesn't have any employees.  Is that right?

14  A.  Except me, you mean?

15  Q.  Except you?

16  A.  Yes.

17  Q.  Okay.  But it owns at least nineteen parcels of property.

18  Is that right?

19  A.  Right.

20  Q.  Valued in the hundreds of millions?

21  A.  Well, that may be a loose term.  We probably need to go

22  back to the schedules and see what the value of the properties

23  are.

24  Q.  If I represented to you that it schedules hundreds of

25  millions of dollars in assets, would you be surprised?

HC 01142

Richard Morgan - Direct (Armed Forces Bank)          91

1  A.   Well, I'm telling you the that the total -- obviously the

2  total did.  You break it down by land and commercial

3  properties, I'm not sure what the breakdown is.

4  Q.   I'm not even asking for the breakdown.  Let's just look at

5  the summary page.  Am I incorrect in saying that FRE has

6  $243,553,624.21 of scheduled assets?

7  A.   I think you transposed the number.

8  Q.   Oh, did I?

9  A.   I see 234, but that's okay.  You said 243; I see 234.

10  You're right.  Down at the bottom, 243.

11  Q.   Okay.  And yet, you're the only employee?

12  A.   Yes.

13  Q.   That's a big job.  Let me ask you this.  Have you been to

14  every single one of these properties?

15  A.   I've been to -- I have not been to the Amoco Building yet.

16  And I have not seen the -- some 2,500 acres, plus or minus,

17  that is the collateral for the Wells Fargo.  Other than that, I

18  know the properties.

19  Q.   Okay.  And how do you know that?  Did you learn all that

20  between December 23rd and today, or did you know that from some

21  other time period?

22  A.   I really knew it from other involvement.  I have -- as the

23  manager, if you will, of the energy division -- which is what I

24  really do; I really run an oil and gas company.  And as the

25  manager of that, I had gotten involved in developing a Barnett

HC 01143

Richard Morgan - Direct (Armed Forces Bank)          92

1 | Shale play, and in and around Mercer Crossing as a nucleus of
2 | that.  And that entity was -- that was spurred by a group
3 | called -- an entity called ATI Mineral Holdings, which was
4 | combined then with the Transcontinental, American Realty and
5 | Income Opportunity Realty Trust.  All of them mineral leases
6 | were put into one pool and I used that as a nucleus, then, to
7 | spread out.

8 | Subsequently negotiated a joint venture with Keystone
9 | Exploration out of Forth Worth.  And under that concept, we
10 | developed about -- tied up about 12,000 acres of mineral
11 | leases.  And in the process of doing that, I had to select
12 | drill sites, and in the process of doing that, determine what
13 | some of these properties were worth in exchange.  So do I give
14 | a drill site here; do I give a drill site there?  And I became
15 | aware, at least where the properties were -- the properties,
16 | you know, if there were any problems with them, access
17 | problems, and became fairly familiar with most of the land
18 | parcels at that time.

19 | Q.   So you're not new to these properties at all?
20 | A.   No.
21 | Q.   Is that right?  So you wouldn't be considered new
22 | management?
23 | A.   I would be considered new management in the sense that
24 | I've never had any specific responsibility for the management,
25 | control or marketing of those properties.

HC 01144

Richard Morgan - Direct (Armed Forces Bank)          93

1  Q.   Mr. Weitman -- you confirmed for him that you had no

2  committed capital for the debtors.  I want to clear up a couple

3  other things.  You don't have any -- presently any letters of

4  intent to purchase the raw land owned by the debtor.  Is that

5  correct?

6  A.   I do.

7  Q.   You do have a letter of intent?

8  A.   Actually, I have better than that.  I just -- I submitted

9  a contract to American Bank -- ABC Bank this week, for the

10  Temple land, ten point something acres, down in Temple, Texas.

11  That actually was a contract that was already there --

12  Q.   That's what you mentioned to Mr. Weitman --

13  A.   Yes.

14  Q.   -- previously, right?

15  A.   Um-hmm.

16  Q.   How about for Armed Forces?

17  A.   Armed Forces, I'll have to go back and look at your

18  pieces.  I don't have any specific working for that I know of

19  on your particular parcels.

20  Q.   Now, the debtor has not filed a plan of reorganization,

21  correct?

22  A.   No.

23  Q.   The debtor has not filed a disclosure statement, correct?

24  A.   I didn't understand your question that time.

25  Q.   The debtor has not filed a disclosure statement, correct?

HC 01145

Richard Morgan - Direct (Armed Forces Bank)          94

1  A.    In what sense do you mean?

2  Q.    A disclosure statement to support a plan of

3  reorganization?

4  A.    Correct.

5  Q.    Now, I want to talk to you a little bit about your success

6  fee.  What percentage of the ultimate recovery is that going to

7  be?  Do you know?

8  A.    I don't really know.  The -- it all depends on what the

9  value is.  You know, it's -- if things happen quickly, it could

10  be an enormous value.  If things take --

11  Q.    Who are you going to -- you --

12          MR. BUNCHER:  Your Honor, I think the witness should

13  be allowed to answer the question or finish his answer, if he's

14  going to ask him questions.

15          THE COURT:  Sustained.

16          MR. AURZADA:  Okay.

17  A.    The overall value that I'm thinking in terms of for a

18  year's term would be in the 150-, 200,000 dollar range.  So

19  I'll adjust the percentage to the success fee according to that

20  range.

21  Q.    So you're going to do that on your own?

22  A.    Pardon?

23  Q.    You're going to do that on your own?

24  A.    No.  I can do it with Mr. Akin.  We've already talked

25  about its --

1  Q.   You're going to do it with who?  I didn't hear what you

2  said.

3  A.   Mr. Akin.

4  Q.   Mr. Akin.

5  A.   Who is the owner.  It's a floating situation.  You never

6  know exactly what assets are going to be there or not be there,

7  what moves quickly, what doesn't move quickly.  And right now,

8  I'm just working on the gentlemen's agreement that there will

9  be a success fee if -- if I bring out the debtor whole.

10  Q.   Okay.  And you're going to get a success fee which is a

11  percentage of a whole, correct?

12  A.   That's correct.

13  Q.   Okay.  Who is the rest of that money going to go to?

14  A.   The rest of the money goes to what?

15  Q.   To whom?  Who will get it?

16  A.   Oh, that goes to FRE, which is the -- which is to Mr.

17  Akin's company.

18  Q.   And what company is that?

19  A.   FRE.

20  Q.   Who is going to get it from FRE?  It's just going to go to

21  FRE?  Where is it going to go?  If there's profit, who is it

22  going to go to?

23  A.   You're asking me a question I can't answer.  If -- I'm

24  saying is the debtor has value after everybody's paid off, then

25  that is what the debtor's value is.  Where it goes is not my --

Richard Morgan - Direct (Armed Forces Bank)                96

1  I don't have control of that.  It's whoever the owner is
2  decides where it goes after that.
3  Q.  Okay.  Who's the owner?
4  A.  Mr. Akin.  ABC Properties, or whatever it is.  Mr. Akin
5  and Mr. Shumate.
6  Q.  Okay.  So I want to evaluate one thing with you there.
7         MR. AURZADA:  One moment, Your Honor.  I need to make
8  sure I get the exhibit reference --
9         THE COURT:  Of course.
10        MR. AURZADA:  -- correct here.
11 Q.  Okay.  I'm going to ask you now to look at Wells Fargo
12 Exhibit number 168.  So we're going to have to change binders
13 here.
14 A.  Is that that same spreadsheet we were looking at a few
15 minutes ago?
16 Q.  No.
17 A.  Sorry, are we on Wells Fargo --
18 Q.  Wells Fargo 186.
19 A.  It was lost in translation here, obviously.
20        MR. AURZADA:  Your Honor, may I approach and try to
21 be --
22        THE COURT:  You may.
23        MR. AURZADA:  -- of assistance?
24        THE WITNESS:  That's yours, right?  I see -- oh, I
25 see.  I have it turned upside down.  Okay.  Okay.

HC 01148

1  Q.   And can you turn to the second page of Wells Fargo Exhibit

2  168?

3  A.   Yes.

4  Q.   Okay.  And I want to look at the last individual line

5  item.  It talks about the property name and information.  It

6  says "Mercer Crossing, 257.05 acres in Farmer's Branch, Texas."

7  A.   Correct.

8  Q.   Is that right?  Now, that's a property that is roughly at

9  the intersection of I-35 and I-635, right?

10  A.   No.

11  Q.   No?  Where is it?

12  A.   I mean, it's basically -- it's basically in runs partially

13  on Valley View Road.  But it is more at the intersection of

14  what is known as Mercer Crossing, which is the Mercer Crossing

15  proper, which is essentially at Luna Road and Valley View.  But

16  the general area is 35 and 635, correct.

17  Q.   Okay.  All right.  And it's vacant land, is that right?

18  A.   Well, it's vacant land with four lane streets running

19  through it.

20  Q.   Are you telling me the debtor owns the streets or?

21  A.   No.  I'm just telling you, the question is -- vacant land

22  has the connotation of being unimproved property.  It is

23  improved by the fact that the sewer, water and streets --

24  Q.   It has street frontage, right?

25  A.   Yes.

Richard Morgan - Direct (Armed Forces Bank)                98

1   Q.   Okay.  But it's vacant.  There's no building on it?

2   A.   That's correct.

3   Q.   Okay.  Now, this property was transferred to FRE on

4   December 23rd.  Is that right?

5   A.   Right.

6   Q.   December 23rd of 2010?

7   A.   Right.

8   Q.   Okay.  And what was the price of that sale?

9   A.   You go back, you mentioned page 2, but I don't think

10  that's on page 2.

11          MR. AURZADA:  Your Honor, may I approach the witness

12  and --

13          THE COURT:  You may.

14  A.   The price is 25,400,000.

15  Q.   That was the sales price?

16  A.   Yes.

17  Q.   Doesn't it actually say 28,400,000?

18  A.   If I had my glasses, it might.

19  Q.   Okay.  Being farsighted myself, I'll probably screw

20  something up here in a minute myself.  So the sale price was

21  28.4 million.  Is that right?

22  A.   Yes.

23  Q.   And that was paid how?

24  A.   That's paid by assumption of debt and then a note for some

25  250,000.  I'll leave that number in.

HC 01150

Richard Morgan - Direct (Armed Forces Bank)                    99

1   Q.   Okay.  And how much debt was assumed?

2   A.   If I read it right, 25,139,000--something-something.

3   Q.   Okay.  28,139,869.  Is that right?

4   A.   Okay.

5   Q.   Does that sound close?

6   A.   Yeah, if the other is 28, that's 28, yeah.

7   Q.   Okay.  All right.  So what I'm asking now is if that

8   property is appraised at 48.1 million, the debtor got quite a

9   deal, didn't it?

10  A.   It did.

11  Q.   And in fact, that means ART, American Realty Trust, Inc.,

12  a publicly-traded company, transferred 48.1 million dollars of

13  property -- if you consider my appraisal to be valid -- for

14  28,400,000 dollars?

15  A.   I've seen the appraisal and I do consider it to be valid.

16  Q.   Okay.  So do you think the shareholders of American Realty

17  Trust, Inc. would be upset to know that that company

18  transferred to this debtor 48 million dollars of real property

19  for 28.4 million dollars?

20        MR. BUNCHER:  Objection, Your Honor, to the form of

21  the question, calling him to speculate on some unknown

22  shareholders who aren't here today.

23        THE COURT:  Sustained.

24  Q.   Has the debtor considered the likelihood that American

25  Realty Trust has a claim against this debtor for fraudulent

HC 01151

1  conveyance?

2         MR. BUNCHER:  Objection, calls for a legal

3  conclusion.

4         MR. AURZADA:  I don't think it does, Your Honor.  I

5  think that's just asking him if he's considered that as part of

6  his restructuring strategy.

7         THE COURT:  Overruled.  I'll allow the witness to

8  answer it.

9  A.   And what is your question again?

10  Q.   Have you considered the fact that American Realty Trust,

11  Inc. might have a cause of action against this debtor for

12  fraudulent conveyance?

13  A.   American Realty Trust board approved it, I'm assuming, in

14  order to make the transfer.

15  Q.   I'm asking if you have considered whether they might have

16  a lawsuit for having transferred forty-eight million dollars of

17  real property for only twenty-eight million dollars of

18  consideration?

19  A.   Well, if you construe the "they" to be American Realty

20  investors, they were the transferor.  They made the transfer.

21  They set the price.

22  Q.   That's not very good business sense, is it?

23  A.   I don't know.  You have to put everything in balance.

24  Q.   Who were the directors and officers of ART that authorized

25  that transfer?

HC 01152

Richard Morgan - Direct (Armed Forces Bank)          101

1    A.   I have no idea.

2    Q.   You don't know?

3    A.   No.

4    Q.   Did you make inquiry to find out?

5    A.   No.

6    Q.   So as part of your duties as the chief restructuring

7    officer, you decided to make no effort or no inquiry as to who

8    would approve the transfer?

9    A.   If a -- if a transfer is made in a public company of

10   certain sizes, it has to have a board approval.  If it's below

11   that, it has management approval.  So the very fact it was

12   transferred gives me the author -- gives me the assumption that

13   all the authority to transfer that was made.

14   Q.   So you made the assumption that it was an authorized

15   transfer?

16   A.   Correct.

17   Q.   And so I'm clear, you haven't considered whether or not

18   there would be a lawsuit or a claim made by American Realty

19   Trust for fraudulent conveyance?

20           MR. AURZADA:  I know it's a bit repetitive, Your

21   Honor, but I've been trying to summarize this.

22           THE COURT:  Okay.

23   A.   Well, I don't know.  How could someone bring a suit

24   against us for fraudulent conveyance when they themselves

25   conveyed it?  I don't understand what you're -- where you're

HC 01153

1  getting.

2  Q.   Well, and forgive me, Mr. Morgan, but that happens all the

3  time for debtors that they make pre-petition transfers and they

4  come to bankruptcy court and they try to get those properties

5  back.   There's also a Uniform Fraudulent Conveyance Act that

6  allows them to get that property back.   So I'm just asking,

7  have you considered the possibility that there's going to be a

8  lawsuit or a claim made by ART?

9  A.   Not even considered, no.

10  Q.   Okay.   In your opinion, is that something that a chief

11  restructuring officer ought to know, think about, and consider?

12  A.   I think I've answered that.   If -- I have assumed that the

13  transfer was done with proper authorization and approved by the

14  board or the management people with the -- with that authority.

15  Q.   Is Mr. Akin affiliated with American Realty Trust, Inc.?

16  A.   Not to my knowledge.   Affiliated may be a loose term.   He

17  does own a company called Sunchase Management that does manage

18  properties for various entities.   And to the extent of American

19  Realty, I don't know.

20  Q.   Mr. Akin offices out at Valley View, is that right?

21  A.   Yes.

22  Q.   Okay, how long have you known him?

23  A.   Going back into the Southmark years which would make that

24  around '80 -- '82 -- forty years -- thirty-five to forty years.

25  Q.   So a long time.   Okay.   And so, just so I'm clear on this,

Richard Morgan - Direct (Armed Forces Bank)       103

1  this transfer, to the extent there's a realization of value in

2  excess of the purchase price, you're going to get a piece of

3  that purchase price?

4  A.    Globally.

5  Q.    Globally.  But if we isolated it to one property, you're

6  going to get a success fee based upon whatever value there is

7  on Mercer Crossing above 28.4 million?

8  A.    No.  If you're isolating it, I can't talk in terms of

9  isolated properties.  It's just not over until it's over.  And

10  once it's all done, then I'll get a piece of that action.

11  Q.    All right, so prior to the filing of this bankruptcy case,

12  did you contact Armed Forces Bank to work out a restructuring?

13  A.    No

14  Q.    Were you aware that the properties were posted for

15  foreclosure?

16  A.    No.

17  Q.    Why not?

18  A.    I didn't ask the question.  You're talking about December

19  23rd?

20  Q.    Um-hmm.

21  A.    I didn't ask the question.

22  Q.    So you're -- on December 23rd, you're the chief

23  restructuring officer; you decide to take the assignment.  And

24  you did not ask the question as to whether or not any of these

25  properties were posted for foreclosure?

HC 01155

Richard Morgan - Direct (Armed Forces Bank)        104

1  A.   That's correct.

2  Q.   The 2009 taxes have not been paid on Armed Forces Bank's

3  collateral, is that right?

4  A.   I don't know.  Without going to look at some type of

5  schedule, I don't know.

6  Q.   Okay.  2010 taxes haven't been paid either, have they?

7  A.   Well, there again, you're going to have to give me a time

8  frame reference.  As to the '09s, if they weren't paid, they're

9  on a schedule.  2010s, which effectively are due January 31st

10 of 2011, I'm almost sure none of those have been paid with

11 exception that some lender may have escrows for that purpose.

12 Q.   When the properties that are secured by Armed Forces liens

13 were transferred to the debtor, you did not obtain the prior

14 consent of Armed Forces Bank, did you?

15 A.   Correct.

16 Q.   I wanted to go back to one point that you made when

17 talking to Weitman, was talking about you thought the raw land

18 needed to be marketed and sold and sort of, if I can paraphrase

19 it, an orderly manner.  Is that right?

20 A.   It wasn't orderly manner.  What I was pointing out, if you

21 look at your -- Mercer Crossing, for example.  Mercer Crossing

22 is a very oddly-shaped piece of property.  It was part of the

23 original acquisition, I'm assuming the reason it was named

24 that; it's call the Mercer parcel.  But it is tied to other --

25 other properties that are in and around that area, some of

HC 01156

Case 11-42042-dml11   Doc 30-36   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit X - Part 1 - Hearing Transcript   February 3   2011   Page 106 of 118

Richard Morgan - Direct (Armed Forces Bank)          105

1  which are in bankruptcy, some are not.  It's also close to one
2  of the properties that NexBank has as additional collateral.
3  And the point is, who's going to market Mercer Crossing needs
4  to be somebody that's going to market everything in Mercer
5  Crossing.
6  Q.   Okay.  So you would disagree with my characterization of
7  that as some orderly process?
8  A.   Orderly process would be the manner in which you
9  accomplish it.  My comment was how should it be marketed.  I
10 think it should be marketed in some type of coordinated effort.
11 Q.   My point is to you that there is nothing that would
12 prohibit you from having tried to convince Armed Forces Bank to
13 do that with you before filing this case, is that right?
14 A.   That's correct.
15 Q.   And in fact, going back to the origination of that loan
16 and the first default a couple years ago, could have talked to
17 the bank about doing that, right?
18 A.   I wasn't involved at that time, sir.
19        MR. AURZADA:  Your Honor, to try to save some time
20 and to complete my record, I would ask that debtor's counsel
21 review Armed Forces Exhibit 79 through 93.  I believe these are
22 the transfer documents.  I believe they're true and correct
23 copies, and I'd like to just stipulate to their admissibility.
24        THE COURT:  79 through 103?
25        MR. AURZADA:  93, Your Honor.

HC 01157

Richard Morgan — Direct (State Bank of Texas)   106

1          THE COURT:  93.

2          MR. AURZADA:  Armed Forces Exhibits 79 through 93.

3          THE COURT:  Any objection, Mr. Buncher?

4          MR. BUNCHER:  One second, Your Honor.  No, Your

5  Honor.

6          THE COURT:  They're admitted.

7  (Armed Forces Bank's Exhibit 79 to 93, various transfer

8  documents, were hereby received into evidence as of this date.)

9          MR. AURZADA:  Nothing further at this time, Your

10  Honor.

11          THE COURT:  Very well.  Anyone else?  Mr. Stromberg?

12  DIRECT EXAMINATION

13  BY MR. STROMBERG:

14  Q.   Good afternoon, Mr. Morgan.

15  A.   Good afternoon, sir.

16  Q.   Going to ask you some questions that you were being asked

17  just a couple of moments ago, my understanding is that you

18  didn't ask about whether or not these properties were posted

19  for foreclosure, right?

20  A.   Correct.

21  Q.   And you didn't ask about whether or not any of these

22  transfers violated any of the lender's loan documents that

23  would otherwise prohibit the transfer of the properties out of

24  the entities they were in?

25  A.   Correct.

HC 01158

Richard Morgan - Direct (State Bank of Texas)      107

1  Q.   And my understanding is also that you didn't actually

2  review any of the loan documents for any of the lenders who had

3  security interests in those properties before they were

4  transferred, right?

5  A.   Correct.

6  Q.   Or contact any of the lenders regarding whether or not

7  they would approve the transfers?

8  A.   Correct.

9  Q.   Okay.  Did you ask about the status of the loans securing

10 these properties, whether they were in default or not?

11 A.   No.

12 Q.   You have a lot of experience with real estate, am I right?

13 A.   I do.

14 Q.   If I remember correctly, over forty years?

15 A.   Yes.

16 Q.   And that involves Texas real estate, too, does it not?

17 A.   It does.

18 Q.   You're aware that the January of the year following, taxes

19 for the previous year, ad valorem taxes always come due, right?

20 A.   Yes.

21 Q.   Okay.  Did you inquire as to whether or not any of these

22 properties that were being transferred to the debtor had unpaid

23 ad valorem taxes that would come due on January 31, 2011?

24 A.   There was either a schedule or reference, and I'm not

25 sure, but I was aware that most, if not all of the properties,

HC 01159

Richard Morgan - Direct (State Bank of Texas)      108

1  that the taxes due coming January 31 were not paid.

2  Q.    Okay.   And not only that, but you were also aware that the

3  debtor entity, collectively, would not have enough money in

4  each of the individual entities that were being folded into the

5  debtor to satisfy the unpaid taxes, correct?

6  A.    Correct.

7  Q.    Let me talk a little bit about the success fee issue, and

8  I'm batting cleanup, here, so if I repeat, I apologize.   You

9  anticipate that a lot of work and energy will probably go into

10 a case involving close to forty income and nonincome-producing

11 properties with almost twenty lenders in it, right?

12 A.    Correct.

13 Q.    Now, have you ever been a chief restructuring officer in a

14 bankruptcy case before?

15 A.    No.

16 Q.    But nonetheless, you understand and appreciate that this

17 is going to involve a lot of your time and energy, am I right?

18 A.    I do.

19 Q.    Without a deal for your compensation, Mr. Morgan, how can

20 you know that you're going to be dealt with fairly by Mr. Akin

21 regards to the success fee you haven't yet negotiated?   How do

22 you know?

23 A.    It's a man I've known for almost forty years.

24 Q.    So you have a belief in Mr. Akin based on that

25 relationship over time that he's going to treat you fairly?

HC 01160

Richard Morgan - Direct (State Bank of Texas)        109

1  A.   I have a belief as follows:  Number 1, unless I create

2  enough value so that everybody's paid off and there's something

3  left over, there is nothing.  To the extent that I do, the best

4  time to be appreciated is when you put the money in the bank.

5  Q.   Right.  But my question is about your subsequent

6  negotiation that's yet to occur with Mr. Akin.  You are telling

7  this Court, if I understand you correctly, that based on your

8  forty years of experience with Mr. Akin, you believe that he is

9  going to deal with you fairly, as it relates to this success

10 fee, right?

11 A.   That's correct.

12 Q.   Okay.  So if value is generated, that you won't have to

13 worry, as you sit here, now, based on this longstanding

14 relationship, that he won't give you a fair success fee?

15 A.   I don't have to worry, anyway.  I'm already compensated.

16 This is really just -- use the word gravy.  It will be

17 excess.-- an additional income for me.

18 Q.   When you say you're already compensated, are you referring

19 to compensation from this debtor or from outside?

20 A.   Outside.

21 Q.   Okay.  So you're referring to other things that you do

22 that are unrelated to the debtor?

23 A.   Correct.

24 Q.   Okay, now am I correct in my understanding that Mr. Akin

25 is an owner of ABCLD, which is the entity that owns the FRE

HC 01161

Richard Morgan - Direct (State Bank of Texas)          110

1  Real Estate stock?

2  A.    That's the way I understand it.

3  Q.    Okay.  So in order for there to be value, excess value

4  with which to compensate you based on a success fee, is it your

5  understanding that this case has to generate enough money to

6  pay all the secured and unsecured creditors, and then filter

7  additional value down to Mr. Akin's level?

8  A.    Exactly.

9  Q.    Okay, now, on December 23rd, when you were consulted about

10  taking on this job, Mr. Morgan --

11  A.    Yes, sir.

12  Q.    It was -- Mr. Akin was one of the two people who came to

13  visit with you about it, am I right?

14  A.    Correct.

15  Q.    The other person was Danny Moos?

16  A.    That's correct.

17  Q.    And Mr. Moos has a role in Transcontinental Realty

18  Investors, does he not?

19  A.    Right.

20  Q.    What is that role?

21  A.    He's a president of one of the entities.  I'm not sure if

22  he's the president of Transcontinental or not.

23  Q.    Okay.  Does he have a role at Prime Asset?

24  A.    Yes, I believe he's the president of Prime.

25  Q.    Okay.

HC 01162

Richard Morgan - Direct (State Bank of Texas)     111

1   A.   I'm not certain, but I think he is.

2   Q.   So in addition to Transcontinental Realty Investors, he's

3   also involved in Prime Asset?

4   A.   You're asking me about the officership of

5   Transcontinental?  I can't testify to that.  But I think he

6   is -- I'm almost certain he's the president of Prime.

7   Q.   Okay, now, Mr. Moos, if I understand correctly, is also

8   the person that you would go to to talk to about any proposed

9   sale of property in this case, am I right?

10  A.   only to the extent that his -- that his -- I'm using the

11  "his" terminology -- the TCI/ARL/IOT that that note may be

12  impugned or not be paid by the sale, I will advise him that

13  this sale is going to occur, and because of the way I've got my

14  understanding the notes are structured, that then becomes a --

15  I'm calling it a soft second, which it really is -- it's a soft

16  second, gets paid back, it rolls into unpaid, and then at the

17  end of the day, when everybody else is paid off, whatever funds

18  I have left will pay those notes.

19  Q.   See if I understand what you just told us.  So for

20  example, the property in which my client had a security

21  interest is this Archon property in Irving.

22  A.   Yes.

23  Q.   Okay.  So if you had a pending proposed sale -- by the

24  way, do you have one for the Archon property?

25  A.   Not yet, no.

Richard Morgan - Direct (State Bank of Texas)    112

1  Q.    Okay.  So if you had a proposed sale for the Archon
2  property, then before you submitted that to the Court, you
3  would talk to Mr. Moos because the note that was given for the
4  difference between the secured debt and the book value on that
5  property which was then assigned to Transcontinental Realty
6  Investors in a note in which Mr. Moos or his company would have
7  some interest, am I right?
8  A.    I want to define the word "talk to".  I think that's
9  better "advise" rather than "talk to".  I'm not asking consent,
10  but as a courtesy, I would tell him what's going on.
11  Q.    Okay, now, in addition, you sought some advice from other
12  quarters, and I'm not referring to your counsel, either Mr.
13  Lewis or Mr. Buncher and his firm.  But before the bankruptcies
14  were filed in this case, when they came to you on December 23rd
15  and they told you what the structure of this deal was, you had
16  questions about the notes as to which you consulted Mr. Jay
17  LaJone, right?
18  A.    That's correct.
19  Q.    And Mr. LaJone is an attorney with Bennett Weston?
20  A.    That's correct.
21  Q.    Okay.  And Mr. LaJone was representing the transferors of
22  these properties into FRE Real Estate, right?
23  A.    That's correct.
24  Q.    And so when you wanted to know what these notes meant, you
25  consulted Mr. LaJone, correct?

HC 01164

Richard Morgan - Direct (State Bank of Texas)        113

1  A.   Well, it's more than that.  Basically, I wrote the

2  question to Mr. Crown, and Mr. Crown and I had exactly the same

3  understanding.

4  Q.   And Mr. Crown, for the record --

5  A.   Mr. Crown -- Mr. Crown works for Prime Asset.

6  Q.   Okay.

7  A.   And he was -- he was enlisted by Prime to assist me in

8  preparing all the schedules.  He had the same understanding of

9  being a soft second.  We have since validated that with Mr.

10  Moos as his understanding of what it was, and that's the way we

11  filed it in our last filings.

12  Q.   I'm just asking about the time before the bankruptcy was

13  filed, between December 23rd and January 4.  Did you seek

14  independent counsel to give -- that is to say, somebody other

15  than somebody who is involved in these entities that were

16  making, helping you, facilitate, creating documents for these

17  transactions -- did you get independent counsel of your own at

18  that time?

19  A.   I didn't have to because if I -- if I -- the way I

20  understood it is the way that it has come down, that's the way

21  it is.  It's a matter of understanding.

22  Q.   All right, and correct me if I'm wrong, but when this came

23  to your attention on December 23rd, these conveyances were

24  already either happening or had already happened.  Am I right?

25  A.   That's correct.

HC 01165

Richard Morgan - Direct (State Bank of Texas)      114

1  Q.   So they handed you this package and said you will be the

2  person responsible for this entity that owns all these

3  properties, and you'll restructure it as is, am I right?

4  A.   Incorrect statement.

5  Q.   Okay.

6  A.   They handed me the properties, said we'd like for you to

7  do this.  Look it over, study, and see if you would.

8  Q.   I understand.  But you weren't furnished with an

9  alternative.  That is to say, you weren't given the opportunity

10  to say, no, I don't think these transactions should be conveyed

11  into one entity; let's do it as separate entities, am I right?

12  A.   No, my job was to decide whether I wanted to take the

13  package as a whole.

14  Q.   As is?

15  A.   Yes.

16  Q.   And so the idea of separate bankruptcies -- well, let me

17  qualify this.  They didn't talk to you about the prospect that

18  FRE Real Estate would be filing a bankruptcy on December 23rd,

19  at all, did they?

20  A.   No.

21  Q.   Okay.  So the first that you heard about the prospect that

22  the entity that you were controlling would be filing bankruptcy

23  was when?

24  A.   I don't remember the exact date; it was after that date,

25  no.

HC 01166

Richard Morgan - Direct (State Bank of Texas)     115

1  Q.   Who told you?

2  A.   I don't recall.

3  Q.   Was it Mr. Moos or Mr. Akin or somebody like that?

4  A.   I don't recall.

5  Q.   Was it somebody that offices at one of these two Valley

6  View Lane addresses?

7  A.   I'm sure it was.  I just don't recall the person that told

8  me about it.

9  Q.   Were you asked for your consent as to this --

10  A.   Pardon?

11  Q.   -- bankruptcy filing?  Were you asked for your consent, or

12  was it sort of already --

13  A.   No.  I understood, once it was going to be bankruptcy, I

14  understood, looking at the assets, the possible logic for going

15  in -- putting everything in one package, but I didn't go -- I

16  didn't go asking any questions about it.

17  Q.   You weren't involved in the decision process to put it in

18  bankruptcy?

19  A.   That's correct.

20  Q.   Okay.  Now, we talked about Mr. LaJone.  Other people that

21  I understand you've consulted, like, for example, in

22  preparation for your testimony as the corporate representative

23  of FRE, that involved RL Lemke and Henry --

24  A.   Butler.

25  Q.   -- Butler?

HC 01167

Richard Morgan - Direct (State Bank of Texas)      116

1  A.   Um-hmm.

2  Q.   And those two people have a role at one of these entities?

3  A.   They were at Prime Income, also.

4  Q.   They were with Prime Income.

5       (Pause)

6  Q.   Excuse me.  I'm batting cleanup, here.  I apologize.

7       Now, as I understood your description of these notes and

8  the way that they work, the price is determined basically off

9  of this value, and you subtract from the value which is on the

10 books of the entity at the time of the transfer the amount of

11 the booked debt, and what's left is the note, right?

12 A.   In reverse.  If you add the book -- add -- if you take the

13 book value and add to it, that would be the net of the debt.

14 Q.   I see.  But it's not as if the book value's changed, based

15 on what it was that the note and the debt were, am I right?

16 They always equal the note -- the note and the debt together

17 always equal the book value?

18 A.   No.

19 Q.   They didn't?

20 A.   No.

21 Q.   In what cases were they different?

22 A.   Well, okay, let's see.  No, 'cause the book value on Amoco

23 Building, like, was 3,506,000 dollars, something like that.

24 But the debt was almost nineteen million dollars, maybe in the

25 nineteen million dollars range.  So the property was

HC 01168

1  transferred at nineteen million dollars.

2  Q.   I see.  Now, the way I understand your description of how

3  this worked, Mr. Morgan, is that the ultimate amount of the

4  notes becomes somewhat irrelevant, if you don't get enough

5  money to cover the secured creditor or the unsecured creditors

6  that have claims against that property.

7  A.   And administrative.

8  Q.   Okay.  And the administrative claims.  So if the note is,

9  in the case of the Archon properties, for 6.7 million dollars,

10  and the debt against it is a little over four and a half

11  million, that the note for the remainder is not going to be

12  honored by the debtor unless you get enough money from the sale

13  of those properties to cover?

14  A.   That's correct.  Well, I want to clarify that, okay?

15  Q.   Please.

16  A.   It then becomes -- it then becomes a secondary to all

17  circumstances note, so that if, in fact, or any one example, if

18  example, if -- you said the note's 6.7.  If I was able to pay

19  four million dollars on the note from the sale, and that other

20  2.7 rolls back to the backside, and if everybody else is paid

21  off, then there's enough to pay that note, he'll be paid.  But

22  it's second, then, to all other claimants.

23  Q.   Right, and am I correct in my appreciation that the way

24  you view these notes, the way you treat these notes for

25  purposes of the job you're doing is that the notes apply only

HC 01169