# EXHIBIT Y

HC 01288

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

IN RE:                          ) CASE NO. 11-30210-BJH-11
                                )
FRE REAL ESTATE, INC., F/K/A    )
TCI PARK WEST, II, INC.,        ) CHAPTER 11
                                )
          Debtor.               )

TRANSCRIPT OF

FIRST MEETING OF CREDITORS

FEBRUARY 8, 2011

HC 01289

Page 2

P R O C E E D I N G S

1

2        MS. DURHAM:  Our lack of high-tech

3   recording system.

4                If guys have photo IDs on you, if you

5   would yank those out while you're sitting there.

6                Thank you.  All right.  All right.

7   Mr. Morgan.

8                UNIDENTIFIED SPEAKER:  Are you going to

9   do a cotton swab in the cheek or what?

10               MS. DURHAM:  Yeah, I'm going to do

11  fingerprints here in a second.

12               Let's see.  I always have trouble

13  finding the -- 2016.  You guys are good for a while.

14               I'm going to hand Gregory Crown back his

15  and Richard Morgan back his Texas driver's license.

16  Thank you very much.

17               Okay.  This is the first meeting of

18  creditors in FRE Real Estate, Inc., Case Number

19  11-30210, a Chapter 11 pending in Judge Houser's court.

20               My name is MaryFran Durham.  I'm acting

21  under the authority of the United States Trustee for

22  the Northern District of Texas.

23               This meeting is being recorded to this

24  chip.  If anyone wants a copy of the recording, give us

25  a blank compact disk and we will burn your recording to

Page 3

1    that disk.  And if you send us a self-addressed,

2    stamped envelope for that disk, we will mail it to you

3    after we've recorded on to it.

4              Today's date is February the 8th, 2011.

5    The case was filed January 4th, 2011.  Debtor appeared

6    at the debtor interview with the Office of the U.S.

7    Trustee and appeared to comply with all of our

8    administrative requirements that were discussed at the

9    -- the debtor interview.  Have provided proof of

10   insurance, I believe, on all of the assets.

11             I've got just a couple -- we're going to

12   have to talk about a couple of things.

13             I'm not sure if the tax returns have

14   been provided yet.  Do you know, Doug?

15             MR. BUNCHER:  They have.

16             MS. DURHAM:  They have?

17             Okay.  Well, let me add, Doug Buncher is

18   here as debtor's counsel.  Gregory Crown and Richard

19   Morgan are here to speak for the debtor.

20             If each of you gentlemen would raise

21   your right hand.

22             Do each of you solemnly swear or affirm

23   that any testimony you give here today will be the

24   absolute truth?

25             MR. CROWN:  I do.

Page 4

1            MR. MORGAN:  I do.

2            MS. DURHAM:  Thank you.

3            There have been several hearings that

4    you-all participated in, and the motion to dismiss is

5    continued to February 17th.

6            Why don't I let you make some opening

7    remarks if you want to, Mr. Buncher.

8            MR. BUNCHER:  Well, as everyone knows,

9    there's a pending motion to dismiss the case, primarily

10   on the basis that all these properties got transferred

11   to this one entity prior to the bankruptcy.  And Judge

12   Houser -- Houser will decide the issues there.

13           The issues have been fully briefed, and,

14   you know, essentially it's the debtor's position that

15   it should be entitled to at least 120-day exclusive

16   time period to prepare and propose a plan in this case.

17   And the schedules have all been prepared.

18           As I said, Mr. Crown was the primary

19   person working with our office to prepare the schedules

20   and the statements, and it appears they accurately

21   reflect all of the assets and liabilities.  And

22   Mr. Crown is here to answer any questions that anybody

23   has.

24           MS. DURHAM:  At the debtor interview we

25   talked about the operating reports and changing the

Page 5

1    date for your reporting period.

2              MR. CROWN:  Yes.  The fiscal period for

3    -- for most of those operating assets is from the 21st

4    through the -- through the 20th, but we're going to

5    conform to the calendar month.

6              MS. DURHAM:  You're going to come to our

7    -- okay.

8              MR. CROWN:  Yes.  Absolutely.

9              MS. DURHAM:  All right.  So then your

10   first report --

11             MR. CROWN:  Cash basis.

12             MS. DURHAM:  -- will be due the 20th.

13             MR. CROWN:  20th.  Yes.

14             MS. DURHAM:  Okay.

15             And the insurance we had, of course, was

16   -- there were some other names.  The insured was listed

17   as the -- the managing company of the Prime Income

18   Asset Management.  And I'm wondering if that was

19   changed over or are you going to leave it?

20             MR. CROWN:  As a matter of fact, we're

21   in the process, and I hope that within the next 24 to

22   48 hours all of those revisions will be made to -- all

23   of the assets are insured.

24             MS. DURHAM:  Yes.

25             MR. CROWN:  The paperwork didn't exactly

HC 01293

Page 6

1    catch up with the things with last week's loss with the

2    weather and so on.  It's been catch-up in that regard.

3              MS. DURHAM:  And even the -- there was a

4    question about the land without any improvements on it.

5    That has a liability --

6              MR. CROWN:  That all has liability, yes.

7              MS. DURHAM:  Okay.

8              MR. CROWN:  Yes.  And each of those with

9    fixed assets on it has replacement value.

10             MS. DURHAM:  Okay.  Is the debtor

11   operating out of -- what is the status of the

12   debtor-in-possession's bank account just now?

13             MR. CROWN:  All the -- all the operating

14   assets have debtor-in-possession accounts set up.

15             MS. DURHAM:  And they are at the --

16             MR. CROWN:  They are at Bank of America.

17             MS. DURHAM:  Bank of America?

18             MR. CROWN:  Yes.

19             MS. DURHAM:  Okay.

20             MR. CROWN:  Individual accounts for each

21   of the operating assets.

22             MS. DURHAM:  And how many people can

23   sign on the debtor-in-possession accounts?

24             MR. CROWN:  I -- I'm not one of the

25   signatories, but I believe there are -- I believe there

1    are three.

2                    MS. DURHAM:  Total of three for the

3    whole --

4                    MR. CROWN:  Yes.

5                    MS. DURHAM:  -- group of them?

6                    MR. CROWN:  Yes.

7                    MS. DURHAM:  And who would those three

8    people be?

9                    MR. CROWN:  Gene Bertcher I believe is

10   one of them.  Rick Conley, who is the president of

11   Regis.  There may be a third person.  I don't recall

12   who that might be.  Like I say, I'm not involved in --

13   in that.

14                   MS. DURHAM:  Do you know, Mr. Morgan?

15   Would it be a --

16                   MR. MORGAN:  I'm sorry.  What was the

17   question?

18                   UNIDENTIFIED SPEAKER:  Mr. Morgan --

19                   MS. DURHAM:  Mr. Morgan --

20                   MR. MORGAN:  Oh, I believe I'm a signor

21   on all the accounts.  I'm sorry.

22                   MS. DURHAM:  You are?

23                   MR. MORGAN:  I believe so.

24                   MS. DURHAM:  So you would be the third?

25                   MR. MORGAN:  Yes.

Page 8

1     MS. DURHAM:  And who typically signs the

2   debtor-in-possession checks?

3     MR. CROWN:  Right now the operating

4   checks are being signed by Regis because they actually

5   pay the bills --

6     MS. DURHAM:  Would that be Rick Conley?

7     MR. CROWN:  Yes.

8     MS. DURHAM:  And have you sent us the

9   evidence of those --

10     MR. CROWN:  Yes.

11     MS. DURHAM:  -- checks?

12     MR. CROWN:  Yes.

13     MS. DURHAM:  Okay.  We didn't get mail

14   service all last week either, so we're a little behind.

15   There are stacks of it.

16     MR. CROWN:  Maybe -- maybe even two or

17   three weeks ago we sent them.

18     MS. DURHAM:  Oh, okay.

19     MR. CROWN:  You should have all of that.

20     MS. DURHAM:  I'm going to let the

21   creditors ask questions, and what I'll do initially is

22   each person can have ten minutes, and then, if someone

23   wants to go the second round, that will be fine, we'll

24   -- we'll do more time than that.  But on this

25   preliminary one the ten minutes to begin with, and

HC 01296

Page 9

1    then...

2                    Please state your name for the

3    recording.

4                    MR. WEITMAN:  Oh, may I be first?

5                    MS. DURHAM:  You may be first.

6                    MR. WEITMAN:  Thank you.  Hi.  David

7    Weitman for Wells Fargo Capital Finance.

8                    Mr. Crown, you were previously the

9    financial advisor to the various transferor entities,

10   if you will, that transferred their assets into FRE, is

11   that correct?

12                   MR. CROWN:  No, not -- not correct.  I

13   was -- I was asked -- I'm vice president with Prime

14   Income Asset Management and Capital Markets Group.

15   When this bankruptcy was -- the petition was filed, I

16   was asked to coordinate the -- putting together the

17   (inaudible) schedules.

18                   MR. WEITMAN:  But was Prime Income Asset

19   Management, were they the financial advisor to the

20   transferror and the (inaudible) to kind of spearhead

21   that?

22                   MR. CROWN:  They -- they were an advisor

23   to the extent that they were an advisor to TCI and TCI

24   was the beneficial owner of many of those entities,

25   yes.

Page 10

1          MR. WEITMAN:  And, as the financial

2     advisor, were you aware of basically the -- the loan

3     documents of the Corp.?

4               When I say "you," I mean Prime Income.

5               Was it aware of the relationships with

6     its various lenders?

7          MR. CROWN:  Yes.

8          MR. WEITMAN:  So if there were let's say

9     default notices and the like that went to a transferror

10    entity, would Prime Income have knowledge of those

11    defaults?

12         MR. CROWN:  Most likely, yes.

13         MR. WEITMAN:  And would they also have

14    knowledge of the loan documents and the conditions

15    under which transfers could occur --

16         MR. CROWN:  Yes.

17         MR. WEITMAN:  -- on the loan documents?

18              Would they also be familiar with the

19    prohibitions on the transfer of the ownership interests

20    in the transferror entities?

21         MR. CROWN:  To the extent there were any

22    such prohibitions, I'm sure they would have been aware

23    of that, yes.

24         MR. WEITMAN:  So that basically was --

25    correct me if I'm wrong -- sort of the back room for

Page 11

1    the transferror entity?  That's where the staff or

2    officers came from was Prime Income?

3              MR. CROWN:  Since the transferror

4    entities did not have any employees, Prime Income Asset

5    Management acted as a -- as the advisor to the entity

6    that owned those assets and therefore supplied the

7    manpower and efforts in that regard.

8              MR. WEITMAN:  Thank you.

9              Can you help me understand where the

10   $100,000 retainer came from that Prime Income provided

11   to Mr. Lewis and now is in these proceedings?

12             MR. CROWN:  When you say where it came

13   from, I'm not sure I understand it.

14             MR. WEITMAN:  There's a statement -- in

15   the statement of financial affairs --

16             MR. CROWN:  Yes.

17             MR. WEITMAN:  -- I believe referring to

18   a $100,000 retainer.

19             MR. CROWN:  Uh-huh.

20             MR. WEITMAN:  It said the source of the

21   $100,000 retainer was Prime Income.

22             MR. CROWN:  Yes.

23             MR. WEITMAN:  Could you give me some

24   more details on whether it was self-funded by Prime

25   Income or if it had collected money from other sources

Page 12

1    and then remitted it to Mr. Lewis?

2              MR. CROWN:  I can't really answer that.

3    Prime Income is -- has, you know, revenues and expenses

4    like any other going concern, and I would presume would

5    have had the -- the resources to -- to write such a

6    check, but I -- I don't know exactly how that was

7    funded.

8              MR. WEITMAN:  But you do understand it

9    was Prime Income's own asset?  Or you really don't know

10   the source?

11             MR. CROWN:  I honestly don't know the

12   source.

13             MR. WEITMAN:  Did Prime Income receive

14   financial advisory fees from these transferror

15   entities?

16             MR. CROWN:  They received financial

17   advisory fees from the publicly-traded companies for

18   which they act as an advisor.

19             MR. WEITMAN:  Okay.  So that would be,

20   if you will, American Realty --

21             MR. CROWN:  And Transcontinental.

22             MR. WEITMAN:  -- Income Opportunity?

23             MR. CROWN:  Yes.

24             MR. WEITMAN:  And Transcontinental

25   Realty?

HC 01300

Page 13

1        MR. CROWN:  Yes.

2        MR. WEITMAN:  You mentioned that

3  Mr. Gene Bertcher is a signatory on the

4  debtor-in-possession accounts.

5        MR. CROWN:  I believe he is as a chief

6  financial officer of -- of TCI and given that he -- he

7  oversees the assets and so on from a financial

8  standpoint.

9        MR. WEITMAN:  I thought what occurred

10  was that after the transfer of the assets into FRE and

11  the transfer of the ownership interests in the

12  transferror entities, I thought Mr. Bertcher was no

13  longer connected with the transferror entities.  Is

14  that not true?

15        MR. CROWN:  Well, to the extent that

16  there -- there's not significant staff staffed over at

17  the transferror entity, FRE -- transferee entity --

18  Regis and Prime are still providing some services to --

19  support services to -- to FRE.

20        MR. WEITMAN:  So, again, if you would --

21  maybe you've got it in front of you.  I'm just trying

22  to understand the Question Number 22 on the statement

23  of financial affairs -- this would be Page 10 of 11 --

24  answer to 22, as a former officer/director of FRE that

25  shows Gene Bertcher -- correct, sir?

Page 16

1      income yet to make the monthly lease payments?

2                  MR. CROWN:  As of yet, no.

3                  MR. WEITMAN:  Is there yet -- excuse me.

4                  At the point in time in which FRE went

5      into bankruptcy, was there any source of revenues

6      beyond the encumbered rents coming from the office

7      buildings and other income-producing properties?

8                  MR. CROWN:  Well, for the

9      non-income-producing properties, particularly the land,

10     that was being funded by the publicly-held parents that

11     were beneficial owners of that land.

12                 MR. WEITMAN:  And were there like

13     intercompany transfers in order to support those

14     operations --

15                 MR. CROWN:  I'm sure there were.  I'm

16     not -- I don't -- I'm not involved in those -- those

17     accounting transactions, but I'm sure that's the way it

18     was handled.

19                 MR. WEITMAN:  So what occurred in this

20     -- if you were there or if you know -- what occurred in

21     December of 2010 to cause Transcontinental, American

22     Realty & Income Opportunity to just sort of transfer

23     all these properties in and try to monetize their

24     interest?  Can you share your perspective?

25                 MR. CROWN:  Well, I was not a part of

HC 01302

1    the decision at all.  But as -- on the periphery I can

2    say that, you know, in a general sense the recession

3    that we've been in for the last two years placed a

4    tremendous burden on all real estate.  Leasing was way

5    down.  That would affect the operating assets.  The

6    sale of land for new development was way off -- nearly

7    nonexistent -- and that would affect the profit

8    potential of the land holdings.

9              Further, the financing markets were

10   dislocated in that it was extremely difficult to get --

11   to extend loans that were coming due and/or replace

12   those loans, which was -- would be the preference for

13   those that had existing loans -- for the mortgagees of

14   existing loans were looking for replacement financing

15   if they could get it, but it wasn't available at -- at

16   reasonable rates.

17             MR. WEITMAN:  Do you know on a monthly

18   basis how much Transcontinental and the other

19   publicly-held entities were supporting these

20   transferror entities that had non-income-producing

21   assets?

22             MR. CROWN:  I do not know that.  But to

23   the extent that they had no revenue productions through

24   the sale of the land -- and most of these are land

25   holdings as opposed to buildings that were

Page 18

1      non-producing revenue -- it could -- it's a function of

2      taxes and -- and insurance and some maintenance fees.

3      But the big nut was -- was the interest payments.

4                    MR. WEITMAN:  Were there --

5                    MR. CROWN:  And to the extent --

6                    MR. WEITMAN:  -- I'm sorry.

7                    MR. CROWN:  -- and to the extent there

8      might be some principal payments along with the

9      interest payments.

10                   MR. WEITMAN:  But they weren't really

11     carrying the taxes, were they?  Because they would

12     refinance through Propel.  Correct?

13                   MR. CROWN:  Well, in some cases, that's

14     true.  In other cases, taxes were paid.  But to those

15     taxes that were -- were funded by Propel, they had

16     monthly income -- monthly interest payments to Propel.

17                   MR. WEITMAN:  And those were being

18     funded by the parent entities?

19                   MR. CROWN:  Yes.  And I don't know

20     exactly.  It depends on -- on which -- which asset

21     you're talking about as to which entity might be

22     involved.  But I've been advised that that's the way it

23     was done.  I was not a part of that, but --

24                   MR. WEITMAN:  Are there any records that

25     summarize, say for the last twelve months, the various

HC 01304

1  financings and transfers that came from the parent

2  companies to support the various transferror entities?

3  Are there any records of that?

4          MR. CROWN:  I'm sure there are records.

5  I don't have those records.  As I said, I was not part

6  of that, but I'm sure there are records, yes.

7          MR. WEITMAN:  I just make that request

8  to Mr. Buncher, if he might be able to provide that to

9  us, because I'd like to know what the historical

10  pairing costs have been and what was being funded prior

11  to the transfers.  It would make it -- I think it's

12  very -- you know, it would elucidate a lot of this

13  subject matter.

14          MR. BUNCHER:  Well, I would suggest that

15  if you've got a document request or a rule -- if you

16  want to take the debtor's 2004 examination and you want

17  to request documents in that regard, because these

18  records you're talking about may not be the debtor's

19  records, for example.  They may be TCI's records.  I

20  don't know.  But I think you and I can just work

21  through that, but I don't know that this is the proper

22  forum to be asking us to produce records.

23          MS. DURHAM:  Well, it's kind of a

24  distinct list.  But do you want it for all of the

25  properties?

Page 20

1          MR. WEITMAN:  Well, let me continue, if

2     I may.

3               Is that an intercompany payable?  Is

4     that -- was that due by the transferror back to the

5     parent company for those loans?  Or were those --

6          MR. CROWN:  I don't know exactly how

7     those were accounted for.  I don't know exactly --

8          MS. DURHAM:  Who would know how that was

9     done?

10         MR. CROWN:  The -- the financial

11    officers of -- of the parent companies of the prior

12    owners.

13         MR. WEITMAN:  I mean, just as an

14    example, let's just say, you know, up until -- up

15    through December 23 there was three million dollars

16    that came down from the transferror entity as a loan

17    into -- into the transferror --

18         MS. DURHAM:  E.

19         MR. WEITMAN:  -- excuse me -- the

20    transferee entity -- thank you -- or it was the

21    transferee of the say three million dollars or

22    whatever, it would then have an obligation, would it

23    not, to repay that sum of money to the parent?

24         MR. CROWN:  I don't know what the --

25    what the terms of the -- of the arrangement would be.

Page 21

1         MS. DURHAM:  Who would know the answer

2    to that question?  Like a person's name.

3         MR. CROWN:  Chief financial officer for

4    TCI would know.

5         MR. WEITMAN:  So Mr. Bertcher?

6         MR. CROWN:  Yes.

7         MR. WEITMAN:  Okay.

8         MR. BUNCHER:  Just so we're clear, we're

9    asking questions about TCI's financial records and TCI

10   -- how TCI, a public company that's not a party in this

11   bankruptcy, funded its subsidiaries at a time when

12   these properties were owned by those companies.  Those

13   are not the debtors's records.

14        MR. WEITMAN:  But what I'm --

15        MS. DURHAM:  I'm interpreting this as

16   trying to figure out the debts of the debtor.  Is that

17   what -- I mean --

18        MR. BUNCHER:  Correct.

19        MS. DURHAM:  -- because if the debtor

20   has an obligation to repay TCI, is that on here in our

21   stack of papers?

22        MR. BUNCHER:  There is no debt reflected

23   to TCI other than what we're calling the seller notes

24   that were given back to Transcontinental, et cetera.

25        MS. DURHAM:  But we -- what his

Page 22

1    question, I guess, a year or so before filing, is there

2    debt that came from -- or is there money that came from

3    TCI that needs to go back and it's in unsecured or bond

4    form or -- it's in some kind of format.

5              MR. CROWN:  Not -- not from the debtor,

6    no.

7              MS. DURHAM:  Okay.  So this debtor --

8    this --

9              MR. CROWN:  These are all the debts of

10   the debtor, period.

11             MS. DURHAM:  Okay.

12             MR. BUNCHER:  And -- and we're assuming

13   too that assuming TCI funded money into its

14   wholly-owned subsidiaries, you're assuming that was

15   treated as a loan.  He said he doesn't know.

16             MS. DURHAM:  No.  He's just wanting to

17   know if it's a debt of --

18             MR. WEITMAN:  No.  I'm trying to

19   understand --

20             MR. BUNCHER:  No.  I understand.  I'm

21   not assuming anything.  I'm just --

22             MR. CROWN:  It's not -- it's not -- the

23   debts of the debtor are --

24             MS. DURHAM:  Here.

25             MR. CROWN -- reflected here.

1        MS. DURHAM:  Okay.

2        MR. CROWN:  Those are the only debts of

3   the debtor.

4        MS. DURHAM:  So this would indicate that

5   there are no alternative --

6        MR. WEITMAN:  So if there was support

7   given, it was through equity infusions?  Is that what

8   we must assume from that, since there are no additional

9   intercompany loans?

10        MR. CROWN:  Like I said, I don't know

11   what to assume.  All I can say is that -- that these

12   are the debts of the debtor.  Pre 12/23 I don't know

13   about.

14        MS. DURHAM:  Your time is up.  I'm going

15   to move --

16        MR. WEITMAN:  Okay.  Can I go one more

17   question?

18        MS. DURHAM:  Uh-huh.  Yeah.  Sure.

19        MR. WEITMAN:  And Mr. Stromberg can

20   follow up.

21        MS. DURHAM:  And then we'll come back

22   around.

23        MR. WEITMAN:  Oh.  Well, then I'll wait.

24        MS. DURHAM:  Go ahead, Mr. Stromberg.

25        MR. STROMBERG:  I was just going to ask

HC 01309

Page 24

1    a clarification question.

2                This is Mark Stromberg on behalf of

3    State Bank of Texas.

4                We were talking about the debts of the

5    debtor, but perhaps it's fair to also ask, as between

6    the transferror entities which were transferring the

7    properties on December 23rd to the debtor, did they

8    have a debt prior to December 23rd with one of the

9    affiliates or parent companies in the TCI/American

10   Realty Trust family?

11               MR. CROWN:  Yeah, I honestly -- I

12   honestly don't know because I've never seen the books

13   of the predecessor entities.

14               MR. STROMBERG:  Okay.  So it's at least

15   possible then, theoretically, that while there may have

16   been a debt between say, for example, Crown Point or

17   TCI Crown Point, which was the entity that my bank went

18   to -- and perhaps TCI or American Realty Trust or one

19   of the other -- or Prime Income Asset or something like

20   that -- that that debt may not have been transferred so

21   it wouldn't necessarily be reflected on the schedules?

22               MR. CROWN:  Yeah.  Well, it wasn't

23   transferred because it's not reflected on the schedule.

24               MR. STROMBERG:  Okay.

25               MR. CROWN:  But whether one existed I

HC 01310

Page 25

1    don't know.

2              MR. STROMBERG:  Okay.  Let me go back a

3    step to the DIP accounts.

4              MR. CROWN:  Uh-huh.

5              MR. STROMBERG:  Was there prior to

6    bankruptcy a separate bank account for Crown Point,

7    Inc. associated with that property?

8              MR. CROWN:  What is that property known

9    as?

10             MR. STROMBERG:  Arcon.

11             MR. CROWN:  Arcon.

12             MR. STROMBERG:  It's the acreage in

13   Irving.

14             MR. CROWN:  I'm going to refer to this

15   schedule to make sure I --

16             MR. STROMBERG:  Please.

17             MR. BUNCHER:  Arcon was raw land,

18   correct?

19             MR. STROMBERG:  Right.  I'm just asking

20   if there was an account.

21             MR. CROWN:  I don't believe there was,

22   no.

23             MR. STROMBERG:  Okay.

24             MR. CROWN:  There were -- the reason I'm

25   looking is there were some small accounts with some of

Page 26

1    the land, but not with that particular one.

2                 MR. STROMBERG:  Okay.  And so is it fair

3    to assume that among the DIP accounts that were set up,

4    when you said they were relating to the operating

5    entities, Arcon is not what you would consider an

6    operating entity?

7                 MR. CROWN:  I believe a DIP account was

8    set up for the land holdings in general.  Since they

9    did not have any revenue flowing in, there's one master

10   DIP account for the non-revenue-producing assets.

11                MR. STROMBERG:  And how was that account

12   funded?

13                MR. CROWN:  Well, at the moment it

14   isn't.

15                MR. STROMBERG:  Okay.

16                MR. CROWN:  I believe there was a de

17   minimis initial deposit, but that was it.

18                MR. STROMBERG:  Okay.  And from whom did

19   that deposit come?  Do you know?

20                MR. CROWN:  I do not know.

21                MR. STROMBERG:  And, insofar as the ad

22   valorem taxes that came due on January 31, 2011, for

23   the year 2010 are concerned, do you know whether or not

24   there were any assets set aside either in Coventry

25   Point, Inc. -- did I say Coventry Point -- I think it's

HC 01312

Page 27

1    Coventry Point is actually the name of the Arcon entity

2    -- or subsequent to the bankruptcy in the DIP account

3    for purposes of paying taxes relative to this property,

4    including perhaps taxes -- you know, percentage -- you

5    know, twelve -- one-twelfth percent interest for the

6    taxes that are coming due in 2011 that will be due in

7    2012?

8              MR. CROWN:  I do not believe there was

9    any -- any escrow accounts set up for the landholders.

10             MR. STROMBERG:  Okay.  I heard from

11   Mr. Morgan in his testimony that it was estimated that

12   overall, for all of the properties that are in the

13   debtor right now, there are approximately 2.9 million

14   dollars worth of ad valorem taxes that came due on

15   January 31, 2011.  Is that a fact consistent with your

16   understanding?

17             MR. CROWN:  Yeah.  It's a little bit

18   higher than that.  It's like 3.16 million is what the

19   number is.  That was a preliminary number, and they may

20   have not seen the final number.

21             MR. STROMBERG:  With respect to the

22   non-income properties, Mr. Crown, what is your

23   understanding and belief as to how the debtor would

24   propose to take care of those taxes?

25             MR. CROWN:  Well, of course, that will

Page 28

1      have to be part of the plan that we present to the --

2      to the creditors and the -- the court, and at the

3      moment we don't have the details on how those will be

4      paid.

5              I will say that both the 2010 taxes due

6      on 1/31 -- payable on 1/31/11 and the 2011 taxes

7      payable on 1/31/12 I believe are both subject to a

8      payment plan under the Bankruptcy Code, and we may

9      avail ourselves of that.

10             MR. STROMBERG:  Okay.  Insofar as the

11     records of the debtor are concerned, were there related

12     to the Arcon property separate files set up dealing

13     with that property or the business entity that held the

14     property prior to December 23rd, 2010?

15             MR. CROWN:  Yes.

16             MR. STROMBERG:  And where were those

17     records located?

18             MR. CROWN:  The - in general, the land

19     holdings were overseen by Prime personnel and

20     accounting.  The producing -- the operating assets were

21     overseen by Regis and its accounting staff.  So Arcon

22     would be under the Prime umbrella in terms of

23     accounting.

24             MR. STROMBERG:  And after the property

25     was transferred on December 23rd, 2010, to the debtor

HC 01314

Page 29

1    have the records related to that property also been

2    transferred to the debtor?

3                MR. CROWN:  For ease they have not yet

4    been transferred to the debtor.  And as part of the --

5    the effort to look after the best interests of its --

6    of its notes payable -- in other words, the notes

7    actually receivable to the prior owners, in Prime's

8    role as an advisor to the parent company of those

9    companies, it's currently donating its services to

10   provide accounting support to -- to them.

11               MR. STROMBERG:  Just to put a name

12   behind the company, who at Prime Income Asset

13   Management were the custodians of the records related

14   to the Arcon property?

15               MR. CROWN:  Amy Cole, C-O-L-E, an

16   accounting manager, was the prime person involved in

17   those.

18               MR. STROMBERG:  Custodian?

19               MR. CROWN:  I used the word "prime.  In

20   both cases, Prime and prime.

21               MR. STROMBERG:  Okay.  (Inaudible.)

22               MR. CROWN:  Exactly.

23               MR. STROMBERG:  Insofar as the decision

24   to roll these properties up into Fenton Real Estate,

25   now known as FRE Real Estate, Inc., you indicated that

HC 01315

Page 30

1   you were not involved in that decision process.  Am I

2   right?

3                    MR. CROWN:  I was not, no.

4                    MR. STROMBERG:  Do you know who was?

5                    MR. CROWN:  Well, I -- I know that --

6   that members of senior management with TCI to the

7   extent that they were -- and Prime were involved.

8   Danny Moos was involved.  Steven Shelley was involved.

9                    Beyond that, I don't know any particular

10   individuals who were involved in those decisions.  As

11   the advisors to the publicly-held companies that were

12   the beneficial owners of most of those assets, they

13   would have been the key personnel to make those calls

14   and decisions.

15                    MR. STROMBERG:  My understanding from

16   Mr. Morgan, both in his deposition and from his

17   testimony in court, was that one of the likely

18   scenarios in which a restructuring or reorganization

19   would take place in this case involves contribution

20   coming from -- forgive me for saying this -- but your

21   side of the ledger, Mr. Crown, either Prime Income

22   Asset Management or TCI or American Realty Trust or one

23   of the associated entities under that umbrella.

24                    What is your appreciation right now of

25   the ability of the -- of these entities to fund a cash

1    contribution today if necessary for the benefit of --

2    of the debtor in this case?

3              MR. CROWN:  I -- I really don't know

4    what their -- what their appetite is and ability is to

5    fund those.  But, as Mr. Morgan stated, it's certain at

6    one of the -- the sources, unless assets could be --

7    loans could be refinanced or a third party unrelated

8    equity source could be found.

9              MR. STROMBERG:  Has Mr. Morgan come to

10   you or somebody else that you know of in TCI or

11   American Realty Trust to seek that contribution or some

12   contribution of -- of equity or reorganization money or

13   restructuring funds?

14             MR. CROWN:  No, he has not come to me,

15   but I know he has had -- has begun discussions with --

16   with those parties to determine whether there's a

17   potential -- or what role they might play in such

18   funding.

19             MR. STROMBERG:  You mentioned in some of

20   your earlier discussions with Mr. Weitman some of the

21   things that have caused and resulted in the roll-up

22   process with all of these properties going into FRE in

23   December of 2010, including leasing that was down, the

24   economy generally having an impact on the availability

25   of financing, the unavailability of sales and

HC 01317

Page 32

1    development of buyers and things of that nature.

2                Is TCI and/or American Realty Trust

3    experiencing many of the same problems right now that

4    might -- that's affecting their liquidity?

5                MR. CROWN:  Well, I think any real

6    estate company in today's economy has for the last

7    couple of years been experiencing those same pressures.

8    If you're a company that develops land -- and these

9    companies are -- they buy land at wholesale and try to

10   sell it at retail.  And if the -- the outlet for

11   selling at retail is stymied or slowed down or comes to

12   a halt, it's -- it's difficult.  It's the cash -- cash

13   pressure on them.  Any -- any real estate company.

14               MR. STROMBERG:  I don't want to

15   over-interpret your answers, so let me ask you to be

16   specific.

17               As it relates to TCI and American Realty

18   Trust, are they in fact having some of these same

19   difficulties, to your understanding?

20               MR. CROWN:  Yes.  And all real estate

21   companies are.  And they are a real estate company.

22   They are having challenges the same.

23               MR. STROMBERG:  And that affects their

24   liquidity as well?

25               MR. CROWN:  Certainly, yes.

HC 01318

1        MR. STROMBERG:  And some of these same

2  issues that resulted in the FRE roll-up and bankruptcy

3  are affecting other properties within the TCI/American

4  Realty Trust family too, are they not?

5        MR. CROWN:  Yes, to one degree or

6  another.

7        MR. STROMBERG:  I'll pass for this time.

8  Thank you.

9        MR. WARNER:  Mr. Crown, let me start

10  with you.

11        You're not an officer of the debtor?

12        MR. CROWN:  I am not.

13        MR. WARNER:  You're not a director of

14  the debtor?

15        MR. CROWN:  No.

16        MR. WARNER:  I'm sorry.  I apologize.

17        Michael Warner, Cole, Scholtz, Meisel,

18  Forman & Leonard, Fort Worth office.  I represent HCMLP

19  as special servicer.

20        MS. DURHAM:  Thank you.

21        MR. WARNER:  I apologize.  Let's start

22  again.

23        You're not an officer of the debtor?

24        MR. CROWN:  I am not.

25        MR. WARNER:  You're not a director of

Page 34

1    the debtor?

2                    MR. CROWN:  No.

3                    MR. WARNER:  You're not a shareholder of

4    the debtor?

5                    MR. CROWN:  I am not.

6                    MR. WARNER:  Are you authorized to

7    testify today on behalf of the debtor?

8                    MR. CROWN:  Yes.

9                    MR. WARNER:  And who authorized you?

10                   MR. CROWN:  Mr. Morgan.

11                   MR. WARNER:  In writing or just orally?

12                   MR. CROWN:  Verbally, yes.

13                   MR. WARNER:  So there's nothing in

14   writing authorizing you to do so today?

15                   MR. CROWN:  Not to my knowledge there

16   isn't, no.

17                   MR. WARNER:  You indicated a moment ago

18   that there are three people that are signing on the

19   debtor-in-possession bank accounts, Mr. Gene -- is it

20   Bertcher?  Buncher?

21                   MR. CROWN:  Bertcher.

22                   MR. WARNER:  Bertcher, Rick Conley and

23   Mr. Morgan, correct?  And nobody else is authorized to

24   sign?

25                   MR. CROWN:  I believe there are only

Page 35

1       three.  I -- I -- I believe those are the three.

2                        MR. WARNER:  Okay.  And you said that

3       you prepared the debtor's schedules, is that correct?

4                        MR. CROWN:  I coordinated the

5       preparation of all of the schedules.  So basically I

6       accessed the accounting staff of Regis and Prime, who

7       are the -- who maintained the regular ongoing books and

8       records for these various assets, and made demands on

9       them in terms of information that I needed to complete

10      the schedules and so forth.

11                       That material was reviewed by Brett

12      Nichol, who oversees the operating assets, and Amy

13      Cole, who was an accounting person overseeing the land

14      assets.  Presented to me.  I reviewed it.  Presented it

15      to a paralegal with Neligan Foley, our attorney.  They

16      prepared the schedules.  They sent them back to me, and

17      Brett Nichol and myself reviewed them again before they

18      were filed.

19                       MR. WARNER:  And let's go back to the

20      signatures then on the bank statements.  Since the --

21      since Mr. Bertcher -- I'm sorry -- it's Bertcher --

22                       MR. CROWN:  Bertcher.

23                       MR. WARNER:  -- Bertcher is a signatory

24      on the debtor-in-possession accounts, he's not an

25      officer of the debtor, is he?

Page 36

1           MR. CROWN:  To my knowledge he's not.

2           MR. WARNER:  Is he a director of the

3    debtor?

4           MR. CROWN:  To my knowledge he is not.

5           MR. WARNER:  Is he a shareholder of the

6    debtor?

7           MR. CROWN:  I don't believe so.

8           MR. WARNER:  So he's a third party

9    signing on the debtor-in-possession bank accounts,

10   correct?

11          MR. CROWN:  Well, I don't think he's

12   signing at all.  He was put on there from an

13   accommodation standpoint in terms of just ease of

14   having another highly-regarded financial person in the

15   loop, but I don't believe he's executing any signatures

16   at this point.

17          MR. WARNER:  But he has the authority to

18   do so?

19          MR. CROWN:  He does.

20          MR. WARNER:  And would the answers be

21   the same with Mr. Conley?  He's not a director?

22          MR. CROWN:  No.  He is the president of

23   Regis.  And he's not affiliated with the debtor per se.

24          MR. WARNER:  Well, okay.  I'm not going

25   to ask you what you mean by the word "affiliated."

HC 01322

Page 37

1          He's not a director of the debtor?

2          MR. CROWN:  He's not a director, he's

3    not an officer.

4          MR. WARNER:  And he's not a shareholder

5    of the debtor?

6          MR. CROWN:  No.

7          MR. WARNER:  And, again, he's a party

8    that can sign on the debtor's bank accounts, correct?

9          MR. CROWN:  Right.  That is, Regis

10   providing the management services for the debtor, yes.

11          Incidentally, that's -- that's -- that's

12   the case in terms of prior to the bankruptcy also.

13          MR. WARNER:  We've been talking about

14   the name TCI.  That really stands for Transcontinental

15   Realty Investors, Inc., correct?

16          MR. CROWN:  It does.

17          MR. WARNER:  And that's a

18   publicly-traded entity?

19          MR. CROWN:  It is.

20          MR. WARNER:  Okay.  And that entity

21   transferred some assets into the debtor somewhere

22   around late December 2010, correct?

23          MR. CROWN:  Yes.

24          MR. WARNER:  Did it transfer all of its

25   assets into the debtor?

Page 38

1              MR. CROWN:  All of TCI's assets?

2              MR. WARNER:  Yes.

3              MR. CROWN:  No.

4              MR. WARNER:  So TCI still has assets it

5        didn't transfer in, correct?

6              MR. CROWN:  Yes.

7              MR. WARNER:  Does TCI still own real

8        property that it did not transfer in?

9              MR. CROWN:  Yes.

10             MR. WARNER:  How did it decide, if you

11       know, which properties to transfer into the debtor and

12       which not to?

13             MR. CROWN:  I was not a party to that --

14       that decision.

15             MR. WARNER:  Did anybody tell you about

16       that decision?

17             MR. CROWN:  Other than to say that these

18       were assets that were -- had performance problems, were

19       facing imminent or near-term foreclosure, and were

20       having generally difficult times --

21             MR. WARNER:  Are there other assets --

22             MR. CROWN:  -- no specifics.

23             MR. WARNER:  -- I'm sorry.

24             Are there other assets owned by TCI that

25       didn't fall into that sort of category of having

Page 39

1   trouble?

2            MR. CROWN:  Yes.

3            MR. WARNER:  There are?

4            MR. CROWN:  Yeah.

5            MR. WARNER:  And those were not

6   transferred in?

7            MR. CROWN:  Those that were -- were

8   flowing cash and covering their expenses and so on were

9   not put in.

10           MR. WARNER:  I'd like you to look if you

11  would at the statement of financial affairs, Question

12  Number 21.  It says that the -- the question asks for

13  the name of current partners, officers, directors and

14  shareholders.

15           The debtor is a C corporation, is it

16  not?

17           MR. CROWN:  Yes.

18           MR. WARNER:  Therefore it would have

19  officers, directors and shareholders, correct?  Not

20  partners?

21           MR. CROWN:  That's correct.

22           MR. WARNER:  Mr. Akin is listed as the

23  president and a director holding a fifty percent

24  indirect interest -- or indirectly held.

25           What did you mean by the word

Page 40

1      "indirectly held"?

2                    MR. CROWN:   He holds it through other

3      entities --

4                    MR. WARNER:   What other entities?

5                    MR. CROWN:   -- and ultimately ABCLD

6      Properties, LLC, I believe.

7                    MR. WARNER:   Is that the holder of the

8      fifty percent interest?

9                    MR. CROWN:   I believe it's the holder of

10     the interest and he owns that proportionate share of

11     that entity.

12                   MR. BUNCHER:  And, Mike, that's set out

13     on Exhibit 1 to the debtor interview information, the

14     intermediate parties --

15                   MR. WARNER:   The steps?

16                   MR. BUNCHER:  Yes.   It's Exhibit 1.

17                   It says FRE is owned 100 percent by

18     ABCLD Properties, LLC, which ABCLD Properties is owned

19     100 percent by ABC Land & Development, Inc., and ABC

20     Land & Development, Inc. is owned 50 percent by Akin

21     and 50 percent by DTS Holdings, LLC, and DTS Holdings,

22     LLC, is owned 50 percent by Terry Shumate and 50

23     percent by Donna Shumate.

24                   So that's -- that's how you get there.

25                   MR. WARNER:   So the 50 percent under

HC 01326

1   Mr. Akin's name -- or across from Mr. Akin's name has

2   now been explained.

3             Let's look at the F. Terry Shumate and

4   the Donna Shumate, each holding a 25 percent indirectly

5   held.  Does that also explain those two holdings?

6             MR. CROWN:  Uh-huh.

7             MR. WARNER:  Okay.  And, sir, what's the

8   relationship between F. Terry Shumate and Donna

9   Shumate?

10            MR. CROWN:  Husband and wife.

11            MR. WARNER:  Would you then look now at

12  Question 22 for me, which -- let me -- let me just go

13  back to Question 21.  I'm sorry.

14            If I read Question 21, 100 percent of

15  the debtor's equity is held indirectly by Mr. Akin,

16  Mr. Shumate and Ms. Shumate, correct?  That would add

17  up to 100.

18            So if we now look at Question 22, it

19  lists nine entities or nine individuals that were

20  either former partners, officers, directors or

21  shareholders.  Can you identify who of these nine were

22  former shareholders?

23            MR. CROWN:  I do not know that.

24            MR. WARNER:  Okay.  Do you know who of

25  these nine were --

Page 42

1              MR. BUNCHER:  Well, the question only

2    asks who the officers or directors were.  And above, in

3    A, 22A, it says as to partners -- as to a partnership,

4    list each member.

5              MR. WARNER:  Right.

6              MR. BUNCHER:  And it's not a

7    partnership.

8              MR. WARNER:  No.  I understand that.

9    I'm just trying to --

10             MR. BUNCHER:  The corporation was owned

11   as part of TCI.  Fenton --

12             MR. CROWN:  Park West II.

13             MR. BUNCHER:  -- TCI.  Park West II,

14   Inc. was the debtor's former name, so it was a

15   subsidiary entity underneath TCI.

16             MR. WARNER:  Wholly owned by TCI?

17             MR. BUNCHER:  Right.

18             MR. WARNER:  Is that your understanding,

19   Mr. Crown?

20             MR. CROWN:  Uh-huh.

21             MR. WARNER:  So prior to December 22,

22   2010, the equity of the debtor was held by TCI.  TCI

23   then transferred the equity of the debtor to Akin,

24   Shumate and Shumate for their entities, correct?

25             MR. CROWN:  Well, that equity is also

Page 43

1    subject to, you know, buyer notes back to the former

2    entities.

3              MR. BUNCHER:  Yeah.  There was a note

4    given for the equity.  ABCL Properties, LLC, acquired

5    the equity of the debtor from TCI in exchange for a

6    note, and I think the note was sixty-plus million

7    dollars.

8              MR. CROWN:  It turned out -- after some

9    netting out, it turned out to be -- well, directly

10   about 49 million dollars.

11             MR. WARNER:  Prior to December 22, 2010,

12   the debtor owned the Fenton building -- we'll call it

13   the Fenton building.  You'll know what I'm talking

14   about when I say that?

15             MR. CROWN:  I do.

16             MR. WARNER:  Did it own any other real

17   property prior to December 22?

18             MR. CROWN:  There's some acreage

19   adjacent to, contiguous to the building that is part of

20   that -- that ownership.

21             MR. WARNER:  Is it owned -- was it owned

22   by the debtor or was it owned by other entities that

23   transferred it in?

24             MR. CROWN:  No.  It was owned -- it was

25   all part of that Fenton Center project.  In other

Page 44

1    words, there's two buildings, connected buildings, and

2    then there's also adjacent land that's all part of the

3    Fenton Center.

4              MR. WARNER:  Other than that, did it own

5    any other real property?  Other than what you just

6    defined as sort of a Fenton Center?

7              MR. CROWN:  To my knowledge, no.

8              MR. WARNER:  Did it own any other

9    assets?

10             MR. CROWN:  Well, it did own the Park

11   West II Association, which is a property management

12   association.  Essentially revenue in/revenue out

13   matching to provide services to the Fenton Center.

14             MR. BUNCHER:  It also I think owned a

15   bunch of equipment and furniture and stuff like that

16   that goes along with the building.

17             MR. WARNER:  In the Fenton Center?

18             MR. BUNCHER:  Right.

19             MR. CROWN:  Right.  But nothing

20   unassociated with the Fenton Center.

21             MR. WARNER:  I'd like now to turn to

22   Mr. Morgan, sir.

23             If I remember your testimony at the

24   first day of the hearings on the motion to dismiss, I

25   think you said that you reviewed the transactions

Page 45

1   whereby the debtor would acquire some 38 or so parcels

2   of property, correct?

3              MR. MORGAN:  Yes.

4              MR. WARNER:  Did you approve doing those

5   acquisitions by the debtor?

6              MR. MORGAN:  No.

7              MR. WARNER:  And that's because you were

8   not part of the debtor at the time those were done?

9              MR. MORGAN:  I was officially an

10  officer, but I had not accepted the role of -- of

11  supervising or being part of the restructuring process

12  at that time.

13             MR. WARNER:  So all of those transfers

14  in occurred prior to your approval process.  So do you

15  know who approved all of those transfers in on behalf

16  of the debtor?

17             MR. MORGAN:  I do not.

18             MR. BUNCHER:  There's resolutions that

19  have been produced of the debtor that authorize all of

20  the transactions on behalf of the debtor.

21             MR. WARNER:  Right.  And that's a

22  corporate resolution.

23             I'm trying to find out if the gentleman

24  who is now running the show approved those transactions

25  in.  And you're saying you did not approve those?

HC 01331

Page 46

1          MR. MORGAN:  No.

2          MR. WARNER:  In looking at those

3  transactions now, would you have approved them had you

4  been asked to?

5          MR. MORGAN:  Well, I approved them close

6  -- close to the presentation because I -- I looked at

7  them and decided there was enough value that was worth

8  my spending my time and effort trying to make the

9  debtor whole.

10          MR. WARNER:  So you would have approved,

11  if you were asked to in the first instance, the

12  transferring of all 38 properties?

13          MR. MORGAN:  I can't directly --

14  directly answer.  I don't know.  It's hard to say.  I

15  approved the process of taking over supervision of it

16  based on what I saw as value.

17          MR. WARNER:  Well, let me ask the

18  question a different way.

19          If you had your choice now to redo it,

20  would you have not taken all 38 properties in?

21          MR. MORGAN:  I can't say I would have

22  taken all 38 in, but, in the whole, I would have, yes.

23          MR. WARNER:  Which properties would you

24  have not taken in had you made that decision -- had you

25  been asked to make that decision?

HC 01332

Page 47

1            MR. MORGAN:  Well, you're getting

2    specific now.  I don't know.  I'm saying I can't say

3    for every specific one that I would have taken them in,

4    but I do know that I approved it as a whole.

5            MR. WARNER:  I believe you testified

6    that you executed an agreement between the debtor and

7    Regis -- and I apologize, I don't know Regis's full

8    name.  What is Regis -- let me start there.

9            What is Regis's full name?

10            MR. MORGAN:  Regis Property Management

11    or something of that ilk.

12            MR. WARNER:  So if I use the term Regis,

13    you know I'm talking about Regis Property Management?

14            MR. MORGAN:  Yes.

15            MR. WARNER:  You executed an agreement

16    between Regis and the debtor, is that correct?

17            MR. MORGAN:  That's correct.

18            MR. WARNER:  And you did that prior to

19    bankruptcy, is that correct?

20            MR. MORGAN:  No, I did that close to

21    bankruptcy.

22            MR. WARNER:  Close to bankruptcy.  Okay.

23            And that is for management of the

24    operating properties or a specific property?

25            MR. MORGAN:  The operating properties.

Page 48

1              MR. WARNER:  All of them?

2              MR. MORGAN:  Yes.

3              MR. WARNER:  Okay.  And did you read the

4     agreement before you signed it?

5              MR. MORGAN:  Yes.

6              MR. WARNER:  And is it the same

7     agreement that existed between the debtor and Regis

8     prior to bankruptcy?

9              MR. MORGAN:  There was one particular

10    issue that I was concerned about, and it had to do with

11    the -- the fact of -- I don't remember it overriding

12    commission the other -- but I seem to remember that in

13    the old agreement they had, you know, a different --

14    different percentage, and then they would roll down

15    into a -- into subcontracting decisions.  But -- and

16    there were some issues regarding leasing commissions I

17    wanted cleaned up, but essentially it was the same.

18             MR. WARNER:  The terms are essentially

19    the same?

20             So you didn't bother to change any of

21    the terms for the benefit of the debtor?

22             MR. MORGAN:  Well, like -- like you

23    said, I -- I did make -- I made sure that it was three

24    percent income only of the gross income, and I went

25    back to the commissions to be sure that the commissions

Page 49

1    were fair.  And I did have them check the commission

2    structure to be sure that there was no overriding

3    commissions up to the management.

4                    MS. DURHAM:  Your ten minutes is all

5    used.

6                    MR. WARNER:  That was a very quick ten

7    minutes.

8                    MS. DURHAM:  You have a little bit more

9    or --

10                   MR. WARNER:  Where I'm from, time goes a

11   long way.  I just have a few little quick questions.

12                   MS. DURHAM:  All right.

13                   MR. MORGAN:  The apartments went

14   directly to Sun Shakes.  Prime -- none of the Prime

15   entities are involved in -- (inaudible) -- direct

16   property (inaudible).

17                   MR. WARNER:  Let's talk about the Fenton

18   Center, which we've just talked about.  So you know

19   what I'm talking about when I use the Fenton Center?

20                   MR. MORGAN:  Yes.

21                   MR. WARNER:  Have all tenants in the

22   Fenton Center paid their January 2011 rent?

23                   MR. MORGAN:  I don't think so.

24                   MR. WARNER:  Okay.  Do you know who

25   hasn't of the tenants?

Page 50

1          MR. MORGAN:  I don't.  But there is a --

2     there is a tracking -- there is a tracking mechanism

3     that the property management people are doing, and I

4     haven't received an updated report as of yesterday.

5          MR. WARNER:  Is that something you can

6     provide to me?

7          MR. MORGAN:  Yes.

8          MR. WARNER:  Okay.  Can I get that later

9     today?

10         MR. MORGAN:  Yes.

11         MR. WARNER:  Okay.

12         MR. BUNCHER:  I'm sorry.  What was it?

13         MR. WARNER:  It's a list of the tenants

14    that have not paid their January 2011 rent.

15         Does the debtor, any of its agents,

16    officers, representatives, affiliates, have any rent

17    that has been paid by a tenant for the month of January

18    or February 2011 in its possession that has not been

19    put into the lock box?

20         MR. MORGAN:  There was a meeting

21    yesterday in which that question was answered.

22         MR. WARNER:  That question was answered?

23         MR. MORGAN:  Yeah, that question -- I

24    got the answer to that question.

25         MR. WARNER:  So who asked the question?

Page 51

1              MR. MORGAN:  I did.

2              MR. WARNER:  And who did you ask it of?

3              MR. MORGAN:  Of Mr. Conley.

4              MR. WARNER:  Of Mr. Conley.  Okay.

5              MR. MORGAN:  Yes.  And there are some 61

6    thousand dollars worth of rents that have been

7    collected.  And I instructed them to give a detailed

8    accounting of those rents, where they came from and to

9    wire those funds into the lock box today.

10             MR. WARNER:  To wire them in today?

11             MR. MORGAN:  Yes.

12             MR. WARNER:  And for what period were

13   those collected?  Do you know?  What did he tell you?

14             MR. MORGAN:  I didn't -- I didn't ask

15   that.  It was just rents that were collected after --

16   after December 23rd.

17             MR. WARNER:  Okay.  So you didn't ask

18   the question when they came in or for what period?  You

19   just know that they came in and they haven't been put

20   into the lock box?

21             MR. MORGAN:  All of that will be

22   provided in the schedule.

23             MR. WARNER:  In the schedule you're

24   going to send me?

25             MR. MORGAN:  Yes.

HC 01337

Page 52

1          MR. WARNER:  Very good.  So it will tell

2     the date it came in to you?

3          MR. MORGAN:  Yes.

4          MR. WARNER:  Very good.

5          MS. DURHAM:  Okay.

6          MR. WARNER:  Yes.  Thank you.  I

7     appreciate the eleven minutes.

8          MS. DURHAM:  You have questions?  Yes.

9     Go ahead.

10          MS. HARTWICK:  Good morning, sir.  My

11     name is Jo Hartwick.  I'm with Stutzman, Bromberg,

12     Esserman & Plifka, and I represent the lender, who is

13     an Amoco building in New Orleans, Petra.

14          MR. MORGAN:  Uh-huh.

15          MS. HARTWICK:  We can call it Petra so I

16     don't have to try to repeat that entire name.

17          You testified earlier, sir, that there

18     is insurance in place on all of the operating of these

19     buildings.  Is that correct?

20          MR. MORGAN:  There is.

21          MS. HARTWICK:  Do you know if in the

22     instance of the Amoco building if Petra is an

23     additional insured name on the --

24          MR. MORGAN:  I believe they are, yes, as

25     are all the mortgagees for the -- (inaudible).

HC 01338

Page 53

1          MS. HARTWICK:  When you were talking

2     about your understanding of why this bankruptcy was

3     filed and some of the reasons for it, I believe you

4     stated that leasing was way down for the most part.  Is

5     that your testimony with regard to the Amoco building?

6     Do you consider that leasing was way down --

7          MR. MORGAN:  Well, the Amoco building is

8     -- first of all, is still somewhat reeling from the

9     aftereffects of Katrina, as is all of New Orleans.

10          Another thing has happened in New

11     Orleans, and that is that the public sector which

12     provides a good deal of the occupancy in downtown New

13     Orleans -- and when I say that, I mean the Orleans

14     Parish, the city of New Orleans, the state of Louisiana

15     -- is currently in a bit of a flux in that as part of

16     the deal to keep the New Orleans Saints in Louisiana

17     and in New Orleans, a deal was cut with the owner of

18     the Saints, Tom Benson, to move many of the public --

19     state -- this was -- I believe this was state agencies

20     from their current residencies at the conclusion of

21     their leases to a new building that Benson had

22     rehabbed, about a 300,000-square-foot building that is

23     just opening up now.

24          And so we've got a couple of assets down

25     there -- 1010 Common and this one in particular -- that

HC 01339

Page 54

1    are -- are losing some tenancy to that -- or are in the

2    process of losing some tenancy.

3                So there's -- there's a -- it's a

4    stagnant market from the growth standpoint, and it's

5    also one that is kind of in flux in terms of movement.

6                MS. HARTWICK:  I want to draw your

7    attention, sir, to Page 4 of 17 of -- it's the rent

8    roll for Amoco -- (inaudible).

9                MR. MORGAN:  Hold on for one second.

10               MR. BUNCHER:  I'm sorry.  Where is that?

11               MS. HARTWICK:  It's part of the -- one

12   of the schedules, and I'm thinking that it's an exhibit

13   to the real property schedule.

14               MR. MORGAN:  What does it -- what does

15   it say at the top?

16               MS. HARTWICK:  It says Amoco office

17   building.

18               MR. BUNCHER:  Security deposit report.

19   On the back of Schedule F.

20               MS. HARTWICK:  Is that it?

21               MR. MORGAN:  No.  It's -- it's --

22   actually, it's a debt.

23               MS. HARTWICK:  Okay.

24               MR. MORGAN:  There are security deposits

25   that were owed to the tenants, and that would be an

Page 55

1   attachment to F, Schedule F.

2            MS. HARTWICK:  So the only tenants of

3   the Amoco building are listed on this document, so I

4   think we're all looking at --

5            MR. BUNCHER:  It's like this.

6            MR. MORGAN:  Okay.  Go ahead.

7            MS. HARTWICK:  -- are those that have a

8   -- for whom the debtor have a security deposit and

9   therefore a debt --

10            MR. MORGAN:  That's correct.

11            MS. HARTWICK:  -- to the tenant?

12            MR. MORGAN:  And the far right column

13   would reflect the amount of that security deposit.

14            MS. HARTWICK:  So the city of New

15   Orleans, for example, is listed on here, although they

16   don't have a security deposit?

17            MR. MORGAN:  Yeah.  They are a tenant,

18   but they -- the deal was cut without them having a

19   security deposit, given their public sector nature.

20            MS. HARTWICK:  Let me ask this a little

21   bit differently then.

22            To your knowledge, sir, is every tenant

23   that is currently occupying the Amoco office building

24   listed on this document?

25            MR. MORGAN:  I don't know the answer to

Page 56

1    that question.  I -- these are all the ones that have

2    security deposits.

3              MS. HARTWICK:  With the exception of the

4    city, which the city and other --

5              MR. MORGAN:  Yes.  Yes.  But I do not

6    know the answer to that question.

7              MS. HARTWICK:  Mr. Morgan, I would like

8    to follow up with a question.

9              Do you -- I have a followup to a

10   question that I asked about during your deposition.

11             It's my understanding that there is a

12   tenant in the Amoco building that occupies a fairly

13   significant amount of space that does not have to pay

14   any rent because it is related to, affiliated -- I

15   don't want to use any improper word -- but there's some

16   connection, I'll put it that way, with either the

17   debtor or the current -- or the former owner of the

18   building.

19             MR. MORGAN:  In my review of the

20   budgets, I did not see any reference to any such thing.

21   You mentioned the name of it, and I've forgotten what

22   it was --

23             MS. HARTWICK:  I've forgotten too.  I

24   provided it to your counsel.

25             MR. MORGAN:  Baronne.  Baronne

Page 57

1    something.

2                    MS. HARTWICK:  Yes.

3                    MR. MORGAN:  I didn't see that tenant on

4    any -- any roll in the budget or the rent rolls.

5                    MS. HARTWICK:  But you don't know

6    whether or not -- or do you know, sir, whether Baronne

7    -- and we'll call it Baronne because I know that is

8    only part of the name -- do you know, sir, if Baronne

9    is a tenant that is actually in the building?

10                    MR. MORGAN:  I don't think they are.

11                    MS. HARTWICK:  Mr. Crown testified that

12   -- and I just want to make sure I understood your

13   testimony correctly -- that there are separate accounts

14   -- separate DIP accounts for each of the operating

15   entities --

16                    MR. MORGAN:  There are, yes.

17                    MS. HARTWICK:  So there is a separate

18   account for Amoco?

19                    MR. MORGAN:  Yes.  And the security

20   deposits, to the extent there are any -- any funds in

21   of those, there are -- those are separate also.

22                    MS. HARTWICK:  Okay.  And are rent

23   paying separate from everything else?

24                    MR. MORGAN:  Separate from all other

25   assets.  And only revenue from that asset goes into

HC 01343

Page 58

1      that DIP account and expenses for that asset come out

2      of that DIP account.  No mixing and matching.

3                    MS. HARTWICK:  Thank you.  Pass the

4      witness.

5                    MS. DURHAM:  Mark?

6                    MR. ANDREWS:  Yes.  Sorry I came in

7      late.  Mark Andrews.  I represent RMR Investments.  I

8      just have a few questions, and I apologize --

9                    MS. DURHAM:  And, Mark, since you came

10     in late, you have Joe-Joe and Peggy Joslin (phonetic)

11     on the telephone right here.

12                    MR. ANDREWS:  Okay.

13                    MS. DURHAM:  And Steve Sakonchick on the

14     telephone right here.

15                    MR. ANDREWS:  Okay.  Let me -- let me

16     ask these questions to you.

17                    First of all, do you know Danny Moos?

18                    MR. MORGAN:  I do.

19                    MR. ANDREWS:  All right.  And he holds

20     no current position with the debtor, as I understand

21     the schedule.  Is that correct?

22                    MR. MORGAN:  I believe that is correct,

23     yes.

24                    MR. ANDREWS:  All right.  And can you

25     tell me whether or not the connection with Mr. Moos --

Page 59

1    do you know whether he held a position in connection

2    with the Woodmont cases that were filed in front of

3    Judge Hill this past year?

4                MR. MORGAN:  Only to the extent that

5    he's the president of TCI, and TCI was one of the

6    supporters of those claims and an interested party who

7    has 75 percent beneficial ownership of those entities,

8    yes.

9                MR. ANDREWS:  All right.  Do you know

10   Mr. Shelley?

11               MR. MORGAN:  Mister?

12               MR. ANDREWS:  Shelley.

13               MR. MORGAN:  Steven Shelley?

14               MR. ANDREWS:  Yes.

15               MR. MORGAN:  Yes.

16               MR. ANDREWS:  Okay.  Can you tell me

17   what position he holds with -- (inaudible).

18               MR. MORGAN:  He's a senior vice

19   president of both Prime and TCI.

20               MR. ANDREWS:  All right.  Do you have

21   any contact with Mr. Shelley?

22               MR. MORGAN:  I do.

23               MR. ANDREWS:  All right.  Would you be

24   familiar with Mr. Shelley's signature?

25               MR. MORGAN:  Yeah, I'd probably

Page 60

1    recognize it, yeah.

2              MR. ANDREWS:  I'd like to show you a

3    document and just ask you if you could identify his

4    signature.  Look at the second page of that, the

5    right-hand side.

6              MR. MORGAN:  Yeah.  That looks like

7    Steven's signature.  All right.

8              MR. ANDREWS:  Can I see that?

9              MR. MORGAN:  Sure.

10             MR. ANDREWS:  And I guess for purposes

11   of the record I'll have that made an exhibit if you

12   want it for part of the record.

13             MS. DURHAM:  What is it?

14             MR. ANDREWS:  It's a -- it's a

15   forbearance agreement.

16             MS. DURHAM:  Okay.  No.  I'll give it

17   back to you because --

18             MR. ANDREWS:  Okay.

19             MS. DURHAM:  -- it's dated 12/6/2010 --

20             MR. ANDREWS:  Right.

21             MS. DURHAM:  -- and then signed by

22   Shelley 12/7/10.

23             MR. ANDREWS:  Right.

24             Did you -- did you ever see this

25   forbearance agreement before --

Case 11-42042-dml11   Doc 30-38   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit Y - Hearing Transcript   February 8   2011   Page 60 of 118

Page 61

1          MR. MORGAN:  I have not.

2          MR. ANDREWS:  Okay.

3          MR. MORGAN:  Well, you mean before right

4     now?

5          MR. ANDREWS:  Before right now.

6          MR. MORGAN:  I have seen it attached to,

7     I believe, either a motion or some kind of document

8     filed by you, I believe.

9          MR. ANDREWS:  All right.  But, other

10    than that, you don't have --

11         MR. MORGAN:  Related to this bankruptcy

12    case.  No.

13         MR. ANDREWS:  -- you don't have any

14    independent knowledge of this document?

15         MR. MORGAN:  No, I was not aware of it

16    before it came to -- it surfaced related to this

17    bankruptcy.

18         MR. ANDREWS:  All right.  Are you

19    familiar with a lender called RMR Investments, Inc.?

20         MR. MORGAN:  I am.

21         MR. ANDREWS:  And are you familiar with

22    the properties that are part of the Fenton Real Estate

23    bankruptcy that were transferred in and all the RMR

24    claims there have been?

25         MR. MORGAN:  Yes.

Page 62

1              MR. ANDREWS:  In connection with those

2    properties, is it okay with you if I refer to them as

3    Crowley Wilmer, Stanley and then Hollywood?

4              MR. MORGAN:  That's okay.

5              MR. ANDREWS:  You know what I'm talking

6    about --

7              MR. MORGAN:  Yes.

8              MR. ANDREWS:  -- if I refer --

9              MR. MORGAN:  Sure.

10             MR. ANDREWS:  -- okay.  With respect to

11   Crowley Wilmer, has that property been listed for sale

12   with a broker in recent -- say the past six months?

13             MR. MORGAN:  I don't know whether it is

14   listed with a broker.  I know in general our land --

15   our -- TCI's land holding, which Prime oversaw, were

16   generally all for sale.  I mean, everything was for

17   sale.  So I don't know whether there were any active

18   signed agreements with any brokers or not.

19             MR. ANDREWS:  Okay.  And given that, I

20   take it you don't know whether or not there was a

21   specific list price on that property?

22             MR. MORGAN:  I do not.  I was not

23   involved in that at all.

24             MR. ANDREWS:  All right.  I'm going to

25   ask you the same question with respect to Stanley and

HC 01348

Page 63

1    Hollywood.

2                    MR. MORGAN:  No knowledge.

3                    MR. ANDREWS:  No knowledge.

4                    Do you -- do you know whether either of

5    them were listed?

6                    MR. MORGAN:  I do not know.

7                    MR. ANDREWS:  All right.  Is there a

8    particular broker that was preferred by I'll call it

9    the TCI family of companies?  Did you -- did you engage

10   a particular brokerage firm commonly that would have

11   been used in connection with your properties?

12                   MR. MORGAN:  No.  I've seen -- again, I

13   was not involved in that, but I've seen many brokers

14   from Grubb & Ellis to Jones Lang LaSalle -- and all of

15   the major players in -- in the Dallas-Fort Worth area

16   for those located in Dallas-Fort Worth.

17                   MR. ANDREWS:  And in the -- in the area

18   of the RMR properties, just given the geography, could

19   you tell me whether there were any brokers that would

20   have been more commonly used in that area by the TCI

21   family of companies?

22                   MR. MORGAN:  Oh, there have been -- I

23   know Grubb & Ellis is very -- very active in -- in the

24   Mercer Crossing area, which some of these properties

25   are located, so they are -- they are certainly

Page 64

1      involved.

2                    Like I say, I've seen Jones Lang LaSalle

3      mentioned as -- as a major player in terms of

4      brokerage, but I -- I don't know as regards the

5      individual properties.

6                    MR. ANDREWS:  With respect to the status

7      of payments on taxes, I -- it's my understanding, and

8      I'd like you to confirm, that with respect to the taxes

9      on the Crowley Wilmer properties, when were those last

10     paid?

11                   MR. MORGAN:  The only taxes that are

12     owing on any of these properties are 2010 vintage.  So

13     if there's a -- if there's a tax payable, then it's the

14     2010 tax.

15                   MR. ANDREWS:  And I take it that there

16     is no escrow for payment of 2010 taxes for any of the

17     three RMR properties?

18                   MR. MORGAN:  There are not.

19                   MR. ANDREWS:  All right.  And I take it

20     that, now we're in 2011, the taxes will be due at the

21     end of this year, there is no ongoing escrow for 2011

22     for any of these properties.

23                   MR. MORGAN:  At the moment there is not.

24                   MR. ANDREWS:  All right.  I'll pass the

25     witness.

HC 01350

Page 65

1          MS. DURHAM:  The phone people, anybody

2    have -- Mr. Sakonchick, do you have questions you want

3    to ask if you're still there?

4          MR. SAKONCHICK:  I'd just like to -- can

5    you hear me?

6          MS. DURHAM:  Yeah, now we can.  Do you

7    have questions you want to ask?

8          MR. SAKONCHICK:  Let me get it on.  Yes.

9          You had mentioned something about not

10   being able to get any renewals of your loan obligations

11   at reasonable rates.  What type of lenders were you

12   approaching?

13         MR. MORGAN:  Well, I was not involved in

14   that process, but I know that people, including

15   Mr. Shelley and Capital Markets Group, were seeking

16   those -- that kind of relief.

17         The first efforts, of course, was made with

18   the existing lenders to try to extend the loans on

19   terms that would take consideration of the current

20   marketplace where lower rates are prevalent and revenue

21   is very low.

22         In the absence of that, we -- I know the

23   Capital Markets people went out to market in general

24   and were constantly in search of lenders of all

25   varieties that would be willing to lend on loan --

HC 01351

Page 66

1    excuse me -- on land, which was very difficult to get,

2    or even on improved property.

3                    MR. SAKONCHICK:  On the improved

4    property, what kind of interest rates were they getting

5    quoted?

6                    MR. MORGAN:  I don't know.

7                    MR. SAKONCHICK:  All right.  Who exactly

8    do I need to talk to to find that out?

9                    MR. MORGAN:  The best source of that

10   would probably be Steven Shelley.

11                   MR. SAKONCHICK:  And Mr. Shelley is not

12   here today?

13                   MR. MORGAN:  He is not here at the

14   moment, no.

15                   MR. SAKONCHICK:  And who is Mr. Shelley

16   with?

17                   MR. MORGAN:  Shelley is with TCI.

18                   MR. SAKONCHICK:  All right.  And

19   Mr. Gaither with your law firm, or your law firm

20   representing here, has indicated there is 52 thousand

21   dollars in your cash collateral account for Parkway

22   North.  There are currently an obligation that they're

23   going to be approved for 10 thousand dollars for

24   Reliant on the utility deposit.  There are probably

25   about 33 thousand dollars needed for payment of the

HC 01352

Page 67

1    2010 taxes.  Is the debtor willing to use that cash

2    collateral for purposes of paying that shortfall in the

3    2010 taxes?

4                MR. MORGAN:  I didn't understand what he

5    said.

6                MR. BUNCHER:  Could you repeat the

7    question?  The person that needs to answer that is not

8    as close to the phone as I am.  It would be David

9    Morgan, who is the vice president of the debtor.

10               MR. SAKONCHICK:  All right.  Mr. Morgan,

11   Mr. Gaither from the law firm representing the debtor

12   in this case has indicated that as of last Thursday

13   there was 52 thousand dollars in the cash collateral

14   account.  I imagine that would have included most of

15   the collections from the February rents.  There's also

16   going to be the March rents to be collected.  There is

17   a 10 thousand dollar utility deposit that needs to be

18   paid to Reliant Energy.  There is about a 33 thousand

19   dollar shortfall in the escrow account if we reinstate

20   it for the payment of ad valorem taxes for 2010.

21               Is the debtor willing to use 33 thousand

22   dollars in the cash collateral account for payment of

23   taxes?

24               MR. MORGAN:  To the extent it's

25   available, yes.

Page 68

1           MR. SAKONCHICK:  All right.  Thank you.

2     That's all I have.  Thank you.

3           MS. DURHAM:  Okay.  Anyone else on the

4     phone have questions?

5           All right.  Then we're going to swing

6     back around to Mr. Weitman.  Is that -- what -- the new

7     guys will all have another ten minutes?

8           MR. WEITMAN:  We have a few more.

9           MS. DURHAM:  Sure.  We're going to give

10    you ten more minutes, and then we'll go around again.

11          MR. WEITMAN:  Thank you.

12          Mr. Crown, could you look at Schedule H,

13    co-debtors, please.

14          MR. CROWN:  All right.

15          MR. MORGAN:  May I make one -- may I

16    make one insert?

17          MS. DURHAM:  Yes.

18          MR. MORGAN:  We are currently -- in our

19    cash collateral we are currently reserving the real

20    estate income taxes into a separate account for each

21    income-producing property from the month of filing

22    forward.  So we now have deposited the January and we

23    will be depositing the February on the cash collateral

24    into a separate tax escrow account.

25          MR. BUNCHER:  That's for the

1    income-producing properties.

2                        MR. MORGAN:  Exactly.

3                        MS. DURHAM:  Did you hear that, Steve?

4                        MR. SAKONCHICK:  No.  Say that again.

5                        MR. MORGAN:  I said, as to the cash

6    collateral, we are currently escrowing into a separate

7    tax escrow account on the income-producing properties

8    the real estate taxes, as per the cash collateral

9    order.  They're going into a tax escrow account.

10                       MR. SAKONCHICK:  I understand that for

11   2011.  I'm talking about the taxes that came due

12   January 31st for 2010.

13                       MR. MORGAN:  Same answer.  I just wanted

14   to be sure that you knew we were escrowing for 2011.

15                       MR. SAKONCHICK:  Yeah.  That was in the

16   budget, and that's what we approved on the budget.  And

17   I'm aware of that.  Thank you.

18                       MR. WEITMAN:  Mr. Crown, I've asked you

19   -- David Weitman for Wells Fargo -- Schedule H refers

20   to co-debtors.  I want to try to understand the various

21   relationships.

22                       I understand that you had roughly a

23   million four of unsecured creditors' claims from the

24   various transferror entities that were assumed by FRE

25   Real Estate.  Correct?

Page 70

1              MR. CROWN:  That's correct.

2              MR. WEITMAN:  But even with the

3     assumption, aren't the trade creditors -- don't they

4     have debts owing by each of the transferror entities?

5              MR. CROWN:  No.

6              MR. WEITMAN:  You haven't -- I mean, is

7     there an agreement by the trade creditor -- let's just

8     say, for example, like TCI Amoco.  And there is a

9     party that extended credit to TCI Amoco, correct?  In

10    my example, if you follow along --

11             MR. CROWN:  Go ahead.  Go ahead.

12             MR. WEITMAN:  -- let's say they extended

13    500 dollars worth of credit.  Is not TCI Amoco still

14    liable and is not also FRE Real Estate liable for that

15    debt?

16             MR. CROWN:  Well, the understanding of

17    the acquiring entities that -- that they would assume

18    the -- the -- the debts of the operating assets.

19             MR. WEITMAN:  Right.  But is not that

20    creditor still able to look to TCI Amoco for payment?

21             MR. BUNCHER:  I'm not going -- you can

22    say your understanding, but he's asking you a legal

23    question about whether the original party is still

24    liable for the debt.

25             MR. WEITMAN:  Isn't it?

Page 71

1              MR. BUNCHER:  I'm not here to answer

2      your questions.  He is, and he's a lay person, so --

3              MR. CROWN:  Yeah.  I mean, I don't know

4      how -- I don't know how to answer that.  I'm not an

5      attorney, so I can't --

6              MS. DURHAM:  So what do you think?

7              MR. WEITMAN:  So wouldn't that make each

8      of those trade creditors a party that should be listed

9      on Schedule H dealing with co-debtors?

10              MS. DURHAM:  What do you think, Doug?

11              MR. BUNCHER:  Trade creditors?  You mean

12      the original borrower -- you mean the original entity?

13      The transferror entity?

14              MR. WEITMAN:  Yes.  Would potentially --

15              MR. BUNCHER:  If they -- well, first of

16      all, the transferror entities are all shells.  They

17      don't have any assets for anybody to collect from.  If

18      somebody sued the transferror entity and got a

19      judgment, the transferror entity would then have a

20      claim back against the debtor, I guess, to the extent

21      it actually paid it.

22              But, again, theoretically, yes.

23      Theoretically somebody could sue the transferror

24      entities that have no assets to try to recover their

25      claims.

HC 01357

Page 72

1          MR. WEITMAN:  Well, just by example,

2     like Petra Mortgage on the first one here, they're --

3     the obligor on that debt is the TCI Amoco entity that

4     changed its name, correct?

5          MR. CROWN:  That's correct.

6          MR. WEITMAN:  And so -- so they have an

7     obligation -- they have a debt owing by TCI Amoco, and

8     that has now been also assumed by FRE Real Estate.

9     Correct?  Why would that not be the same for every

10    single trade creditor of TCI Amoco and every other

11    transferror entity?

12         MR. BUNCHER:  Yes.  Theoretically,

13    you're correct.

14         MR. WEITMAN:  Why would it not also be

15    the same for every person that provided a security

16    deposit that's a tenant, that they can look to their

17    original transferror entity, right, and now FRE Real

18    Estate, in which case those entities are co-debtors?

19    Is this not inaccurate then by your not listing every

20    other trade creditor and party with a security deposit

21    or that gave a security deposit?

22         MR. BUNCHER:  Yeah.  I mean, if we could

23    -- we could -- we could list all the original

24    transferors and -- and say that these creditors could

25    theoretically sue the original transferror that has no

Page 73

 1    assets, at which point that transferror would then sue

 2    the debtor or assert a claim against the debtor,

 3    saying, hey, debtor, you assumed this debt by a

 4    contract, so technically you're correct --

 5                    MS. DURHAM:  But the other way, if

 6    you're the creditor, you should know that, well, you've

 7    got FRE on the hook, but you also never let the other

 8    guy off the hook.

 9                    MR. BUNCHER:  Correct.

10                    MS. DURHAM:  The transferror.

11                    MR. BUNCHER:  Right.

12                    MS. DURHAM:  I'd look at it --

13                    MR. BUNCHER:  Sure.

14                    MS. DURHAM:  -- from the --

15                    MR. BUNCHER:  Sure.

16                    MS. DURHAM:  -- smaller person's point

17    of view --

18                    MR. BUNCHER:  Sure.

19                    MS. DURHAM:  -- and then TCI could pay

20    it.

21                    And it's also my understanding that --

22                    MR. WEITMAN:  I was just going to say

23    that I think theoretically you could add 157 names to

24    this list --

25                    MS. DURHAM:  Yeah.

Page 74

1                    MR. WEITMAN:  -- of guys that you owed

2       $11.62 to.

3                    MS. DURHAM:  Right.

4                    MR. WEITMAN:  But I don't see that

5       there's anything gained by that in the understanding of

6       anybody.

7                    MS. DURHAM:  Well, the next step then is

8       who gets to vote on the plan, and do you include all

9       those --

10                   MR. BUNCHER:  Well, they're -- the

11      creditors are already listed --

12                   MS. DURHAM:  They're in here.

13                   MR. BUNCHER:  -- as creditors.

14                   MS. DURHAM:  They're all in there.

15                   MR. BUNCHER:  Yeah.

16                   MR. WEITMAN:  They're all in here as

17      owing --

18                   MS. DURHAM:  And is the transferror

19      going to pay any of those for any other reasons?

20                   MR. BUNCHER:  No.  No, they're going to

21      get --

22                   MS. DURHAM:  Ancillary reason to pay

23      them or --

24                   MR. BUNCHER:  They haven't asked us to

25      pay them.

Page 75

1            MS. DURHAM:  I thought you said that

2     there were some properties retained.

3            MR. BUNCHER:  By the parent company,

4     Transcontinental Realty Investors.

5            MS. DURHAM:  Okay.

6            MR. BUNCHER:  But not by the transferree

7     -- transferror sub --

8            MS. DURHAM:  Okay.

9            MR. BUNCHER:  -- subsidiaries.

10           MR. WEITMAN:  Were you responsible for

11     retaining the services of any of those law firms that

12     go out there and protest the tax assessments?

13           MR. CROWN:  I was not.  There was --

14     there was a tax group within Prime that handles that.

15           MR. WEITMAN:  And were most of those

16     properties subject to protest?

17           MR. CROWN:  Many were.  I will not say

18     all were, but -- but many were, sure.

19           MR. WEITMAN:  Okay.  And if you would

20     look at Schedule F, the unsecured buyer notes payable.

21           MR. CROWN:  Okay.

22           MR. BUNCHER:  The attachments?

23           MR. WEITMAN:  Yes, sir.  Attachment

24     Exhibit, Page 17 of 17, if you've got that.

25           MR. CROWN:  All right.

HC 01361

Page 76

1                    MR. WEITMAN:  Now, the amount of that

2       claim is not -- do you have that, Mr. Crown?

3                    MR. CROWN:  Yes.

4                    MR. BUNCHER:  That attachment.

5                    It's near the end of Schedule F, and it

6       says 17 of 17.

7                    MR. WEITMAN:  Now, you're familiar with

8       each of those assets, correct?

9                    MR. CROWN:  I am.

10                   MR. WEITMAN:  And are you also familiar

11      with the valuations that I've recently been introducing

12      to evidence from the -- from the records of the

13      lenders?

14                   MR. CROWN:  From the records of the

15      lenders?  You mean the various appraisals that

16      lenders --

17                   MR. WEITMAN:  Yes.

18                   MR. CROWN:  I'm not very familiar with

19      them.  I'm generally familiar with them.  Mr. Morgan is

20      more familiar than I.

21                   MR. WEITMAN:  Have -- have you had any

22      experience in selling any of these properties at

23      anything close to the older appraised values?

24                   MR. CROWN:  These properties?

25                   MR. WEITMAN:  Yes, sir.

HC 01362

Page 77

1        MR. CROWN:  None of them have been sold,

2    so we don't have any --

3        MR. WEITMAN:  Any trying to sell.  I'm

4    sorry.  Or marketing.

5        MR. CROWN:  Well, a general -- a general

6    marketing program will be a part of the plan, but, as

7    of yet, it has not kicked off.

8        MR. WEITMAN:  But as the -- one of the

9    principals of Prime Income, was not Prime Income

10   charged with the responsibility to try to sell or

11   refinance these properties for the last couple of

12   years?

13       MR. CROWN:  Yes, but I was not involved

14   in that.

15       MR. WEITMAN:  But you understand the

16   organization was?

17       MR. CROWN:  The organization -- as I

18   said, generally all the assets of TCI and a couple of

19   the other companies are for sale at any given time.

20       MR. WEITMAN:  And they've had no

21   success, obviously, because we're here --

22       MR. CROWN:  Some are -- some are being

23   pursued more actively, placed with brokers and what

24   have you.  Others are just generally acknowledged in

25   the community as Prime -- Prime -- excuse me -- TCI or

Page 78

1       ARI, Income Opportunity Real Estate Investors --

2       they'll all sell their properties if you give them a

3       good offer, so --

4                       MR. WEITMAN:  Have you any personal

5       firsthand knowledge of the recent inclusion of that

6       footnote 4?

7                       MR. CROWN:  Footnote 4.

8                       MR. WEITMAN:  See the footnote 4 on that

9       same Schedule F?

10                      MR. CROWN:  I know that this was the

11      outgrowth of a discussion that --

12                      MR. WEITMAN:  Why don't you just

13      summarize what you understand that to mean, please.

14                      MR. CROWN:  Upon the sale of any given

15      property, the proceeds of those -- of that sale, the

16      net proceeds after any selling costs will be applied

17      first to priority claims, second to secured claims, and

18      the third --

19                      MR. WEITMAN:  Excuse me.  The secured

20      claim on that property?

21                      MR. CROWN:  On that property.  This was

22      all per property.

23                      MR. WEITMAN:  Uh-huh.

24                      MR. CROWN:  And then, after that, to

25      unsecured claims --

Page 79

1          MR. WEITMAN:  Of that property?

2          MR. CROWN:  -- of that property.  And if

3     there is anything left over at that point it will be

4     applied to the buyer note payable.  To the extent that

5     that buyer note payable is totally satisfied, then

6     those funds will be available for administrative and

7     other costs.  To the extent that that note is not

8     satisfied, any unsatisfied portion will move to the

9     back of the line of sale of all assets.  Not just that

10    asset, but all assets.

11         MR. WEITMAN:  So, if you will, let's say

12    there's net proceeds after payment of ad valorem taxes

13    and the secured claim on that property, would those

14    excess dollars be used to pay all of the other

15    unsecured creditors of FRE Real Estate or simply the

16    trade creditors of that entity before you get to trying

17    to satisfy the, quote, seller note?

18         MR. CROWN:  Let's say you had a million

19    dollars left over from the sale of the property.  After

20    you paid the taxes and after you paid the secured

21    creditor on that property, you would then pay the

22    unsecured creditors on that property.

23         Let's say there were a hundred thousand

24    gross, and then you had nine hundred thousand left in

25    your pocket, you would pay off or pay towards the

Page 80

1   seller note payable on that property.

2            If it satisfied that note and there were

3   any funds in excess of that note on that property --

4   let's say the note was eight hundred thousand dollars,

5   now you have a hundred thousand left.  That hundred

6   thousand would be used for administrative and other --

7   other expenses of the total FRE.

8            MR. WEITMAN:  Now, you were at the

9   hearing on February 3rd when Mr. Morgan testified,

10  correct?

11           MR. CROWN:  Yes.

12           MR. WEITMAN:  Now there's -- what you

13  just described -- you know, describing this footnote 4,

14  that's nowhere in the purchase agreement or the note,

15  correct?

16           MR. CROWN:  I -- I don't believe it is,

17  no.

18           MR. WEITMAN:  And this is just as a

19  product of -- is it your discussions with selling --

20           MR. CROWN:  Mr. Morgan's discussion.

21           MR. WEITMAN:  Okay.  So you just

22  captured what Mr. Morgan told you --

23           MR. CROWN:  Yes.

24           MR. WEITMAN:  -- included in the

25  footnote 4?

HC 01366

1           MR. CROWN:  Yes.

2           MR. WEITMAN:  You were not a party to

3     any of those discussions?

4           MR. CROWN:  I discussed with him, but I

5     did not discuss it with the individual that he

6     discussed it with.

7           MR. WEITMAN:  Okay.  And there are no

8     documents other than your inserting footnote 4?

9           MR. CROWN:  No.  Just that there was a

10    verbal discussion and understanding and then a

11    commitment to it in the -- in the bankruptcy filing.

12          MR. WEITMAN:  Thank you.  Pass the

13    witness.

14          MS. DURHAM:  Okay.  We had three new

15    people come in -- sorry to trump you.  Do any of the

16    new people want to ask questions?  And, if you do, just

17    state your name for the recording.

18          Dennis?  Yeah, it would be helpful.

19    There's also people on the telephone.

20          MR. OLSON:  Dennis Olson.  I'm

21    representing the Bank of Weatherford on a piece of the

22    property which is not income producing.

23          My question in followup to Mr. Weitman,

24    are you telling the court and creditors that nine

25    hundred thousand dollars excess in the hypothetical

Page 82

1    that we were just talking about would go to the entity

2    that held the seller note instead of going to other

3    creditors in the bankruptcy?

4              MR. CROWN:  Once the creditors,

5    priority, secured and unsecured, for the given excess

6    are satisfied, the next in line would be to pay off of

7    that seller note payable or buyer note payable.

8              MR. OLSON:  So is it your position --

9              MR. CROWN:  To the extent that that is

10   not covered, then there would be no distribution.  To

11   the extent it is covered, there would be monies left

12   over that would be used for the entire authority.

13             MR. OLSON:  My point is, your position

14   is that money would first go to the holder of the

15   seller note and not to the other creditors of that --

16             MR. CROWN:  That is my understanding on

17   the sale of an individual asset.

18             MR. OLSON:  So you would want the

19   insiders of FRE to get their money ahead of the other

20   creditors of FRE?

21             MR. CROWN:  Well, that's what's been

22   committed to in this -- in this document.

23             MR. OLSON:  Just in the schedules, no

24   place else?

25             MR. CROWN:  Just in the schedules.  Not

Page 83

1    in a plan.  It's subject to -- to consideration and

2    discussion.  At this point in time, that's what's been

3    proposed, yes.

4              Now, I was not -- again, I was not a

5    party to the decision to do that, except as I discussed

6    it with Mr. Morgan.

7              MR. OLSON:  So, for those of us that

8    have properties that are not income producing who have

9    been thwarted repeatedly in trying to foreclose on

10   their properties, why isn't that indicia of bad faith

11   in making that transfer and filing this case?

12             MR. CROWN:  Well, remember, the revenues

13   we're talking about -- if the revenues we're talking

14   about are for the sale of one of Mr. -- is it Weitman?

15             MR. WEITMAN:  Yes, sir.

16             MR. CROWN:  -- one of Mr. Weitman's

17   client's assets, that's unrelated to your client's

18   assets.

19             MR. OLSON:  Well, how many bankruptcies

20   did you file?

21             MR. CROWN:  One.

22             MR. OLSON:  And aren't all of these

23   people creditors in the bankruptcy that you filed?

24             MR. CROWN:  They are.

25             MR. OLSON:  And before you made these

HC 01369

Page 84

1    transfers, none of these people were creditors of FRE,

2    were they?

3                    MR. CROWN:  The note payable folders,

4    the folders of those -- those notes from the transfers,

5    they weren't, but that was -- that was determined to be

6    the -- the equity that those people had in that

7    property.

8                    MR. OLSON:  Well, why would the equity

9    that those people had go ahead of the arm's-length

10   third-party creditors of this entity that you created?

11                   MR. CROWN:  Only to the extent that we

12   tried to look at it individually asset by asset.

13                   MR. OLSON:  Well, I thought that you

14   filed this as a substantive case instead of nineteen

15   separate cases.

16                   MR. CROWN:  We did.  Well, it was filed.

17   I didn't, but the debtor did.

18                   MS. DURHAM:  You got a problem with that

19   -- with that idea?

20                   MR. OLSON:  I think so.

21                   MS. DURHAM:  You see that?

22                   MR. BUNCHER:  Yeah.  Well, I mean, we'll

23   deal with that.  I mean, we haven't put forth a plan

24   yet.  This is what -- this is what -- this footnote was

25   what has been discussed and agreed to, as I understand

Page 85

1      it, between the debtor and what -- subject to further

2      discussion and modification as to what we end up

3      putting in the plan, well, that hasn't been put forth

4      yet.

5              MR. OLSON:  Well, just as a heads-up,

6      you have until the 17th to have a better answer for us.

7      I think that -- (inaudible).

8              MS. DURHAM:  Because it would seem that

9      those -- the note payable holders, as you're referring

10     to them, are insiders, and they would be at the bottom

11     of the payment list after everybody and all of the

12     pieces of property are settled.  That's what it looks

13     like to me from what's on file.

14             UNIDENTIFIED SPEAKER:  And their

15     deficiency claims.

16             MS. DURHAM:  And their deficiency

17     claims.  They're like the last guy to get paid, the

18     note payable guy.

19             And I appreciate the fact that you just

20     disclosed it, what the thought process was in the

21     schedules, so everybody could see who's on first.

22             But in the bankruptcy priority, if

23     you're doing this in the bankruptcy court, as far as I

24     can tell, those guys are -- of course, I'm not going to

25     decide, the judge will decide that at some point down

HC 01371

Page 86

1    the road, but that's what Mr. Olson is trying to get

2    at.  Okay.

3              MR. WARNER:  MaryFran, can I just do a

4    followup question on this issue?

5              MS. DURHAM:  Yes.  State your name.

6              MR. WARNER:  I'm sorry.  Michael Warner

7    again on behalf of HCMLP Special Services.

8              The footnote that was added to the

9    schedules was intended to sort of address what you just

10   defined as the waterfall, right, of how the money would

11   flow.  And you've earlier testified that you're not an

12   officer, director or shareholder of this debtor.  So I

13   guess I -- and I think I heard Mr. Morgan testify at

14   the hearing that that was also his understanding of his

15   structure.

16             Is that correct, Mr. Morgan?

17             MR. MORGAN:  Correct.

18             MR. WARNER:  But I've not heard the

19   recipient of the note that the debtor gave that was

20   then subsequently transferred -- but it really doesn't

21   matter -- whoever holds the note from the debtor has

22   not acknowledged the language.  And since you're not

23   the holder of the note, correct, Mr. Crown?

24             MR. CROWN:  I am not.

25             MR. WARNER:  Okay.  And, Mr. Morgan,

HC 01372

Page 87

1    you're not the holder of the note, is that correct?

2                MR. MORGAN:  Correct.

3                MR. WARNER:  So we don't have any

4    evidence that the holder of the note has acknowledged

5    that they also understand, notwithstanding the language

6    of the note, how the terms of the note will be handled.

7                MR. BUNCHER:  Well, he testified that

8    he's had discussions, so there is that evidence.

9    You're saying that there hasn't been somebody from -- a

10   representative of the individual note holders

11   testifying to that effect --

12               MR. WARNER:  Correct.

13               MR. BUNCHER:  -- or file anything to

14   that effect.  And I acknowledge that.

15               MR. WARNER:  That's right.

16               MR. BUNCHER:  That's true.  You have

17   what Mr. Morgan has said, and he said that they've

18   agreed to that.  So that is some evidence.  I mean,

19   whether you want to call it hearsay or whatever, but he

20   says he's had discussions and that's been agreed to.

21               MR. WARNER:  It sure seems to me that if

22   I were going to have a note and then have it modified,

23   I would have the modification in writing.

24               So, Mr. Morgan, is there anything in

25   writing modifying the terms of the note?

HC 01373

Page 88

1              MR. MORGAN:  No, not yet.

2              MS. DURHAM:  Okay.  Dennis, did you have

3     more questions?

4              MR. OLSON:  No.

5              MS. DURHAM:  Did you have questions?

6     Anybody have questions?  Yes?

7              MR. GORDON:  We have one that's kind of

8     a --

9              MS. DURHAM:  You have to get real close

10    because we're recording it, and then you've got to

11    state your name before asking it.

12             MR. GORDON:  All right.  I'm Jim Gordon,

13    and I'm representing --

14             MS. DURHAM:  Closer.  Sorry.

15             MR. GORDON:  Where is the microphone?

16             MS. DURHAM:  It's hidden.

17             MR. GORDON:  I'm Jim Gordon, and I

18    represent Access 1st Bank, and obviously we had several

19    -- many notes that the properties are now part of the

20    debtor's estate.  One note, though, that we cannot

21    confirm is TCI Alvin (phonetic) loan.  Do you know, was

22    that transferred to FRE?

23             MR. CROWN:  It was not.

24             MR. GORDON:  It was not?  Okay.

25             Is there any thought that it might be at

1   some -- some point in the future?

2                   MR. CROWN:  Not for this -- (inaudible).

3                   MR. GORDON:  I guess then this next

4   question would just be a matter of curiosity.

5                   Why was it not transferred along with

6   the other notes of the other borrowers of Access 1st

7   Bank?

8                   MR. CROWN:  I was not the architect of

9   that note.

10                  MR. GORDON:  I see.

11                  Doug, do you know?

12                  MR. BUNCHER:  I do not.

13                  MS. DURHAM:  Well, earlier, Mr. Crown,

14  you said that properties that were doing well weren't

15  transferred.  Is that right?  Did I understand that

16  right?  Cash flowing and --

17                  MR. CROWN:  Well, I said that TCI and

18  other public entities that were the beneficial owners

19  of the transferrors of these properties own many other

20  properties, income-producing and --

21                  MS. DURHAM:  Is that --

22                  MR. CROWN:  -- and many of those were

23  note transferred.

24                  MR. GORDON:  That is just to my

25  understanding raw land.

HC 01375

Page 90

1          MR. CROWN:  Right.

2          MS. DURHAM:  So it couldn't have been

3    cash flowing too much, huh?

4          MR. GORDON:  Right.  Right.

5          MR. CROWN:  Right.

6          MR. GORDON:  Not at all.

7          And I apologize for being late.  We were

8    delayed by traffic.

9          MR. CROWN:  Another criteria I have to

10   say is that, remember, some -- a lot of these were

11   cross-collateralized.  So, to the extent that a given

12   loan was not cross-collateralized where one asset at

13   risk kind of brought the other one with it, that might

14   have been the case -- (inaudible).

15         MR. GORDON:  All right.  Do you know

16   whether the entities that have been referred to as the

17   insider -- the original owners of the property, the

18   debtors of the various banks, have they retained funds

19   or have they paid the ad valorem taxes that were due by

20   January 31st?

21         MR. CROWN:  They did not retain funds,

22   and to the -- I can't vouch for the fact that no taxes

23   were paid, but the vast majority of the taxes were not

24   paid for 2010 for Texas properties.

25         MR. GORDON:  And I looked at the

HC 01376

1    schedules and it didn't appear that the original owning

2    entities transferred anything other than land in

3    connection with these transactions at the end of

4    December.  Is that -- is that correct?

5              MR. CROWN:  Well, to the extent -- most

6    of the land had very few accounts payable trade

7    payables.  To the extent they did, those were

8    transferred -- the taxes payable were transferred.

9    There was very, very -- there were only a couple of

10   small bank accounts for the land parcels.  So they

11   transferred the -- the land asset and any associated

12   payables or tax -- trade payables or tax payables with

13   it.  To the extent there was any cash, it was

14   transferred, and there were a couple of accounts that

15   were -- were there for land, but not many.

16             MR. GORDON:  That's all I have.

17             MS. DURHAM:  Okay.

18             MR. GORDON:  And I'll yield this prime

19   position --

20             MS. DURHAM:  Laurie, do you have

21   questions?  You really do have to get kind of close to

22   the mike.  I'm sorry.

23             MS. HUFFMAN:  I'm Laurie Huffman, and I

24   represent Dallas County, Urbanized Kaufman County, and

25   other taxing authorities in this case.

Page 92

1          Where are the two hangers that you

2     leased in Addison?

3          MR. CROWN:  They're right near Addison

4     Airport.

5          MS. HUFFMAN:  I need addresses for those

6     hangers.

7          MR. CROWN:  Yeah.  I believe that we got

8     a request from you for detailed information, and that

9     should be outgoing today or tomorrow.  All of the DCAD

10    numbers and so on of every single one of the taxes

11    payable.

12          I realize the detail shown on the

13    Schedule E was not great.

14          MS. HUFFMAN:  Okay.  I don't need tax

15    amounts from you, but addresses --

16          MR. CROWN:  Yeah.  They'll have all of

17    that.

18          MS. HUFFMAN:  -- and account numbers

19    will be very helpful because --

20          MR. CROWN:  They will all have account

21    numbers.

22          MS. HUFFMAN:  -- I don't think that the

23    amounts are actually going to reflect what will be in

24    our claim because there are 2011 taxes as well.  Just

25    so you know.  So don't worry about providing me with

Page 93

1    amounts, but some of these accounts, because of all the

2    transfers that were done in December prior to the

3    filing, the appraisal districts have not picked those

4    deeds up yet.

5                MR. CROWN:  Right.

6                MS. HUFFMAN:  So at this point I can't

7    tell anyone how much the tax that is, but it's over a

8    million.

9                MR. BUNCHER:  For 2011?

10               MS. HUFFMAN:  Well, no.  There are some

11   -- the 2010 accounts that we have found that are in the

12   names of the debtor's alias, some of those have been

13   paid for 2010, some of them have been partially paid.

14   And that million dollars is not just 2011.

15               MR. BUNCHER:  Okay.

16               MS. DURHAM:  The alias you're talking

17   about is Fenton?

18               MS. HUFFMAN:  No.  I'm talking about TCI

19   Park West.

20               MR. BUNCHER:  Okay.

21               MS. HUFFMAN:  The only -- the only

22   properties that are showing up in that name in Dallas

23   County are eight properties in Farmers Branch.  So the

24   Dallas Central Appraisal District still has all the

25   other properties located in Dallas County in other

HC 01379

Page 94

1   names.

2                    MR. CROWN:  Should that information go

3   to you?

4                    MS. HUFFMAN:  Which information?

5                    MR. CROWN:  That you're requesting,

6   addresses and so on and so forth.

7                    MS. HUFFMAN:  Yes.

8                    MR. CROWN:  Can you give me a card?  And

9   I'll make sure it gets to you.

10                   MS. HUFFMAN:  I'll definitely do that

11  when this concludes.

12                   MR. CROWN:  All right.

13                   MS. HUFFMAN:  And Mr. Neligan is aware

14  of my request as well.  He has all my contact

15  information.

16                   MR. BUNCHER:  Right.  Somebody in our

17  office has already -- we've already requested it from

18  -- there was -- he's the guy that is handling that

19  request, so --

20                   MS. HUFFMAN:  Okay.  Well, I didn't

21  include the two hangers in my request yesterday --

22  (inaudible).

23                   MR. CROWN:  Now, do you recognize that

24  those are not owned?

25                   MS. HUFFMAN:  Yes, I understand that.

Page 95

1    But you also have business personal property at those

2    locations, and I need to locate those business personal

3    property accounts.

4                    MR. CROWN:  All right.

5                    MS. DURHAM:  Okay.  Then we're going to

6    do a few more.  So Mark --

7                    MR. STROMBERG:  A couple of followup

8    questions.

9                    MS. DURHAM:  Will you state your name

10   one more time.

11                   MR. STROMBERG:  Yes.  Mark Stromberg on

12   behalf of State Bank of Texas.

13                   Mr. Weitman had asked you in his initial

14   questions about whether or not there were payments

15   being made by Prime Income Asset Management -- overseen

16   by Prime Income Asset Management from the transferror

17   entities, and I remember your answer as being Prime

18   Income Asset Management received payments from American

19   Realty Trust and/or TCI.  Am I right?

20                   MR. CROWN:  That's correct.

21                   MR. STROMBERG:  Did however, Prime

22   Income Asset Management also receive payment from any

23   of the transferror entities?

24                   MR. CROWN:  I believe not.  I believe

25   that the fee arrangements related to asset management

HC 01381

Page 96

1    provided by Prime to those public entities was directly

2    with the public -- public entities, and that was the

3    source of the -- (inaudible).

4           MR. STROMBERG:  So if Prime Income Asset

5    Management was providing services for the transferror

6    entities prior to December 23rd, 2010, those services

7    were being paid for by one of the public companies?

8           MR. CROWN:  Yeah.  Now, I can't -- there

9    may have been some intercompany payables, receivables,

10   allocations and so forth that filtered down to the

11   various subsidiaries.  I -- I don't know exactly how it

12   was accounted for.

13          MR. STROMBERG:  You anticipated my next

14   question, which is going to be, if the publicly-traded

15   companies were paying for the expenses that Prime

16   Income Asset Management was incurring on behalf of the

17   transferror entities prior to December 23rd, 2010,

18   would there have been a liability reflected in the

19   books of the transferror entities back to either of

20   those publicly-traded entities who were paying the

21   expenses on their behalf?

22          MR. CROWN:  If that was -- if it was

23   accounted for that way, presumably so, but I don't know

24   how it was accounted for.

25          MR. STROMBERG:  Okay.  Who would know

1    the answer to that?

2            MR. CROWN:  Amy Cole.

3            MR. STROMBERG:  Okay.  You just were

4    asked some questions earlier by Mr. Gordon on behalf of

5    Access 1st Bank, and looking at a schedule that was

6    discussed in Mr. Morgan's deposition regarding the

7    Arcon property, they hold a lien on the Arcon property,

8    as does State Bank of Texas.

9            MR. CROWN:  Uh-huh.

10           MR. STROMBERG:  Do you know what that

11    loan was for?

12           MR. CROWN:  I don't know what that loan

13    was for.

14           MR. STROMBERG:  And you're referencing

15    the debtor interview document?

16           MR. CROWN:  Yes.  And this is the

17    attachment to Schedule B.

18           MR. STROMBERG:  Okay.

19           MR. CROWN:  There's a separate 5.3 acre

20    site that Arcon -- that Access 1st Capital has a --

21    it's not the same parcel as the State Bank of Texas.

22           MR. STROMBERG:  Okay.  So --

23           MR. CROWN:  It's an entirely different

24    parcel, but we label it as Arcon because they are

25    adjacent.

HC 01383

Page 98

1              MR. STROMBERG:  I see.

2              MR. CROWN:  One is 5.3 acres; one is

3      18.8 acres.  It's got -- that one has got the

4      tenant-in-common issue --

5              MR. STROMBERG:  With parking garage?

6              MR. CROWN:  -- with the parking garage

7      and so on.

8              MR. STROMBERG:  Okay.

9              MR. CROWN:  So two separate parcels both

10     called Arcon, but separate lenders.

11             MR. STROMBERG:  Thank you.  I appreciate

12     that.

13             I had asked you some questions earlier

14     about who was involved in the decision to file the

15     bankruptcy, and you indicated it was -- it may have

16     been others, but Mr. Moos and Mr. Shelley were the two

17     that you named.

18             MR. CROWN:  Yes.

19             MR. STROMBERG:  Were there any others

20     that you can think of?

21             MR. CROWN:  I -- I don't know who else

22     was involved in the meetings.  I was not part of any of

23     them.

24             MR. STROMBERG:  Okay.  And just to be

25     clear, there was a prior decision made to roll the

HC 01384

Page 99

1    properties up on December 23rd, 2010.  Who was involved

2    in making that decision again?

3              MR. CROWN:  Well, certainly those two

4    individuals would have been involved.  I don't know

5    beyond that who else was part of the decision.

6              MR. STROMBERG:  And you weren't involved

7    in that decision?

8              MR. CROWN:  I was not, no.

9              MR. STROMBERG:  Okay.  In your schedules

10   and also in the document you were just looking at from

11   the debtor interview there are values listed for the

12   property.

13             MR. CROWN:  Yes.

14             MR. STROMBERG:  Can you amplify on how

15   it is that these values were ascertained?

16             MR. CROWN:  I was given those values as

17   part of the file, so I was not a party to the

18   determination of what the values were.

19             MR. STROMBERG:  Who gave you those

20   values?

21             MR. CROWN:  I was given some -- some

22   information to summarize each of the -- each of the

23   sales with basically the same information that's

24   disclosed here.  This is the value.  This is the

25   underlying secured debt.  This is the buyer/seller note

Page 100

1    payable.  And I was not given the details as to how

2    they were derived at.

3                    MR. STROMBERG:  Okay.  Who was it that

4    gave you those values again?

5                    MR. CROWN:  Well, I was given the -- the

6    information by -- let's see, I believe an individual by

7    the name of John Daugherty gave me a summary, and he is

8    in our legal department -- gave me a summary of the --

9    of the assignments.

10                   MR. STROMBERG:  How do you spell

11   Mr. Daugherty's name?

12                   MR. CROWN:  D-A-U-G-H-E-R-T-Y.  I

13   believe the Irish way.

14                   MR. STROMBERG:  And you say he's in our

15   legal department.  What do you mean when you say "our"?

16                   MR. CROWN:  He's in the Prime legal

17   department.

18                   MR. STROMBERG:  Prime Income Asset

19   Management?

20                   MR. CROWN:  Yes.

21                   MR. STROMBERG:  Okay.  And is he an

22   attorney?

23                   MR. CROWN:  I don't believe he is.

24                   MR. STROMBERG:  Do you know where

25   Mr. Daugherty got these values?

1          MR. CROWN:  He got them based on

2    discussions with -- with the individuals that made the

3    decisions to -- to transfer the assets.

4          MR. STROMBERG:  Again, as far as we

5    know, that's Mr. Moos and/or Mr. Shelley and perhaps

6    others?

7          MR. CROWN:  Perhaps others, yes.

8          MR. STROMBERG:  Did you get an

9    understanding from Mr. Daugherty what these values

10   represented or where they came from?

11         MR. CROWN:  No.  I know that there were

12   -- there were several -- several considerations.  There

13   were concepts of book value, concepts of market value

14   based on recent or comparable appraisals for the

15   income-producing properties, considerations of income

16   -- the income approach to value as would be contained

17   in an appraisal using various and sundry cap rates

18   applied to net operating income, consideration of

19   stabilized values for those that were not fully leased

20   at the moment.

21         MR. STROMBERG:  Let me just ask you with

22   respect to the Arcon property.

23         MR. CROWN:  All right.

24         MR. STROMBERG:  Will you take a look at

25   the document again.  Can you tell me specifically with

Page 102

1    respect to that one what the considerations were if you

2    know?

3              MR. CROWN:  Well, it's not an

4    income-producing property.  So it's going to be based

5    on a combination of -- of book value, recent appraisals

6    or comparable appraisals, an idea of what the market

7    is.

8              The individuals at TCI and Prime and so

9    forth that are involved in the management and sale of

10   land are in the marketplace constantly, so they're well

11   aware of what land is fetching in various locales.

12             MR. STROMBERG:  Can you tell me what the

13   alchemy is here as between these various considerations

14   that comes up with this number, what those various

15   values were or how it was they were weighted to come up

16   with a number that --

17             MR. CROWN:  I can't because I wasn't in

18   the room at the time that those numbers were arrived

19   at.

20             I do know that those were some of the

21   considerations.  I just don't know what measure of each

22   was applied, if there was a recent appraisal that

23   someone had of the particular property or perhaps an

24   adjacent or very comparable property that they could

25   put side by side and say, yes, that applies to this

HC 01389

Case 11-42042-dml11   Doc 30-38   Filed 04/11/11   Entered 04/11/11 15:34:21   Desc
Exhibit Y - Hearing Transcript   February 8   2011   Page 102 of 118

Page 103

1    property, it's dated eleven months ago or five months

2    ago or last Tuesday or what have you.  I don't know

3    exactly what they were considering, but I know that a

4    combination of those approaches was used.

5                MR. STROMBERG:  Do you know whether in

6    respect to this particular property there was an

7    appraisal within the last several years?

8                MR. CROWN:  (Inaudible.)

9                MR. STROMBERG:  Okay.  Have you -- have

10   you checked the file related to the Arcon property that

11   you indicated Ms. Cole probably has in her possession

12   to see if such documentation exists?

13               MR. CROWN:  Well, she wouldn't have

14   that.  What she would have would be just the accounting

15   information.  She'd have, you know, expenditures for --

16   for interest and taxes and so on and so forth.  She's

17   an accountant, and that's what she handles.

18               MR. STROMBERG:  So who --

19               MR. CROWN:  Steven Shelley would have

20   access to any appraisals that were prepared --

21   (inaudible).

22               MR. STROMBERG:  Okay.  Now, what

23   diligence did you do in determining the accuracy of the

24   alchemy that went into determining these numbers based

25   on all of these considerations?

Page 104

1          MR. CROWN:  I did not do any particular

2     due diligence.  I've -- these -- I've been in the real

3     estate business for 38 years, and when I looked at

4     these assets, you know, whether it be raw land and cost

5     per square foot or value per square foot or

6     income-producing assets, looking at their grosses and

7     nets and values per square foot, it did not seem at all

8     aggressive to me.

9          MR. STROMBERG:  So kind of a squint and

10    look at it, seems right kind of approach?

11         MR. CROWN:  I think it's a little bit --

12    it's based on a long time looking at a lot of numbers

13    in my case.

14          But, as I looked at them, I said, you

15    know, is it -- is it out of the question that this

16    particular asset could be valued at, you know, 75

17    dollars a foot, or, in the case of land -- in some

18    cases some of these lands are valued at 20 cents a

19    square foot.

20         MR. STROMBERG:  Well, I'm just trying

21    to --

22         MR. CROWN:  It's hard to imagine that

23    these -- that these property values are aggressive.

24         MR. STROMBERG:  I'm just trying to get

25    an understanding of what sort of background work you

HC 01391

Page 105

1    did to follow up, if anything, to make a determination

2    beyond your general knowledge --

3              MR. CROWN:  Other than applying my

4    experience and eyeballing these from a reasonableness

5    standpoint, I did not do a due diligence on the value,

6    no.

7              MR. STROMBERG:  All right.  My last

8    question --

9              MR. CROWN:  These were the value that

10   two -- two entities agree on when they sold and bought

11   an asset, and I believe that that probably dictates at

12   least the market value of that asset.

13             MR. STROMBERG:  And those entities being

14   the transferror entity and Fenton Real Estate?

15             MR. CROWN:  Yes.

16             MR. STROMBERG:  All right.  Were you

17   involved in the decision as to who would be the chief

18   restructuring officer for Fenton Real Estate or FRE

19   Real Estate?

20             MR. CROWN:  No.  No, I wasn't.

21             MR. STROMBERG:  Do you know who was?

22             MR. CROWN:  No, I -- I do not know.  I

23   was not involved in the process at all.

24             David -- I had seen Dave at various

25   times in the past, but I had never been involved in

Page 106

1    working with him and I didn't know what his involvement

2    was until he announced himself.

3                    MR. STROMBERG:  You were in court when

4    Mr. Morgan had an opportunity to testify at the last

5    hearing, am I right?

6                    MR. CROWN:  I was.

7                    MR. STROMBERG:  Okay.  And you were

8    there when he indicated to the court that, for his due

9    diligence in preparing the schedules and the values and

10   what have you, he was relying on you.  Am I right?

11                   MR. CROWN:  Yes.

12                   MR. STROMBERG:  Okay.

13                   MR. CROWN:  Largely so.

14                   MR. STROMBERG:  Pass the witness.

15                   MS. DURHAM:  I have a question.

16                   Why would FRE right now need to lease

17   air -- airplane hangers?

18                   MR. CROWN:  FRE doesn't -- (inaudible).

19                   MS. DURHAM:  Okay.  No.  So FRE, there

20   was transfer because it was property owned by --

21                   MR. BUNCHER:  One of the -- one of the

22   airplane hangers actually has positive cash flow.

23                   MR. CROWN:  Yeah.

24                   MS. DURHAM:  Because it -- because you

25   rent out the space?

HC 01393

Page 107

1              MR. BUNCHER:  They sublease it.

2              MR. CROWN:  Yeah, to the people who own

3      the planes and they -- they pay you rent.

4              And the other one was occupied until the

5      11th, so, I mean --

6              MS. DURHAM:  By a rent payer?

7              MR. CROWN:  By a rent payer.  Yes.

8              MS. DURHAM:  Okay.  An unrelated rent

9      payer?

10             MR. CROWN:  Unrelated rent payer.

11             MR. BUNCHER:  We're not sure what we're

12     doing with those leases, by the way.

13             MR. CROWN:  So what they've acquired is

14     the leasehold interest in those, which, up until

15     November, both of them were --

16             MS. DURHAM:  Okay.

17             MR. CROWN:  -- flowing operating

18     profits.

19             MS. DURHAM:  Okay.

20             MR. WARNER:  I'm going to follow up

21     on --

22             MS. DURHAM:  We're going to hold you to

23     ten minutes this time.  Go ahead.  Take two.

24             MR. WARNER:  Oh, I'm sorry.  Michael

25     Warner --

HC 01394

Page 108

```
 1                    UNIDENTIFIED SPEAKER:  Does he only get
 2      nine this time?
 3                    UNIDENTIFIED SPEAKER:  This is Round 3,
 4      isn't it?
 5                    UNIDENTIFIED SPEAKER:  No.  This is a
 6      followup.
 7                    MR. WARNER:  Michael Warner on behalf of
 8      HCMLP.
 9                    Let me follow up on your discussions on
10      the numbers that were placed in the schedules in the
11      valuation.
12                    You said you'd never seen an appraisal
13      done by a third party on these properties or you didn't
14      use those two to determine the numbers, correct?
15                    MR. CROWN:  I didn't use anything to
16      determine the numbers because I didn't determine them.
17                    MR. WARNER:  Right.  You were just told
18      what numbers to put in?
19                    MR. CROWN:  Yes.  And I looked at them
20      and felt that they, based on the assets as I knew them,
21      were reasonable.
22                    MR. WARNER:  Right.  But -- and again,
23      that's your years --
24                    MR. CROWN:  I did not do any due
25      diligence on them.
```

HC 01395

Page 109

1          MR. WARNER:  -- your years of

2    experience, your knowledge of the market, your

3    expertise, and then you concluded by saying sort of a

4    willing buyer and a willing seller came up to a number

5    and these made sense?

6          MR. CROWN:  Yes, to those individuals --

7          MR. WARNER:  But you never looked at an

8    appraisal performed by a third party in order to value

9    these properties and put them down.  You took what

10   someone else told you to put down?

11         MR. CROWN:  Right.

12         MR. WARNER:  Okay.  Did you challenge

13   any of the numbers that -- that whoever it was that

14   ultimately gave them to you, did you say that's too

15   high or that's too low?

16         MR. CROWN:  No, I did not challenge

17   them.  I felt that they were conservative, quite

18   frankly.  In many cases I felt they were conservative,

19   but I did not -- did not challenge them, no.

20         MR. WARNER:  So you took them as they

21   were given, but you did do your own gut check?

22         MR. CROWN:  Yes.

23         MR. WARNER:  Okay.  Mr. Morgan, did you

24   look at any appraisals of the properties before you

25   signed the schedules to determine that these are good

Page 110

1    numbers?  Did you ask anybody for appraisals?

2                    MR. MORGAN:  No.

3                    MR. WARNER:  Did you do the same gut

4    check?

5                    MR. MORGAN:  More than a gut check.  I

6    actually went around and interviewed the land people,

7    for example, to get an idea about what land was doing,

8    -- problems were with them, where they were positioned

9    in that particular asset, and a ballpark range for what

10   today's market would be if it was (inaudible).

11                   And then I took a sample of those and

12   compared it to the debt that was being assumed, and

13   concluded that there was about a 200 percent debt

14   service coverage based on today's market, not the ones

15   that I sampled.  I did not sample them all.

16                   In respect to your particular asset, I

17   looked at two things.  I looked at the replacement

18   cost, which is a (inaudible).  I looked -- I didn't

19   have the comparables to work with, but I could see that

20   with a minimus amount of leasing -- not a minimus

21   amount of leasing, but leasing to get it up to the

22   market rate that the market was going for, the property

23   would be worth far in excess of the debt.

24                   MR. WARNER:  You said you spoke to land

25   people.  Land people at TCI?

Page 111

1    MR. MORGAN:  No.  It's land (inaudible).

2  The guy's name is Henry Butler and R. L. Lemke.  They

3  are the ones that have been involved representing Prime

4  in the land management and sales of all the land.

5    MR. WARNER:  Those gentlemen work for

6  Prime or TCI or one or the other?

7    MR. MORGAN:  Prime.

8    MR. WARNER:  Prime.  So, again, no

9  outside third party.  Everybody is in the umbrella of

10  American Realty Trust, TCI, Prime, that you've spoken

11  to and you've talked to, correct?

12    MR. MORGAN:  That was -- that was

13  preliminary -- my preliminary decision.

14    MR. WARNER:  Okay.  Let me ask you a

15  question on a different subject.

16    You testified a week ago on the 3rd of

17  February at the hearing that you had no commitments for

18  funding of this debtor for administrative costs or plan

19  or anything.  Is that correct?

20    MR. MORGAN:  That's correct.

21    MR. WARNER:  Has that changed today?

22    MR. MORGAN:  Not today, but it could

23  change by tomorrow.

24    MR. WARNER:  What's happening tomorrow?

25    MR. MORGAN:  I have -- I have a meeting

HC 01398

Page 112

1    -- I have a meeting this afternoon at Transcontinental.

2              MR. WARNER:  I'm sorry.  With who?

3              MR. MORGAN:  I have a meeting with

4    Transcontinental to talk through the various issues and

5    concerns that I have relative to how we're going to run

6    this stuff to see if they're willing to step to the

7    table.

8              MR. WARNER:  And who is that meeting

9    with?

10             MR. MORGAN:  Mr. Moos.

11             MR. WARNER:  Mr. Moos?  Anybody else?

12             MR. MORGAN:  (No audible response.)

13             MR. WARNER:  Okay.  Has there been any

14   preliminary discussions or exchanges of documents?

15             MR. MORGAN:  In what sense?

16             MR. WARNER:  Well, funding usually comes

17   with documents, long documents, agreements, terms, term

18   sheets.  Or is this just you and he are getting

19   together to talk?

20             MR. MORGAN:  No.  Yeah.  You don't do

21   the term sheets until you have an agreement, and I

22   don't have an agreement yet.

23             MR. WARNER:  Okay.  Have you asked for

24   funding?

25             MR. MORGAN:  Not yet.  I have advised

HC 01399

Page 113

1    him that that was -- that was -- (inaudible).

2              MR. WARNER:  So at this moment you have

3    no source of funding?

4              MR. MORGAN:  I do not.

5              MR. WARNER:  Okay.  Let me go into one

6    other topic, and that's the efforts that you're

7    undertaking to lease the Fenton property.  Are you

8    doing those efforts?

9              MR. MORGAN:  No.

10             MR. WARNER:  Who is doing them?

11             MR. MORGAN:  The leasing is coordinated

12   by Regis through a gentleman named Scott Porter.  And

13   Scott Porter is a liaison with all of the third-party

14   brokers, in this case, Grubb & Ellis as the next

15   (inaudible).

16             MR. WARNER:  Grubb & Ellis is an outside

17   brokerage firm retained by whom?

18             MR. MORGAN:  By Regis.

19             MR. WARNER:  To represent whom?  Regis?

20             MR. MORGAN:  No, to represent the

21   property in doing the leasing in behalf of --

22   (inaudible).

23             MR. WARNER:  And I assume, unless I'm

24   missing something, you haven't filed an application to

25   employ them with the court yet, have you?

Page 114

1              MR. MORGAN:  Employ whom?

2              MR. WARNER:  Grubb & Ellis.

3              MR. MORGAN:  No.  They were already in

4    place.

5              MR. WARNER:  But there's been no

6    application since you've filed bankruptcy?

7              MR. MORGAN:  That's correct.  They're

8    commission only.

9              MR. WARNER:  That's fine.

10             MR. BUNCHER:  If we sell the property or

11   we have the lease -- I mean, do you really need to

12   question him and take up time about whether we need to

13   file an application?

14             MR. WARNER:  Well, I'm just trying --

15             MR. BUNCHER:  If we need to file an

16   application, we'll file an application.

17             MR. WARNER:  So tell me what's the

18   status of your discussions with this tenant that you

19   told the court is hoping to come to the table.

20             MR. MORGAN:  Coming from the brokerage

21   or the broker and to me, we are in competition with one

22   other tenant, one other building, which is I believe

23   the Duke Realty Building at Belt Line and 635.

24             The difference is that they're -- it has

25   covered parking.  It also has food service, interior

HC 01401

Page 115

1       food service, which is available to the tenants.  It

2       also is in the process of doing an exercise facility,

3       which was very attractive to the tenant initially, and

4       so it has the ability to provide -- it's not a major

5       issue, but it has it -- one of their requirements in

6       their last request for proposal was they wanted the

7       ability to have their own electrical generator, and it

8       just so happens that there's one in the building.

9                    MR. WARNER:  How long a lease is it that

10      they're proposing?

11                   MR. MORGAN:  Ten years.

12                   MR. WARNER:  And when would it start?

13                   MR. MORGAN:  Right now the rent would

14      start about December.

15                   MR. WARNER:  The rent would start

16      December 1.  When would the tenant take possession?

17                   MR. MORGAN:  I don't -- I don't recall

18      the particulars, but we thought we had filed and

19      provided to -- to all the parties the -- to -- to I

20      assume your counsel -- we provided the actual lease

21      proposal.

22                   MR. WARNER:  Okay.  And is there tenant

23      improvement requirements to be done by the building?

24                   MR. MORGAN:  Yes.  Thirty-five dollars a

25      square foot.

HC 01402

Page 116

1              MR. WARNER:  I'm sorry.  How much?

2              MR. MORGAN:  Thirty-five dollars a

3     square foot.

4              MR. WARNER:  And how many square feet

5     are they looking for?

6              MR. MORGAN:  Short changes, three and a

7     half million dollars.

8              MR. WARNER:  A hundred thousand square

9     feet would be the answer, is that correct?

10              MR. MORGAN:  That's correct.

11              MR. WARNER:  So three and a half million

12     dollars in tenant improvements?

13              MR. MORGAN:  Yes.

14              MR. WARNER:  And the tenant would pay

15     that?

16              MR. MORGAN:  No.

17              MR. WARNER:  Who would pay that?

18              MR. MORGAN:  The landlord is going to

19     have to pay that.

20              MR. WARNER:  And where do you envision

21     that coming from?

22              MR. MORGAN:  Once they are signed, the

23     property is worth more -- worth a lot more than the

24     first mortgage.  So we'd either refinance it or we'd

25     have to borrow the money from a second mortgage in

Page 117

1    order to pay for it.

2              MR. WARNER:  And who have you talked to

3    about refinancing that property?

4              MR. MORGAN:  Again, I don't get the cart

5    before the horse.  You have to have the income first

6    before -- (inaudible).

7              MR. WARNER:  Okay.  So you've talked to

8    nobody about refinancing the property.

9              Have you talked to a second source, as

10   you used?

11             MR. MORGAN:  No.

12             MR. WARNER:  No?  Your answer is no?

13             MR. MORGAN:  No.

14             MR. WARNER:  Okay.  So would you sign

15   the lease without having the second source for the

16   funding of that three point five million?

17             MR. MORGAN:  I won't sign the lease

18   until I submit it to the court with a source of funds.

19             MR. WARNER:  And so you wouldn't sign

20   the lease with this proposed tenant without having the

21   source to do the tenant improvement, correct?

22             MR. MORGAN:  My testimony is, and I want

23   to be sure that I'm clear, I can't sign a lease without

24   court approval.  I would be remiss to go to the court

25   without having a funding source to cover the -- to

Page 118

1       cover the tenant.

2                     MS. DURHAM:  Okay.

3                     MR. WARNER:  How long?  Was that nine?

4                     MS. DURHAM:  You were under.  You were

5       actually at eight and a half.

6                     Mark?  Does anybody else --

7                     MR. STROMBERG:  No.

8                     MS. DURHAM:  -- have any other

9       questions?

10                    Mr. Weitman, did you want to ask any

11      more questions?

12                    MR. WEITMAN:  No.  I'm done.

13                    MS. DURHAM:  Okay.  Mr. Gordon?

14                    MR. GORDON:  No.  Thanks.

15                    MS. DURHAM:  Okay.  I don't have any

16      more questions.

17                    We'll be looking forward to the what

18      would be a lengthy operating report I'm going to guess

19      on the 20th.

20                    Did you have any questions?

21                    UNIDENTIFIED SPEAKER:  I do not.

22                    MS. DURHAM:  Okay.  This meeting is

23      concluded then.  Thank you.

24                    (End of proceedings.)

25

Page 119

1    STATE OF TEXAS              *

2    COUNTY OF DALLAS            *

3         I, Frances M. Blacha, Certified Shorthand Reporter

4    Number 305 in and for the State of Texas, certify that

5    the foregoing is a correct transcription, to the best

6    of my ability, from the tape recording of the

7    proceedings in the above-entitled matter.

8         I further certify that I am neither counsel for nor

9    related to, nor employed by any of the parties to the

10   action in which this hearing was taken, and further

11   that I am not financially interested in the outcome of

12   the action.

13        I further certify that the transcription fee of

14   $_____ was paid/will be paid in full by

15   _____.

16        Given under my hand of office on this the 11th day

17   of February, 2011.

18

19   _Frances M. Blacha_

20

21                  Frances M. Blacha, Texas CSR #305
                    Expiration Date:  12/31/2012
22                  Lockwood & Associates
                    Certified Shorthand Reporters
23                  Firm Registration No. 425
                    7548 Preston Road
24                  Suite 141, PMB 102
                    Frisco, Texas  75034

25

Lockwood & Associates
(214) 705-0141

HC 01406