Henry W. Simon, Jr.
Texas Bar No. 18394000
Robert A. Simon
Texas Bar No. 18390000
Spencer D. Solomon
Texas Bar No. 24066117
**BARLOW GARSEK & SIMON, LLP**
3815 Lisbon Street
Fort Worth, Texas 76107
Telephone: (817) 731-4500
Facsimile: (817) 731-6200
**Proposed Attorneys for FRE Real Estate, Inc.,**
**Debtor-in-Possession**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 11-42042-dml-11 |
| FRE REAL ESTATE, INC., | § | |
| | § | CHAPTER 11 |
| DEBTOR. | § | |

**DEBTOR'S RESPONSE TO OBJECTION OF THE SPECIAL SERVICER TO THE**
**DEBTOR'S MOTION FOR AUTHORITY TO USE CASH COLLATERAL**
[Relates to Docket No. 30]

TO THE HONORABLE D. MICHAEL LYNN, UNITED STATES BANKRUPTCY JUDGE:

Debtor-in-Possession, FRE Real Estate, Inc. (the "Debtor"), files this Response to the *Objection of the Special Servicer to the Debtor's Motion for Authority to Use Cash Collateral*, [Docket No. 30]. In support, the Debtor respectfully represents as follows:

1. On April 4, 2011 (the "Petition Date"), the Debtor filed a voluntary petition, initiating the above-referenced Chapter 11 case.

2. The Debtor owns four separate parcels of real property: (a) two seven-story office towers located at 1501-1503 and 1505-1507 LBJ Freeway in Farmer's Branch, Texas 75234 ("Fenton Centre"); (b) 4.7 acres of undeveloped land adjacent to Fenton Centre on LBJ Freeway

(the "Adjacent Land"); (c) a 177,805 square foot building in Farmer's Branch, Texas, off of Valley View Lane, just east of Mercer Crossing (the "Thermalloy Building"); and (d) 6.60 acres of vacant land in Mercer Crossing, just off Valley View Lane, alongside Whittington (the "Three Hickory Tract"); (collectively, the "Real Property"). The Debtor's primary source of income comes from rents generated from Fenton Centre.

3. The Debtor is indebted to its mortgage lender, NexBank, in the principal amount of approximately $60,000,000.00. NexBank's note is collateralized by Fenton Centre pursuant to a Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Filing executed on or about January 19, 2007 (the "Deed of Trust").

4. Prior to the Petition Date, the Debtor was contractually required to deposit rental payments into a bank account (the "Lockbox Account") held in the name of Highland Capital Management, L.P. ("Highland"), NexBank's purported special servicer for the Debtor's mortgage loan, pursuant to a Cash Management Agreement executed between the Debtor and Highland on July 6, 2009 (the "Cash Management Agreement"). Under the Cash Management Agreement, the Debtor would either direct its tenants to deposit rental payments directly into the Lockbox Account or collect rent itself and deposit such rent into the Lockbox Account within one (1) business day of receipt. Pursuant to Section 2.4 of the Cash Management Agreement, Highland is required to apply the funds comprising the Lockbox Account to, *inter alia*, pay taxes on the Property, to pay expenses related to loan administration, to pay debt service, principal, and interest on the Debtor's mortgage obligation, and to the Debtor to pay monthly operating expenses. If any funds remain after allocation of the Lockbox Account funds, Highland is required to remit such remaining funds to the Debtor.

5. On April 7, 2011, the Debtor filed its Motion for Authority to Use Cash Collateral (the "Motion"). [Docket No. 21] The Motion acknowledges that rents from the Debtor's Property are collateral for NexBank's loan and seeks a Court order authorizing the Debtor to use such cash collateral to pay its operating expenses.

6. On April 11, 2011, Highland filed an Objection to the Motion (the "Objection"). [Docket No. 30.] The Objection—like other pleadings filed by Highland in connection with this case—attempts to raise a variety of issues irrelevant to the relief sought in the Motion. Indeed, nearly two-thirds of the Objection (read: confirmation brief) are devoted to issues completely unrelated to the Debtor's use of cash collateral, including allegations that that the Debtor has no ability to formulate a feasible plan of reorganization, and that the Debtor filed this case in bad faith. While most of the Objection raises issues that may later arise but are not yet before the Court, a minor segment of the Objection does address cash collateral. The Debtor will respond to Highland's sundry allegations as they are presented to the Court at the proper time. However, for the purpose of its Motion relating to cash collateral, the Debtor will limit its response to the small portion of the Objection dedicated to that issue.

7. Highland's thirty-three page Objection boils down to two basic arguments that bear on the issue of the Debtor's use of its rents as cash collateral. First, Highland contends that its loan documents create an absolute assignment of rents and, therefore, the Court cannot authorize use of such rents as cash collateral. Second, Highland asserts that there is no equity in the Debtor's *real property* and that somehow this purported fact translates to a lack of adequate protection in Highland's interest in the Debtor's *cash*. The Debtor will address each argument in turn.

**A.    Highland has not established by "especially clear evidence" that the parties intended an absolute assignment of rents, and, alternatively, the Debtor's post-petition rents are property of the estate and may be used as cash collateral.**

**1.    Highland's loan documents do not overcome the strong presumption that the parties intended a collateral assignment of rents.**

8.    Texas recognizes two distinct types of assignments of rents: a collateral assignment (which merely creates a security interest in rental income) and an absolute assignment (which vests fee title in the assignee). *Cadle Co. v. Collin Creek Phase II Associates*, 998 S.W.2d 718, 722 (Tex. App.—Texarkana 1999, no pet.). In short, a collateral assignment creates a security interest in the rents, whereas an absolute assignment operates as a present transfer of title to rents contingent upon the mortgagor's default. *FDIC v. Int'l Prop. Mgmt., Inc.*, 929 F.2d 1033, 1035 (5th Cir. 1991). Collaterally assigned rents may be used as cash collateral, whereas rents absolutely assigned to a lender prepetition cannot. In Texas, there is a strong presumption that parties to an assignment of rents intended a collateral assignment. *Int'l Prop.*, 929 F.2d at 1036. Indeed, to overcome this presumption, Highland must show "especially clear evidence" that an absolute assignment was intended. *Id.* At least three Texas bankruptcy courts have held that a lender cannot satisfy this evidentiary burden where the loan documents purport to create *both* a security interest *and* an absolute assignment. *In re Las Torres Development, L.L.C.*, 408 B.R. 876, 883 (Bankr. S.D. Tex. 2009) (Bohm, J.); *In re Amaravathi Ltd. P'ship*, 416 B.R. 618 (Bankr. S.D. Tex. 2009) (Isgur, J.); *In re Allen*, 357 B.R. 103 (Bankr. S.D. Tex. 2006) (Steen, J.). Highland's loan documents do exactly that.

9.    Highland's Deed of Trust grants a security interest in the "Mortgaged Property," which it defines in Section 1.1(v) as "The Land, Improvements, Fixtures, Personalty, Leases ***and Rents***," together with a number of other enumerated items. (emphasis added). Additionally, Section 9.1 of the Deed of Trust, titled "<u>Security Interest</u>," expressly conveys "a first and prior

security interest in and to all of Grantor's right, title, and interest in, to and under the Personalty, Fixtures, Leases *and Rents* and all other non real estate portions of the Mortgaged Property in trust, to secure the full and timely payment of the Indebtedness and the full and timely performance and discharge of the Obligations." (emphasis added). Section 9.5 of the Deed of Trust further provides that upon the occurrence of an "Event of Default," "Beneficiary may elect . . . to collect and receive all of the Rents and to proceed in the manner set forth in Section 9.604 of the Texas Uniform Commercial Code relating to the procedure to be followed when a Security Agreement covers both real and personal property."

10. Despite the abundance of language in the Deed of Trust creating a security interest in the Debtor's rents, the Deed of Trust also provides for an absolute assignment of rents. Specifically, Section 10.1 of the Deed of Trust provides that "All of the Rents are hereby absolutely and unconditionally assigned to Beneficiary, to be applied by Beneficiary in payment of the Indebtedness." This Section further provides that "Notwithstanding any provision of this Deed of Trust or any other Loan Document to the contrary, the assignment in this paragraph 10.1 is an absolute assignment and not merely a security interest." Highland contends that the language in Section 10.1 of the Deed of Trust unambiguously creates an absolute assignment of rents. However, Section 10.1 cannot be read in isolation and must be construed alongside the language in Sections 1.1, 9.1, and 9.5, set forth above. Read as a whole, the Deed of Trust purports to pledge rents as collateral for the Debtor's mortgage obligations while simultaneously assigning those rents to the lender. The Bankruptcy Court for the Southern District of Texas has held that a deed of trust that contradicts itself in this fashion creates a collateral assignment of rents.

11. The language in Highland's loan documents is identical to those of the lender in *In re Las Torres Development, L.L.C.*, 408 B.R. 876 (Bankr. S.D. Tex. 2009) (Bohm, J.). In *Las Torres*, the debtor's lender also took a security interest in "Mortgaged Property," which its loan documents defined as "the Land, Building, Fixtures, Personalty, Rents and Contracts." *Id.* at 884. That lender's deed of trust also referred to "the Personalty, Fixtures, Leases and Rents" as "the Collateral" and stated that it was intended "to secure the full and timely payment of the Indebtedness and the full and timely performance and discharge of the Obligations." *Id.* The Court concluded that "the explicit inclusion of the 'Rents' in the definition of 'Mortgaged Property' indicates a definite intent to create a security interests in the Rents." *Id.* The Court compared this language with other sections of the loan documents, which stated that "this Assignment provides for an absolute assignment of Rents, not a collateral assignment of Rents." *Id.* Another provision also stated that "this assignment is absolute, unconditional and immediately effective," and that "it shall never be necessary for Assignee to institute legal proceedings of any kind to enforce the provisions of this Assignment." *Id.* Reading the loan documents as a whole, the Court determined that they were "patently ambiguous with respect to whether a collateral assignment or an absolute assignment of the Rents was intended" and looked to the maxims of contract construction to resolve the ambiguity. Because there, as here, the loan documents were drafted by the lender and in light of the strong presumption against absolute assignments, the Court construed the loan documents against the drafter and found that the parties intended a collateral assignment of rents.[2] *Id.* at 884-85.

---

[2] Highland contends that the *Las Torres* case is distinguishable from the case at bar because it "involved multiple loans." This is no distinguishing characteristic, as the language of the loan documents, rather than the number of loans, was the sole focus of the court. In fact, in *Las Torres*, the Court construed two separate loan documents—one deed of trust and one assignment of rents—which the Court explained should be read together as a single document. Here, we are dealing with only one document—the Deed of Trust—which itself contains all the contradictory language. Thus here the Court does not have to make the additional step of construing two documents as one.

12. This case is materially distinguishable from this Court's unpublished opinion in *In re Four Bucks, LLC*, No. 09-42629, 2009 WL 1857432 (Bankr. N.D. Tex. June 29, 2009). Most importantly, in *Four Bucks*, the lender's loan documents did NOT attempt to create both a security interest and an absolute assignment. Rather, in that case, the loan documents provided only for an absolute assignment of rents and allowed the Debtor to collect such rents pursuant to a revocable license. *Id.* at *2. Because the lender's deed of trust did not contradict itself by also providing for a security interest in the rents, this Court determined that the document unambiguously reflected the parties' intent to effectuate an absolute assignment. *Id.* at *3. By contrast, Highland's Deed of Trust does not provide for a revocable license for the Debtor to use the rents. Instead, the Deed of Trust tries to create *both* a security interest *and* an absolute assignment. When a lender attempts to create such a fiction, the Court must construe it as a collateral assignment, pursuant to the reasoning in *Las Torres*.

13. Moreover, Highland's self-serving construction of its Deed of Trust requires this Court to completely ignore the economic realities of the transaction between the Debtor and its mortgage lender. There is only one explanation for why Highland's Deed of Trust contains incompatible language, attempting to create both a security interest and an absolute assignment in rents: The Debtor's lender wanted to have its cake and eat it too. Section 10.1 of the Deed of Trust purports to absolutely assign the Debtor's rents to its mortgage lender "to be applied by beneficiary in payment of the Indebtedness." Without this latter clause, there would have been no consideration for the absolute assignment of the Debtor's rents, as earlier sections of the Deed of Trust already pledge rents as collateral for the mortgage loan. Highland's application of purportedly "absolutely" assigned rents to repayment of mortgage indebtedness is a logical fallacy. For example, if Highland had collected $300,000 of the Debtor's rents pursuant to its

"absolute" assignment and the next day the Debtor wrote a check for the full amount of the indebtedness, Highland would be required to return the rents because there would be no indebtedness to which to apply them. The Debtor's rents cannot be *both* collateral for its mortgage indebtedness *and also* absolutely assigned to the lender. The reason Texas courts have developed the "strong presumption" against absolute assignments is to prevent the economic fiction that Highland asks this Court to indulge. In Texas, if it looks like a mortgage and smells like a mortgage, the Court will treat the transaction like what it is: a mortgage. As the Fifth Circuit has determined,

> The concept of a present transfer of title to rents contingent upon default, as opposed to a security interest in the rents, is essentially a legal fiction. . . . Whatever terminology the court uses, . . . mortgagees employ such assignments to secure the debt, and all such assignments would be considered security interests under the Uniform Commercial Code, which treats all transfers intended to secure a debt as security interests despite their form.

*FDIC v. Int'l Prop. Mgmt., Inc.*, 929 F.2d 1033, 1035 (5th Cir. 1991) (emphasis added); *see also In re Foundry of Barrington P'ship*, 129 B.R. 550, 557 (Bankr. N.D. Ill. 1991) ("[The lender] can call this arrangement an 'absolute assignment' or, more appropriately, 'Mickey Mouse.' It's still a lien . . .").

14. Finally, not even Highland really believes it has an absolute assignment of the Debtor's rents. When Highland posted the Property for foreclosure pursuant to this Court's instructions in its order denying Highland's request for expedited hearing on its motion to take the Debtor's 2004 examination, Highland specifically seeks to foreclose on its lien on rents. Specifically, Highland's notice of foreclosure, dated April 8, 2011 and attached hereto as <u>Exhibit A</u>, recites that, in addition to Highland's lien on the Debtor's real property, "further to secure the Indebtedness, the Deed of trust also created a lien and security interest in favor of Mortgagee in certain other collateral located on or related to the Land as more particularly described on

Exhibit B hereto." A reading of Exhibit B to Highland's foreclosure notice reveals that Highland seeks to foreclose its lien on, among other things, the Debtor's rents. Thus, not three days before Highland filed the Objection—which vehemently argues that the Debtor's rents have already been absolutely assigned—Highland flat out admitted that it holds a lien on the rents and that it intends to foreclose on that lien. Highland should not be allowed to play fast and loose with the Court in this way. Its statements in the foreclosure notice constitute admissions, and Highland is estopped from denying that its notice of foreclosure is false. *See United States v. McCaskey*, 9 F.3d 368, 378 (5th Cir. 1993) ("The policies underlying the [estoppel] doctrine include preventing internal inconsistency, precluding litigants from playing fast and loose with the courts, and prohibiting parties from deliberately changing positions according to the exigencies of the moment.").

> **2.     Even if the Debtor's prepetition rents have been absolutely assigned to Highland, its post-petition rents are property of the estate and subject to use as cash collateral.**

15.    The commencement of the Debtor's Chapter 11 case created a bankruptcy estate comprised of the property described in § 541(a) of the Bankruptcy Code, which includes "[p]roceeds, product, offspring, *rents*, or profits *of or from property of the estate*." 11 U.S.C. § 541(a)(6) (emphasis added). Two Texas bankruptcy courts have held that this language, when read alongside § 552(b) and § 363 of the Bankruptcy Code, creates a statutory framework that allows a debtor to use post-petition rents as cash collateral for the benefit of the estate.

16.    Specifically, the *Las Torres* court, discussed above, held that notwithstanding a collateral or absolute assignment of rents, "Section 541(a)(6) . . . enables debtors to use post-petition rents to increase the value of the estate, instead of simply applying them to pay creditors or turning them immediately over to assignees. This structure comports with the twin goals of

bankruptcy, which are (1) permitting the debtor to obtain a fresh start, and (2) ensuring that claims are paid." *Las Torres Development*, 408 B.R. at 886. That court further concluded that post-petition rents are also property of the estate pursuant to § 541(a)(1), which encompasses "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). The *Las Torres* court reasoned that even though a debtor may have a prepetition contractual obligation to assign rents, that debtor nonetheless has a conceivable interest in the rents sufficient to make them property of the estate. *Las Torres Development*, 408 B.R. at 887 ("[E]ven if § 541(a)(6) does not place post-petition rents from estate property in the debtor's bankruptcy estate, the debtor nonetheless retains some minimal interest in the rents sufficient to make those rents 'property of the estate' under § 541(a)(1).").

17. The Honorable Marvin P. Isgur, sitting for the Bankruptcy Court for the Southern District of Texas, engaged in a lengthy analysis of this issue in *In re Amaravathi Ltd. P'ship*, 416 B.R. 618 (Bankr. S.D. Tex. 2009). Judge Isgur reviewed § 541(a)(6), alongside various other sections of the code, and concluded as follows:

> A review of pertinent sections of the Bankruptcy Code demonstrates that Congress created a wholly rational structure for resolving disputes involving post-petition rents:
>
> • Section 541(a)(6) makes post-petition rents property of the estate;
>
> • Section 552(b) extends a lender's pre-petition collateral interest in rents to rents that are collected post-petition; and
>
> • Section 363 mandates that a trustee or debtor-in-possession provide adequate protection before the rents can be utilized by the estate.
>
> This carefully crafted statutory framework promotes the salutary goal of allowing an estate to maintain its assets, which enhances the likelihood of a successful reorganization.

*Id.* at 624.  Judge Isgur further reasoned that, as a matter of policy, "Section 541(a)(6)'s inclusion of post-petition rents within property of the estate also limits the ability of a mortgagee to 'choke' the debtor out of chapter 11. Assuming that debtors-in-possession continue to generate income despite the inefficient incentives discussed directly above, the prospects for reorganization would remain dim if the rents were paid to the mortgagee instead of the estate." *Id.* at 626.

18.     Highland argues that this Court should disregard Judge Isgur's poignant opinion in *Amaravathi* because "state law governs a mortgagee's rights to rents during a bankruptcy case."  The Debtor agrees that state law does govern Highland's rights, except where Congress enacts a statute that preempts them.  As Judge Isgur concluded in *Amaravathi*, that is precisely what Congress did when it enacted § 541(a)(6).  *Id.* at 625 ("Given [Congress's] broad Constitutional powers, it is no surprise that the *Butner* Court recognized Congress's ability to supersede state law in the bankruptcy arena. *Butner*, 440 U.S. at 54, 99 S.Ct. 914. Congress's decision to do so in the case at hand was a wholly rational exercise of its expansive authority."). Post petition rents generated from the Debtor's Property are therefore property of the estate and subject to use as cash collateral.

**B.     Highland's interest in the Debtor's cash is adequately protected.**

19.     Section 363(c)(2) of the Bankruptcy Code permits a debtor-in-possession to use a secured creditor's cash collateral if (a) the secured creditor consents, or (b) the Court, after notice and a hearing, authorizes the use of the cash collateral. 11 U.S.C. § 363(c)(2).  The Court may authorize the use of cash collateral if the Debtor demonstrates some degree of adequate protection of Highland's interest in such cash collateral—which, in this case, are the rents being paid into Highland's Lockbox Account.  Exactly what constitutes adequate protection is decided

on a case-by-case basis. *See In re O'Connor*, 808 F.2d 1393, 1396–97 (10th Cir. 1987) (citing *In re Martin*, 761 F.2d 472 (8th Cir.1985)). The focus of the requirement is to protect the secured creditor—in this case, Highland—from diminution in the value of its interest in the rents during the reorganization process. *See In re Kain*, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988).

20. As an initial matter, Highland asserts that its interest in the Debtor's cash is not adequately protected because, according to Highland, there is no equity in the Fenton Centre property. Although this issue may be important in the context of a motion to lift stay, it is completely irrelevant to the question of whether Highland's interest in the Debtor's *cash* is adequately protected. Highland has not filed a motion to lift stay and the issue of whether Highland's interest in Fenton Centre is adequately protected is not before this Court. Additionally, Highland's contention that there is no equity in Fenton Centre is based solely on an appraisal commissioned by Highland for a "liquidation value" of Fenton Centre, which is based on a 30-60 day liquidation of the office building complex.[3] As this Court knows, liquidation value is vastly different from Fenton Centre's value as a going concern. It is going concern value that the Debtor seeks to preserve through a plan of reorganization and it is that value that should be used for the purpose of determining adequate protection. Highland's appraisal also presumes a discount value of 9.0% to 11.0% even though the interest rate on the Debtor's mortgage loan is 5.0%. Applying the loan interest rate as the discount rate yields a value greater than $60,000,000.00. Additionally, a 30-60 day sale of two seven-story office towers totaling approximately 700,000 square feet is an unreasonably short period of time and does not reflect fair market value. Fair market value is the amount for which Fenton Centre would sell within a reasonable period of time, which, for a large commercial office complex like Fenton Centre, is more likely between twelve and eighteen months, with adequate efforts to market the property.

The Debtor is in the process of obtaining a professional appraisal of Fenton Centre, taking into account a reasonable time for marketing, and the value of the property as an operating business. In any event, this issue is not before the Court and the Debtor will address Highland's concerns about the value of Fenton Centre when the issue is properly presented to the Court for adjudication. Fenton Centre is not melting ice cream. It is a Class A office complex on LBJ Freeway that is professionally managed, well maintained, and insured for $100,000,000.00. There is no risk that the value of Fenton Centre will diminish in 14 days or before Highland can obtain an orderly hearing on a motion to lift the automatic stay.

21. Highland's interest in the Debtor's rents is adequately protected in a variety of ways. First, the rent deposits are paid directly by tenants into Highland's Lockbox Account, over which the Debtor has no control. The Debtor proposes to maintain this arrangement as a form of adequate protection. Because Highland controls the Debtor's cash, there is zero risk that the cash will be unnecessarily diminished or misappropriated by the Debtor. Second, the Debtor has proposed a reasonable 14-day cash collateral budget. The Debtor's 14-day budget proposes to spend $106,000.00, leaving a surplus cash flow of approximately $500,000.00 under Highland's control. Third, § 552(b) ensures that Highland will retain a lien on all post-petition rents, which, so long as the Property continues operating, will add an additional $200,000.00 per month to the value of Highland's cash collateral. These three factors will ensure Highland's interest in the Debtor's rents are adequately protected until the Debtor begins making adequate protection payments in accordance with a final cash collateral order.

22. In sum, and despite Highland's protests to the contrary—which are made solely for the purpose of leverage and posturing—it is better for everyone (the Debtor, the tenants, the

---

[3] The Debtor does not concede that Highland's appraisal is admissible for any purpose.

creditors, and Highland, itself) if the Debtor is able to spend the money necessary to protect and maintain the Property for 14-days, pending a final hearing.

WHEREFORE, the Debtor requests that the Court overrule Highland's Objection, enter an interim order authorizing the Debtor's use of cash collateral, as requested in the Motion, and order such other and further relief to which the Debtor is justly entitled.

April 12, 2011

Respectfully submitted,

**BARLOW, GARSEK & SIMON, L.L.P.**

By: /s/ Robert A. Simon
      _____
Henry W. Simon, Jr.
Texas Bar No. 18394000
Robert A. Simon
Texas Bar No. 18390000
Spencer D. Solomon
Texas Bar No. 24066117

3815 Lisbon Street
Fort Worth, Texas 76107
Telephone:  (817) 731-4500
Facsimile:  (817) 731-6200
**Proposed Attorneys for FRE Real Estate, Inc., Debtor-in-Possession**

## CERTIFICATE OF SERVICE

      I hereby certify that on this 12th day of April, 2011, I served a true and correct copy of the foregoing to all parties receiving service via this Court's ECF notification system, and the parties listed below by email.

    Michael D. Warner
    COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
    301 Commerce Street, Suite 1700
    Fort Worth, Texas 76102
    Telephone: (817) 810-5250
    Facsimile: (817) 810-5255
    Email: mwarner@coleschotz.com

                                                        /s/ Robert A. Simon
                                                        Robert A. Simon