Michael D. Warner, Esq., Texas Bar No. 00792304
Emily S. Chou, Esq., Texas Bar No. 24006997
**COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.**
A Professional Corporation
301 Commerce Street, Suite 1700
Fort Worth, Texas 76102
817-810-5250 Telephone
817-810-5255 Facsimile
mwarner@coleschotz.com
echou@coleschotz.com

Attorneys for Highland Capital Management, L.P., as Special Servicer

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| In re | : | Case No. 11-42042-DML-11 |
| | : | |
| FRE REAL ESTATE, INC., | : | Chapter 11 |
| | : | |
| Debtor. | : | Preliminary Hearing Date: May 26, 2011 |
| | : | Preliminary Hearing Time: 9:30 a.m. |
| | : | |
| | : | |

### MOTION FOR RELIEF FROM THE AUTOMATIC STAY

PURSUANT TO LOCAL BANKRUPTCY RULE 4001-1(b), A RESPONSE IS REQUIRED TO THIS MOTION, OR THE ALLEGATIONS IN THE MOTION MAY BE DEEMED ADMITTED, AND AN ORDER GRANTING THE RELIEF SOUGHT MAY BE ENTERED BY DEFAULT.

ANY RESPONSE SHALL BE IN WRITING AND FILED WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT AT 501 W. TENTH STREET, ROOM 147, FORT WORTH, TEXAS 76102-3643 BEFORE CLOSE OF BUSINESS ON **MAY 10, 2011**, WHICH IS AT LEAST 14 DAYS FROM THE DATE OF SERVICE HEREOF. A COPY SHALL BE SERVED UPON COUNSEL FOR THE MOVING PARTY AND ANY TRUSTEE OR EXAMINER APPOINTED IN THE CASE. ANY RESPONSE SHALL INCLUDE A DETAILED AND COMPREHENSIVE STATEMENT AS TO HOW THE MOVANT CAN BE "ADEQUATELY PROTECTED" IF THE STAY IS TO BE CONTINUED.

A PRELIMINARY HEARING IS SET FOR **MAY 26, 2011 AT 9:30 A.M.**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................... ii

I.    INTRODUCTION ........................................................................................4

II.   STATUS OF THE CASES AND JURISDICTION ........................................7

    A.    THE SECOND CHAPTER 11 CASE .................................................. 7

    B.    THE FIRST CHAPTER 11 CASE ...................................................... 10

III.  FACTUAL BACKGROUND ........................................................................12

    A.    THE FENTON CENTRE ................................................................... 12

    B.    THE FENTON LOAN DOCUMENTS AND THE JANUARY AND
           APRIL 2011 FORECLOSURES ......................................................... 15

IV.   LEGAL ANALYSIS....................................................................................16

    A.    THE AUTOMATIC STAY SHOULD BE VACATED PURSUANT TO
           11 U.S.C. § 362(D)(2) BECAUSE NO EQUITY EXISTS IN THE
           PROPERTIES AND THE PROPERTIES ARE NOT NECESSARY TO
           AN EFFECTIVE REORGANIZATION ............................................. 16

    B.    THE COURT SHOULD GRANT THE SPECIAL SERVICER RELIEF
           FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. §
           362(D)(1) BECAUSE THE SECOND CHAPTER 11 CASE WAS
           CLEARLY A BAD FAITH FILING. ................................................... 21

V.    CONCLUSION............................................................................................23

76332/0022-7551282v6

# TABLE OF AUTHORITIES

**Page(s)**

CASES

In re 234-6 West 22 Street Corp., 214 B.R. 751 (Bankr. S.D.N.Y. 1997).....................................18

Albany Partners, Ltd. v. Westbrook (In re Albany Partners, Ltd.), 749 F.2d 670 (11th Cir. 1984) ........................................................................................................................................16

In re Anderson Oaks (Phase I) Ltd. P'ship., 77 B.R. 108 (Bankr. W.D. Tex. 1987)....................13

In re Barakat, 99 F.3d 1520 (9th Cir. 1996)..................................................................................17

Boston Post Road Ltd. P'ship v. Fed. Deposit Ins. Corp. (In re Boston Post Road Ltd. P'ship), 21 F.3d 477 (2d Cir. 1994).............................................................................................17

Canal Place Ltd. P'ship v. Aetna Life Ins. Co. (In re Canal Place Ltd. P'ship.), 921 F.2d 569 (5th Cir. 1991)...............................................................................................................13, 14, 16

In re Island Helicopter Corp., 63 B.R. 809 (Bankr. E.D.N.Y. 1986)...........................................16

John Hancock Mutual Life Ins. Co. v. Route 37 Bus. Park Assocs., 987 F.2d 154 (3d Cir. 1999) ..............................................................................................................................................17

In re Laguna Assocs., L.P., 30 F.3d 734 (6th Cir. 1994) ..............................................................18

In re Little Creek Dev. Co., 779 F.2d 1068 (5th Cir. 1986) .........................................................18

In re Northwest Timberline Enters, Inc., 348 B.R. 412 (Bankr. N.D. Tex. 2006)........................16

Phoenix Mutual Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture), 995 F.2d 1274 (5th Cir. 1991) ......................................................................................16

In re Playa Dev. Corp., 68 B.R. 549 (Bankr. W.D. Tex. 1986)...............................................13, 16

In re Reitnauer, 152 F.3d 341 (5th Cir. 1998) ..............................................................................18

In re Saypol, 31 B.R. 796 (Bankr. S.D.N.Y. 1983) ......................................................................16

Sutton v. Bank One (In re Sutton), 904 F.2d 327 (5th Cir. 1990) .................................................14

U.S. Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365 (1988)....13, 16

STATUTES

11 U.S.C. § 362(d)(1) ........................................................................................4, 8, 18, 19, 20

11 U.S.C. § 362(d)(2) .......................................................................................4, 13, 14, 15, 20

76332/0022-7551282v6

11 U.S.C. § 362(g)(1) ..................................................................................................13

11 U.S.C. § 362(g)(2) ..................................................................................................13

11 U.S.C. § 363(d)(3) ....................................................................................................8

11 U.S.C. §1129(a)(10) ............................................................................................2, 17

28 U.S.C. §§ 157 and 1334 ...........................................................................................5

28 U.S.C. § 157(b)(2) ....................................................................................................5

28 U.S.C. §§ 1408 ..........................................................................................................5

28 U.S.C. §§ 1409 ..........................................................................................................5

§§ 1107(a) and 1108 of the Bankruptcy Code .............................................................5

76332/0022-7551282v6

**To the Honorable D. Michael Lynn, United States Bankruptcy Judge:**

Highland Capital Management, L.P. (the "Special Servicer"), the special servicer of the

secured loan in the original principal amount of $62 million advanced to the Debtor, FRE Real

Estate, Inc. (the "Debtor"), hereby files this Motion for Relief from the Automatic Stay (the

"Motion"), and respectfully states as follows:

# I.
# INTRODUCTION[1]

1.      This Second Chapter 11 Case, filed less than three months after dismissal of the

First Chapter 11 Case as a bad faith filing, is yet another ill-conceived and bad faith attempt by

the Debtor to derail the Special Servicer's foreclosure of the Debtor's real property in North

Texas, commonly referred to as the Fenton Centre.  The Special Servicer holds a valid mortgage

lien on the Fenton Centre[2], securing a debt currently in excess of $60 Million, which has been in

default multiple times over the last two years and continuously for the last eight months.  The

Debtor has no equity in the Fenton Centre, as the appraised value (of all the Special Servicer's

collateral) is no more than $45 Million[3], and thus the Debtor is facing a deficiency claim of at

---

[1]      Capitalized terms used in this Introduction are defined hereinbelow.  All references to
Exhibits herein incorporate such exhibit into this Motion.  Exhibits previously offered by the Special
Servicer in connection with the Interim Cash Collateral Hearing (as defined below), and admitted into
evidence by the Court, are (i) noted herein, (ii) incorporated herein by such reference, (iii) identified by
the Exhibit Letter assigned to such Exhibit in connection therewith, and (iv) referenced by the Bates
Stamped numbers used thereon.  Additional Exhibits offered herein have been Bates Stamped with
numbers for the Court's convenience.

[2]      The Special Servicer also has liens on two other non-cash generating minor parcels of
real property originally pledged as additional collateral by entities other than the Debtor, which are more
fully addressed in § III., infra.

[3]      The appraisal of the Fenton Centre and the other real property now owned by the Debtor
and subject to the liens of the Special Servicer, is addressed in paragraph 19, infra.  The Fenton Appraisal,
defined below, addresses all collateral and has a range of $38,355,000 to $45,640,000 (depending upon
the period of time to market the Properties).

least $15 Million held by the Special Servicer.  The Debtor has no ability to meaningfully increase the value of the Special Servicer's collateral.  The Debtor has no ability to service the secured debt, no business plan, and no ability to reorganize.

2.      The Debtor has four significant infirmities that absolutely prohibit any ability to reorganize: (a) a complete lack of equity in the Fenton Centre (or the other real property recently transferred to the Debtor and subject to the liens of the Special Servicer); (b) the Fenton Centre's occupancy rate is approximately 50% (and the other two properties are vacant and produce no cash flow and are thus are economic drains on the Debtor), which occupancy rate, even if higher, would not increase the value significantly; (c) an absolute assignment of Rents/Leases prohibiting the Debtor from utilizing funds from the Fenton Centre to fund a reorganization; and (d) because the Special Servicer has a deficiency claim of at least $15 Million which overwhelmingly exceeds two-thirds of the non-insider unsecured debt, the Special Servicer controls the only legitimate classes of claimants and, thus, there will not be any impaired class of creditors who will vote for any reorganization plan the Debtor proposes, as required by 11 U.S.C. §1129(a)(10).[4]  Incredibly, despite its repeated bankruptcy filings and testimony and other evidence during the past four months, the Debtor has presented <u>nothing</u> to meaningfully contest these critical facts.

3.      The Debtor places it entire fate in the assertion that it will be able to improve its occupancy rates, and thus the value of the Fenton Centre, by procuring a new tenant.  In the "Preliminary Statement" filed as part and parcel to the Petition commencing this Second Chapter 11 Case [Docket no. 1], and at the Interim Hearing on the Debtor's Motion to Use Cash

---

[4]      The Special Servicer believes there would be multiple infirmities in any plan the Debtor would propose, including feasibility and bad faith.  The Special Servicer is also filing a motion seeking to dismiss this Case, or alternatively to terminate exclusivity so that the Special Servicer can file its own plan.

5

Collateral, the Debtor trumpets a new lease transaction with HSS Systems, LLC ("HSS") as its prospect for improving the value of the Fenton Centre and creating equity. However, by the Debtor's own admission, the discussions with HSS have been going on for in excess of 4 months, and are no further along than when they commenced. Even if the discussions with HSS were real lease negotiations, the Debtor has no ability or realistic opportunity of completing a lease transaction. The Debtor's own testimony has included the fact that HSS has requested no less than $4.5 Million in tenant improvements, all at a cost to the Debtor[5]. The Debtor has absolutely no prospect for funding such costs. The Debtor has not offered any explanation on how it will find the funds to complete the tenant improvement costs, if a lease were to be approved by the Court and the Special Servicer. Even if the Debtor were allowed to use every dollar of cash flow from the Fenton Centre[6], it would not have sufficient funds to conclude a transaction requiring $4.5 Million in tenant improvement costs, if in fact such transaction ever materialized.

4.     Even more important than the Debtor's inability to undertake $4.5 Million in tenant improvement costs, is the fact that the outlined terms of a proposed transaction with HSS would not add or increase the value of the Fenton Centre in any significant manner, and when added to the high end of the appraised value of $45 Million, is a far cry from the more than $60 Million owed to the Special Servicer.

_____

[5]     The Debtor's own testimony at the Interim Cash Collateral Hearing (as defined below), confirmed the "request" of HSS for $45 per square foot for tenant improvement costs for approximately 100,000 square feet, as well as the Debtor's complete lack of ability to afford such amount. See Motion for Use of Cash Collateral (Day 1) Transcript of 4/13/11 (**Exhibit AA**), at 60:5-8, Bates 1467.

[6]     The Special Servicer disputes that the Debtor is entitled to use the proceeds of the Rents/Leases, as the same is not cash collateral, but rather was absolutely assigned to the Special Servicer. See paragraph 9, infra.

5.      Against this backdrop, the Special Servicer respectfully requests that the Court lift the automatic stay pursuant to 11 U.S.C. § 362(d)(1) and (2) to permit the Special Servicer to proceed with a foreclosure of its collateral.  As demonstrated below, there is no equity in the Fenton Centre (or the other collateral pledged to the Special Servicer).  Moreover, because the Special Servicer's enormous deficiency claim, which is anywhere from $15 Million to $21 Million, will swamp the class of unsecured creditors, the Debtor will be unable to obtain the consent of an impaired class of creditors to any plan of reorganization that it proposes.  There is simply no reason to permit the Debtor to delay the inevitable any longer through dilatory tactics and bad-faith bankruptcy filings.  The Court should permit the Special Servicer to realize the benefit of its bargain immediately.  For these reasons and those set forth below, it is respectfully requested that the Court grant the Special Servicer's Motion for Relief From the Automatic Stay.

## II.
## STATUS OF THE CASES AND JURISDICTION

### A.      THE SECOND CHAPTER 11 CASE

6.      On April 4, 2011 (the "Petition Date"), the Debtor filed its voluntary petition initiating this case (the "Second Chapter 11 Case").  This is the second Chapter 11 Petition filed by the Debtor within a 3-month period.  The Debtor's first chapter 11 case (the "First Chapter 11 Case")[7] was filed on January 4, 2011, and dismissed by the Honorable Barbara J. Houser, United

---

[7]      The First Chapter 11 Case was assigned Case number 11-30210-BJH-11.  The Debtor's Street Address on the Petition initiating the First Chapter 11 Case was 1750 Valley View Lane, Suite 400, Dallas, Texas.  Notably, however, the Debtor's Street Address on the Petition initiating the Second Chapter 11 Case was 6731 Bridge Street, Suite 372, Fort Worth, Texas.  The Special Servicer queries whether this sudden change of address (and corresponding change of jurisdiction of its bankruptcy case) was a calculated attempt by the Debtor to avoid the possibility of having its case heard by Judge Houser.

States Bankruptcy Judge for the Northern District of Texas, Dallas Division ("Judge Houser"), as a bad faith filing on February 17, 2011.

7.      Since the Petition Date, the Debtor has remained in possession of its assets and continues to operate its business as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. No official committee of unsecured creditors has been appointed in the Second Chapter 11 Case. Further, no trustee or examiner has been appointed.

8.      This Court has jurisdiction over the Motion pursuant to, *inter alia*, 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this District and before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      On April 13 and 14, 2011, the Court considered the Debtor's Motion to Use Cash Collateral [Docket no. 21] (the "Cash Collateral Motion" and the "Interim Cash Collateral Hearing")[8]. The Court has yet to rule on the Special Servicer's Objection to the Cash Collateral Motion [Docket no. 30] (the "Cash Collateral Objection")[9], with respect to the assertion that the Debtor has no cash collateral, as an absolute assignment of the Rents/Leases[10] occurred prior to the First Chapter 11 Case, and, obviously, the Second Chapter 11 Case[11]. An Interim Order permitting the use of the cash flow (as opposed to the concept of cash collateral) from the Fenton

---

[8]      Attached hereto, incorporated by this reference and marked as **Exhibit AA** (April 13, 2011) and **Exhibit BB** (April 14, 2011) are the transcripts of the Interim Cash Collateral Hearing.

[9]      The Cash Collateral Objection, and each Exhibit admitted by the Court in connection therewith, are incorporated herein by this reference, *to wit*: the Special Servicer's **Exhibits B, C, D, F, G, H, I, J, K, L, M, N, O, P, Q, R and S**. Included in such admitted Exhibits are the documents collectively referred to in the Cash Collateral Objection as the Fenton Loan Documents (Exhibits **F, G, H, I, J, K, L, M, N, and O**), which support the obligation owed to the Special Servicer, and the liens against the Properties held by the Special Servicer.

[10]      The term Rents/Leases, is defined in the Cash Collateral Objection, at paragraph 38.

[11]      The license to use the cash generated from the Fenton Centre, pursuant to the Fenton Deed of Trust (as such term is defined in the Cash Collateral Objection, at paragraph 26) was terminated, on, *inter alia*, October 8, 2010, as addressed in the Cash Collateral Objection, at paragraph 50.

Centre was entered on April 19, 2011 [Docket no. 44] (the "Interim Cash Collateral Order"), and

a final hearing is scheduled for May 2, 2011, on the Cash Collateral Motion (the "Final Cash

Collateral Hearing").

10.     The Special Servicer continues to assert, and will do so at the Final Cash

Collateral Hearing, that the Debtor cannot adequately protect the Special Servicer's interest in

any of its collateral, including the Fenton Centre, the Transcontinental Property[12] (also

commonly referred to by the Debtor as the *Three Hickory Tract*), and the Income Realty

Property[13] (also commonly referred to by the Debtor as the *Thermalloy Building*).  Assuming

*arguendo*, that the Debtor has established an ability to adequately protect any of the Special

Servicer's collateral (an assumption that, as of this date, the Court has not validated and the

Special Servicer clearly has not agreed to), the mere fact that adequate protection is

demonstrated, solely for the purpose of the Cash Collateral Motion, should not permit the Debtor

to continue to use the cash flow from the Fenton Centre if it has absolutely no prospects of

reorganization.

11.     Further, and again assuming *arguendo*, that the Debtor has shown, and the Court

has found, that the Debtor can adequately protect the Special Servicer's interest in the Fenton

Centre (the only collateral that generates cash flow), there is absolutely no showing that the

Special Servicer's other collateral (the Transcontinental Property and the Income Realty

Property) is adequately protected, and thus relief from stay is clearly warranted as to that

---

[12]     The term "Transcontinental Property" is defined in the Cash Collateral Objection, at
paragraph 28.

[13]     The term "Income Realty Property" is defined in the Cash Collateral Objection, at
paragraph 28.

9

collateral. Both the Transcontinental Property and the Income Realty Property have ongoing and regular expenses (notwithstanding that neither property is operating), including real property taxes, insurance, security services, normal repairs, maintenance and up-keep.    Absent payment of these ongoing and regular expenses, the value of such collateral continues to decline and the overall obligation owing to the Special Servicer continues to increase (thus obviously increasing the deficiency claim that the Special Servicer has against the Debtor).    None of these ongoing regular expenses are being paid by the Debtor, nor are any of these expenses included in the budget approved as part of the Interim Cash Collateral Order or the proposed budget to be considered at the Final Cash Collateral Hearing.

### B.    THE FIRST CHAPTER 11 CASE

12.    In direct response to the Special Servicer's foreclosure sale of the Fenton Centre (and its two other parcels of collateral), scheduled for January 4, 2011, TCI Park West II, Inc. ("Park West"), now known as FRE Real Estate, Inc., the Debtor herein, and its insiders/affiliates embarked on a campaign to intentionally delay the Special Servicer's exercise of its enforcement rights and orchestrated multiple transactions to intertwine the properties and assets of multiple single asset real estate entities.

13.    More specifically, as the Debtor admitted in the First Chapter 11 Case, multiple parcels of real property, owned by entities other than the Debtor, many of which were subject to foreclosure sales scheduled on January 4, 2011, were transferred to the Debtor on the eve of the filing of the First Chapter 11 Case in an improper attempt to avoid designation as a single asset real estate case and to thwart the scheduled foreclosure sales.    Through the machinations of the Debtor's insiders/affiliates, the foreclosure sales were abruptly halted through the filing of a single Chapter 11 case.    Some, but clearly not all, of the actions of the Debtor and its

Case 11-42042-dml11    Doc 54    Filed 04/26/11    Entered 04/26/11 14:02:42    Desc Main
Document       Page 12 of 30

insiders/affiliates that rose to the level of bad faith, as found by Judge Houser, would not have existed had each of the transferor entities (the insiders/affiliates) simply addressed its own respective financial structures using whatever legal rights they possessed. In other words, each individual transferor could have resorted to its respective rights and filed its own respective Chapter 11 cases –but they did not – and the Debtor still has not.

14. While the Debtor has asserted that it has corrected the infirmities articulated by Judge Houser that warranted the dismissal of the First Chapter 11 Case, the truth of the matter is that the Debtor has not. As of this moment in time, the Debtor still has several significant infirmities that demonstrate the bad faith filing of the Second Chapter 11 Case that warrant relief from stay, pursuant to, inter alia, 11 U.S.C. § 362(d)(1), as *cause* exists.[14]

15. The numbers spoke for themselves - - 38 properties, owned by at least 19 different entities, that affect 11 different secured lenders, were transferred to the Debtor on the eve of the filing of the First Chapter 11 Case.

---

[14]    As Judge Houser aptly confirmed, the roll-up of properties into the Debtor, within days prior to the filing of the First Chapter 11 Case, effectuated a consolidation of entities without Court approval. Further, Judge Houser found that the purpose or intent of such roll-up included, *inter alia*, the avoidance of the Single Asset Real Estate provisions of the Bankruptcy Code (11 U.S.C. § 363(d)(3)). See generally, Ruling on Motions to Dismiss, Transcript of February 17, 2011 (**Exhibit B**) [to the Cash Collateral Objection, and admitted at the Interim Cash Collateral Hearing].

Among the properties rolled into the Debtor were the Transcontinental Property and the Income Reality Property. Both such properties were owned by entities other than the Debtor. At least 36 other properties, owned by other third party entities, were rolled up into the Debtor prior to the filing of the First Chapter 11 Case and were un-rolled and their respective title was restored to their rightful owner, prior to the filing of the Second Chapter 11 Case. The Transcontinental Property and the Income Realty Property were not – title to those properties remains in the Debtor. This demonstrates the continued bad faith of the Debtor and its insiders/affiliates – constituting *cause* for relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1).

76332/0022-7551282v6

16.     The backlash of this unfathomable roll-up of properties was two motions to dismiss and multiple joinders. Following two days of hearings, at significant cost to the various secured creditors, Judge Houser dismissed the First Chapter 11 Case[15].

## III.
## FACTUAL BACKGROUND

### A.     THE FENTON CENTRE

17.     The Fenton Centre is located in Farmers Branch, Dallas County, Texas, and consists of four tracts of land totaling 33.035 acres located at the northwest corner of LBJ Freeway and Luna Road.  Two of the tracts are improved with the Fenton Centre office improvements, one tract contains 12.47 acres of common area land, and the fourth tract contains 4.70 acres (considered to be excess land).  The improved portion of the land consists of two four-story office buildings containing a total of 696,458 net rentable square feet commonly known as Fenton Centre I and II.  The foregoing four tracts and the two office buildings are referred to herein as the "Fenton Centre".

18.     The Debtor confirmed[16], that as of January 20, 2011, that the Rent Roll[17] for the Fenton Centre demonstrates that the Fenton Centre had an average occupancy rate of 50.94%.

19.     At the Interim Cash Collateral Hearing, the Court accepted into evidence, the appraisal of the Fenton Centre, as of November 17, 2010, prepared by the Court qualified Expert, Charles Dannis of Crosson Dannis, Inc. (the "Fenton Appraisal" and the "Expert",

---

[15]     See generally, Ruling on Motions to Dismiss, Transcript of February 17, 2011 (**Exhibit B**) [to the Cash Collateral Objection, and admitted at the Interim Cash Collateral Hearing].

[16]     See Motion for Use of Cash Collateral (Day 1) Transcript of 4/13/11 (**Exhibit AA**), at 66:2 – 67:17, Bates 1474-1475.

[17]     See **Exhibit C** [to the Cash Collateral Objection, and admitted at the Interim Cash Collateral Hearing].

76332/0022-7551282v6

respectively)[18].   The Fenton Appraisal was accepted into Evidence by the Court, in connection

with the Interim Cash Collateral Hearing[19].   The unchallenged and unrefuted testimony of the

Expert included the following:

    (i)    The Fenton Centre, the Transcontinental Property and the Income Realty Property (collectively, the "Properties"), if marketed for a period of 6 to 9 months, would have an aggregate value of $45,640,000[20];

    (ii)    The Properties, if marketed for a period of 90 days, would have an aggregate value of $40,785,000, calculated as a reduction of 11% from the 6 to 9 month marketing value[21];

    (iii)    The Properties if marketed for a period of 30 days would have an aggregate value of $38,355,000 Million, calculated as a reduction of 16% from the 6 to 9 month marketing value[22]; and

---

[18]    See Motion for Use of Cash Collateral (Day 1) Transcript of 4/13/11 (**Exhibit AA**), at 108:12-13, Bates 1515.

[19]    See Fenton Appraisal **Exhibit D** [to the Cash Collateral Objection, and admitted at the Interim Cash Collateral Hearing]. See Motion for Use of Cash Collateral (Day 1) Transcript of 4/13/11 (**Exhibit AA**), at 114:22, Bates 1521.

During the First Chapter 11 Case and in connection with the Debtor's efforts to defend the various motions to dismiss the First Chapter 11 Case, the Debtor sought from all secured lenders, including the Special Servicer, copies of appraisals with respect to such secured lender's respective collateral. As part of the exhibits offered by the Debtor, and admitted by the Court, were the appraisals of various parcels of real property owned by the Debtor (i.e., the parcels included in the roll-up). The Debtor used these appraisals to suggest to the Court that equity exists in the properties and, thus, the Debtor should be given the opportunity to attempt to reorganize. Conspicuously absent from the group of appraisals admitted into evidence by the Debtor was the Fenton Appraisal, notwithstanding that the Fenton Appraisal was promptly provided to the Debtor in response to its request for production. When asked why the Debtor did not include the Fenton Appraisal in the exhibits presented to the Court, the Debtor's counsel stated that the Fenton Appraisal demonstrated that there is no equity in the Fenton Centre and thus did not suit the Debtor's purpose in presenting appraisals to the Court. Nevertheless, the Debtor failed to present any appraisal with respect to the Fenton Centre building in connection with the First Chapter 11 Case.

[20]    See Motion for Use of Cash Collateral (Day 1) Transcript of 4/13/11 (**Exhibit AA**), at 113:3-5, Bates 1520.

[21]    See Motion for Use of Cash Collateral (Day 1) Transcript of 4/13/11 (**Exhibit AA**), at 113:12-14, Bates 1520.

[22]    See Motion for Use of Cash Collateral (Day 1) Transcript of 4/13/11 (**Exhibit AA**), at 113:5-10, Bates 1520.

76332/0022-7551282v6

      (iv)     Marketing the Properties for more than a period of 6 to 9 months, would <u>not</u> yield a greater return or value[23].

20.     At the Interim Cash Collateral Hearing, the Debtor presented no evidence to refute the valuation testimony of the Expert and the Fenton Appraisal, other than the brief testimony of the Debtor's newly retained Chief Restructuring Officer, Mr. John Doyle ("<u>Mr. Doyle</u>"), which testimony included:

      (i)     Mr. Doyle was retained by the Debtor one week prior to the filing of the Second Chapter 11 Case[24];

      (ii)    Mr. Doyle is neither an attorney nor a licensed appraiser of real property[25];

      (iii)   Mr. Doyle is not, and has never been, an owner of the Debtor nor the Properties[26]; and

      (iv)    Mr. Doyle believes that the Properties have a value of $67 Million[27].

21.     No testimony was elicited by the Debtor from Mr. Doyle to confirm that Mr. Doyle evaluated any of the normal and customary considerations used to value real property, including: (a) historical rent roll reviews; (b) projected rent roll reviews; (c) cash flow projections; (d) market studies; (e) comparable historical sales reviews; (f) operating expense reviews; and (g) projections of operating expenses.   In contrast, each of these considerations, and various others, were included in the Expert's Fenton Appraisal.

---

[23]    <u>See</u> Motion for Use of Cash Collateral (Day 1) Transcript of 4/13/11 (**Exhibit AA**), at 120:22 – 121:6, Bates 1527.

[24]    <u>See</u> Motion for Use of Cash Collateral (Day 1) Transcript of 4/13/11 (**Exhibit AA**), at 14:21-22, Bates 1421.

[25]    <u>See</u> Motion for Use of Cash Collateral (Day 1) Transcript of 4/13/11 (**Exhibit AA**), at 53:5-6, Bates 1460.

[26]    <u>See</u> Motion for Use of Cash Collateral (Day 1) Transcript of 4/13/11 (**Exhibit AA**), at 53:8-10, Bates 1460.

[27]    <u>See</u> Motion for Use of Cash Collateral (Day 1) Transcript of 4/13/11 (**Exhibit AA**), at 22:11-13, Bates 1429.

22.     Mr. Doyle's personal opinion can not be accepted for any purpose in this Case.

Mr. Doyle is neither the owner of the Properties nor a qualified expert to value the Properties.

Rather, Mr. Doyle is a *hired gun*, with the title of Chief Restructuring Officer, having been on

the job less than a month.  Again, such valuation is completely without any support whatsoever.

**B.     THE FENTON LOAN DOCUMENTS AND THE JANUARY AND APRIL
2011 FORECLOSURES**

23.     In the Cash Collateral Objection, the Special Servicer sets forth in great detail the

history of its loan to the Debtor that gave rise to its liens on the Properties, the various

documents memorializing the Debtor's monetary and other obligations, the Debtor's numerous

defaults under the Fenton Loan Documents, the State Court Action filed by the Special Servicer

against the Debtor and various related entities (which alleged claims for breach of contract,

fraud, tortious interference, and related claims), and the scheduling of foreclosure sales in

January and April 2011, each of which were stayed by the Debtor's last-minute bankruptcy

filings.  In the interest of brevity, the Special Servicer will not repeat the history of its dealings

with the Debtor here, and instead refers the Court to the Cash Collateral Objection, and the

Exhibits admitted by the Court in connection therewith, for a comprehensive discussion of those

dealings and the Debtor's repeated bad-faith attempts to avoid its undisputed obligations to the

Special Servicer.

24.     As the Cash Collateral Objection and the record developed thus far in this Case

make clear, the Debtor will go to great lengths to prevent the Special Servicer from prosecuting

its rights and remedies pursuant to the express terms of the Fenton Loan Documents and

applicable law.  It is equally clear, however, that there is no equity in the Properties and that,

given the Special Servicer's enormous deficiency claim, the Debtor will not be able to propose

any plan of reorganization that has even a remote possibility of being confirmed.  Under these

circumstances, relief from the automatic stay is warranted to permit the Special Servicer to

foreclose on its collateral and realize whatever benefit remains of its bargain with the Debtor.

# IV.
## LEGAL ANALYSIS

**A.**   **The Automatic Stay Should Be Vacated Pursuant to 11 U.S.C. § 362(d)(2) Because No Equity Exists in the Properties and the Properties Are Not Necessary to an Effective Reorganization**

25.     Section 362(d)(2) of the Bankruptcy Code provides as follows:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying or conditioning the stay with respect to a stay of an act against property under subsection (a) of this section if
>
> (A) the debtor does not have any equity in such property; and
>
> (B) such property is not necessary to an effective reorganization.

11 U.S.C. § 362(d)(2).

26.     A secured creditor seeking relief from the automatic stay under Section 362(d)(2)

bears the burden of proof on one issue only – lack of equity in the collateral.  See 11 U.S.C. §

362(g)(1); see also U.S. Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S.

365, 375 (1988); In re Anderson Oaks (Phase I) Ltd. P'ship., 77 B.R. 108, 110 (Bankr. W.D.

Tex. 1987); In re Playa Dev. Corp., 68 B.R. 549, 553 (Bankr. W.D. Tex. 1986).  Once a lack of

equity in the property is established, the burden shifts to the Debtor on the remaining issue –

whether the property is necessary for an effective reorganization.  See 11 U.S.C. § 362(g)(2);

Timbers, 484 U.S. at 375-76; Canal Place Ltd. P'ship v. Aetna Life Ins. Co. (In re Canal Place

Ltd. P'ship.), 921 F.2d 569, 576 (5th Cir. 1991).  Where a debtor fails to establish a reasonable

prospect for a successful reorganization, relief from the stay is appropriate. See Canal Place, 921

F.2d at 577; Sutton v. Bank One (In re Sutton), 904 F.2d 327, 331 (5th Cir. 1990) (concluding

the debtor cannot file bankruptcy to stop foreclosure and wait for more favorable conditions).

Here, the Special Servicer clearly satisfies both elements for relief under Section 362(d)(2).

(i)      <strong>The Debtor Lacks Equity in the Properties</strong>

27.      "Equity," for purposes of Section 362(d)(2)(A), is defined as "the difference

between the value of the subject property and the encumbrances against it." Sutton, 904 F.2d at

329.

28.      As demonstrated above, the Fenton Appraisal attributes a value to the Properties,

as of November 17, 2010, in a range of $35 Million to $45 Million (which range is based upon

the amount of marketing time – 30 days to 9 months).   As addressed above, the Debtor has

presented no legitimate evidence to refute these valuations.

29.      Beyond Mr. Doyle's personal opinion of value at the Interim Cash Collateral

Hearing, the Debtor alluded to, without the support of any documentation, a possible new tenant

for the Fenton Centre, which tenant, if a lease transaction comes to fruition, would add minimal

value to the Properties, due in part to the terms of the possible lease.   The testimony at the

Interim Cash Collateral Hearing of Kurt Daum, the representative of the Special Servicer,

included a recitation of multiple attempts by the Debtor to present unviable new tenants for the

Fenton Centre.  Most of the Debtor's attempts to gain new tenants have failed due in part to an

inability of the Debtor to fund the costs of tenant improvements that are necessary prerequisites

to a new lease[28]. The panacea currently suggested by the Debtor has the same shortcomings – a

need of at least $4.5 Million to fund tenant improvements.

30.    Equally important as the fact that the Debtor does not have the wherewithal to

fund the tenant improvements, is the fact that the proposed lease adds only minimal value to the

Properties. While the Debtor has presented no written terms, the Debtor's representatives have

alluded to certain basic lease terms. The Expert has considered such basic terms and has

suggested that the value of the Properties would increase, but likely no more than $2 Million[29].

This remains a far cry from the debt obligation owed to the Special Servicer.

31.    The unrefuted evidence presented at the Interim Cash Collateral Hearing is that

the Special Servicer is owed in excess of $60.4 Million (exclusive of fees, costs, expenses,

etc.).[30] The Debtor's own pleadings, including the Cash Collateral Motion, confirm that the Debt

owed to the Special Servicer is at least $60.6 Million.[31]

32.    The Debtor has provided no competent evidence to contest the Expert's Fenton

Appraisal. At the same time, as shown above, the Debtor's mortgage debt exceeds the value of

the Properties by approximately $21 million. Thus, because there is no equity in the Properties,

the Special Servicer satisfies the first prong under Section 362(d)(2).

---

[28]    See Motion for Use of Cash Collateral (Day 1) Transcript of 4/13/11 (**Exhibit BB**), at
38:13 – 40:6, Bates 1575-1577.

[29]    The Special Servicer has clearly met its burden to demonstrate a lack of equity in the
Properties. No evidence is needed to refute the non-existent new tenant lease. However, should the
Debtor present evidence, as opposed to its hopes and expectations, the Special Servicer will present, and
reserves the right to do so, the testimony of the Expert to evaluate such new lease and how the same
increases the value of the Properties.

[30]    See Motion for Use of Cash Collateral (Day 1) Transcript of 4/13/11 (**Exhibit BB**), at
35:23 – 36:3, Bates 1572-1573.

[31]    See Cash Collateral Motion, at page 3, paragraph 5.

18

(i)      **The Debtor Cannot Reorganize**

33.      To establish that the Properties are necessary for an effective reorganization, the

Debtor must demonstrate that they are "essential for an effective reorganization that is in

prospect." Timbers, 484 U.S. at 375-76.  More specifically, the Debtor must be able to show a

reasonable prospect for a successful reorganization within a reasonable time.  Canal Place, 921

F.2d at 577.  A debtor's high hope of reorganizing is not enough to continue the automatic stay

over property in which the debtor has no equity.  See In re Northwest Timberline Enters., Inc.,

348 B.R. 412, 430 (Bankr. N.D. Tex. 2006); Playa Dev. Corp., 68 B.R. at 554; In re Island

Helicopter Corp., 63 B.R. 809, 816 (Bankr. E.D.N.Y. 1986) (citing In re Saypol, 31 B.R. 796

(Bankr. S.D.N.Y. 1983) ("The automatic stay will remain operative only if the Debtor

demonstrates that its prospects of an effective reorganization are well founded...")).  Notably,

the mere fact that property is indispensable to the debtor's survival is insufficient.  See, e.g.,

Albany Partners, Ltd. v. Westbrook (In re Albany Partners, Ltd.), 749 F.2d 670, 673 n.7 (11th

Cir. 1984).

34.      Given the amount and nature of the Special Servicer's claim, the Debtor cannot

confirm a plan over Special Servicer's objection.  Based on the Fenton Appraisal, the Special

Servicer holds a significant deficiency claim in excess of $15 Million.  Under any plan proposed

by the Debtor, that deficiency claim must be classified with the Debtor's other general unsecured

creditors.  See e.g., Phoenix Mutual Life Ins. Co. v. Greystone III Joint Venture (In re Greystone

III Joint Venture), 995 F.2d 1274, 1279 (5th Cir. 1991) (holding that a deficiency claim cannot

be separately classified from other general unsecured creditors in order to "gerrymander an

affirmative vote on a reorganization plan."); Northwest Timberline, 348 B.R. at 436 (separately

classifying unsecured claims over $10,000 from those under $10,000 is impermissible

gerrymandering to obtain an unsecured accepting class without inclusion of the secured

19

creditor's deficiency claim); In re Barakat, 99 F.3d 1520, 1526 (9th Cir. 1996) (denying a

debtor's separate classification of a lender's deficiency claim from other general unsecured

claims); John Hancock Mutual Life Ins. Co. v. Route 37 Bus. Park Assocs., 987 F.2d 154, 157

(3d Cir. 1999) (same); Boston Post Road Ltd. P'ship v. Fed. Deposit Ins. Corp. (In re Boston

Post Road Ltd. P'ship), 21 F.3d 477, 482 (2d Cir. 1994) ("Classifications designed to manipulate

class voting must be carefully scrutinized.").

35.    As set forth on Schedule F of the Debtor's Schedule of Assets and Liabilities

[Docket No. 46], the Debtor only has $4,859,191.23 of unsecured debt, inclusive of insiders.

When claims held by insiders are excluded for voting purposes, as required pursuant to Section

1129(a)(10) of the Bankruptcy Code, unsecured claims total approximately $1.4 Million.  As a

result, the Special Servicer's deficiency claim will dominate the unsecured class and the holders

of general unsecured claims will be unable to accept any plan unless the Special Servicer also

votes to accept the plan.  Thus, the Special Servicer will control both potentially impaired classes

under any plan (the secured and unsecured classes) and will be able to effectively block any plan

proposed by the Debtor.  Absent the Special Servicer's vote to accept a plan, the Debtor would

not have an impaired accepting class, which is one of the requirements for confirmation pursuant

to Section 1129(a)(10) of the Bankruptcy Code.  See 11 U.S.C. § 1129(a)(10) (requiring that at

least one class of claims impaired under the plan has accepted the plan, determined without

including any acceptance of the plan by any insider).  Thus, the Debtor will not be able to "cram

down" the Special Servicer in any proposed plan of reorganization, and a plan of reorganization

contemplating a pay-off or refinancing of the Special Servicer's secured debt is not realistic or

confirmable.

36.     Accordingly, the stay must be lifted.[32]   Certainly if this Court finds, consistent

with its own and overwhelming authority, that the Rents/Leases have been absolutely assigned to

the Special Servicer and, therefore, are not property of the estate, cause will exist because the

Debtor will not have any funds to pay even minimal operating expenses.

**B.      The Court Should Grant the Special Servicer Relief From the Automatic Stay Pursuant to 11 U.S.C. § 362(d)(1) Because the Second Chapter 11 Case Was Clearly a Bad Faith Filing.**

37.     The automatic stay in the Second Chapter 11 Case should similarly be vacated

pursuant to 11 U.S.C. § 362(d)(1).   Section 362(d)(1) provides that a "court shall grant relief

from the stay provided under subsection (a) of this section ... for cause, including the lack of

adequate protection of an interest in property of such party in interest." 11 U.S.C. § 362(d)(1).

38.     While "cause" is not defined under the Bankruptcy Code, it has been held that "a

debtor's lack of good faith in filing a petition for bankruptcy may be the basis for lifting the

automatic stay." In re Laguna Assocs. Ltd. P'ship, 30 F.3d 734, 737 (6th Cir. 1994); see also In

re Reitnauer, 152 F.3d 341, 344 n.15 (5th Cir. 1998) (same).   Further, "[e]very bankruptcy

statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith

for the commencement ... of bankruptcy proceedings." In re Little Creek Dev. Co., 779 F.2d

1068, 1071 (5th Cir. 1986).

39.     As discussed previously, Judge Houser dismissed the First Chapter 11 Case as a

bad-faith filing after finding that the Debtor had engaged in the above-referenced roll-up of its

properties in order to avoid state court foreclosure proceedings.   In addition to the roll-up with

---

[32]     The history of this matter clearly demonstrates bad faith and cause for relief from the
automatic stay under Section 362(d)(1) of the Bankruptcy Code.   See In re 234-6 West 22 Street Corp.,
214 B.R. 751 (Bankr. S.D.N.Y. 1997); and In re Laguna Assocs., L.P., 30 F.3d 734, 737 (6th Cir. 1994).

76332/0022-7551282v6

insiders and affiliates, the Debtor was also found to have filed its bankruptcy petition on the eve of a foreclosure sale, and thus attempted to use the bankruptcy process as a means to circumvent creditors' state law remedies. Further, Judge Houser found that among the purposes of the filing of the First Chapter 11 Case was the avoidance of the Single Asset Real Estate provisions of the Bankruptcy Code.[33]

40.    Nothing has changed since the dismissal of the First Chapter 11 Case. Once again, the Debtor filed its Chapter 11 petition on the eve of the Special Servicer's foreclosure sale of the Fenton Centre, the Transcontinental Property and the Income Reality Property, simply in order to delay the inevitable destiny for the Properties. The Debtor lacks any real chances at reorganizing under the framework of Chapter 11, and the filing of this Second Chapter 11 Case is merely a bad faith effort to frustrate the Special Servicer's rights to foreclose upon the Properties. Accordingly, the automatic stay should be lifted pursuant to 11 U.S.C. § 362(d)(1) in order to allow the Special Servicer to foreclose on the Properties and attempt to recover any remaining benefit in the Properties before the value of the collateral declines even further.

---

[33]    See generally, Ruling on Motions to Dismiss, Transcript of February 17, 2011 (**Exhibit B**) [to the Cash Collateral Objection, and admitted at the Interim Cash Collateral Hearing].

## V.
## <u>CONCLUSION</u>

41.     For the reasons set forth above, the Special Servicer respectfully requests that the

Court enter an order granting the Special Servicer relief from the automatic stay pursuant to

Sections 362(d)(2) and (1) of the Bankruptcy Code and such other just and proper relief.


DATED:  April 26, 2011.              Respectfully submitted,


                                     /s/ MICHAEL D. WARNER
                                     _____
                                     Michael D. Warner (Texas Bar No. 00792304)
                                     Emily S. Chou  (Texas Bar No. 24006997)
                                     **COLE, SCHOTZ, MEISEL, FORMAN &**
                                     **LEONARD, P.A.**
                                     301 Commerce Street, Suite 1700
                                     Fort Worth, Texas 76102
                                     Telephone:     (817) 810-5250
                                     Facsimile:     (817) 810-5255
                                     <u>mwarner@coleschotz.com</u>
                                     <u>echou@coleschotz.com</u>

                                     Attorneys for the Special Servicer

## CERTIFICATE OF SERVICE

I hereby certify that on April 26, 2011, true and correct copies of the *MOTION FOR RELIEF FROM THE AUTOMATIC STAY* were served on the following by U.S.P.S. First Class Mail, postage pre-paid.

FRE Real Estate, Inc.
6731 Bridge Street, Suite 373
Fort Worth, TX 76112

Robert A. Simon, Esq.
Barlow Garsek & Simon, LLP
3815 Libson Street
Fort Worth, TX 76107

US Trustee
1100 Commerce Street, Room 976
Dallas, TX 75242-1496

IBM
1501-1503 LBJ Freeway
Suite 300160
Dallas, TX 75234

World Travel Partners
1505-1507 LBJ Freeway
Suite 500325
Dallas, TX 75234

National Cable Comm
1505-1507 LBJ Freeway
Suite 500555
Dallas, TX 75234

Crawford & Company
1501-1503 LBJ Freeway
Suite 300600
Dallas, TX 75234

Motorola
1505-1507 LBJ Freeway
Suite 700700
Dallas, TX 75234

Cris Dessi
2015 William Lane
Carrollton TX 75006

City Wide Building Service, Inc.
425 W. Mockingbird Lane
Dallas, TX 75247

Oxea Corp
1505-1507 LBJ Freeway
Suite 500400
Dallas, TX 75234

Mitec Net
4475 River Green Pkwy #300
Duluth, GA 30096

Heery International
1505-1507 LBJ Freeway
Suite 500700
Dallas, TX 75234

Boston Pizza
1501-1503 LBJ Freeway
Suite 100450
Dallas, TX 75234

Britanna, Inc.
1501-1503 LBJ Freeway
Suite 100790
Dallas, TX 75234

76332/0022-7551282v6

Kintetsu Global
1505-1507 LBJ Freeway
Suite 500405
Dallas, TX 75234

GA Snipe dba Plant Place
10704 Goodnight Lane
Dallas, TX 75220
Computer Task Group

Reliant Energy Solutions
Dept 0954
P.O. Box 120954
Dallas, TX 75312-0954

ABM Security Services
Dept 1088-03
P.O. Box 6400
San Francisco, CA 94161

Champion Commercial Builders
P.O. Box 740095
Dallas, TX 75374-0095

Entech Sales & Service
P.O. Box 650110
Dallas, TX 75265-0770

International Building Service
P.O. Box 59975
Dallas, TX 75229

Access Technology Systems, Inc.
4309 Reeder Drive
Carrollton, TX 75010

Advanced Petroleum Distribution
P.O. Box 163704
Fort Worth, TX 76161-3704

Air Performance Service, Inc.
10625 Control Place
Dallas, TX 75234

1501-1503 LBJ Freeway
Suite 100250
Dallas, TX 75234

Doug Buncher, Esq.
Neligan Foley, LLP
325 N. St. Paul, Suite 3600
Dallas, TX 75201

Aramark Uniform Services, Inc.
P.O. Box 36028
Dallas, TX 75235

ASI Business Solutions LTD
13701 Hutton Drive #102
Dallas, TX 75234-5881

AT&T
P.O. Box 5001
Carol Stream, IL 60197-5001

Barnes & Nobles
1501-1503 LBJ Freeway
Suite 100290
Dallas, TX 75234

C&D Commercial Services
5030 Dexham Road #102
Rowlett, TX 75088

C&S Filter Co, Inc.
P.O. Box 870425
Mesquite, TX 75187

Call Rossi
1501-1503 LBJ Freeway
Suite 100510
Dallas, TX 75234

25

Chandlers Cuisine
1501-1503 LBJ Freeway
Suite 300130
Dallas, TX 75234

CIMA Solutions
1501-1503 LBJ Freeway
Suite 300110
Dallas, TX 75234

City of Farmers Branch
P.O. Box 819010
Carrollton, TX 75381-9010

Contract Electrical Service
1216 N. Beltline Road
Irving, TX 75061

Coppell Heating & A/C, Inc.
P.O. Box 406
Coppell, TX 75019

Dallas County Tax Assessor
P.O. Box 139066
Dallas, TX 75313-9066

Ethicon, Inc.
1505-1507 LBJ Freeway
Suite 500175
Dallas, TX 75234

FedEx
P.O. Box 660481
Dallas, TX 75266-0491

Filgo Oil Co
P.O. Box 565421
Dallas, TX 75356-5421

Fresh Scent Air Deoderizers
P.O. Box 121054
Arlington, TX 76012

Geary Porter & Donovan
P.O. Box 700248
Dallas, TX 75370-0248

Grainger
P.O. Box 419267
Dept 844760454
Kansas City, MO 64141-6267

Henry & Jones, LLP
2902 Carlisle Street, Suite 250
Dallas, TX 75204-4078

Hopson Service Co, Inc.
P.O. Box 764857
Dallas, TX 75376

IMS, Inc.
P.O. Box 400
Rockwall, TX 75087

Income Opportunity Realty Investors,
Inc.
1800 Valley View Lane, #300
Dallas, TX 75234

Interactive TKO
1505-1507 LBJ Freeway
Suite 500250
Dallas, TX 75234

Internal Revenue Service
P.O. Box 21126
Philadelphia, PA 19114

Interprise Design
P.O. Box 671275
Dallas, TX 75267

K. Thompson Electric, Inc.
670 International Pkwy #14
Richardson, TX 75081

76332/0022-7551282v6

Kings III
751 Canyon Drive #100
Coppell, TX 75019

Leslie Swimming Pool Supply
P.O. Box 501162
St. Louis, MO 63150-1162

Lightfoot Guest Moore
1501-1503 LBJ Freeway
Suite 100500
Dallas, TX 75234

Logix
P.O. Box 3608
Houston, TX 77253-3608

M&M Aerospace
1505-1507 LBJ Freeway
Suite 500220
Dallas, TX 75234

McGuyer Homebuilders
1501-1503 LBJ Freeway
Suite 100100
Dallas, TX 75234

Metro Landscape Maintenance
P.O. Box 177
Lewisville, TX 75067-0177

Mustang Lighting, Inc.
3250 West Miller Road #130
Garland, TX 75041

Myers Pest & Termite Svcs, Inc.
P.O. Box 210009
Bedford, TX 76095

NexBank
13455 Noel Road
Dallas, TX 75240

Overland & Associates, Inc.
P.O. Box 836455
Richardson, TX 75083-6455

Ozarka
P.O. Box 856680
Louisville, KY 40285-6680

Paragon Painting, Inc.
1702 S. Highway 121
Suite 412
Lewisville, TX 75067

Paragon Solutions
1501-1503 LBJ Freeway
Suite 300260
Dallas, TX 75234

Piper-Weatherford Co.
P.O. Box 550428
Dallas, TX 75355-0428

Pitney Bowes Credit Corp
P.O. Box 371887
Pittsburgh, PA 15250-7887

Pollard Plastics Corp
636 Third Avenue
Dallas, TX 75226

PracticeHighway
1505-1507 LBJ Freeway
Suite 500200
Dallas, TX 75234

Precision Water Technology
4287 Beltline Road #286
Addison, TX 75001

Prime Income Asset Management
1800 Valley View Lane #300
Dallas, TX 75234

76332/0022-7551282v6

Prime Income Asset Mgmt
1800 Valley View Lane #200
Dallas, TX 75234

Private Healthcare
1501-1503 LBJ Freeway
Suite 100650
Dallas, TX 75234

Propel Financial Services, Inc.
P.O. Box 100350
San Antonio, TX 78201

Quality Floors Contract, Inc.
1225 Tappan Circle
Carrollton, TX 75006-6911

RdRc Services, Inc.
6256 Green Valley Circle
Aubrey, TX 76227-4044

Red Hat
1501-1503 LBJ Freeway
Suite 100200
Dallas, TX 75234

Regency Office Products
P.O. Box 568629
Dallas, TX 75356

Regis Property Management
1800 Valley View Lane, #200
Dallas, TX 75234

Regis Property Mgmt-Mgmt Fees
1800 Valley View Lane, #200
Dallas, TX 75234

Reliant Energy Solutions
Dept 0954
P.O. Box 120954
Dallas, TX 75312-0954

Renaissance Metals, Inc.
P.O. Box 186
Forsyth, MO 65653

RLB Design LP d/b/a Daryan Displ
3145 Halifax Street
Dallas, T X75247

Safeway Insurance
1505-1507 LBJ Freeway
Suite 500170
Dallas, TX 75234

Sprint
P.O. Box 4181
Carol Stream, IL 77216-0441

Tam's Glass Company, Inc.
10820 County Road 124
Kaufman, TX 75142

TCI
1800 Valley View Lane, Suite 300
Dallas, TX 75234

Temperature Control Systems
P.O. Box 550249
Dallas, TX 75355-0249

Teter's Faucet Parts Ctr
P.O. Box 141075
Dallas, TX 75214

Thyssen Krupp Elevator
P.O. Box 933004
Atlanta, GA 31193-3010

Time Warner Cable
1505-1507 LBJ Freeway
Suite 500210
Dallas, TX 75234

28

United Mechanical
P.O. Box 551206
Dallas, TX 75355-1206

Universal Music & Video
1501-1503 LBJ Freeway
Suite 100460
Dallas, TX 75234

Venture Mechanical
2222 Century Circle
Irving, TX 75062

Visto Corp
1505-1507 LBJ Freeway
Suite 500350
Dallas, TX 75234

VMC Landscaping
2433 Merrell Road
Dallas, TX 75229-2535

Vollmer Public Relations
1505-1507 LBJ Freeway
Suite 500340
Dallas, TX 75234

Waste Management
P.O. Box 660345
Dallas, TX 75266

White Rock Commercial
1501-1503 LBJ Freeway
Suite 100550
Dallas, TX 75234

Valwood Improevment Authority
c/o Elizabeth Banda Calvo, Esq.
Perdue, Brandon, Fielder, Collings &
Mott, LLP
P.O. Box 13430
Arlington, TX 76094-0430

Laurie Spindler Huffman, Esq.
Linebarger Goggan Blair & Sampson,
LLP
2323 Bryan Street, Suite 1600
Dallas, TX 75201

Carrollton-Farmers Branch
Independent School District
c/o Andrea Sheehan, Esq.
Law Office of Robert E. Luna, P.C.
4411 N. Central Expressway
Dallas, TX 75205


DATED: April 26, 2011

By:  /s/ *Michael D. Warner*  _____