Henry W. Simon, Jr.
Texas Bar No. 18394000
Robert A. Simon
Texas Bar No. 18390000
Spencer D. Solomon
Texas Bar No. 24066117
**BARLOW GARSEK & SIMON, LLP**
3815 Lisbon Street
Fort Worth, Texas 76107
Telephone: (817) 731-4500
Facsimile: (817) 731-6200
**Proposed Attorneys for FRE Real Estate, Inc.,**
**Debtor-in-Possession**

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 11-42042-dml-11** |
| **FRE REAL ESTATE, INC.,** | § | |
| | § | **CHAPTER 11** |
| **DEBTOR.** | § | |

### DEBTOR'S RESPONSE TO HIGHLAND CAPITAL MANAGEMENT L.P.'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY
**[Relates to Docket No. 54]**

TO THE HONORABLE D. MICHAEL LYNN, UNITED STATES BANKRUPTCY JUDGE:

Debtor-in-Possession, FRE Real Estate, Inc. (the "Debtor"), files this Response to the Motion for Relief from the Automatic Stay (the "Motion"), [Docket No. 54], filed by Highland Capital Management, L.P. ("Highland").  In support, the Debtor respectfully represents as follows:

## I.

## INTRODUCTION

1.     On April 4, 2011 (the "Petition Date"), the Debtor filed a voluntary petition, initiating the above-referenced Chapter 11 case.  The Debtor maintains possession of its property

and management of its financial affairs as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108. No creditors' committee has yet been formed and none is expected.

2.     The Debtor's principal asset is a commercial real estate complex comprising two (2) seven-story office towers totaling approximately 696,458 square feet and two (2) five-level parking garages located at 1501-1503 and 1505-1507 LBJ Freeway in Farmer's Branch, Texas 75234 ("Fenton Centre"). Fenton Centre is part of a large development North of Dallas known as Mercer Crossing, and includes various amenities, including an on-site restaurant, a jogging trail, a conference center, and a fitness center. Fenton Centre is currently 51% leased and well maintained. The Debtor also owns 4.7 acres of undeveloped land adjacent to Fenton Centre on LBJ Freeway (the "Adjacent Land"); a 177,805 square foot building in Farmer's Branch, Texas, off of Valley View Lane, just east of Mercer Crossing (the "Thermalloy Building"); and 6.60 acres of vacant land in Mercer Crossing, just off Valley View Lane (the "Three Hickory Tract").

3.     Fenton Centre is the Debtor's only income-producing property. The Debtor has commissioned an appraisal prepared by Deverick & Associates, Inc., which estimates Fenton Centre's present fair market value at $62,800,000.00 (the "Debtor's Appraisal"). A true and correct copy of the Debtor's Appraisal is attached hereto as **Exhibit A**. The Debtor estimates that the Thermalloy Building is worth approximately $1,790,000.00, and that the Three Hickory Tract is worth approximately $1,250,000.00. The Debtor is actively marketing Fenton Centre to lease up the vacant space and improve cash flow. Specifically, the Debtor is in the final stages of its negotiations with HSS Systems, LLC ("HSS"), a subsidiary of Hospital Corporation of America, for a lease of 100,000 square feet of office space in Fenton Centre at the rate of $19.50 per square foot. The terms of the proposed lease permit HSS to occupy the space rent-free for six (6) months and to begin making rental payments for nine and a half (9.5) years thereafter.

The HSS lease will require a cash infusion of approximately $4.5 million for tenant improvements. Transcontinental Realty Investors ("TCI"), the Debtor's former equity holder and the guarantor of the Debtor's mortgage obligation, will agree to fund the $4.5 million for tenant improvements on the Debtor's behalf.[2] By July 1, 2012, the HSS lease, if consummated, will increase the Debtor's monthly cash flow by approximately $1,450,000.00. In addition (provided that the HSS lease is signed) Pillar Income Asset Management, LLC ("Pillar"), will lease 75,000 square feet of space in Fenton Centre at the rate of $20.00 per square foot. The lease to Pillar will increase the Debtor's net monthly cash flow by approximately $1,125,000.00, beginning in 2012.

4. The Debtor is indebted to its mortgage lender, NexBank, in the principal amount of $60,400,000.00. NexBank's note is collateralized by Fenton Centre, the Adjacent Land, the Thermalloy Building, and the Three Hickory Tract (collectively, the "Property"). The indebtedness bears interest at the contract rate of 4.25%.[3] NexBank is represented in these proceedings by Highland, the purported Special Servicer for the Debtor's mortgage loan  At the contract rate, the monthly payment of interest due under the mortgage is approximately $190,000.00. Per the Debtor's Appraisal, the fair market value of Fenton Centre as of May 3, 2011, is $62,800,000.00. When added to the value of the Debtor's remaining Property (for a total of $65,690,000.00), this creates an equity cushion in the amount of $5,290,000.00. The Debtor's Appraisal further estimates that, by May 1, 2014, the value of Fenton Centre will be

---

[2] Alternatively, American Realty Investors, Inc., TCI's parent company, or another TCI affiliated entity may fund the tenant improvements provided for under the proposed HSS lease.

[3] NexBank's loan documents provide for a non-default interest rate calculated by using the current 1-month LIBOR rate as a base and adding 4.0%. At the time this Motion was filed, the 1-month LIBOR rate was 0.25%.

$89,000,000.00.  When added to the value of the Debtor's remaining Property (for a total of $91,890,000.00), this creates an equity cushion in the amount of $31,490,000.00.

5.      The Debtor intends to reorganize in bankruptcy.  Specifically, the Debtor intends to recast the mortgage through a plan note with a longer maturity, at the same interest rate.  As set forth in greater detail, below, the Debtor will propose a plan which pays interest on NexBank's secured claim for the first year and will begin paying principal and interest in the second year, when the additional cash generated by the HSS lease becomes available.

## II.

## ADMISSIONS & DENIALS

6.      The Debtor admits that the Debtor filed a prior Chapter 11 case on January 4, 2011, which was dismissed on March 1, 2011.  The Debtor denies the remaining allegations contained in paragraph 1 of the Motion.

7.      The Debtor denies the allegations contained in paragraph 2 of the Motion.

8.      The Debtor admits that it is negotiating a new lease in Fenton Centre with HSS Systems, LLC.  The Debtor denies the remaining allegations contained in paragraph 3 of the Motion.

9.      The Debtor denies the allegations contained in paragraph 4 of the Motion.

10.     The Debtor denies the allegations contained in paragraph 5 of the Motion.

11.     The Debtor admits that it filed a voluntary Chapter 11 petition on April 4, 2011. The Debtor admits that the Debtor filed a prior Chapter 11 case on January 4, 2011 assigned to the Honorable Barbara J. Houser, United States Bankruptcy Judge for the Northern District of Texas.  The Debtor's prior Chapter 11 case was dismissed on March 1, 2011 principally because Judge Houser found that the approximately 30 properties transferred to the Debtor for the

purpose of consolidating all of these properties into a single bankruptcy case, was improper and denied some of the lenders rights that they would have otherwise enjoyed if the cases had been filed separately.  After the dismissal, the properties were transferred back to their former owners and new cases, including this case, were filed separately.  The reason the Debtor filed this case in Fort Worth, rather than Dallas, is because Debtor's counsel is located in Fort Worth and filing the case in Dallas would have involved significant travel expenses.  Other cases involving TCI subsidiaries have been filed in Dallas, including the *Denver Merchandise Mart* case, No. 11-31615-bjh11, currently pending before Judge Houser.  In any event, there are no internal venue rules in the Northern District of Texas, and the Dallas and Fort Worth divisions of the Bankruptcy Court for the Northern District of Texas are the same court for venue purposes.  The Debtor denies the remaining allegations contained in paragraph 6 of the Motion.

12.     The Debtor admits the allegations contained in paragraph 7 of the Motion.

13.     The Debtor admits the allegations contained in paragraph 8 of the Motion.

14.     The Debtor denies the allegations contained in paragraph 9 of the Motion insofar as the Court has now ruled on the Debtor's Motion for Authority to Use Cash Collateral.  The Debtor has moved for reconsideration of that ruling, which motion this Court will hear on May 11, 2011.  The Debtor reserves all rights to object to the admissibility, relevance, and/or authenticity of the exhibits referenced in the footnotes in paragraph 9 of the Motion.  The Debtor admits the allegations contained in paragraph 9 of the Motion in all other respects.

15.     The Debtor denies the allegations contained in paragraph 10 of the Motion.

16.     The Debtor denies the allegations contained in paragraph 11 of the Motion.

17.     The Debtor denies the allegations contained in paragraph 12 of the Motion.

18.     The Debtor denies the allegations contained in paragraph 13 of the Motion.

19.     The Debtor denies the allegations contained in paragraph 14 of the Motion.  The Debtor's prior case was dismissed because the consolidation of approximately thirty (30) properties—formerly owned by different entities and pledged as collateral for loans made by different lenders—into one debtor prejudiced the rights of some of those lenders. Here, the four (4) properties owned by the Debtor are all collateral for the same loan with the same lender.  In fact, NexBank *requested* that the Debtor include the Thermalloy Building and the Three Hickory Tract as additional collateral for its note, which was originally secured only by Fenton Centre. To the extent NexBank complains these properties have been consolidated, NexBank is the architect of its own grievance.  Unlike the Debtor's prior Chapter 11 case, this case—even though not technically a single asset real estate case—is being treated like one, as the Debtor's five-month budget proposes to pay NexBank interest starting in July, 2011.

20.     The Debtor admits that the Debtor's prior case involved the consolidation of 38 properties originally owned by 19 entities, and involved 11 secured lenders.  This case only involves 4 properties, all of which are collateral for the same loan with the same lender.  The Debtor denies the remaining allegations contained in paragraph 15 of the Motion.

21.     The Debtor admits that its prior case was dismissed because of the roll-up of 38 properties originally owned by different entities subject to different loans made by different lenders.  Here, NexBank *caused* the alleged roll-up of the Debtor's 4 properties by requesting that the Three Hickory Tract and the Thermalloy Building be pledged as additional collateral for the preexisting loan, which was originally secured only by Fenton Centre.  The Debtor denies the remaining allegations contained in paragraph 16 of the Motion.

22.     The Debtor admits the allegations contained in paragraph 17 of the Motion.

23.     The Debtor admits the allegations contained in paragraph 18 of the Motion.

24.     The Debtor admits that the Court admitted an appraisal of Fenton Centre, as of November 17, 2010, prepared by Charles Dannis of Crosson Dannis, Inc., in connection with the interim cash collateral hearing.  Highland's allegation that the appraisal was "unchallenged" is a blatant mischaracterization, as Debtor's counsel cross examined Mr. Dannis at length regarding many of the presumptions on which the appraisal is based.  Mr. Dannis's appraisal is refuted by the Debtor's Appraisal, and will be challenged by the Debtor's appraiser at the hearing on the Motion, at which time appraisal testimony will actually be relevant. The Debtor denies the remaining allegations contained in paragraph 19 of the Motion.

25.     The Debtor admits that John Doyle has been retained as an officer of the Debtor responsible for overseeing the Debtor's restructuring effort.  The Debtor admits that Mr. Doyle was retained by the Debtor's corporate parent in late March or early April, 2011 and that he became an officer of the Debtor at that time.   The Debtor admits that Mr. Doyle is not an attorney or a licensed appraiser and that Mr. Doyle, individually, does not own the Debtor's Property.  The Debtor denies the remaining allegations contained in paragraph 20 of the Motion.

26.     The Debtor admits that it did not offer comprehensive evidence on the value of the Debtor's real property at the *interim cash collateral hearing*.  The Debtor did not offer such evidence because the value of the Debtor's real property is irrelevant to whether NexBank's interest in the Debtor's cash would be adequately protected for 14 days.  In addition, on the date of the interim cash collateral hearing, the Debtor had not yet obtained an appraisal.  The Debtor will offer the Debtor's Appraisal and the testimony of its valuation expert at the hearing on the Motion, at which hearing the evidence will be relevant.   The Debtor denies the remaining allegations contained in paragraph 21 of the Motion.

27.     The Debtor admits that Mr. Doyle does not own the Debtor's Property and that he is not a licensed appraiser.  The Debtor denies the remaining allegations contained in paragraph 22 of the Motion.

28.     Paragraph 23 of the Motion does not contain any allegations; rather it sets forth a non-specific summary of Highland's allegations contained in other pleadings, which allegations the Debtor denies.   Highland's allegations regarding the Debtor's prepetition defaults and Highland's unproven allegations in a state court lawsuit have zero relevance to this bankruptcy case or the relief sought in the Motion.   To the extent paragraph 23 of the Motion may be construed as containing factual allegations, the Debtor denies such allegations.

29.     The Debtor denies the allegations contained in paragraph 24 of the Motion.

30.     Paragraph 25 of the Motion sets forth Highland's interpretation of law and contains no factual allegations requiring admission or denial.

31.     Paragraph 26 of the Motion sets forth Highland's interpretation of law and contains no factual allegations requiring admission or denial.

32.     Paragraph 27 of the Motion sets forth Highland's interpretation of law and contains no factual allegations requiring admission or denial.

33.     The Debtor admits that Highland's appraisal of November 17, 2010, contains the information summarized in paragraph 28 of the Motion.  The Debtor denies the substance of Highland's appraisal and denies the allegations contained in paragraph 28 of the Motion in all other respects.

34.     The Debtor admits that it is negotiating a new lease in Fenton Centre with HSS Systems, LLC.  The Debtor denies the remaining allegations contained in paragraph 29 of the Motion.

35.     The Debtor denies the allegations contained in paragraph 30 of the Motion.

36.     The Debtor admits that at the interim cash collateral hearing, NexBank's representative testified that NexBank believes it is owed $60,400,000.00 by the Debtor.  In its prior pleadings, the Debtor has only estimated the amount of NexBank's claim and has never taken a hard position on the amount of the debt owed to NexBank.  The Debtor has not received a statement from NexBank in over a year. The Debtor denies the allegations contained in paragraph 31 of the Motion in all other respects.

37.     The Debtor denies the allegations contained in paragraph 32 of the Motion.

38.     Paragraph 33 of the Motion sets forth Highland's interpretation of law and contains no factual allegations requiring admission or denial.

39.     The Debtor denies the allegations contained in paragraph 34 of the Motion.

40.     The Debtor admits that its Schedule F reflects that the Debtor has $4,859,191.23 in unsecured debt.  The Debtor denies Highland's legal conclusion that certain, non-specified creditors listed on Schedule F are "insiders."  The Debtor denies the allegations contained in paragraph 35 of the Motion in all other respects.

41.     The Debtor denies the allegations contained in paragraph 36 of the Motion.

42.     The Debtor denies the allegations contained in paragraph 37 of the Motion.

43.     Paragraph 38 of the Motion sets forth Highland's interpretation of law and contains no factual allegations requiring admission or denial.

44.     The Debtor admits that Judge Houser dismissed the Debtor's prior case because she determined the roll-up of approximately 30 properties formerly owned by different entities, pledged as collateral for different loans with different lenders, deprived some of those lenders of

rights they might have otherwise enjoyed if cases had been filed separately.  The Debtor denies

the allegations contained in paragraph 39 of the Motion in all other respects.

45.     The Debtor denies the allegations contained in paragraph 40 of the Motion.

46.     The Debtor denies that Highland is entitled to the relief sought in paragraph 41 of

the Motion.

### III.

### ARGUMENT & AUTHORITIES

A.     **THE DISMISSAL OF THE PRIOR CHAPTER 11 CASE INVOLVING THE DEBTOR IS NOT
"CAUSE" TO LIFT THE STAY PRUSUANT TO § 362(d)(1).**

47.     Section 362(d)(1) of the Bankruptcy Code authorizes the Court, upon request of a

party in interest, to grant relief from the automatic stay "for cause, including lack of adequate

protection of an interest in property of such party in interest." 11 U.S.C. § 362(d)(1).  Generally,

"cause" for lifting the stay involves consideration of whether the lender's interest in its collateral

can be adequately protected from depreciation.  However, in limited circumstances, a debtor's

bad faith in filing for bankruptcy may constitute cause to lift the stay.  As recognized by the Fifth

Circuit, bad faith in this context is found where "there is no going concern to preserve, there are

no employees to protect, and there is no hope of rehabilitation, except according to the debtor's

'terminal euphoria.'"  *In re Little Creek Development Co.*, 779 F.2d 1068, 1073 (5th Cir. 1986).

Bad faith filings generally require evidence demonstrating that "[t]he predominant purpose in

filing the petition was to prevent foreclosure upon the heavily encumbered property" and that the

debtor has "no plan contemplated for the infusion of capital, no gain in managerial expertise, no

history of past business conduct, no employees and . . . no current business activity on the date of

the commencement of the case nor are there any reasonable prospects for the conduct of future

business." *Id.* at 1074 (quoting *In re Thirtieth Place, Inc.*, 30 B.R. 503, 505-06 (BAP 9th Cir. 1983)).

48.    By contrast with the standard articulated by the Fifth Circuit in *Littlecreek*, in this case, the Debtor has a clear path to reorganization.  The Debtor expects increased cash flows from the HSS lease, which is in the final stages of negotiation, and which will cover debt service to NexBank starting in 2013.  The Debtor has gained significant managerial expertise through its retention of John Doyle, whom has substantial experience in business restructuring and the duties imposed upon a debtor-in-possession under the Bankruptcy Code.  The Debtor has a long history of past business conduct and—even without the HSS lease—generates a positive monthly operating income of approximately $230,000.00, which allows the Debtor to pay interest to NexBank at the contract rate beginning in July.

49.    Highland's sole basis for its allegation of "bad faith" is that the Debtor filed a prior bankruptcy case that was dismissed.  Highland is correct that the Debtor filed a prior Chapter 11 case in this District on January 4, 2011, administered under Case Number 11-30210-bjh-11, which was dismissed on March 1, 2011, (the "Prior Case").  In an admittedly ill-conceived attempt to jointly administer the reorganization of approximately thirty (30) properties owned by different entities subject to common ownership, the properties were transferred to the Debtor and filed as a single Chapter 11 case.  Judge Barbara J. Houser was troubled by the aggregation of the properties into one entity principally because this consolidation deprived some secured lenders of rights they would have had if the original owners filed separately.  A true and correct transcript of Judge Houser's ruling at the dismissal hearing is attached hereto as **Exhibit B**.  Specifically, Judge Houser expressed concern that five secured creditors had been denied the

protections of a single asset real estate case, which they would have otherwise enjoyed if the

former owners of those properties filed separate Chapter 11 cases:

> Now, in some instances I can unequivocally state that the rights have been
> changed to the detriment of the creditors.  In other instances, it is premature to
> know if the rights have been changed to the detriment or potentially to the benefit
> of the creditors. But certainly with respect to Petra and the Amaco Office
> Building; state Bank and the Arcon land; U.S. Bank and the Parkway North
> Office Building; Regions Bank and the Westgrove Air Plaza Office Hanger; and
> First Bank & Trust Centura land; we know for a fact that the rights of those
> creditors have been adversely effected by the orchestration that occurred with
> respect to these assets immediately prior to the debtor's bankruptcy filing.

> Now, with respect to those five creditors and those five assets, had the
> transfer not occurred, those creditors and those assets would have had to have
> been filed in what the Bankruptcy Code calls a single asset real estate case.
> Congress has seen fit to provide special protections to lenders in single asset real
> estate cases. Section 362(d)(3) of the Bankruptcy Code requires specific things to
> occur in order for the automatic stay to remain in place in a single asset real estate
> case. Other provisions of the Code give a single asset real estate entity a more
> limited period of time in which to propose and confirm a plan of reorganization.

> By undertaking the orchestration that occurred here, each of those five
> secured creditors have been denied their rights pursuant to those provisions of the
> Bankruptcy Code.

*See* Exhibit A, p. 5, ln. 9, to p. 6, ln. 9.  Notably, NexBank was *not* one of the five creditors

Judge Houser believed would have certainly been entitled to single asset protection.  However,

Judge Houser explained that the failure to file separate cases for the single asset entities could

easily have been remedied by the Court without dismissing the case. Judge Houser stated:

> Now, as I indicated in my colloquy with Mr. Roberts, I could fix that
> problem, because I have given thought to the potential from the debtor's
> perspective, harshness of dismissing the case and the chaos that they fear will
> occur upon a dismissal of the case. And how I could fix that problem is by simply,
> coincidentally upon those creditors' request for adequate protection, fashioning an
> adequate protection order that simply happened to track the requirements of
> Section 362(d)(3).

*See* Exhibit A, p. 6, ln. 10-18.  Although this case is not technically a single asset real estate case,

the Debtor is treating it like one to ensure NexBank is not prejudiced.  And the Debtor will agree

---

to an adequate protection order of the kind suggested by Judge Houser, who specifically noted that a debtor's failure to designate its case as a single asset real estate case could be easily remedied without dismissal.

50.     The reason Judge Houser dismissed the Prior Case was because the consolidation of all assets and secured creditors into one case deprived many of those creditors of what would have been a dominant secured position in a stand-alone Chapter 11 case.   Judge Houser reasoned:

> But what I can't fix for those creditors is the fact that with respect to a bankruptcy filing – and I'll pick State Bank, as an example. With respect to a bankruptcy filing of what would have been on December 22nd [for] Coventry Point, Inc., State Bank of Texas would have been the substantial creditor in that case, with a secured claim of roughly $3.9 million and tax debt of roughly a quarter of a million dollars, and trade debt of $22,000.

> Now, while I suppose it's theoretically possible that $22,000 of unsecured claims could be an impaired accepting class so that I would cram down a plan on a $4 million creditor. The simple fact remains that that is always a better argument than it is a likely outcome, for a lot of reasons.  State Bank could go up and buy the $22,000 of unsecured claims, if worse comes to worse and completely control the class and the case.

> But my point being is there's no way to return those secured lenders to the position that they would have enjoyed had these orchestrated transfers not occurred. They would have been substantially in control, if not completely in control, of the fate of the bankruptcy of their single asset entity and would have had considerable powers.  And now that the eggs all got scrambled as a result of the orchestrated transfers that occurred here, I have no way of unscrambling those eggs in the context of a confirmation process to put those parties back to the relative position they would have had before.  Because now they are simply one of dozens of secured creditors of a single debtor, my debtor. And they don't enjoy the same, for lack of a better word, power that Congress gave them under the Bankruptcy Code in an entity which has lesser creditor and lesser debt levels. So there is no question but those creditors have been, for lack of a better word, irreparably damage[d] by the orchestration of transfers that occurred here.

*See* Exhibit A, p. 6, ln. 19, to p. 8, ln. 2. Judge Houser had no choice but to dismiss the Prior Case because there was nothing she could do to place the secured lenders back into the dominant

positions they might have enjoyed in separate cases filed by their respective borrowers. Those same circumstances do not exist in this case. Here, NexBank is the Debtor's only mortgage lender. Here, NexBank is the dominant secured creditor. Here, all of the Debtor's Property is collateral for NexBank's mortgage loan. And here, unlike in the Prior Case, no creditor has been prejudiced by an improper consolidation.

51.     As important as what Judge Houser said when dismissing the Prior Case is what she did *not* say: She did not find that the Debtor in the Prior Case orchestrated the consolidation with the intent to disenfranchise creditors or without any prospect for reorganization. In fact, Judge Houser was very hesitant to dismiss the case because she heard testimony that there was substantial equity that might have been preserved through a plan. *See* Exhibit A, p. 3, ln. 14, to p. 4, ln. 3. Judge Houser was troubled that no testimony was offered regarding the reason for the consolidation of all the properties into a single entity in the Prior Case. Again, that problem does not exist in this case because there is no improper consolidation to explain. Following dismissal of the Prior Case, the properties were returned to their original owners, many of which (including the Debtor) filed separate Chapter 11 cases to remedy the problems cited by Judge Houser. The Debtor filed this case *in response to*—rather than in spite of—Judge Houser's comments in the Prior Case.

52.     Highland argues that because the Prior Case was dismissed, the Debtor should be forever damned and precluded from having any opportunity to reorganize in Chapter 11. This is unduly harsh considering the prior case was dismissed because of an ill-conceived business decision to jointly administer assets, and not because there was no prospect for reorganization Highland attempts to paint this case as a "serial filing" by the Debtor. However, the Prior Case was dismissed for reasons completely unrelated to the Debtor's prospects for reorganization.

This is not the Debtor's second bite at the apple; it is its *first*.  This Debtor has a realistic prospect for preserving equity and restructuring its financial affairs.  At a minimum, the Bankruptcy Code gives the Debtor the opportunity to present its plan within a reasonable time, with adequate protection to NexBank in the interim.

53.    This case is not like the Prior Case.  The 30 property aggregation that Judge Houser found objectionable has been dismantled.  This case contains only Fenton Centre, the Adjacent Land, the Three Hickory Tract, and the Thermalloy Building.  Each of these properties is mortgaged to NexBank as security for the same loan. The Debtor is represented by a highly qualified Restructuring Officer, John Doyle,[4] who has significant experience and success in like matters.  The Debtor is in the final stages of negotiating a lease with HSS in Fenton Centre, which will make the Debtor cash flow positive, even after debt service to NexBank.   The Debtor is nearly breakeven without the HSS lease and is giving NexBank the protections of § 362(d)(3) of the Bankruptcy Code.  The Debtor should be given a reasonable opportunity to present its plan to the Court for consideration.  The dismissal of the Prior Case is not cause to lift the stay.

54.    Highland does not address the issue of adequate protection in its Motion likely because it cannot dispute that its interest in the Debtor's Property is adequately protected.  As stated above, and although this is technically not a single asset real estate case, the Debtor is providing NexBank with all the protections that a single asset case affords.  Congress created a statutory benchmark for adequate protection to secured creditors in single asset real estate cases in § 362(d)(3), which requires the Debtor to either file a confirmable plan or begin paying interest at the contract rate within 90 days.  As reflected by the Debtor's 5-month cash collateral budget, attached hereto as __Exhibit C__, the Debtor will begin making interest payments to

---

[4] Mr. Doyle is Vice president of the Debtor and is therefore entitled to represent the Debtor in connection with this Chapter 11 proceeding.

Highland in July, 2011.  The trade-off contemplated by § 362(d)(3) is axiomatic:  if the lender is getting interest at the non-default contract rate within 90 days, the Debtor is given a reasonable time to reorganize.  That does not mean that the Debtor will get an indefinite time to confirm a plan, but it certainly means more than *one-month* (the current phase of this case).  Even in a single asset real estate case, the Debtor is not required to win a confirmation hearing one month after the Petition Date. Indeed, such requirement would deprive debtors of even a minimal breathing spell and would contravene the statutory scheme for adequate protection in § 362(d)(3) of the Bankruptcy Code.  Given that Highland will begin receiving interest payments in July, it cannot reasonably complain that its interest is not adequately protected. The Property is not declining in value. The Property is fully insured. The Property is professionally managed and well maintained.  And, NexBank has total control over the Debtor's cash, which is being paid into the lock box. These facts conclusively establish that NexBank's interest in the Property is adequately protected. Highland's allegations surrounding the Prior Case are merely a side-show designed to draw the Court's attention away from the real issues. The stay should not be lifted for "cause."

**B.     THE STAY SHOULD NOT BE LIFTED PURSUANT TO § 362(d)(2).**

55.     Section 362(d)(2) of the Bankruptcy Code provides for relief from the stay of an act against property where two requirements are satisfied: (A) the debtor does not have an equity in such property; ***and*** (B) such property is not necessary to an effective reorganization.  Both of these elements must be met before the Court may lift the stay.

**1.     The Debtor has equity in the Property.**

56.     Equity is the value of property in excess of all encumbrances against it. *See In re Sutton*, 904 F.2d 327, 329 (5th Cir. 1990) ("'Equity' as used in section 362(d) portends the

difference between the value of the subject property and the encumbrances against it.") (citations omitted). The Debtor owes no delinquent property taxes on Fenton Centre and owes a *de minimis* amount of delinquent taxes on the remaining Property. The total amount of the Debtor's property taxes for 2011 is approximately $1.5 million, which does not come due until January, 2012. NexBank holds a disputed claim in the amount of $60,400,000.00, per the representations of NexBank's representative, Kurt Daum, at the interim cash collateral hearing, and such amount is secured by all four parcels comprising the Property. Thus, the total amount of debt secured by the Property is approximately $62,000,000.00.[5]

57.    Highland has the burden of proving that the Debtor lacks equity in the Property. *See* 11 U.S.C. § 362(g)(1).   Highland attempts to satisfy this burden with its appraisal of the "liquidation value" of the Property, dated November 17, 2010, admitted into evidence as Highland's Exhibit D at the interim cash collateral hearing (the "Highland Appraisal").   The appraisal was commissioned by Highland for the express purpose of providing "a liquidation value for each subject property, in its current state, assuming that consummation of a sale occurs within both a 30-day and a 90-day marketing period."   *See* Highland Appraisal, Bates Nos. HC 00027 & HC 00032.   The Highland Appraisal defines "liquidation value," in part, as the most probable price that the Property would bring "within a *severely limited* future marketing period specified by [Highland]," where "[t]he seller is under *extreme* compulsion to sell."   *See* Highland Appraisal, Bates No. HC 00052 (emphasis added).   Thus, per Highland's analysis, the Debtor, acting under "extreme" compulsion, could sell the Property within the "severely limited" marketing period of 30-days for $38,355,000.00.   And, again, acting under "extreme"

---

[5] The Debtor disputes the secured claims of the Dallas County Tax Assessor and of NexBank.  As such, the total amount of allowed secured claims may be reduced by some amount.  However, for the purposes of the analysis herein, the Debtor will use the total amount claimed, rather than the total amount that will ultimately be allowed.

compulsion, could sell the Property within the "severely limited" marketing period of 90-days for $40,785,000.00.

58.     In a bankruptcy context, the value of the Debtor's Property must be "determined in light of the purpose of the valuation and of the proposed disposition or use of the property." 11 U.S.C. § 506(a); *see also In re Diplomat Electronics Corp.*, 82 B.R. 688, 692 (Bankr. S.D.N.Y. 1988); *In re Kids Stop of America, Inc.*, 64 B.R. 397, 401 (Bankr. M.D. Fla. 1986). Here, the Debtor proposes to continue operating the Property as a going concern.  Thus, the Property's going concern value—or at least its fair market value—is the proper measure for valuation.   As the Highland Appraisal concedes, "*the obtainable price at a forced and semi-forced liquidation is typically below the market value of the property, often by a significant amount*."  *See* Highland Appraisal, Bates No. HC 00168 (emphasis in original). Thus, the "liquidation value" set forth in the Highland Appraisal must be disregarded.

59.     Although outside its stated scope and purpose, the Highland Appraisal also contains an analysis of the "market value" of the Property, based upon a six (6) to nine (9) month marketing period.  *See* Highland Appraisal, Bates No. HC 00161.  The Highland Appraisal's analysis of the market value of Fenton Centre assumes a 10.50% discount rate and a 8.50% capitalization rate and further assumes an incremental increase in occupancy over a five (5) year period.  *See* Highland Appraisal, Bates Nos. HC 00144 & HC 00152-154.  The Highland Appraisal's market valuation presumes that Fenton Centre will be 82% leased by 2015, with an average occupancy of 68% during the 5-year period.  Based upon these presumptions, the Highland Appraisal estimates the value of Fenton Centre to be approximately $42,750,000.00. *See* Highland Appraisal, Bates Nos. HC 00160-161.  Notably, Highland's estimate of "market value" of Fenton Centre is only about $3 million greater than its estimate of Fenton Centre's

liquidation value in a 90 day fire-sale.  This anomaly contradicts the expressed opinion of Highland's appraiser that "*the obtainable price at a forced and semi-forced liquidation is typically below the market value of the property, often by a significant amount*."  *See* Highland Appraisal, Bates No. HC 00168 (emphasis in original).

60.     Highland's estimate of Fenton Centre's "market value" suffers from a number of flaws.  First, a six (6) to nine (9) month marketing period is unreasonably short for a commercial office complex comprising approximately 700,000 square feet.  In the current financial climate, the marketing period presumed by the Highland Appraisal is more suited to a single-family home than to a pair of commercial office buildings and covered parking garages in Farmer's Branch, Texas.

61.     Second, a 10.50% discount rate is high, especially given the fact that NexBank's contract rate of interest for its $62,000,000.00 loan on Fenton Centre is 4.25%.  Surely, NexBank did not expect a return of less than present value for its mortgage loan.  Highland's appraiser testified at the interim cash collateral hearing that for each one-half (1/2) percentage decrease in the discount rate, under his calculation, the value of Fenton Centre increases by $2 million.  And, when applying a discount rate of 7.0%—which is about 200 basis points greater than the actual interest rate under NexBank's mortgage—Highland's appraiser testified that the value of Fenton Centre would be roughly $57,250,000.00.  Highland's appraiser further testified that when this amount is added to the value of the other Property, as set forth in the Highland Appraisal, the total basket of collateral would exceed $60 million.

62.     Third, the Highland Appraisal assumes expenses of $9.50 per square foot based upon industry averages, even though the Highland Appraisal sets forth that *historically* (i.e. in 2009 and 2010), the expenses for Fenton Centre were less than $7.25 per square foot.  *See*

Highland Appraisal, Bates Nos. HC 00137-140. This difference of approximately $2.25 per square foot, for two buildings comprising approximately 700,000,000 square feet, results in a $1,575,000.00 difference in monthly net income, which yields a significantly higher market value under the Highland Appraisal's methodology. Although the precise difference was not addressed by Highland's appraiser at the interim cash collateral hearing, he agreed that a $2.0 reduction in expenses per square foot would result in a "big difference" in Fenton Centre's market value.

63.     Finally, and most importantly, Highland's estimate of the market value for Fenton Centre fails to account for the expected 75% lease-up of Fenton Centre by January, 2012. The Highland Appraisal assumes a gradual increase in occupancy over five (5) years, with an average occupancy rate of 68%. Fenton Centre is currently 51% occupied. The HSS lease, which is in the final stages of negotiation and which the Debtor expects to be completed in the next two months, involves the lease up of 100,000 square feet of Fenton Centre at approximately $19.50 per square foot, which will increase the occupancy rate by 15%. In addition, the Pillar lease involves the lease up of 75,000 square feet of Fenton Centre at approximately $20.00 per square foot, which will increase the occupancy rate by an additional 10%. With these two new leases, Fenton Centre will likely be 75% occupied by January, 2012.[6] As Highland's appraiser testified at the interim cash collateral hearing, the HSS lease, if effectuated, would improve net cash flow by approximately $1.1 million per month, assuming hypothetical expenses of $9.00 per square foot. Using the Highland Appraisal's methodology and applying the Debtor's historical expenses of $7.15 per square foot, the Debtor's monthly cash flow increases by approximately

---

[6] Pillar would begin making lease payments in January, 2012. HSS would begin making lease payments in January, 2013.

$1.45 million.   Thus, a 25% increase in occupancy in Fenton Centre by 2012 drastically increases the fair market value of the property.

64.     By contrast, the Debtor's Appraisal, assumes a reasonable three (3) to ten (10) year marketing period (as opposed to the Highland Appraisal's "fire-sale"), applies the Debtor's historical average monthly expenses of $7.14 per square foot, and estimates the fair market value of Fenton Centre, as of May 3, 2011, to be $62,800,000.00.   Additionally, the Debtor's Appraisal—unlike the Highland Appraisal—recognizes an average occupancy rate of 72% among similar buildings.   This number very closely tracks the Debtor's present circumstances, where the HSS lease and the Pillar lease will very likely result in 75% occupancy of Fenton Centre by January, 2012.   Assuming an increase in occupancy, the Debtor's Appraisal estimates that by May 1, 2014, the value of Fenton Centre will be $89,000,000.00.

65.     As an evidentiary matter, the Court has two valuations before it: Highland's Appraisal, which was created for the stated purpose of estimating a "liquidation value" within the "severely limited future marketing period specified by [Highland]," *see* Highland Appraisal, Bates Nos. HC 00052; and the Debtor's Appraisal, which was created for the purpose of estimating Fenton Centre's current fair market value and future going concern value, applies the correct expense factor, and includes the effect of new leases likely to be approved within the next two months.   Highland has the burden of proving that the value of the Debtor's Property is less than the debt owed against it.   *See* 11 U.S.C. § 362(g)(1).   Thus, even if the Court finds the Highland Appraisal and the Debtor's Appraisal have equal weight on the issue of value, the Court must rule for the Debtor.   The Debtor's Appraisal shows that, with the new leases, there is equity in the Property, and is properly focused "in light of the purpose of the valuation and of the ***proposed disposition or use*** of the property." 11 U.S.C. § 506(a) (emphasis added).   Notably, the

Court need not make an express finding on valuation.  As set forth below, the Debtor need only show that it has a reasonable prospect for reorganization to enjoy the continued protection of the automatic stay.

**2.     The Property is necessary to an effective reorganization.**

66.     Highland does not dispute that Fenton Centre, as the Debtor's only income-producing property, is necessary for the Debtor to reorganize.  However, the term "necessary to an effective reorganization" also means that there must be a reorganization in prospect.  This does not mean that the Debtor must establish that it can confirm a plan tomorrow.  To continue operating under the protection of the automatic stay, the Debtor need only show that it has a "reasonable probability of a successful reorganization within a reasonable period of time." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 375 (1988). This standard "has different meanings depending on the stage of the proceeding" and is therefore "measured on a sliding scale." *In re Brian Wise Trucking, Inc.*, 386 B.R. 215, 219 (Bankr. N.D. Ind. 2008); *see also, e.g., In re Grand Sports, Inc.*, 86 B.R. 971, 974 (Bankr. N.D. Ind. 1988), *Matter of Holly's Inc.*, 140 B.R. 643, 699 (Bankr. W.D. Mich. 1992); *In re Ashgrove Apartments of DeKalb County*, 121 B.R. 752, 756 (Bankr. S.D. Ohio 1990).  Essentially, "the older the case, the better [the debtor's prospect for reorganization] has to look." *In re Eisentrager*, 102 B.R. 181, 182 (Bankr. W.D. Mo. 1989).

67.     At bottom, "the inquiry's proper focus is, relative to the date of filing, whether the debtor is moving meaningfully to propose a plan which may be confirmable." *Brian Wise Trucking*, 386 B.R. at 219 (citing *Holly's*, 140 B.R. at 700 n 91).  Thus, the Court must examine the Debtor's prospect for reorganization keeping in mind that, at the time of the hearing on the Motion, this case will have only been on file for ***one month and seven days***.  The Bankruptcy

Court for the Western District of Michigan developed a standard for a stay motions filed early in

the case, which is now widely adopted:

> At the early stages of a bankruptcy case, the moving target requires a less strenuous showing of "a reasonable possibility of a successful reorganization within a reasonable time." This is especially true when a creditor requests relief from the stay fast on the heels of the bankruptcy filing. At such an early stage in the bankruptcy, the burden of proof under § 362(d)(2)(B) is satisfied if the debtor offers sufficient evidence to indicate that a successful reorganization within a reasonable time is "plausible". The debtor need only present sufficient evidence to demonstrate it is superficially worthy of belief that it is capable of producing a plan which by preponderance may be confirmable. Although, if it is possible, the debtor may present a plan or evidence regarding plan confirmation standards, at this early stage it is only required to produce some substantive evidence that a successful reorganization is on the horizon. The debtor's plan to reorganize does not have to be crystal clear. At this stage, the debtor's plan can be somewhat obscure or vague as long as it is plausible that a successful reorganization may occur. The court must balance the reasonableness of the delay borne by a secured creditor against the debtor's ability to formulate a plan. At this stage in the bankruptcy case, if the debtor presents any evidence that a confirmable plan is plausible, the balance favors the debtor, and the creditor must bear a reasonable delay while debtor attempts to formulate a plan.

*Holly's*, 140 B.R. at 701.  Thus, at this early stage of the case (a little over one month), the

Debtor enjoys the benefit of the doubt and need only show that reorganization is "plausible."

68.    Notwithstanding the fact that this Chapter 11 case was filed very recently, the

Debtor has a clear and definable plan for successful reorganization that depends upon obtaining

the HSS lease, which will either occur or not occur in two months.  As set forth in the plan

summary attached hereto as **Exhibit D**, the Debtor's plan will likely create ten (10) classes

comprised of six (6) classes of secured claims, including property tax claims, three (3) classes of

unsecured claims, and a class of equity interests.  Assuming the HSS and Pillar leases are

finalized by January, 2012, the Debtor can propose a feasible plan that pays *all* creditors the full,

allowed amount of their respective claims over time, with administrative claims and tax claims

being paid in full, when due.  By contrast, if the Court lifts the stay and allows Highland to foreclose, no unsecured claims will be paid.

## IV.

## CONCLUSION

69.     Highland is not harmed by a two-month wait, given that: (a) the Property is fully insured against loss, (b) the Property is well maintained by a professional management company, (c) Highland has complete control over all the Debtor's cash, and (d) the Debtor can and will begin paying Highland interest at the contract rate beginning in July.  Highland attempts to paint this case as a classic example of a Debtor with "terminal euphoria," but no real prospects. However, the Debtor does not fit that bill.  The Debtor is not expecting a rapid change in market conditions. It is not frantically seeking post-petition financing.  It is not hoping for a large tenant to emerge from nowhere.  The Debtor is in the *final stages* of negotiating a large commercial lease with an *identifiable*, creditworthy tenant (HSS), which will either occur or not within the next *two months*.  During that time, the Debtor is generating sufficient cash flow to pay Highland interest on its claim and will do so.  At a minimum, Chapter 11 of the Bankruptcy Code gives debtors (even single asset real estate debtors) 90-days to reorganize. The Debtor is asking for that bare minimum—nothing more.

WHEREFORE, the Debtor requests that the Court enter an order denying the Motion, and order such other and further relief to which the Debtor is justly entitled.

May 9, 2011

Respectfully submitted,

**BARLOW, GARSEK & SIMON, L.L.P.**

/s/ Robert A. Simon

By:_____

Henry W. Simon, Jr.
Texas Bar No. 18394000
Robert A. Simon
Texas Bar No. 18390000
Spencer D. Solomon
Texas Bar No. 24066117

3815 Lisbon Street
Fort Worth, Texas 76107
Telephone:  (817) 731-4500
Facsimile:  (817) 731-6200
**Proposed Attorneys for FRE Real Estate, Inc.,
Debtor-in-Possession**

## CERTIFICATE OF SERVICE

I hereby certify on this 9th day of May, 2011, that I filed a true and correct copy of the foregoing using this Court's CM/ECF electronic filing and notification system, which constitutes service upon all parties in this case registered to participate in the ECF system, including the following:

Michael D. Warner, &
Emily Chou
Cole, Schotz, Meisel, Forman & Leonard, P.A.
301 Commerce Street, Suite 1700
Fort Worth, Texas 76102
Telephone: (817) 810-5250
Facsimile: (817) 810-5255
Email: mwarner@coleschotz.com

/s/ Robert A. Simon

_____

Robert A. Simon