

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

_____
**United States Bankruptcy Judge**

**Signed June 06, 2011**

___

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CHAPTER 11 |
| FRE REAL ESTATE, INC., | § | |
| | § | |
| DEBTOR. | § | CASE NO. 11-42042 (DML) |
| | § | |

## MEMORANDUM OPINION AND ORDER

Before the court is the *Motion for Relief from the Automatic Stay* (the "Motion") filed by Highland Capital Management, L.P. ("Highland") as agent for NexBank (the "Bank"). The court conducted a hearing (the "Hearing") respecting the Motion over a period of 6 days.[1] During the Hearing the court heard testimony from John Doyle ("Doyle"), chief restructuring officer for FRE Real Estate, Inc. ("Debtor"); Ronald Akin ("Akin"), Debtor's chief executive officer; Kurt Daum ("Daum"), an officer of Highland

---

[1] May 11, 2011, May 19, 2011, May 20, 2011, May 23, 2011, May 25, 2011, and May 31, 2011.

and the Bank; Charles Dannis ("Dannis"), an expert appraiser retained by Highland and the Bank; John Jordan ("Jordan"), Debtor's expert appraiser; Daniel Moos ("Moos"), president and chief executive officer of Pillar Income Asset Management ("Pillar"), American Realty Investors, Inc., and Transcontinental Realty Investors, Inc. ("TCI"); Gregory Crown ("Crown"), vice president of Pillar; Louis Scott Porter ("Porter"), senior vice president of Regis Property Management ("Regis")[2]; Richard Morgan ("Morgan"), Debtor's former vice president and chief restructuring officer who served in both positions during a prior chapter 11 case of Debtor's; and Randall Chrisman ("Chrisman"), a commercial real estate broker representing Carrollton–Farmers Branch Independent School District (the "ISD"). The court also received into evidence exhibits identified as necessary below.[3]

This matter is subject to the court's core jurisdiction. 28 U.S.C. §§ 1334 and 157(b)(2)(G). This memorandum opinion contains the court's findings of fact and conclusions of law. Fed. R. Bankr. P. 7052 and 9014.

I. Background

Debtor has three material assets: a piece of raw land located in Farmers Branch, Texas, known as the Three Hickory site (the "Vacant Land"); a vacant building and the underlying land also located in Farmers Branch, Texas (the "Thermalloy Building" and, with the Vacant Land, the "Other Collateral"); and Debtor's principal asset, two office towers totaling 696,458 square feet of rentable space and the underlying and adjacent

---

[2] At the Hearing, Moos testified that Regis, a company affiliated with Pillar, "physically manages" assets on commercial properties. *See* TR (Moos) May 25, 2011 at 8:23-9:3.

[3] The court will also consider the record made in hearings respecting Debtor's use of the Bank's cash collateral. *See Nantucket Investors II v. Cal. Fed. Bank (In re Indian Palms Assocs. Ltd.)*, 61 F.3d 197, 205 (3d Cir. 1995); *In re Mirant Corp.*, 348 B.R. 725, 729 (Bankr. N.D. Tex. 2006).

land also located in Farmers Branch, Texas ("Fenton Centre"). Debtor acquired Fenton Centre in 2007 with a loan from the Bank in the original principal amount of $62,000,000. *See* Ex. F.[4] Subsequently, two affiliates of Debtor pledged the Other Collateral in 2009 to further secure the debt to the Bank.[5]

Until late 2010, Debtor was owned by TCI. In December of 2010, in anticipation of a chapter 11 filing for Debtor, TCI sold the stock of Debtor to ABC LD Properties, LLC ("ABC").[6] Subsequently, on January 4, 2011, Debtor commenced its first chapter 11 case, case no. 11-30210, in the Dallas Division of this court. Prior to filing that case, various affiliates of TCI transferred property in danger of foreclosure (including the Other Collateral) into Debtor. Principally because of these transfers, Debtor's first chapter 11 case was dismissed as a bad faith filing by Chief Judge Barbara J. Houser on March 1, 2011. *See* Ex. B (*Order Granting Motions to Dismiss of Wells Fargo Capital Finance, Inc. and Armed Forces Bank, N.A.*, Case No. 11-30210, Docket No. 182 (Bankr. N.D. Tex. Mar. 1, 2011)).

Thereafter, Debtor transferred back to the original owners or otherwise disposed of all properties received on the eve of its first case, other than the Other Collateral. *See*

---

[4] Exhibits identified by letter were offered by Highland. Debtor's exhibits are identified by number.

[5] Debtor's Exhibit 4 from the hearing respecting *Debtor's Motion for Authority to Use Cash Collateral* (the "Cash Collateral Motion") is a "Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Filing" (the "Deed of Trust"), the execution of which caused certain collateral to be encumbered. The Deed of Trust is inartfully and confusingly drafted almost to the point of comedy. As such, (and also because critical exhibits accompanying the Deed of Trust were not provided to the court as part of Exhibit 4), the court is unable to determine what, exactly, the Deed of Trust encumbered. The court assumes, however, that the Deed of Trust effected the pledge of the Other Collateral. No party to the case at bar disputes that Fenton Centre and the Other Collateral are encumbered by the Bank's lien.

[6] Moos testified that TCI could not own a chapter 11 debtor because that would create a default for TCI under certain of its other loans. *See* TR (Moos) May 25, 2011 at 11:4-23. Akin is the president and chief executive officer of ABC as well as Debtor.

Ex. 7 (Statement of Financial Affairs). In response to dismissal of the first case, Highland posted Fenton Centre in March of 2011 for April foreclosure. Debtor then retained Doyle and filed the instant chapter 11 case in this court on April 4, 2011, thus frustrating Highland's planned foreclosure on Fenton Centre.

II.   Discussion

At the time of the filing of the instant case, Debtor scheduled its debt to the Bank in the amount of $60,400,000. *See* Ex. 6 at 39.[7] Debtor's schedules also reflect *ad valorem* taxes owed on its real property of $1,561,988.73. *See* Ex. 6 at 38-39. Scheduled unsecured debt totals $4,859,191.23, of which $3,423,542.45 is owed to insiders and $548,085.84 represents tenant obligations.[8] *See* Ex. EE at 1724. This leaves, however, well over $800,000 of unsecured debt owed to unrelated unsecured creditors.

With the exception of Fenton Centre, Debtor's properties produce no cash flow. Fenton Centre is presently approximately 50% occupied, though one major tenant, BCD Travel, will be vacating its space at the end of July. BCD Travel's space represents 45,158 square feet, or approximately 6% of Fenton Centre's leasable space. *See* Ex. C at

---

[7] During the Hearing, Highland introduced Exhibit XX, which reflects indebtedness to it of $61,162,534.57 as of April 4, 2011. *See* Ex. XX at 2028. Exhibit XX also reflects accrual of *per diem* interest of $8,068.90 and payment in kind (or "PIK") interest daily of $1,613.78. As of June 1, 2011, therefore, according to Highland, the debt owed the Bank totals $61,520,793.73, not including postpetition fees and expenses.

[8] Approximately $400,000 of this represents repayment of overcharges for expenses. It is not clear from the record if these overcharges must be paid pursuant to tenant leases and so are not properly classified as unsecured claims absent rejection of the leases. *See Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274, 1281 (5th Cir. 1991).

00021. The cash flow from Fenton Centre should be sufficient, after operating expenses,[9] to pay to the Bank its contract interest rate.

Highland argues that the automatic stay of section 362(a) of the Bankruptcy Code (the "Code")[10] should be terminated to allow it to foreclose on Fenton Centre and the Other Collateral because (1) Debtor lacks equity in its real property and will be unable to reorganize effectively, and so the stay should be terminated pursuant to section 362(d)(2); and (2) Debtor's present chapter 11 case, like its first case, was a bad faith filing, and so the stay should be terminated pursuant to section 362(d)(1).[11]

Courts frequently have held that a real estate case amounting to a two-party dispute and commenced to frustrate a foreclosure was filed in bad faith. *See Little Creek Dev. Co. v. Commonwealth Mortgage Co. (In re Little Creek Dev. Co.)*, 779 F.2d 1068, 1073 (5th Cir. 1986); *NMSBPCSLDHB v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 129-30 (3d Cir. 2004); *Trident Assocs. v. Metropolitan Life Ins. Co. (In re Trident Assocs.)*, 52 F.3d 127, 128, 131-32 (6th Cir. 1995); *Laguna Assocs. v. Aetna Cas. & Sur. Co. (In re Laguna Assocs.)*, 30 F.3d 734, 738

---

[9] Following the prior hearing respecting the Cash Collateral Motion, the court ruled that Debtor's assignment of its rents to the Bank was absolute and not as collateral. That ruling is the subject of a motion for reconsideration (the "Reconsideration Motion").

[10] 11 U.S.C. §§ 101 *et seq.*

[11] Section 362(d) provides:
. . .
(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay–
    (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;
    (2) with respect to a stay of an act against property under subsection (a) of this section, if–
        (A) the debtor does not have an equity in such property; and
        (B) such property is not necessary to an effective reorganization[.]

(6th Cir. 1994); *Humble Place Joint Venture v. Fory (In re Humble Place Joint Venture)*, 936 F.2d 814, 818 (5th Cir. 1991); *Carolin Co. v. Miller,* 886 F.2d 693, 694 (4th Cir. 1989).

In determining whether a case was filed in bad faith, these courts typically have looked for a fact pattern that may include one or more of the following factors: a debtor whose only asset is a tract of undeveloped or developed real estate; a secured creditor's liens encumber such real property; the debtor has no employees except for the principals; the debtor's property generates little or no cash flow; there are few unsecured creditors and they hold relatively small claims; bankruptcy was the only means of preventing foreclosure; there was improper pre-petition conduct by the debtor; the debtor created a one-asset entity on the eve of foreclosure to isolate the insolvent property and its creditors (commonly referred to as the "new debtor syndrome"); and there is no realistic chance of reorganization. *See Little Creek*, 779 F.2d at 1072-73; *Trident Assocs.*, 52 F.3d at 131-32; *Laguna Assocs.*, 30 F.3d at 738. A bad faith filing may lead to dismissal of the case (as with Debtor's first chapter 11) or to termination of the automatic stay for cause pursuant to Code § 362(d)(1) to allow foreclosure to proceed. *See Little Creek*, 779 F.2d at 1073; *Integrated Telecom Express*, 384 F.3d at 129-30; *Trident Assocs.*, 52 F.3d at 128, 132; *Laguna Assocs.*, 30 F.3d at 738; *Humble Place*, 936 F.2d at 818; *Carolin Co.*, 886 F.2d at 694.

Highland argues that a number of facts in this case support a determination that the case was filed in bad faith. Debtor has no employees. *See* TR (Crown) May 13, 2011 at 93:23-24. Fenton Centre and the Other Collateral are encumbered by the Bank's lien and secure a single debt. *See* Ex. 6 at 39. The case was filed to stop a foreclosure. *See*

TR (Akin) May 11, 2011 at 41:5-7. Though Debtor was not organized on the eve of bankruptcy, its ownership was restructured in preparation for filing to avoid tainting TCI with a bankruptcy, and the Other Collateral was transferred to Debtor just prior to its first chapter 11 filing. *See* TR (Moos) May 25, 2011 at 11:4-12:3.

However, in the case at bar, there is significant cash flow from Debtor's property, making reorganization possible. More importantly, there is a meaningful amount of non-insider unsecured debt.[12] If this chapter 11 case is terminated, either through lifting the stay or dismissal, those creditors (at least those owed only by Debtor) will not recover at all on their claims. While it is true that the non-insider unsecured debt is small in comparison to the debt owed the Bank, it is not, on the other hand, the mere handful of small claims typical in cases in which a bad faith filing was found to have occurred. The court will not penalize Debtor's unsecured creditors by lifting the stay if chapter 11 offers them a reasonable expectation for a meaningful recovery. As any prospect for a substantial return to unsecured creditors depends on consent of the Bank, or upon whether there is equity in Debtor's property above the debts owed to the Bank and to taxing authorities, the court now turns to the test for relief from stay posed by Code § 362(d)(2): absence of equity in the property *and* whether the property is necessary for an effective reorganization.

First, the court concludes that the Bank is unlikely to vote for any plan of reorganization proposed by Debtor. Daum testified that the Bank would not consider favorably any plan pursuant to which it would have to deal with a borrower owned or controlled directly or indirectly by Gene Phillips ("Phillips"), *see* TR (Daum) May 11,

---

[12] It is not clear from the record how much of the unsecured debt is attributable to Debtor and how much, if any, actually is the direct obligation of TCI. *See* TR (Doyle) May 31, 2011 at 131:10-19.

2011 at 91:23-93:22, who, through his children's trust, exercises effective control over TCI and its affiliates. *See* Ex. SSS at 4. While the Bank's distaste for Phillips is not a reason to grant relief from the stay[13] – it would be inappropriate for a court to consider dislike for a debtor's owners or management in that context – the court recognizes that the consequence of Daum's testimony is that no plan will be confirmable if the Bank holds an unsecured claim large enough to control the non-insider vote of the unsecured creditor class under Code § 1126(c). *See Greystone*, 995 F.2d at 1277.[14] That means that, unless the value of Fenton Centre and the Other Collateral is sufficient to warrant finding the Bank fully secured (or virtually so),[15] the Debtor can be expected to propose no confirmable plan of reorganization,[16] since Debtor would be unable to meet the test of Code § 1129(a)(10) – acceptance of the plan by a class of creditors excluding the vote of insiders.[17]

Disposition of the Motion, therefore, turns on the question of value. The Other Collateral was appraised by Dannis at $1,865,000, representing $1,025,000 for the Vacant Land and $840,000 for the Thermalloy Building. *See* Ex. D at 00172, 00178.

---

[13] The court, though lacking experience with him, is generally aware that, for some lenders and members of the local bankruptcy bar, Phillips is toxic and not credible. This, however, does not enter into the court's consideration.

[14] Debtor suggested during the Hearing that the fact that the Bank's debt is guaranteed by TCI would justify classifying any deficiency due the Bank separately from other unsecured creditors.

[15] As discussed further below, a creditor may be undersecured for purposes of section 362(d) but fully secured for purposes of plan treatment.

[16] Neither party addressed a sale of Debtor's properties to a third party as a possible outcome for this case.

[17] Besides the possibility that any deficiency of the Bank's could be separately classified, Debtor has several small secured creditors that arguably could satisfy section 1129(a)(10). The court, however, is not prepared to rely on these alternatives in assessing Debtor's reorganization prospects.

Jordan did not appraise the Other Collateral, but Debtor offered evidence of a prospective sale of the Vacant Land that is discussed below, and Doyle opined (as Debtor's representative) that the Thermalloy Building was in fact worth $1,790,000. *See* TR (Doyle) May 31, 2011 at 112:22-113:23.

Dannis and Jordan differed substantially in their views of the value of Fenton Centre. Dannis estimated the fair market value of Fenton Centre at $42,750,000[18] and Jordan fixed it at $62,800,000. *See, respectively*, Ex. D; Ex. 3. The court found both appraisers to be credible witnesses. The difference between the two appraisals is largely (though admittedly not entirely) explained because Dannis assumed a stabilized occupancy of 82%, which would be reached in four years, *see* Ex. D at 00035, and Jordan assumed a stabilized occupancy of 89% which would be reached in just three years, *see* Ex. 3 at 3-4 ("Stablized Vacancy/Collection Loss: 11%").[19]

It is axiomatic that valuation in bankruptcy depends on a debtor's ability to generate income in the future. *See, e.g.*, *Protective Comm. of Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 442 (1968) ("[T]he commercial value of property consists in the expectation of income from it.") (quoting *Consol. Rock Prods. Co. v. Du Bois*, 312 U.S. 510, 526 (1941) (internal quotations omitted); *Gilliam v. S. Coop. Dev. Fund Inv. Cooperation*, No. 94-2108-M1/A, 1994 WL 682659, at *3 (W.D.

---

[18] Dannis was commissioned "to form two opinions of liquidation value for each of the three subject properties." *See* Ex. D at 00027. He worked back to those values for Fenton Centre from the fair market value of $42,750,000, noted above. *See* Ex. D at 00160.

[19] At the Hearing, Dannis actually testified that he assumed a stabilized occupancy rate of 83% (as opposed to the 82% in Exhibit D), and Jordan testified that he assumed a stabilized occupancy rate of 90% (as opposed to the 89% in Exhibit 3). *See* TR (Dannis) May 19, 2011 at 24:9-16; TR (Jordan) May 19, 2011 at 34:17-19. This 1% difference between each appraiser's assumed occupancy rate in his appraisal report and in his testimony is apparently due to whether the assumed occupancy rate took into account "collection loss." *See* TR (Dannis) May 23, 2011 at 23:17-24:1.

Tenn. Nov. 15, 1994) ("[T]he going concern valuation [of a debtor] must be based upon the company's future earning capability . . . ."); *In re Equity Funding Corp. of Am.*, 416 F. Supp. 132, 142 (C.D. Cal. 1975) ("The method normally used to project earnings of a business organization focuses on the following elements: (1) past earnings reports and (2) future sales and expense assumptions."). In the case of an asset like Fenton Centre, the future income it can generate is largely dependent on occupancy and rental rates[20] (though other factors such as expenses play an important role as well). Because Fenton Centre is presently only 50% occupied, *see* TR (Dannis) May 19, 2011 at 8:3-5, 20:16-23, whether or not there is equity above the Bank's debt will largely turn on the absorption rate at which the court concludes the vacant space will lease up. In this regard, in addition to the models used by the appraisers, the record reflects four critical elements that the court must assess: (1) the impact of the loss of BCD Travel as a tenant; (2) the expiration at two points in time of leases to IBM; (3) the prospect of a lease of 100,000 square feet of space to Hospital Corporation of America ("HCA" and the "HCA Lease");[21] and (4) the prospect of a lease of 75,000 – 100,000 square feet of space to either Pillar or Regis (the "Pillar-Regis Lease")[22] and its affiliates, including TCI.

Only the first of these elements is clear: BCD Travel is vacating a total of 45,158 square feet of space at the end of July. *See* Ex. C at 00021. This will reduce the

---

[20] Dannis assumed an average rental rate of $18 per square foot per year, *see* Ex. D at 00035, and Jordan a rate of $19.59 per square foot per year, *see* Ex. 3 at 4.

[21] The lease would actually run to a subsidiary of HCA.

[22] At the Hearing, Moos testified that the prospective 75,000 – 100,000 square feet lease was to Pillar, and Doyle testified that it was to Regis. *See* TR (Moos) May 25, 2011 at 23:20-24:5; TR (Doyle) May 11, 2011 at 18:3-5. This discrepancy does not materially affect the court's conclusions.

occupancy of Fenton Centre as of August 1, 2011, to approximately 44%. *See* TR (Dannis) May 19, 2011 at 20:16-23; Ex. C at 00022, 00024.

IBM leases two spaces at Fenton Centre. The first, totaling 50,928 square feet, is subject to a lease that will expire on January 31, 2013. *See* TR (Dannis) May 19, 2011 at 16:12-16; Ex. C at 00023; Ex. KKK at 2227. The second lease, expiring on January 31, 2015, covers 26,573 square feet. *See* TR (Dannis) May 19, 2011 at 16:12-16; Ex. C at 00023; Ex. KKK at 2227. IBM is currently trying to sublease the space. *See* TR (Dannis) May 19, 2011 at 93:1-11. The evidence supports the conclusion that any sub-lessee would be likely to retain the space past the term of IBM's leases. *See* TR (Dannis) May 19, 2011 at 33:13-17. However, IBM has been marketing the space since at least November 2010 without success. *See* TR (Dannis) May 19, 2011 at 93:1-11.

As of this writing, HCA has not agreed to lease space at Fenton Centre. Debtor has relied on a term sheet (Exhibit 8) transmitted by Debtor's broker to HCA on April 14, 2011, assuming the agreed terms of a lease acceptable to HCA will mirror the terms set forth in that exhibit.[23] The Bank elicited testimony, however, that negotiations with HCA have been going on for a long time and Debtor has consistently been overly optimistic about when the HCA Lease might be signed. *See* TR (Morgan) January 27, 2011 at 146:25-153:17 (testimony from first case, available in Exhibit V at 00907-00910). Moreover, as reflected in Exhibit 8, Debtor will be required to provide HCA with up to $5,500,000 for tenant improvements ($45 – $55 per square foot) and will incur lease commissions in connection with the HCA Lease of almost $1,000,000.

---

[23] Some support for this assumption was offered by Doyle in his testimony. *See* TR (Doyle) May 11, 2011 at 18:3-20:10.

While Moos testified that TCI or one of its affiliates would cover these expenses in exchange for part equity ownership of Debtor, the court cannot be so confident that TCI – a publicly traded company – will in fact be able to do so. Thus, while the court will take into account the HCA Lease in its ruling, it will not find for purposes of determining the present value of Fenton Centre that that lease will in fact be entered into and implemented.

The court has greater confidence that the Pillar-Regis Lease will become a reality. Moos is the chief executive officer of Pillar, which is an affiliate of TCI. He testified not only that Pillar would enter into a lease for at least 75,000 square feet of space with Debtor, but also that Pillar would receive no free rent, would receive no tenant improvement allowance, would lease the space at $19 per square foot and would commence leasing the space on January 1, 2012. *See* TR (Moos) May 25, 2011 at 23:18-25:5. Similarly, Doyle testified that Debtor had submitted a lease proposal to Regis whereby Regis would lease 75,000 square feet at $19 per foot. TR (Doyle) April 13, 2011 at 33:24-34:3. The court accordingly finds that either Pillar or Regis will (absent foreclosure by the Bank) enter into the Pillar-Regis Lease on those terms. The lease to Pillar will offset the unanticipated losses of tenants reflected in the record, including loss of BCD Travel as a tenant, and the uncertainties respecting the space now leased by IBM.

This leaves one remaining moving piece that the court must consider in assessing the value of the Bank's collateral: the contract for purchase of the Vacant Land. Debtor's Exhibit 11 is an executed contract of sale (the "ISD Contract") between TCI Meridian Acres, LLC ("TCI Meridian")[24] and the ISD. Exhibit 12 is a certified copy of a

---

[24] Debtor is not a party to the ISD Contract. The named seller is an affiliate of TCI that has purported to act for Debtor.

resolution by the ISD's board approving purchase of the land covered by the ISD Contract.[25] Chrisman, having served for some years as the ISD's broker, testified he expected the contract would be performed by the ISD. *See* TR (Chrisman) May 31, 2011 at 71:2-15. The Vacant Land represents a bit less than half of the land covered by the ISD Contract, but because the Vacant Land includes most of the tract's frontage on Valley View Road (the principal adjacent thoroughfare), Moos testified that Debtor would receive between 60 and 65 percent of the $5,250,000 purchase price, *see* TR (Moos) May 25, 2011 at 37:2-11, after deduction of a 3% commission. *See* Ex. 11 at 10. This return to Debtor (and, hence, the Bank)[26] substantially exceeds Dannis's estimate that the Vacant Land is worth $1,025,000. *See* Ex. D at 00172.

      Arguably, an enforcable contract of sale is the best indication of the value of raw land. *See Oltman Homes, Inc. v. Mirkes*, 190 P.3d 1182, 1188 (Okla. Civ. App. 2008) (contract for the sale of property established market value); *Tannetics, Inc. v. A.J. Indus.*, No. 5306, 1979 WL 4842, at *1 (Del. Ch. Sept. 25, 1979) (non-consummated contract of sale was the best test for establishing the value of real property). But in the case at bar, Debtor is not a party to the ISD Contract, there is no agreement with TCI Meridian respecting division of proceeds, the portion of the property not owned by Debtor is pledged to other lenders to partially secure them and so they must consent to the sale, and the earnest money put up by the ISD is only $1,000 (of which all but $100 is refundable). *See* Ex. 11 at 10. These facts cause the court to conclude that, while the ISD Contract

---

[25]    Debtor also offered Exhibit 21, a certified copy of the school board's agenda at which the purchase of the Vacant Land was considered.

[26]    The court assumes as part of its ruling on the Motion that net proceeds of the ISD Contract will be paid to the Bank to reduce its debt.

may in fact indicate the value of the Vacant Land, that value should not at this time be fully counted in determining whether the Bank is oversecured.

Before turning to its disposition of the Motion, the court must briefly address the Reconsideration Motion.  If Debtor does not persuade the court to reverse itself, and the court concludes that the assignment of rents to the Bank is absolute and so those rents are the Bank's property, operation of Fenton Centre will require cooperation of the Bank.  If Debtor prevails, then the rentals will be cash collateral of the Bank and so subject to use upon court order under Code § 363(c)(2).  While the distinction is not significant now – either way the rents must be used to pay operating expenses – if the Motion is denied, but ultimately the Bank forecloses, it will have been penalized by continuation of the automatic stay to the extent of rentals forcibly invested in Fenton Centre.  Under those circumstances the Bank will be entitled either to payment for its lost rents, or to adequate protection of its collateral position, depending on the disposition of the Reconsideration Motion.  In either case, to the extent of benefit to the Bank of expenditures in preservation of its collateral, the Bank will be subject to a surcharge under section 506(c) of the Code.  The court must, in its ruling, consider these matters as well.

Arriving at disposition of the Motion, given all the variables involved, notwithstanding the bright prospects perceived by Debtor, the court is not sufficiently confident that the sale contemplated by the ISD Contract will close and is too doubtful of the economy to be satisfied that Fenton Centre will lease up at a rate that would justify the values attributed to it by Jordan.  A prior appraisal prepared for Highland and the Bank by CB Richard Ellis in 2009 – Exhibit 4 – proved to be based on unwarranted

optimism respecting the time necessary for lease-up.[27] The delays in consummating the HCA Lease and the loss of large tenants – BCD Travel and IBM – are indicative of problems Debtor will continue to face in achieving 89% occupancy in three years. The court therefore finds that there is no equity in the Bank's collateral today.[28]

If, however, the HCA Lease and the Pillar-Regis Lease materialize, as Debtor confidently predicts, the court finds the value of Fenton Centre will then exceed the claims which it secures – a conclusion that will be bolstered should the ISD Contract indeed result in proceeds of more than $3,000,000 to Debtor. While, in determining equity for purposes of section 362(d)(2), the court must consider liquidation value of collateral – i.e., what the creditor may realize on disposition of the collateral (*see In re Stembridge*, 287 B.R. 658, 662 (Bankr. N.D. Tex. 2002), *rev'd on other grounds*, 394 F.3d 383 (5th Cir. 2004); *Winthrop Old Farm Nurseries v. New Bedford Inst. for Savings (In re Winthrop Old Farm Nurseries)*, 50 F.3d 72, 74 (1st Cir. 1995)) – the result is different if value is considered for purposes of confirmation of a plan, where the issue is what Debtor would have to pay to acquire the property as it then exists. *See Assocs. Comm. Corp. v. Rash*, 520 U.S. 953, 117 S. Ct. 1879 (1997).[29]

---

[27] However, Debtor offered some evidence that it lost one or more potential leases due to the Bank's failure to approve non-disturbance agreements with the prospective tenants. *See* TR (Porter) May 20, 2011 at 232:6-234:7. The record nevertheless reflects that Debtor has never come close to 82% – let alone 89% – occupancy. *See* TR (Dannis) May 19, 2011 at 25:9-18.

[28] In reaching this conclusion, only for purposes of the Motion, the court finds the debt to the Bank to be $61,500,000. The court further finds presently accrued *ad valorem* taxes to be at least $700,000. The court further finds the value of Fenton Centre to be $52,500,000 and the value of the Other Collateral to be $2,250,000. Even adding to this the rental proceeds held by the Bank, the Bank is undercollateralized.

[29] Section 506(a)(1) of the Code anticipates that valuation of the same property may yield a different result depending on the purpose of the valuation: "Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest."

Thus, while the court may not find the Bank oversecured at this juncture, it may consider what future value the Bank's collateral will have for plan purposes – i.e., fair market value considering leases actually in prospect – in determining whether the Bank will then have a deficiency claim for purposes of classification in a plan.  Since, in the confirmation context, if Debtor's views of its prospects prove accurate, the Bank would be fully secured, the court concludes that, in fact, Debtor's reorganization is possible and, since the prerequisites to that possibility are likely to be determined in the short term, an effective reorganization is realistically in prospect.[30]  It is undeniable that the Bank's collateral would be necessary to such a reorganization.  Thus, the test for relief from stay of section 362(d)(2) is not met.

That said, it is not equitable to force the Bank to finance this case pending resolution of the issues that must resolve favorably for the Bank to be fully secured and so fully satisfied (as required by Code § 1129(b)) under a plan.  To rule on the Motion properly, the court must protect against the very real possibility that Debtor's optimism will prove unwarranted.

Fortunately, TCI's (or its affiliates') willingness to aid Debtor and the language of section 362(d) provide the court the tools necessary to fashion a fair result.  TCI, according to Moos's testimony, has the wherewithal to assume the risk that the Debtor is too optimistic regarding its future that otherwise would fall on the Bank.  Indeed, Moos testified that, despite TCI's public character, funds for Debtor could be accessed quickly through use of TCI's cash flow or through TCI's affiliate companies.  *See* TR (Moos)

---

[30] While the court cannot find equity today based on Debtor's expectations, it can find those expectations likely enough to materialize to find that the possibility of reorganization should be preserved, provided that in maintaining the stay and so preserving the chance of a successful reorganization, the court does not place the Bank at undue risk.

May 31, 2011 at 61:8-22.  Whether or not that is true can be quickly tested.  Section 362(d), by permitting the court to "grant relief from the stay . . . , such as by terminating, annulling, modifying or conditioning such stay," gives the court sufficient flexibility to shift risk from the Bank to TCI (or its affiliates) while preserving the possibility that Debtor can reorganize successfully for the benefit of its unsecured creditors.  Accordingly, as its ruling on the Motion, the court adopts the following Order:

### III.  Order[31]

Based upon the record of the Hearing and other relevant proceedings in this chapter 11 case, it is

ORDERED that the automatic stay of section 362(a) of the Code shall terminate at 10:00 a.m. local time on June 7, 2011, to permit the Bank to conduct a foreclosure sale of Fenton Centre and the Other Collateral, unless, prior to such time, TCI and/or one or more of its affiliates deposits in the registry of this court $800,000 (the "Deposit"), in the form of cash (or a cash equivalent satisfactory to the court), to be dealt with as described herein, in which event the stay of section 362(a) shall continue as hereinafter provided; and it is further

ORDERED that the stay of section 362(a) of the Code shall terminate to permit the Bank to post for foreclosure and sell at October foreclosure sale Fenton Centre and the Other Collateral unless on or before September 12, 2011, TCI and/or one or more of its affiliates deposits in the registry of this court an additional $6,000,000 (the "Additional Deposit") in the form of cash (or a cash equivalent satisfactory to the court); provided, however, if TCI and/or one or more of its affiliates satisfies the court by

---

[31] Prior to the issuance of this Memorandum Opinion and Order, the court communicated its Order to counsel for the parties during a telephone call held on June 1, 2011.

similarly conclusive evidence, after notice and hearing held prior to September 12, 2011, that it has dedicated $6,000,000 (in addition to the Deposit) to Debtor's rehabilitation, then the stay of section 362(a) shall continue as hereinafter provided; and it is further

ORDERED that, unless Debtor confirms a plan of reorganization that provides a recovery acceptable pursuant to Code § 1126(c) to non-insider unsecured creditors by December 31, 2011, the stay of section 362(a) of the Code will terminate for all purposes on January 1, 2012; provided, however, such dates may be extended by the court to allow full consideration of any objections to Debtor's plan or disclosure statement which Highland or the Bank may interpose; and it is further

ORDERED that the Deposit shall be refundable to TCI and/or any of its affiliates only in the event the Bank (1) itself proposes and confirms a plan of reorganization; or (2) acts in bad faith with respect to (a) Debtor's efforts to enter into a lease with HCA, or with Pillar or Regis (including by the unreasonable refusal to execute or inordinate delay in executing a non-disturbance agreement for any such tenant), or (b) Debtor's efforts to enter into and consummate a contract for sale of the Vacant Land; should the Deposit not be refundable to TCI (and/or one or more of its affiliates) as provided in this paragraph, the Deposit shall be used to

(a) first, subject to any charges allowable pursuant to Code § 506(c), satisfy any claim by the Bank (1) for rents lost, if the Reconsideration Motion is denied or (2) pursuant to Code § 507(b) if the Reconsideration Motion is granted;

(b) second, pay administrative claims in this chapter 11 case; and

(c) third, pay a dividend to Debtor's unsecured creditors;

and it is further

ORDERED that the Deposit and the Additional Deposit may be used to facilitate Debtor's reorganization in any manner, including but not limited to funding any obligations of Debtor under the HCA Lease; provided, however, if a plan of reorganization is proposed by Debtor and confirmed by the court, to the extent such funds are not necessary to carry out such plan of reorganization such funds shall be returned to (or retained by) the originator of the funds upon substantial consummation of such plan; and it is further

ORDERED that the court shall retain jurisdiction to interpret and enforce this Order and to determine the parties' compliance with it.

### END OF MEMORANDUM OPINION AND ORDER ###